IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID BUSH et al.                          :
                                           :
                    Plaintiffs   :         NO.  07- 4936
         -vs-                              :
                                           :         CIVIL ACTION
S. C. ADAMS; et al                         :

**PLAINTIFFS' OPPOSITION TO DEFENDANTS
HILL, TRIPP AND IGNAZ'S MOTION FOR SUMMARY JUDGMENT**

I.       STATEMENT OF THE FACTS

DAVID BUSH

1.       David Bush is the natural Father to several children born from a marriage with

Serene Bush Moserate which ended in Divorce. Complaint & Answer ¶ 4.

2.       Serene Bush Moserate left the Commonwealth of Pennsylvania with the children

fathered by David Bush, did not have court granted authority to leave with the children, did not

have court granted custody of the children, and did not tell anyone, including David Bush, where

she was going with the children or where she had taken new residence with the children.

Complaint ¶ 7.

3.       David Bush reported to the State Police that his children were missing. Tripp Dep.

18:17-19:12; 75:22-76:2; 78:19-21.

4.       The Pennsylvania State Police officer taking David Bush's Missing Children

Report, was supervised by Defendant Tripp. Oliphant Dep. 155:15- 156:5.

5.       The David Bush children were not placed into the CLEAN Missing Children Data

Bank, nor was a prompt investigation done by the State Police into the missing Bush children

Ignatz 97:11-20.; 98:4-7 Exh. A (report), (Ignatz 141:1- 146:15.

6.      18 P.S. 2908 is a statute (law) for Missing children and requires the reported missing children to be entered into NCIC/CLEAN Missing Child System by Law Enforcement. Tripp 49:2-11.

7.      There is no documentation showing that Bush's missing children investigation by Troop F was being supervised in accordance with State Police policies and rules.  A supervisor that does not supervise a subordinate is subject to discipline for not supervising the subordinate. Ignatz 147:6- 148:14.

8.      Commonwealth of Pennsylvania Criminal Law (18 C.S. 2908) requires Law Enforcement to immediately enter Missing children into CLEAN – regardless of the reason - and does not limit which law enforcement agency may make the Missing children entry into CLEAN. Ignatz 93:22 - 97:9, also 106:14-107:5; Exh. A statute.  Also Ignatz 107:6-22 and Tripp 49:2-11.

9.      It is a felony graded crime to conceal the whereabouts of a child. Oliphant Dep. 65:20-66:2

10.     Troop F did not put the Bush children into CLEAN as missing. Ignatz 97:11-20.; 98:4-7

11.     Troop F did not start an immediate investigation into the missing Bush children as required under state Police policy, practices and rules. Ignatz  125:11- 128:11.

12.     Officer Tripp was given the "heads up" about David Bush's report that his children were missing. Officer Tripp was made aware of the "investigation".   Wheeler Dep. 25:17-26:8; 27:10-14.

13.     The first time that Wheeler saw the investigation report was six months after the investigation started. Wheeler Dep. 30:17-20

14.     Officer Tripp wrongfully concluded that because the children were with their Mother that they were not missing, so they did not have to be entered into NCIC/CLEAN. Tripp 50:10-16

15.     It is a disciplinary violation for a State Police Member, including a Captain, to not follow state law. Ignatz 98:21- 99:3.

16.     A Captain of the State Police is subject to discipline if another State Police Officer under his supervision did not follow the law and was not reported to internal affairs, since the Captain is required to take action and/or required to report the matter to internal affairs. Ignatz 99:7-21

17.     18 C.S. 2908 required the State Police at Troop F to place the Bush children into CLEAN as Missing children after David Bush reported the children missing. Ignatz 100:14-20.

18.     Defendants assert the reason they did not enter the David Bush children into CLEAN, as Missing children, is because the children were believed to be with their Mother, so they were not missing. Ignatz 101:25 - 103:10. Tripp 50:10-16.

19.     The Pennsylvania State Police assisted Serene Bush to enter the David Bush children into CLEAN's Missing children data bank when Serene Bush reported the children missing.  Tripp 52:12 - 53:16; 56:4-15.

20.     Serene Bush reported that the David Bush children were missing after the same report was made by David Bush. Exh. A.

21.     Serene Bush's missing children report to the State Police was made to the Troop F, as was David Bush's missing children report.  Tripp 52:12 - 53:16 Exh. A.

22.     Serene Bush reported to the Pennsylvania State Police the Bush children as missing, and the State Police assisted Serene Bush to enter the David Bush children into CLEANS' Missing children Data Bank. Id.

23.     At the time Serene Bush reported to the Pennsylvania State Police the Bush children as "Missing children", Serene Bush and the Pennsylvania State Police Troop F members, including Officer Tripp, knew that the Bush children were with their Father (David Bush) and that the Richmond City Virginia Police Department had, pursuant to a Virginia Family Court Judge, turned the Bush children over to David Bush. Id. Tripp 52:12 - 53:16; 140:9-15, and Dep. of Sean Adams (33:18-36:5, 21037:6).

24.     Tripp did not enter David Bush's children into the Missing children CLEAN/NICI System. Oliphant Dep. 112:19-21.

25.     Tripp spoke with the Richmond Police Department Officer Adams. Adams' Dep. 45:25-48:22. It was Tripp that contacted Adams. Adams dep. 51:4-10.

26.     Adams contacted Pennsylvania Law Enforcement Authorities after obtaining the arrest warrant for David Bush, and knew that David Bush was in Pennsylvania. Adams' Dep. 106:9-107:25.

27.     David Bush was charged by Adams for Kidnapping his own children. Complaint

28.     Richmond Police Lt. Russell contacted persons in Pennsylvania to arrange for David Bush to bring his children back to Serene Bush peacefully. Russell Dep. 50:5-52:4.

29.     Richmond Police Lt. Russell had not yet obtained an arrest warrant for David Bush when he contacted Newtown Police Chief Martin Duffy in Pennsylvania. Russell Dep. 53:6-55:4.

30.     Richmond Police Lt. Russell was asking Newtown Police Chief Duffy to take the David Bush children from David Bush. Russell Dep. 55:20-25.

31.     Richmond Police Lt. Russell did not know who had lawful custody of the David Bush children. Russell Dep. 59:22-25.

32.     Lt. Russell called the U.S. Marshall's Office. Russell Dep. 66:6-24.

33.     Lt. Russell's intent for contacting Pennsylvania [law enforcement] was to have someone arrest David Bush. Russell Dep. 81:17-23.

34.     Tripp told Sgt. Charles Patton that he (Tripp) was involved in the Bush missing children investigation. Patton statement, Also Tripp Dep. 116:2-10; 118:19-119:10; 122:13-17 127:8-11.

35.     The State Police provided its members with training on civil rights and the training held before May 17, 2007 taught state police members that they could not do anything to prevent a father from being with his child unless the law allowed for the State Police to keep the father and child apart. Ignatz Dep. 15:6-17:10.

36.      State Police, whether a captain, lieutenant, sergeant, corporal or trooper, cannot tell a parent they have no rights to be with their children. Oliphant Dep. 130:19-24.

37.     There is no explanation given as to why the State Police at Troop F would immediately help Serene Bush declare the David Bush children as missing when the children were with their father under court order, but Tripp would not declare the David Bush children as missing when they were with Serene Bush without a court order. Oliphant 63:15-19.

38.     It is misconduct for Tripp to tell a parent (David Bush) that he cannot be with his children. Oliphant Dep. 103:15-104:12-14; 105:13-20.

39.     State Police Officers must obey the law and are not permitted to ignore the law. Oliphant Dep. 112:22-24.

40.     Tripp admits to being kept up to date on the David Bush Missing children complaint. Tripp Dep. 32:7-33:11.

41.      Tripp was the "Station Commander" in the Station at the time David Bush reported his children missing.  There was no higher supervisor in the station at that time, and it was Tripp's legal duty as Station Commander, and moral obligation to make sure that all of his subordinates obeyed the law and performed their sworn duty to uphold the law. Tripp 33:12-18; 36:3-12.

42.     Tripp was "kept updated" on the David Bush complaint. Tripp 36:13 - 37-14.

43.     The David Bush report of his missing children was the only missing person complaint for the Station for that month. Tripp 45:11-15; 48:12-16.

CHRISTOPHER BUSH

44.     Christopher Bush made a complaint of misconduct by Defendant Tripp to the Pennsylvania State Police. Tripp Dep. 99:22-100:22

45.     BPR investigations are confidential. Oliphant Dep. 68:18 .

46.     Christopher Bush's complaint was turned over to Defendant Hill on January 26, 2007 for investigation under Pennsylvania State Police Internal Affairs Bureau, procedure. Captain Oliphant Dep. 31:15; also 33:21-34:4 and 38:5-7.

47.     Christopher Bush's BPR complaint included a complaint that the David Bush children were not entered into CLEAN; that there was no investigation done about the missing David Bush children; and Tripp's conduct or demeanor towards Christopher Bush was unprofessional. Oliphant 38:14-39:6; also. 41: 25 - 42:19.; Oliphant 67:12-68:1.

48.     State Police rules (work/disciplinary rules) regulate the conduct of troopers when speaking either to other law enforcement officials or to the public. Oliphant 39:7-9.

49.     Defendant Hill was assigned the BPR investigation of Christopher Bush's complaint and Hill assigned Lt. Hill, at Troop F, to conduct the Christopher Bush BPR Tripp investigation. Oliphant Dep. 70:5-7; 70:17-24. Hill Arbitration testimony 45:9-10; 82:19. Tripp Dep. 163:12-20.

50.     Hill did not report back to IAB Capt. Oliphant, as required under State Police procedures; rather, the next communication from Hill was July 3, 2007. Oliphant Dep. 31:19-32:2.

51.     A.R.4-45 is the State Police Administrative regulation that controls internal affairs investigations, and a purpose for the rule is to avoid arbitrary decisions. Oliphant 37:3-11

52.     Tripp was never interviewed about the Christopher Bush complaint. Oliphant Dep. 41:5-7, and 55:4-8 and 55:19-21. However, Tripp might have been by Fultz  (who did the CLEAN investigation). Oliphant Dep. 41:7, also 77:1-3.  See also, see Oliphant Dep. Exh. 2. Further see, Tripp Dep. 100:15-102:16  which shows communication and a written report, but none in the BPR file or turned over by the Defendants in Discovery, as no BPR investigation was done (Stipulation Tripp Dep. 107:16-107:13; 127:20-128:6; 147:146:21-147:13).

53.     Tripp could have had communication with Hill about Christopher Bush and David Bush. Tripp Dep. 131:24 - 132:4

54.     Christopher Bush was not interviewed in the BPR investigation about Tripp. Oliphant 55:13:18.

55.     It is customary in a BPR investigation to interview one or both of the complainant or the accused. Oliphant 55:9-12

56.     Hill on July 3, 2007 decides to do a supervisory injury (limited investigation) for the Christopher Bush BPR complaint. Oliphant 72:25-73:7.Also Oliphant 77:11-13; Hill Arb. testimony 45:10.

57.     Tripp was cleared wrong doing by Hill on May 17, 2007 (Hill Arbitration testimony 89:20-24.

58.     By June 28, 2007 the January 2007 Christopher Bush BPR complaint and the Supervisory (Limited) Investigation, according to Tripp, was "long over". Tripp Dep. 179:24-178:9. 180:23-25.

59.     Hill on July 3, 2007 asked for a CLEAN investigation of Christopher Bush for Christopher Bush's entry of the David Bush children. Oliphant Dep. 47:15-18. Oliphant 68:2-14; Hill Arb. Testimony 45:10-24.

60.     Hill was waiting for the CLEAN investigation results before investigating Christopher Bush's BPR complaint against Tripp. Oliphant Dep. 47:23-24. Also 79:15-18. Also 89:17-19.

61.     The Director of BPR, Captain Oliphant, could not say why Hill would wait for a CLEAN investigation conclusion before conducting the BPR investigation of Christopher Bush's complaint. Oliphant 129:3-10

62.     There was no CLEAN violation by Christopher Bush or anyone in regards to Christopher Bush entering the David Bush children into CLEAN as Missing children". Oliphant De. Stipulation by counsel 50:20-24. Which fact Hill knew when Hill limited the BPR investigation about Tripp and cleared  Tripp. Oliphant 79:21-25.

63.     Hill in his report to BPR on the Christopher Bush complaint accused Christopher Bush of lying; however, Hill offered no proof to support the accusation as required by State Police regulation. Oliphant 83:8-, 86:14-16

64.     Hill asked for the CLEAN investigation. Hill Arbitration testimony 96:3-20.

65.     Hill is the Troop F Commander and Tripp is under Hill's command. Hill Arb.............................................................. Testimony 81:7-25.

66.     State Police email records show Lt. Hill contacted CLEAN and the CLEAN investigation started. The communication to CLEAN was on February 8, 2007. Fultz Dep. 8:12-19.

67.     Fultz reports receiving a phone call and an e-mail informing him of C. Bush's BPR complaint as well as charges of abduction of his children against D. Bush being dropped. Id 10:22-23 also 16-23 also 16:25-17:7.

68.     Fultz, since doing CLEAN investigations, has never been told about a BPR complaint or the information about a BPR complaint to do a CLEAN investigation. Fulltz 17:22-18:5

69.     It was not determined in the BPR investigation on Christopher Bush's complaint whether Tripp had acted unprofessional. Oliphant Dep. 53:8-22

70.     The State Police Defendants presented an unsigned copy of Fultz's report, and Fultz could not explain why an unsigned copy exists, when none should exist, because he turns in only signed report copies.  The report, in unsigned form, appears only in the electronic data file which Fultz keeps and that file is in a password protected personal data file, assigned only to him, and he has not given to anyone his password. Fultz 18:20:5-22:10.

71.     Fultz testified he was not investigating Christopher Bush in 2006.

72.     Fultz's file shows Fultz communicating with Troop F Montoursville State Police Sgt. David Young on 11/9/2006 about Christopher Bush. Fultz19:20-25 and 26:13-23

73.     Tripp was assigned to Montoursville. Tripp Dep158:9-12.

74.     By June 28, 2007 the Christopher Bush BPR Limited Investigation was "long over". Tripp Dep. 179:24-178:9.

75.     Defendant Ignatz and Fultz conducted the CLEAN investigation requested by Hill. The request for the CLEAN investigation was after Christopher Bush entered the David Bush children into CLEAN as missing children and after C. Bush made a BPR complaint against Tripp.  Fultz Dep. 30:3-31:6

76.     Fultz knew of the BPR investigation into Tripp's conduct. Fultz 38:14-15.

77.     Fultz told Ignatz about the Christopher Bush BPR complaint against Tripp during the trip to Newtown Township.  Fultz 47: 19-22.

78.     Ignatz and Fultz were told about Christopher Bush's BPR/Internal Affairs citizen complaint against Tripp, and the two discussed Christopher Bush's BPR complaint on the way to Newtown Township for the CLEAN investigation document examination. (Ignatz Dep. 20:15-21:19  and 41:11) and the missing David Bush children (Id 40:19-41:11)

79.     BPR investigations are confidential. Oliphant 68:18.

80.     Ignatz was a supervisor and "Commander" of CLEAN. Ignatz Dep. 21:25 -22:6

81.      No State Police officer or employee other than the assigned BPR investigator is to interfere with a BPR investigation. Ignatz 43:8-16;

82.     Prior to going to the Newtown Police Department on May 17, 2007, Ignatz had never gone to any other Police Department to examine the records of the Police Department for a report. Ignatz Dep. 232:24-25:3-4; also 23;23-24:5

83.     Fultz was Ignatz's subordinate. Ignatz Dep. 26:6-10.

84.     Ignatz, as the supervisor for Fultz, is held under State Police regulation to be responsible for Fultz's actions. Ignatz Dep. 12:16-13:9.

85.     Fultz asked during the CLEAN investigation about David Bush's custody order and if the order was fraudulent. However, Fultz was not authorized to investigate the custody order because the CLEAN investigation was limited to whether or not there was a report held by Newtown Township Police Department to substantiate the CLEAN entry. 39:17-44:18.

86.     There is nothing in the CLEAN Act that concerns "Jurisdiction" of a police department or police officer to make a CLEAN Missing Child entry into the CLEAN system. Fultz 42:3-6.

87.     Chief Duffy authorized Christopher Bush to make the CLEAN Missing Child" entry for the David Bush children. Fultz 19:-20.

88.      Fultz asked Christopher Bush for a "Missing person report" to be produced. Fultz 44:24-45:10.

89.     Fultz construed the Newtown Township Police Department "Incident Investigation Report" to be a missing person's report, because the words are semantic. Fultz. 46:7-47:2.

90.     The incident report for the CLEAN entry about the David Bush children being missing, is understood by the State Police to be a Missing Child Report". Fultz 47:5-9.

91.     Thought the David Bush children "could be with the non-custodial parent" they under CLEAN/State Police standards they would still be "missing" children. Fultz 47: 19-22.

92.     The Fultz/Ignatz CLEAN investigation was the occurrence where a State Police Officer was the person making a complaint about a CLEAN entry. Fultz 49:18-21.

93.     The Fultz CLEAN investigation was in the BPR complaint file held by Capt. Oliphant, as was the Fax sheet from Officer Young at Troop F Montoursville to CLEAN regarding the NCIC (CLEAN) entry of the David Bush's missing children. Oliphant Dep. 10:2-5; 11:2-5; 13:6-9.

94.     Defendant Hill knew of no CLEAN violation when he made the request for the CLEAN investigation into Christopher Bush's entry of the David Bush children into the CLEAN system. Hill Dep.

95.      It was known to Hill that no CLEAN violation by Christopher Bush existed when Hill wrote a letter to Christopher Bush's employer, Newtown Twp.

96.     The CLEAN investigation determination was reported to "Troop F", Lt Hill. Ignatz 47:10-12; also 58:10-25, 59:10-14, and 81:3-9.

97.     Hill and Tripp were always assigned to Troop F. Ignatz 81:8-9, 82:15-24, 83:8-11.

98.     The CLEAN investigation was not about "jurisdiction". Ignatz 84:10-17 also 87:23-25

99.     Every Police Officer in Pennsylvanian has jurisdiction and can enter children as missing in CLEAN. Ignatz 70:12-20

100.    The CLEAN investigation revealed a lawful entry of the David Bush children into CLEAN. Ignatz 71:5-8.

101.     Hill wrote letters to Christopher Bush's employer and Chief of Police for Newtown Township. Depositions of: Oliphant 159:9-15, 161:4- 162:9.

102.    Hill in his July 30, 2010 said the Tioga County District attorney approved of Tripp's action, which was not true, and Hill was not investigated for the untrue statement by State Police. Oliphant 161:19.

103.     The Toga County District Attorney file for David Bush does not show that the Tioga County District Attorney spoke with anyone from the Pennsylvania State Police concerning Missing Children under 18 C.S. 2809 and 2908. Crowley Dep. 62:15-18, 64:15-65:19.

104.     Ignatz and Fultz knew on May 17, 2007 when they went to Newtown for the CLEAN investigation that there was a First Amendment right by Christopher Bush to make a complaint about Tripp and there could be no retaliation for making the complaint. Ignatz Dep. 19:15-20:5. Also, Fultz Dep. 36:25-37:7.

II.       INTRODUCTION

Before the Court is Defendants Tripp, Hill and Ignatz's Motion for Summary Judgment, for the argument provided below, and the record showing a genuine issue over disputed material facts, which is for the jury to resolve, the Motion for Summary Judgment must be denied.

III.      STANDARD

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c).

The moving party bears the initial burden of proving there is no genuine issue of material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, the burden shifts to the nonmoving party to set forth specific facts and make an affirmative showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence produced must be of sufficient quantum and quality to allow a rational and fair-minded fact finder to return

a verdict in favor of the nonmovant. _Id._ at 253-54, 106 S.Ct. 2505. All justifiable inferences should be drawn in favor of the nonmoving party. _Id._ at 255, 106 S.Ct. 2505.

IV.      ARGUMENT

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS DEFECTIVE BECAUSE THE MOTION LACKS A STATEMENT OF UNDISPUTED FACTS

Preliminarily, it is noted that the PSP Defendants' motion is not properly presented in form and should be denied for this reason. Federal Civil Procedural Rule 56 requires that a Statement of Undisputed Facts accompany a Motion for Summary Judgment. The Statement is to point to the place in the Record where the "undisputed" facts appear; it is not merely to show there is a fact and where it can be found.  Rather, that fact must be undisputed.

As noted in the Standard portion of this brief, summary judgment shall be granted only when there are no genuine issues of material fact in dispute and the movant (here the PSP Defendant) have shown the fact is undisputed and they are entitled to judgment as a matter of law. Fed.R.Civ.P 56(c). It is only after this burden is met that Plaintiff has a burden to present facts to show a dispute both genuine and material, i.e., one upon which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claim. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's sole function, with respect to the facts, is to determine whether there are any disputed issues and, if there are, to determine whether they are both genuine and material. Id. The Court's consideration of the facts, however, must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Tigg Corp. v. Dow Corning Corp, 822 F.2d 358 (3d Cir.1987).

In order for the Defendants to obtain summary judgment, they, as the proponent of the motion have the initial burden of identifying evidence, from the sources enumerated in Rule 56, which demonstrates the absence of a genuine issue of material fact. It is only after the proponent has fulfilled the burden to provide a properly supported motion for summary judgment that the opposing party is required to produce, from the same sources, some contrary evidence which could support a favorable verdict. Childers v. Joseph, 842 F.2d 689 (3d Cir.1987).  Here, the Moving Defendants have not shown their facts are "undisputed". Rather, the Defendants have simply presented "facts" from the record and then asserted the facts are undisputed when the facts are disputed. The Defendants have not even presented their testimony; rather, it seems they present the Plaintiff's testimony and submit the Plaintiff's facts and testimony are undisputed by them. This, however, is not stated in their motion or by way of the "Statement of Undisputed Facts". Therefore, Plaintiff is forced to guess at what are the undisputed facts the Defendants present.

Since Plaintiff and the Court have to guess as to whether the stated facts are undisputed, and since the Defendants' carry the initial burden to show what are the undisputed facts, and have not done so, the motion is not properly presented in form; therefore, the motion for summary judgment is defective and must be denied on that basis.

**NOT ALL OF BUSH'S SECTION 1983 CLAIMS WERE DISMISSED; RATHER, THERE REMAINS A FOURTEENTH AMENDMENT EQUAL PROTECTION AND FIRST AMENDMENT INTERFERENCE WITH FAMILY CLAIM AGAINST TRIPP.**

David Bush brought a First and Fourteenth Amendment civil rights action that asserts an Interference with Family Relations claim  and denial of equal protection of Law. See Complaint ¶¶ 47, and  8 "a," "b," and "e". The moving Defendants did not seek to dismiss the claim or to have a more specific pleading done. As such, the claim remains.

First Amendment liberty and Fourteenth Amendment Due Process rights exists to protect a parent from unequal treatment by government to the right to maintain the family unity and/or raise and or be with one's child. The Third Circuit has said, "We recognize the constitutionally protected liberty interests that parents have in the custody, care and management of their children. _Lehr v. Robertson,_ 463 U.S. 248, 258, 103 S.Ct. 2985, 2991-92, 77 L.Ed.2d 614 (1983); _Myers v. Morris,_ 810 F.2d 1437, 1462 (8th Cir.1987). Indeed, the liberty interest in familial integrity has been protected to such degree that it is limited by the "compelling governmental interest: requirement under an equal protection analysis --- "particularly where [the government believes] the children need to be protected from their own parents. _See Myers,_ 810 F.2d at 1462.

The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process.  In determining whether a constitutionally protected interest is violated, courts balance the fundamental liberty interests of the family unit with a compelling interests of the state. _Watterson,_ 987 F.2d at 8; _see also Frazier v. Bailey,_ 957 F.2d 920, 931 (1st Cir.1992).

The Supreme Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." _Quilloin v. Wolcott,_ 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978). Responsibility for the "custody, care and nurture of the child reside(s) first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." _Prince v. Massachusetts, supra,_ 321 U.S. at 166, 64 S.Ct. at 442. The Supreme Court's basis for its constitutional concern with the integrity of the family is set forth in _Stanley v. Illinois,_ 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972):

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and "(r)ights far more precious than property rights," May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953) The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, 62 S.Ct. at 1113 and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

Strict scrutiny is warranted. See Brown, 543 F.Supp.2d at 485. Strict scrutiny is required when there is "impermissibly interference] with the exercise of a fundamental right," Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)), Adopted in the shadow of the Civil War, the Equal Protection Clause protects individuals from government efforts to intentionally classify and designate disparate groups for disparate treatment. Yick Wo v. Hopkins, 118 U.S. 356, 368, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). To assert a valid equal protection claim, the plaintiff must allege intentional or purposeful discrimination by the defendant. See Personnel Adm'r v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

The Supreme Court has held that a " 'class of one' " can attack intentionally different treatment if it is " 'irrational and wholly arbitrary.' " *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (internal citations omitted) (per curiam). The Magistrate Judge briefly addressed this issue in denying the motion for summary judgment on this claim, but the District Court reversed and granted summary judgment without discussion.

The undisputed facts at hand show that David Bush's fundamental right to be with his children was intentionally deprived by Tripp, who made the decision to not treat David Bush

equally as he did Serene Bush . David Bush went to the State Police to have his children entered into CLEAN as missing children. He did so after Serene Bush illegally fled Pennsylvania with the David Bush children and went to Virginia. Commonwealth law did not allow Serene Bush to leave Pennsylvania or Tioga County with the children; rather, it required her to obtain court permission to leave with the children. See Grubber.  Pennsylvania Law also requires police to enter children in the CLEAN Missing children system, no matter the reason they are missing. Despite such, Pennsylvania State Police Defendant Tripp acted outside his authority in deciding which parent to help and which parent he would not.  Tripp used his police authority to deny David Bush the police service the law required be performed and to which David Bush was entitled.  Tripp, however, decided to afford the full benefits of the law to Serene Bush , viz have the child placed in the Missing Child CLEAN System, but facing the same set of facts, Tripp decided to deny David Bush the same service viz, Tripp said the children were not missing because the children were with a parent and refused to place them in the CLEAN system. When Serene Bush  sought State Police aid, she called Tripp and wanted David Bush arrested. Serene Bush was assigned an investigator and she and the investigator immediately worked with Virginia police to place the David Bush children into the Missing children data system. See Exh.A.  For David Bush it was months before the PSP acted. See Report (Exh. A. This is not proper.

Substantive Due Process Claim Under the "improper motive" Test
of <u>Bello v. Walker,</u> 840 F.2d 1124 (3d Cir.), Now The
Shock The Conscience Standard

Defendant Tripp chose not to place the children in CLEAN or help David Bush because, as a reasonable jury could conclude, Tripp had an improper motive, such as to decide with which parent the David Bush children should be, and ultimately chose Serene Bush to have the children

and not David Bush.   As such, there remains the substantive due process claim.  Tripp's decision

caused David Bush to be without his children, and but for David Bush's brother Christopher

Bush, he, to this day, would not have contact with his children. David Bush' children would

never have been placed in the Missing children CLEAN system.   Tripp has presented no

compelling state interest for the different treatment of David Bush, which different treatment he

caused, and/or allowed and was to interfere with and/or actually lose David Bush' right to raise

and be with his family and make a decision as to whom the David Bush children should live with

and by whom they should be raised by. This is shocking conduct for a State Police officer and

the evidence of record allows a reasonable jury to so find.

The Third Circuit Model Jury instruction (4.6.1) provides for supervisor liability of a

deprivation of civil rights and it is helpful here. The instruction provides that there will be

supervisor liability when:

> First: the [Supervisor] directed [subordinate] to take the action in
> question;
>
> Second: the [Supervisor] had actual knowledge of the
> [subordinate's] violation of [plaintiff's] rights or the [supervisor]
> acquiesced in that violation; or
>
> Third: the [Supervisor], acted with deliberate indifference to the
> consequences, established and  maintained a policy, practice or
> custom which directly caused the violation.

Here, Tripp assigned a traffic trooper to conduct a criminal investigation into the missing

David Bush children; meaning he "directed a subordinate to take action", which satisfies prong

one of the jury instruction.  Additionally, Tripp had three (3) troopers at his disposal to conduct

the criminal investigation, which were all specifically assigned and trained to conduct criminal

investigations.   However, Tripp chose only a traffic trooper, and none of the criminal

investigator troopers, to conduct the criminal investigation.  The investigation did not proceed as it should have proceeded, and it was months before action was taken by the assigned traffic trooper.  The first action by the non-criminal investigator trooper was to go to a woman's shelter and merely ask if they had any information regarding the Bush children.  Months later, the traffic trooper asked a family member if she had any information. No further actions were taken to investigate, except that David Bush provided possible locations of his alleged missing children. Tripp was the highest ranking person in the State Police Station and he supervised everyone at that Station.  Tripp wanted the investigation to fail and chose the subordinate to insure that failure while allowing the subordinate to ignore his statutory duties, such as placing the children into CLEAN's missing children system as state law required.  Tripp, as the Station Commander, arranged for a facade of providing police service but he made the decision to not locate the children or perform the minimal acts the law required, viz place the children into CLEAN.  This was a deliberate wrongful act done with a deliberate indifference to David Bush's rights to be with his children.  Tripp chose this action and/or acquiesced to what his subordinate was doing; Tripp did such, for the purpose of denying David Bush his fundamental right to be with his children.  Tripp unilaterally and shockingly made the deliberate decision to deny David Bush his right to be with and raise his children.  Tripp used and misused his supervisor position and authority to affect his intent, and to allow the assigned subordinate to drag his feet and perform substandard police work which was designed to obstruct the finding of David Bush's alleged missing children".

If so, as it is, summary judgment is not properly granted to Defendant Tripp.

As for Ignatz, he too failed to supervise the subordinate assigned the CLEAN investigation. Ignatz was told by the subordinate of Christopher Bush, about his BPR complaint against Tripp. There is no basis that the complaint needed to be given to CLEAN, and Ignatz as

the supervisor would know there was absolutely no reason for the CLEAN investigator to know about Tripp or Christopher Bush's BPR complaint about Tripp. Yet, when the subordinate told Ignatz about the Christopher Bush BPR complaint against Tripp, Ignatz did nothing to stop the investigation; although he could have. For example he could have told the investigator to turn the car around and return. Ignatz could have contacted BPR to investigate the circumstances and release of a confidential BPR complaint. Ignatz could have contacted Hill to inquire as to why Hill asked for the investigation and if there was a retaliatory reason. Hill admits he started the CLEAN investigation (see page 16 of the Defendants brief where that fact is admitted). Ignatz would have known of the illegal investigation because Hill was assigned to Tripp's BPR investigation.  No Defendant has explained why Christopher Bush's BPR complaint was released to CLEAN when BPR investigations are confidential under PSP regulation.  Neither the CLEAN investigator nor Ignatz explain why they were talking about the Christopher Bush BPR complaint on the drive to Newtown Township to conduct the CLEAN check for a report to support the CLEAN entry by Christopher Bush.  This fact infers the intent to retaliate, their agreement and aid to retaliate, and their acquiescence to the retaliatory purpose for the Hill initiated CLEAN investigation.

If so, Ignatz is not entitled to summary judgment, because he is subject to supervisor liability for not stopping the retaliatory Hill CLEAN investigation.

## CHRISTOPHER BUSH – FIRST AMENDMENT

The Defendants concede that Christopher Bush was engaged in First Amendment activity when he reported Tripp's misconduct to the Internal Affairs Unit of the Pennsylvania State Police. The Defendants, however, argue that no reasonable Jury could conclude that the CLEAN investigation was started to retaliate against Christopher Bush, for engaging in the First

Amendment activity. The Defendants are incorrect. More importantly, because there remain disputed material facts about the Defendants' motive, for starting and conducting the CLEAN investigation, which disputed facts are for the Jury to decide, Summary Judgment cannot be granted to the Defendants on Christopher Bush's First amendment claim.

To state a claim for actionable retaliation under the First Amendment, the plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir.2006). Also, as protected under the Fourteenth Amendment, there is the Pennsylvania free speech right. See, Mobley v. Tarlini, 641 F.Supp.2d 430 (E.D.Pa.,2009). The Pennsylvania right of free speech provides greater protections than the federal right. See Pap's A.M. v. City of Erie, 571 Pa. 375, 812 A.2d 591, 605 (2002). In fact the text of Article I, Section 7 in the Pennsylvania Constitution is broader than the federal First Amendment text in that it "specifically affirms the 'invaluable right' to the free communication of thoughts and opinions, and the right of 'every citizen' to 'speak freely' on 'any subject' so long as that liberty is not abused." Id. at 603 (quoting Pa. Const. art. I, § 7).

Here, the State Police Defendants all concede two of the tree elements of the  free speech retaliation claim; they concede Christophe Bush was engaged in protected activity (pg. 12 of Defendant's brief) and that adverse action exists. The protected activity was reporting Tripp's misconduct to BPR. The adverse action was Christopher Bush's termination from employment with Newtown Township.  The Defendants argue, however, they cannot be held liable under section 1983, because they had no "involvement" in the decision to terminate Christopher Bush, but that argument fails, because it is Hill's letter to the Township that solely caused the

Township's decision which resulted in Christopher Bush's termination. Without Hill's letter and retaliatory CLEAN investigation, the harm upon Christopher Bush would have never occurred. There would not have been a Township investigation or reliance by the Township on Hill's letter and opinions Hill expressed in his letter. This is so, because the Township, to defend its act to terminate Christopher, called Hill, Tripp and Ignatz at the arbitration hearing regarding Christopher Bush's termination.  Christopher Bush prevailed in the arbitration.  As such, but for the Defendants conduct, viz Hill's letter and Hill and Ignatz' CLEAN investigation, Christopher Bush would not have been terminated from his employment.  If so, the cause of harm to Christopher Bush is exclusively the adverse action by Hill and Ignatz; neither may escape liability because the Township took the very action each sought, which was to cause injury and harm to Christopher Bush.

Since there is a sufficient nexus to be found by the Jury between the adverse action and Christopher Bush' protected activity, viz Hill's letter and the CLEAN investigation,  it is submitted the only element now in dispute is the motive of the Defendants for their action. A Defendant's motivation for acting as they did is a fact question and one for the jury. See, Karchnak v. Swatara Tp., Slip Copy, 2009 WL 2139280 (M.D.Pa.,2009). Plaintiff, to satisfy his burden, now must produce more than a scintilla of evidence from which a reasonable jury could rule in their favor. See Saldana, 260 F.3d at 232 (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir.1989)). They have done so and the time between protected activity, adverse act and cause for the adverse act established more than  scintilla of motive evidence.

Though the Defendants do not concede that their motivation for their action was to retaliate against Christopher Bush for engaging in free speech protected activity, when they started and conducted the CLEAN investigation, or when Hill sent his letter to the Township,

there is sufficient evidence to present at trial for  the Jury to find that a motivating factor for starting, conducting, and continuing the CLEAN investigation, and for Hill to write his letter to Newtown Township, was Christopher Bush's protected activity.

Here, the undisputed evidence shows that each Defendant was aware of Christopher Bush's protected activity. Hill was given the complaint by BPR captain Oliphant.  Tripp was told about it by the person assigned by Hill to investigate Christopher Bush's complaint, and Ignatz admitted knowing about it and even talking about it in the car on the way down to Newtown Township to conduct the CLEAN investigation. The evidence shows Hill asked for the CLEAN investigation. A reasonable Jury could accept this evidence to find the CLEAN investigation was initiated because or in part of the protected activity. There is also the timing evidence, viz the dates between when Hill asked for the investigation and when Hill was assigned the task to investigate Tripp for Christopher Bush's complaint. Hill requested the CLEAN investigation near immediately upon being assigned the duty to investigate Tripp upon Christopher Bush's complaint. Hill concedes he had the investigation started. The CLEAN investigators were told of Christopher Bush's complaint; despite the fact such complaints are not needed for a CLEAN investigation and are confidential. The Defendants do not explain why Christopher Bush's complaint about Tripp through BPR was told to the CLEAN investigators. Thus, the inference is there is no valid reason.  This evidence, viewed favorably to Christopher Bush, the non-moving party, allows a reasonable jury to conclude that the CLEAN investigation was started because of Christopher Bush's complaint about Tripp.  After all, the CLEAN issue arose in Tripp's station and Hill was Tripp's Commander. Hill started the CLEAN investigation when told about Christopher Bush's BPR complaint about Tripp.  A Jury could easily conclude the disclosure was to encourage the CLEAN investigators to punish Christopher Bush for his complaint.  When

they could not, Hill became dissatisfied with the result of the CLEAN investigation and right after the CLEAN investigation clearance, took the extra step to write a letter to Newtown Township's Board of supervisor and Chief of Police, accusing Christopher Bush of misconduct when in fact there was no misconduct. Hill used state police letter head and never wrote such a letter before or after. Exh. A (letters clearing Tripp, Bush and to Twp.) .

If so, there is ample evidence to show a Jury that at least a motivating reason for Hill's CLEAN investigation and letter to Newtown Township was Christopher Bush's protected activity. Accordingly, the motion for summary judgment is properly denied.

As for Defendant Ignatz, by his own testimony, he knew before getting to Newtown Township (to conduct the CLEAN investigation) that Christopher Bush had made a complaint about Tripp through BPR, or in other words, about Christopher Bush's first amendment protected activity.  Ignatz was openly accused by Christopher Bush and Newtown Chief of Police Martin Duffy of conducting a retaliatory CLEAN investigation, because Christopher Bush had made a complaint about Tripp. He did not question the source of the investigation assignment, viz Hill, or Hill's motivation for asking for the investigation. Ignatz did not report to BPR an illegal act by Hill, viz asking for a CLEAN investigation for an improper purpose, viz to retaliate for a BPR complaint. Ignatz intentionally conducted the CLEAN investigation and supervised its conclusion. On this record and applying all reasonable inferences for Christopher Bush, a jury can conclude that a motivating reason for Ignatz to continue the CLEAN investigation was Christopher Bush's protected activity, viz file a BPR complaint against Tripp.

If so, Ignatz is not entitled to summary judgment and Ignatz's motion is properly denied.

### THE DEFENDANTS ARE NOT ENTITLED QUALIFIED IMMUNITY BECAUSE THE LAW WAS FIRMLY ESTABLISHED AT THE TIME

Defendants argue that they are entitled to qualified immunity from all of Plaintiff's claims. If there is no evidence from which a jury can conclude that a reasonable official in these Officers' positions at the relevant time could have believed that their conduct was unlawful, Defendants are entitled to summary judgment under a qualified immunity defense.

A court that is faced with a qualified immunity issue, during a summary judgment motion, must consider this threshold question in the light most favorable to the non-moving party.[1] The Court first must determine whether a constitutional right exists and has been violated. Where a violation exists, as it does here, the next step is to ask whether the right was clearly established. 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted). The Supreme Court recently announced, however, that Saucier's two-step protocol is not mandatory, courts have the discretion to decide whether that procedure is worthwhile in particular cases. Pearson v. Callahan, ---U.S. ----, 129 S.Ct. 808, 821, 172 L.Ed.2d 565 (2009).

#### Violation of Constitutional Rights

In their brief, Defendants simply argue that the law was not "clearly established" to put them on notice of Section 1983 liability for their conduct (Defendants' Brief page 16). The

---

[1] When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity. See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir.2000); Russoli v. Salisbury Twp., 126 F.Supp.2d 821, 838-41 (E.D.Pa.2000); see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir.1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

argument is simply not correct.  The law was firmly establish before 2007 and the law noticed the Defendants that the Plaintiff's conduct in making a complaint to BPR about Tripp's misconduct and right to be with one's child was protected activity under the First and Fourteenth Amendments. The law was equally firmly established that if a motivating reason for a person's conduct was the protected activity and harm came from that conduct then  there would be Section 1983 liability.

<u>Clearly Established Right</u>

The Defendants do not argue that the right asserted by Plaintiff is clearly established. The court should be deeply suspicious of any assertion that the First Amendment retaliation claims were not clearly established in 2008 to put the Defendants on Notice of liability for their actions. The court should be suspicious because the law was  settled since at least 1968 that a public employee does not relinquish their First Amendment rights to comment on matters of public concern by virtue of their government employment. See <u>Pickering v.</u> <u>Bd. of Educ.</u>, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) nor does and/or may a parent loses his First Amendment fundamental  rights to be with his children upon the arbitrary decision of a government official, such as a state Police sergeant, viz Tripp. The Government official in deciding to deny the right must always afford first the person with  valid due process. That is the established law and was in 2007 and 2008.

The law was equally settled in 2007 and 2008 that all Americans enjoy equal rights and protection of the law and the government may not treat unequally those similarly situated unless there is a compelling state interest to justify the different treatment when the different treatment denies a fundamental right, such as to be with one's children.  Recently, the Supreme Court in <u>Garcetti</u> recognized the well-settled nature of the free speech right, and said: "[i]t is well settled

that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' " <u>Garcetti, 547 U.S. at 413</u> (quoting <u>Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).</u>) The Defendants here  would be hard pressed to argue that Plaintiff's right to make a complaint against Tripp, for his misconduct, was not protected activity. Equally, they are hard pressed to say they did not know they would be subject to Section 1983 liability for conduct that was done to retaliate for the protected speech conduct, such as starting a CLEAN investigation, or writing a letter to cause harm to Christopher Bush, or to continue a CLEAN investigation.   That is, however, what occurred and why Hill and Ignatz are subject to Section 1983 liability for the harm that flowed from the CLEAN investigation and Hill's letter to Newtown Township.

Plaintiff's rights and the law were clearly established since 1986.   Since this is so and the Defendants have not shown the law was not clearly established, which is their burden as the party asserting the defense, the Court nor Plaintiff should belabor the point.  It is enough to say, the Defendants had "Notice" prior to their conduct, and the argument they did not have notice is unsupported by the authority.   Also, it is fair to note that though the Defendants have made light references to some of their actions. Tripp, for one, has not argued the conduct he is sued for; rather, he argues that his phone calls to Christopher Bush and his unprofessional conduct was not conduct he was on notice of to allow for Section 1983 liability. The phone call was not the act that was prohibited and/or would subject him to Section 1983 liability.   As such, Defendant Tripp has not presented a motion which seeks qualified immunity for the conduct for which he is being sued.  Therefore, Tripp's motion must be denied, as must Hill's who started a retaliatory CLEAN investigation, and Ignatz motion because he continued the retaliatory CLEAN investigation. Hill also sent a letter to Newtown that caused Christopher Bush's termination as a

police officer after the retaliatory CLEAN investigation failed to show any wrongdoing by Christopher Bush. None of these acts have the Defendants argued nor have they shown would not be conduct that subjected them to Section1983 liability; they do not do so, because the law was firmly established. This was their burden and duty to do.

Finally there is telling testimony by Ignatz who specifically testified the State Police teaches its members of the First Amendment Rights to speech and to be free from retaliation. Ignatz testified the training on the topic was before May 7, 2007. See Undisputed Fact #  .

If so, because the law was firmly established when the defendants acted, and they specifically were taught of the right, and liability for retaliation, there is no merit to the Defendants "lack of notice" argument. The evidence shows each Defendant was on notice that their conduct subjected them to Section 1983 liability. Therefore, the Defendants are not entitled to qualified immunity.

## SOVEREIGN IMMUNITY DOES NOT PROVIDE AID TO THE DEFENDANTS ON THE STATE CLAIMS

The final effort by the Defendants to avoid liability is to claim sovereign immunity for the "state claims". The immunity is not available to the defendants.

Sovereign immunity applies to claims asserted against Commonwealth officials in their individual capacities. Unlike employees of municipal agencies who remain liable for intentional torts, employees of Commonwealth agencies are immune from liability even for intentional torts. Dill, 1999 WL 508675, at *4 (citations omitted). Under Pennsylvania's sovereign immunity statute, "an employee of the Commonwealth ... is only immune for acts done "within the scope of his or her employment duties" If the act is not done to perform an employment duty the employee is not protected by sovereign immunity from the imposition of liability for intentional tort claims." Holt v. Nw. Pennsylvania Training P'ship Consortium, Inc., 694 A.2d 1134, 1139

(Pa.Cmmwlth.Ct.1997) (citing La Frankie v. Miklich, 152 Pa.Cmwlth. 163, 618 A.2d 1145 (1992)). Cited in Mitchell v. Luckenbill, 680 F.Supp.2d 672 (M.D.Pa.,2010).

Here, Hill's job duties are as a Troop commander. He is not assigned the duty to send letters to municipal entitles and complain about municipal officers. Rather as a Troop Commander he supervises Members of the State Police. Hill asserts the defenses of sovereign immunity; thus, Hill bears the burden to show his letter writing was done in the performance of his employment duties; he has not done so. There is thus, a genuine issue of material fact in dispute about his job duties, which dispute precludes summary judgment being granted to hill under the sovereign immunity defense. The record evidence shows only that Hill sent his letters. The Record does not show Hill was sending the letters "in the performance of his duties" as a Troop Commander. The letters caused Christopher Bush to be dismissed and were untrue; known to be untrue and known by Hill to be unsupported by fact; they were sent with malice aforethought. The letters caused Christopher Bush to lose his employment, thus economic damages, and the letters caused Bush to suffer personal injury.

If so, sovereign immunity for the "state claims" is not available to Hill.

V.      CONCLUSION

For the disputed facts and law pointed to in Plaintiff's opposition to the Defendants' Motion for Summary Judgment, the Plaintiff submit there are material facts in dispute to create a genuine issue for the Jury to decide, so Summary Judgment is not properly granted to the Defendants.

Dated: October 1, 2010                    By:          /s/

                                          Brian M. Puricelli
                                          Attorney for the Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has this 1st day of

October, 2010, been filed electronically and is available for viewing and downloading on the

ECF System:

Attorney for PSP Defendants Kenneth Hill,
Steven J. Ignatz and Sgt. Tripp
**Randall J. Henzes, Esq.**
Assistant Attorney General
The Pennsylvania Attorney General's Office
21 South 12th Street
Philadelphia, PA 19107
rhenzes@attorneygeneral.gov

Attorney for Defendants Sean Adams and Brian Russell
**David J. Freedman**
(Pa. Bar #207257)
dfreedman@barley.com
126 East King Street
Lancaster, PA 17602-2893
Tel: (717) 299-5201
Fax: (717) 291-4660

Attorneys for Defendant Sara Bush
**Sharon Lopez, Esq.**
**Andrea Farney, Esq.**
35 East Orange Street, Suite 301
Lancaster, PA 17602
Tel: (717) 299-6300 Fax: (717) 299-6338
srl@dflworkforjustice.com
acf@dflworkforjustice.com

Dated: <u>October 1, 2010</u>                    By:  */s/ Brian M Puricelli*

                                                Brian M. Puricelli, Esq.
                                                691 Washington Crossing Road
                                                Newtown, PA 18940
                                                (215) 504-8115
                                                Attorney for Plaintiffs

31