**SYNOPSIS cont'd**

On 10/13/06, Christopher BUSH, his brother David BUSH, and their father went to Richmond, VA where the ex-wife and children had been located and solicited the assistance of the Richmond City police to obtain custody of his children from their school pursuant to the fraudulent court order which they did. The children were turned over to David BUSH who then returned to Pennsylvania. Subsequently, the court order was vacated and a new custody order was issued giving Mrs. BUSH custody and the children were returned to her after David Bush turned himself in to the FBI on 10/26/07. The FBI had charged him with 3 counts of Abduction of Children and Conspiracy to Commit Abduction.

On 10/23/06, after obtaining a valid court order, Mrs. BUSH went to PSP Montoursville and spoke with TPR Matthew R. MCDERMOTT who assisted her with the authorities in Richmond City Police Department to file a missing persons report for her children (see enclosure).

On 05/17/07 @ 1005hrs., Lt. Steve IGNATZ and I went to Newtown Township Police to interview Chief Martin DUFFY and Detective Chris BUSH concerning this matter. The interview was adversarial from the start, beginning with an accusation by Chief Duffy that the only reason we were sitting in his office is because we were sent by IAD in Harrisburg to harass and intimidate them since they filed an IAD complaint against some members of PSP. The chief also thought this matter was too trivial to include a state police Lieutenant who has better things to do and that I should be able to handle this matter by myself. After several comments about a federal law suit and Chris BUSH being advised by his attorney that he shouldn't talk to us, he chose to talk to us anyhow since he wanted to cooperate fully in this investigation. It was determined that Detective Chris BUSH had made the entries after he had asked the chief and was given permission to do so without an ongoing investigation. After denying that he had a report to backup the entries, report number 06-4111 was produced. It only had sufficient information on it to make an NCIC entry for the children and no other investigative information. The mother of the children was never charged criminally by Detective BUSH for Interference with the Custody of a Child or any crime.

**CONCLUSION:**

Newtown Township PD had not initiated an official missing person's investigation. The report that was initiated by Detective BUSH was only for the purpose of making the NCIC entry, and was only done after PSP Mansfield determined this was not a missing person's case and that the children were not actually missing but in the custody of their mother and that this was part of a custody dispute. The court order that was used to substantiate the removal of the children from Richmond Virginia was fraudulently obtained by David BUSH. Detective BUSH also contacted the National Center for Missing and Exploited Children and had a poster made showing the 3 children as missing which had some inconsistencies with the NCIC entry, mainly, on the NCMEC poster it indicates that the last contact was on 09/01/04 and on the NCIC entry date of last contact was 07/08/2006. Detective BUSH lied to me about the existence or a report to substantiate his NCIC entry. A report was available for hit confirmation, therefore, no violation of CLEAN/NCIC regulations occurred.

It remains undetermined if Detective Chris BUSH knew that the custody order was obtained fraudulently or not.

## RECOMMENDATIONS AND COMMENT:

I believe that when David BUSH failed to get the results he wanted from his attempt to use PSP to support his agenda he went to his brother Detective Chris BUSH, who, because he was emotionally involved and personally involved in the case due to the family situation, allowed that to cloud his judgment in this case to the point where he acted inappropriately, albeit with the permission of his chief. Detective Chris BUSH filing an IAD complaint has no relevance in this investigation as to whether or not he misused CLEAN.

I also believe that Chief DUFFY knew of this NCIC entry and became personally and emotionally involved in this case and gave his permission for Detective BUSH to make these entries. I also believe that Chief DUFFY was surprised that Detective BUSH lied to me about the existence of a report when he found the report in the file and handed it to Detective BUSH and then directed Detective BUSH to allow me to see the report.

## LIST OF ATTACHMENTS:

Information from SGT David YOUNG, PSP Montoursville
CLEAN offline search
NCIC offline search
NCMEC poster
Court documents

## DETAILS:

On 05/17/07 at approx. 1005 hours, I interviewed Chief of Police Martin C. DUFFY, W-N/M – 64 (04/15/1943), Newtown Township Police Department in his office at 100 Municipal Drive, Newtown, PA 18940 (215)579-1000.

After I introduced myself and LT IGNATZ, Chief DUFFY and Detective BUSH both went on the offensive, accusing us of being there to intimidate and harass his detective since he had filed an IAD complaint against members of PSP. He questioned the timing of this investigation and the need for a State Police Lieutenant to be involved in such a trivial matter. Chief DUFFY advised that he prides himself on the integrity of his department where he has worked for 30 plus years. Chief DUFFY advised that he stands behind his officers 100% and if there is a violation here, it is should rest on his shoulders and not on Detective BUSH. He advised that he was aware of this case and that Detective BUSH came to him and asked his permission to enter his brothers kids into CLEAN/NCIC before he did it. He advised of an ongoing federal lawsuit involving this case and that he wasn't sure how much he should talk about. Chief DUFFY was advised that this was an administrative investigation concerning only the NCIC entries made by Detective BUSH when his department did not have jurisdiction to make the entries as the children were not missing from his jurisdiction and not associated with the IAD or any other investigation. When advised of the possible sanctions of a violation, he advised that he didn't want his officers safety to be jeopardized because of his emotional involvement in this case and that he hoped his department would not lose CLEAN access. Chief Duffy stood his ground until I caught Detective BUSH lying to me about the existence of a report in this case. As I was interviewing Detective BUSH, Chief DUFFY pulled a file out of his desk drawer and began to go through it, and as Detective BUSH lied outright saying a report didn't exist, Chief DUFFY pulled a report out of the file with a puzzled look on his face, showed the report to Detective BUSH, then directed him to show it to me. Chief DUFFY apologized for his error in judgment and acknowledged his emotional involvement in this case. Chief DUFFY'S demeanor seemed to change after he found the report that Detective BUSH said didn't exist.

## DETAILS cont'd

On 05/17/07 at approx. 1015 hours, I interviewed Detective Christopher BUSH, W-N/M – 44 (12/31/62), 100 Municipal Drive, Newtown, PA 18940, in the presence of his police chief, Martin C. DUFFY, in the chief's office.

Detective BUSH proceeded to provide me with the fact that he filed an IAD investigation that was still pending and that IAD would not provide him with any information concerning the investigation. He proceeded to tell of his brothers' plight and the custody of his brothers' children, all of which I told him I could sympathize with, but it didn't justify the entries made into NCIC. The regulation concerning entries and the availability of a report for hit confirmation were explained to Detective BUSH. I asked Detective BUSH for a copy of his missing persons report that he filed in conjunction with the NCIC entries that he made. He vehemently denied the existence of a report and stated "you know I don't have a report why are you even asking?" I advised Detective BUSH that it was my belief that his brother made an attempt to get PSP Mansfield to take a missing person report and when he didn't get the results that he wanted he requested Detective BUSH get involved, a statement which Detective BUSH didn't deny or even challenge. He was advised that because of his personal involvement in this case he shouldn't have used his position to further his brother's cause. At this point in the interview, the chief pulled the report out of a file, showed it to Detective BUSH and Detective BUSH took possession of it. Detective BUSH was reluctant to allow me to see the report until he consulted with his attorney at which time he was directed by Chief DUFFY to give me the report. The report, 06-4111, had only the information on it to support the NCIC entries and no additional investigative information. When I questioned his integrity at this point he stated that he didn't know that *that* was the report I was looking for, he thought I was looking for a different one.



**PENNSYLVANIA STATE POLICE**

CLEAN TRAINING UNIT
Bureau of Technology Services
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110
Phone: (717)787-1585



**TROOPER RICHARD T. FULTZ**
Training Supervisor
rifultz@state.pa.us   Fax (717)772-1434



**PENNSYLVANIA STATE POLICE**

CLEAN Administrative Section
Bureau of Technology Services
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110
Phone: (717)787-1438



**LIEUTENANT STEVE J. IGNATZ**
COMMANDER/CJIS Systems Officer
stignatz@state.pa.us   Fax (717)772-1434

May 17-2007
visit

1-7-10
IGNATZ

offense under this chapter, is guilty of a felony of the third degree.

1974 Dec. 30, P.L. 1120, No. 361, § 2, imd. effective.

### § 2908. Missing children

**(a) Duties of law enforcement agencies.**—Law enforcement agencies shall have the following duties with respect to missing children:

(1) To investigate a report of a missing child immediately upon receipt of the report regardless of the age of the missing child or the circumstances surrounding the disappearance of the child. In no case shall law enforcement agencies impose a mandatory waiting period prior to commencing the investigation of a missing child.

(2) When conducting a missing child investigation, to record all information relevant to the missing child and the circumstances surrounding the disappearance of the missing child on the appropriate law enforcement investigative report.

(3) To make an entry into the Missing Persons File through the Commonwealth Law Enforcement Assistance Network (CLEAN) in accord with Pennsylvania State Police policy and procedures immediately upon receipt of sufficient identification information on the missing child.

(3.1) To make an entry into the Unidentified Persons File through Commonwealth Law Enforcement Assistance Network (CLEAN) in accord with Pennsylvania State Police policy and procedures immediately upon:

(i) taking custody of an unidentified living child, such as an infant, or a physically or mentally disabled child; or

(ii) discovering an unidentified deceased child.

(4) To insure timely cancellation of any entry made pursuant to this section where the missing child has returned or is located.

**(a.1) Unidentified deceased children.**—Law enforcement agencies and coroners shall, with respect to unidentified deceased children, have the duty to make an entry into the Unidentified Deceased Person File through the Commonwealth Law Enforcement Assistance Network (CLEAN) in accordance with Pennsylvania State Police policy and procedures immediately upon observing or receiving any descriptive information on an unidentified deceased child.

**(b) Definition.**—As used in this section the term "child" means a person under 18 years of age.

1985, May 9, P.L. 31, No. 14, § 1, imd. effective. Amended 1990, Feb. 2, P.L. 6, No. 4, § 2, effective in 60 days; 1992, June 25, P.L. 315, No. 59, § 1, effective in 60 days.

### § 2909. Concealment of whereabouts of a child

**(a) Offense defined.**—A person who removes a child from the child's known place of residence with the intent to conceal the child's whereabouts from the child's parent or guardian, unless concealment is authorized by court order or is a reasonable response to domestic violence or child abuse, commits a felony of the third degree. For purposes of this subsection, the term "removes" includes personally removing the child from the child's known place of residence, causing the child to be removed from the child's known place of residence, preventing the child from returning or being returned to the child's known place of residence and, when the child's parent or guardian has a reasonable expectation that the person will return the child, failing to return the child to the child's known place of residence.

**(b) Application.**—A person may be convicted under subsection (a) if either of the following apply:

(1) The acts that initiated the concealment occurred in this Commonwealth.

(2) The offender or the parent or guardian from whom the child is being concealed resides in this Commonwealth.

1990, Feb. 2, P.L. 6, No. 4, § 3, effective in 60 days.

### § 2910. Luring a child into a motor vehicle or structure

**(a) Offense.**—Unless the circumstances reasonably indicate that the child is in need of assistance, a person who lures or attempts to lure a child into a motor vehicle or structure without the consent, express or implied, of the child's parent or guardian commits a misdemeanor of the first degree.

**(b) Affirmative defense.**—It shall be an affirmative defense to a prosecution under this section that the person lured or attempted to lure the child into the structure for a lawful purpose.

**(c) Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"Motor vehicle." Every self-propelled device in, upon or by which any person or property is or may be transported or drawn on a public highway.

"Structure." A house, apartment building, shop, warehouse, barn, building, vessel, railroad car, cargo container, house car, trailer, trailer coach, camper, mine, floating home or other enclosed structure capable of holding a child, which is not open to the general public.

1990, Feb. 2, P.L. 6, No. 4, § 3, effective in 60 days. Amended 2005, Nov. 10, P.L. 330, No. 64, § 1, effective in 60 days [Jan. 9, 2006].

## CHAPTER 30

### TRAFFICKING OF PERSONS

Section
3001. Definitions.
3002. Trafficking of persons.
3003. Restitution for offenses.
3004. Forfeiture.

### Oliphant, Willard M

| | |
|---|---|
| From: | Henzes, Randall [rhenzes@attorneygeneral.gov] |
| Sent: | Tuesday, June 22, 2010 10:42 AM |
| To: | Oliphant, Willard M |
| Subject: | Bush v. Tripp et al |

Captain, my name is Randall J. Henzes and I am with the Attorney General's office. I currently represent Major Hill in lawsuit filed against him, a Sgt. Joe Tripp and Lt. Steven Ignatz. The lawyer who represent the plaintiffs would like to take you deposition. The lawyer is looking for dates when you are available. The deposition will take place in Harrisburg.
   As to why he wants to depose, one his clients Christopher Bush filed a complaint with BPR against Sgt. Tripp alleging that Tripp did not due his job properly. The BPR control number on the complaint is 2006-0692. From the deposition of Major Hill, it was learned that a decision was made between you and Major Hill to have the complaint investigated as a limited investigation. At the time of the complaint, Major Hill was the Troop commander for Troop "F" Montoursville. Tripp was the station commander at the Mansfield barracks which is located Troop "F" Montoursville. The lawyer, I am assuming, wants to know your thougth process as to why the complaint was handled as a limited investigation. When you have free moment please give me call so we discuss the matter further. My number is 215-560-2136. Your cooperation in this matter is greatly appreciated.
Randall J. Henzes

6/25/2010