IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER BUSH, ET. AL.,      :
    PLAINTIFFS              :
                            :
    V                       :   NO. 07-4936
                            :
S.C. ADAMS, ET. AL.,            :
    DEFENDANTS              :


DEPOSITION OF:   RICHARD T. FULTZ

TAKEN BY:        PLAINTIFFS

BEFORE:          DONNA E. GLADWIN, RPR
                 NOTARY PUBLIC

DATE:            JULY 20, 2010, 1:44 P.M.

PLACE:           PENNSYLVANIA STATE POLICE
                 7820 ALLENTOWN BOULEVARD
                 HARRISBURG, PENNSYLVANIA

APPEARANCES:

  BY:   BRIAN M. PURICELLI, ESQUIRE

       FOR - PLAINTIFFS

  OFFICE OF THE ATTORNEY GENERAL
  BY:   RANDALL J. HENZES, ESQUIRE

       FOR - DEFENDANTS


ALSO PRESENT:
  CHRISTOPHER BUSH

Case 2:07-cv-04936-MAM   Document 52-4   Filed 10/01/10   Page 2 of 7

Page 2

```
                    WITNESS
NAME                        EXAMINATION
RICHARD T. FULTZ
    BY MR. PURICELLI                 3



                    EXHIBITS
FULTZ DEPOSITION EXHIBIT NO.    PRODUCED AND MARKED
1.  E-MAIL DATED FEBRUARY 12, 2007       5
2.  INCIDENT INVESTIGATION REPORT       16
```

Page 3

```
                    STIPULATION
        It is hereby stipulated by and between counsel for the
respective parties that reading, signing, sealing,
certification and filing are hereby waived; and that all
objections except as to the form of the question are reserved
to the time of trial.

        RICHARD T. FULTZ, called as a witness, being duly
sworn, testified as follows:

                    DIRECT EXAMINATION
BY MR. PURICELLI:
    Q   Is it Trooper Fultz?
    A   Corporal.
    Q   Corporal?
    A   Yep.
    Q   Corporal, my name is Brian Puricelli. You've been
asked to come down here to see if you can fill in some gaps for
us --
    A   Okay.
    Q   -- in a lawsuit. Are you familiar with the reason
you're down here?
    A   I am familiar, yes.
    Q   Okay. And you brought with you today some records?
    A   Yes.
```

Page 4

```
    Q   What did you bring?
    A   A possible misuse investigation of the CLEAN and NCIC
system, and that would have been No. 2007-06.
    Q   Okay. And that's an investigation involving an
allegation that someone entered children in the NCIC system?
    A   Correct.
    Q   Okay. And the conclusion on that investigation was
there was no violation?
    A   That's correct.
    Q   Okay. Now, before you came here today did you speak
with anybody other than an attorney to prepare for today's
deposition?
    A   No.
    Q   Did you review any documents other than the ones you
got in front of you?
    A   No, I did not.
    Q   Okay. Were you the investigator on the -- what you
refer to as possible misuse of the system?
    A   Yes.
    Q   Okay. And how did you get assigned to that?
    A   It came from my sergeant to me.
    Q   What's the name of your sergeant?
    A   Shawn Sanders at the time. S-A-N-D-E-R-S.
    Q   And was that assignment verbal or in writing?
    A   Oh, my goodness. It was initially verbal, and then at
```

Page 5

```
some point I received an e-mail from him with some details for
me to follow up on.
    Q   Is that e-mail inside your packet, the packet that you
brought, the file?
    A   I believe so.
    Q   Could we see it, please?
        MR. HENZES: Yeah.
        MR. PURICELLI: Okay. You want to mark that as 1?
        (E-mail dated February 12, 2007 was produced and
marked as Fultz Deposition Exhibit No. 1.)
BY MR. PURICELLI:
    Q   Now, I'm going to show you a document that's been
marked Fultz 1. It's an e-mail. Can you tell me is this the
e-mail that we just looked at in your pile?
    A   Except for the last page.
    Q   Okay. The last page wasn't on yours?
    A   Not this document, no.
    Q   Okay. Can we take that off then, Randy? I have it
with -- I don't care if it's there.
    A   Well, that documents somewhere in this report, but not
attached to that e-mail.
    Q   Okay. This document indicates that on Tuesday,
February 13, 2007 you were given this assignment that we're
referring to?
    A   That's correct.
```

Page 6

1  Q  It says follow up flag. Do you see that, below
2  subject?
3  A  Yep.
4  Q  What's that mean?
5  A  That is just a note to me to follow up on it, and it's
6  flagged so that I can see the little red flag on my e-mail.
7  Q  Okay. And prior to February 12, 2007 how much
8  experience had you had to investigate possible misuse of the
9  CLEAN system?
10  A  About one year, I think. I think March 1st would have
11  been one year with the CLEAN section at that point.
12  Q  So you started with the CLEAN roughly around March of
13  '06?
14  A  March 1 of '06.
15  Q  And for that approximately one year, I want to be
16  specific for Randy, about 11 months how many CLEAN
17  investigations did you do where it was alleged that someone had
18  outside of jurisdiction entered missing children into the CLEAN
19  system?
20  A  Entered missing children?
21  Q  Right.
22  A  This was the only one.
23  Q  Okay.
24  A  I mean, I had done a couple other misuse
25  investigations, but this was the only one involving children.

Page 7

1  Q  What other type did you investigate?
2  A  One was a municipality allegedly running driver's
3  information on employees. And there was another one. I don't
4  recall at this point in time what it was about, but something
5  similar to that.
6  Q  Okay. And in your investigation of the Newtown
7  Township case did you consult with any regulations?
8  A  The CLEAN Administrative Regulations is my piece of
9  this, of this assignment that you have on the e-mail, is
10  strictly an administrative investigation.
11  Q  Okay. Is that AR 9-6?
12  A  Negative.
13  Q  What AR?
14  A  It's not an AR. It's actually called the CLEAN
15  Administrative Regulation.
16  Q  Okay. So AR 9-6 would apply only to the State Police
17  then?
18  A  That's correct.
19  Q  Okay. And what was the alleged misconduct that you
20  were to investigate?
21  A  Entry of three children into the NCIC database by
22  Detective Christopher Bush.
23  Q  And the CLEAN Administration Regulations that you
24  reviewed, do they prohibit that?
25  A  They don't prohibit entry. They prohibit entry for

Page 8

1  personal reasons. They prohibit entry for -- without a report
2  justifying the entry.
3  Q  Okay. And, again, the conclusion of that
4  investigation was there was no violation, correct?
5  A  The conclusion of the report, that's correct.
6  Q  Okay. Now, the e-mail that we're looking at, Fultz 1,
7  has an e-mail just below the one that was sent to you. It says
8  from Hile, Dennis C. Do you see that?
9  A  I do.
10  Q  Do you know who he is?
11  A  No, I do not.
12  Q  Did you have any discussion with Shawn sanders about
13  that e-mail that he was receiving and thus sending to you to do
14  the investigation?
15  A  Yes. This was the basis of the verbal assignment of
16  the misuse, and he forwarded Mr. Hile's e-mail to me.
17  Q  Okay. And Hile's e-mail is dated February 8th,
18  correct?
19  A  Yes.
20  Q  Okay. Do you have any reason to believe that that
21  date is inaccurate?
22  A  No, I do not.
23  Q  Did you talk to Sanders to find out why he held it
24  approximately five days?
25  A  No.

Page 9

1  Q  In the course of your investigation did you learn why
2  it took five days for Shawn Sanders to then send you the e-mail
3  so you could start the investigation?
4  A  No.
5  Q  Ordinarily how do investigations get assigned to you
6  for CLEAN violations?
7  A  Many times in a similar manner as this. Back at that
8  point in time I was also the training supervisor for the CLEAN
9  section. So I was out of the office a lot. I -- I don't know
10  why the difference between the 8th and the 13th.
11  Q  How many investigations were referred to you where the
12  complaint came in and they held the complaint five days before
13  assigning it?
14  A  At this point in time I have no way of knowing that.
15  Q  Do you recall any occurring like that?
16  A  I can't really accurately answer that question because
17  I don't know.
18  Q  I'm only referring to you.
19  A  I understand.
20  Q  Do you ever recall any investigation coming in to be
21  done and being held five days before it was assigned to you?
22  A  Well, I don't know. I don't know.
23  Q  You don't know that it ever was held, or I'm trying to
24  know if you recall?
25  A  I don't recall if there's ever been a time lapse like

## Page 10

1  that or there was or there wasn't.
2  Q  Okay.
3  A  But I know it's common for me to get a phone call
4  saying, hey, there's one coming your way and then receive the
5  documentation later on.
6  Q  Did that occur in this case?
7  A  In this case?
8  Q  Yeah.
9  A  I -- making an assumption, yeah. I assume I got the
10 verbal, and then I -- he followed up with this e-mail.
11 Q  You would assume that?
12 A  Well, it's three years ago. It's more than three
13 years ago.
14 Q  Granted. So it's easier to say you don't recall it
15 occurring, but if you assume it, I'm going to ask you why you
16 assume it.
17 A  Why I assume what?
18 Q  That you got a phone call first before you got the
19 e-mail?
20 A  Well, in this case?
21 Q  Yes.
22 A  I know I got the verbal first, and then I got the
23 e-mail. I know.
24 Q  How much time passed?
25 A  I don't know that.

## Page 11

1  Q  And the verbal came from Shawn Sanders?
2  A  Correct.
3  Q  Okay. On the second page, the very top, it says after
4  the children were returned the Richmond police and the FBI both
5  dropped their charges against the father, David Bush.
6  Originally they had charged him with three counts of abduction
7  of children and conspiracy to commit abduction. Did you
8  investigate that?
9  A  No.
10 Q  Okay. So you don't know if that's true or not?
11 A  No, I don't. Well, I shouldn't say that. I know
12 because Detective Bush indicated that that was the case when we
13 were at Newtown Township. But actually calling the FBI or the
14 Richmond, I did not do that. That was actually outside the
15 scope of my administrative investigation.
16 Q  The second -- the second paragraph reads sometime
17 right after the kids were returned the Newtown police officer,
18 Christopher Bush, brother of father, David Bush, filed an
19 Internal Affairs complaint against our officers for not taking
20 this as a missing child investigation. This IAD complaint was
21 determined to be unfounded.
22     Were you informed of -- by anyone other than by this
23 e-mail about the IAD investigation?
24 A  I think it was Chief --
25 Q  Duffy?

## Page 12

1  A  -- Duffy indicated that there was an IAD complaint
2  filed by Mr. -- by Detective Bush.
3  Q  Did you talk to anybody about the fact that there was
4  a complaint by Officer Christopher Bush that was being
5  investigated by the State Police IAD unit?
6  A  I don't recall talking to anybody. Because, again,
7  this was outside the scope of my administrative investigation
8  as to whether or not there was a violation of the CLEAN
9  Administrative Regulation.
10 Q  And this e-mail has not been -- that you know of, been
11 tampered with by the dates?
12 A  Not that I'm aware of, no.
13 Q  And you never spoke to Dennis Hile?
14 A  Not that I recall.
15 Q  When you start an ordinary investigation under CLEAN
16 what kind of paperwork do you create?
17 A  I ask for a -- an off-line search to see if, in fact
18 -- depending on what it was, if the person was queried, if the
19 person or property was entered, if it was cancelled, et cetera,
20 et cetera, to see, if in fact, there was some interaction with
21 the CLEAN/NCIC system.
22 Q  Okay. And did you do that in this case?
23 A  I did.
24 Q  Okay. And what did you learn?
25 A  I learned that there had been entry of the three

## Page 13

1  children and subsequent cancellation of the three children in
2  the NCIC system.
3  Q  How long did your investigation take?
4  A  A little more than three months, I think.
5  Q  When you got the assignment did you speak to anybody
6  to assist you?
7  A  When I initially got the assignment, no, I did not.
8  Q  You said you were the training supervisor?
9  A  I was.
10 Q  Okay. And you would train people on what, supervise
11 --
12 A  How to properly use the system.
13 Q  Okay. And when you say that you mean to stay within
14 the requirements of the CLEAN Administration Regulation?
15 A  And the NCIC regulations, yes.
16 Q  Okay. So when you got your report about these
17 children being entered in Newtown, by Newtown, and their names
18 being changed and David Bush trying to find his children and
19 there was not an official comparison -- investigation, what
20 would you have looked for to see if there was a violation of
21 the CLEAN Administrative Regulation?
22 A  Well, for every missing person entry there has to be a
23 missing person's report on file with the agency that makes the
24 entry.
25 Q  A report or a missing child's report?

Page 14

1  A  A missing person report, a missing child report,
2  whatever they would classify it.
3  Q  Whatever the reporting agency would classify it?
4  A  Yeah. It has to be a missing person's report to enter
5  somebody into the missing person's file.
6  Q  Okay. Is there a distinction between a missing
7  child's report and a report of a missing person?
8  A  It depends on the department.
9  Q  Okay.
10 A  Some departments have different checklists for, you
11 know, different entries. Some are different for juveniles,
12 some are different for adults. But substantially most that
13 I've seen correspond with the NCIC entry screens.
14 Q  Okay. So you look to see if there's a report that
15 corresponds with information of what's in the NCIC?
16 A  Yes, sir.
17 Q  And if there is such a report that correspondences to
18 that, that's sufficient for the purposes of the CLEAN
19 Administrative Regulation?
20 A  That's correct.
21 Q  Okay. There's no magical type of report, just
22 something that has the information that's consistent with
23 what's put in?
24 A  That's correct.
25 Q  Okay. And when you started your investigation did you

Page 15

1  ask for a report that was consistent with the information --
2  A  I did.
3  Q  -- on -- let me get the question out, okay. -- that
4  was consistent with what was put in, or did you ask for a
5  particular name of a report?
6  A  I don't recall exactly what I asked for. I asked if
7  he had a police report that would justify the entry. Whether I
8  said missing persons or just a report, I don't -- I really
9  don't recall.
10 Q  You don't recall?
11 A  I don't recall.
12 Q  Okay. Now, if a -- would you agree with me if a
13 police department, not your police department, has a report
14 system and a particular form that's called a missing, and you
15 asked for a missing, and they don't have a missing, but they
16 got a report, would you agree that there would be some
17 confusion that's created as to what you're asking for and what
18 they're answering?
19 A  I disagree.
20 Q  You disagree? Why?
21 A  Because they knew exactly why I was there, to
22 investigate the entry of missing children.
23 Q  Well, didn't you just tell me that you weren't
24 interested in what the classification was, only that they have
25 a report that's consistent with the information in NCIC?

Page 16

1  A  That's correct.
2  Q  So if that police department is being asked for a
3  particular type of report and not a report that's consistent
4  with the entry information, you don't believe confusion can
5  result?
6  A  Semantics at this point. No, I don't. Not in this
7  case.
8      MR. PURICELLI: Not in this case. Well, just mark
9  this Fultz 2.
10     (Incident investigation report was produced and marked
11 as Fultz Deposition Exhibit No. 2.)
12 BY MR. PURICELLI:
13 Q  Showing you Fultz 2. Have you seen this document
14 before?
15 A  Yes, I have.
16 Q  Is this the document you were showing when you went to
17 Newtown Township?
18 A  To the best of my recollection, yes, it is.
19 Q  Does this document contain the information consistent
20 with what was in the NCIC entry?
21 A  Yes.
22 Q  When you went to Newtown Township you met with
23 Detective Bush and Chief Duffy?
24 A  Yes.
25 Q  Did Chief Duffy accuse you of being down in his

Page 17

1  department looking at this report in retaliation of Christopher
2  Bush making a complaint against the state trooper?
3  A  Yes, he did make that accusation.
4  Q  The e-mail that you received in your assignment
5  specifically identifies that complaint, doesn't it? You can
6  read it if you want.
7  A  Yes, yes, it does. I think that was on the second
8  page.
9  Q  So you knew -- did you ask Duffy -- strike that. Did
10 you tell Duffy you knew nothing about that complaint?
11 A  I don't recall telling him I knew nothing about it,
12 but I did -- do recall telling him that we were not there to
13 pursue this IAD complaint.
14     My investigation was from the CLEAN administrative
15 section and was strictly administrative and not as a result of
16 the IAD.
17 Q  Prior to this complaint, this assignment, how many
18 times had you been informed that you were to go out and
19 investigate a matter that involved an officer who had already
20 filed a complaint to BPR against a state trooper?
21 A  I don't recall any.
22 Q  Since this time how many times have you been assigned
23 a CLEAN investigation where the person sending the information
24 is the assigned investigator for a BPR complaint?
25 A  Can you ask that one more time?

Page 18

1  Q  I can. Prior -- after this investigation -- well,
2  even both.
3  A  All right.
4  Q  How many times has a person assigned to do an
5  investigation that comes from BPR to them to investigate called
6  you and said do a CLEAN investigation of the person in his
7  agency that's making the complaint against the trooper?
8  A  As I recall, none of my misuse investigations aside
9  from this.
10 Q  How many times in any of your investigations have you
11 been told that somebody -- that BPR is also investigating a
12 portion of what you're doing?
13 A  Aside from this?
14 Q  Aside from this case?
15 A  None.
16 Q  None. I'm going to show you what's already been
17 marked as Ignatz 1. Have you ever seen these documents before?
18 A  Yes.
19 Q  One is a -- they're both business cards, right?
20 A  They are.
21 Q  When you went down and saw Chief Duffy and Detective
22 Bush did the two of you hand your business cards to them?
23 A  I believe we did.
24 Q  Okay. Are these true and correct representations or
25 copy of your business card back on the date that you went and

Page 19

1  saw Chief Duffy?
2  A  At the time, yes.
3  Q  Okay. Have you ever talked to Sergeant David Young in
4  the Montoursville State Police barracks?
5  A  I believe I had communication with Sergeant Young
6  about a report that one of the troopers did that I wanted to
7  take a look at based on the incident that Mr. Bush -- Detective
8  Bush's brother went to Mansfield, I think, or Montoursville. I
9  don't recall. But the trooper did a -- did an assignment
10 report.
11 Q  Okay. And just so --
12 A  So I believe if I recall I talked to Sergeant Young
13 about obtaining that document.
14 Q  And just so that we're clear, you didn't -- before the
15 e-mail date of February 12th or 13th you weren't investigating
16 the Bush entry of the kids, correct, in '06? You weren't --
17 A  In '06?
18 Q  Yeah.
19 A  I don't believe so.
20 Q  All right. So if we understand correctly, this
21 e-mail, aside from maybe a phone call, you know, in February of
22 2007 -- so in January of 2007, December of 2006, and November
23 of 2006 you weren't involved in any investigation of this
24 purported misuse of the CLEAN system?
25 A  That would be correct.

Page 20

1  Q  Okay. And your --
2  A  To the best of my knowledge.
3  Q  You're free to look at your report. And it's dated
4  the same as the e-mail from Sergeant Sanders. I'm going to
5  show you what's been marked as Hill 5. Is that your report?
6  A  It appears to be, yes, sir.
7  Q  Is that a complete report? I have every page of your
8  report?
9  A  That's correct.
10 Q  Okay. The report that you have in your file is
11 signed, isn't it?
12 A  It is.
13 Q  And the report I gave you is not signed; is that
14 correct?
15 A  That's correct.
16 Q  Do you know why I would have an unsigned copy of your
17 report?
18 A  No, I don't.
19 Q  Do you release your report?
20 A  It has my badge number on it.
21 Q  Anybody can type that down, right?
22 A  That's correct.
23 Q  But not just anybody can sign your name though, right?
24 A  True.
25 Q  Do you release unsigned reports, meaning you

Page 21

1  personally give them for review before they're signed?
2  A  To my supervisor.
3  Q  Who is your supervisor?
4  A  Shawn Sanders. But he would have received this -- the
5  final copy of the report here is what would have went forward.
6  Q  Do you have an unsigned copy of your report in your
7  file?
8  A  No.
9  Q  Is your report placed in the computer system?
10 A  I do it in the computer, if that's what you're asking.
11 Q  Yeah. Well, I'm going to probably help you out. You
12 have a word processing system that you use to do your reports,
13 correct?
14 A  Correct.
15 Q  Do you save that file?
16 A  I do.
17 Q  And do you place it in a data bank that anybody can
18 access?
19 A  No, I don't.
20 Q  So the report that you prepare is kept to you
21 personally?
22 A  That's correct.
23 Q  And do you have it password protected?
24 A  Yes.
25 Q  And did you give your password to anybody?