## Page 22

1   A  No.
2   Q  Can you explain why I have an unsigned copy of your
3 report?
4   A  Not at this point, no.
5   Q  Can you explain how it could possibly even be gotten
6 in my possession --
7   A  No.
8   Q  -- if you have a signed one and nobody can get to your
9 word processing system?
10   A  No.
11   Q  Can I see your file, your entire file? In your file
12 you have a card here from a person that named Varis K. Babris,
13 New Jersey State Police?
14   A  I recall meeting him, yes.
15   Q  When did you meet him?
16   A  Oh, gees. I don't know.
17   Q  Where in your report do you indicate meeting him?
18   A  It would have been after my report was completed and
19 submitted. And as I recall, he was an investigator assigned by
20 the township who requested a copy of the report, if I'm not
21 mistaken. It was a long time ago, so I can't tell you exactly
22 the date that he would have done that.
23   Q  Was he from the state -- New Jersey State Police?
24   A  He was a retired State Police lieutenant, and he was
25 an investigator of some sort brought back to do --

## Page 23

1   Q  Meet him in Pennsylvania?
2   A  I did.
3   Q  Pennsylvania has a -- has a law about private
4 detectives, don't they?
5   A  I'm sure that they do.
6   Q  Did you check to see if he was licensed in the State
7 of Pennsylvania to conduct investigations?
8   A  I did not.
9   Q  Why not?
10   A  I don't know. I didn't. I just didn't.
11   Q  Is it State Police policy to aide a person to commit a
12 crime?
13   A  Absolutely not.
14   Q  Is it -- are you charged as a duty as a state trooper
15 to enforce the laws of Pennsylvania?
16   A  Yes.
17   Q  Isn't it a crime to act as a private detective when
18 you're not licensed in Pennsylvania?
19   A  If acting in a capacity of a private detective.
20   Q  What was the person that you were meeting acting in,
21 what capacity?
22   A  I don't recall. I mean, it's three years ago. But I
23 recall him coming to the headquarters. We got -- I got a
24 message from my chain of command requesting that a copy of the
25 report be provided. So I provided that report.

## Page 24

1   Q  Who in your chain of command told you to meet with a
2 person and aide them in an investigation who wasn't licensed in
3 the state to be a private investigator?
4   A  I don't recall. I mean, the letter came to Lieutenant
5 Dougherty, but it would have came down through channels to me.
6   Q  Well, here's your complete file. Show me where you
7 were given any assignment to meet with this person.
8   A  My report was already completed.
9   Q  Why were you meeting with somebody then if your
10 investigation was completed?
11   A  Based on this letter.
12   Q  Um-hum. This letter's from a township official asking
13 you to cooperate in their investigation to meet with this
14 investigator, correct, paraphrasing the length of it?
15       MR. HENZES: It's not to him, to Lieutenant whatever
16 his name is on there.
17 BY MR. PURICELLI:
18   Q  Okay. Well, that's true. Asking your superiors to
19 cooperate with their investigation, correct?
20   A  And to deliver the report, yes.
21   Q  Okay. And how many times have you delivered one of
22 your investigation reports from CLEAN to an individual who's
23 working for another person, a private investigator?
24   A  This was the only time I've ever had a request to do
25 that.

## Page 25

1   Q  So this is the only time it was done?
2   A  Well, I can't say that. This is the only time I've
3 ever been requested to do it.
4   Q  That's all you can give me, your information. How
5 many times did you meet with an individual that said he was a
6 private detective and wasn't and gave him copies of a official
7 police report of the State Police?
8   A  I met with this man and gave him a report, as I was
9 supposed to give to him.
10   Q  And who ordered you to give a copy of a State Police
11 CLEAN investigation?
12   A  Whoever passed this on to me. And I assume it was my
13 supervisor, Sergeant Sanders, that gave me this letter.
14   Q  How come you didn't put a note in your report here
15 that showed that you were given an order by a superior to give
16 official State Police reports to a private citizen who's not
17 even licensed in the state?
18   A  I put this request in the file. That's what I put in
19 the file.
20   Q  Would you agree with me there's nowhere in here to
21 verify what you're saying, that you were ordered to give an
22 official police investigation of the State Police to a private
23 citizen?
24   A  I would have to agree with that.
25   Q  Okay. And what rules and regulations are there with

## Page 26

1  the State Police about passing off official State Police
2  reports to private citizens?
3    A  Well, they are supposed to be subpoenaed by law, if
4  it's an official investigative report, criminal investigation.
5  This is a administrative investigation. So --
6    Q  Did you have a subpoena?
7    A  Not as I recall, no, or it would be here.
8    Q  So you have no subpoena, and you have no direct
9  written order from a superior to pass off the record, correct?
10   A  Not a written order, no.
11   Q  And you don't recall a superior giving you the order?
12   A  As I recall, no.
13   Q  In your report, you can look at it, you'll see a fax
14  transmission dated 11/9/06. I'll help you. I think it's in
15  this packet here, to Corporal Hills.
16   A  Um-hum.
17   Q  The date on this transmission is 11/9/06?
18   A  Okay.
19   Q  It's from a Sergeant David Young, Montoursville, to a
20  Corporal Hills?
21   A  It is.
22   Q  The memo is NCIC entry, Officer Christopher Bush,
23  Newtown Police Department?
24   A  Correct.
25   Q  I've accurately described that?

## Page 27

1    A  Yes.
2    Q  Okay. Why is that in your report?
3    A  Corporal Hills was, up until a few days after this
4  date, the audit and misuse unit supervisor. He retired a short
5  time thereafter. I can't recall the exact date, but I think it
6  was right around the beginning of the year.
7    Q  Um-hum.
8    A  And this would have been provided through Sergeant
9  Sanders and come to my desk as the investigator of the misuse.
10   Q  Do you have any documents that says Sanders gave you
11  this?
12   A  No.
13   Q  What else did he give you that you can recall, if you
14  recall him specifically giving you this fax sheet?
15   A  This and the e-mail from -- and he would have e-mailed
16  me this, not given me the hard copy, but this and the e-mail.
17  That's all.
18   Q  Um-hum. What was with the fax transmittal sheet, if
19  anything?
20   A  It would have been Trooper McDermott's report.
21   Q  Do you recall that being the case?
22   A  I recall seeing all this. Exactly when I received it,
23  when I personally received it, I don't recall that.
24   Q  Do you recall?
25   A  It would have been around -- it would have been around

## Page 28

1  the time that Sergeant Sanders actually assigned me to do this
2  misuse investigation.
3    Q  And your e-mail says about February 12th, 13th, 2007?
4    A  That's what the e-mail says. That would be correct.
5    Q  Okay. And there's nothing in your report that you
6  created in this investigation about ever receiving this
7  information; is that true?
8    A  Yes, there is.
9    Q  And who did you get it from?
10   A  In my report I indicate that that was an enclosure to
11  my report.
12   Q  It's an enclosure to your report which means you got
13  it during the course of your investigation?
14   A  Or at the beginning. It's Enclosure 1, so --
15   Q  And your investigation started, again, February 12th
16  or 13th?
17   A  Mine did, that's correct.
18   Q  You spoke with -- you spoke with a detective from
19  Tioga? You have his card in here?
20   A  Right here, the last one, Michael Dasoy?
21   Q  Yes, um-hum.
22   Q  Did he give it to you?
23   A  Did he give me?
24   Q  Those reports?
25   A  He gave me court documents, PFAs, the court custody

## Page 29

1  order, if I recall. And I don't recall him giving this to me,
2  no.
3    Q  Why did you need all of that for whether or not an
4  entry was backed by a report or not?
5    A  Why I did need all what?
6    Q  PFAs and court orders if your investigation was
7  administrative and only whether or not a missing -- or an NCIC
8  entry was backed by a report?
9    A  Well, the background of the investigation was based on
10  the custody of the children and whether or not the father had
11  legal custody. So for me to determine whether there was reason
12  to proceed and whether there was a reason to check NCIC, I
13  obtained all the background documents that I thought were
14  necessary.
15   Q  Just so I understand your investigation. Your
16  investigation was to determine whether or not there was a
17  violation of the CLEAN Administrative Regulation, correct?
18   A  Correct, um-hum.
19   Q  And the CLEAN Administrative Regulation required an
20  entry to be backed by a report that contains the information in
21  the NCIC entry, correct?
22   A  Correct.
23   Q  Why did you need to know whether or not there had
24  existed a PFA for the children that were missing before?
25   A  Well, it was -- it was information from the

### Page 30

1  documentation that I had received, and I verified with the
2  courts that that was, in fact, the case in order to proceed.
3  Q  And part of the information that you had received was
4  the e-mail from Hile, correct, who said that there had been a
5  complaint made against one of their members by the person who
6  made the NCIC entry; isn't that true?
7  A  Say that -- part of the documentation that I received?
8  Q  I'll say it a different way for you. I'll rephrase
9  it.
10 A  Go ahead.
11 Q  The person who made the NCIC entry was Detective Bush?
12 A  Correct.
13 Q  Christopher Bush?
14 A  Okay.
15 Q  And Detective Christopher Bush was identified in your
16 e-mail of your assignment as a person making a complaint
17 against the State Police?
18 A  That's correct.
19 Q  State Police Sergeant Tripp up in the Montoursville
20 area, correct?
21 A  I don't know that it was that specific.
22 Q  Did you ever tell Ignatz that?
23 A  Did I ever tell him?
24 Q  Yeah, that Sergeant Tripp was the subject of the BPR
25 investigation?

### Page 31

1  A  I don't know. I don't recall whether I did or not.
2  Q  Did the two of you discuss it as you were going down
3  the Turnpike to Newtown?
4  A  I'm sure that we did.
5  Q  Why?
6  A  To -- so he had the background on why we were going to
7  Newtown Township.
8  Q  You were going there to find out about an entry, not
9  about a complaint against one of your own members; isn't that
10 true?
11 A  That's correct. An entry, not a complaint.
12 Q  Why was it important to mention that the person that
13 you were going to go look at had made a complaint against a
14 state trooper?
15 A  I don't know that I mentioned it or he read it in here
16 or --
17 Q  Would you be surprised to know he testified that you
18 did, he being Ignatz?
19 A  Well, I very well could have. I don't recall our
20 exact conversation going down the road in a car three years
21 ago.
22 Q  Why would you even be mentioning that you're going
23 down to Newtown to investigate an entry and the person who's
24 making the entry made a complaint against a state trooper?
25 A  I don't know, just conversation.

### Page 32

1  Q  You didn't know that the person who was asking for the
2  investigation by you, Hile, was the person assigned to
3  investigate the trooper who was being accused?
4  A  That's correct, at that point I didn't.
5  Q  It's just a coincidence?
6  A  Yes, sir.
7  Q  In your experience of investigating how many times
8  have you run into such coincidences before, that the person
9  you're going to go investigate is the person making a complaint
10 against a trooper who's being investigated by the person asking
11 you to investigate the complaint?
12 A  Quite honestly I don't care if there's an IAD
13 complaint or not. My goal was to see if the entry overall --
14 the end goal was to see if there was an entry in NCIC that was
15 justified. And after an hour or two or so interview at Newtown
16 Township Police Department these reports magically appeared.
17    And subsequently the letter was sent out by Lieutenant
18 Ignatz saying we found that, you know, your reports were there,
19 the report -- or the entry was justified. And to that extent
20 that was the end of my investigation.
21    I filled out my report, sent it to my supervisor, and
22 that was the extent of it.
23 Q  Until you got ordered by somebody to cooperate with
24 the -- some private investigator?
25 A  Yeah. As I recall, I asked if it was okay for me to

### Page 33

1  give this report to this person. And I was told, yes, go ahead
2  and give the report.
3  Q  But you don't know who it was that told you that?
4  A  I'm just assuming it was Sergeant Sanders, as he would
5  have received the letter from Lieutenant Dougherty I believe it
6  was e-mailed or addressed to.
7  Q  Okay. And you definitely spoke with Young from
8  Montoursville about this?
9  A  I -- I -- I believe I recall speaking to him three
10 years ago.
11 Q  And you never spoke to Hile?
12 A  No, I don't believe I did.
13 Q  Do you recall speaking to anybody that you can tell me
14 about that doesn't appear in your report?
15 A  Not that I recall. I mean, I remember Detective
16 Dasoy.
17 Q  From Tioga?
18 A  I think he's a detective, yeah.
19 Q  Um-hum. Can you tell me why you don't have Young
20 mentioned in your report?
21 A  No.
22 Q  You testified in a arbitration matter, in a hearing
23 that was a arbitration?
24 A  I did? No.
25 Q  Did you?

Page 34

1 A No. For him?
2 Q For him, yeah. Did you know he got fired?
3 A I did know after the fact. I think Lieutenant Ignatz
4 might have been there. Somebody from PSP was there. I think
5 it was Lieutenant Ignatz. But I was not involved in that.
6 Q After -- after --
7 A As a matter of fact, after this report and after my
8 interview with Detective Bush and turning in a report, aside
9 from Lieutenant Ignatz indicating to me that he was going to a
10 hearing, that was the end of my involvement with this until --
11 until this --
12 Q Prior to --
13 A -- hearing today.
14 Q Prior to the date you went down to Newtown with
15 Lieutenant Ignatz how many times did a lieutenant accompany you
16 to any outside investigation?
17 A None.
18 Q So this was the first time?
19 A This was the first time.
20 Q Since that time how many times has a lieutenant
21 accompanied you?
22 A None. It was an opportunity. I was on my way, and I
23 walked by his office. And I said, are you doing anything
24 today, Lieutenant? And he said no, I don't think so. I said,
25 well, I'm riding down to Newtown Township. Do you want to go

Page 35

1 along? And he said sure.
2 Q How many times have you invited him before that?
3 A He was new.
4 Q Okay. Since he was new, how many times have you
5 invited him to ride along with you?
6 A I hadn't had another misuse after this until he --
7 after he had left.
8 Q What about any of the investigation? You've had other
9 investigations since this time, right?
10 A Yeah.
11 Q Have you ever invited him to go with you on those
12 investigations?
13 A No. But I invited the new sergeant to go along with
14 us after Sanders -- after Sergeant Sanders. He left, I'm not
15 sure how long ago. But he transferred out, and we just got a
16 new sergeant, and the door's open.
17 Q When you went to Newtown Township they did produce to
18 you a police -- the police report we showed to you right,
19 Ignatz 2?
20 A Yes, after -- yes, after.
21 Q Did that end the conversation you had with either
22 Detective Bush or the chief?
23 A Concerning this matter? If it didn't end the
24 conversation, it was almost the end of the conversation, yeah.
25 Q Okay. Is there any reason you couldn't have just

Page 36

1 picked up the phone and asked him to send you a copy -- send to
2 you by fax or something a copy of the report showing the
3 information in the NCIC entry?
4 A No. Normally we do investigations in person though.
5 Q All of them?
6 A Yes.
7 Q You've never done any by picking up the phone and say
8 just send us a copy of the report?
9 A And not showing up?
10 Q Yeah.
11 A And talking to the person who made the complaint or
12 the target? No.
13 Q Okay. Well, in this case did you talk to the person?
14 Did you go out and have a physical contact with the person who
15 made the complaint about this entry being wrong?
16 A About whether or not there was an entry?
17 Q You just --
18 A I don't know where the initial complaint came from,
19 somewhere from up in Mansfield. And I know Detective Bush at
20 some point in time made an IAD complaint. I received the
21 documentation. I followed up on the documentation. I went and
22 interviewed Detective Bush in the presence of Chief Duffy at
23 the time and asked him to provide the report so that I could
24 see it.
25 Q Have you ever been told that a person -- ever been

Page 37

1 taught in the State Police that a person has a First Amendment
2 right to make a complaint against a police officer, including a
3 trooper?
4 A Absolutely.
5 Q Okay. And are you aware that you can't retaliate, not
6 you personally, but a person cannot be retaliated against?
7 A Absolutely.
8 Q Okay. So when you found out that the person that you
9 were going to go look into about making an entry had already
10 made a complaint against a state trooper, it didn't dawn on you
11 that you might be engaged in retaliatory conduct by doing this
12 investigation?
13 A No.
14 Q Never dawned on your mind?
15 A No.
16 Q But you did know that it was illegal?
17 A To retaliate?
18 Q To retaliate against a person?
19 A Absolutely. And my investigation was not retaliatory.
20 Q You never thought that somebody was using you as a
21 pawn?
22 A No.
23 Q Did you ever find out who made the complaint that you
24 were now investigating?
25 A Sergeant -- I believe Sergeant Young is where the --

Page 38

1 Sergeant Young to Sergeant Sanders, if I recall correctly.
2  Q  Well, the e-mail says Hile?
3  A  Okay. Hile.
4  Q  Did you talk to Hile?
5  A  I didn't talk to Hile.
6  Q  Did you call --
7  A  My investigation was completely separate from the IAD
8 investigation.
9  Q  I'm not talking about that.
10 A  Did I talk to Hile? No.
11 Q  Okay. And it's your testimony you didn't know Hile
12 was assigned to do the investigation against Tripp?
13 A  No, I did not.
14 Q  But you knew that there was a investigation?
15 A  I knew there was an investigation.
16 Q  Against Tripp?
17 A  Because it indicated in the e-mail.
18 Q  Um-hum. And you knew at that point also that someone
19 couldn't be retaliated for making that mistake, for making that
20 complaint?
21 A  That's correct. You know --
22 Q  And when you got to the point --
23 A  -- if there's a police officer that does something
24 wrong and an IAD complaint is filed, you know, that's okay, and
25 I would expect that. And I would expect that if they did

Page 39

1 something wrong in Montoursville or Mansfield and a person,
2 Detective Bush, had the grounds to file an IAD complaint, by
3 all means that's his right to do that free from retaliation.
4      That's why my administrative investigation had nothing
5 to do with the IAD investigation. I was just concerned with
6 whether or not he made the entry.
7  Q  If it had nothing to do with it, Corporal, why was it
8 specifically mentioned in the e-mail sent to you as your
9 assignment to investigate?
10 A  My assignment was to investigate whether or not
11 Detective Bush misused the system by putting his -- his
12 brother's children into NCIC and whether or not there was a
13 report to justify him doing so. That was my role.
14     MR. PURICELLI: Okay.
15     (Discussion held off the record.)
16 BY MR. PURICELLI:
17 Q  All right. Corporal, it's your testimony that you
18 were only interested in the administrative end, whether there
19 was or wasn't a report?
20 A  That's correct.
21 Q  To verify that. Did you ask when you were in front of
22 Duffy and Bush about an order, whether an order was or wasn't
23 fraudulently obtained?
24 A  I may have, because that was part of the pack -- I'm
25 sure that I did, yes.

Page 40

1  Q  What --
2  A  Because that's part of my report.
3  Q  Can you tell me what part of the CLEAN Administration
4 Act will be violated -- for you to have an administrative
5 violation of whether the brother of the person making the entry
6 obtained an order properly or improperly?
7  A  It was part of the packet that Detective Dasoy sent to
8 me. There was allegations that the court order obtained was
9 obtained fraudulently, which would mean, in turn, that the
10 entry should not have been made.
11 Q  Entry was allowed if there was information to
12 correlate with the entry, correct?
13 A  And it turned out that there was.
14 Q  There's no rule under the CLEAN Administration Act
15 about an order being valid or not, is there?
16 A  About a court order?
17 Q  Yes. On custody?
18 A  No, no.
19 Q  Why were you asking about it?
20 A  Because it was part of the information that I received
21 in my investigation.
22 Q  You weren't investigating whether an order was valid
23 or not, were you?
24 A  No.
25 Q  You weren't investigating whether an order was

Page 41

1 obtained fraudulently or not, were you?
2  A  At that point in time, no.
3  Q  So how was it --
4  A  It just came out in my investigation.
5  Q  As did the complaint against the state trooper too?
6  A  Yes.
7  Q  And you say that that had nothing to do with your
8 investigation, correct?
9  A  What had nothing to do with my investigation?
10 Q  The fact that the complaining party from Montoursville
11 was the subject of a BPR complaint that was made by the very
12 person you're going down to question?
13 A  All I was asked to do was to -- to obtain enough
14 information in my investigation to determine whether or not
15 this police department, this agency with their ORI and this
16 detective, had the authorization and the supporting
17 documentation to actually make an NCIC entry. That was my --
18 that was my responsibility.
19     That's exactly what I did. And once that information
20 was provided to me, it's reported here, I find no violations of
21 CLEAN Criminal Justice Services Policy.
22 Q  So you would have had no reason then to be asking
23 Duffy or Officer Bush about jurisdictional issues?
24 A  Jurisdiction came up in my mind because obviously this
25 appeared to be of a personal nature to me.

### Page 42

1 Q Okay. I'm going to get to that in a second.
2 A Okay.
3 Q Is there anything in the N -- in the CLEAN
4 Administration Act that talked about jurisdiction that you were
5 supposed to investigate?
6 A No.
7 Q Was there anything in the CLEAN Administration Policy
8 that talked about whether an officer who made the entry had a
9 personal involvement in it or not?
10 A It does indicate in the CLEAN Administrative
11 Regulation that the system is not to be used for a personal
12 nature.
13 Q Okay. It wasn't his children, correct?
14 A That's correct.
15 Q And did you investigate to find out whether or not the
16 officer who made the entry had cleared it with his superiors to
17 make the entry?
18 A Yes. I asked -- I don't know if I asked the pointed
19 question, but it came out from Chief Duffy that he gave the
20 authorization for Detective Bush to actually make that entry.
21 Q And your investigation is to collect the facts, not
22 render opinions; is that true?
23 A Yes.
24 Q Did you render an opinion to Chief Duffy that he
25 shouldn't allow Detective Bush to make the entry, and that

### Page 43

1 Detective Bush should have stepped to the side and another
2 police officer in the department made the entry?
3 A Yes.
4 Q What would have been the difference?
5 A The personal involvement, the personal reasons for
6 doing this.
7 Q The information was properly admitted, correct?
8 A Yeah. After all -- after everything was already done,
9 the reports showed up out of Chief Duffy's drawer.
10 Q What evidence do you have that that report wasn't
11 created on the date that it indicated it was created? What
12 evidence do you have?
13 A Which report?
14 Q The --
15 A The Newtown Township report?
16 Q Right. What evidence do you have?
17 A I don't have any evidence of that.
18 Q Do you always make accusations that you don't think
19 the report is prepared on the date that it indicates and was
20 made up for you to come down and look at so that you could see
21 there's no violation? Are you alleging that is what happened?
22 A No, I don't believe I was.
23 Q So why do you say it magically showed up?
24 A I asked for the report at the beginning of the
25 interview.

### Page 44

1 Q Did you ask for a missing person's report?
2    MR. HENZES: He didn't answer your question. Let him
3 answer your question. Answer the first one.
4 BY MR. PURICELLI:
5 Q Okay.
6 A I asked for the report that the department would have
7 filed to justify the NCIC entries that were made by Newtown
8 Township Police Department, and for the next hour we got beat
9 up about being there for retaliation purposes and some other
10 stuff.
11    Detective Bush made comments like, you know I don't
12 have a report. Why are you even asking? And then all of a
13 sudden Chief Duffy reaches down and opened up his drawer and
14 pulls this report out at the end of the interview.
15 Q Could you turn to the last page, details, your signed
16 report?
17 A Sure.
18 Q Um-hum. Second paragraph down.
19 A I'm sorry, last page?
20 Q Um-hum. Fourth line down, all the way at the end
21 after the capital Bush. Do you see it?
22 A Tell me again, fourth line down.
23 Q And then there's a period, okay. What do you type
24 Detective Bush -- or what was asked? That is you that's the I,
25 right?

### Page 45

1 A Make sure we're on the same line there. I asked
2 Detective Bush for a copy of his missing person report that he
3 filed in conjunction with the NCIC entries that he made.
4 Q Asked for specifically a missing child's report,
5 didn't you? You typed this, didn't you?
6 A I said a missing person's report.
7 Q Okay. Missing person's report. So you asked for a
8 particular type of report, didn't you?
9 A That he filed in conjunction with the NCIC entries
10 that he made.
11 Q So you --
12 A Whether he titled it missing persons, whether he
13 titled it incident report, incident investigation, I asked for
14 the report that he filed in conjunction with the entries that
15 he made, period.
16 Q All right. So when he -- when you type the following
17 sentence, you put in quotations, did you record that? Did you
18 have a recorder to record his statement?
19 A Audio recording, no, I did not.
20 Q Did you write it as he was talking?
21 A I wrote notes, yes, I did.
22 Q Where are your notes?
23 A I don't have them anymore. I would have transcribed
24 them on to the report.
25 Q So you destroyed your notes?