Case 2:07-cv-04936-MAM   Document 53   Filed 10/01/10   Page 1 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2                      for the
 3            EASTERN DISTRICT OF VIRGINIA
 4
 5
 6
 7   CHRISTPHER BUSH AND DAVID BUSH
 8   ─────Plaintiff──────────────────────
 9
10       v.           Civil Action No. 07-4926
11
12   S.C. ADAMS, ET AL.
13   ─────Defendants─────────────────────
14
15
16       Deposition of SERGEANT SEAN ADAMS, taken at the
17   instance of the Plaintiff, before Mary E. Aliff,
18   Court Reporter and Notary Public for the State of
19   Virginia at Large on May 20, 2010 commencing at
20   10:00 a.m. at the offices of the City of Richmond
21   City Attorney, 900 E. Broad Street, Richmond,
22   Virginia, pursuant to Rule 4:5 of the Supreme Court
23   Rules of Virginia, pursuant to notice.
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3       Mr. Brian Puricelli, Esq.
         Law Offices of Brian Puricelli
 4       691 Washington Crossing Road
         Newtown, PA  18904
 5
 6            on behalf of Plaintiff;
 7
 8       Mr. Nicholas Simopoulos, Esq.
         Office of the City Attorney
 9       900 East Board Street
         Richmond, Virginia  23219
10
11            on behalf of Defendant.
12
13
14            I N D E X
15
16   DIRECT EXAMINATION
       By Plaintiff      pages   4 - 139
17
18   No Cross Examination
19
20   Exhibit No. 1        page        19
     Adams Police File
21
     Exhibit No. 2        page        19
22   Warrants
23
24   Eratta             pages   141 - 144
25
```

Page 3

```
 1            SERGEANT SEAN ADAMS
 2   Being called as a witness by and on behalf of the
 3   Plaintiff, being first duly sworn, as hereinafter
 4   certified, was examined and testified as follows:
 5       MR. PURICELLI:  My name is Brian Puricelli
 6   here for a witness deposition in regards to an
 7   action up in Pennsylvania against the
 8   Pennsylvania State Police.  I'm going to ask
 9   you a series of questions.  If I ask you a
10   question you're not fully able to understand,
11   please tell me.  I'll try to rephrase it.
12       MR. PURICELLI:  Do we have the usual
13   stipulation?
14       MR. SIMOPOULOS:  What stipulation is that?
15       MR. PURICELLI:  The usual stipulation is
16   if I ask a question other than a privileged
17   question or the form of the question and he
18   doesn't understand, he'll answer the question
19   that I ask and any objections are preserved and
20   reserved for trial.
21       MR. SIMOPOULOS:  That's okay.
22       MR. PURICELLI:  All right.
23       You have the right to read and sign,
24   meaning before the court stenographer releases
25   the official version she can send it to you if
```

Page 4

```
 1   you're going to be purchasing a copy and not go
 2   to her.  And he can review to do any
 3   corrections.  Now, the corrections wouldn't be
 4   to change the answer.  The correction would be
 5   if you meant to say "where" and "when" is there
 6   you would say, no.  I meant to say "where" not
 7   "when."  Things like that.
 8       So he'll read and sign?
 9       MR. SIMOPOULOS:  Yes.
10       MR. PURICELLI:  Okay.
11            DIRECT EXAMINATION
12   BY MR. PURICELLI:
13   Q   Sir, my name is Brian Puricelli.  I
14   represent the plaintiff.  Could you identify
15   yourself for the record, please.
16   A   My name is Sean Adams.
17   Q   Mr. Adams, you are a Richmond City Police
18   Officer?
19   A   Yes, sir; I am.
20   Q   When did you start working for the
21   Richmond City Police Department?
22   A   January 1994.
23   Q   What was the hiring process to become a
24   police officer in the city?
25   A   The hiring process involved an application
```

Case 2:07-cv-04936-MAM   Document 53   Filed 10/01/10   Page 2 of 6

Deposition of Sergeant Sean Adams                              Christpher Bush & David Bush V S.C Adams, et al.

Page 5

1  on my part, and we had to have a written test,
2  physical test, background interview and a
3  conditional offer of employment and then offer of
4  acceptance of actual employment.
5      Q   Okay. And I assume, correct me if I'm
6  wrong, you went through that process, passed it and
7  have been an officer since January 1994?
8      A   Yes.
9      Q   Okay. When you became an officer was
10 there any training provided to you?
11     A   Yes, there was.
12     Q   What was that training?
13     A   It was approximately an eight-month basic
14 police academy. I believe it was 34 weeks actually.
15 Involved reviewing the law in the State of Virginia,
16 training in defensive tactics, driving techniques,
17 restraint of prisoners, a myriad of topics involving
18 law enforcement.
19     Q   Okay. Does the Commonwealth of Virginia
20 require a mandatory update of training?
21     A   Yes, sir; they do.
22     Q   What would that training requirement be?
23     A   40 hours of in-service every two years.
24     Q   Prior to becoming a police officer for the
25 city had you worked for any other police

Page 6

1  departments?
2      A   No, sir; I haven't.
3      Q   Had you received any types of training to
4  be a police officer?
5      A   No, sir; I didn't.
6      Q   Have you had any military experience as a
7  police officer?
8      A   No, sir.
9      Q   Okay. Did any of your training that you
10 received to be a police officer since starting to
11 present date involve anything with federal law?
12     A   I received some training through other
13 outside training opportunities. I can't exactly
14 enumerate what those are but a lot of drug training
15 can be applied federally, fire arms.
16         MR. SIMOPOULOS: Maybe specify what you
17     mean.
18         MR. PURICELLI: Yes. Noncriminal.
19         MR. SIMOPOULOS: Specify federally.
20         MR. PURICELLI: Sure.
21 BY MR. PURICELLI:
22     Q   Civil rights or constitutional rights.
23     A   On occasion during the legal update which
24 is part of in-service we're trained in terms of
25 violation of civil rights, civil liberties.

Page 7

1      Q   Okay. Can you give me a general idea of
2  your understanding of that training.
3      A   As a supervisor I'm trained as far as what
4  the pitfalls may be in terms of failure to supervise
5  employees and failure to train individuals so they
6  know the right things to do. That's basically it.
7  It's just anything that may occur under what they
8  call a 1983 Violation.
9      Q   Have you received any formalized training
10 in the course of civil rights that deal with family
11 relations and rights of family relations?
12     A   I'm not sure what you're asking.
13     Q   Sure. A right of a parent to be with his
14 child, the right of a parent to petition or use the
15 courts to obtain custody of a child or visitation
16 rights?
17     A   At the federal level I don't believe I've
18 received any training in reference to that.
19     Q   At any kind of level? You say federal
20 level. I don't know if Virginia provides any?
21     A   Definitely. Virginia State Law is what
22 we're trained on in terms of who has rights to
23 custody, interpreting orders of the court, petitions
24 of the court, juvenile domestic relations.
25     Q   Okay. Give me the extent of the training

Page 8

1  as best you recall it.
2      A   It's pretty straightforward in the State
3  of Virginia. Absent a court order as long as the
4  arrangement between two individuals that are still
5  married, individuals each have equal right to
6  custody of the children. Anything outside of that
7  is usually decreed by the Court, delineated in the
8  order of divorce, something along those lines.
9  There are also petitions that are reviewed and
10 either granted or not granted by the Court that give
11 temporary custody to parents of the children or a
12 third party.
13     Q   How does Virginia Law as you've been
14 trained deal with persons who have left one's state
15 and relocated to Virginia without having a custody
16 order and the other natural parent shows up --
17         MR. SIMOPOULOS: Objection to form.
18 BY MR. PURICELLI:
19     Q   Do you understand the question?
20     A   I'm sorry. One more time.
21     Q   No problem. The training you received in
22 this domestic law, based on your training what's
23 your understanding of the process that should be
24 done where one parent, say the female, the mother,
25 relocates to Virginia say from Pennsylvania without

Case 2:07-cv-04936-MAM   Document 53   Filed 10/01/10   Page 3 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 9

1  a custody order, and the other natural parent, the
2  father, comes to Virginia and wishes to see his
3  children or even have custody of his children?  How
4  do the police handle that situation?
5          MR. SIMOPOULOS:  Objection to form.
6          THE WITNESS:  Are you talking about
7      divorced parents?
8  BY MR. PURICELLI:
9      Q    Divorced but no custody order?
10     A    Divorced but no custody order.  Seems to
11 be logical that whoever has custody of the child or
12 would have been given custody by the previous court,
13 that would prevail.
14     Q    Okay.  And if there is no custody order
15 from the courts but there is a divorce?
16     A    If there is no custody order?  Then I'm
17 not exactly certain.  I would have to receive some
18 advice about that.
19     Q    Okay.  Do you recall any type of training
20 in that type of scenario?
21     A    Not at this time I don't.
22     Q    Okay.  Who would you talk to to obtain
23 that type of advice to find out how you should
24 proceed as a police officer in that scenario?
25     A    I'd consult the Commonwealth's Attorney's

Page 10

1  Office.
2      Q    Are you familiar with the facts that bring
3  you to be deposed today?
4      A    As best I recall them, yes.
5      Q    Okay.  I'll give you some facts, and if
6  they're not in sync with what you believe the facts
7  are, tell me.  And we'll see what you know are the
8  facts, and we'll try to operate on the facts as you
9  know them.
10         Mr. Bush, who is to my right,
11 directly across from you, is the natural father of
12 several children known as the Bush children.  His
13 wife, Serene, and he divorced but have no custody
14 order.  Serene then left the Commonwealth of
15 Pennsylvania without a court order allowing her to
16 remove the children from the Commonwealth of
17 Pennsylvania to relocate with the children, and she
18 does not have a court order.
19         MR. SIMOPOULOS:  Objection.  Is there a
20     question?
21         MR. PURICELLI:  Yes.  I'm giving him
22     facts.
23         MR. SIMOPOULOS:  I object to reading facts
24     into the record as a deposition is questions
25     and answers.

Page 11

1          MR. PURICELLI:  Okay.
2  BY MR. PURICELLI:
3      Q    So she relocates to Virginia with the
4  children.  He's looking for his children, finds them
5  after a period of time looking for them.  Are those
6  the facts as you understand that bring you to be
7  brought into this deposition?
8          MR. SIMOPOULOS:  Objection to form.
9          THE WITNESS:  I'm not sure I understand
10     what you just asked.
11 BY MR. PURICELLI:
12     Q    Well, I gave you a series of facts that
13 brings the lawsuit that's in Pennsylvania.  To a
14 basic degree those are the facts.  You said you're
15 familiar with the facts.  I want to know if those
16 are the facts that you're familiar with?  If they're
17 not, tell me the facts that you're familiar with.
18         MR. SIMOPOULOS:  Again, objection to form.
19     If there's a question as to a specific fact
20     then I would appreciate that we proceed in that
21     manner if it's possible.
22         MR. PURICELLI:  It's not possible with
23     this type of question.  Because the question
24     I'm going to ask him about consulting has to do
25     with the facts that he has.  I'm going to --

Page 12

1          MR. SIMOPOULOS:  Compound question.
2      Objection to form.
3          MR. PURICELLI:  That's reserved for trial.
4          THE WITNESS:  The facts as I know them
5      were that I was contacted by a police officer
6      in Pennsylvania about an individual who is
7      living in Virginia in the City of Richmond with
8      three children who was divorced from David Bush
9      who had a court order from Pennsylvania to have
10     custody of the children.  I was also advised by
11     this detective that the person that was living
12     in Richmond, Virginia with three children of
13     David Bush had changed their names and changed
14     their social security numbers and was living in
15     hiding unlawfully presumably from David Bush.
16     And that there was a valid court order which
17     would return custody to Mr. Bush.
18 BY MR. PURICELLI:
19     Q    Okay.  Now, are those the facts as you
20 recall them today?
21     A    Those are the facts as I recall them.
22     Q    Okay.  And when you say that she had a
23 valid court order are you certain of that fact?
24     A    I didn't say she had a valid court order.
25     Q    All right.  Well, you said the detective

Case 2:07-cv-04936-MAM  Document 53  Filed 10/01/10  Page 4 of 6

Deposition of Sergeant Sean Adams                         Christpher Bush & David Bush V S.C Adams, et al.

Page 13

1  from Pennsylvania told you the person who relocated
2  to the City of Richmond had a valid court order.
3     A   No. That Mr. Bush had a valid court
4  order.
5     Q   Okay. So is it your understanding that
6  the person who was in Richmond with the three
7  children did not have a valid court order, custody
8  order?
9     A   That was unclear at the time whether they
10 had actual possession of the children. But it was
11 determined or inferred that he had the legal right
12 to have physical custody of the children.
13    Q   Okay. And based on those facts did you
14 receive any type of training as a police officer in
15 Virginia that would allow you to then know exactly
16 what you should or shouldn't be doing as a police
17 officer?
18    A   Yes. Based upon that set of circumstances
19 the Commonwealth Attorney's Office was consulted and
20 the decision --
21    Q   Who did you speak with there?
22    A   I didn't speak with anyone there. My
23 detective spoke to a representative of the
24 Commonwealth Attorney's Office who spoke with an
25 Assistant Commonwealth's Attorney.

Page 14

1     Q   Were you informed by this detective of
2  that conversation?
3     A   Yes.
4     Q   Do you recall who that detective is, the
5  name of the detective?
6     A   The detective's name is Joel Lawson.
7     Q   He is with the City of Richmond Police
8  Department?
9     A   He's since retired.
10    Q   He's retired now?
11    A   Yes.
12    Q   At the time he was?
13    A   Yes. He was one of my detectives in the
14 unit.
15    Q   Is there a reason he was assigned to this
16 case or just making the phone call?
17    A   He was available when the initial call
18 came in. I assigned him the case.
19    Q   So you were supervising his activities?
20    A   Yes.
21    Q   All right. Did Joel Lawson take the
22 actual call and receive the assignment from you
23 directly, or how did he actually start
24 investigating?
25    A   I told Detective Lawson that I received a

Page 15

1  call from a detective in Pennsylvania, and that he
2  was going to call back at a later date. I believe
3  the initial call date was October 11th. I had
4  either advised Joel Lawson that he would be calling
5  back, or I had given him the phone number for the
6  detective in Pennsylvania and advised him to call.
7  But I put them into contact with each other at that
8  point.
9     Q   Did you take any active part in the
10 investigation, or did you just merely supervise it?
11    A   No. I had to take an active part in the
12 investigation.
13    Q   When did you take an active part?
14    A   I'm not sure of the exact date, but it was
15 when Detective Lawson became ill and was out of
16 work.
17    Q   At the time Detective Lawson became ill
18 had any action been taken by the Richmond City
19 Police Department to recover the Bush children?
20    A   To recover from the former Ms. Bush?
21    Q   Yes.
22    A   Yes, sir. He was involved in
23 orchestrating that recovering of the children. And
24 there was another detective involved. And then the
25 children were turned over to the custody of

Page 16

1  Mr. Bush.
2     Q   Okay. Was it after that activity that you
3  then took over?
4     A   My involvement was subsequent to that,
5  yes.
6     Q   Okay. Prior to Detective Lawson becoming
7  ill did you instruct him in any way on how to
8  proceed?
9     A   I recall us talking about the case, the
10 facts of the case. I don't recall at this time
11 instructing him in what to do on the case.
12    Q   Did he keep you informed as to what his
13 activities were and his actions were?
14    A   I believe so.
15    Q   Did he prepare any types of reports?
16    A   Yes, he did.
17    Q   Did you bring those reports today?
18    A   I brought part of -- (reviews documents)
19 let's see. I know that he produced these three
20 pages right (indicates) here. And there may be some
21 more administrative paperwork that he did which just
22 would have involved either entry or removal of the
23 names of the children into NCIC.
24    Q   Okay. Can you look at my three pages.
25 And your attorney can look at them. There's no

Case 2:07-cv-04936-MAM   Document 53   Filed 10/01/10   Page 5 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 17

1  secret. They've been marked already. Tell me if
2  those are true and correct copies of what you're
3  showing to me as your pages.
4      A   (Reviews documents.) Those are the pages
5  I was referring to.
6      Q   Okay. For the purposes of the record I'm
7  showing what's been marked as Tripp 4, a three-page
8  document and Lawson's notes in the upper right hand
9  corner marked on January 7, 2010 in the deposition
10 of Sergeant Tripp with the Pennsylvania State
11 Police.
12     MR. SIMOPOULOS: Can I see that? January
13 7, 2010?
14     MR. PURICELLI: That's the date we marked
15 them.
16     MR. SIMOPOULOS: Okay.
17 BY MR. PURICELLI:
18     Q   Aside from these three pages you indicate
19 there's other documents that make up the official
20 record of Lawson's activities?
21     A   I said there may be, sir. And that would
22 involve teletypes or something along the lines that
23 I previously mentioned. I'll double check and see
24 if it's here in the file.
25     Q   Please do.

Page 18

1      A   (Reviews documents.) Looks like there's a
2  fax here if you're interested in seeing that.
3      Q   Sure. You can show it to your attorney
4  first. Make sure there's nothing in there
5  privileged.
6      MR. SIMOPOULOS: (Reviews document.)
7      THE WITNESS: Yes. This is his writing.
8  This is just probably a fax or entries he made.
9      MR. SIMOPOULOS: I've seen all that stuff.
10     THE WITNESS: (Documents proffered.)
11     MR. PURICELLI: (Reviews documents.) Can
12 you make a copy of those and I can return what
13 goes back to him?
14     MR. SIMOPOULOS: Sure. Off the record.
15         (Proceedings temporarily off the
16         record after which time the
17         following resumed on the
18         record.)
19 BY MR. PURICELLI:
20     Q   All right. I'm going to have marked 13
21 pages that we received from Sergeant Adams that
22 exist in his file. In addition to that in his file
23 would be the three-pages notes of Lawson previously
24 marked and identified on this record as Tripp 4.
25 And I know there are probably warrants that we have.

Page 19

1  We'll mark this as Adams 1.
2         (The aforementioned documents
3         were marked for purposes of
4         identification as Deposition
5         Exhibit No. 1.)
6      MR. PURICELLI: Is that acceptable?
7      MR. SIMOPOULOS: That's fine. For the
8  purposes of the deposition?
9      MR. PURICELLI: Yes. And just to finish
10 the file out, I want to show you what we'll
11 have marked Adams 2.
12        (The aforementioned documents
13        were marked for purposes of
14        identification as Deposition
15        Exhibit No. 2.)
16 BY MR. PURICELLI:
17     Q   Sergeant, what I've shown you is Adams 2
18 which are the documents I have which appear to be a
19 four-page document consisting of two felony
20 warrants. And I'm assuming, and correct me if I'm
21 wrong, you have these copies in your file as part of
22 your file?
23     A   They're part of my file. There's more
24 warrants on file.
25     Q   Okay. And that was going to be my next

Page 20

1  question. Are there any other documents that would
2  consist of your file that we have not marked?
3      MR. SIMOPOULOS: Of course, you can review
4  these documents to make sure those are the same
5  as what you have.
6      THE WITNESS: (Reviews documents.) This
7  is for two of the three children.
8  BY MR. PURICELLI:
9      Q   There would be another one for the other
10 child?
11     A   Yes, sir.
12     Q   Would it be substantially the same form as
13 that one?
14     A   Yes, sir.
15     Q   Would there be any differences between the
16 last child that's not indicated in these two
17 warrants?
18     A   Other than the name and the IDR Number
19 probably not much else.
20     Q   All right. Aside from the missing warrant
21 for the one child which we can determine -- I don't
22 think it's necessary unless your attorney says
23 otherwise -- is there any other document that I
24 haven't shown you or that we haven't copied?
25     A   I have an awfully big file. I have to see

Case 2:07-cv-04936-MAM   Document 53   Filed 10/01/10   Page 6 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 21

1  all the documents that you have and compare them and
2  let me be certain of that.
3     Q   Well, I've shown you what I have.
4     A   Just with respect to the ones?
5     Q   Well, with respect to your file?
6        MR. SIMOPOULOS: Are you asking for a copy
7  of the file?
8        MR. PURICELLI: Yes. But I don't need to
9  see copies of things we already have.
10       THE WITNESS: Without looking at it I
11 can't be certain.
12       MR. PURICELLI: All right. Why don't you
13 look through your file for a few minutes here,
14 and see if there are other documents. If there
15 are pull them aside.
16       MR. SIMOPOULOS: Just so we're clear. Are
17 there other documents besides Adams 2?
18       MR. PURICELLI: We know there's another
19 warrant. I know there's probably a warrant for
20 that child floating around. But there has been
21 a change on the name as I understand it so
22 there's no sense making a copy.
23       THE WITNESS: You want me to go through
24 my file and see if you have a copy of it?
25

Page 22

1  BY MR. PURICELLI:
2     Q   I'm giving you everything that I have
3  basically that I can think of that is part of your
4  file that I've been able to put together in this
5  suit so far.
6     A   Okay.
7     Q   I'm asking you to look at the documents
8  we've looked at already, including Lawson's notes,
9  the warrants, and the ones that your attorney has
10 been gracious enough to copy for us and see if there
11 are others. And we'll look at them, and I'll tell
12 you if I have them or not. If not, I'll ask for
13 copies. So we'll go off the record for a few
14 minutes.
15           (Proceedings temporarily off the
16           record after which time the
17           following resumed on the
18           record.)
19 BY MR. PURICELLI:
20    Q   All right. We've gone through your police
21 file for the Bush matter, I'll refer to it as.
22    A   Yes, sir.
23    Q   Okay. And we've identified for the
24 purposes of this deposition documents that I don't
25 have and various documents that I do have that are

Page 23

1  part of your file; correct? Off the record.
2     A   Yes, sir.
3     Q   And you've provided me with copies of the
4  police report, clearances, warrants and identifying
5  various court filings in matters that are contained
6  and make up your file; correct?
7     A   Everything that you said that you didn't
8  have that I do have you now either have copies or
9  they're being made for you right now.
10    Q   Okay. When the call came in you indicated
11 that you talked to a Pennsylvania Detective. Do you
12 recall who that was?
13    A   He identified himself as Chris Bush.
14    Q   Did you create a report in regards to that
15 communication?
16    A   No, sir. I just made note of it probably
17 on my daily pad where I write stuff down.
18    Q   And when we went through your file was
19 that note within your file?
20    A   No, sir. I tried to locate that
21 previously and was unsuccessful.
22    Q   Okay. Do you recall what was contained on
23 the note other than what you've already testified as
24 to what transpired during that communication?
25    A   Nothing other than what I testified to.

Page 24

1     Q   Okay. Subsequently after taking the
2  information is that when you then assigned the job,
3  as they say on the street, to Lawson?
4     A   I passed the assignment off to him, yes.
5     Q   Okay. Now, the particular facts that were
6  described to you as you understand them are the
7  types of facts that are common in your experience as
8  a police officer?
9     A   I wouldn't characterize them as terribly
10 common, no.
11    Q   Okay. Were they facts that you had come
12 across before in your employment as a police
13 officer?
14    A   I really can't say. I mean, I haven't had
15 it where children's names and social security
16 numbers were changed before and they've left another
17 state. I can't say that I had had that experience
18 before. But I'm not saying that I didn't. It just
19 didn't leap to mind.
20    Q   Okay. And as a result you indicated you
21 contacted somebody in the City Attorney's Office?
22    A   I didn't contact somebody in the City
23 Attorney's Office.
24    Q   Lawson did?
25    A   That's something I don't recall and I