Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 1 of 6

Deposition of Sergeant Sean Adams                                   Christpher Bush & David Bush V S.C Adams, et al.

Page 25

1  didn't do but.
2      MR. SIMOPOULOS: He said Commonwealth's
3  Attorney but.
4      MR. PURICELLI: Sorry. Commonwealth's
5  Attorney.
6  BY MR. PURICELLI:
7    Q   Who was it that called the Commonwealth's
8  Attorney?
9    A   I believe it was Detective Lawson.
10   Q   And you weren't present for that
11 communication?
12   A   I don't believe so, sir. I don't recall.
13   Q   Do you recall if Lawson made a phone call,
14 teletype, letter or how he communicated?
15   A   I believe it was a phone call.
16   Q   Do you recall anything of what Lawson may
17 have represented of what he told the Commonwealth's
18 Attorney?
19   A   I don't recall being privy to that
20 conversation or the content of it. Just the notes
21 that he made about it that I was able to review.
22   Q   Aside from the written notes that we have
23 you don't recall anything else him specifically
24 saying or left on the field notes?
25   A   I don't recall, sir.

Page 26

1    Q   As a result of his communication with the
2  Commonwealth's Attorney did he come back and report
3  to you what he had been instructed or advised?
4    A   I believe we spoke about it. He indicated
5  that he had consulted juvenile court, and that it
6  appeared to be a valid order from Pennsylvania.
7    Q   And what unit were you working?
8    A   Youth and Family Crimes Team.
9    Q   And what is that unit?
10   A   You're asking me the composition of it?
11   Q   Basically. What is the purpose of the
12 unit?
13   A   The purpose of the unit is to investigate
14 missing persons, crimes against children, crimes
15 committed by children, domestic violence.
16   Q   Was any specialized training provided to
17 you to work that unit and supervise that unit?
18   A   Yes.
19   Q   And was that training to work the unit?
20   A   Certain aspects of it: Missing persons,
21 runaways. Domestic violence is an ongoing topic
22 that we discover and service on a regular basis.
23 Crimes against children I've been to conferences
24 for.
25   Q   Was there any specialized training to

Page 27

1  supervise this particular unit?
2    A   Not that I recall. Just basically
3  investigating crimes of that nature. Not
4  necessarily supervision of the unit.
5    Q   Was there any specialized training to be a
6  supervisor?
7    A   Yes. I've been to a few leadership
8  classes. I don't recall specific dates or times.
9  It's been more than one.
10   Q   Okay. With respect to the Bush incident,
11 as I'm going to refer to it, you gave me four
12 categories: Domestic violence, crimes against
13 children, runaways and missing persons. Were there
14 any other category activities that you use in that
15 unit?
16   A   Every once in a while we'll catch
17 something that doesn't fall neatly into one of those
18 categories.
19   Q   Can we agree we'll call that miscellaneous
20 category? Would that be fair for the purposes of
21 this deposition?
22   A   Right.
23   Q   You've already identified it as one that
24 doesn't fit neatly into one of the other four.
25 Would there be any other type of classification of

Page 28

1  activities your unit would look into?
2    A   I'm not sure what you're referring to.
3  Like sex crimes or something of that nature?
4    Q   I'm just looking to see what you and that
5  unit principally handle so that I can either exclude
6  those categories in this deposition and find out
7  what you actually focused on.
8    A   I'm not sure. Do you want me to enumerate
9  every sort of crime we investigate?
10   Q   Let's try it this way and see if we can
11 shorten this up. With the Bush incident how would
12 you classify that incident for the purposes of your
13 report in your reporting system?
14   A   Ultimately, it's investigated as an
15 abduction.
16   Q   Why was it classified that?
17   A   Because of the facts and circumstances
18 that were developed.
19   Q   And what facts did you develop to indicate
20 that it was an abduction?
21   A   Person without a valid, a person without
22 the legal right legitimately obtained carried three
23 children, noncustodial parent, across state lines.
24   Q   Okay. And were there any other facts
25 other than those you just described that you relied

Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 2 of 6

Deposition of Sergeant Sean Adams                Christpher Bush & David Bush V S.C Adams, et al.

Page 29

1  on to classify David Bush's removal of the children
2  as an abduction?
3    A   I'm sure there were other facts.
4    Q   Do they appear in the paperwork?
5    A   At some point, yes.
6    Q   So I could read them and see what other
7  facts in your missing children's report?
8    A   (No response.)
9    Q   I don't want to make you recall things
10 that I can read is all I'm saying.
11   A   There are other facts that are involved in
12 the case that may not be in here. I'm not saying
13 that there's 100 percent everything is written down.
14   Q   Okay. I'm just looking for the facts to
15 have it classified as an abduction. That's all.
16   A   I'm not sure I can answer that because I
17 don't know exactly what you're saying.
18       MR. SIMOPOULOS: Just clarify or rephrase
19   it.
20       MR. PURICELLI: Sure. I can rephrase it.
21   I'll ask it a different way.
22 BY MR. PURICELLI:
23   Q   You indicated to us that the Bush matter
24 we're talking about was classified in your unit as
25 an abduction?

Page 30

1    A   Right.
2    Q   And you've given me some factors and
3  you've indicated there are others possibly why you
4  classified this incident as an abduction. Does that
5  help you understand what I'm asking about?
6    A   All right. There's some content of
7  conversation that I had with the victim, the victim
8  being the mother of the children, which was not
9  reduced to writing which did have bearing on the
10 material facts to whether this would constitute an
11 abduction.
12   Q   Why don't you tell me what she told you.
13       MR. SIMOPOULOS: You're asking why it was
14   classified as an abduction; right?
15       MR. PURICELLI: Yes. And he's telling me
16   the mother told him some other things other
17   than these. And I have to get it off his mind
18   right now because apparently he might be able
19   to think of others so let's get that off his
20   mind.
21 BY MR. PURICELLI:
22   Q   Why don't you tell me what the mother told
23 you.
24   A   All right. She told me that she had lived
25 in Pennsylvania for quite some time, at least a

Page 31

1  year. The content of the court order that I was
2  given indicated that she had some nexus with Luzerne
3  County which was found out to be untrue. She
4  provided the vacate order of the, the order from
5  Luzerne County. I vaguely recall mention of a
6  weapon or firearm being involved. And I believe
7  there was also some discussion about the location of
8  the children being in Pennsylvania, possible
9  locations for Mr. Bush where he lived, and that the
10 children were with him, and some domestic violence
11 previously that had occurred some years ago between
12 the two parties: Mr. and former Ms. Bush.
13   Q   Anything else?
14   A   That's all I can recall at this time.
15   Q   You indicated that she had told you there
16 were weapons and a firearm involved?
17   A   Possible firearm involved.
18   Q   In regards to what?
19   A   In possessing one and the children being
20 afraid of him or something along those lines.
21   Q   So when she told you about the weapon or
22 firearm she was merely telling you he owned them?
23 Or was he using them in some manner that was
24 contrary to law?
25       MR. SIMOPOULOS: Objection to form.

Page 32

1       THE WITNESS: (Reviews documents.) That
2   he may be armed with a 45 caliber firearm.
3  BY MR. PURICELLI:
4    Q   So the conversation that you had with her,
5  this was after the children had already been turned
6  over to Mr. Bush pursuant to a Virginia Court Order?
7    A   Sir, what was the question?
8    Q   The information that you're telling me,
9  the conversation that you had with the mother, this
10 was occurring after Mr. Bush had left Virginia --
11   A   Yes, sir.
12   Q   -- with the children pursuant to a
13 Virginia Court Order?
14   A   Not pursuant to a Virginia Court Order
15 that I know of. It was pursuant to the Pennsylvania
16 Court Order.
17   Q   You're not aware that there was a Virginia
18 Family Court Order?
19   A   I'd have to look back through my notes.
20 But at the time, no. I was not aware that there was
21 a Virginia Court Order.
22   Q   Can you check the file and see if there
23 was any indication in there that the Virginia Family
24 Court had authorized Mr. Bush to remove the
25 children?

Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 3 of 6

Deposition of Sergeant Sean Adams　　　　　　　　　　　　　Christpher Bush & David Bush V S.C Adams, et al.

Page 33

1  A  (Reviews documents.) No. There's nothing
2  in my file to indicate that Mr. Bush had a valid
3  Virginia Court Order.
4  Q  Okay. What is the policy, if there is a
5  policy in the police department, for going to any
6  schools to pick up children from school and turn
7  them over to a parent who would be from out of
8  state?
9  A  You're asking me what the policy is?
10  Q  Yes.
11  A  We don't typically deal with that a lot.
12  But what we do interpret is who has the valid right
13  to custody of the child. Now, whether you know,
14  whether they're picking them up from school or
15  whether they're picking up from another location and
16  we're asked to facilitate transfer of children or a
17  child, that's our primary function.
18  Q  Were you aware that the Richmond Police
19  Department actually were the ones that picked up the
20  children at their school in Richmond, Virginia and
21  brought them back to the police station and turned
22  them over to Mr. Bush?
23  A  Yes, I was.
24  Q  In that fact scenario what was the policy
25  of the police department in turning a child over to

Page 34

1  a parent who's from Pennsylvania or out of state?
2  A  What I was led to believe at the time was
3  that we were returning children to an individual who
4  had valid right to custody of them based upon a
5  document from out of state which appeared to be
6  valid.
7  Q  For the purposes of this question let's
8  assume that he did not have a valid court order nor
9  did the mother. Neither had a valid court order for
10  custody of the children. What rights under your
11  training and policy of the police department did
12  Mr. Bush have to be with his children?
13     MR. SIMOPOULOS: Objection to form.
14  BY MR. PURICELLI:
15  Q  If you understand it you can answer it.
16  A  I'm not sure I follow what you're asking
17  me to speculate on.
18  Q  No. I'm not asking you to speculate.
19  Just tell me based on your training and your
20  policies at the police department how police
21  officers would handle that matter.
22  A  If parents are divorced and one from out
23  of state wants to come pick up their kid from
24  school?
25  Q  And neither the parent living in Virginia

Page 35

1  or the parent from Pennsylvania has a valid court
2  order?
3  A  That --
4     MR. SIMOPOULOS: Objection. Speculation.
5  Go ahead.
6     THE WITNESS: I'd probably have to get
7     some legal advice on that. I would call the
8     Commonwealth's Attorney's Office.
9  BY MR. PURICELLI:
10  Q  And in this sort of fact scenario Lawson
11  has already contacted the Commonwealth's Attorney?
12  A  In this case, yes.
13  Q  Did you learn what that advise was from
14  the Commonwealth's Attorney?
15  A  I found out at some point.
16  Q  At what point?
17  A  That part I don't recall.
18  Q  Was it before or after the warrants was
19  issued for Mr. Bush's arrest?
20  A  I believe it was prior to custody.
21  Q  Prior to what custody?
22  A  Prior to custody of the children. I say
23  that I'm not certain because I don't remember the
24  exact time and date that we discussed it. But for
25  us to be involved at that level it would have had to

Page 36

1  have been on the advice, the pre advice of the
2  Commonwealth's Attorney's Office pre custody, before
3  we went and picked up the children and returned them
4  to Mr. Bush.
5  Q  And the warrants that were issued against
6  Mr. Bush occurred after that period of time; is that
7  right?
8  A  Yes, sir.
9  Q  So you knew when the warrants were issued
10  that the Commonwealth's Attorney had instructed the
11  Richmond Police to allow Mr. Bush to leave with the
12  children. Is that true?
13  A  There were a whole different set of
14  circumstances based upon --
15  Q  Answer my question and I'll listen to you.
16     MR. SIMOPOULOS: Objection to the form.
17     THE WITNESS: Can I get the question one
18     more time?
19     MR. PURICELLI: Absolutely.
20  BY MR. PURICELLI:
21  Q  Is it true that at the time the warrants
22  were issued for Mr. Bush's arrest for abduction of
23  these children you and the Richmond Police
24  Department had received advice from the
25  Commonwealth's Attorney to allow him to return to

Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 4 of 6

Deposition of Sergeant Sean Adams                                   Christpher Bush & David Bush V S.C Adams, et al.

Page 37

1 Pennsylvania with the children?
2     A    We received advice from the Commonwealth's
3 Attorney. It changed again as to what their advice
4 was at one point in time. By the time that the
5 children were turned over to Mr. Bush, and then the
6 advice changed before I obtained the warrants.
7     Q    Fair enough. Okay. So at what point in
8 time did you recontact -- and I don't mean you
9 personally -- but was there contact with the
10 Commonwealth's Attorney? Was it after Mr. Bush had
11 already left the Commonwealth of Virginia?
12    A    Yes.
13    Q    And why did there become a need to
14 recontact the Commonwealth's Attorney?
15    A    Because it was determined that the order
16 was vacated for reasons after he left the
17 Commonwealth, that there were some material issues
18 with the original order that needed to be addressed,
19 and that based upon the totality of the
20 circumstances constituted abduction.
21    Q    And is that a conclusion you personally
22 reached? Or is that a conclusion reached by another
23 person and it was told to you?
24    A    I was consulted -- I consulted with the
25 Commonwealth's Attorney.

Page 38

1     Q    You say you, you personally?
2     A    I would say I was in consultation. I was
3 part of the conversations with the Commonwealth's
4 Attorney's Office.
5     Q    And was that before or after Serene
6 provided you with a copy of the vacated Luzerne
7 County Pennsylvania Court Order?
8     A    That was after.
9     Q    Who did you talk to in the Commonwealth's
10 Attorney's Office?
11    A    Mary Langer.
12    Q    Did you know her?
13        MR. SIMOPOULOS: Objection to form.
14 BY MR. PURICELLI:
15    Q    Prior to speaking that date had you had
16 conversations with her to know you were taking to
17 Mary Langer?
18    A    Yes, sir.
19    Q    Okay. And how did you know you were
20 talking with Mary Langer, what experience?
21    A    I recognized her voice.
22    Q    Had you worked with her before or sought
23 advice?
24    A    Yes.
25    Q    You sought advice from her?

Page 39

1     A    Yes. And worked with her. I mean, not in
2 the same office or anything but on other cases.
3     Q    Were they cases of similar factual
4 scenarios we've been discussing in the Bush case?
5     A    I don't recall.
6     Q    Okay. Who called who?
7     A    I don't recall. I probably called her
8 though.
9     Q    Okay. And what if anything did you tell
10 her?
11    A    The facts and circumstances.
12    Q    And those are the facts and circumstances
13 that we've been talking about today?
14    A    Yes, sir.
15    Q    Are there any others that you would have
16 told her that we haven't discussed today?
17    A    Not that I recall.
18    Q    Okay. And what advice did she give you?
19    A    We received advice that there was -- I say
20 we. Lieutenant Russell and I received advice that
21 facts and circumstances could constitute an
22 abduction.
23    Q    Did she say could or did?
24    A    I don't recall.
25    Q    At the time that you received the advice

Page 40

1 that there could be an abduction did you tell --
2        MR. SIMOPOULOS: Objection to form.
3        MR. PURICELLI: I don't want to say
4     anything incorrect.
5 BY MR. PURICELLI:
6     Q    Did she tell you it could be an abduction
7 or would be an abduction?
8        MR. SIMOPOULOS: Objection. Asked and
9     answered.
10 BY MR. PURICELLI:
11    Q    You can answer that.
12    A    I don't recall the exact verbiage that she
13 used, but there was implication that abduction
14 warrants could be sought from the magistrate.
15    Q    Did you place the substance of this phone
16 call down on any document? In other words, did you
17 write a report that indicated that I called the
18 Commonwealth's Attorney and the following
19 information was provided, and the following advice
20 was given? Anything like that?
21    A    No, sir. I didn't.
22    Q    In the course of your training as a
23 supervisor did you receive training about note
24 taking and preparing a complete file?
25    A    Yes, I did.

Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 5 of 6

Deposition of Sergeant Sean Adams                Christpher Bush & David Bush V S.C Adams, et al.

Page 41

1  Q  Did that training also include notes as to
2  information that you received to allow you to
3  explain why you took a course of action?
4  A  Yes.
5  Q  Is there a reason you don't have that note
6  in your file now of that conversation?
7  A  No. There's no reason. Just went to the
8  magistrate's office pretty much right from that
9  phone call.
10  Q  I'm going to tell you right off the bat I
11  don't know about Virginia law and procedure on
12  obtaining warrants. Can you tell me the procedure
13  that Virginia uses for an officer to obtain a
14  warrant of arrest from a magistrate?
15  A  Well, the officer takes the facts and
16  circumstances to the magistrate, appears in person
17  usually or via teleconferencing to the magistrate,
18  states the facts and circumstances of a particular
19  incident, and the magistrate either issues or does
20  not issue a warrant based upon those facts and
21  circumstances after sworn testimony is provided.
22  Q  Is the procedure recorded when you appear
23  in front of a magistrate? Is it on the record? Is
24  there an actual writing or document as to what you
25  tell the magistrate are the facts and circumstances?

Page 42

1  A  I don't believe so.
2  Q  So is it you appear in front of the person
3  yourself, typically you seeking a warrant in this
4  case, and simply tell the person in front of you?
5  A  Basically that's how it goes.
6  Q  Is it under oath?
7  A  Yes, sir.
8  Q  Was it you who appeared in front of the
9  magistrate to obtain the warrants?
10  A  Yes, sir.
11  Q  And what magistrate did you go to?
12  A  (Reviews documents.) Looks like
13  Magistrate Nardella. N-A-R-D-E-L-L-A.
14  Q  Have you been in front of this magistrate
15  before?
16  A  I believe so.
17  Q  Is that the last name?
18  A  Well, I mean, I'm not sure exactly how you
19  spell it, but that's what it looks like on here.
20  Q  You're looking at what we've already
21  identified as Adams 2, one of the warrants?
22  A  Yes. A box checked, Magistrate.
23  Q  And above that appears to be a signature
24  of somebody?
25  A  Yes.

Page 43

1  Q  Is that the signature of the person you're
2  describing as Nardella?
3  A  Yes, sir.
4  Q  And do you recognize that being the
5  signature of the magistrate named Nardella?
6  A  I don't know what his signature looks
7  like. And it comes up automatically on the warrant.
8  Or maybe they sign it.
9  Q  Where do you physically go to do this
10  presentment?
11  A  It's 200 West Grace Street is where the
12  magistrate's office is. Police Headquarters.
13  Q  Is there more than one magistrate in that
14  building?
15  A  Yes, sir.
16  Q  How many are there?
17  A  I don't know how many there are. At least
18  eight of them.
19  Q  How did you come to appear before this
20  magistrate?
21  A  Subsequent to consulting the
22  Commonwealth's Attorney's Office I went downstairs
23  and obtained a warrant after relaying the facts and
24  circumstances to Mr. Nardella.
25  Q  How did you come to chose among the eight,

Page 44

1  this particular magistrate?
2  A  That's just who was on duty at the time.
3  Q  When you appeared before him was it during
4  regular business hours or was it after hours?
5  A  Magistrate's hours run 24 hours a day.
6  Q  Forgive my ignorance. I know little about
7  Virginia law. So you have a magistrate available to
8  you 24 hours a day?
9  A  Yes, sir.
10  Q  Do the magistrates do anything other than
11  review for warrants?
12  A  They do bond hearings.
13  Q  Do they actually do court proceedings
14  meaning other than setting bonds or anything like
15  that?
16  A  Not actual court proceedings. They issue
17  protective orders, emergency protective orders, they
18  issue green warrants or emergency custody orders.
19  Q  At the time when you appeared before this
20  magistrate were any notes or recordings taken of
21  what you were telling the judge?
22      MR. SIMOPOULOS: Objection to form.
23  BY MR. PURICELLI:
24  Q  When you were present did he just listen,
25  or did he tape record?

Case 2:07-cv-04936-MAM   Document 53-1   Filed 10/01/10   Page 6 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 45

1  A  Not that I know of.
2  Q  Was he writing anything when you were
3  appearing in front of him?
4  A  I don't recall.
5  Q  Okay. Did you personally appear in front
6  of him?
7  A  Yes, sir.
8  Q  Okay. Aside from what you told me today
9  were the facts and circumstances did you tell him
10 anything different?
11 A  I don't recall. I mean, I don't recall
12 the exact content of the conversation.
13 Q  Did you have a conversation with him
14 before giving him the facts and circumstances about
15 why you were there?
16 A  I don't believe so.
17 Q  Did you have a conversation after
18 obtaining the warrants with him about this matter?
19 A  I believe I just left after I obtained the
20 warrants.
21 Q  Did you have any conversation with him
22 after obtaining the warrants about this case?
23 A  I don't believe so. I really don't
24 recall.
25 Q  Before you went down and obtained the

Page 46

1  warrants had you communicated with anybody from
2  Pennsylvania in regards to obtaining the warrants?
3  A  Had I communicated with anybody in
4  Pennsylvania before obtaining the warrants?
5  Q  Yes.
6  A  Yes, I believe I did.
7  Q  Who did you speak with?
8  A  I believe I spoke with a Sergeant Tripp on
9  one occasion.
10 Q  Is Sergeant Tripp from the Pennsylvania
11 State Police?
12 A  Yes, I believe so.
13 Q  Do you have any records or notes created
14 or have been created by other people in regards to
15 that communication with Sergeant Tripp with the
16 Pennsylvania State Police?
17 A  No, I don't.
18 Q  Did you contact him or did he contact you?
19 A  That I don't recall.
20 Q  What was the nature of the communication?
21 In other words, what information was exchanged?
22 A  I don't exactly recall what we were
23 speaking about. It was possible -- I mean, I would
24 be speculating at this point, but it was about
25 Mr. Bush and -- I just don't recall. I only spoke

Page 47

1  to him on just one occasion. Maybe more. But I
2  don't recall the content of the conversation.
3  Q  Was the conversation occurring after
4  Mr. Bush left Virginia with the children but before
5  you obtained the warrants for his arrest?
6  A  I don't know. I just don't remember.
7  Q  Was he the only person you spoke to from
8  Pennsylvania about the Bush matter?
9  A  I believe so.
10 Q  Did you speak with a Trooper McDermott in
11 the Montoursville Barracks?
12 A  I don't believe so.
13 Q  Were you the only person working on the
14 case to bring the abduction charges which I believe
15 were actually classified as kidnapping charges?
16 A  No, I was not. I was being assisted by
17 Lieutenant Russell.
18 Q  Were you supervising Lieutenant Russell?
19 A  No, sir. He was my direct supervisor.
20 Q  Are you familiar with what he was doing
21 before the warrants were issued but after Mr. Bush
22 left in regards specifically to the Bush case?
23 A  I don't recall exactly what he was doing.
24 Q  What do you recall in general?
25 A  I remember he was communicating with

Page 48

1  either folks in Pennsylvania or the FBI. I don't
2  remember which.
3  Q  What did Sergeant Tripp tell you?
4  A  I don't recall.
5  Q  What did you tell him?
6  A  I just remember speaking to him. I don't
7  remember what the content of the conversation was.
8  Q  Assuming you called him how would you know
9  who to contact?
10    MR. SIMOPOULOS: Objection to form. You
11    can answer it.
12    THE WITNESS: I don't know how I
13    ultimately ended up with him on the phone. But
14    like I said, I don't know if he contacted me or
15    if I contacted him. I just don't remember.
16 BY MR. PURICELLI:
17 Q  It's not indicated anywhere in your
18 report?
19 A  I had made a note that I had spoken to
20 Tripp on -- there's no specific date mentioned, but
21 just that I had spoken to him on at least one
22 occasion and that was it.
23 Q  And this is the note you can't find?
24 A  It was jotted down in the margin of one of
25 these pages (indicates.)