Case 2:07-cv-04936-MAM   Document 53-2   Filed 10/01/10   Page 1 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 49

1  Q  Could you find the page and look at the
2  note.
3  A  (Reviews documents.) I know where it
4  might be. It's on that communication with David
5  Freeman.
6  MR. SIMOPOULOS: Oh. It's attorney/client
7  privilege document. It's the attorney.
8  MR. PURICELLI: Strike out the part that's
9  the attorney/client privilege. That's all we
10 have to do.
11 MR. PURICELLI: Who's Attorney Freeman?
12 MR. SIMOPOULOS: That's his attorney in
13 Pennsylvania.
14 MR. PURICELLI: Okay. Strike out that
15 part.
16 MR. SIMOPOULOS: Just let me see the
17 document. You come with me.
18 MR. PURICELLI: Take a break?
19 THE WITNESS: Sure.
20    (Proceedings temporarily off the
21    record after which time the
22    following resumed on the
23    record.)
24 MR. PURICELLI: We took a short break, and
25 it's been disclosed to us by the city attorney

Page 50

1  that there are other documents that may exist
2  that have been deemed by Counsel to be
3  attorney/client privilege, and the City's
4  attorney has graciously agreed to provide us
5  with a privileged log so that we can look at
6  those documents. Have I stated that
7  accurately?
8  MR. SIMOPOULOS: Actually, the documents
9  were created after the lawsuit was filed.
10 MR. PURICELLI: I haven't identified
11 anything I just want to see if there are other
12 documents.
13 MR. SIMOPOULOS: Okay.
14 MR. PURICELLI: There has been a
15 discussion off the record that the note
16 referenced to be in the margin of a certain
17 document is a note that was written to
18 Mr. Adams' attorney in Pennsylvania, Mr.
19 Freeman. Is that correct?
20 THE WITNESS: Yes.
21 BY MR. PURICELLI:
22 Q  And I have agreed that communications
23 between Mr. Adams and his attorney could be covered
24 under the attorney/client privilege. However, it's
25 been represented to me that the note may have

Page 51

1  refreshed your memory as to the communications you
2  had with Tripp. Is that true?
3  A  Yes, sir. That's correct.
4  Q  Okay. Having looked at your note that you
5  wrote to your attorney in Pennsylvania can you tell
6  me now what that communication was with Tripp in
7  Pennsylvania?
8  A  I can't tell you about the content of it.
9  It was just the fact that I didn't initiate contact
10 with him. He was the one who had called me.
11 Q  Okay. And having now learned that he was
12 the one that called you, does that help refresh your
13 memory as to what the two of you talked about?
14 A  No, sir. I said I can't remember the
15 content of what we talked about.
16 Q  Have you received communications from the
17 sergeant from the Pennsylvania State Police before
18 this communication?
19 A  Before which communication?
20 Q  The one from Tripp to you?
21 A  I don't recall.
22 Q  Was that communication before or after
23 warrants that you had procured for Mr. Bush had been
24 issued?
25 A  You want to know --

Page 52

1  Q  I just want to know if you talked to him
2  before of after you obtained your warrants?
3  A  I just don't recall. I don't know. It
4  was an approximate ten-ten day period when the
5  warrants were actually obtained when Mr. Bush
6  actually came and took custody of the children.
7  Q  Okay. And do you recall anything
8  Lieutenant Russell told you he was doing before the
9  warrants were obtained? Specifically in this Bush
10 case.
11 A  Right. No. I knew he was either in
12 contact with some entity in Pennsylvania, the State
13 Police or the FBI at that point.
14 Q  Before Ms. Bush came to you with the order
15 from Luzerne County had you had any discussions with
16 her?
17 A  I believe I had. Lieutenant Russell and I
18 had met with her previously. I believe it was on or
19 about the day or the day after Mr. Bush came to
20 town.
21 Q  Okay. What transpired then?
22 A  She was basically distraught about what
23 had happened, indicated certain other things that I
24 mentioned about their past abusive relationship,
25 what she intended to do in terms of getting the

Case 2:07-cv-04936-MAM   Document 53-2   Filed 10/01/10   Page 2 of 6

Deposition of Sergeant Sean Adams                              Christpher Bush & David Bush V S.C Adams, et al.

### Page 53

1  children back or the court order. I only have a
2  vague memory of it.
3      Q   Did she provide you with any court order
4  saying that she had lawful custody of the children?
5      A   No. Not at that time, sir.
6      Q   What if anything did you advise her?
7      A   I advised her that the court of record at
8  that time was in Pennsylvania. That was probably
9  where she needed to go to have that overturned or
10 addressed with some other legal remedy.
11     Q   Had you done any type of investigation at
12 all at the time she was talking to you? Do you
13 remember whether or not there were any court
14 proceedings in Virginia for custody of the children?
15     A   Can you rephrase that for me.
16     Q   I can. Prior to Ms. Bush coming to you
17 and telling you what she intended to do, had you
18 done any investigative work by contacting the family
19 court, the juvenile court to determine whether there
20 was any Virginia action for custody of the children?
21     A   I don't recall. I believe I addressed
22 that issue with her. And I just don't recall what
23 the response was at that point.
24     Q   Relying on your training for this type of
25 situation and your experience for this type of

### Page 54

1  situation would you ordinarily contact family court
2  to find out whether or not a parent does or does not
3  have an ongoing custody matter in Virginia or
4  already has an order?
5         MR. SIMOPOULOS: Objection to form. Are
6      you referring to family court in Virginia?
7  BY MR. PURICELLI:
8      Q   In Virginia.
9      A   Well, Virginia usually one parent or the
10 other has paperwork indicating custody and
11 possession of the children and visitation.
12     Q   And we've gone through your file and you
13 have no court order from Virginia saying Ms. Bush
14 had custody of the children at issue before you got
15 the warrants. Isn't that true?
16     A   That's correct.
17     Q   And I'm just trying to find out whether
18 you had looked to see if there was ongoing custody
19 proceedings in Virginia since you know there was no
20 court order.
21     A   I believe the one in Virginia is dated the
22 25th which is the same day -- I want to make sure
23 I'm telling you correctly here. The same day as the
24 warrants. (Reviews documents.) Yes. That's the
25 same day as the warrants. Four hours previous.

### Page 55

1  It's a preliminary protective order.
2      Q   Right. And that was a protective order,
3  not a custody order; correct?
4      A   Right.
5      Q   Is it also true in the protective order
6  temporary custody was granted based on the temporary
7  order being given?
8      A   I'm sorry.
9      Q   I'll rephrase it. The order referring to
10 this order isn't specifically a custody order; is
11 it?
12     A   Right. It is a preliminary protective
13 order that grants custody to a parent, that being
14 Sarah Serene.
15     Q   Okay. Just so that the judge up in
16 Pennsylvania understands your paperwork, he's also
17 going to read this transcript, the temporary order
18 is an ex-parte order. Isn't that true? Meaning
19 Mr. Bush wouldn't have been present for that order.
20 Is that true?
21     A   That's correct.
22     Q   He wouldn't have been present for the
23 presentment of the paper to the Court; correct?
24     A   It wasn't necessary for him to be there.
25     Q   And he wasn't there to your knowledge;

### Page 56

1  correct?
2      A   Correct.
3      Q   And this order is based solely on her
4  representations to the Court; correct?
5      A   Correct.
6      Q   All right. And based on her
7  representations to the Court she obtained
8  protections from Mr. Bush; correct?
9      A   She obtained a preliminary protective
10 order.
11     Q   And the purpose of the order is to give
12 her protection from abuse; correct?
13     A   Protection and custody of the children.
14     Q   All right. Now, are you aware that order
15 was summarily dismissed upon first review of the
16 assigning judge?
17        MR. PURICELLI: Objection. You can answer
18     that.
19        THE WITNESS: No. I'm not aware.
20 BY MR. PURICELLI:
21     Q   Did you do anything in the course of your
22 investigation to determine whether or not the Court
23 when reviewing the order had dismissed it?
24     A   I was unaware it was dismissed.
25     Q   In the course of your investigation did

Case 2:07-cv-04936-MAM   Document 53-2   Filed 10/01/10   Page 3 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 57

1  you do anything to find out whether it had been
2  dismissed?
3      A    I don't recall.
4      Q    What would be the ordinary procedures when
5  you're faced with a temporary order to determine
6  whether or not a parent has been given permanent
7  custody or custody after a hearing?
8          MR. SIMOPOULOS: Objection to form.
9  BY MR. PURICELLI:
10     Q    Do you understand the question?
11     A    No, sir; I don't.
12     Q    All right. You understand there's going
13 to be a hearing to determine the voracity or
14 truthfulness of her allegations. Isn't that true?
15     A    That's correct.
16     Q    And you see these types of orders all the
17 time; correct?
18     A    Frequently.
19         MR. SIMOPOULOS: Objection to form.
20 BY MR. PURICELLI:
21     Q    And you understand there are many times
22 that these orders are only temporary to the point
23 the Court hears the allegations; correct?
24     A    Some are I imagine.
25     Q    In your experience you've learned some of

Page 58

1  these orders never turn into permanent orders.
2  Isn't that true?
3      A    Some don't. That's correct.
4      Q    Okay. And what reason did you have to
5  believe this order was going to be a permanent
6  order?
7          MR. SIMOPOULOS: Objection to form.
8  BY MR. PURICELLI:
9      Q    You can answer it if you understand.
10     A    Based upon the facts and circumstances in
11 the case I believed it was going to be permanent.
12     Q    Okay. Why did you believe that? What
13 were the primary facts that made you believe this
14 temporary would be become a permanent protection
15 order giving permanent custody to Ms. Bush?
16         MR. SIMOPOULOS: Objection to form.
17 BY MR. PURICELLI:
18     Q    And specifically, what did you believe at
19 the time you issued the warrants or sought the
20 warrants?
21         MR. SIMOPOULOS: Objection to form. Which
22     question do you want him to answer?
23         MR. PURICELLI: I want him to answer that.
24     What fact did he rely on to believe at the time
25     he was getting the warrants this temporary

Page 59

1  order would become a permanent order?
2          MR. SIMOPOULOS: Objection. That's not
3      relevant but go ahead. You can answer.
4          THE WITNESS: I believed the probability
5      that it was going to be permanent was
6      relatively high compared to the other cases
7      which I'd seen based upon the long-term
8      residence of the children here in Richmond,
9      based upon the facts and circumstances in the
10     case involving Mr. Bush.
11 BY MR. PURICELLI:
12     Q    In your experience with people who have
13 established what you refer to as long-term residency
14 here had you ever come across a person claiming to
15 be a long-term resident here that had changed their
16 identity and the identity of the children?
17         MR. SIMOPOULOS: Objection to form. You
18     can answer again. Calls for speculation as
19     well.
20         MR. PURICELLI: I'm just asking if he
21     recalls ever having those facts. I don't know
22     why that's speculative.
23         THE WITNESS: I don't recall those facts.
24 BY MR. PURICELLI:
25     Q    Do you recall ever coming across facts

Page 60

1  where a parent claims to have long-term residency
2  that also changed the children and her social
3  security numbers?
4      A    Is that the same question?
5      Q    No. The other was identity. This one is
6  social security number.
7      A    Not that I recall.
8      Q    Did you ever come across where a person
9  claiming to be a long-time resident of Richmond was
10 already a respondent in a custody action in another
11 state?
12         MR. SIMOPOULOS: Objection to form.
13         THE WITNESS: Could you repeat the
14     question again.
15 BY MR. PURICELLI:
16     Q    Sure. In your experience have you ever
17 come across a person claiming to be a long-time
18 residence in Virginia with kids who had left the
19 state where she was already involved in a custody
20 action --
21         MR. SIMOPOULOS: Objection to form.
22 BY MR. PURICELLI:
23     Q    -- with the children she has --
24         MR. SIMOPOULOS: Objection to form.
25

Case 2:07-cv-04936-MAM   Document 53-2   Filed 10/01/10   Page 4 of 6

Deposition of Sergeant Sean Adams                             Christopher Bush & David Bush V S.C Adams, et al.

Page 61

BY MR. PURICELLI:
Q  -- in Virginia?
   MR. SIMOPOULOS: Objection to form.
BY MR. PURICELLI:
Q  You can answer if you understand.
A  I'm not sure I understand.
Q  You're saying based on these facts and circumstances you believe she was going to get a permanent order. Did I understand that correctly?
A  Yes.
Q  Okay. And I'm asking you based on that belief had you ever come across a fact where the person with the temporary order had fled another state where she was already involved in a custody action with the children?
   MR. SIMOPOULOS: Objection to form.
   MR. PURICELLI: How about if I change the word fled to left? Is that going to help?
   MR. SIMOPOULOS: Objection to form.
   MR. PURICELLI: Okay. I'll rephrase it to left the state as opposed to fled.
   MR. SIMOPOULOS: Compound. Objection to form.
BY MR. PURICELLI:
Q  You can answer it.

Page 62

A  Okay. Not that I recall.
Q  All right. So what was it then that you believed from the facts and circumstances that you believed her allegations were going to be accepted by the Court and she would end up with a permanent order for protection from Mr. Bush and custody of the children?
A  Based on the fact that she lived alone with the children, that they were divorced, she had long-term residence in Virginia, and the facts as I knew them at the time were that the other order had been overturned. That's basically all I can think of right now.
Q  Okay. Had those types of facts come up in your experience as a police officer before in this unit that you're working?
A  Not that I recall.
Q  Okay. Now, before she came to you with the order you said you had a conversation with her. Did you have any other conversation with her other than these two with her, ever?
A  Ever?
Q  Ever?
A  I don't recall.
Q  Did you talk to her about being sued?

Page 63

A  No. Pretty sure I didn't talk to her about being sued.
Q  Did you talk to her about any custody proceedings she had in Virginia?
A  I don't recall.
Q  If you had would you have noted it in a police report?
   MR. SIMOPOULOS: Objection to form.
BY MR. PURICELLI:
Q  You can answer that.
A  Probably not.
Q  In the course of your history of being a police officer have you had communications with people that you don't make notes about? And I mean particularly about a case. I don't mean friends and stuff.
A  Can you restate that.
Q  In your history as a police officer have you had communications with persons alleged to be victims of crimes and not made notes about it?
A  Yes.
Q  What types of crimes would the victim be involved in that you would communicate with them but not make notes of that communication?
A  (No response.)

Page 64

Q  Let me help you out. Did it involve an allegation of kidnapping?
A  No, it didn't. No. Not that I can recall.
Q  Prior to the kidnapping charges you leveled against Mr. Bush how many times have you leveled a kidnapping child against a parent?
   MR. SIMOPOULOS: Objection to form.
   THE WITNESS: I don't recall.
BY MR. PURICELLI:
Q  Since Mr. Bush how many people have you charged with kidnapping their own children?
A  None.
Q  Okay. So is it true then Mr. Bush is the only person that you have charged with kidnapping his own children?
   MR. SIMOPOULOS: Objection to form. Asked and answered.
BY MR. PURICELLI:
Q  You can answer.
A  I can't say no. I can't say that he's the only person I've ever charged with kidnapping.
Q  Well, my question is kidnapping their own children.
A  No. I can't say that.

Case 2:07-cv-04936-MAM   Document 53-2   Filed 10/01/10   Page 5 of 6

Deposition of Sergeant Sean Adams                                Christpher Bush & David Bush V S.C Adams, et al.

Page 65

1  Q  Can you give me any recollection at all of
2  ever charging another parent with kidnapping their
3  children?
4       MR. SIMOPOULOS: Objection. Asked and
5    answered.
6       THE WITNESS: We get a few of those. I
7    can't say that -- I mean, I know I've over seen
8    other cases involving that.
9  BY MR. PURICELLI:
10  Q  All right. In those other cases did a
11  parent have a court order at the time of the charge?
12  A  I don't know.
13  Q  What do you classify as long term?
14  A  All depends on what you're talking about.
15  Q  You said one of the reasons that you
16  believed she would obtain a permanent order was
17  because she was a long-term resident. And I want to
18  know what in your mind you consider long term?
19  A  If you're talking about living in a
20  certain city, I think a year is long term,
21  establishing a residence, putting your children in
22  school, things of that nature.
23  Q  How long had Ms. Bush lived in Richmond?
24  A  I was told approximately a year.
25  Q  Did you do anything to determine whether

Page 66

1  that was true or not?
2  A  It was determined that her kids were
3  enrolled in school. Couldn't establish an exact
4  duration. Through DMV records indicated a previous
5  address as well in the city. I can verify that if
6  you'd like.
7  Q  I just want to know what you knew. Now,
8  when Ms. Bush originally came to you did she want
9  Mr. Bush arrested?
10       MR. SIMOPOULOS: Objection to form.
11  BY MR. PURICELLI:
12  Q  You can answer.
13  A  I don't exactly recall. I believe she
14  did.
15  Q  Did she want the children declared as
16  missing children?
17       MR. SIMOPOULOS: Objection to form.
18       THE WITNESS: Yes.
19  BY MR. PURICELLI:
20  Q  Did you declare them as missing children?
21  A  Not at that time.
22  Q  Why not?
23  A  Because at that time we believed he had a
24  legitimate court order indicating that he had right
25  to custody.

Page 67

1  Q  Did you instruct her on anything she
2  should do with the Richmond Police Department to
3  declare those children missing?
4  A  Just what we spoke about earlier which is
5  dealing with the Pennsylvania issue, having that
6  order corrected or overturned or whatever needed to
7  be done there. They're the authority that was
8  granting that. It would need to evaluate that and
9  make a decision.
10  Q  Did she say anything in response to that?
11  A  I'm sure she did. I don't remember what
12  it was.
13  Q  Is that all you told her?
14  A  I'm certain that's not all I told her. I
15  don't remember what else I told her.
16  Q  What would you ordinarily tell a person in
17  that situation based on the policies in the police
18  department and your experience?
19  A  Based upon if they're a city resident they
20  would also need to go here and address custody here.
21  But we were under the impression that she had full
22  custody, and she was divorced and on the run from
23  him for a couple years.
24  Q  And that impression was obtained from what
25  source?

Page 68

1  A  Well, from her and also from Chris Bush.
2  Q  When the children were turned over to
3  Mr. Bush were you present?
4  A  I was in the office that day. I recall
5  seeing him briefly and the kids.
6  Q  Do you recall seeing paperwork at that
7  time or just before that time?
8  A  I don't recall. It was Joel Lawson's
9  case. That was something that had been
10  predetermined before we would make a custody
11  decision.
12  Q  Okay. Did Joel Lawson tell you he was
13  going to the school to pick up the children?
14  A  I believe so.
15  Q  And what did you say?
16  A  I said okay.
17  Q  Did you look at the paperwork to see if
18  there were any problems or if everything was in
19  order per the policies and procedure of the police
20  department and to your understanding of the law?
21  A  I'm pretty sure he checked with the
22  Commonwealth's Attorney's Office at that point. And
23  we had a plan for that day to return the kids to
24  Mr. Bush.
25  Q  Did anybody give Mr. Bush any instructions

Case 2:07-cv-04936-MAM  Document 53-2  Filed 10/01/10  Page 6 of 6

Deposition of Sergeant Sean Adams                                Christpher Bush & David Bush V S.C Adams, et al.

Page 69

1  after the children were turned over to him?
2      MR. SIMOPOULOS: Objection to form.
3      MR. PURICELLI: Well, okay. I'll rephrase
4  that. That's fair.
5  BY MR. PURICELLI:
6   Q   Did you or did anyone in your presence
7  give Mr. Bush any instructions as to what he should
8  do after receiving custody of the children?
9   A   No, sir. Not that I recall.
10  Q   Did you hear anyone say to him you need to
11 leave Virginia now?
12  A   I don't recall.
13  Q   Would that be something that would be told
14 to a person in that situation?
15  A   I can't say that it would be something
16 that I would say. I'm not saying that it couldn't
17 or wouldn't or wasn't said but -- can you re-ask the
18 question.
19  Q   Well, you're not saying you can't say it
20 wasn't said. You're saying to me you wouldn't have
21 said it. But you're not telling me somebody else
22 didn't say it. Do I understand that correctly?
23  A   I'm not saying somebody didn't say that.
24  Q   Okay.
25  A   I can't confirm or deny whether that

Page 70

1  happened.
2   Q   That's fair. Let's assume for the
3  purposes of this next question that he was told that
4  by Richmond City Police. Would you have to tell the
5  magistrate that issued the warrants that he was
6  advised to leave Virginia with the children by the
7  police?
8      MR. SIMOPOULOS: Objection to form.
9  BY MR. PURICELLI:
10  Q   You can answer if you understand.
11  A   Would I have mentioned that to the
12 magistrate?
13  Q   Absolutely. When you were seeking a
14 warrant for kidnapping?
15  A   Well, it depends at that point.
16  Q   Tell me the factors it depends on.
17  A   Depends on if the custody order was
18 fraudulently obtained.
19  Q   How do you determine whether something was
20 fraudulently obtained?
21  A   Whether there were material misstatements
22 or things that mattered in the determination of the
23 arbiter's decision to do that.
24  Q   Did you have any evidence at the time you
25 obtained the warrants for kidnapping that Mr. Bush

Page 71

1  materially misrepresented facts or had
2  misrepresented material facts to obtain this custody
3  order?
4   A   Yes, I did.
5   Q   What was that?
6   A   Based upon Ms. Bush being associated with
7  Luzerne County.
8   Q   Are you familiar with Pennsylvania law?
9      MR. SIMOPOULOS: Objection to form.
10 Argumentative.
11 BY MR. PURICELLI:
12  Q   You can answer that. Are you familiar
13 with Pennsylvania law relating to filing or seeking
14 custody orders in counties?
15  A   Do you want me to review the order?
16  Q   No. I'm just asking if you're familiar
17 with the law --
18     MR. SIMOPOULOS: Objection to form.
19 BY MR. PURICELLI:
20  Q   -- as to who can go to what county and
21 obtain court orders in regards to custody and
22 divorce?
23  A   I'm not familiar with the entirety of
24 Pennsylvania law.
25  Q   Okay. Were you familiar as to whether or

Page 72

1  not Mr. Bush could go to a county of non-residence
2  and obtain a custody order?
3   A   No, no. I was not familiar.
4   Q   What was it that made you believe he
5  materially misrepresented something in another
6  county to obtain a court order?
7   A   Based upon the statements of Ms. Bush.
8  Based on the content of the order.
9   Q   What did the order say? That would be the
10 vacating order; correct? The order you're referring
11 to?
12  A   No. There's the vacating one and then the
13 initial one which I was relying on.
14  Q   Okay. Clarify for me which one you're
15 referring to.
16  A   (Reviews documents.) It's right here.
17 It's Number 2. There's no basis for jurisdiction
18 with the courts. This is in the vacating order.
19  Q   Okay. Does it say in any way he
20 misrepresented something, or it just said there was
21 no basis for jurisdiction?
22  A   There's no basis for jurisdiction.
23  Q   Where do you get the word "fraudulently
24 obtained?"
25  A   She hadn't been served.