Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

| | |
|---|---|
| **Page 73** | **Page 75** |

Page 73

1  Q   Okay.  Do you have any evidence that
2  Mr. Bush represented she had been served?
3  A   That she had been served?
4  Q   Sure.  Had been served with the custody
5  notice?
6  A   No.  I have no indication that she had
7  been served with the custody notice.
8  Q   And do you know whether or not the
9  jurisdiction they're referring to is personal
10  jurisdiction or is subject matter jurisdiction?
11      MR. SIMOPOULOS:  Objection to form.  Lack
12      of foundation.
13  BY MR. PURICELLI:
14  Q   Do you know the difference between
15  personal jurisdiction and subject matter
16  jurisdiction of a court?
17  A   I don't know the entire difference.
18  Q   Okay.  If I represent to you -- and your
19  attorney can correct me.  It's standard law.
20  Subject matter jurisdiction means the Court can hear
21  the matter.  In this case, a custody matter.
22  Personal jurisdiction means the Court can hear that
23  matter and make a decision over the person meaning
24  that they have control.  They can actually compel a
25  person to do something.  Make them obey the order.

Page 74

1      Now, if your attorney wants to
2  explain it a different way or accept that as --
3      MR. SIMOPOULOS:  No.  I'm just going to
4      object to the question.
5      MR. PURICELLI:  Okay.
6  BY MR. PURICELLI:
7  Q   Do you know which of the two this Court's
8  referring to?
9  A   Does it say on here?
10  Q   You're relying on that to make a
11  representation.  I'm trying to find out why you
12  believe it's fraudulent.  You've identified a
13  sentence now and I want to know why you think the
14  Court's saying we don't have jurisdiction and it's a
15  fraudulent order?
16  A   It was improperly obtained.
17  Q   Why was it improperly obtained?  Based on
18  your working knowledge.
19  A   It says right here that it was vacated
20  because it was inappropriately granted.
21  Q   Because why?
22  A   And jurisdiction is hereby relinquished.
23  Q   The Court never said it was fraudulently
24  issued; correct?
25  A   It just said it was inappropriately

Page 75

1  granted.  That's what it says.
2  Q   Right.  So why did you use the word
3  fraudulent?
4  A   Perhaps I should have said inappropriately
5  obtained.
6  Q   Okay.  So we're at the point now that
7  Mr. Bush didn't obtain it fraudulently.  He
8  inappropriately went to Luzerne County and obtained
9  this order; correct?
10  A   And then represented it to me as being
11  official and appropriately granted.
12  Q   He told you this was appropriately
13  granted?
14  A   That's how it was presented to me.
15  Q   How was it exactly presented to you?
16  A   I received it I believe via fax from
17  Mr. Bush's brother, Chris Bush.
18  Q   And when you looked at it did it appear to
19  be a valid order?
20  A   It appeared to be a valid order.
21  Q   Did you confer with the Commonwealth's
22  Attorney with regards to this order that was sent to
23  you?
24  A   That was done -- I can't say that I did
25  that.  I said that was done prior to giving custody

Page 76

1  to Mr. Bush.
2  Q   All right.  So the order you received
3  through the investigation of Lawson was at least
4  given to the Commonwealth's Attorney for review?
5  A   I believe that was done by my detective.
6  Q   That's fair.  My question simply was based
7  on your belief that the order was sent to the
8  Commonwealth's Attorney for review?
9  A   That's my understanding.
10  Q   Okay.  And subsequent to that
11  understanding it's also your understanding that the
12  Commonwealth's Attorney also believed it to be a
13  valid order?
14      MR. SIMOPOULOS:  Objection to form.
15  BY MR. PURICELLI:
16  Q   Is that true?
17      MR. SIMOPOULOS:  Objection to form.  Also
18      as to not testify to what other people
19      believed.
20  BY MR. PURICELLI:
21  Q   You were not instructed not to obey the
22  order.  Is that fair?  You were not instructed by
23  the Commonwealth's Attorney to disregard the
24  Pennsylvania order?
25  A   We were instructed to treat it as valid.

Farnsworth & Taylor Reporting, LLC

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 77

1    Q   Okay.  And you weren't aware that that
2  same order was shown to a Virginia Court, and that
3  they issued an order as well?  Is that true?
4    A   Not sure what you're referring to.  You're
5  asking me if I knew that was shown to a Virginia
6  Court?
7    Q   Yes.
8    A   No.  I don't recall.  I mean, I don't
9  recall any knowledge of that.
10   Q   Did you represent to the magistrate that
11 Mr. Bush had procured a fraudulent order?
12   A   I said it had been inappropriately
13 obtained.
14   Q   Is that what you told the magistrate?
15   A   That's what I told -- there was a material
16 misstatement as far as the obtaining of this order.
17   Q   What material misstatement did you tell
18 the magistrate Mr. Bush had said?
19   A   It was vacated for being inappropriately
20 obtained and jurisdiction.  And the fact that she
21 had not been served I was relying on this vacated
22 order and the information it obtained.
23   Q   I know you were.  But I'm asking what did
24 you tell the magistrate?  Did you read him the
25 order?

Page 78

1    A   I don't recall.  I recall having it with
2  me at the time as part of the case folder, but I
3  don't recall exactly what I told the magistrate at
4  the time.  The substance of it was that the custody
5  order was inappropriately obtained and presented as
6  valid.
7    Q   Okay.  So let's assume now that you're
8  faced with a scenario where you have neither parent
9  with an order for custody from any court, who, from
10 your experience and training and policies of the
11 police department, can be charged with kidnapping if
12 they leave the state with their natural children?
13   A   If they're from another state or they're
14 both Virginia residents?
15   Q   I don't care if one of them is residing in
16 Pennsylvania, and one of them is residing in
17 Virginia.  Neither has a custody order and one
18 leaves the state with their natural children?
19       MR. SIMOPOULOS:  Objection to form.
20 BY MR. PURICELLI:
21   Q   You can answer the question.
22   A   Once more time please.
23   Q   Sure.  The fact scenario is based on the
24 representation that neither parent had a valid court
25 order; correct, when Mr. Bush left the state of

Page 79

1  Virginia with his children?
2    A   Well, when he left I believed he had a
3  valid.
4    Q   Your point is, it really wasn't; was it?
5  Isn't your point to bring the charges, Mr. Adams, at
6  the time he gave that the order really wasn't valid
7  so he didn't have a court order?
8        MR. SIMOPOULOS:  Objection to form.
9  BY MR. PURICELLI:
10   Q   Or do I have that all wrong?  You
11 represented to a magistrate that the order he gave
12 you was no good, put simply.  Isn't that true?
13   A   That it was not good, yes.
14   Q   All right.  So working on that premiss
15 that when he came he didn't really have a good
16 order.  He left Virginia with his children; correct?
17   A   Correct.
18   Q   And when he left Ms. Bush didn't have a
19 court order either; did she, for custody of the
20 children?
21   A   I had no knowledge of her having one.
22   Q   I understand.  So when you brought the
23 charges it was for him leaving the state with his
24 children; true?
25       MR. SIMOPOULOS:  Objection to form.

Page 80

1        THE WITNESS:  Under false pretenses.
2  BY MR. PURICELLI:
3    Q   What is Virginia law --
4        MR. SIMOPOULOS:  Objection to form.
5  BY MR. PURICELLI:
6    Q   -- on kidnapping under your understanding?
7        MR. SIMOPOULOS:  Argumentative.
8        THE WITNESS:  I would look at the law.
9  I'd see what the law says in reference to
10 kidnapping.
11 BY MR. PURICELLI:
12   Q   Is the law written on the warrants that
13 you were relying on?
14       MR. SIMOPOULOS:  Objection to form.
15 Argumentative.
16 BY MR. PURICELLI:
17   Q   You can answer the question.
18   A   No.  The code section is but the law is
19 not.
20   Q   You were trained in the code sections;
21 weren't you?
22   A   Yes.
23   Q   You were trained on kidnapping; weren't
24 you?
25   A   Yes, I was.

Page 81

1    Q   All right.  Based on your training what's
2  the requirement, what are the elements for
3  kidnapping in the Commonwealth of Virginia?
4        MR. SIMOPOULOS:  Objection to form.
5  BY MR. PURICELLI:
6    Q   You can answer the question.
7    A   Rephrase the question.
8        MR. PURICELLI:  I don't think it could be
9  rephrased any simpler.
10       THE WITNESS:  It's different for parental
11   abduction.
12  BY MR. PURICELLI:
13   Q   Is he charged with parental abduction or
14  kidnapping?
15   A   It's 18.2-47.  I'd have to look and see
16  what --
17   Q   Do you have a code that you can rely on to
18  find out what it is you charged on?
19   A   Yes.  It's on there.
20   Q   Are you saying you don't know what the
21  elements are?
22   A   I don't know the exact verbiage of it.
23   Q   What's your best recollection?
24       MR. SIMOPOULOS:  I'm going to object to
25  this line of questions, and just for the record

Page 82

1  state that my witness is not the Commonwealth's
2  Attorney.
3        MR. PURICELLI:  We'll concede that he's
4  not an attorney.
5        MR. SIMOPOULOS:  And there's no foundation
6  for these questions.
7        MR. PURICELLI:  I won't say that.
8        MR. SIMOPOULOS:  Well, that's the
9  objection.
10       MR. PURICELLI:  I merely asked his
11  understanding based on his training.  And he's
12  already admitted that he has been trained on
13  this section.
14       MR. SIMOPOULOS:  You can answer the
15  question.
16       THE WITNESS:  And the question was?
17  BY MR. PURICELLI:
18   Q   What are the elements to your best
19  recollection for the charge 18.2-47 which I believe
20  is kidnapping in the Commonwealth?
21       MR. SIMOPOULOS:  Again.  Objection to
22  form.
23  BY MR. PURICELLI:
24   Q   Or is that correct?  Is it parental
25  abduction?

Page 83

1    A   I'd have to review the exact code section.
2    Q   Well, on the third page of what we've
3  marked Adams 2 there's a Short Offense Description.
4  On this particular document it's called conspiracy.
5  Am I reading that correctly?
6    A   Your point -- I'm not that familiar with
7  it.  Conspired to.  All right.
8    Q   Okay.  On this particular one it's 18.2-22
9  and 18.2-47.  Did I read that correctly?
10   A   Yes.
11   Q   Okay.  So if we look at the front page of
12  Adams 2.  18.2-47 appears on the front page;
13  correct?
14   A   Yes.
15   Q   And if we read down, Short Offense
16  Description, it says Abduction by parent, Remove
17  from the state; correct?
18   A   Right.  I see it.
19   Q   Okay.  I've read that correctly; right?
20   A   Correct.
21   Q   Is there a difference between the
22  kidnapping statute and abduction by parent?
23   A   It should be all part of the same section.
24  It just makes a specific delineation by parent.
25  It's not a felony unless they remove them from the

Page 84

1  state.
2    Q   Okay.  Based on your training and this
3  statute what would be the elements, constituting in
4  your mind and training, of the crime of abduction by
5  parent, removal from state?  What would a person
6  have to do in your mind and training to be charged
7  with that offense?
8        MR. SIMOPOULOS:  Objection to form.
9        THE WITNESS:  I would have to look at the
10   exact code section, review it, make the
11   determination as to elements of what the person
12   did to see if it fit that criteria and then
13   proceed to the magistrate.
14  BY MR. PURICELLI:
15   Q   Are you answering today that you don't
16  know the general elements if not all of them?
17       MR. SIMOPOULOS:  Objection to form.  You
18  can answer.
19       THE WITNESS:  It seems pretty basic to me,
20   but I want to give you the exact correct answer
21   that you're looking for.
22  BY MR. PURICELLI:
23   Q   I'll give you the latitude that maybe you
24  don't know all the elements verbatim, but I'm asking
25  your general understanding.

Page 85

1      A    You have to be a parent of the children.
2  You have to take them out of state.  You have
3  to have -- it's probably not have permission of the
4  other parent or legal right to do so.
5      Q    Okay.  Let's assume those are the
6  requirements.  What evidence did you have that Ms.
7  Bush could come into Virginia with authority from
8  Pennsylvania to bring the kids?
9      A    With the authority from Pennsylvania?
10     Q    Yes.
11     A    I have to look at the other order.
12     Q    You're free to look at whatever you need
13  to.
14     A    (Reviews documents.)  I don't recall.
15     Q    You've gone through your whole file.  We
16  took a few minutes off the record to allow you to go
17  through your file to see what authority you had in
18  your file from Pennsylvania, meaning a court order
19  or something, saying Ms. Bush was in the
20  Commonwealth of Virginia with the authority to have
21  those children.  Isn't that true?
22     A    That she had the authority from
23  Pennsylvania to bring the children here and --
24     Q    To bring the children here and reside here
25  with them.  You looked through your file for that;

Page 86

1  isn't that true?
2      A    Right.
3      Q    And you were unable to find anything;
4  isn't that true?
5      A    I couldn't locate anything.
6      Q    Have there been documents lost other than
7  the ones that you know that you referred to in your
8  file, your police file?
9          MR. SIMOPOULOS:  Objection to form.
10     Argumentative.
11  BY MR. PURICELLI:
12     Q    You can answer that.
13     A    Obviously, I don't know what's been lost
14  but.
15     Q    Are documents routinely lost that are in
16  police files in the Richmond City Police Department?
17         MR. SIMOPOULOS:  Objection to form.
18  BY MR. PURICELLI:
19     Q    I'm sure you're going to tell me no or
20  yes, but I want to know if there's something unusual
21  about this file --
22         MR. SIMOPOULOS:  Is there a point?
23         MR. PURICELLI:  Yes, there is.  If you let
24     him answer it.
25         MR. SIMOPOULOS:  What's the question?

Page 87

1  BY MR. PURICELLI:
2      Q    The question simply is, there's something
3  unusual about that file that would be missing
4  documents.
5          MR. SIMOPOULOS:  Objection to form.
6      That's not a question.  What's the question?
7          MR. PURICELLI:  That is the question.
8          MR. SIMOPOULOS:  What's the question?
9  BY MR. PURICELLI:
10     Q    Is there something unusual about this file
11  that there would be missing documents in it?  For
12  example, it was kept in the basement and nobody
13  watched it or nobody put it together properly?  Is
14  there a reason that documents that might have been
15  in it aren't in it?
16         MR. SIMOPOULOS:  Objection to form.
17         THE WITNESS:  The detective that had the
18     case initially has since left.
19  BY MR. PURICELLI:
20     Q    When you talked to the magistrate to
21  obtain the warrants did you tell the magistrate that
22  Ms. Bush was in Virginia with authority from
23  Pennsylvania to have the children here, or she was
24  here without having obtained authority from
25  Pennsylvania when she left?

Page 88

1          MR. SIMOPOULOS:  Objection to form.
2  BY MR. PURICELLI:
3      Q    Did you say anything like that?
4          MR. SIMOPOULOS:  Objection to form.
5          THE WITNESS:  I believe what I said was
6      that she was a resident of Virginia with her
7      three kids enrolled in school here.
8  BY MR. PURICELLI:
9      Q    Did you tell the magistrate that the --
10         MR. SIMOPOULOS:  Could you let him finish
11     answering the question, please.
12         MR. PURICELLI:  I thought he was.  Okay.
13         MR. SIMOPOULOS:  No.  Let him finish
14     answering the question.  Thank you.  Please
15     continue answering.
16         THE WITNESS:  And that she had lived here
17     from quite some time, approximately a year.
18     And that was basically it as far as her
19     residency, her being here in Virginia.
20  BY MR. PURICELLI:
21     Q    Did you tell the judge she came from
22  Pennsylvania?
23     A    Initially, I may have said that their
24  relationship originated in Pennsylvania.  I don't
25  remember specifically the content, what I said about

Case 2:07-cv-04936-MAM   Document 53-3   Filed 10/01/10   Page 5 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 89

1  that.
2      Q   I'm sure your attorney does not want you
3  guessing.  Do you recall saying that?
4      A   Do I recall saying what?
5      Q   What you just said.  "I may have said."
6      A   That this, that the whole relationship
7  with the children?  I can't say that I, you know,
8  100 percent of what I told the magistrate in
9  reference to that specific issue.
10     Q   All right.  I don't want you to guess.
11 You don't have to guess.  If you don't recall that's
12 fair.  I'm sure your attorney doesn't want you to
13 guess.  I don't want to be going around chasing a
14 guess.  So if your memory is the best you can do,
15 just don't guess.
16         All right.  Now, when one parent has
17 no court order and neither does the other parent and
18 it's their children, and one parent lives in
19 Pennsylvania, and one parent lives in Virginia who
20 cares how long, how does your police department
21 under policy handle the situation when a parent
22 comes down here, picks up his children and leaves?
23     A   Well, we don't remove them from the
24 custody of one parent and give custody of children
25 to another parent absent some sort of legal reason

Page 90

1  to.
2      Q   Okay.  The police don't get involved in
3  that.  In this case we know they did.  Assume you
4  guys didn't do that.  He simply just went and picked
5  up his kids and went to Pennsylvania.  How would you
6  handle that?
7      A   That's not what happened here.  You're
8  asking me what would have happened?
9      Q   Yes.  Under your policy what would you
10 have done?
11         MR. SIMOPOULOS:  Objection.  Calls for
12     speculation.  Not relevant.  I can go on and
13     on, but if you can answer the question go
14     ahead.
15 BY MR. PURICELLI:
16     Q   And just so you know, I'm asking based on
17 your policy not on what --
18         MR. SIMOPOULOS:  Which policy are you
19     referring to?
20         MR. PURICELLI:  The police department
21     policy.
22         MR. SIMOPOULOS:  Well, there are many
23     policies.
24         MR. PURICELLI:  In handling a situation
25     like this.

Page 91

1          MR. SIMOPOULOS:  I'm going to object to
2      the form of this question.  We're not
3      referencing any particular policy.
4          MR. PURICELLI:  Fine.
5  BY MR. PURICELLI:
6      Q   Does the police department have a policy
7  or procedure in handling domestic matters where one
8  parent doesn't have a custody agreement and neither
9  does the other and one picks up the children and
10 leaves the state?
11     A   Leaves the state?  That's different.  I
12 mean, with -- I'd have to look up the exact elements
13 of the crime of parental abduction again.
14     Q   I'm asking about a policy.  Not a crime.
15     A   A policy cannot permit a crime so our
16 policy would be in line with the law.
17     Q   Okay.  So if I understand you correctly
18 the policy says in a situation like that if it
19 constitutes a crime you charge?
20     A   Yes.  If it constitutes a crime we enforce
21 the law.
22     Q   Okay.  And is it your understanding that
23 it's a crime in Virginia for one parent who has
24 children here that's left from another state,
25 relocated from Virginia, has no court order for

Page 92

1  bringing the children into Virginia or gives the
2  parent custody exclusive or otherwise, but another
3  parent coming in and picking up their children to
4  return them from where they were removed is a crime?
5          MR. SIMOPOULOS:  Objection to form.
6  BY MR. PURICELLI:
7      Q   You can answer it if you understand.
8      A   I mean, that's the part I don't exactly
9  understand because they don't initially leave.
10 Usually, we're on the front end of those type of
11 disagreements where one parent wants to come in and
12 take the children, and the other parent wants them
13 to stay.  So they stay where they're at.  And if
14 they leave with the consent of the other parent then
15 they're stuck with going to the other state where
16 the parent is.  If they overstay some sort of verbal
17 agreement then we refer them to the appropriate
18 jurisdiction.
19     Q   When all these facts are surrounding did
20 you know Serene and the children were from
21 Pennsylvania before they came here to Virginia?
22     A   I believe I was told by the detective in
23 Pennsylvania that they had left the state of
24 Pennsylvania.
25     Q   To be clear, did you do anything before

Page 93

1 you got your warrants to find out that Serene was in
2 Virginia with the kids under the authority of a
3 Pennsylvania law?  In other words, she was here with
4 the kids lawfully?
5     A   I didn't have any reason to believe
6 otherwise so I can't --
7     Q   You didn't have a court order from
8 Pennsylvania that said she had the right to have the
9 children; did you?
10     A   No.  I believe what I had was the -- which
11 order did I have.  (Reviews documents.)  I believe
12 the one that was faxed to me was the only one that I
13 had at the time that decision was made.
14     Q   That was the one vacating the prior one
15 you determined was inappropriately issued?
16     A   The initial one.  (Reviews documents.)
17 Yes.  The initial one dated the 23rd of June which
18 was later vacated.
19     Q   So can we agree by the time it was issued
20 and you went and sought warrants that caused the
21 arrest of Mr. Bush you had not determined whether
22 Ms. Bush had lawful custody of the children when she
23 entered Virginia?
24     A   She had custody at the time that I did
25 that.

Page 94

1     Q   Did you have any agreement that she was
2 able to provide to you that --
3         MR. SIMOPOULOS:  Objection.
4 BY MR. PURICELLI:
5     Q   -- Mr. Bush had entered into saying she
6 could live in Virginia with the children?
7         MR. SIMOPOULOS:  Objection to form.
8     Rephrase that question.
9 BY MR. PURICELLI:
10     Q   Did you have any agreement between
11 Mr. Bush and Ms. Bush about the custody of the kids?
12         MR. SIMOPOULOS:  Agreement between
13     Mr. Bush and Ms. Bush?
14     MR. PURICELLI:  Yes.
15         MR. SIMOPOULOS:  Oh.  I didn't understand.
16     THE WITNESS:  I don't believe so.
17 BY MR. PURICELLI:
18     Q   And my understanding of your policy is if
19 there's not one of those, there should be a court
20 order; correct, that you guys look to?
21     A   We refer to instructions from the Court,
22 yes.
23     Q   All right.  And you didn't have one of
24 those either; correct?
25     A   At which time?

Page 95

1     Q   At the time Mr. Bush is leaving Virginia
2 with his children?
3     A   At the time he was leaving Virginia with
4 his children the only one I had was the one dated
5 the 23rd of June that was later vacated.
6     Q   And you concluded that really wasn't a
7 good one because it was vacated; right?
8     A   Eventually.
9     Q   Right.  So would I be correct that you
10 viewed that not a lawful basis to remove the
11 children because the order was really no good?
12     A   I don't understand the question.
13     Q   I'm trying to rephrase it.  I understand
14 that order was vacated, and we've discussed that it
15 was a jurisdictional issue; correct?
16         MR. SIMOPOULOS:  Again, objection to form.
17     I don't know if he gave any conclusions
18     regarding the jurisdictional issue.
19         MR. PURICELLI:  Well, if he didn't, I'll
20     clarify.  I don't mean to put words in his
21     mouth.  Just trying to get past the question so
22     he understands it.
23 BY MR. PURICELLI:
24     Q   As it turned out, on hindsight if you
25 will, you don't believe the order that Mr. Bush

Page 96

1 presented was good, valid law or something to that
2 effect; is that true?
3     A   It was vacated and determined to be
4 invalid.
5     Q   Okay.  And all I'm saying is, having
6 hindsight, if you'd had that knowledge when the
7 children were turned over and he was leaving
8 Virginia if you knew it was no good, okay, the
9 premiss would have been he didn't have an order.
10 She didn't have an order; correct?
11     A   Correct.
12     Q   He didn't have an agreement.  She didn't a
13 have an agreement; correct?
14     A   Correct.
15     Q   In that situation you also knew that you
16 had nothing that said she came to Virginia with the
17 kids with any authority or consent from Pennsylvania
18 to move here with them or his consent; correct?
19     A   That's correct.
20     Q   All right.  In that factual scenario his
21 leaving Virginia with his children -- and there's no
22 dispute they were his children; correct?
23     A   No dispute as to that; no, sir.
24     Q   You're faced with those facts.  Those
25 facts.  In your mind based on the procedures in the