Case 2:07-cv-04936-MAM  Document 53-4  Filed 10/01/10  Page 1 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 97

1 police department and the law that you're trained
2 on, what crime do you understand occurred?
3     MR. SIMOPOULOS: Are we asking him
4   hindsight again?
5     MR. PURICELLI: Yes. Because I'm giving
6   him the benefit of the doubt.
7     MR. SIMOPOULOS: Because I object to the
8   compound narrative questions. This is all
9   clearly misleading and misstating facts.
10    MR. PURICELLI: Well, I don't mean to
11  mislead him.
12 BY MR. PURICELLI:
13  Q   Did I say any facts in your mind that you
14 didn't believe to be true?
15  A   We never would have granted custody to him
16 in the first place if we believed this to be no
17 good.
18  Q   He wouldn't have gotten the kids; correct?
19  A   Right. We would not have facilitated that
20 at all.
21  Q   All right. Give you the benefit of that
22 doubt. I'm past all that. I'm at the point now
23 that if you didn't believe he had a good order. He
24 didn't have an agreement and neither did she. Is
25 leaving Virginia within that factual scenario in

Page 98

1 your mind, in your training of the law and your
2 policies of the police department, what crime would
3 he have committed?
4   A   It would have been different because we
5 would have had to investigate further as to the
6 disposition of the mother because she had custody of
7 the children.
8   Q   And how would you have investigated? What
9 would you have done?
10  A   We would have spoken to her.
11  Q   And asked her what?
12  A   We would have asked her, do you want him
13 to take the children or not?
14  Q   Assume she says no. I moved away. I'm
15 trying to get away from him. Let's assume she said
16 that.
17  A   Then like I said, we would not have
18 facilitated the removal of the children and given
19 them to him.
20  Q   So was he being charged with parental
21 abduction because you believed you were being
22 tricked by him to help him or because he violated
23 some other law?
24    MR. SIMOPOULOS: Objection to form.
25    THE WITNESS: Repeat that.

Page 99

1 BY MR. PURICELLI:
2   Q   Sure. Was Mr. Bush being charged with
3 parental abduction in the kidnapping statute because
4 the Richmond Police Department facilitated him to
5 pick up the children and leave Virginia with the
6 kids, or did he do something else?
7   A   This was done because this was determined
8 to be invalid. It was presented as valid and
9 applicable. And he left and took the kids against
10 the will of the mother out of the state.
11  Q   And that constitutes abduction?
12    MR. SIMOPOULOS: Objection to form. Go
13  ahead. I think we've gone through this about
14  three times now. He testified that he had a
15  valid order that was overturned. What is the
16  point of the question any further? I think
17  it's starting to go beyond ...
18 BY MR. PURICELLI:
19  Q   The point of the question is, is he was
20 charged with child abduction. They're his children;
21 correct?
22  A   Parental abduction.
23  Q   Okay. I tried to find out from you what
24 the elements were for that offense. You don't
25 recall them all. Is that fair?

Page 100

1   A   Not off the top of my head.
2   Q   So in general you gave me an idea of what
3 you believed the elements were. Isn't that what I
4 asked?
5   A   Yes, sir.
6   Q   Okay. And I asked you would it be child
7 abduction if neither parent had an order giving them
8 custody, neither parent had an agreement as to who
9 had custody. The parent who had the children in
10 Virginia has no authority granted to her from the
11 courts of Pennsylvania to be in Virginia with the
12 kids. Would it be a crime for the parent from
13 Pennsylvania to come to Virginia to pick up his kids
14 and return under that fact?
15    MR. SIMOPOULOS: Objection to form. I
16  don't think there's a question in there.
17    THE WITNESS: That's where I said I'd have
18  to look at the law and see what exactly it
19  enumerates, what it allows for, if there are
20  any exceptions.
21 BY MR. PURICELLI:
22  Q   So sitting here now you can't tell me that
23 violates the law?
24  A   I can look in a book and tell you in a
25 short period of time.

Case 2:07-cv-04936-MAM   Document 53-4   Filed 10/01/10   Page 2 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

### Page 101

1  Q  I asked you if you wanted to look in a
2  book.
3  A  I'm sorry I didn't.
4  Q  I'm sure your attorney has one.  I'm not
5  trying to trick you.
6     MR. SIMOPOULOS:  Are we asking hindsight
7  questions again?
8     MR. PURICELLI:  No, we're not.  If he
9  needs to look at a book and you have a book
10 please give him the book.  I'm not here to
11 trick him.
12    MR. SIMOPOULOS:  Again I'm going to
13 object.  What is the point of examining the
14 criminal code?  Don't you have that?  Shouldn't
15 you have brought that with you?
16    MR. PURICELLI:  I didn't know I'd --
17    MR. SIMOPOULOS:  You're the one that's
18 going down the hindsight --
19 BY MR. PURICELLI:
20 Q  Let's put it this way, Sergeant.  The
21 charges were dropped; weren't they?
22 A  Yes.
23 Q  Dismissed by the Court; weren't they?
24 A  I don't know if they were nol pros'ed or
25 dropped or dismissed or what.

### Page 102

1  Q  Were you present for any of the hearings?
2  A  I don't believe so.
3  Q  You weren't present for the bail hearing?
4  A  I may have been.  I don't recall.
5  Q  If you were there do you recall the judge
6  saying there's no crime here?
7     MR. SIMOPOULOS:  Objection.
8     THE WITNESS:  Like I said, I don't recall
9  that.
10 BY MR. PURICELLI:
11 Q  Okay.  Well, me having represented the
12 judge said at the bail hearing, "There's no crime
13 here, Counselor" talking to the Commonwealth's
14 Attorney, does that refresh your memory as to what
15 occurred at the bail hearing?
16    MR. SIMOPOULOS:  Objection to form.
17    THE WITNESS:  I don't believe I was at the
18 bail hearing.
19 BY MR. PURICELLI:
20 Q  I thought you just told me you were.
21 A  No.
22 Q  If you weren't I won't ask you anymore
23 questions.
24    MR. SIMOPOULOS:  Objection.  Misstatement
25 of the facts.  I'm going to object to that line

### Page 103

1  of questioning.
2     MR. PURICELLI:  Court Reporter, I don't
3  mean to do this to you, but could you read back
4  what I'm asking for.
5     (Read back was provided.)
6     MR. PURICELLI:  That's fine.  That's fine.
7  Will you agree he said, May have?  I'm going to
8  ask him questions if he thinks he was.
9     MR. SIMOPOULOS:  I'm going to object to
10 that line of questioning.
11    MR. PURICELLI:  Okay.  It's objected to.
12 BY MR. PURICELLI:
13 Q  Officer, I don't mean to delay for the
14 record.  If you don't recall tell me you don't
15 recall.  If you say that you might have been there
16 and you believe that to be true, tell me that.  But
17 I am going to ask you questions and see if things
18 prompt your memory if you may have been there.  I
19 don't mean to belabor.
20    Now, assuming you may have been
21 there, me telling you that it's been represented
22 that the judge said to the Commonwealth's Attorney,
23 "You don't have a crime here" does that help refresh
24 your memory as to whether you were there or weren't
25 there?

### Page 104

1  A  It doesn't help.  I don't recall if I was
2  there or not.
3  Q  Assuming that the bail judge said that for
4  the purposes of this question, assume the judge said
5  that, would you have dismissed the charges?
6  A  That's not my decision to make.
7  Q  Would you have communicated with the
8  Commonwealth's Attorney not to pursue the charges?
9  A  I assume we would have met about it and
10 discussed the merits of the case at that point.
11 Q  Did you meet at any time with the
12 Commonwealth's Attorney about the merits of the
13 case?
14 A  Prior to obtaining the warrants we
15 discussed the facts and circumstances and merits of
16 the potential criminal case.
17 Q  And you told the Commonwealth's Attorney
18 everything you've testified to today; correct?
19 A  Yes.
20 Q  Okay.  You didn't tell him anything
21 different than what you testified to today; correct?
22 Maybe different words but.
23 A  I don't recall.
24    MR. SIMOPOULOS:  If you don't recall, tell
25 him that.

Case 2:07-cv-04936-MAM   Document 53-4   Filed 10/01/10   Page 3 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

### Page 105

1  THE WITNESS: I don't recall.
2  BY MR. PURICELLI:
3  Q  Okay. After Mr. Bush was in Virginia did
4  you have a discussion with the Commonwealth's
5  Attorney about this case?
6     MR. SIMOPOULOS: Objection. Asked and
7     answered a couple times now.
8     THE WITNESS: Did I speak with the
9     Commonwealth's Attorney about the case?
10 BY MR. PURICELLI:
11 Q  After Mr. Bush had been arrested?
12 A  Yes.
13 Q  Okay. How many times did you talk to the
14 Commonwealth's Attorney after he was arrested?
15 A  I don't know.
16 Q  Do you know whether or not Mr. Bush had
17 been incarcerated as a result of your warrants?
18 A  He was arrested and incarcerated is what I
19 understand.
20 Q  After the warrants were issued what if
21 anything did you do to facilitate the arrest?
22 A  I just obtained the warrants which
23 resulted in the arrest.
24 Q  You physically had them? Did you leave
25 them on your desk? Put them in NCIC? Did you give

### Page 106

1  them to a detective? What did you do?
2  A  I believe I filed them with the
3  information desk which is the normal procedure that
4  we do.
5  Q  Okay. Tell me the procedure that Richmond
6  City Police Department operates under when an
7  officer obtains felony warrants for parental child
8  abduction.
9  A  Warrants are obtained and carried from the
10 magistrates office over to the information desk
11 where they're logged in and put in file in our
12 system. Or in this case they would be logged into
13 NCIC so if other jurisdictions came across the
14 individual and there was a hit they could confirm
15 the existence of warrants for an individual.
16 Q  And then is it then the practice that you
17 don't go looking for the person, or do you allow
18 time for --
19 A  If we know where the person is we notify
20 the appropriate jurisdiction.
21 Q  Did you know where Mr. Bush was?
22 A  At the time I obtained the warrants I
23 didn't exactly know where he was, no.
24 Q  Did you have an idea where he was?
25 A  Yes.

### Page 107

1  Q  Where?
2  A  Pennsylvania.
3  Q  Knowing that he was going to Pennsylvania
4  with the kids and you had warrants what, if
5  anything, did you do?
6  A  I don't exactly recall.
7  Q  Did you write it down?
8  A  No. I don't believe I wrote it down.
9  Lieutenant Russell was handling the communications
10 with the other agencies at that time.
11 Q  So you can't tell me you didn't contact
12 the Pennsylvania authorities?
13 A  I can't tell you that I did. I'm not
14 saying that I didn't.
15 Q  So if the Pennsylvania authorities say you
16 did contact them you have no reason to dispute that?
17    MR. SIMOPOULOS: Objection to form.
18    THE WITNESS: It depends who it was. I
19    mean, I remember speaking to some individuals.
20 BY MR. PURICELLI:
21 Q  Tell me what you remember.
22 A  I remember speaking to Sergeant Tripp. I
23 remember speaking to an FBI agent. That's about it.
24 That's all I remember as far as other agencies and
25 contacts with this case and the arrest of Mr. Bush.

### Page 108

1  Q  Do you call the Bucks County District
2  Attorney?
3  A  I did not do that.
4  Q  Did you call Bucks County Sheriff's
5  Office?
6  A  I don't believe I did. I believe
7  Lieutenant Russell was doing that.
8  Q  Were you keeping in contact with him to
9  see what he was doing so you weren't duplicating his
10 acts?
11 A  He indicated to me that he was handling
12 that side of the case.
13 Q  How did Russell know you even obtained
14 warrants?
15 A  Because we met with the Commonwealth's
16 Attorney over the phone prior to that, and based on
17 the substance and conversation I told him I was
18 going to get warrants. He stayed in his office and
19 was on the phone.
20 Q  With who?
21 A  I don't know at that time.
22 Q  Nobody that has anything to do with this
23 case?
24    MR. SIMOPOULOS: Objection to form. He
25    just answered he didn't know.

Case 2:07-cv-04936-MAM   Document 53-4   Filed 10/01/10   Page 4 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 109

1   MR. PURICELLI: He might have told him
2 later.
3   MR. SIMOPOULOS: Asked and answered.
4 BY MR. PURICELLI:
5   Q   All right. You got your warrants. You
6 came back. You put it in a box for somebody to
7 enter it in. Do I understand that correctly?
8   A   I don't know if I handed it to somebody at
9 the information desk or what the next step was.
10   Q   You don't remember?
11   A   I don't remember.
12   Q   What should have happened based on policy?
13   A   I should have handed it to the person at
14 the information desk. But when we're working a case
15 and communicating with another agency for serving of
16 a warrant, it's imminent we know where somebody is,
17 or it's going to be served in an immediate fashion
18 then sometimes we'll just fax a copy.
19   Q   In your file you identified a sticky
20 yellow pad with Mr. Bush's information on it; didn't
21 you?
22   A   Yes, I did.
23   Q   And I told you you didn't need to copy
24 that; correct?
25   A   Correct.

Page 110

1   Q   Did that have his address on it?
2   A   It has an address on it. Would you like
3 me to get it?
4   Q   Yes. You can look at it.
5   A   Okay.
6   Q   Did it have the phone number?
7   A   No, it doesn't.
8   Q   Does it have a license plate number on it?
9   A   It has a license plate number on it.
10   Q   Vehicle description?
11   A   Yes.
12   Q   Did you run a search for the address based
13 on the tag?
14   A   I believe I -- no. I don't recall.
15   Q   Do you want to check your file to see if
16 you have records indicating that you ran a motor
17 vehicle check?
18   A   I think the only DMV records that I have
19 are from Ms. Bush.
20   Q   Just wanted to know if you did or didn't.
21   MR. PURICELLI: By the way, the copies
22 that they made for me, do you have them?
23   MR. SIMOPOULOS: Which copies?
24   MR. PURICELLI: His reports from the
25 records and stuff like that.

Page 111

1   MR. SIMOPOULOS: I thought we gave them to
2 you.
3   MR. PURICELLI: It's going to be the
4 missing child reports and those documents
5 there.
6   MR. SIMOPOULOS: I'm sure I've given you
7 those already.
8   MR. PURICELLI: I've identified what I
9 don't have. And I don't have a DMV printout
10 for Mr. Bush's address. So since we've
11 established already that he's given me
12 everything except the court filings it's
13 apparent that you didn't do a search of his tag
14 number.
15 BY MR. PURICELLI:
16   Q   Is there any reason that --
17   A   I didn't print a copy of it.
18   Q   Oh, okay. You may have run it?
19   A   Correct.
20   Q   So you knew his address then?
21   A   I may have had an address for him, yes.
22   Q   All right. Well, you have an address or I
23 should say there is an address that appears on the
24 warrants; correct? Adams 2 (indicates.)
25   A   Correct.

Page 112

1   Q   Do you know how that address got on the
2 warrants?
3   A   It's the same address that's on the sticky
4 note here. That was the address that I gave to the
5 magistrate. Otherwise it wouldn't appear on the
6 warrants.
7   Q   So you had an address for him; right?
8   A   (Nods.)
9   Q   You knew he was going to Pennsylvania;
10 correct?
11   A   (Nods.)
12   Q   You have to say it orally for the record.
13 She can't take down nods and things.
14   A   Yes.
15   Q   So since you knew where he was going. You
16 knew there was a warrant for his arrest. Did you or
17 somebody at your direction contact the local police
18 department with the address you had?
19   A   I don't know whether Lieutenant Russell
20 did of his own volition. I don't recall directing
21 him to do that.
22   Q   Is there any policy in your police
23 department as to a person that's out of state to
24 contact the local police department and let them
25 know you have a warrant?

Case 2:07-cv-04936-MAM  Document 53-4  Filed 10/01/10  Page 5 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 113

1  A  Sure.  You can do that.
2  Q  Is there such a policy?
3  A  There's a policy on cooperating with other
4  law enforcement agencies.  It doesn't specifically
5  delineate the necessary procedure for just serving
6  warrants.
7  Q  Okay.  So your department does not have a
8  written policy on what the actions of an officer are
9  once they have a warrant for the arrest of a person.
10 Do I have that right?  Do I understand that
11 correctly?
12 A  Well, what we do is with the warrant on
13 file at our information desk, if we know where the
14 individual is you can contact the appropriate
15 jurisdiction were you believe that person to be so
16 that the local jurisdiction can arrest the
17 individual.
18 Q  Based on the information you had you knew
19 where he would be, an address; correct?
20 A  Possibly, yes.
21 Q  So you had the ability to contact the
22 local police department in Pennsylvania to
23 facilitate an arrest on your warrants; correct?
24 A  Yes.  I had the ability.
25 Q  Did you act on that ability?

Page 114

1  A  I don't recall if I did or if it was
2  Lieutenant Russell.  But one of us contacted that
3  agency or the federal agency to facilitate that
4  arrest.
5  Q  And you say you personally contacted
6  someone else.  You don't recall who it was?  Did I
7  understand that?
8     MR. SIMOPOULOS:  Objection to form.
9  BY MR. PURICELLI:
10 Q  Did you call anybody in Pennsylvania?
11    MR. SIMOPOULOS:  Objection.  Asked and
12 answered.  You've already asked this question
13 three times.
14    MR. PURICELLI:  No.  He says Tripp called
15 him.
16    THE WITNESS:  That's what my notes
17 indicate is that Tripp called me.  I don't
18 recall initiating contact with anyone in
19 Pennsylvania.
20 BY MR. PURICELLI:
21 Q  You indicated that you may have contacted
22 the FBI.  Is that what you said?
23 A  Yes.
24 Q  In Pennsylvania?
25 A  Yes.  The local FBI.

Page 115

1  Q  In Virginia?
2  A  Yes.
3  Q  Who did you talk to?
4  A  I talked to Candice Rose.
5  Q  What did you tell Candice Rose?
6  A  I told her -- let's see.  (Reviews
7  documents.) I can't recall exactly what I told her,
8  but the warrants that were on file we faxed to her.
9  Q  (Reviews documents.)  Sorry.  I can't seem
10 to find that piece of paper that you're reading from
11 in the packet that you just gave me.
12    MR. SIMOPOULOS:  It should be there.
13    THE WITNESS:  It's a fax cover sheet.
14    MR. PURICELLI:  (Reviews documents.)
15    MR. SIMOPOULOS:  We'll just make a copy of
16 the file and do it that way.
17    MR. PURICELLI:  I just didn't want to kill
18 trees if we didn't have to.  Do you want to
19 call that Adams 1D since it's part of the
20 packet?  Or just agree to attach it to Adams 1?
21    MR. SIMOPOULOS:  You can call it whatever
22 you want.
23    MR. PURICELLI:  All right.  By agreement,
24 we've incorporated the other documents that
25 were in his file into Adams 1 so we can call

Page 116

1  that his file.  Is that acceptable?
2     MR. SIMOPOULOS:  Fine.
3  BY MR. PURICELLI:
4  Q  You showed me a fax copy bearing your name
5  checked of for review.  It's in the message that
6  says Candice.  Did I describe the document fairly
7  accurate?
8  A  Yes.
9  Q  Just for the purpose of the record so we
10 can find it again, it has the name Candice.  Do you
11 know who that is?
12 A  I believe it's Candice Rose.
13 Q  Okay.  And that's the person you spoke to
14 at the FBI?
15 A  Yes, sir.
16 Q  Did you know her before you contacted her?
17 A  No, sir.
18 Q  Okay.  So this was this first contact you
19 had ever with her?
20 A  Yes, sir.
21 Q  Does this typing here accurately reflect
22 the conversation you had with her?
23 A  That's what I said.
24 Q  Okay.  PPO stands for what?
25 A  Preliminary Protective Order.

Case 2:07-cv-04936-MAM   Document 53-4   Filed 10/01/10   Page 6 of 6

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 117

1  Q  Did you talk to anybody other than Candice
2  at the FBI?
3  A  Not that I recall.
4  Q  What if anything did you tell Candice?
5  A  May I see that?
6  Q  Sure.  (Document proffered.)
7  A  (Reviews documents.)  We discussed the
8  fact that warrants were either on file or going to
9  be on file, and I believe Detective Lawson faxed her
10 the ones.
11 Q  So you may have contacted Candice before
12 you actually had the warrants?
13 A  It didn't indicate what time on that fax,
14 but I have another fax cover sheet for the same
15 person with Detective Lawson that sent the warrants.
16 I don't know which time those -- what time exactly
17 both of these occurred.
18 Q  You don't have a receipt printout?
19 A  No, sir; I don't.
20 Q  What reason if any would there have been
21 to have contacted the FBI before you had the
22 warrants?
23 A  Maybe from a missing persons standpoint.
24 I'm just speculating.
25 Q  Don't speculate.  I'm sure your attorney

Page 118

1  doesn't want you to guess.
2  A  I don't know that that happened.
3  Q  Had you contacted the FBI before for some
4  reason in regards to a situation similar to what we
5  have with Mr. Bush before you got a warrant?
6  A  I don't recall.
7  Q  The fax cover sheet doesn't indicate that
8  you have the warrants; correct?
9  A  Doesn't indicate that I do and doesn't
10 indicate that I don't.
11 Q  And you've indicated that there's another
12 fax cover sheet that was prepared by Detective
13 Lawson that indicates that the warrants were being
14 faxed over to the FBI?
15 A  Yes, sir.
16 Q  Why were you contacting the FBI?
17 A  It involved an abduction across state
18 lines at this point.
19 Q  What if anything did the FBI tell you?
20 A  Told me to fax the warrants or have the
21 warrants faxed and any other pertinent information.
22 And I believe it was going to be assigned to their
23 fugitive department.  Something along those lines.
24 That was the information.
25 Q  Is that personally through Candice?

Page 119

1  A  I spoke to her; yes, sir.
2  Q  But the part you just mentioned that it
3  was going to be assigned to the fugitive task force,
4  was that based on your belief from your conversation
5  with Candice, or was that belief from what someone
6  else told you?
7  A  I don't know.
8  Q  Did anybody else talk to you about the
9  fugitive task force and getting your warrants?
10 A  I believe -- let's see.  I know I spoke
11 with Lieutenant Russell about the possibility of
12 having him assigned to the fugitive task force.
13 They have contacts with the FBI.
14 Q  Did you have communications with
15 Lieutenant Russell about the course of action you
16 should take to cause the arrest of Mr. Bush?
17 A  Yes.
18 Q  What was the conversation?
19 A  Part of it was about whether the fugitive
20 task force would be the route to go or another
21 route.
22 Q  What other route was available to you?
23 A  I don't recall at this time.  It was local
24 police, state police, FBI fugitive task force.
25 Q  Did anybody contact the U.S. Marshal's

Page 120

1  Office?
2  A  I believe they're part of the task force,
3  part of our fugitive task force here in the city.
4  Q  Did you come into information that members
5  of the Richmond Police Department were working on
6  loan to that task force?
7  A  I'm not sure I understand the question.
8  Q  Are there members of the Richmond Police
9  Department that work on that task force?
10 A  Yes.
11 Q  Is that task force out of the U.S.
12 Marshal's office?
13 A  They work out of headquarters and probably
14 the U.S. Marshal's office too.
15 Q  Did you know who the officers were that
16 were working on that task force from the Richmond
17 Police Department?
18 A  Yes, sir.
19 Q  What are their names?
20 A  Sandy Leadbetter and Brian Pendagrass.
21 Q  Did anybody from your unit including
22 yourself reach out to them to assist in the arrest
23 of Mr. Bush?
24 A  I don't recall.
25 Q  You don't recall if you asked them to help