1                STEVEN J. IGNATZ

2    received any other types of none law

3    enforcement training in regards to criminal

4    justice?

5         A.    None law enforcement training?

6         Q.    Yeah.  At a university or

7    college.  Something like that.

8         A.    I did.  I attended the Southern

9    Police Institute in Louisville at the

10   University of Louisville in Louisville,

11   Kentucky in 2001.

12        Q.    All right.  And what was the

13   purpose of that?

14        A.    It's a police executive

15   development.  I was sent there by the State

16   Police.

17        Q.    Okay.  And what was the

18   curriculum at that police development?

19        A.    There were classes regarding law,

20   psychology.  Things like that.

21        Q.    Okay.

22        A.    I can't remember.  It was five

23   classes.  Three credits per class.

24        Q.    Okay.  In the area of the law

25   segment can you describe what areas of law

1                STEVEN J. IGNATZ

2  because obviously law is a very big area?

3        A.      As I recall it was police

4  liability. Dealing with police as -- members

5  of your department as a supervisor.

6        Q.      Okay. Can you give me a thumb

7  sketch, thumbnail sketch of that curriculum

8  which you were taught about police liability

9  as a supervisor?

10       A.      I'm trying to remember.

11       Q.      It had an impact in training.

12       A.      Yes, sir.

13               Basically, the training

14 was put on to help us be better supervisors

15 and to develop into command level positions

16 with the State Police.

17               As far as the law course,

18 I remember one of the instructors was a

19 processor of law at the university and we had

20 to do reports on -- well, just various

21 things. I remember I wanted to do something

22 on how to deal with the Posse Comitatus. You

23 know, people that were involved in that type

24 of issues.

25       Q.      Would it be fair to say from this

1        STEVEN J. IGNATZ

2  training you learned that a supervisor and
3  lesser persons could be civilly liable for
4  the conduct as a supervisor or a police
5  officer?
6       A.    Yes.
7       Q.    Okay.  And would those areas that
8  you covered in law also include civil
9  liability for civil rights violations?
10      A.    I believe so.
11      Q.    Okay.  And have you relied in
12 your actions as a lieutenant with the State
13 Police with that training?  That civil
14 liability training.
15      A.    I've used all my training --
16      Q.    Okay.
17      A.    -- as a lieutenant.
18      Q.    And would it be fair for me to
19 say that the civil liability training that
20 you received as a supervisor included the
21 requirement to make sure that your
22 subordinates that you're with don't do
23 anything that would violate persons' civil
24 rights?
25      A.    Yes.

```
 1                STEVEN J. IGNATZ

 2        Q.      Okay.  In the course of your

 3   training since being in law enforcement, so

 4   I'll go back to '82 so you get the benefit of

 5   all of it, were you aware that person's had

 6   constitutionally protected rights under the

 7   United States Constitution to associate with

 8   their family?

 9        A.      I don't follow the question.

10                Could you repeat it?

11        Q.      Sure.

12                Throughout your training

13   since '82 as a police officer are you aware

14   that police could not do anything to

15   interfere with a father being with his

16   children unless the law allowed it?

17        A.      I'm just not grasping the concept

18   here.

19        Q.      It's not a problem.  These are

20   hard areas.

21                Not to my be too

22   inquisitive about your family, I see that you

23   have a ring on.  So I'm assuming you're

24   married.

25                Is that correct?
```

1                STEVEN J. IGNATZ

2       A.    That's correct.
3       Q.    I'm assuming broadly that you
4  have children.
5       A.    That's correct.
6       Q.    Okay.  Are you aware from your
7  training as a police officer that in your
8  case you, as the father, would have the right
9  to be with your children unless the law
10 stepped in and prevented?
11      A.    Yeah.  I would think that would
12 be something that I picked up regardless of
13 having police training.
14      Q.    Okay.  But I'm now going to look
15 at your police training.
16            And in the course of all
17 your training did you learn that there was
18 nothing you as a police officer could do to
19 interfere with a father being with his child
20 unless some specific law or act of the court
21 prevented it?
22      A.    Yes.
23      Q.    Okay.  And in this training for
24 civil liability issue, would that be the kind
25 of civil liability issues that you might have

1       STEVEN J. IGNATZ

2    looked at?

3       A.   No.  It wasn't the type of thing

4    we looked at the training that I recall.

5       Q.   In all your training with the

6    State Police, Pennsylvania State Police, have

7    they provided you with any type of training

8    in that area of federal civil rights?

9       A.   I'm sure they have, but right now

10   I can't --

11      Q.   Okay.

12      A.   -- recall specific classes on

13   that type of thing.

14      Q.   And you're sure you've received

15   that type of training because why?

16      A.   I know that they've given us

17   quite a broad spectrum of training over the

18   years.  I'm sure that's been picked up in

19   that training.

20      Q.   Okay. And would it be fair to

21   say that when you visited the Newtown

22   Township Police Department to do a CLEAN

23   investigation that you had already received

24   that training?  You had that knowledge

25   already.

1        STEVEN J. IGNATZ

2    A.    Yes.

3    Q.    Okay. And I know I haven't asked

4 you a date. I don't know if you remember the

5 date.

6              So I'll ask you if you

7 remember the date that you went down and met

8 with Mr. Bush, Detective Bush, Chief Duffy at

9 Newtown Township Department.

10   A.    I believe it was May 17, 2007.

11   Q.    Okay. So as of May 17, 2007 we

12 can agree that you knew that there was

13 nothing that a State Trooper could do to

14 interfere with a father being with his child.

15   A.    Within the law.

16   Q.    Okay. Within the law.

17   A.    Right.

18   Q.    And as of that date did you know

19 of anything in which you were doing that

20 prevented, let's say, David Bush from being

21 with his children?

22   A.    No, sir.

23   Q.    Okay. Did you know of anything

24 that would prevent Christopher Bush from

25 associating with David Bush in his effort to

1           STEVEN J. IGNATZ

2   find the David Bush children?

3       A.    I knew of nothing --

4       Q.    Okay.

5       A.    -- between the family members.

6       Q.    Nobody told you from the State
7   Police when they sent you down whenever you
8   did your investigation about anything that
9   would prevent them from doing interaction
10  with anybody.

11      A.    No, sir.

12      Q.    Okay. Now, did anybody provide
13  you with training at any time since you've
14  been with law enforcement in regards to first
15  amendment rights?

16      A.    Yes.

17      Q.    Okay. And when I say first
18  amendment rights I'm going to focus on the
19  right to make a complaint against, say, a
20  member of the State Police.

21            Have you received any type
22  of training in that?

23      A.    I've had training discussing
24  first amendment rights, but I've had nothing
25  about somebody making a complaint against

1              STEVEN J. IGNATZ

2    members of the State Police as it pertains to

3    their first amendment rights.

4         Q.     Okay.  So I'm not bumping all

5    over the place, can you tell me what first

6    amendment training you've received as a

7    police officer?

8         A.     It's reviewed periodically at

9    update training.  First amendment.  Fourth

10   amendment.  Freedom of speech.  Due process.

11   That type of thing.

12        Q.     Okay.  And did you have that

13   training as of May 17, 2007?

14        A.     Yes.

15        Q.     All right.  So when you went down

16   there you were fully aware of the rights of

17   citizens under the first amendment then.

18        A.     Yes, sir.

19        Q.     Okay.  I'm saying that broadly

20   because there's a lot of clauses, but to the

21   ones that you've received training on.

22        A.     Yes, sir.

23        Q.     Okay.  If I told you that a

24   citizen has a right to make a complaint

25   against a police officer and not fear

1  STEVEN J. IGNATZ

2  retaliation, would that fall within the

3  training knowledge you have?

4      A.   Oh, I would think so.  Yes.

5      Q.   Okay.  Now, according to the

6  testimony, you knew when you went down to

7  Newtown that there had been a complaint made

8  by Christopher Bush, Detective Bush, Newtown

9  Township against Sergeant Tripp.

10            Is that correct testimony?

11     A.   Yes, sir.  Uh-huh.

12     Q.   Okay.  How did you come to that

13 knowledge?

14     A.   I was asked by Trooper Rich Fultz

15 to go down that morning.  I was new in my

16 position with the CLEAN section as the CLEAN

17 commander and I would occasionally go out on

18 investigations.  That particular morning he

19 asked me if I would be interested in going

20 down to -- I think he said Philadelphia.  Go

21 down near Philadelphia to go along on this

22 investigation.

23            I said, sure.

24            As we drove down there he

25 gave me a little rundown about what he knew

1          STEVEN J. IGNATZ

2   about the case.
3        Q.    Okay.  So you came to the
4   knowledge of the complaint through Fultz.
5                Is that correct?
6        A.    That's right.
7        Q.    Okay.  And he volunteered it to
8   you?
9        A.    I'm sure we were just discussing
10  what the case was about.
11       Q.    The reason for the trip going
12  down?
13       A.    Yes, sir.
14       Q.    Okay.  Now, did Fultz indicate to
15  you how he came to this knowledge?
16       A.    I just knew that he had been
17  working on that particular case and he had to
18  go down and do an interview.  He wanted to go
19  down to Newtown to do an interview.
20       Q.    Okay.  How long had you been in
21  the position as the -- I'm going to call it
22  the chief supervisor of the CLEAN system?
23                Would that be a fair
24  description of your job?
25       A.    My job was the commander of the

Bucks County Court Reporters
215.348.1173

```
 1                    STEVEN J. IGNATZ

 2   CLEAN section, which is Commonwealth Law

 3   Enforcement Assistance Network.  And my

 4   position was criminal justice information

 5   service system officer.  That's -- that's the

 6   official title of my position.

 7        Q.    Okay. Well, how long have you

 8   been had you been in that position before

 9   this trip?

10        A.    I started on May 25, 2007.  So a

11   little bit less than two months.

12                MR. HENZES:  March.

13                THE WITNESS:  March 25,

14   2007.  I'm sorry.

15   BY MR. PURICELLI:

16        Q.    Three months.

17        A.    A little less.  April, May.  A

18   little bit less than two months.

19        Q.    April, May, June, July.

20        A.    I went down there on May 17 --

21        Q.    Oh, okay.

22        A.    -- as I recall.

23        Q.    Prior to this trip how many times

24   had you gone out specifically to see if a

25   police department had an actual report on
```

```
 1                     STEVEN J. IGNATZ

 2   file for any CLEAN entry?

 3        A.    I don't know if I had gone on

 4   that particular type of instant complaint.  I

 5   had gone out to Allegheney County shortly

 6   after my arrival there for an incident

 7   involving a police chief.  And I think I was

 8   on one other -- I had gone up to the north

 9   eastern part of the state for an arbitration

10   hearing.  I think those were the only times I

11   had actually gone out on the road since I had

12   gotten there.

13        Q.    Okay.  That appears to be two and

14   this incident in Newtown appears to be three.

15        A.    Yes.  I believe that's accurate.

16        Q.    In your testimony in the

17   arbitration that you reviewed you indicated

18   you had been out maybe five or six.

19                    Is that correct?

20        A.    That might be correct.  I just

21   can't recall the particular instances, but it

22   was a handful.

23        Q.    Okay. And this handful, none of

24   which none of them included you going out

25   with another trooper for the specific
```