STEVEN J. IGNATZ

of investigation before.

Q. Okay. So would it be fair to say that you were weren't really needed to go, you were just going to learn?

A. That's fair.

Q. Okay. And how long had Fultz been with the CLEAN system?

A. He was there before I had gotten there, sir. I don't know how long. He's still there. So I'm not sure.

Q. Okay. And did he tell you before the conversation in the car how he had gotten involved in this investigation?

A. I don't think so. I think it was just something that was reported and he was following up with it.

Q. Okay. Did he show you any documentation during this conversation do you want to go?

A. No. I don't recall seeing any documentation.

Q. Okay. Now, I want you to try and recall what was said by him as best as you can when he asked you to go. I know we've

1           STEVEN J. IGNATZ

2   been kind of paraphrasing.  And if all that

3   you've paraphrased so far is all you can

4   recall then I'll move passed this.

5                But can you tell me

6   exactly how he approached you, where and what

7   he said?

8       A.    I believe his office was right

9   outside of my office across a partition and

10  in the mornings we generally spoke over, you

11  know, he'd have a coffee or whatever and I

12  would ask what's on the agenda for the day,

13  which I did with the entire unit.

14               And I believe he just

15  said, I have to run down to Philadelphia

16  today.  Would you be interested in going

17  along?  Riding along?

18               And I just thought why

19  not.  I'm new here.  See what's going on.

20  You know, it sounded like it was something

21  that, you know, I should know about.  So I

22  wanted to ride along.

23      Q.    Okay.  In your years as a law

24  enforcement officer since '82 had you come to

25  have the knowledge that people sometimes

1          STEVEN J. IGNATZ

2   don't provide others with all the information

3   about the reason they're doing something?

4                   In other words, in this

5   case, for example, Fultz didn't tell you all

6   the information to tell you he was helping

7   Tripp.

8                   MR. HENZES:  Who was

9       helping Tripp?

10                  MR. PURICELLI:  Fultz.

11                  THE WITNESS:  I didn't get

12      that impression at all.

13  BY MR. PURICELLI:

14      Q.     I know.  My question --

15      A.     Okay.

16      Q.     -- is have you come to learn in

17  all your years that people hold information

18  for a variety of reasons?

19                  One, for example, would be

20  helping a friend or a coworker.

21      A.     It does happen.

22      Q.     Okay.  And is there a reason that

23  you can tell me factually why that couldn't

24  have occurred here with Fultz not telling you

25  he received the phone call from Sergeant

1                STEVEN J. IGNATZ

2    Tripp at Troop F about a request to go down

3    and check out Christopher Bush at the Newtown

4    Police Department?

5        A.    No.  I can't say whether that

6    occurred or not.

7        Q.    Okay.  I take it you didn't read

8    the entire transcript of testimony at the

9    arbitration?

10       A.    Of?

11       Q.    The arbitration.

12       A.    The entire testimony?

13       Q.    Right.

14       A.    No, sir.

15       Q.    Okay.

16       A.    I just saw mine.

17       Q.    Just saw yours?

18       A.    Yes, sir.

19       Q.    Okay.  Now, when you were

20   traveling, obviously you then said that

21   Fultz -- I'll rephrase that.  I think you

22   told me that Fultz then started telling you a

23   little bit about the events with the Bush

24   kids and the Bush complaint.  Christopher

25   Bush's complaint.

1          STEVEN J. IGNATZ

2              Right?

3     A.    Yes.

4     Q.    All right. So you at least knew going into Newtown that Fultz had had information that Christopher Bush, who you were going to go down and look at his report, had already made a BPR complaint against Tripp.

10             Isn't that true?

11    A.    Yes, sir.

12    Q.    All right. Did you ask Fultz what that was about?

14    A.    I think he just told me, basically gave me a little briefing about the entire thing that it had come up from a BPR complaint.

18    Q.    Okay. Now, in your years with the State Police when you know there's a BPR investigation is it true that you know that no member of the State Police other than the assigned investigator are to do anything in regards to that BPR investigation?

24    A.    Do anything?

25    Q.    Yeah. Get involved. Unless

1              STEVEN J. IGNATZ

2    they're assigned to that BPR investigation

3    they're not to get involved in that

4    investigation.

5                   Is that true?

6       A.    I think that's generally true,

7    but I'm just trying to think that through for

8    a second.

9       Q.    Let me help you on that.

10      A.    Okay.

11      Q.    Okay.  Because I'm not here to

12   confuse you.  As you can see I'm fairly

13   familiar and Randy will tell you with State

14   Police policies.

15                  State Police require an

16   investigation either delegated to the troop

17   or itself when there's a complaint.

18                  Correct?

19      A.    Correct.

20      Q.    Okay.  And whether it's a limited

21   investigation or a thorough investigation

22   depends on discussions other than with

23   investigators.

24                  Correct?

25      A.    Yes.

1                    STEVEN J. IGNATZ

2      Q.     All right.  And when that
3  complaint comes in someone is specifically
4  assigned or someones to investigate the
5  allegation against the trooper.
6                    Correct?
7      A.     Correct.
8      Q.     All right.  And isn't it common
9  knowledge based on the field regulations that
10 unless you're assigned as that investigator
11 you shouldn't be going out there asking
12 questions or doing anything that might
13 jeopardize or interfere with that BPR
14 investigation?
15                   Would that be fair?
16     A.     I think that's accurate.
17     Q.     Okay.  Now, that's what I'm
18 getting at.
19                   When Trooper Fultz told
20 you that there was a BPR investigation
21 involving the same department, the same
22 people and Tripp and where you were going,
23 didn't that send a red flag to you that maybe
24 you shouldn't be going down there?
25     A.     No.  It didn't.

```
1                STEVEN J. IGNATZ

2        Q.    Oh, okay.  How much do you get
3   paid hourly?
4                I'm not interfering with
5   your --
6        A.    I think --
7        Q.    Roughly.
8        A.    -- about $49.50 per hour.
9        Q.    Let's just say $49.  Okay.  Round
10  it off to $50 just for argument sake.
11               Okay?
12       A.    Okay, sir.
13       Q.    How much did Fultz get paid an
14  hour?
15       A.    I have no idea.
16       Q.    Less than that?
17       A.    Yes.
18       Q.    Okay.  Would we say it would
19  probably be around $40 an hour, no less?
20             MR. HENZES:  I'm sure
21       Fultz would have liked it to be $40 an
22       hour.  I don't think it was.
23             MR. PURICELLI:  Okay.
24       Well, if you want to tell me what it was
25       I'll use that number.
```

1              STEVEN J. IGNATZ

2              MR. HENZES:  No.

3              THE WITNESS:  I don't

4     know.

5  BY MR. PURICELLI:

6     Q.     Okay.  Let's say it was $30 an

7  hour.

8              Okay.  You guys took how

9  long to go down there?

10    A.     I think the ride down there was

11 probably around 90 minutes.

12    Q.     And how long did you stay and

13 what time did you get back?

14    A.     I think we were there for maybe

15 45 minutes from the time we got there until

16 they had us in, we did our thing and left.  I

17 would say all in all we probably had five

18 hours tied up for the day.

19    Q.     Okay.  Portal to portal.  Leaving

20 and coming back.

21    A.     Yes.

22    Q.     So it was $350 fair estimate of

23 the hourly cost of the Commonwealth for the

24 two of you to go down and come back.

25             Is that right?

1            STEVEN J. IGNATZ

2      A.    I think so.

3      Q.    To look at a report.

4            Right?

5      A.    Yes, sir.

6      Q.    And you went there and saw the

7 report.

8            Correct?

9      A.    Yes, sir.

10     Q.    And you made a determination that

11 everything was honky dory.  No violations.

12           Correct?

13     A.    Yes, sir.

14     Q.    So it cost the Commonwealth tax

15 payers a few hundred dollars to learn that

16 everything was just okay.

17           Right?

18     A.    Yes, sir.

19     Q.    Okay. And when that was done who

20 did Fultz report that information to?

21     A.    The report goes -- he documented

22 it.  It came back to me.  I signed off on it.

23 And that was the end of it; as far as I know.

24     Q.    Well, if you were requested to do

25 a report under the FR you're required to

1               STEVEN J. IGNATZ

2     notify the complainant the investigation was

3     satisfied.

4                    Isn't that true?

5        A.     Yes, sir.

6        Q.     All right.

7        A.     It actually went back to Troop F,

8     I believe.

9        Q.     Okay.  Who sends it to Troop F?

10       A.     I believe I contacted Lieutenant

11    Hile at Troop F and told him that there was

12    no CLEAN violation.

13       Q.     Okay.  And what did he say?

14       A.     I don't recall.

15       Q.     Oh, okay.  Now, according to the

16    testimony and from the arbitration hearing

17    Sergeant Tripp is the complainant.

18                 MR. HENZES:  The

19       complainant?

20    BY MR. PURICELLI:

21       Q.     The complainant, the requester of

22    this.

23                    Did you know that?

24       A.     I didn't know that.

25       Q.     Okay.  So under the FR then --

1                    STEVEN J. IGNATZ

2                        MR. HENZES:  Where does it
3     say in the testimony he's the
4     complainant?
5                        MR. PURICELLI:  He's the
6     one that testified he made the request.
7     BY MR. PURICELLI:
8          Q.    That makes him the complainant.
9                        Doesn't it, Lieutenant?
10                       The person calling you
11    asking you to do something would be
12    classified as the complainant?
13         A.    I would classify them as the
14    complainant.  Yes.
15         Q.    Okay.  And in your -- since '82
16    you've been taking reports, I assume.
17                       Right?
18         A.    Yes, sir.
19         Q.    And you've been trained in the
20    State Police's forms.
21                       Correct?
22         A.    Yes, sir.
23         Q.    Okay.  And that form doesn't --
24    the initiations, either an incident report or
25    victim statements doesn't say requester.  It

1          STEVEN J. IGNATZ

2     says complainant.

3               Correct?

4     A.    I'm not sure about the complaints

5     for CLEAN violation if it says complainant on

6     there or not.

7     Q.    Okay. Did you at any time talk

8     with Captain Hill?

9     A.    No.

10    Q.    Okay. Do you know if Captain

11    Hill called to CLEAN in order to initiate the

12    investigation done by Fultz and yourself?

13    A.    I don't know that. Like I said,

14    it came in before my tenure at CLEAN.

15    Q.    Okay. Well, the investigation is

16    supposed to be thorough.

17              Correct?

18    A.    Yes.

19    Q.    Okay. Now, the Tripp called and

20    requested that CLEAN --

21         MR. HENZES: Read

22         paragraph 145 before you get into that

23         question. Read page 145 because now

24         you're asking questions on inaccurate

25         information.

1                    STEVEN J. IGNATZ

2                         MR. PURICELLI:  I don't

3     believe that's the area I'm referring

4     to.

5                         I am going to question

6     them about that area so we'll be able

7     to --

8                         MR. HENZES:  You're saying

9     Tripp called them.  He's saying, no.

10    Tripp never called him.  Nor did Tripp

11    ever call CLEAN.

12                        MR. PURICELLI:  Okay.

13    We'll find out.  I guess what we'll have

14    to do is look at that form and see who's

15    the complainant.

16                        Won't we?

17                        MR. HENZES:  It says on

18    the form.  Look at Fultz's report.

19                        MR. PURICELLI:  Okay.

20                        MR. HENZES:  I received

21    this investigation from Sean Sanders.

22                        MR. PURICELLI:  That's the

23    report.  I'm looking for the

24    complaintant form.  Not the report.

25                        MR. HENZES:  No.  He told