51

1                    STEVEN J. IGNATZ

2           you they don't -- they may not have a

3           complainant form.  They may have gotten

4           a phone call, can you look into this.

5           That would be it.  It says go look into

6           it.  They did it.  You were a police

7           officer.

8                         MR. PURICELLI:  Yes.  I

9           was for 15 years.

10                         MR. HENZES:  People file

11          complaints.  The supervisor says go look

12          into this.  Okay.  They go.

13                         MR. PURICELLI:  I know

14          from my 15 years when somebody calls for

15          official action we document it.  We

16          don't put it in a report.

17                         MR. HENZES:  There it is.

18     BY MR. PURICELLI:

19          Q.    Since '82 when you start a police

20     action is it your experience that you start

21     with at least an incident report and then do

22     your report?

23          A.    I'm not sure your definition of

24     incident report.

25          Q.    Okay.  You were a municipal

52

1              STEVEN J. IGNATZ

2    police officer and they haven't changed the

3    last 19 years since I've been gone and the 15

4    that I was.  The little tiny thin piece of

5    paper that's called incident report, okay

6    that, generally initiates or starts an

7    investigation.

8                      Is that true?

9        A.     Generally.

10       Q.     Generally.

11       A.     Yes.

12       Q.     Okay.  So I'm relying on my 33

13   years now in this area and I haven't seen it

14   change.  So if it has, please tell me, but I

15   always understood that you started something

16   with at least initiating a number and you did

17   that by creating an incident report and then

18   starting your report, which is different from

19   the incident report.

20                      Isn't that true?

21       A.     We didn't do -- in CLEAN we

22   didn't do such a thing as an incident report.

23       Q.     Okay.  Did you have a system that

24   was different than the State Police's

25   policies about how to initiate complaints and

1              STEVEN J. IGNATZ

2    reports?

3       A.     Those reports were documented on

4    general investigation report.

5       Q.     Okay.  All right.  And to get the

6    general investigation report you have to have

7    an assignment.

8                    Correct?

9       A.     Yes.

10      Q.     You have to get a number assigned

11   to it.

12                   Correct?

13      A.     Right.

14      Q.     Which means there has to be a

15   document with who's assigning the person.

16                      Isn't that correct?

17      A.     Yes.

18      Q.     All right.  Did you see any

19   document in the CLEAN report that you signed

20   off on to show who it was that was the person

21   who caused the initiation of that

22   investigation?

23      A.     I do not recall seeing such a

24   document.

25      Q.     Okay.  Now, when you went to --

1                    STEVEN J. IGNATZ

2    we were talking about money before we got off

3    on this tangent which Randy and I sometimes

4    do.  All you wanted to do was see a report in

5    hand.

6                          Correct?

7         A.       That was our objective.  Yes.

8         Q.       Is there any reason in the world

9    you couldn't have picked up the phone and

10   said e-mail me, FAX me, mail me a copy of

11   your report to verify your NCIC entry?

12        A.       I think we just wanted to see it

13   in person.  I don't know what the reason was

14   for it, but we generally did not have them

15   FAXed in.  We went to the departments to see

16   them in person.

17        Q.       Why?

18        A.       It's just how it was done.

19        Q.       Okay.  Was there any rule or

20   regulations that that's how it's to be done?

21        A.       I'm not sure.

22        Q.       Okay.  Didn't we testify earlier

23   before today that you never before and never

24   ever since went out just to see if a report

25   of a missing person was in hand at the police

1   STEVEN J. IGNATZ

2   department?

3         A.      No.  I don't recall going out for

4   that particular type of complaint afterwards.

5         Q.      Okay.  Would you agree with me

6   cost effective wise, budget wise it's a lot

7   cheaper to get an e-mail attachment or a FAX

8   in or even mailed to you the report the

9   department has as opposed to sending two

10  people down for five hours and 300 and some

11  dollars?

12        A.      I would agree with that, sir.

13        Q.      Okay.  Would you agree with me

14  that it is the policy of the State Police to

15  try to minimize costs, not increase them?

16        A.      Yes.

17        Q.      Okay.  Now, aside from talking to

18  Trooper Fultz who other than he did you talk

19  to about the investigation?

20                Now, I'm going to be fair

21  to you here because I know you talked to your

22  attorney.  Exclude him.  We know you talked

23  to the Township's attorney because you said

24  it in your deposition.  Exclude him.  I know

25  you talked to the Sean Welby and the

1                    STEVEN J. IGNATZ

2    arbitrator.  So exclude them.  We know you

3    talked to those.

4                    Anybody else?

5        A.       Up until the time that I got

6    sued, no.  I didn't -- it was nothing I

7    thought twice about.

8        Q.       Okay.

9        A.       After I got sued of course I

10   talked to some people.

11       Q.       Who would the people be?

12       A.       My wife.

13       Q.       Forget that.  You've got spousal

14   immunity there.

15       A.       Okay.

16       Q.       Anybody else?

17       A.       My current commanding officer,

18   I've told him, you know, that I was subject

19   of a federal lawsuit.

20       Q.       Who is that?

21       A.       Captain Neal at Troop D in

22   Butler.

23       Q.       Anybody else you can think of?

24       A.       Probably the secretary at CLEAN.

25   When I did correspondence she would get it

1                STEVEN J. IGNATZ

2     and may have some questions about it.

3          Q.     And what's her name?

4          A.     Sandy or Sandra Spiegelmeyer.

5          Q.     And what did you ask?

6          A.     I don't recall asking her

7     anything, but, you know, I probably sent her

8     the correspondence saying this is regarding

9     the Newtown case.  Here's my preliminary

10    notes or whatever for correspondence to go

11    out to the police chief.

12         Q.     All right.  I'm trying to figure

13    out what all that means.  I mean, you know

14    what it means in your head.  You say notes.

15                     What notes?

16         A.     What I would do is I would draft

17    a letter and send it to her for correction,

18    you know, for grammar, proofreading and so

19    forth.  I always thought it was best to have

20    two sets of eyes.

21                MR. HENZES:  Prior to

22         being sued.

23                MR. PURICELLI:  Because

24         that's the job.  I see.

25                MR. HENZES:  You asked him

STEVEN J. IGNATZ

2      who he talked about it to.

3  BY MR. PURICELLI:

4      Q.      So you basically just sent her

5  your notes of the letter you ultimately sent

6  out.

7      A.      Yes, sir.

8      Q.      Okay.  Aside from that, anybody

9  else?

10      A.      Lieutenant Hile.

11      Q.      And what did you talk to

12  Lieutenant Hile about?

13      A.      I just said there was no CLEAN

14  violation.

15      Q.      Okay.  And you had told me that

16  before --

17      A.      Yes.

18      Q.      -- once the investigation was

19  done.

20              Anybody else?

21      A.      Not that I can think of, sir.

22      Q.      How did you know to call

23  Lieutenant Hile?

24      A.      I'm not sure.  I think I just

25  knew that he was staff services -- I think he

1                    STEVEN J. IGNATZ

2    was staff services lieutenant there and

3    that's generally who handles that type of

4    thing for a troop.

5         Q.    Okay.  Did you look up anything

6    or ask your secretary to get you a number?

7                    I mean, I'm trying to

8    figure out how you knew then to physically

9    call him to make this report to.

10        A.    I think I just knew that it came

11   out of Troop F and I looked up the staff

12   services lieutenant's name and/or we have a

13   directory and I just called him to let him

14   know.

15        Q.    But we can agree that the FR

16   regulations require you to notify the

17   complainant.

18                    Correct?

19                    MR. HENZES:  The

20        complainant in this instance of the BPR

21        or the CLEAN?

22   BY MR. PURICELLI:

23        Q.    The CLEAN.

24        A.    I don't think there is such a

25   requirement to notify complainant for a CLEAN

1          STEVEN J. IGNATZ

2    violation.

3        Q.      You don't believe the FR requires

4    that?

5        A.      I don't believe it does.

6        Q.      You're familiar with the three

7    section of FR.

8        A.      Somewhat.

9        Q.      Somewhat?

10       A.      (Nods head up and down.)

11       Q.      Okay.  Now, in your testimony you

12   had indicated you were not interested in a

13   jurisdictional issue.  I think your buzz

14   words were we're not the jurisdictional

15   police.

16       A.      That's true.  I still believe

17   that.

18       Q.      And you still believe that.

19   Okay.

20               So jurisdiction never was

21   an issue of the investigation.

22               Correct?

23       A.      That's correct.

24       Q.      Just whether the report was in

25   hand.

1                STEVEN J. IGNATZ

2                    Correct?

3       A.      That's all our concern was.

4       Q.      Okay.  All right.  Now, when you

5  went down to the township did you hand out

6  business cards?

7       A.      Probably.

8                    - - -

9                    (Exhibit Ignatz-1, marked

10      for identification.)

11                   - - -

12  BY MR. PURICELLI:

13      Q.      Lieutenant, I'm showing you what

14  we've had marked as Ignatz-1.  I'm going to

15  represent to you it's a copy of two cards

16  provided to me by my client.  I'll ask you if

17  you recognize these cards or any of the

18  cards.

19      A.      I believe those are cards that --

20  that's my business card from when I was in

21  CLEAN and looks like Trooper Fultz's business

22  card for CLEAN.

23      Q.      Do these documents at all help to

24  refresh your memory as to whether or not the

25  two of you had provided your business cards

1                     STEVEN J. IGNATZ

2    when you went down to Newtown Township?

3          A.      I assume that we gave them out,

4    but I don't remember doing that.

5          Q.      Okay.

6          A.      It was common to give out cards

7    when I dealt with people.

8          Q.      Okay.  Now, do you know who Shawn

9    W. Sankey is, S-A-N-K-E-Y?

10         A.      He is an auditor or he was.  I'm

11   not sure if he's still there or not.  He was

12   an auditor with CLEAN section.

13         Q.      Was he involved in any way, shape

14   or form in the investigation that we've been

15   talking about; your visit to look and see if

16   a report?

17         A.      Not that I know of.  He came just

18   before I left CLEAN in September of 2007, I

19   believe.  I don't remember the date he

20   transferred in, but it wasn't long before I

21   had left.  I don't think he was involved with

22   this case at all.

23                            - - -

24                      (Exhibit Ignatz-2, marked

25         for identification.)

1                    STEVEN J. IGNATZ

2                         - - -

3  BY MR. PURICELLI:

4        Q.       I'm showing you what's been

5  marked as Ignatz-2 described as a

6  December 12, 2007 letter on State Police

7  letterhead.  Appears to be signed by a

8  Corporal Shawn W. Sankey.

9                         Did I accurately describe

10  this document, Lieutenant?

11        A.       Yes, sir.

12        Q.       Is that, in fact, the letterhead

13  of the CLEAN department for the State Police?

14        A.       Yes, sir.

15        Q.       Okay.

16        A.       Well, it's State Police

17  letterhead.

18        Q.       Okay.

19        A.       Doesn't say CLEAN on it or

20  anything.

21        Q.       Right.

22                         That would be the

23  letterhead letter paper --

24        A.       That's what they typically used.

25        Q.       -- used by CLEAN?

1                STEVEN J. IGNATZ

2        A.     Yes, sir.

3        Q.     Okay.  That's a fair way to

4   describe it.

5                      Now, on December 12, 2007

6   were you still the supervisor for CLEAN?

7        A.     No, sir.

8        Q.     Okay.  Did Corporal Sankey take

9   over for you?

10       A.     No, sir.  Another lieutenant took

11  over for me.

12       Q.     Okay.  Now, the first

13  paragraph -- well, did you know Corporal

14  Shawn Sankey?

15       A.     Yes, sir.

16       Q.     Had you become familiar with his

17  signature?

18       A.     I believe that to be his

19  signature.  From what I can remember that

20  looks like his signature.

21       Q.     Okay.  Is there any reason you

22  could believe or tell me that this particular

23  document I'm showing you is not authentic?

24       A.     No.

25       Q.     Okay.  Now, this December 12,