BY MR. PURICELLI:

Q. Okay. I'm showing you what's been marked Ignatz-4. You testified earlier under oath truthfully that you reviewed the statute that we're talking about, 2908.

Did you not?

A. Yes.

Q. Is this the statute you reviewed?

A. Yes.

Q. Okay. So when you were testifying previously, you were testifying truthfully.

A. Yes.

Q. Okay. Now, in this particular one it says the duties of law enforcement agency.

Doesn't it?

A. Yes, sir.

Q. Okay. Does it limit anywhere in that statute only the agency investigating a missing child report is to make an entry into NCIC about a missing child?

Can you find that anywhere in that statute?

A. I don't read that in that particular statute.

Q. Well, you were trained in this. Tell me what your training was.

Strike that.

I'll lay a foundation.

You were, in fact, trained by the Pennsylvania State Police and the crimes code sections.

Weren't you?

A. Yes.

Q. Okay. And you were given annual updates just like municipal police officers on the crimes code.

Isn't that true?

A. Yes.

Q. Okay. So this would have been one of the statutes you were specifically trained at the State Police Academy.

Correct?

A. Probably was.

Q. Okay. Relying on your training -- and we'll go get those records afterwards -- can you tell me what that

statute you were taught was to mean?

A. To me it doesn't say any law enforcement agency.

Q. That's to you.

What's your training?

What did they train you?

That was my question.

A. Well, my training was to read the law and try to get an understanding of it beforen enforcing it.

Q. Uh-huh.

A. And by doing that, to me it doesn't say any law enforcement agency has the ability to investigate a report of a missing child from any jurisdiction.

Q. Does it talk about investigating in here anywhere?

A. Yes.

Q. Can you show me where it says investigating?

A. (a)(1).

Q. Uh-huh. Law enforcement agency shall have the following duty to respect to missing children.

Did I read that sentence correctly?

A. Yes.

Q. Nothing in there about investigating.

Right?

A. The next section.

Q. That says what the duties shall be of the law enforcement agency.

Correct?

A. Yes, but goes on to the subsections.

Q. Okay. And it says -- the first one says it shall investigate immediately upon receipt of a report regardless of the age of missing child or the circumstances surrounding the distance parents of the child.

Doesn't it say that?

A. Yes.

Q. Doesn't say that if the child is missing from a neighboring township another police department receiving that information shouldn't start the investigation.

Does it?

A. It does not say that.

Q. Does not say that.

Now, we go to two unless you want to read the rest of it. Just to paraphrase, it says you can't wait any time.

Does it?

Police department can't impose like a three day wait.

Right?

A. That's correct.

Q. Okay. So we're being fair on the record for Randy.

Second one says: When conducting the investigation, okay, the officer is to record all information relevant to the missing child and the circumstances surrounding the disappearance, okay, of the missing child on the appropriate law enforcement investigation report.

Correct?

A. Yes.

Q. Now, in the Newtown Township case the law doesn't say they had to investigate

it.

Did it?

A. No.

Q. But if they did, they had to do it promptly and put it on the right forms.

Correct?

A. Yes.

Q. And you weren't interested in whether they were properly investigating, right, or doing the right forms, you were simply seeing did they have a report?

Right?

A. Right.

Q. Okay. Now, three: To make an entry into the missing persons file through the Commonwealth Law Enforcement Assistance Network, what we have been referring to as CLEAN, and they see in this.

Right?

A. Yes.

Q. In accordance with the Pennsylvania State Police policies and procedures immediately upon the receipt of sufficient identification information on the

missing child.

Did I read that accurately?

A. Yes, sir.

Q. Now, that didn't limit any police agency from making an entry.

Did it?

A. No. That didn't.

Q. That didn't.

Now, in your search to see whether there was a report and your discussions with Troop F, did you ever come across a CLEAN entry in compliance with the law for the missing children that were put in by Newtown Township by Troop F?

A. That wasn't part of our investigation.

Q. Oh.

A. I did not.

Q. You were doing audits, your department.

Weren't they?

A. Yes, sir.

Q. And in your audits do you audit

State Police requirements under the law?

A. Yes, sir.

Q. Did you come across at any time that you were there any NCI entry for the Bush children by Troop F in conformity with 2908 (3) -- (a)(3)?

A. I did not.

Q. Now, the law specifically that we're talking about that your attorney wanted us to look at, okay, specifically says there are policies and procedures of the Pennsylvania State Police to be filed.

Does it not?

A. Yes.

Q. What are those?

A. Basically I believe it mirrors the missing children section of the crimes code if we receive a report of missing children.

Q. Is it a discipline infraction in the Pennsylvania State Police under the FRs, ARs, or any code of conduct rules that the state has to violate a state law requirement?

A. Yes.

Q. Trooper including a captain who's under the code of conduct --

A. Yeah.

Q. -- to be --

A. It --

Q. If a captain was looking into whether a police department had jurisdiction on a particular matter and he came across information that members of his troop and subordinates to him had violated the law should he have reported that violation to anybody?

A. I believe so.

Q. Okay. And who would he, under police procedure, have been required to report it to?

A. Well, I think our policy is to take immediate action to make that stop and then file a complaint. Internal affairs complaint.

Q. Okay. He can't ignore it.

Right?

A. Correct.

Q. Now, can we agree that 2908

(a)(3) referencing the State Police policies and procedure we just talked about require the State Police to make a CLEAN entry when someone comes in and reports their children missing?

MR. HENZES: Object to the form of the question.

BY MR. PURICELLI:

Q. You can answer it if you understand it.

A. Could you repeat it?

Q. I can.

Can we agree under the law that we just went over, 2908 (a)(3), the last one we talked about, okay, that if a person went into Troop F and reported his children missing, one, the law required Troop F to start an investigation?

A. That's accurate.

Q. Put that investigation on the appropriate State Police form.

Correct?

A. Yes.

Q. And enter the children into NCIC

regardless of the circumstances that they're reported missing.

A. I don't think that's accurate.

Q. Did you read three?

A. I did read it.

Q. Did it say to enter them?

Immediately, in fact, it said.

Didn't it?

A. If there's sufficient evidence.

Q. Isn't it saying --

A. Sufficient information on the missing child.

Q. Where does it say sufficient evidence?

A. I'm sorry. I misread that, sir. Sufficient identification information on the missing child.

Q. All right. Now, was there any question in what you knew of the case now not your investigation that the Bush children weren't identified sufficiently enough to be entered into the NCIC system?

A. It's my understanding that they

weren't actually missing. They were with their mother.

Q. Is that true?

A. That's my understanding.

Q. So when the kids were found then in Virginia and turned over to the father and the State Police knew that they equally wouldn't be missing.

Would they?

Lieutenant?

A. I guess not.

Q. Well, what was your reason they weren't missing?

A. They knew where they were at.

Q. Someone told you they weren't missing.

Who told you that?

MR. HENZES: Told him?

MR. PURICELLI: Yes.

MR. HENZES: When?

At the time it happened?

MR. PURICELLI: We'll get to that.

MR. HENZES: Or what he

subsequently learned throughout this investigation?

MR. PURICELLI: Let's find out.

BY MR. PURICELLI:

Q. When did you find out the kids weren't missing under the law?

A. That was discussed on our way down there to do the audit.

Q. Thank you.

A. Or --

Q. I understand that completely.

Fultz told you that.

Didn't he?

A. Yes.

Q. Okay. Did you ask what the circumstances were; as the law required?

A. We had discussed the case in general terms on the way down there.

Q. Did he tell you why he was saying the kids weren't missing?

A. Because they were with their mother is what I was told.

Q. Did he tell you that he -- that

the State Police and Troop F up until Mr. Bush found them knew where the children were other than they were with the mother somewhere in this world?

A. This was -- we were down there long after the fact. All I knew is when the entry was made the mother had the children out of state. That's what he told me.

Q. And that's all he told you.

A. I believe so.

Q. Okay. Can children be missing even if they're with their mother, known their with their mother and still violate the law for taking the children?

A. That, I don't know, sir.

Q. Were you aware that Montgomery County just the last couple of months prosecuted a mother who absconded away with her child into Canada and was just sentenced because she held the child in Canada from the father?

A. I wasn't aware of that.

Q. Weren't aware of that.

A. No. I work in the western part