1        STEVEN J. IGNATZ

2   usually. It's probably -- if it's a crime
3   report the crime supervisor would probably
4   have that conversation or if it's a patrol
5   report the parole supervisor.
6       Q.   Okay. Just so my hypothetical is
7   as close to what I think the facts are, it's
8   my understanding Eric J. Wismer is a trooper
9   who was assigned to patrol. And I get that
10  from the testimony at arbitration. And that
11  he was being supervised by a corporal in the
12  crime unit. Okay.
13              Now, assuming I've got
14  those facts correct, would it be that crime
15  supervisor's job then to call the trooper and
16  say you're 60 days out, you haven't done
17  anything, what's going on?
18      A.   Yes.
19      Q.   Okay. Would he document that?
20      A.   I'm not sure. Probably.
21      Q.   Under State Police policies and
22  processes should he document that
23  interaction?
24      A.   Generally, yes.
25      Q.   Okay. And if there was such a

2    document would it be maintained in the

3    investigation file?

4        A.    No.

5        Q.    Where would it be maintained?

6        A.    If somebody was counseled for a

7    late report it would be in their supervisory

8    file.

9        Q.    Now, I take it the supervisor who

10   doesn't supervise properly is subject to, I'm

11   going to say, counseling or at least some

12   discussion from his supervisor.

13              Is that correct?

14       A.    Yes.

15       Q.    How would that supervisor know

16   whether or not the subordinate supervisor has

17   not brought in a trooper to say, you know,

18   he's 60 days out and what have you done?

19       A.    I was a station commander for a

20   time and what I would generally do is also

21   check those overdue reports and then talk to

22   the supervisor and say, hey, what's going on

23   with these.

24       Q.    So basically if I can assume from

25   that testimony a station commander is

1                    STEVEN J. IGNATZ

2   essentially supposed to be up to speed and

3   aware of what's going on in his

4   investigations by his personnel.

5        A.   Yes, sir.

6        Q.   And equally the status of the

7   investigation.

8        A.   I'd say for some. There's just

9   so many investigations typically going on

10  that you can't be aware of everything, but

11  some of them.

12       Q.   How about if the investigation

13  was an unusual one described by the station

14  commander as something that didn't happen all

15  the time?

16            Would he keep track of

17  that?

18       A.   I think you would have to ask

19  that person, but I think I would,

20  personally --

21       Q.   Okay.

22       A.   -- would keep track of it.

23       Q.   Okay. Would I find any

24  documentation of the station commander

25  talking to the assigned supervisor about the

1 STEVEN J. IGNATZ

2 status of an investigation by, let's say, an

3 assigned trooper who was in patrol, but not a

4 crime investigator?

5     A.    That's possible.  Might be an

6 e-mail or supervisor notation.

7     Q.    Okay.  And the schooling that you

8 went to was for supervisory conduct; to

9 paraphrase it differently.

10         Right?

11     A.    Yes, sir.

12     Q.    Did that training also include

13 the training to document counseling so that

14 you could show a pattern of incorrect

15 behavior by a subordinate?

16     A.    The training -- we're referring

17 to the training I went to in Kentucky, and,

18 no, it didn't deal with that, but we have

19 supervisor training in the State Police and

20 it does describe that.

21     Q.    That's fair enough.  That's fair

22 enough.

23         And that training that the

24 State Police provides would provide that to

25 sustain commanders?

2      A.    All supervisors are required to
3  attend basic supervision school.
4      Q.    Okay. Just so the record is
5  thorough here, who would be classified as a
6  supervisor in the State Police in order to
7  get that training?
8      A.    All corporals and above. When
9  you make corporal or sergeant.
10     Q.    Corporal? Sergeant? Captain?
11 Lieutenant?
12     A.    Yes.
13     Q.    Okay. So they all knew you
14 should document when talking to people about
15 conduct that you don't think is consistent
16 with the rules and regulations.
17     A.    Yes.
18     Q.    Okay. Now, do you recall whether
19 or not the FR regulations requires the person
20 reporting the offense to be kept up to speed
21 with the investigation?
22     A.    I'm not sure if that's in the
23 FR --
24     Q.    Okay.
25     A.    -- regulations or not.

1                    STEVEN J. IGNATZ

2         Q.    Do you know whether or not the FR
3    regulations require -- do you know whether or
4    not the code of conduct of the FR
5    regulations, specifically the stated code,
6    provisions and missions has changed since
7    you've been with the State Police?
8         A.    It has changed --
9         Q.    Okay.
10        A.    -- over the years.  Sort of
11   evolves every few years with new commissions.
12        Q.    Okay.  And the code of conduct
13   you're familiar with the -- well, I'll just
14   show it to you.  This is a '92 version.
15              The document I'm showing
16   you whether or not the code of conduct has
17   remained consistent to that?
18        A.    This is our call of honor.  Yeah.
19   It's the same.  It has not changed since '92.
20        Q.    This call of honor is in the FR
21   regulations.
22              Correct?
23        A.    Yes.
24                   - - -
25              (Recess.)

1                    STEVEN J. IGNATZ

2                         - - -

3    BY MR. PURICELLI:

4        Q.    Lieutenant Ignatz, I'm going to
5    show you what's been previously marked as C.
6    Busch-3 from a deposition taken on
7    December 22 and ask you if you wrote that
8    letter.

9        A.    Yes. I did.

10       Q.    Is that your signature on the
11   bottom?

12       A.    Yes. It is.

13       Q.    Okay. Now, this letter was
14   written after your visit to Newtown Township
15   in the effort to see if there was or wasn't a
16   report.

17       A.    That's right.

18       Q.    Okay. And did Martin Duffy ask
19   for you to send him a letter?

20       A.    Not that I recall.

21       Q.    Okay. And did you inform him
22   before you left there was no violation?

23       A.    Yes.

24       Q.    Okay. Did you make any other
25   statements to Martin Duffy while you were

1 STEVEN J. IGNATZ

2 there in regards to the conduct of Detective
3 Bush?
4     A.    No.
5     Q.    Okay. In your letter you
6 indicate -- well, strike that.
7         Did you specifically
8 accuse Detective Bush while in the presence
9 of Chief Duffy that he had lied?
10     A.    No.
11     Q.    Okay. Did you accuse him of any
12 misconduct?
13     A.    No.
14     Q.    Did anybody from your department
15 who may have been with you, being Fultz,
16 accuse Detective Bush of misconduct?
17     A.    No.
18     Q.    All right. Were you aware of any
19 misconduct as a result of your investigation?
20     A.    I thought he was being untruthful
21 with us regarding the existence of a report
22 that we could review --
23     Q.    Okay.
24     A.    -- because he told us there was
25 none.

1      STEVEN J. IGNATZ

2      Q.    And did he also explain to you
3  that he thought you meant a particular type
4  of form as opposed to just an incident
5  report?
6      A.    I don't remember that.
7      Q.    Okay.  Were you specific in
8  asking for a missing persons report or just a
9  report to justify the NCIC entry?
10     A.    Trooper Fultz had asked for a
11 copy of the report that backs up the NCIC and
12 CLEAN entry.
13     Q.    Okay.  And did one get actually
14 presented by the chief?
15     A.    After some time.  Yes.
16     Q.    Okay.  And did Detective Bush
17 tell you he didn't have a missing persons
18 report?
19     A.    No.  He told us he didn't have a
20 report.
21     Q.    But one was produced.
22     A.    Yes.
23     Q.    Okay.  Now, is it because he says
24 he didn't have a report that you think he was
25 lying about not having a report that the

2    chief produced?

3        A.    I don't know why he was telling

4    us there was no report.

5        Q.    You formed a belief he was not

6    being truthful with you.

7        A.    Yeah. That was my observation,

8    sir.

9        Q.    Okay. And the truthfulness to

10   his statement was I don't have a report.

11                Correct?

12       A.    He said, guys, there is no

13   report.

14       Q.    Okay. But one was produced.

15       A.    One was produced.

16       Q.    I'm trying to find out --

17       A.    Yes, sir. One was ultimately

18   produced.

19       Q.    What I'm trying to find out is

20   what is the untruthful statement or the

21   statement he made that caused you to believe

22   he was being untruthful?

23       A.    He told us there was no report.

24       Q.    But there was one.

25       A.    But there was one.

1                    STEVEN J. IGNATZ

2       Q.     So he lied about having a report

3   that justified your --

4       A.     Had he not had the report CLEAN

5   would have had to take some action.

6       Q.     Okay. I understand all of that.

7       A.     And after some time a report was

8   produced and that took care of the issue with

9   CLEAN.

10      Q.     All right. Well, you also write

11  in here that Detective Bush was the

12  investigator. Okay. You say, furthermore,

13  only after you twice directed to allow the

14  investigator to review the report did he do

15  so.

16              MR. HENZES:  He doesn't

17      say Detective Bush was the investigator.

18  BY MR. PURICELLI:

19      Q.     Was it your understanding he was

20  the investigator of the report, assigned

21  investigator for the report you were looking

22  at?

23      A.     Yes.

24              MR. HENZES: That's not

25      what he's making reference to.

1                    STEVEN J. IGNATZ

2                         Let him see the letter
3      because you're --
4                         MR. PURICELLI:  I did.  He
5      authenticated it.
6                         MR. HENZES:  You're
7      reading it to him.
8                         It says -- where does it
9      say investigator?
10                        MR. PURICELLI:  That's
11     what happens when you jump in the middle
12     of something, Randy.
13                        MR. HENZES:  The
14     investigator.  The investigator and I.
15     You said Christopher Bush was the
16     investigator.
17     BY MR. PURICELLI:
18     Q.       And then I said wasn't it your
19     understanding he was the investigator?
20     A.       He was the investigator --
21                        MR. HENZES:  Well, then
22     read it again.  Brian, read the whole
23     quote to yourself.  It doesn't -- if
24     you're equating the investigator in that
25     letter to Christopher Bush, then they

1                     STEVEN J. IGNATZ

2       don't match.

3                    MR. PURICELLI:  That's

4       your argument, Randy.

5                    MR. HENZES:  Let him read

6       the context of the thing.

7                    THE WITNESS:  The word

8       investigator in there refers to Trooper

9       Fultz.

10   BY MR. PURICELLI:

11       Q.     Okay.  Trooper Fultz is the

12   investigator?

13       A.     Yes.

14                   MR. HENZES:  Read the

15       sentence to yourself.

16   BY MR. PURICELLI:

17       Q.     And are you saying that Trooper

18   Fultz wasn't allowed to see the report?

19       A.     That is correct.

20       Q.     By Detective Bush?

21       A.     Yes.

22       Q.     Well, the chief had the report.

23                   Didn't he?

24       A.     He gave it to the detective.

25       Q.     All right.  And the chief was a

1                    STEVEN J. IGNATZ

2   superior to the detective.

3                  Correct?

4       A.    Yes.

5       Q.    Was it anticipated in your view

6   that Detective Bush was supposed to

7   circumvent an instruction from his chief?

8       A.    The chief handed it to him and

9   told him to give it to Trooper Fultz.

10      Q.    Okay.  And then you got it.

11                 Right?

12      A.    And he didn't do it.  He withheld

13  it and said -- he did a motion like this,

14  handed it toward him and then pulled back and

15  ultimately gave it to him --

16      Q.    Okay.

17      A.    -- after the chief said give him

18  the report, Chris.  That's what the chief

19  said.

20      Q.    And that has nothing to do with

21  truthfulness.

22                 Right?

23      A.    Has nothing to do with what?

24      Q.    Truthfulness.

25      A.    The truthfulness issue is