1  Q   We know two weeks goes by roughly --
2  A   Correct.
3  Q   -- before anything.  And what's the next step?
4  A   August the 11th.
5  Q   August 11th.  What was that date that he called Haven
6  again?
7  A   3/11.  No, 3/6.
8  Q   And then five months later he does the next step in
9  this important investigation?
10 A   Um-hum.
11 Q   Seem reasonable to you as a State Police supervisor?
12 A   I don't know.
13 Q   Looking for kids?
14 A   It's not saying what he's done in between there.
15 Q   Well, shouldn't it?
16 A   Should there be documentation?
17 Q   Yes.
18 A   Sure there should be?
19 Q   It doesn't say I'm doing anything in his
20 documentation?
21 A   No, it does not.
22 Q   And State Police have a regulation about how they're
23 to document their activities in a criminal investigation,
24 right?
25 A   Um-hum.

```
1    Q    Okay.  And does that report conform with that
2  regulation?
3    A    I forget what it is offhand.
4    Q    Assuming it's truthful.  I am.
5    A    I assume it's truthful.
6    Q    I'm assuming it is.
7    A    This is out of order.  This is out of order, okay.
8  You're jumping here from page four to six, and here's page
9  five.
10   Q    Two months?
11   A    Um-hum.
12   Q    Still a long time, isn't that, Captain?
13   A    An attempt to locate the welfare of the Bush children.
14   Q    Excuse me.  Who were they looking for?
15   A    The mother.
16   Q    What's it say, an attempt to do what?
17   A    Locate and check the welfare of the Bush children.
18   Q    Children?
19   A    Well, no, we're looking for the children.
20   Q    So we're not looking for mom, right?
21   A    No.
22   Q    Okay.
23   A    Found the Bush family.
24   Q    So almost four months what has the trooper done?
25   A    I'm sorry, what?
```

 1    Q    In almost four months looking for the children, the
 2 welfare of the children, what has he done?
 3    A    Made some attempts.
 4    Q    What has he done, Captain, contacted one -- an agency
 5 to see if they knew where mom was, right?
 6    A    Um-hum.
 7    Q    And then sent, what, a teletype out?
 8        MR. HENZES:  What does this have to do with whether or
 9 not Tripp -- what they ultimately did, what this guy did?
10        MR. PURICELLI:  Because Tripp is alleged not to have
11 been doing his job.
12        MR. HENZES:  Okay.  And so that's the allegation.  So
13 Tripp wasn't the one doing the investigation.
14 BY MR. PURICELLI:
15    Q    All right.  Well, let's go down that road then for
16 you, Randy, because I thought we did it before.  Who's in
17 charge of that barracks?
18    A    That would be Tripp.
19    Q    Tripp?
20    A    Correct.
21    Q    And he'd be responsible to make sure important
22 investigations are being done timely and properly according to
23 State Police regulation; is that true, Captain?
24    A    Well, actually it would be the supervisor that would
25 keep those records.

1      Q     Who's the ultimate supervisor?

2      A     Oh, Tripp is.

3      Q     Tripp.  And he'd make sure his supervisors are doing
4   their job, isn't he?

5      A     Well, he should, yeah.

6      Q     Okay.  Did he?  Did he make sure that this guy was
7   diligently looking for the welfare of the children?

8      A     Tripp -- Tripp would not be involved in the day-to-day
9   operations, okay, of a case.  There's no way he would know,
10  okay, unless a supervisor brought that to his attention.

11     Q     Okay.  Then let's try it this way, Captain.  In the
12  course of a BPR investigation, limited or full --

13     A     Can we take a break again, please?

14          MR. PURICELLI:  Sure.

15          (Recess.)

16  BY MR. PURICELLI:

17     Q     During the course of a BPR investigation, if
18  misconduct or conduct that might surface, you don't ignore it,
19  right?  You look into that conduct as well?

20     A     Oh, sure, yeah.

21     Q     Okay.  So even if they were looking at this report,
22  and they saw the investigator investigating where the kids are
23  to make sure they were okay, even though you know where they
24  are, and you saw a two week delay and a three month delay with
25  only two contacts, that could rise to a level of failure to be

1  properly supervised or investigated, correct?
2      A    It could.
3      Q    Okay.
4      A    It could.
5      Q    And could we agree in this particular investigation
6  that Hile was doing, that he didn't examine that?
7      A    No, hum-um.  He didn't look at that.
8      Q    Okay.  Do you know whether or not, Captain, that the
9  State Police ever learned during the course of the
10 investigation, their investigation, up until mom showed up in
11 their barracks that they ever had a communication with mom to
12 find out where she was, whether she and the kids were okay?
13     A    No, I don't know.
14     Q    Okay.  And if the law for missing children dictates
15 that once the children are located the investigator, in this
16 case we know who it is, is mandated by law to interview the
17 kids for that period of time they're missing, okay?
18     A    Um-hum.
19     Q    Should the trooper follow the law?
20     A    If they were missing?
21     Q    Well, we went down that road.
22     A    Yeah.
23     Q    And would you agree that this is semantics whether
24 they were missing because father just knew they were with the
25 mom, but didn't know where in the world they were?

1     A    Um-hum. I don't know that it would be required then
2 if they were with a parent.
3     Q    Okay. And you were aware there's an operations
4 manual?
5     A    Yeah.
6     Q    Okay. And the OM is supposed to do what?
7     A    Well, it depends. There's different operation
8 manuals. We have a bunch of them.
9     Q    Well, I'm looking at OM-72?
10     A    Okay.
11     Q    Specifically with missing persons, right?
12     A    Okay.
13     Q    The OM manual I'm trying to find tells the trooper
14 what, how you do something, or what?
15     A    Well, yeah. Oh, yeah. Okay. I'm sorry. I didn't
16 understand your question.
17     Q    That's okay. That's all it was.
18     A    You know there's a whole library of OMs.
19     Q    Oh, yes, I do.
20     A    Dealing with everything basically. Okay. So that's
21 why I just didn't know what you wanted.
22     Q    Well, I just pulled that out. I know you guys got --
23 I once said 11 volumes of regulations?
24     A    Yeah.
25     Q    I forget which commissioner that I was deposing one

1  time where I brought them in.  He looked and he said you think
2  I know all those?
3     A    Well, they -- well, when Cowley came in that changed
4  everything also with the regulations and -- well, you know
5  about that.  It's ten fold.
6     Q    That's when you got your little sticker on the side of
7  the car.  And they use that too, that certification process.
8     A    Yeah.
9     Q    All right.  One other thing.  Captain Hill wrote
10 letters to Detective Bush, the Newtown Township Board of
11 Supervisors, and the chief of police?
12    A    Um-hum.
13    Q    And Captain Hill wrote those as a result of the BPR
14 investigation?
15    A    Okay.
16    Q    Okay.  By what authority did he write those letters?
17    A    That would be his prerogative.
18    Q    There's actually a regulation about performing a BPR
19 investigation, right, internal investigation?
20    A    Sure.
21    Q    Okay.  Regulation doesn't say that he's supposed to
22 report to the employer of a complainant the opinions of the
23 State Police, does it?
24    A    No, not what -- as the person that would review it.  I
25 mean, I don't think he's precluded from notifying anybody.  I

1  mean, there's certain people we have to notify.
2      Q    Is he permitted to make an accusation to get the
3  officer disciplined, a person disciplined or fired?
4      A    I don't know that there is anything prohibiting from
5  him from doing that.
6      Q    Okay. You're aware that a person has a First
7  Amendment right to make a complaint against troopers?
8      A    Oh, sure.
9      Q    Okay. How many times since you've been director has
10 the person who has made a complaint against a trooper had that
11 person's employer informed of the complaint?
12     A    I can think of a couple right offhand. As far as
13 numbers, you'd almost have to research. I don't think we
14 captured that in the -- in fact, there's nowhere I know we
15 capture that in the data banks, but I know there have been some
16 instances where it's been done.
17     Q    How many times since you've been a director are you
18 aware of the complainant being investigated as a result of the
19 BPR investigation?
20     A    I don't have the numbers for that. I don't -- I don't
21 know.
22     Q    Can you identify any names of any person who made a
23 complaint about a trooper's misconduct and after the trooper
24 was cleared the BPR either investigator or the person --
25     A    Well, it wouldn't be BPR. IAD would not investigate

1  that.  If we had found that there was a false report or
2  something, we would turn that over to troop.  We would not
3  investigate.
4      Q    Okay.  Captain Hill wrote a July 30, 2007 letter.
5  Second paragraph he writes, the investigation that gave rise to
6  Detective Bush's complaint.
7          MR. HENZES:  Who's this letter to?
8          MR. PURICELLI:  Newtown Township supervisors.
9          MR. HENZES:  Okay.  Go ahead.  You just said July 30.
10  You didn't say who it was to.
11  BY MR. PURICELLI:
12      Q    Okay.  Was discussed and approved by the Tioga County
13  District Attorney at the inception of the complaint.  It's in
14  your packet.
15      A    Yeah, um-hum.
16      Q    Okay.  That statement made, if not true, would that
17  subject be held to discipline?
18      A    Was he disciplined?
19      Q    No.  Would it -- if that statement about discussing
20  with the Tioga County District Attorney and the Tioga County
21  approving the action, if that was not true, would it be subject
22  to discipline?
23      A    We'd probably look into it, yeah.
24      Q    Okay.  And it is in your packet that you looked at for
25  the BPR investigation?

1    A    Yeah.

2    Q    Were you aware that Captain Hill testified under oath
3 in the Christopher Bush arbitration matter?

4    A    Was I aware?

5    Q    Yeah.

6    A    Yeah.

7    Q    Were you aware that he admitted that that wasn't a
8 truthful statement?

9    A    No, I have no idea.

10    Q    And this was written to the Newtown Township
11 supervisors. If that wasn't -- you were aware that as a result
12 of a letter that he wrote Christopher Bush was fired?

13    A    I was not until just recently.

14    Q    Oh, the captain didn't tell you that?

15    A    Captain Hill?

16    MR. HENZES: He wasn't fired because of the letter.
17 That's a misstatement of the facts.

18    THE WITNESS: I had no reason to talk to Captain Hill
19 about that.

20 BY MR. PURICELLI:

21    Q    Okay. And you were recently made aware that
22 Christopher Bush had not only lost his job, but after
23 arbitration got his job back?

24    A    No.

25    Q    Okay.

1  A    No.

2  Q    Okay. Were you, in your investigation, aware -- you
3  not personally in the investigation aware that the District
4  Attorney's Office did not endorse the State Police
5  investigation?

6       MR. HENZES:  Of what, investigation of what?
7  BY MR. PURICELLI:

8  Q    It says -- Hill says he, meaning the Tioga County
9  District Attorney?

10      MR. HENZES:  Approved?
11 BY MR. PURICELLI:

12 Q    Endorsed the action of the investigators in this case
13 based on the extensive litigation relative to divorce custody
14 criminal proceedings and PFA proceedings between the parties.

15      MR. HENZES:  You realize the investigation he's
16 talking about is the investigation into the whereabouts of the
17 daughter, that one?

18      MR. PURICELLI:  We're talking about the concealment of
19 whereabouts of children.

20      MR. HENZES:  Right.  Not the IAD's investigation, the
21 investigation of the brother's complaint.
22 BY MR. PURICELLI:

23 Q    Did Hile's report indicate that he had gotten -- that
24 he had gotten confirmation that the District Attorney's Office
25 endorsed the actions of the State Police?

1   A   I'd have to -- no.

2   Q   Okay. But this packet was in the ones that you

3   reviewed? And when you read that --

4   A   Um-hum.

5   Q   -- didn't you wonder where the confirming facts were

6   to be making these statements by Hill?

7   A   No. I figured he was making the statements, so it was

8   true.

9   Q   Okay. And if it's not true, would he be subject to

10   discipline?

11   A   Probably, yeah.

12   Q   What would it take for it to be yes as opposed to

13   probably?

14   A   Okay. I'm saying probably because we're all innocent,

15   right, until proven guilty. So there would be an

16   investigation.

17   Q   And would that same innocent and proved guilty also

18   apply to when Detective Bush is accused of acting outside his

19   jurisdiction?

20   A   Yeah.

21   Q   So when he made his complaint it shouldn't have

22   mattered in his complaint whether he was or wasn't guilty of a

23   jurisdictional issue? He was presumed not to have done it,

24   done everything proper?

25   A   Yes, that's correct.