ORIGINAL

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER BUSH and DAVID BUSH,

        Plaintiffs

vs.        NO. 07-4936

S. C. ADAMS, LT. RUSSELL, STEVEN J. IGNATZ,   CIVIL ACTION
SGT. JOSEPH TRIPP, SARAH NICOLE BUSH a/k/a
SERENE ISARA ISABELLA a/k/a SARAH NICOLE
MONSERRATE a/k/A SARAH NICOLE
MONSERRATE BUSH,   Pages 1 through 89

        Defendants

| | |
|---|---|
| DEPOSITION OF: | JOHN F. COWLEY, ESQUIRE |
| TAKEN BY: | BRIAN M. PURICELLI, ESQUIRE |
| DATE & TIME: | MONDAY, MAY 17, 2010<br>1:02 P.M. to 3:10 P.M. |
| LOCATION: | Stephen J. Banik & Associates<br>41-42 Water Street<br>Wellsboro, PA 16901 |

**APPEARANCES:**

BRIAN M. PURICELLI, ESQUIRE
691 Washington Crossing Road
Newtown, PA 18940
   (For the Plaintiffs)

RANDALL J. HENZES, ESQUIRE
PA Deputy Attorney General
Litigation Section
21 South 12th Street - 3rd Floor
Philadelphia, PA 19107
   (For the Defendants)

**ALSO PRESENT:**

MR. DAVID BUSH, Plaintiff

CARLTON W. SWETLAND
Court Reporter - Notary Public
3085 Route 49
Westfield, PA 16950-9106
(814) 367-5482

ORIGINAL

CONTENTS

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN F. COWLEY | 3 | — | — | — |

EXHIBITS

| COWLEY NUMBER | PAGE |
|---|---|
| 1 - John Cowley letters of 4-17-06 to Trooper Whisner and David Bush. | 33 |
| 2 - William A. Kovalcik, Jr., Esquire Affidavit of Service dated 3-1-06. | 57 |
| 3 - Helga A. Bush 4-24-06 letter to John Cowley and John Cowley's 4-26-06 reply letter to Lyle and Helga Bush. | 63 |
| 4 - William A. Kovalcik, Jr., Esquire letter of 2-17-06 to John Cowley. | 69 |
| 5 - John Cowley letter of 2-23-06 to Corporal Christopher Wheeler. | 65. |
| 6 - PSP Investigative Report Transmittal Sheet dated 7-27-06. | 27 |

No other exhibits identified or marked.

Any reproduction of this transcript
is prohibited without authorization
by the certifying Court Reporter.

* * * * * *

1    PROCEEDINGS

2    BRIAN M. PURICELLI, ESQUIRE: This is Brian Puricelli. We're on the
3    record. We're here for a noticed deposition of a witness, John Cowley, of Tioga
4    County, who was duly subpoenaed and served. A copy of the Subpoena will be
5    attached to the record. The subpoena was duly served personally on him, directing
6    a deposition at 41-42 Water Street, Wellsboro, PA in the Law Office of Stephen
7    Banik for May 17th, 2010 at 9:30 a.m.. It is now 10:15 a.m. and neither the witness
8    or Defense counsel is present. I have not been contacted. We will continue to
9    wait, but the witness has failed to appear, and has been paid a day's witness fee
10   and travel costs.

11   * * * * * *

12   Whereupon, at 1:02 p.m.,

13   JOHN F. COWLEY, ESQUIRE

14   was called upon by Brian M. Puricelli, Esquire, counsel for the Plaintiffs, to give
15   an oral deposition. It was agreed by counsel present that John F. Cowley is an
16   Officer of the Court, therefore he was not duly sworn by the Carlton W. Swetland,
17   Notary Public, but was examined and testified as follows:

18   DIRECT EXAMINATION

19   BY BRIAN M. PURICELLI, ESQUIRE

20   Q    Mr. Cowley, my name is Brian Puricelli and we're here to ask you
21   some questions. You are an attorney of the Bar, correct?

22   A    That's correct.

23   Q    And you're in good standing?

24   A    Yes.

25   Q    Alright. And that's the Pennsylvania Bar?

1   A   Yes.

2   Q   Alright. At some point in time you were a District Attorney for Tioga
3   County?

4   A   Correct.

5   Q   When was that, sir?

6   A   I was the elected D.A. from 1992. I went into office in 1992, and I've
7   been out coming up on two and a half years, so let's see; ten, nine, eight – I guess
8   at the end of seven George must have taken office. I have sixteen years in.

9   Q   Okay. Since being with the District Attorney's office did you have
10  occasion to come in contact with a case involving David Bush?

11  A   Yes.

12  Q   Okay. That's pretty general, "a case".

13  A   Right. I was going –

14  Q   Okay.

15  A   My guess is – you know, I don't know.

16  Q   The particular case I'm talking about is an incident involving he, his
17  children, and his wife over an allegation that the children were missing. Are you
18  familiar with that?

19  A   I'm familiar with the allegation, yeah, and the case, I think probably
20  that I have some recollection of, deals with a PFA violation.

21  Q   Okay.

22  A   Where David was a Defendant. I'm aware of that case.

23  Q   Okay. And your being familiar with that PFA Violation case, did that
24  allow you to come in contact with the alleged victim, his wife?

25  A   I don't believe I did that case. I had contact – I do recall – it is my

1  recollection that at some point in time she was in my office, the D.A.'s office.
2  I don't think I met with her.
3      Q    So to clarify the record, at some time Serena Bush appeared in the
4  District Attorney's office?
5      A    At some point it seemed, but I don't know the reason. I don't know if
6  it was related to the PFA case. I don't know the timing, but I have this thing in my
7  mind that somehow she was in the office maybe with her attorney, and I don't know
8  the time.
9      Q    Can you approximate about when it was?
10      A    Obviously before she left.
11      Q    Was it –
12      A    I don't know. I don't know when it was.
13      Q    That's not necessarily true, obviously.
14      A    Well no, I don't know that either. I don't know.
15      Q    Okay.
16      A    It just seemed – I don't know the timing of it, to be honest with you.
17      Q    Okay. At the time that Serena Bush, and possibly her attorney, –
18      A    Right.
19      Q    – were in the District Attorney's office, not your personal office, –
20      A    Correct.
21      Q    – how many people worked in the District Attorney's office, at that
22  time?
23      A    At that time? We would have basically a Secretary/Office Manager;
24  we would have one Assistant, one County Detective, obviously myself, we have a
25  Victim/Witness Coordinator, and that would be it.

1  Q  Alright. Let's put some names on that. The Secretary and Office Manager was who?

3  A  Mary Kimball, K-i-m-b-a-l-l.

4  Q  Is she still there now?

5  A  Yes.

6  Q  She's the young lady, I guess, who I talked to. Who was the Assistant D.A.?

8  A  George Wheeler. He is now the District Attorney.

9  Q  And he has a relationship with the State Trooper Wheeler, correct?

10  A  Yes, he's a brother; yes.

11  Q  And who was the County Detective?

12  A  John Davis.

13  Q  Is he still the County Detective?

14  A  No, he's retired.

15  Q  Obviously I know who yourself is. And who was the Victim/Witness Coordinator?

17  A  Reva, R-e-v-a, Baldwin, B-a-l-d-w-i-n, I guess.

18  Q  And who was the attorney in the office, if the attorney was in the office with Mrs. Bush?

20  A  It would have been Lenore Urbano.

21  Q  Okay.

22  A  And it may have been down the hall; it may have been somewhere else in the courthouse. Do you understand? It's possible. Somehow I have a recollection that somehow she was somehow in the courthouse with Lenore, you know.

1   Q   What gives you the reason to believe you have a recollection they
2   were in the courthouse?
3   A   Because the County Detective, I think, talked to me about it
4   afterwards at some point.
5   Q   And what, if anything, do you recall him saying?
6   A   Just that she was in there with Lenore, and I don't even know what
7   the issue was at that time. I don't know if the issue was a PFA issue, I don't know if
8   it was a custody issue, I don't know what it was.
9   Q   Okay. In the course of your career with the District Attorney's office
10  how many times, if ever, did a person come in to your office, the District Attorney's
11  office, for the purpose of a custody issue?
12  A   Well, he has quite a few times.
13  Q   "He", being Mr. Bush?
14  A   Yes, he has.
15  Q   Aside from the Bush incident?
16  A   We have often people that call or contact, or come in; grandparents
17  sometimes come in and are concerned and they raise issues. I mean we have –
18  it's not an everyday thing. It's hard to put a numeric number on it, but does it
19  happen? Sure, because we're rural, we're small, people have access. It's not
20  like – we aren't kept away from people, say, as big city offices are. And so it's not
21  uncommon for people to come in and ask issues. Sometimes we say, "You'll have
22  to go get an attorney". A lot of times you still get an attorney.
23  Q   What were the type of issues that were considered custody issues
24  that your office would be contacted for?
25  A   Grandparents want to see grandkids.

1  Q    Okay.

2  A    Parents separated, you know, and "How do we" – you know, we'd

3 have to tell them to go to Legal Aid, or go get an attorney.

4  Q    Would they commonly talk to the County Detective about custody

5 issues?

6  A    No, no.

7  Q    Okay. So this conversation you had with the County Detective, John

8 Davis, would have been something out of the norm?

9  A    It was not typical. I wouldn't call it out of the norm; I would call it not

10 typical. Now I don't know why Lenore wanted John Davis – or if she wanted John

11 Davis to sit in, or if he did sit in. I'm just telling you that I have a recollection.

12  Q    Okay. So you have a recollection of Mrs. Bush and her attorney being

13 in the courthouse, in your office?

14  A    Maybe in my office, yes, uh-huh.

15  Q    And just so the record is clear; when you say your office, you mean

16 the District Attorney's office?

17  A    Yes, the Office of the District Attorney, uh-huh.

18  Q    Okay. Now you also mentioned a PFA matter?

19  A    Right.

20  Q    And how did you come to know about that if you weren't involved in it?

21  A    I don't know exactly. I know there was a PFA in place. I know that at

22 some point in time there was an allegation that he violated the PFA, and I believe

23 he was convicted, and he may have been incarcerated.

24  Q    Okay. If you were not involved in that where would you have learned

25 that information?

1   A   Probably – well, I guess the question is "What's involved?" I mean we
2   have a small office.
3   Q   Uh-huh.
4   A   Maybe Mr. Banik may have come in.
5   Q   Well, you don't need to speculate. If you know, tell me; and if you
6   don't, you don't?
7   A   I don't know. You're asking me who told me about it. Maybe
8   Mr. Banik, or maybe Mr. Wheeler, who handled the hearing.
9   Q   Okay, which was going to be my next question. There's only two
10  people in your office that would have done a PFA –
11  A   Right.
12  Q   – since it's a criminal violation, correct?
13  A   Right.
14  Q   Or I should say a criminal contempt, not a criminal law violation?
15  A   Correct.
16  Q   So if you didn't handle it, then Mr. Wheeler would have had to, is that
17  correct?
18  A   My recollection is I did not handle it.
19  Q   Okay. And during that period of time, since you were the District
20  Attorney and he was your assistant, would you have regular meetings where he
21  would tell you the types of cases he was handling and the dispositions?
22  A   Yes.
23  Q   Okay. And how were cases actually assigned by you during that
24  period of time?
25  A   During that time I would say, in terms of the PFA violations, he did

1  the vast majority.
2  Q  Uh-huh.
3  A  I don't want to say he did every single one because I don't know.
4  I mean I certainly could have, over the sixteen years, done a PFA. I'm sure I did,
5  but I don't have any specific recollection. But he would do the vast majority of the
6  PFA violations.
7  Q  Okay.
8  A  So if that's an assignment, that's – it was a standing situation.
9  Q  Aside from these two incidents did you have any other contacts which
10 involved the Bush family; the wife, the husband David, or the children?
11 A  I don't think I ever saw the kids. I don't know that I ever saw the kids.
12 I don't think I ever saw the kids. David, who is sitting here, I saw – I don't know –
13 more than once, that's for sure. I know Mr. Banik had brought him in, and he had
14 stopped in on his own before. That's what I can remember.
15 Q  Did you ever speak to Mrs. Bush?
16 A  I don't think so. I don't recall speaking to her. It's possible. I mean
17 although we only have two people, we still have to handle 500 to 600 cases a year,
18 so it's hard to say.
19 Q  If you had spoken with Mrs. Bush, would you have created notes or
20 records from your office that you did have contact with that person?
21 A  Probably not, unless there was something that required some written
22 followup.
23 Q  Okay. And you're still with the District Attorney's office now, correct?
24 A  Yes, uh-huh.
25 Q  You received a subpoena to appear today, correct?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | You're not here voluntarily, correct? |
| 3 | A | Yes. |
| 4 | Q | Okay. And the subpoena also asked you to bring certain records? |
| 5 | A | Yes. |
| 6 | Q | Did you bring those records? |
| 7 | A | Yes. I brought – I just asked the secretary to pull whatever we had, |
| 8 | | and that's what we have. |
| 9 | | (Mr. Cowley handed a file folder to Mr. Puricelli.) |
| 10 | | MR. PURICELLI: Okay. Let's go off the record for a second and we'll |
| 11 | | look at them. |
| 12 | | MR. COWLEY: Sure. |
| 13 | | (Ten minute recess taken at 1:13 p.m. for Mr. Puricelli to review the |
| 14 | | documents in the file folder that was given to him by Mr. Cowley.) |
| 15 | | MR. PURICELLI: Alright, let's go back on the record. |
| 16 | | DIRECT EXAMINATION   (Continued) |
| 17 | | BY MR. PURICELLI: |
| 18 | Q | Mr. Cowley, you indicated to me that that is the entire file on the Bush |
| 19 | | matter? |
| 20 | A | That is what was in – I asked the lady in the office to give me what |
| 21 | | she had in the file. |
| 22 | Q | The lady in the office is who? |
| 23 | A | Mary Kimball. |
| 24 | Q | Okay. |
| 25 | A | And that's what she gave me. |