Case 2:07-cv-04936-MAM   Document 54-3   Filed 10/01/10   Page 1 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 73

Q  Okay. Do you have any evidence that Mr. Bush represented she had been served?
A  That she had been served?
Q  Sure. Had been served with the custody notice?
A  No. I have no indication that she had been served with the custody notice.
Q  And do you know whether or not the jurisdiction they're referring to is personal jurisdiction or is subject matter jurisdiction?
    MR. SIMOPOULOS: Objection to form. Lack of foundation.
BY MR. PURICELLI:
Q  Do you know the difference between personal jurisdiction and subject matter jurisdiction of a court?
A  I don't know the entire difference.
Q  Okay. If I represent to you -- and your attorney can correct me. It's standard law. Subject matter jurisdiction means the Court can hear the matter. In this case, a custody matter. Personal jurisdiction means the Court can hear that matter and make a decision over the person meaning that they have control. They can actually compel a person to do something. Make them obey the order.

Page 74

    Now, if your attorney wants to explain it a different way or accept that as --
    MR. SIMOPOULOS: No. I'm just going to object to the question.
    MR. PURICELLI: Okay.
BY MR. PURICELLI:
Q  Do you know which of the two this Court's referring to?
A  Does it say on here?
Q  You're relying on that to make a representation. I'm trying to find out why you believe it's fraudulent. You've identified a sentence now and I want to know why you think the Court's saying we don't have jurisdiction and it's a fraudulent order?
A  It was improperly obtained.
Q  Why was it improperly obtained? Based on your working knowledge.
A  It says right here that it was vacated because it was inappropriately granted.
Q  Because why?
A  And jurisdiction is hereby relinquished.
Q  The Court never said it was fraudulently issued; correct?
A  It just said it was inappropriately

Page 75

granted. That's what it says.
Q  Right. So why did you use the word fraudulent?
A  Perhaps I should have said inappropriately obtained.
Q  Okay. So we're at the point now that Mr. Bush didn't obtain it fraudulently. He inappropriately went to Luzerne County and obtained this order; correct?
A  And then represented it to me as being official and appropriately granted.
Q  He told you this was appropriately granted?
A  That's how it was presented to me.
Q  How was it exactly presented to you?
A  I received it I believe via fax from Mr. Bush's brother, Chris Bush.
Q  And when you looked at it did it appear to be a valid order?
A  It appeared to be a valid order.
Q  Did you confer with the Commonwealth's Attorney with regards to this order that was sent to you?
A  That was done -- I can't say that I did that. I said that was done prior to giving custody

Page 76

to Mr. Bush.
Q  All right. So the order you received through the investigation of Lawson was at least given to the Commonwealth's Attorney for review?
A  I believe that was done by my detective.
Q  That's fair. My question simply was based on your belief that the order was sent to the Commonwealth's Attorney for review?
A  That's my understanding.
Q  Okay. And subsequent to that understanding it's also your understanding that the Commonwealth's Attorney also believed it to be a valid order?
    MR. SIMOPOULOS: Objection to form.
BY MR. PURICELLI:
Q  Is that true?
    MR. SIMOPOULOS: Objection to form. Also as to not testify to what other people believed.
BY MR. PURICELLI:
Q  You were not instructed not to obey the order. Is that fair? You were not instructed by the Commonwealth's Attorney to disregard the Pennsylvania order?
A  We were instructed to treat it as valid.

Case 2:07-cv-04936-MAM   Document 54-3   Filed 10/01/10   Page 2 of 6

Deposition of Sergeant Sean Adams                         Christpher Bush & David Bush V S.C Adams, et al.

Page 77

1  Q  Okay. And you weren't aware that that
2  same order was shown to a Virginia Court, and that
3  they issued an order as well? Is that true?
4  A  Not sure what you're referring to. You're
5  asking me if I knew that was shown to a Virginia
6  Court?
7  Q  Yes.
8  A  No. I don't recall. I mean, I don't
9  recall any knowledge of that.
10  Q  Did you represent to the magistrate that
11  Mr. Bush had procured a fraudulent order?
12  A  I said it had been inappropriately
13  obtained.
14  Q  Is that what you told the magistrate?
15  A  That's what I told -- there was a material
16  misstatement as far as the obtaining of this order.
17  Q  What material misstatement did you tell
18  the magistrate Mr. Bush had said?
19  A  It was vacated for being inappropriately
20  obtained and jurisdiction. And the fact that she
21  had not been served I was relying on this vacated
22  order and the information it obtained.
23  Q  I know you were. But I'm asking what did
24  you tell the magistrate? Did you read him the
25  order?

Page 78

1  A  I don't recall. I recall having it with
2  me at the time as part of the case folder, but I
3  don't recall exactly what I told the magistrate at
4  the time. The substance of it was that the custody
5  order was inappropriately obtained and presented as
6  valid.
7  Q  Okay. So let's assume now that you're
8  faced with a scenario where you have neither parent
9  with an order for custody from any court, who, from
10  your experience and training and policies of the
11  police department, can be charged with kidnapping if
12  they leave the state with their natural children?
13  A  If they're from another state or they're
14  both Virginia residents?
15  Q  I don't care if one of them is residing in
16  Pennsylvania, and one of them is residing in
17  Virginia. Neither has a custody order and one
18  leaves the state with their natural children?
19      MR. SIMOPOULOS: Objection to form.
20  BY MR. PURICELLI:
21  Q  You can answer the question.
22  A  Once more time please.
23  Q  Sure. The fact scenario is based on the
24  representation that neither parent had a valid court
25  order; correct, when Mr. Bush left the state of

Page 79

1  Virginia with his children?
2  A  Well, when he left I believed he had a
3  valid.
4  Q  Your point is, it really wasn't; was it?
5  Isn't your point to bring the charges, Mr. Adams, at
6  the time he gave that the order really wasn't valid
7  so he didn't have a court order?
8      MR. SIMOPOULOS: Objection to form.
9  BY MR. PURICELLI:
10  Q  Or do I have that all wrong? You
11  represented to a magistrate that the order he gave
12  you was no good, put simply. Isn't that true?
13  A  That it was not good, yes.
14  Q  All right. So working on that premiss
15  that when he came he didn't really have a good
16  order. He left Virginia with his children; correct?
17  A  Correct.
18  Q  And when he left Ms. Bush didn't have a
19  court order either; did she, for custody of the
20  children?
21  A  I had no knowledge of her having one.
22  Q  I understand. So when you brought the
23  charges it was for him leaving the state with his
24  children; true?
25      MR. SIMOPOULOS: Objection to form.

Page 80

1      THE WITNESS: Under false pretenses.
2  BY MR. PURICELLI:
3  Q  What is Virginia law --
4      MR. SIMOPOULOS: Objection to form.
5  BY MR. PURICELLI:
6  Q  -- on kidnapping under your understanding?
7      MR. SIMOPOULOS: Argumentative.
8      THE WITNESS: I would look at the law.
9  I'd see what the law says in reference to
10  kidnapping.
11  BY MR. PURICELLI:
12  Q  Is the law written on the warrants that
13  you were relying on?
14      MR. SIMOPOULOS: Objection to form.
15  Argumentative.
16  BY MR. PURICELLI:
17  Q  You can answer the question.
18  A  No. The code section is but the law is
19  not.
20  Q  You were trained in the code sections;
21  weren't you?
22  A  Yes.
23  Q  You were trained on kidnapping; weren't
24  you?
25  A  Yes, I was.

Case 2:07-cv-04936-MAM  Document 54-3  Filed 10/01/10  Page 3 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 81

1  Q   All right. Based on your training what's
2  the requirement, what are the elements for
3  kidnapping in the Commonwealth of Virginia?
4      MR. SIMOPOULOS: Objection to form.
5  BY MR. PURICELLI:
6  Q   You can answer the question.
7  A   Rephrase the question.
8      MR. PURICELLI: I don't think it could be
9  rephrased any simpler.
10     THE WITNESS: It's different for parental
11  abduction.
12 BY MR. PURICELLI:
13 Q   Is he charged with parental abduction or
14 kidnapping?
15 A   It's 18.2-47. I'd have to look and see
16 what --
17 Q   Do you have a code that you can rely on to
18 find out what it is you charged on?
19 A   Yes. It's on there.
20 Q   Are you saying you don't know what the
21 elements are?
22 A   I don't know the exact verbiage of it.
23 Q   What's your best recollection?
24     MR. SIMOPOULOS: I'm going to object to
25 this line of questions, and just for the record

Page 82

1  state that my witness is not the Commonwealth's
2  Attorney.
3      MR. PURICELLI: We'll concede that he's
4  not an attorney.
5      MR. SIMOPOULOS: And there's no foundation
6  for these questions.
7      MR. PURICELLI: I won't say that.
8      MR. SIMOPOULOS: Well, that's the
9  objection.
10     MR. PURICELLI: I merely asked his
11 understanding based on his training. And he's
12 already admitted that he has been trained on
13 this section.
14     MR. SIMOPOULOS: You can answer the
15 question.
16     THE WITNESS: And the question was?
17 BY MR. PURICELLI:
18 Q   What are the elements to your best
19 recollection for the charge 18.2-47 which I believe
20 is kidnapping in the Commonwealth?
21     MR. SIMOPOULOS: Again. Objection to
22 form.
23 BY MR. PURICELLI:
24 Q   Or is that correct? Is it parental
25 abduction?

Page 83

1  A   I'd have to review the exact code section.
2  Q   Well, on the third page of what we've
3  marked Adams 2 there's a Short Offense Description.
4  On this particular document it's called conspiracy.
5  Am I reading that correctly?
6  A   Your point -- I'm not that familiar with
7  it. Conspired to. All right.
8  Q   Okay. On this particular one it's 18.2-22
9  and 18.2-47. Did I read that correctly?
10 A   Yes.
11 Q   Okay. So if we look at the front page of
12 Adams 2. 18.2-47 appears on the front page;
13 correct?
14 A   Yes.
15 Q   And if we read down, Short Offense
16 Description, it says Abduction by parent, Remove
17 from the state; correct?
18 A   Right. I see it.
19 Q   Okay. I've read that correctly; right?
20 A   Correct.
21 Q   Is there a difference between the
22 kidnapping statute and abduction by parent?
23 A   It should be all part of the same section.
24 It just makes a specific delineation by parent.
25 It's not a felony unless they remove them from the

Page 84

1  state.
2  Q   Okay. Based on your training and this
3  statute what would be the elements, constituting in
4  your mind and training, of the crime of abduction by
5  parent, removal from state? What would a person
6  have to do in your mind and training to be charged
7  with that offense?
8      MR. SIMOPOULOS: Objection to form.
9      THE WITNESS: I would have to look at the
10 exact code section, review it, make the
11 determination as to elements of what the person
12 did to see if it fit that criteria and then
13 proceed to the magistrate.
14 BY MR. PURICELLI:
15 Q   Are you answering today that you don't
16 know the general elements if not all of them?
17     MR. SIMOPOULOS: Objection to form. You
18 can answer.
19     THE WITNESS: It seems pretty basic to me,
20 but I want to give you the exact correct answer
21 that you're looking for.
22 BY MR. PURICELLI:
23 Q   I'll give you the latitude that maybe you
24 don't know all the elements verbatim, but I'm asking
25 your general understanding.

Case 2:07-cv-04936-MAM   Document 54-3   Filed 10/01/10   Page 4 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 85

1  A  You have to be a parent of the children.
2  You have to take them out of state. You have
3  to have -- it's probably not have permission of the
4  other parent or legal right to do so.
5  Q  Okay. Let's assume those are the
6  requirements. What evidence did you have that Ms.
7  Bush could come into Virginia with authority from
8  Pennsylvania to bring the kids?
9  A  With the authority from Pennsylvania?
10  Q  Yes.
11  A  I have to look at the other order.
12  Q  You're free to look at whatever you need
13  to.
14  A  (Reviews documents.) I don't recall.
15  Q  You've gone through your whole file. We
16  took a few minutes off the record to allow you to go
17  through your file to see what authority you had in
18  your file from Pennsylvania, meaning a court order
19  or something, saying Ms. Bush was in the
20  Commonwealth of Virginia with the authority to have
21  those children. Isn't that true?
22  A  That she had the authority from
23  Pennsylvania to bring the children here and --
24  Q  To bring the children here and reside here
25  with them. You looked through your file for that;

Page 86

1  isn't that true?
2  A  Right.
3  Q  And you were unable to find anything;
4  isn't that true?
5  A  I couldn't locate anything.
6  Q  Have there been documents lost other than
7  the ones that you know that you referred to in your
8  file, your police file?
9      MR. SIMOPOULOS: Objection to form.
10     Argumentative.
11 BY MR. PURICELLI:
12  Q  You can answer that.
13  A  Obviously, I don't know what's been lost
14  but.
15  Q  Are documents routinely lost that are in
16  police files in the Richmond City Police Department?
17     MR. SIMOPOULOS: Objection to form.
18 BY MR. PURICELLI:
19  Q  I'm sure you're going to tell me no or
20  yes, but I want to know if there's something unusual
21  about this file --
22     MR. SIMOPOULOS: Is there a point?
23     MR. PURICELLI: Yes, there is. If you let
24     him answer it.
25     MR. SIMOPOULOS: What's the question?

Page 87

1 BY MR. PURICELLI:
2  Q  The question simply is, there's something
3  unusual about that file that would be missing
4  documents.
5     MR. SIMOPOULOS: Objection to form.
6     That's not a question. What's the question?
7     MR. PURICELLI: That is the question.
8     MR. SIMOPOULOS: What's the question?
9 BY MR. PURICELLI:
10  Q  Is there something unusual about this file
11  that there would be missing documents in it? For
12  example, it was kept in the basement and nobody
13  watched it or nobody put it together properly? Is
14  there a reason that documents that might have been
15  in it aren't in it?
16     MR. SIMOPOULOS: Objection to form.
17     THE WITNESS: The detective that had the
18     case initially has since left.
19 BY MR. PURICELLI:
20  Q  When you talked to the magistrate to
21  obtain the warrants did you tell the magistrate that
22  Ms. Bush was in Virginia with authority from
23  Pennsylvania to have the children here, or she was
24  here without having obtained authority from
25  Pennsylvania when she left?

Page 88

1     MR. SIMOPOULOS: Objection to form.
2 BY MR. PURICELLI:
3  Q  Did you say anything like that?
4     MR. SIMOPOULOS: Objection to form.
5     THE WITNESS: I believe what I said was
6     that she was a resident of Virginia with her
7     three kids enrolled in school here.
8 BY MR. PURICELLI:
9  Q  Did you tell the magistrate that the --
10     MR. SIMOPOULOS: Could you let him finish
11     answering the question, please.
12     MR. PURICELLI: I thought he was. Okay.
13     MR. SIMOPOULOS: No. Let him finish
14     answering the question. Thank you. Please
15     continue answering.
16     THE WITNESS: And that she had lived here
17     from quite some time, approximately a year.
18     And that was basically it as far as her
19     residency, her being here in Virginia.
20 BY MR. PURICELLI:
21  Q  Did you tell the judge she came from
22  Pennsylvania?
23  A  Initially, I may have said that their
24  relationship originated in Pennsylvania. I don't
25  remember specifically the content, what I said about

Case 2:07-cv-04936-MAM   Document 54-3   Filed 10/01/10   Page 5 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 89

that.
Q I'm sure your attorney does not want you guessing. Do you recall saying that?
A Do I recall saying what?
Q What you just said. "I may have said."
A That this, that the whole relationship with the children? I can't say that I, you know, 100 percent of what I told the magistrate in reference to that specific issue.
Q All right. I don't want you to guess. You don't have to guess. If you don't recall that's fair. I'm sure your attorney doesn't want you to guess. I don't want to be going around chasing a guess. So if your memory is the best you can do, just don't guess.
   All right. Now, when one parent has no court order and neither does the other parent and it's their children, and one parent lives in Pennsylvania, and one parent lives in Virginia who cares how long, how does your police department under policy handle the situation when a parent comes down here, picks up his children and leaves?
A Well, we don't remove them from the custody of one parent and give custody of children to another parent absent some sort of legal reason

Page 90

to.
Q Okay. The police don't get involved in that. In this case we know they did. Assume you guys didn't do that. He simply just went and picked up his kids and went to Pennsylvania. How would you handle that?
A That's not what happened here. You're asking me what would have happened?
Q Yes. Under your policy what would you have done?
   MR. SIMOPOULOS: Objection. Calls for speculation. Not relevant. I can go on and on, but if you can answer the question go ahead.
BY MR. PURICELLI:
Q And just so you know, I'm asking based on your policy not on what --
   MR. SIMOPOULOS: Which policy are you referring to?
   MR. PURICELLI: The police department policy.
   MR. SIMOPOULOS: Well, there are many policies.
   MR. PURICELLI: In handling a situation like this.

Page 91

   MR. SIMOPOULOS: I'm going to object to the form of this question. We're not referencing any particular policy.
   MR. PURICELLI: Fine.
BY MR. PURICELLI:
Q Does the police department have a policy or procedure in handling domestic matters where one parent doesn't have a custody agreement and neither does the other and one picks up the children and leaves the state?
A Leaves the state? That's different. I mean, with -- I'd have to look up the exact elements of the crime of parental abduction again.
Q I'm asking about a policy. Not a crime.
A A policy cannot permit a crime so our policy would be in line with the law.
Q Okay. So if I understand you correctly the policy says in a situation like that if it constitutes a crime you charge?
A Yes. If it constitutes a crime we enforce the law.
Q Okay. And is it your understanding that it's a crime in Virginia for one parent who has children here that's left from another state, relocated from Virginia, has no court order for

Page 92

bringing the children into Virginia or gives the parent custody exclusive or otherwise, but another parent coming in and picking up their children to return them from where they were removed is a crime?
   MR. SIMOPOULOS: Objection to form.
BY MR. PURICELLI:
Q You can answer it if you understand.
A I mean, that's the part I don't exactly understand because they don't initially leave. Usually, we're on the front end of those type of disagreements where one parent wants to come in and take the children, and the other parent wants them to stay. So they stay where they're at. And if they leave with the concent of the other parent then they're stuck with going to the other state where the parent is. If they overstay some sort of verbal agreement then we refer them to the appropriate jurisdiction.
Q When all these facts are surrounding did you know Serene and the children were from Pennsylvania before they came here to Virginia?
A I believe I was told by the detective in Pennsylvania that they had left the state of Pennsylvania.
Q To be clear, did you do anything before

Case 2:07-cv-04936-MAM   Document 54-3   Filed 10/01/10   Page 6 of 6

Deposition of Sergeant Sean Adams                                    Christpher Bush & David Bush V S.C Adams, et al.

### Page 93

1  you got your warrants to find out that Serene was in
2  Virginia with the kids under the authority of a
3  Pennsylvania law?  In other words, she was here with
4  the kids lawfully?
5      A   I didn't have any reason to believe
6  otherwise so I can't --
7      Q   You didn't have a court order from
8  Pennsylvania that said she had the right to have the
9  children; did you?
10     A   No.  I believe what I had was the -- which
11 order did I have.  (Reviews documents.)  I believe
12 the one that was faxed to me was the only one that I
13 had at the time that decision was made.
14     Q   That was the one vacating the prior one
15 you determined was inappropriately issued?
16     A   The initial one.  (Reviews documents.)
17 Yes.  The initial one dated the 23rd of June which
18 was later vacated.
19     Q   So can we agree by the time it was issued
20 and you went and sought warrants that caused the
21 arrest of Mr. Bush you had not determined whether
22 Ms. Bush had lawful custody of the children when she
23 entered Virginia?
24     A   She had custody at the time that I did
25 that.

### Page 94

1      Q   Did you have any agreement that she was
2  able to provide to you that --
3          MR. SIMOPOULOS:  Objection.
4  BY MR. PURICELLI:
5      Q   -- Mr. Bush had entered into saying she
6  could live in Virginia with the children?
7          MR. SIMOPOULOS:  Objection to form.
8      Rephrase that question.
9  BY MR. PURICELLI:
10     Q   Did you have any agreement between
11 Mr. Bush and Ms. Bush about the custody of the kids?
12         MR. SIMOPOULOS:  Agreement between
13     Mr. Bush and Ms. Bush?
14         MR. PURICELLI:  Yes.
15         MR. SIMOPOULOS:  Oh.  I didn't understand.
16         THE WITNESS:  I don't believe so.
17 BY MR. PURICELLI:
18     Q   And my understanding of your policy is if
19 there's not one of those, there should be a court
20 order; correct, that you guys look to?
21     A   We refer to instructions from the Court,
22 yes.
23     Q   All right.  And you didn't have one of
24 those either; correct?
25     A   At which time?

### Page 95

1      Q   At the time Mr. Bush is leaving Virginia
2  with his children?
3      A   At the time he was leaving Virginia with
4  his children the only one I had was the one dated
5  the 23rd of June that was later vacated.
6      Q   And you concluded that really wasn't a
7  good one because it was vacated; right?
8      A   Eventually.
9      Q   Right.  So would I be correct that you
10 viewed that not a lawful basis to remove the
11 children because the order was really no good?
12     A   I don't understand the question.
13     Q   I'm trying to rephrase it.  I understand
14 that order was vacated, and we've discussed that it
15 was a jurisdictional issue; correct?
16         MR. SIMOPOULOS:  Again, objection to form.
17     I don't know if he gave any conclusions
18     regarding the jurisdictional issue.
19         MR. PURICELLI:  Well, if he didn't, I'll
20     clarify.  I don't mean to put words in his
21     mouth.  Just trying to get past the question so
22     he understands it.
23 BY MR. PURICELLI:
24     Q   As it turned out, on hindsight if you
25 will, you don't believe the order that Mr. Bush

### Page 96

1  presented was good, valid law or something to that
2  effect; is that true?
3      A   It was vacated and determined to be
4  invalid.
5      Q   Okay.  And all I'm saying is, having
6  hindsight, if you'd had that knowledge when the
7  children were turned over and he was leaving
8  Virginia if you knew it was no good, okay, the
9  premiss would have been he didn't have an order.
10 She didn't have an order; correct?
11     A   Correct.
12     Q   He didn't have an agreement.  She didn't a
13 have an agreement; correct?
14     A   Correct.
15     Q   In that situation you also knew that you
16 had nothing that said she came to Virginia with the
17 kids with any authority or consent from Pennsylvania
18 to move here with them or his consent; correct?
19     A   That's correct.
20     Q   All right.  In that factual scenario his
21 leaving Virginia with his children -- and there's no
22 dispute they were his children; correct?
23     A   No dispute as to that; no, sir.
24     Q   You're faced with those facts.  Those
25 facts.  In your mind based on the procedures in the