Page 121

1 you arrest Mr. Bush?
2    A   I remember being in contact with them
3 about the arrest of Mr. Bush definitely post arrest
4 about his transport back to Richmond.
5    Q   Tell me what you talked about and with who
6 about the post arrest conversation.
7    A   I don't remember which one I spoke to but
8 they said -- they gave me the date he was returning
9 to Richmond.  That was about it.
10    Q   And you had no contact with anybody from
11 that task force about Mr. Bush other than that
12 contact?
13    A   That's where I said I can't recall pre
14 arrest.
15    Q   Well, how many conversations did you have
16 post arrest?
17    A   One or two.
18    Q   One was about when are they going to get
19 here; correct?  What other do you remember?
20       MR. SIMOPOULOS:  Objection to form.
21 BY MR. PURICELLI:
22    Q   One was about when are they going to be
23 brought to Richmond.  Is that a fair way to describe
24 it?
25    A   Yes.  The other one was probably he's in

Page 122

1 Richmond.  That was probably the extent of it.
2    Q   Did you talk to them at all about the
3 nature of the case?
4    A   I don't recall.  I mean, the arrest, I
5 mean, the gist of the facts about the arrest are on
6 the warrants.  It's pretty straight forward.  I
7 don't recall dealing with them about the facts and
8 circumstances.
9    Q   Up to this point is there anybody that you
10 communicated with other than an attorney about the
11 Bush arrest that we haven't talked about?
12    A   Other than the Commonwealth's Attorney's
13 Office?
14    Q   You already told me you spoke to the
15 Commonwealth's Attorney.
16    A   Right.
17    Q   Was there a conversation you had with
18 anybody else that we haven't talked about?
19    A   Not that I recall.
20    Q   Was there any conversations with anybody
21 that we haven't talked about already about the Bush
22 case:  The arrest, the facts, anything?
23    A   Not that I can think of at this time, no.
24    Q   You had mentioned sometimes you met with
25 the Commonwealth's Attorney to talk about the merits

Page 123

1 of the case.  You told me there was a conversation
2 pre arrest.  Were there any conversations post
3 arrest after bail?
4       MR. SIMOPOULOS:  With the Commonwealth's
5 Attorney?
6       MR. PURICELLI:  Yes.
7 BY MR. PURICELLI:
8    Q   With the Commonwealth's Attorney?
9    A   After bail?  When did bail occur?
10    Q   November 24th.
11    A   November 24th.  How many days was that
12 after he got arrested?
13    Q   About six weeks.  He spent a month in
14 federal detention center and about two weeks here.
15    A   I spoke to him before the case came up in
16 court.
17    Q   What did you talk about other than the
18 case?  Specifically what did you say and he say?
19    A   I don't remember specifics.
20    Q   Give me the general idea.
21    A   The only thing I remember is that they
22 were talking about not prosecuting the case.
23    Q   My experience when an attorney tells me
24 I'm not going to prosecute a case, I usually ask
25 why.  Did you ask a similar type question?

Page 124

1    A   Yes.
2    Q   What was the response?
3    A   I don't recall.
4    Q   In general, do you recall what the
5 response was?
6    A   Yes.  There was trouble getting witnesses.
7 I don't recall why but that was the main thing that
8 stuck in my mind.
9    Q   Who was the Commonwealth's Attorney you
10 were speaking to at this point?
11    A   It was either Mary Langer or Julie
12 McConnell.
13    Q   Mary's last name?
14    A   L-A-N-G-E-R.
15    Q   Were you at the first court listing for
16 the case?  Not the bail hearing.
17    A   I don't recall.
18    Q   How do you ordinarily get noticed in a
19 case?
20    A   You get subpoenaed.
21    Q   And I notice that we didn't find a
22 subpoena in your file.  Do you ordinarily keep
23 subpoenas in your police file?
24    A   Not ordinarily.
25    Q   Okay.  Assuming you were subpoenaed, and

Deposition of Sergeant Sean Adams        Christpher Bush & David Bush V S.C Adams, et al.

Page 125

1 assuming you were, did you appear for the hearing?

2    A   I said I don't know.

3    Q   If you appear for a hearing would you be

4 paid any over time?

5    A   If it occurred during your off duty hours.

6    Q   And you don't know if you appeared so you

7 don't know if you were on or off; right?

8    A   I would just be speculating.

9    Q   How did you learn of the disposition?

10    A   I heard from the Commonwealth's Attorney.

11 I believe they called me up. That's why I don't

12 recall the hearing. Because I was probably called

13 off on it.

14    Q   Okay. That's fair. Do you recall which

15 of the two attorneys that you named was the

16 Commonwealth's Attorney that called you to tell you

17 the case had been dismissed?

18    A   I don't recall, sir.

19    Q   Do you recall asking the Commonwealth's

20 Attorney why the case was dismissed?

21    A   In leading up to it that was when I was

22 told about the issues with getting the necessary

23 witnesses there and that there was a problem with

24 that.

25    Q   With obtaining witnesses to prosecute?

Page 126

1    A   Correct.

2    Q   And that was the prehearing conversation;

3 correct?

4    A   Pre?

5    Q   You said you had one postbail prehearing

6 conversation about the merits of the case. Did I

7 get that correct?

8    A   That's correct. That was prehearing.

9    Q   Okay. And I'm looking to see if that was

10 the same reason given to you when the Commonwealth's

11 Attorney called to say it was dismissed or dropped?

12    A   I don't believe I spoke with them after

13 the fact about the case.

14    Q   That's why I asked how you learned about

15 the disposition. I know you said there was a

16 problem with the case and it might get dropped. But

17 you knew the disposition of the case; didn't you?

18    A   I don't recall how I knew that.

19    Q   So you don't recall if someone called you

20 or if a document came to tell you what the

21 disposition was?

22    A   I'm pretty sure what happened was they

23 called me and called me off and said I didn't need

24 to appear that it was going to be nol pros'ed.

25 There would have been no conversation after that

Page 127

1 day.

2    Q   Subsequent to you learning the case had

3 been dismissed was that the end of any involvement

4 you had with the Bush custody matter?

5    A   I believe so.

6    Q   Okay. And has there been discussions with

7 anybody other than your attorneys about the Bush

8 case and the arrests and the facts that caused the

9 arrest that we haven't talked about yet?

10    A   I don't believe so.

11    Q   Has there been anybody you've talked to

12 other than your attorney about the Bush case, the

13 warrants, the facts, anything that we've covered

14 today that we haven't talked about?

15    A   Have I spoken with anybody other than --

16    Q   Anybody.

17    A   I just spoke to Lieutenant Russell about

18 it.

19    Q   Okay. Aside from Lieutenant Russell, who

20 was involved in it, was there anybody else? Any

21 superiors in your police department that asked about

22 it?

23    A   No, sir.

24    Q   There's been no memo down from the chief?

25    A   No, sir.

Page 128

1    Q   There's been no inquiry about it from

2 Internal Affairs?

3    A   No, sir. The legal department,

4 specifically our department lawyers, I've spoken to

5 them. But that was about it.

6    Q   That's close enough to attorney/client

7 privilege. All you have to do is say I'm talking to

8 my lawyers about it. That's enough for me.

9       Aside from the legal department have

10 you talked in general to people about the events? I

11 see you're married. It would dawn on me that you

12 would tell your wife what was going on?

13    A   Is that what you're asking?

14    Q   Well, I'm sure in the Commonwealth of

15 Virginia there's a spousal privilege. There is in

16 Pennsylvania. I don't intend to ask you

17 conversations with your wife. I'm just trying to

18 give you an idea when I ask if there's someone you

19 talked to, keep it broad. Because I don't want to

20 leave here and find out that somebody said they

21 talked to you and you didn't tell me.

22    A   So you're asking anybody other than my

23 wife?

24    Q   Right. I'm assuming you did. And it

25 would seem sensible to me that you would talk to

Page 129

1  your wife about that, and I don't care to know about
2  that.
3      A.   No.  I didn't talk to anybody else about
4  it.
5      Q.   Okay.  And of everything we've talked
6  about that that hasn't refreshed your memory as to
7  anybody else you talked to in Pennsylvania other
8  than Tripp?
9      A.   No, sir.
10     Q.   Never talked to Trooper McDermott?
11        MR. SIMOPOULOS:  Objection.  Asked and
12     answered.
13  BY MR. PURICELLI:
14     Q.   If you answered that I apologize for
15  asking again.
16     A.   I don't recall, sir.
17     Q.   Did you talk to anybody from the Virginia
18  State Police?
19     A.   Maybe their fugitive guys who's on the
20  same task force as the U.S. Marshals.
21     Q.   And who would that be?
22     A.   I think -- it's Ed Kellam, K-E-L-L-A-M.
23  And it just would have been about transport.
24     Q.   Do you know Sergeant McCann, M-C-C-A-N-N,
25  with the Virginia State Police?

Page 130

1      A.   No, sir.
2      Q.   Just Ed Kellam.  Captain Mark Segal?
3      A.   Oh, right.  He's a former captain that has
4  since left the department.
5      Q.   Did you talk to him?
6      A.   Yes, sir.
7      Q.   What did you tell him?
8      A.   He was calling the night that the report
9  was being taken.  His name's on that report.
10  (Reviews documents.)
11     Q.   One of the missing children's report?
12     A.   Yes, sir.
13     Q.   Why don't you tell me about the captain.
14  How does he fall in the chain of your supervision
15  chain?
16     A.   He is or was at the time the commander for
17  the city at nighttime.
18     Q.   Night command?
19     A.   Yes, sir.
20     Q.   Okay.  What would have been his duties and
21  the relationship to the events involving the Bushes?
22     A.   I can't remember who contacted him, but he
23  had a question about the case.  And I believe I
24  referred him to Detective Lawson.  Or I spoke to him
25  on the phone.  I don't know which.

Page 131

1      Q.   Did you have a conversation with him about
2  speaking to people in Pennsylvania?
3      A.   I don't recall.  That's possible.
4      Q.   On or about October 24, 2006 you don't
5  recall any conversation with Captain Mark Segal from
6  the Richmond Police Department and Pennsylvania
7  State Police?
8      A.   Are you asking?
9      Q.   Yes.
10     A.   I'm not sure what you're asking.
11     Q.   According to your testimony as I
12  understand it, and correct me where I'm wrong if I'm
13  wrong, he had asked about the Bush matter.  You
14  referred him to Detective Lawson.  Did I hear that
15  right?
16     A.   No.  I said I either referred him to
17  Detective Lawson or I answered his question over the
18  phone.  I believe he called me in the middle of the
19  night.  And I don't remember what the content of our
20  conversation was.
21     Q.   He didn't tell you that he was speaking
22  with the Pennsylvania State Police?
23     A.   I just told you I don't recall.
24     Q.   I'm trying to give you facts that might
25  jog your memory.

Page 132

1      A.   And I said it's possible.
2      Q.   I know and I'm just trying to help.  Maybe
3  it will jog your memory.
4        MR. SIMOPOULOS:  If he doesn't recall he
5     doesn't recall.
6  BY MR. PURICELLI:
7      Q.   Did Captain Segal ask you if you were
8  working on a missing child case?
9      A.   I believe he asked me about these specific
10  children.  He asked me what the case was about.
11     Q.   The case was about an abduction charge;
12  correct?
13     A.   I'm not sure at this time.
14     Q.   This time being on or about October 24,
15  2006 at approximately 035 hours?
16     A.   Right.  So the night of the 23rd
17  basically, just the start of the 24th.
18     Q.   So the 23rd would have been approximately
19  when he came to you and you said you need to do
20  something about the court order.  Is that correct?
21     A.   I believe she presented me with a vacated
22  court order on the 23rd.
23     Q.   When she did that, if I understand your
24  testimony, you then got the warrants for Mr. Bush
25  for parental child abduction.  Do I have that right?

Page 133

1    A    Warrants where are obtained on the 25th.
2  That's the executed date. Obtained date. Lower
3  left it says October 25th.
4    Q    I see. That's cut off on my copy. So
5  October 25th at 7:40 pm is the date the warrants
6  were issued. So that was the day before Captain
7  Segal was contacted; correct?
8    A    I updated him; yes, sir.
9    Q    Did Captain Segal indicate to you that he
10 was receiving faxes from the Pennsylvania State
11 Police?
12   A    I don't recall.
13   Q    Your record doesn't indicate any faxes
14 from the Pennsylvania State Police; do they?
15   A    I do not have any records of what you're
16 describing. They would be here.
17   Q    If an outside agency such as the
18 Pennsylvania State Police contacted your department
19 in regards to NCIC entries would they be referred to
20 the captain?
21   A    They're usually referred to
22 communications, and they query our system and
23 determine the validity of the existence of the
24 warrants.
25   Q    Would there be any reason you know of why

Page 134

1  the captain would have been contacted to deal with
2  the Pennsylvania State Police of an NCIC entry of
3  missing children?
4    A    I don't know why. I just don't remember
5  the content of our conversation.
6    Q    Did Captain Segal ask you to explain if
7  there were any detectives that aided in removing the
8  children from the schools?
9        MR. SIMOPOULOS: Objection to form. He's
10       already answered the question three times now.
11       MR. PURICELLI: Just seeing if it sparks
12       anything.
13       MR. SIMOPOULOS: If he doesn't recall he
14       doesn't recall. He's answered numerous times.
15       MR. PURICELLI: He can answer that
16       specific question. He could say I remember
17       now. Maybe not and he'll say no.
18       MR. SIMOPOULOS: Don't speculate.
19       THE WITNESS: Sorry. Say it again.
20 BY MR. PURICELLI:
21   Q    I just want to know whether or not my
22 reading what the Pennsylvania State Police are
23 writing sparks memory? It does or it doesn't.
24   A    Go ahead.
25   Q    Did Captain Segal ask you in a phone call

Page 135

1  whether two detectives aided in the removing of kids
2  out of the school and turning them over to the
3  father?
4    A    I just don't recall.
5    Q    All right. Do you know this number:
6  (804)646-6456?
7    A    That sounds like one of our numbers. It
8  could be the captain's desk number.
9    Q    And you have nothing in your file showing
10 a fax from the Pennsylvania State Police?
11   A    I'll check again real quick if you want me
12 to.
13   Q    I don't want to belabor the point. I'll
14 let you look at the report. It says they faxed you
15 something (document proffered.)
16   A    (Reviews document.) Where are you
17 looking?
18   Q    Right there (indicates.) They indicated
19 they faxed the captain documents.
20   A    (Reviews documents.) The part about the
21 kids being entered in the NCIC?
22   Q    Yes. Keep reading. You'll see the number
23 I read off to you.
24   A    Okay.
25   Q    You read on and you'll see the sentence

Page 136

1  about the state police confirming that the captain
2  received the faxes that they sent, the documents
3  they faxed?
4    A    What were they faxing?
5    Q    Good question. That's what I'm asking
6  you.
7    A    Oh. I believe I have the NCIC entry
8  confirmations but.
9    Q    You don't have any documents with the
10 state police fax labels on the top in your file. I
11 didn't see any anywhere. You haven't given me any.
12   A    I don't have any.
13   Q    I know you're not hiding them. I'm just
14 saying they say they exist, and they're not in the
15 file.
16   A    No. Everything I have you have.
17   Q    If they were faxed to the captain under
18 the normal course of events under your procedures
19 what would he do with whatever he received from the
20 state police on a file that you're working?
21   A    He would either put them in inner city
22 mail and get them to me or put them in my hand.
23   Q    Do you have recollection of him putting
24 any documents in your hand in regards to the Bush
25 case?

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

Page 137

1    A   No.  Because I never see him.  He works
2  6 pm to 6 am, and I don't come in until 8.
3    Q   And the only phone call you have any
4  recollection of is the one he called to ask you
5  about the case?
6    A   Yes.
7    Q   Okay.  Is there anybody else that you
8  might have remembered now talking to?
9    A   Yes.  I remember one more.  The other
10  detective's name that went to the school.  I don't
11  know if you have that.  But that sparked my memory.
12  Tish Edmonds.  E-D-M-O-N-D-S.  She went to one of
13  the schools, and Detective Lawson went to the other
14  school.
15    Q   Tish?
16    A   Yes.  T-I-S-H.
17    Q   E-D-M-O-N-D-S?
18    A   Yes.  Edmonds.
19    Q   All right.  How did she come into this?
20    A   Detective Lawson got with her and planned
21  it.
22    Q   Planned what?
23    A   Planned that she would go to one school,
24  and he would go to the other school.
25    Q   I see.  Aside from picking up the children

Page 138

1  and bringing them back safely is that the only thing
2  she played a part in?
3    A   You asked about people I talked to.
4    Q   Yes.
5    A   I just told her we were getting sued at
6  one point about it.  That was it.
7    Q   Absent no other involvement she just
8  happened to be the one person to go.  Is that it
9  with her?
10    A   That's the extent of it.
11    Q   Okay.  And you only told her you were
12  being sued?
13    A   I said -- I asked her if she remembered
14  anything more than just going to pick up the kids at
15  a school.  And she didn't have anything to add so
16  that was that.
17    Q   Was that all she said?  I have nothing
18  more than what you just said?
19    A   That was pretty much the content of it.
20  We didn't discuss anything at length.
21    Q   I know that you said I'm being sued.  I
22  don't know what she said.  What did she say?
23    A   She just told me that she didn't remember
24  anything else about it other than going to pick up
25  the kids at the one school.

Page 139

1    Q   Okay.  Anybody else other than her?
2    A   No.  I can't remember anybody else right
3  now.
4    Q   Okay.
5    A   If you want to throw some names at me,
6  feel free.
7    Q   I don't want to belabor the point.
8    A   I just want to help.
9      MR. PURICELLI:  Sergeant, that's all I
10  have for today.
11
12
13      (Witness to read and sign.)
14      (2 exhibits.)
15      (Proceedings concluded at 1:50 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 140

1      C E R T I F I C A T E
2  State of Virginia  )
3                     )  Ss:
4  Chesterfield County  )
5      I, Mary E. Aliff, a Notary Public
   within and for the State of Virginia, at Large, duly
   commissioned and qualified, do hereby certify that
   the within named witness, SERGEANT SEAN ADAMS, was
6  by me first duly sworn to tell the truth, the whole
   truth and nothing but the truth in the cause
7  aforesaid; that the testimony then given by him was
   reduced by me to stenotype in the presence of said
8  witness, subsequently transcribed into English text
   under my direction, and that the foregoing is a true
9  and accurate transcript of the testimony so given.
10      I do hereby certify that this
   deposition was taken at the time and place as
11  specified in the foregoing caption and was completed
   without adjournment.
12
13      I do hereby further certify that I am
   not a relative, counsel or attorney of either party
14  or otherwise interested in the outcome of this
   action.
15
      In witness whereof, I have hereunto set
16  my hand this 13th day of July, 2010.
17
18
19
20      --------------------------------
        Mary Elizabeth Aliff
21
22  Virginia Notary Registration No. 270874
23  My commission expires
   May 31, 2014.
24
25

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

---

Page 141

1    UNITED STATES DISTRICT COURT
2           for the
3    EASTERN DISTRICT OF VIRGINIA
4
5
6
7    CHRISTPHER BUSH AND DAVID BUSH
8        Plaintiff
9
10      v.        Civil Action No. 07-4926
11
12   S.C. ADAMS, ET AL.
13       Defendants
14
15
16      Deposition of SERGEANT SEAN ADAMS, taken at the
17   instance of the Plaintiff, before Mary E. Aliff,
18   Court Reporter and Notary Public for the State of
19   Virginia at Large on May 20, 2010 commencing at
20   10:00 a.m. at the offices of the City of Richmond
21   City Attorney, 900 E. Broad Street, Richmond,
22   Virginia, pursuant to Rule 4:5 of the Supreme Court
23   Rules of Virginia, pursuant to notice.
24
25

---

Page 142

1    APPEARANCES:
2
3        Mr. Brian Puricelli, Esq.
4        Law Offices of Brian Puricelli
         691 Washington Crossing Road
5        Newtown, PA  18904
6           on behalf of Plaintiff;
7
8        Mr. Nicholas Simopoulos, Esq.
9        Office of the City Attorney
         900 East Board Street
10       Richmond, Virginia  23219
11          on behalf of Defendant.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 143

1       I, SERGEANT SEAN ADAMS, hereby certify that
2    this transcript is true and accurate, with comments,
3    of the statement given in the above styled matter at
4    the time and place specified in the caption
5    hereinabove.
6
7
8    -------------------------------
9
10
11   Sworn to before me this _____
     date of _____, 2010.
12
13   Notary Public within and for the
     State of_____.
14
15
16
17   My commission expires_____.
18
19
20
21
22
23
24
25

---

Page 144

Deposition of Sergeant Sean Adams                    Christpher Bush & David Bush V S.C Adams, et al.

## WORD INDEX

**< 0 >**
**00** 1:20 141:20
**035** 132:15
**07** 1:10 141:10

**< 1 >**
**1** 2:20 19:1, 5
115:20, 25 139:15
**10** 1:20 141:20
**100** 29:13 89:8
**11th** 15:3
**13** 18:20
**139** 2:16
**13th** 140:15
**141** 2:24
**144** 2:24
**18.2** 81:15 82:19
83:8, 9, 12
**18904** 2:4 142:4
**19** 2:20, 20
**1983** 7:8
**1994** 4:22 5:7
**1D** 115:19

**< 2 >**
**2** 2:20 19:11, 15,
17 21:17 42:21
72:17 83:3, 12
111:24 139:14
**20** 1:19 141:19
**200** 43:11
**2006** 131:4 132:15
**2010** 1:19 17:9, 13
140:15 141:19
143:11
**2014** 140:23
**22** 83:8
**23219** 2:9 142:9
**23rd** 93:17 95:5
132:16, 18, 22
**24** 44:5, 8 131:4
132:14
**24th** 123:10, 11
132:17
**25th** 54:22 133:1,
3, 5
**270874** 140:22

**< 3 >**
**31** 140:23
**34** 5:14

**< 4 >**
**4** 1:22 2:16 17:7
18:24 141:22
**40** 5:23 133:5
**45** 32:2
**47** 81:15 82:19
83:9, 12
**4926** 1:10 141:10

**< 5 >**
**5** 1:22 141:22
**50** 139:15

**< 6 >**
**6** 137:2, 2
**6456** 135:6
**646** 135:6
**691** 2:4 142:4

**< 7 >**
**7** 17:9, 13 133:5

**< 8 >**
**8** 137:2
**804** 135:6

**< 9 >**
**900** 1:21 2:9
141:21 142:9

**< A >**
**a.m** 1:20 141:20
**abduction** 28:15, 20
29:2, 15, 25 30:4,
11, 14 36:22 37:20
39:22 40:1, 6, 7, 13
47:14 81:11, 13
82:25 83:16, 22
84:4 91:13 98:21
99:3, 11, 20, 22
100:7 106:8
118:17 132:11, 25
**ability** 113:21, 24,
25

**able** 3:10 22:4
25:21 30:18 94:2
**Absent** 8:3 89:25
138:7
**Absolutely** 36:19
70:13
**abuse** 56:12
**abusive** 52:24
**academy** 5:14
**accept** 74:2
**acceptable** 19:6
116:1
**acceptance** 5:4
**accepted** 62:4
**accurate** 116:7
140:9 143:2
**accurately** 50:7
116:21
**act** 113:25
**Action** 1:10 3:7
15:18 41:3 53:20
60:10, 20 61:15
119:15 140:14
141:10
**actions** 16:13
113:8
**active** 15:9, 11, 13
**activities** 14:19
16:13 17:20 27:14
28:1
**activity** 16:2
**acts** 108:10
**actual** 5:4 13:10
14:22 41:24 44:16
**ADAMS** 1:12, 16
2:20 3:1 4:16, 17
18:21 19:1, 11, 17
21:17 42:21 50:18,
23 79:5 83:3, 12
111:24 115:19, 20,
25 140:5 141:12,
16 143:1
**add** 138:15
**addition** 18:22
**address** 66:5
67:20 110:1, 2, 12
111:10, 20, 21, 22,
23 112:1, 3, 4, 7, 18
113:19

**addressed** 37:18
53:10, 21
**adjournment** 140:11
**administrative**
16:21
**admitted** 82:12
**advice** 9:18, 23
35:7 36:1, 1, 24
37:2, 3, 6 38:23, 25
39:18, 19, 20, 25
40:19
**advise** 35:13 53:6
**advised** 12:10
15:4, 6 26:3 53:7
70:6
**Affairs** 128:2
**aforementioned**
19:2, 12
**aforesaid** 140:7
**afraid** 31:20
**agencies** 107:10,
24 113:4
**agency** 109:15
114:3, 3 133:17
**agent** 107:23
**ago** 31:11
**agree** 27:19 93:19
103:7 115:20
**agreed** 50:4, 22
**agreement** 91:8
92:17 94:1, 10, 12
96:12, 13 97:24
100:8 115:23
**ahead** 35:5 59:3
90:14 99:13 134:24
**aided** 134:7 135:1
**AL** 1:12 141:12
**Aliff** 1:17 140:4, 20
141:17
**allegation** 64:2
**allegations** 57:14,
23 62:4
**alleged** 63:19
**allow** 13:15 36:11,
25 41:2 85:16
106:17
**allowing** 10:15
**allows** 100:19
**answer** 3:18 4:4
29:16 34:15 36:15