1  the State Police?
2          MR. HENZES:  There's a problem with your example
3  compared -- do it properly, because your client didn't contact
4  the State Police.  The State Police contacted your client.
5          MR. PURICELLI:  Sure.
6          MR. HENZES:  There's a difference.
7  BY MR. PURICELLI:
8     Q    A sergeant contacts the police department to find out
9  why they've got children in NCIC.
10    A    Correct, okay.
11    Q    Okay.  That they haven't put in, that they can't find,
12 but are reported missing by a parent.
13         MR. HENZES:  By the brother of the guy who's
14 complaining his children are missing.  So give it the clearest
15 example as you can have in front of the guy.
16 BY MR. PURICELLI:
17    Q    Does the importance of children being missing diminish
18 because a brother who's reporting they were missing -- does it
19 diminish the fact --
20    A    Have we established that they were missing?
21    Q    Actually, if you want to know, I'll tell you what the
22 State Police reasons are for not putting them in.  They knew
23 they were with the mother.  That's the reason.  Were you aware
24 of that?
25    A    No, I can't say that I was aware of it.  But being

```
 1  that there was a PFA against the brother.
 2      Q    That had expired, and that's --
 3      A    Okay.
 4      Q    -- in the report.
 5      A    Just recently, I believe.
 6      Q    No, not recent.  It had expired, and she had left.
 7           MR. HENZES:  Six months.
 8           THE WITNESS:  How long?  Okay.
 9           MR. PURICELLI:  Yes, it expired.
10           MR. HENZES:  What's the definition of recently?
11  BY MR. PURICELLI:
12      Q    Randy and I do this all the time.  19 years, we do
13  this all the time.  It's just a little sparring.  If a PFA
14  expired today --
15      A    Correct.
16      Q    -- or it expired six months ago --
17      A    Okay.
18      Q    -- no matter what, it expired, didn't it?
19      A    Sure, it did.
20      Q    And if it expired, what does it mean to a police
21  officer?
22      A    Nothing.
23      Q    Full agreement with you.  So it doesn't -- it's either
24  valid or it's not.  And if it's not valid, you ignore it?
25      A    That's the PFA?
```

1    Q    PFA?

2    A    Right. So that doesn't -- go ahead.

3    Q    If you have a question, I want you to have as much
4 information as you can.

5    A    Go ahead.

6    Q    Because you have a report that's attached to it that
7 says it's expired. You have a father coming in, according to
8 the State Police report that's attached that you're reviewing,
9 that says he can't find his kids. And he thinks they're with
10 his wife, but he doesn't know. And the State Police, for
11 months, can't find the children to determine their welfare,
12 okay. That's all in that report. And if it wasn't, believe
13 me, Randy would be jumping all over me.

14    MR. HENZES: What wasn't in the report? No, he
15 doesn't report -- no. No, you're misstating what he reported
16 to the State Police.

17    MR. PURICELLI: Does he know where the kids are?

18    MR. HENZES: He says the kids are with the wife.

19    MR. PURICELLI: Okay. Does he know the location of
20 his wife and his children?

21    MR. HENZES: Does he know the location? No. But he
22 says the kids are with the wife. He doesn't say the kids are
23 missing.

24 BY MR. PURICELLI:

25    Q    State Police -- if a parent comes in and says my kids

1  are with my wife, and I don't know where they are.
2      A      He doesn't know where they are.
3      Q      Thank you.  He thinks they're missing?
4      A      Doesn't mean they're in danger.
5      Q      How do you find out if they are?
6      A      You do an investigation.
7      Q      Look for them, right?
8      A      Yeah.
9      Q      Okay.  Suppose the kids are found, what's the law
10 require?
11     A      I don't know what the custody order would be.
12     Q      Forget the custody order.  What's the criminal law
13 require?
14     A      Well, okay.  If they're found?
15     Q      Um-hum.  They're located, what's the statute require?
16     A      If they're -- well, I guess under the circumstances I
17 guess let the father know or the mother know.
18     Q      Okay.  You didn't know under the state law the statute
19 that the State Police are required to enforce is that if the
20 children are reported missing and located, that the police are
21 supposed to interview the children to find out what their
22 welfare was?
23     A      Oh, I'm sure part of the investigation, sure.
24     Q      Sure.  Does Hile's report indicate that the children
25 were located?

1     A    Yeah, I think he did.

2     Q    You talked all about them being returned to the
3 mother, didn't you?

4     A    Yeah.

5     Q    Yes. Where does Hile's report indicate that the
6 children were ever interviewed to find out what their welfare
7 was during the period of time? No one knew where they were.
8 They knew who they were with.

9     A    That wouldn't be in Hile's report.

10     Q    Why not?

11     A    That should be in the incident report.

12     Q    Why not? Wasn't he supposed to get the big picture?

13     A    No. He was supposed to get the circumstances of the
14 -- Mr. Bush's complaint.

15     Q    Well, if the state law required --

16     A    Well, that would be in the investigative report.

17     Q    If the state law required the investigator to
18 interview the kids and they didn't, would that be misconduct, a
19 violation of a state law?

20     A    I don't know. I'd have to take a look at it with --
21 are we talking about Hile now?

22     Q    We're talking about this big picture that you say you
23 needed to do in order to agree with this report.

24     A    Well, I'm looking at the big picture. I'm looking at
25 Mr. Bush's complaint and Lieutenant Hile's investigation.

1   Q   Right.

2   A   Okay.

3   Q   But you told me, Captain, to investigate Christopher
4   Bush's complaint against Tripp you had to get the big picture
5   so you had to talk about his brother too?

6   A   Yeah.

7   Q   Well, if you're going to look at the big picture,
8   aren't you going to see if your troopers up in the
9   Montoursville area in Tioga County have simply decided who
10  they're going to help and who they're not going to help?

11  A   Well, I think Lieutenant Hile answered that by his
12  sequence of events as to where the kids were. The court orders
13  and the subsequent.

14  Q   He wrote conclusions in there that certain things were
15  illegal, didn't he?

16  A   He wrote conclusions that certain things were illegal?

17  Q   Right. Was it his job to write a conclusion or just
18  collect the facts?

19  A   Just the facts.

20  Q   And then you were supposed to make the decision?

21  A   What decision?

22  Q   The ultimate decision whether a full investigation was
23  supposed to be done, right?

24  A   If I thought something was --

25      MR. HENZES: Do we may favor, point out where he makes

1  a legal conclusion.
2          THE WITNESS:  Yeah, I'm missing that.
3          MR. PURICELLI:  Can I see the report?  Okay.  I'll
4  withdraw that.  Okay.
5          MR. HENZES:  Um-hum.
6          THE WITNESS:  I lost that one too.
7  BY MR. PURICELLI:
8      Q   Oh, that's okay.  All right.  So his report that you
9  adopted indicates the children were turned over?
10     A   Yeah.  They were turned over to Mr. Bush and then back
11 to Mrs. Bush.
12     Q   Okay.  And how did that help you determine whether or
13 not Trooper Tripp -- Sergeant Tripp had properly engaged in
14 conduct by refusing to accept information from a police
15 department about the location of kids, which --
16     A   I'm not going to guess, but Sergeant Tripp was
17 conducting -- or the barracks was conducting their own
18 investigation now at this point.
19     Q   And he was in charge of the barracks.  He was the
20 highest ranking supervisor.  It was one of those odd points
21 where a sergeant was a CO?
22     A   Right.
23     Q   And we've already deposed him, so we know his point of
24 view.
25     A   Yeah.

1    Q    Just interested in why it's been so much talking about
2  David, and there's so much missing that you don't know, but you
3  say Tripp acted appropriately, didn't engage in any misconduct.
4  I'm just trying to think what the thinking was.
5    A    What misconduct?
6    Q    From the report, from this report was all he talks
7  about --
8    A    Which report now?  I'm sorry.
9    Q    Hile's report.
10   A    Hile's report deals with the complaint verification.
11   Q    Actually it doesn't, does it?  It talks about David
12  Bush, his history, doesn't it?
13   A    Yeah, what -- why he didn't do what he did.  Why
14  allegedly he didn't do what he did.
15   Q    Doesn't say -- well, we've already conceded it doesn't
16  say why Tripp laughed?
17   A    No, it does not.
18   Q    It doesn't say why Tripp wouldn't take information
19  about missing children, does it?
20   A    No.
21   Q    And that was the important part, wasn't it?
22   A    Following up on the kids, absolutely.
23   Q    And you adopted that?
24   A    Yes, I did.
25   Q    Why?

1    A    Why would I not?

2    Q    Wouldn't you want to know if a station commander was
3    choosing who he's going to help and not help?

4    A    There was no -- no allegation to that to me that I
5    saw.

6    Q    Well, you testified you knew that the kids weren't put
7    in NCIC by the State Police up there?

8    A    Absolutely.

9    Q    You didn't know from the reports that they had made
10   the determination not to put them in because they decide they
11   weren't missing because they knew they were with the mother?

12   A    When I read Mr. Bush's complaint verification, okay,
13   there's no mention of there being any problem with the kids,
14   any concern for the safety.

15   Q    Wasn't Serene fleeing?

16   MR. HENZES:  Let him answer the question.  He didn't
17   finish answering the question.  You're asking him his thought
18   process.

19   THE WITNESS:  I have no idea that she fled.

20   BY MR. PURICELLI:

21   Q    Well, there was a mention of a PFA?

22   A    That doesn't mean she fled.

23   Q    Didn't you know the PFA was for the kids too?

24   MR. HENZES:  Let him answer the question.  Continue
25   with what you have in front of you with what you're looking at

1  what he filed.  That was when he cut you off.
2         THE WITNESS:  I forget where I was when I stopped.
3         MR. HENZES:  Well, you were looking at the complaint
4  verification.
5  BY MR. PURICELLI:
6     Q    The complaint verification, the second paragraph.
7     A    Yeah.
8     Q    Do you have that in front of you?
9     A    Yes, I do.
10    Q    Okay.  Detective Christopher Bush identifies
11 specifically Sergeant Tripp's failure.  He says Sergeant Tripp
12 -- Dave Bush was told by Sergeant Tripp that because a
13 protection from abuse had been entered into, I guess it's into
14 him, by him that he had no rights to his children.
15    A    Um-hum, okay.
16    Q    Is that true?
17    A    No, of course not.
18    Q    Okay.  Did anybody investigate Tripp to find out if he
19 ever told that to David Bush?
20    A    No.
21    Q    No?
22    A    No.
23    Q    But that was a specific allegation against Tripp?
24    A    By Christopher Bush.
25    Q    Right.

```
 1      A    Correct.
 2      Q    That Tripp was telling parents you have no rights to
 3  your children because of a PFA?
 4          MR. HENZES:  No.  Telling David Bush, not parents.
 5          MR. PURICELLI:  David Bush is a parent.
 6          MR. HENZES:  But, Brian, you can't -- you can't
 7  extrapolate because he told one guy that he's telling every
 8  other parent.
 9          MR. PURICELLI:  Telling a parent.
10          MR. HENZES:  No, you said parents.
11          MR. PURICELLI:  Okay.  Then I'll rephrase.
12          MR. HENZES:  That's the allegation in the
13  verification.
14  BY MR. PURICELLI:
15      Q    It's not proper conduct for a station commander, a
16  sergeant, and particularly Tripp, to tell a parent, in this
17  particular case David Bush, he has no rights to his children,
18  correct?
19      A    I'm sorry.  Go ahead.  What was that?  I'm sorry.
20      Q    I'm sorry.  This is getting tiring, I'm sure.
21      A    I don't -- go ahead.
22      Q    It's important to Mr. Bush.  I want you to recognize
23  that.
24      A    Oh, absolutely.
25      Q    He goes to the State Police to ask for help, and he's
```

```
1   told, according to this verified complaint, that a station
2   commander, Tripp, told David Bush, a parent, you have no rights
3   to your children because you had a PFA.
4       A    Right.
5       Q    And that's flat out wrong, isn't it, Captain?
6       A    I would say --
7       Q    Under these facts?
8       A    I would say if I were to believe that, yeah.
9       Q    And you'd want to know if there's any truth to that,
10  wouldn't you?
11      A    Yeah, um-hum.
12      Q    Because that would be misconduct, wouldn't it, telling
13  a parent they can't be with your kids?
14      A    Possibly, yeah.
15      Q    What would be less misconduct?
16      A    Well, what I've read here, okay, they obviously were
17  aware of the issues with the Bushes, that it's been going on
18  since their divorce in 2004.  So the station obviously was
19  familiar with this situation, that there was a PFA against Mr.
20  Bush.
21      Q    You're assuming all that though, right?
22      A    No.  I'm reading it here in Mr. -- Lieutenant Hile's
23  report.  So this was not something that just came out of the
24  blue.  There obviously was a history here.
25      Q    Okay.  And do you know what that history was?
```