1   A   Just reading from here.

2   Q   Okay. That the history was a PFA, right?

3   A   Um-hum.

4   Q   And a contempt for trying to see his children,
5   correct?

6   A   Um-hum. Well, okay.

7   Q   Okay. And that PFA and that contempt were no longer
8   valid, isn't that the history?

9   A   Yeah, until January 6th of '06.

10  Q   And after the PFA is expired, which we all agree means
11  nothing anymore --

12  A   Right.

13  Q   -- he says my children are missing?

14  A   Right.

15  Q   Okay. And then the allegation is at that point in
16  time, even with that history, Tripp says you had a PFA, you
17  have no rights to your kids, paraphrased?

18  A   Um-hum.

19  Q   Flat out wrong statement; isn't that true, Captain?

20  A   If he said that.

21  Q   And how do you know if he said it from a BPR
22  standpoint?

23  A   Well, because he's saying here, Hile's saying,
24  February 23rd, '06 David Bush reported his children missing and
25  attempted to have police locate his children. And he may have.

1  Members of Mansfield were familiar with the Bush family. An
2  effort was made to locate Sarah Bush, AKA Isara Serene, to
3  determine the well being of the children, but not disclose
4  their location to David Bush.
5      Then it goes to on to say David Bush traveled to
6  Luzerne County.
7  Q    And tells the history of him. It doesn't say one word
8  about calling David Bush, does it, to find out whether Tripp
9  said what he's accused of saying, does it?
10 A    No, it does not.
11 Q    Doesn't say one word that he called Christopher Bush
12 and said how do you know that he said that, does it?
13 A    No. That's part of this other report.
14 Q    And it doesn't say one word that I went to Tripp and
15 he denied it because he didn't interview him, did he?
16 A    No, he did not.
17 Q    It's completely ignored that allegation, isn't it?
18 A    Which one now, that he said what?
19 Q    The allegation that Tripp --
20     MR. HENZES: It's not an allegation. It's not an
21 allegation. He's not saying that what Tripp was saying was
22 against policy. He's just giving a background. Read it,
23 Brian. He just says what the allegation is, that he didn't do
24 his job by not entering the kids in the NCIC. He's not saying
25 about no rights to the kids. Read the complaint.

1  BY MR. PURICELLI:
2      Q    Does it say in this verified complaint that Tripp
3  makes a statement attributed to him? I read it. Do you want
4  me to read it again?
5      A    No.
6      Q    It says Tripp said something, correct?
7      A    Did not only --
8      Q    Go above it.
9      A    He had no rights to his children.
10     Q    And that is a statement attributed to him, isn't it?
11     A    To Tripp, yes.
12     Q    The actual allegation in the verified complaint is
13  Tripp actually made a statement?
14     A    Um-hum.
15     Q    And that statement is identified that he told -- Tripp
16  told David Bush he had a PFA, and you have no rights to your
17  kids? That's paraphrasing.
18     A    That's the allegation.
19     Q    That's the allegation?
20     A    Right.
21     Q    So for Randy's benefit --
22         MR. HENZES: There isn't an allegation. He's just
23  saying this is what he wrote. That's not an allegation that
24  he's just writing that there. That's what he's writing.
25         MR. PURICELLI: You interpret the way he did. The

1  allegation is he didn't do his job by entering the kids into
2  NCIC.  That's the allegation that's investigated.  He doesn't
3  say you acted unprofessionally by saying to my brother you
4  don't have the rights to my kids.  You look at the parts you
5  want to look at.
6      MR. HENZES:  No, Brian.  You look at the parts you
7  want to look at.
8  BY MR. PURICELLI:
9      Q   All right.  So, Captain, you don't have an answer
10 whether Tripp said something and what's the reason?
11     A   Well, I know they were looking into it.
12     Q   Looking at Tripp?
13     A   No.  They were looking into it.  They were looking
14 into the missing kids.
15     Q   Okay.  And do you know the extent of looking for the
16 kids?
17     A   No, I don't not offhand.
18     Q   Did they ask the mom if she knew where the kids were?
19     MR. HENZES:  The attachments.
20     THE WITNESS:  I don't have it in front of me.
21 BY MR. PURICELLI:
22     Q   And then after that they talked to some parents, some
23 family members?
24     A   Okay.
25     Q   Do you know where she is?  No, we don't.  That's it.

```
 1      A     Okay.
 2      Q     Did the State Police, based on that, based on my
 3  representation, know where the kids are other than they're with
 4  their mother?  I'm just asking you from your 29 years, Captain?
 5      A     No.
 6      Q     It's obvious, right?
 7      A     No, I don't know.
 8      Q     Do you know if they're safe or not?
 9      A     Do I know now?
10      Q     Not now.
11      A     No.
12      Q     Based on those facts, nobody can tell me where they
13  are.  I know they're with mom.
14      A     When I see the report, it's done.  They have been
15  found.
16      Q     Yeah.
17      A     Okay.  When I see it it's all done.  It's finished.
18  It's over.  Did I know at that point?  No, but I do now.  I did
19  -- when this came in the kids changed hands a couple of times.
20  You know, they went through the court system.
21      Q     Okay.  That's all fair.  Hindsight they were safe,
22  right?
23      A     You're asking me, okay, if when this all came in --
24      Q     When this started.
25      A     When it started.
```

1    Q    Yes.
2         MR. HENZES:  When he became aware of it?
3         THE WITNESS:  When it came in?
4         MR. HENZES:  When it came in to him?
5         THE WITNESS:  That's when everything was attached
6    here.
7    BY MR. PURICELLI:
8    Q    Right. And the allegation is Tripp didn't do his job,
9    not at the end when it turns out maybe he was okay that no
10   harm, no foul occurred?
11   A    Um-hum.
12   Q    That's not the allegation, right, no harm, no foul?
13   He said he didn't do his job when? When the complaint came in
14   by David Bush, correct?
15   A    Yeah, sure.
16   Q    Okay. Isn't that the point you have to ask did you do
17   your job then?
18   A    Well, based on the outcome it was done. It was done.
19   Now, we don't know about the laughing, okay. That's --
20   Q    We don't know about the statement?
21   A    About who?
22   Q    The statement?
23   A    No, we don't.
24   Q    That he tells David Bush?
25   A    No, we don't, no. But the mere fact that they

```
 1   conducted an investigation.
 2        Q    And the kids were found not because Tripp put them
 3   into NCIC, but because David's brother, Christopher, but them
 4   in NCIC, isn't it?
 5        A    That's correct.
 6        Q    If the NCIC hit that he put in hadn't occurred, that
 7   investigation shows the State Police wouldn't have found them;
 8   isn't that true?
 9        A    I don't know what -- you're asking me a hypothetical
10   question.  I don't know what the end result would have been.  I
11   don't know at what point they would have put them in or
12   wouldn't have put them in.  There's no way I can answer that.
13   All I can say is I see the end result.  Here it is.
14        Q    All right.  So as long as the kids were okay in the
15   end, there would be no violation by not putting them in NCIC?
16   Is that what you're telling me?
17        A    I don't know at what point.  What I'm telling you is I
18   don't know at what point.
19        Q    That's what I'm trying to get to.
20        A    I don't know.  It doesn't get to that point because
21   Mr. Bush entered them prior to that, okay.  I don't know what
22   investigative steps that would have continued obviously from
23   the report they were attempting to discover.
24        Q    So that was a good thing that he put them in, right?
25        A    Well --
```

1  Q   You have the State Police investigating him, and the
2  end result was it was a good thing, right?  Aren't we looking
3  at the end result now in your thinking?
4  A   Yeah.  But there's no way to know what the end result
5  would have been if he hadn't.  I don't know.
6  Q   Would that same statement --
7  A   I'm not saying --
8  Q   Would that same statement be true, we don't know what
9  the end result would be if they didn't get in?
10        MR. HENZES:  They weren't found by the report, Brian.
11 BY MR. PURICELLI:
12 Q   That's the problem with speculating.  The law says
13 that if the children are reported missing without delay, that's
14 the law, they're to be put in NCIC.  Doesn't say if you think
15 they're okay because they're with their mother.  It says if
16 they're reported missing, without delay they're to be put in.
17 That's what the law requires?
18 A   Um-hum.
19 Q   Okay.  And isn't it true the State Police, Tripp,
20 without delay never put the children in NCIC?
21 A   No, I guess he didn't.
22 Q   Is the state trooper permitted to ignore the dictates
23 of law, statutes?
24 A   No, of course not.
25 Q   Is a state trooper, a sergeant, allowed to pick and

```
 1  choose who they're going to determine is missing or not?
 2      A    Well, I don't think we thought the people were
 3  missing, right?  They were with the mother.
 4      Q    Well, would you follow the dictates of law as to
 5  whether a person is or isn't missing?
 6      A    Well, I think he said they were with the mother.
 7  Their whereabouts weren't known.
 8      Q    I want to follow that throughout.
 9      A    Okay.
10      Q    So if the State Police thinking, permitted thinking
11  for Tripp, is as long as I know where the kids are, I have no
12  evidence they're in danger, they're not missing?  Is that what
13  you're telling me?  It's okay then?
14      A    No.
15      Q    Tell me what you're telling me.
16      A    What I'm telling you is by the father's apparent
17  admission they were with the mother.  They were conducting an
18  investigation.
19      Q    And their investigation couldn't find mom, could they?
20      A    Well, you'd have to show me the time frame.  They were
21  obviously -- by your thing they were.
22      Q    I don't want you to guess, Captain.
23      A    What's that?
24      Q    I don't want you to guess.  We got the report here.
25  We don't have to.  I'll tell you, if you need that information
```

1  to be comfortable, I'll tell you the report says they didn't
2  know.
3      A    I do.  They didn't know.
4      Q    They did not know where mom was?
5      A    Okay.
6      Q    Never learned where mom was.  Any time they had an
7  idea where mom was it was because David Bush provided them with
8  the information.
9      A    Okay.  I'm sorry.  Can you ask that question again?
10     Q    I'm just trying to help you along, Captain, because
11 you --
12     A    After the fact you're trying to help me along.
13     Q    Because you're saying after the fact it turns out they
14 were okay.  You looked at the end because you were --
15     A    That's all I had.
16     Q    I understand.
17     A    That's all I had.
18     Q    And I'm saying isn't the real complaint here -- isn't
19 that in the end result he was okay, nothing happened to the
20 kids, isn't the complaint is he wasn't supposed to wait until
21 the end.  He's supposed to do something in the beginning like
22 the statute says, take immediate action and put the kids in?
23 Isn't that what he's saying he didn't do?
24     A    I think this is going to come down to missing.  It's
25 an unknown whereabouts.

```
 1    Q    I'm glad you went that way, Captain.
 2    A    Okay.
 3    Q    And the State Police have told us, not you.
 4    A    Yeah, not me.
 5    Q    Tripp, not you.
 6    A    Not me.
 7    Q    Tripp has said under testimony, since David Bush said
 8  they were with the mother, they weren't missing.
 9    A    Okay.
10    Q    Okay.  And is that the theme you're following now?
11    A    Well, if you're going to say that they have to be put
12  in immediately or whatever you said.
13    Q    That's what the statute said, right?
14    A    Missing.
15    Q    Right.  How do we know they're missing?  Because we
16  know they're with the mother.
17    A    Well, again, missing -- are they missing, or is it
18  unknown whereabouts?
19    Q    You classified, not you personally, State Police
20  classified it.
21         MR. HENZES:  They didn't classify it as missing.  They
22  classified it as concealment of the whereabouts of a child.
23  They didn't classify it as missing.
24  BY MR. PURICELLI:
25    Q    Okay.  What's the difference?
```

```
 1      A     Missing could be --
 2      Q     You don't know where their whereabouts are?
 3      A     No, no.
 4      Q     Okay.
 5      A     My interpretation.
 6      Q     All right.
 7      A     Missing is, God forbid that that child walks away from
 8   home or is coming home from school and never makes it home.
 9      Q     Okay.
10      A     Okay.  I'm thinking of a thousand examples.
11      Q     Good one.  I can live with that one.
12      A     Okay.
13      Q     You don't know who the child is with?
14      A     I have no idea who the child is with.
15      Q     I can live with that.  The State Police, according to
16   their thinking, said look, because by your own words David says
17   they're with the mother, they're really not missing so we're
18   not going to put them in NCIC.  It's not a missing child
19   report.  It's I don't know the whereabouts as Randy points out,
20   right?
21      A     Okay.
22      Q     My question is if we're thinking that way in
23   Montoursville, why is it when Mrs. Bush comes back to
24   Pennsylvania from Virginia the State Police have now decided
25   the children are missing?
```