1          MR. HENZES:  Where is -- show me in the record where
2    they -- hold on.  Brian, stop.  First -- stop.  Where is it
3    anywhere where the State Police -- and, again, the State Police
4    isn't a Defendant here, anybody in the State Police puts the
5    children in NCIC as missing?
6          MR. PURICELLI:  I didn't ask him that.
7          MR. HENZES:  You're assuming a fact that's not even
8    true.
9          MR. PURICELLI:  I'm not assuming.  You should have
10   come down to Virginia.
11         MR. HENZES:  Who said that they're right?  You can't
12   attribute what Virginia said that it's the State Police.
13         MR. PURICELLI:  Can I ask my question?  I'm not going
14   down that road with you.  Why did the State Police then help
15   Mrs. Bush?
16         MR. HENZES:  I object to the form.  You're asking for
17   speculation.  You're asking for speculation as to why the State
18   Police did something.
19         THE WITNESS:  Is that in here, that they declared them
20   missing?
21   BY MR. PURICELLI:
22   Q      No.  You'll find the reports and the trooper we're
23   going to depose next who actually assists the Virginia State
24   Police and the Richmond police to have them declared missing
25   even though they know the child's with the father.  They know

1  the father was given the custody of the children by the police
2  and courts of Virginia.
3     A    Um-hum.
4     Q    Why is the State Police now assisting agencies to
5  declare them missing?
6     A    Well --
7     Q    If -- if the thinking is when Mr. Bush is asking, you
8  know, where they are, they're not missing?  Why two standards?
9     A    If I read this report, okay, Mr. Bush traveled to
10 Luzerne County, okay, and got a court order.  If I'm reading
11 this, reading this, it was apparently a flawed order.
12    Q    Yeah, the attorney didn't have service, nor did the
13 attorney have consent of both parties.  So they vacated it for
14 lack of jurisdiction?
15    A    Okay.  All right.
16    Q    Nothing fraudulent?
17    A    I'm not saying there was, but it was --
18    Q    Some members have said it was fraudulent, okay.
19 That's not true?
20    A    I don't think the court would do that.
21         MR. HENZES:  It was fraudulently obtained.
22 BY MR. PURICELLI:
23    Q    Neither parent had a valid court order giving them
24 custody.  She didn't.  He didn't.  Whether he had this, it was
25 flawed.  It was no good.  So I have two parents --

Case 2:07-cv-04936-MAM   Document 54-13   Filed 10/01/10   Page 3 of 12
119

1  A   Right.

2  Q   And if you remember, I asked you earlier about that.

3  A   Right, right, exactly, yeah.

4  Q   So I have two parents, one in Virginia, one in Pennsylvania, which one would get themselves in trouble criminally if they took their children? Would you agree neither in that -- because neither have a court order?

8  A   Yeah.

9  Q   The police can't get involved as long as no violence is occurring?

11 A   Right, okay.

12 Q   One parent who leaves Pennsylvania leaves without court permission?

14 A   Okay.

15 Q   The other parent finds the children, gets court permission and police assistance to return to Pennsylvania?

17 A   Okay.

18 Q   Which one's acted in your mind more prudently?

19 A   Okay.

20 Q   The one who goes to the court and gets permission or the one who doesn't?

22 A   Well, the one who went to the court if it was proper jurisdiction and stuff I would say. I don't know why he would go to Luzerne County.

25 Q   Why isn't any of this -- these are all facts that are

```
 1   known?
 2       A    Um-hum.
 3       Q    All known because he gives you -- why aren't all those
 4   facts in there?
 5           MR. HENZES:  They are.
 6           THE WITNESS:  It is.
 7   BY MR. PURICELLI:
 8       Q    Does he say that David Bush got a court order from
 9   Virginia?
10           MR. HENZES:  David Bush never got a court order from
11   Virginia.
12           MR. PURICELLI:  Yes, he did.
13           MR. HENZES:  No, he didn't.  He never got a court
14   order from Virginia.
15   BY MR. PURICELLI:
16       Q    Does it say in there that the Virginia authorities
17   acting on the Virginia court order went to the school, picked
18   up the children, and turned them over to him to come to
19   Pennsylvania?  Does it say that?
20           MR. HENZES:  No, no, it doesn't say that.
21           THE WITNESS:  It says the Richmond Police Department
22   --
23           MR. HENZES:  Based upon the Luzerne County court
24   order.  It doesn't say Virginia, Brian.  It says Luzerne County
25   court order, which is true based upon the entry his brother put
```

1  in.

2  MR. PURICELLI: Randy, you should go all the way to
3  Virginia, not just stay sometimes in Pennsylvania. You'd be
4  surprised what you learn when you get out and talk to Virginia
5  police officers what happened in a deposition.

6  MR. HENZES: Well, that doesn't mean because they said
7  it that's what's actually true and what happened. What
8  happened was they used the order to send him back with the
9  brother, the Luzerne County court order.

10  MR. PURICELLI: Yes.

11  MR. HENZES: Yeah, but that doesn't say a Virginia
12  court order. That says Luzerne County court order.

13  MR. PURICELLI: You should find out about the
14  domestication requirements in Virginia.

15  MR. HENZES: But that doesn't make it the fact that --
16  see, that's something different. That's something different,
17  Brian. Now you're taking a state -- an order from a different
18  county and all you're doing to the state is just domesticating.

19  That doesn't mean Virginia gave -- a court in Virginia
20  gave David Bush authority over the children. They couldn't
21  because David Bush didn't live there.

22  MR. PURICELLI: Good legal argument. You get to make
23  that in your brief.

24  MR. HENZES: Why are we arguing about this?

25  MR. PURICELLI: We're not.

```
 1         MR. HENZES:  I don't understand why we're getting into
 2  this.  The fact remains he did -- there was an investigation
 3  done.  Your client didn't like the outcome.  He told you why
 4  they sent it down to the troop.  That's all you needed the guy
 5  for.  We wasted two and a half hours on bullshit.
 6         MR. PURICELLI:  We haven't.
 7         MR. HENZES:  Yes, we have.
 8         MR. PURICELLI:  For the near six months that we were
 9  waiting for the CLEAN investigation.
10         MR. HENZES:  We weren't waiting for it.  Captain Hill
11  was.  Use the proper terminology here.
12         MR. PURICELLI:  All right, Randy.  We're just trying
13  to be friendly here.  Nothing's being done to find out about
14  any of the Bush complaints.  They want to find out if Detective
15  Bush violated the CLEAN regulation.  Why?
16         MR. HENZES:  Did you ask Captain Hill?
17         MR. PURICELLI:  I did.
18         MR. HENZES:  Okay.
19         THE WITNESS:  I can't answer that.  How can I answer
20  that?
21  BY MR. PURICELLI:
22     Q    You're the guy in charge of the BPR.  I thought you
23  would be asking these questions.
24     A    I'm the guy that gets it in the end.  I don't know
25  what's going on at every stage.
```

1   Q   With all these questions that I'm raising now --
2   A   Um-hum.
3   Q   -- a limited investigation is sufficient to determine
4   whether or not Tripp did or didn't do his job based on all the
5   facts that I'm throwing at you?
6   A   You're throwing a lot of facts. That's for sure.
7   Q   I am throwing documents to show you my facts, aren't
8   I?
9   A   Yeah.
10  Q   And Hill --
11  A   But if I --
12  Q   Biggest fact was that somebody lied, and he doesn't
13  get a single fact to support that, does he?
14  A   Well --
15  Q   He's got an opinion?
16  A   He's got two people telling him that in the
17  investigation that it's their opinion. I'm not guessing, okay.
18  I'm just reading that. I don't know what Captain Hill meant by
19  that. So --
20  Q   Captain Hill could only know what Hile learned,
21  correct?
22  A   No. He would have known probably what they discovered
23  if he's waiting for that report to be finished.
24  Q   The -- the CLEAN investigation?
25  A   Yeah.

```
 1    Q    And we know he did.  We know what he did.
 2    A    Okay.
 3    Q    It says he didn't do anything wrong because he writes
 4  in his e-mail.
 5    A    Okay.
 6    Q    I waited to find out if Detective Bush entered the
 7  children wrongly.  Isn't that all?
 8    A    If he want --
 9    Q    Wrongly entered them?
10    A    That was the CLEAN investigation, yeah.
11    Q    Whether Detective Bush entered the children wrongly or
12  not, which we know he didn't, does that mitigate conduct of a
13  trooper which would be considered inappropriate?
14    A    No.
15    Q    Okay.  And isn't the complaint about Tripp's conduct,
16  not Christopher Bush's?
17    A    The complaint, yeah, was about --
18    Q    Yes.
19    A    -- Tripp.
20    Q    So isn't it true that the investigation was to try and
21  show Christopher Bush as a bad guy, and therefore Tripp has to
22  be the good guy as opposed to finding out whether Tripp did or
23  didn't?
24    A    No.  The investigation is why did Tripp do what he
25  did?
```

```
 1    Q    And do we know that?  Why did he say what he said?
 2    A    Yeah.
 3    Q    Why did he say what Christopher Bush accused him of
 4  saying?  Why did he say that?
 5    A    I don't know that he said it.
 6    Q    So the investigation didn't --
 7    A    The investigation was obviously ongoing.  They were
 8  doing it.  They were doing an investigation.  So I don't see
 9  how Tripp could have said that.
10    Q    All right.  The CLEAN investigation?
11    A    No, no, this one, the criminal investigation.
12    Q    Okay.
13    A    They were obviously looking into it.  So there was
14  some substance to it, some merit to it, and they were looking
15  into it.
16    Q    The complaint was he didn't -- I'll use his words, not
17  my words.  David Bush's concern for his children's welfare,
18  contacted the State Police for the purposes of filing a missing
19  children's report.  And he did that, didn't he?
20         MR. HENZES:  Who?
21  BY MR. PURICELLI:
22    Q    I'm reading the verification because I don't want to
23  say that I'm saying something.
24    A    Okay.
25    Q    We know that's factually true, don't we, because we
```

```
 1  got a report that he did that, didn't we?
 2      A    Okay.
 3      Q    And he's not -- I know who they're with, but I don't
 4  know the safety of my kids?
 5      A    Well, he categorizes the missing children -- he
 6  categorized it as concealing the whereabouts.
 7      Q    Because that's the statute.  There's no criminal
 8  statute missing children?
 9      A    Oh, no, I guess not.  Well, it could be -- it could be
10  kidnapping.  That would be missing -- missing child.
11      Q    But they listened to the facts and decided it wasn't a
12  kidnapping offense, right?
13      A    Right, okay.
14      Q    And that's because one parent had just as much right
15  as the other parent, right?
16      A    Um-hum.
17      Q    So you can't very well kidnap your own kids when each
18  has a right?
19      A    Right.
20      Q    So they were proper not to say kidnapping?
21      A    Yeah.  I wouldn't have.
22      Q    So they just said we don't know where they are, and
23  the State Police investigate criminal matters, right?
24      A    Right.
25      Q    Okay.  So now Christopher Bush then says David Bush
```

1  was told by Sergeant Tripp that because a protection of abuse
2  order had been entered into by him that he had no rights to his
3  children.  So, I mean, we've been down this road?
4      A    Yeah.
5      Q    I can keep repeating it.  There's an accusation that
6  Tripp is doing something that he --
7          MR. HENZES:  No, there's not.  That's not an
8  accusation.  That's just a statement.
9          MR. PURICELLI:  You make your argument so I get this
10 question.
11         MR. HENZES:  Don't say that's an accusation.
12 BY MR. PURICELLI:
13     Q    He then says, David Bush only requested a PSP
14 investigation into his missing children upon the expiration,
15 01/20/06, of the order.  Was that factually correct?  He asked
16 after the PFA expired?  Was that factually true based on Hile's
17 report?
18     A    On or about April.
19         MR. HENZES:  Right there it tells you when it expires.
20         THE WITNESS:  Okay.  January 6th.
21 BY MR. PURICELLI:
22     Q    So facts --
23     A    It doesn't tell me when he --
24     Q    What day does this report say he showed up?
25     A    It looks like 2/23.

```
 1      Q     First entry I think it says when he shows up at the
 2   barracks.
 3      A     2/23.
 4      Q     After January?
 5      A     Yeah.
 6      Q     So factually that's true, right?
 7      A     Sure.
 8      Q     So even without talking to Tripp we know from the
 9   police reports so far Christopher Bush can be verified through
10   State Police records of saying factual, truthful statements?
11      A     Um-hum.
12      Q     Now, it then goes on and says Sergeant Tripp not only
13   didn't do his job, okay, but failed, as required by law
14   regardless of circumstances and without delay, to enter David
15   Bush's children into CLEAN.
16            Now, they were waiting for a CLEAN investigation, so
17   they were waiting for the circumstances of the kids being put
18   into CLEAN to decide whether they were going to investigate
19   Tripp; isn't that true?
20            MR. HENZES:  What?
21   BY MR. PURICELLI:
22      Q     Hill is they.  I know it sounds kind of strange.
23   Isn't that true, Captain?
24      A     There was going to be an investigation.  Obviously, I
25   mean, Captain Hill himself bumped it up.
```