```
 1    Q     Yeah, after?
 2    A     From information only.
 3    Q     After the CLEAN investigation, isn't that true?
 4    A     Okay.  Well, I only go by the e-mails.
 5    Q     That's all I am.  It's the first I saw it today.
 6    A     Yeah.
 7    Q     Why was he waiting?
 8    A     You'd have to ask him.  I don't know.
 9    Q     But --
10    A     I don't know.
11    Q     But you adopted it, Captain?
12    A     Yeah, I did based on this.  Based on this and based on
13 this.  The only question that wasn't answered as far as I was
14 concerned is the laughing incident.
15    Q     Okay.  Or the statement?
16    A     Or the statement?
17    Q     Oh, his allegation?
18    A     Yeah, but they were investigating it.  So obviously
19 this couldn't have been true.
20    Q     Captain --
21    A     He was investigating it.
22    Q     -- they were investigating where the kids were?
23    A     The concealment, correct.
24    Q     The complaint was that Tripp told David Bush because
25 of the PFA you have no rights to your kids?
```

1    A    Um-hum.

2    Q    Which we both can agree on these facts and any facts

3    --

4         MR. HENZES:  Well, not necessarily.

5    BY MR. PURICELLI:

6    Q    There's no -- it's not true for a trooper to be

7    saying, is it?

8    A    Based on his statement, his allegation.

9    Q    Yeah.  If he said it?

10   A    If he said it.

11   Q    And we know if he said it at least there would be a

12   dispute if he at least talked to Tripp, wouldn't we?

13   A    Well, based on the fact that they were doing an

14   investigation that wouldn't be true because they weren't doing

15   an investigation.  Maybe I'm -- I'm sorry.  Maybe I'm missing

16   the point.

17   Q    I think you are missing my point.

18   A    I apologize for that.

19   Q    I know.  We get these interruptions.  State Police

20   standards, just State Police standards for me, okay.  When can

21   a State Police member, sergeant, corporal, lieutenant,

22   commandant, anybody, tell a parent you have no rights to your

23   children?

24   A    You can't.

25   Q    Okay.

```
 1      A      Based on -- based on that, okay, when there's no
 2   custody order and stuff you can't.
 3      Q      Exactly, okay.  And we know from the Hile report
 4   there's no custody order mentioned at all.  So you don't know
 5   if there was?
 6             MR. HENZES:  Well, that's not necessarily true.
 7   BY MR. PURICELLI:
 8      Q      So the premise for you would be can he make that
 9   statement or not, right?  That should be --
10      A      The way I look at it --
11      Q      Okay.
12      A      -- with the report obviously an investigation is
13   ongoing.
14      Q      Um-hum.
15      A      He may -- I don't know if he said it or he didn't say
16   it.  He could have been -- maybe if he said it, he was
17   mistaken, but that's not the actions that were taken.  The
18   actions that were taken was they were doing an investigation.
19             I'm trying to determine was there a misconduct at the
20   end of this thing.  Obviously if they were doing an
21   investigation, if he said it, it was -- it wasn't true.  It was
22   erroneous.
23      Q      Would that be misconduct?
24      A      No, not necessarily, because his actions -- the
25   actions of the troop were they were doing an investigation.
```

```
 1    Q    They were looking for the whereabouts of the kids?
 2    A    Yeah.
 3    Q    Does that mean a parent doesn't have the right to be
 4  with their kids?
 5    A    No, it does not.
 6    Q    Then I'm trying to understand this apples and orange
 7  theory.
 8         MR. HENZES:  You can't grasp the concept.  The
 9  statement to him -- he's telling you, Brian, based upon what
10  they did, the statement's irrelevant.
11  BY MR. PURICELLI:
12    Q    Why is the statement irrelevant?
13    A    Because they were doing an investigation.  It -- if
14  he, in fact, did say it, it doesn't match the action.  The
15  troop was conducting an investigation.
16    Q    But that's only part of the complaint, isn't it,
17  Captain?
18    A    Yeah.
19    Q    That's fine.  So part of the complaint you said would
20  support unfounded -- that he wasn't doing his job, right, part
21  of it, you say because they were looking, right?
22    A    That statement to me would not be applicable if it was
23  made.  If it was made, it was erroneous, okay.  It's -- it
24  doesn't work that way.  But the troop was taking action.
25    Q    All right.  Well, let me --
```

```
 1      A    By investigating it.
 2      Q    Let me ask it this way.
 3      A    I apologize.  I'm just trying to answer you honestly.
 4      Q    I'm not saying.  I'm testing what you're saying,
 5 Captain.
 6      A    Can we open this door?
 7      Q    Absolutely.  Let me ask you this while we're just
 8 chewing on this fact.
 9      A    Okay.
10      Q    Okay.  If they're doing their job and they're looking
11 for the kids, why would a trooper, a sergeant, anybody tell a
12 parent you have no rights?  It's like telling the person --
13 it's like saying I'm not going to look for your kids because
14 you have no rights?  Isn't that a fair interpretation?
15           MR. HENZES:  He didn't say that.  He didn't say he
16 wasn't going to look for his kids.  Why are you getting into
17 these hypotheticals?  First of all, to be clear to everybody
18 here, the PFA did not give David Bush -- actually the PFA says
19 he can have no contact with the kids for 18 months.
20           Then the brother writes it's only after the order
21 expired.  Then what happens is what do they do?  They look for
22 the kids.  So you get into all this nonsense when, in fact, if
23 Tripp read the PFA, which said you had no rights to the kids,
24 which it did say that and you read it, I read it, it's part of
25 this package, then the next thing -- the brother writes, okay,
```

1  it's only upon the expiration of the PFA.
2      Apparently the brother was in agreement with Tripp
3  that for that 18 month period the brother had no rights.  Chris
4  was in agreement with Bush that he had no rights because he
5  doesn't complain about that statement.
6      So what do they do?  They do the investigation.  And
7  all he's complaining about during the investigation is not what
8  steps they took, the steps that they didn't take was not put
9  the kids in the CLEAN.  That's what he's complaining about.
10 BY MR. PURICELLI:
11    Q    Did you hear Randy, all he said?  I'm going to ask you
12 some simple questions about that.
13    A    Yeah, I was listening.
14    Q    Okay.  I know it was hard to follow.
15    A    No, no, no.  I'm just --
16    Q    All right.  Very simple.  We're both in agreement PFA
17 in February, 2006 when he came to the barracks was no longer
18 valid?
19    A    Yeah, correct.
20    Q    Okay.  We're both in agreement?
21    MR. HENZES:  According to what Chris is saying to him.
22 Remember, this is what Chris is saying to him.
23    MR. PURICELLI:  That's your interpretation.  That's
24 your interpretation.
25    MR. HENZES:  Brian, did you know the PFA expired when

1  he wrote that?
2         THE WITNESS:  No.
3         MR. HENZES:  Okay.  Then you're asking his state of
4  mind.  So you might want to put it that way.
5         THE WITNESS:  No.
6  BY MR. PURICELLI:
7     Q    You were relying -- you were relying on the report,
8  right?  And Randy, your attorney, just got done saying the PFA
9  was attached, was it?
10        MR. HENZES:  It was part of the package.
11        THE WITNESS:  Yeah, I'm sure.
12 BY MR. PURICELLI:
13    Q    So you would have read it if you were doing a thorough
14 investigation?
15    A    Yeah.
16    Q    And it would have told you exactly what I just said,
17 it was expired when all --
18    A    Okay.  Yeah.
19    Q    So you would have known, regardless of what Hile said,
20 regardless of what Hill said, the document said when David Bush
21 came the PFA was no longer valid?
22    A    Um-hum.
23    Q    You would have known all that factually, right?
24    A    I'm sure.
25    Q    You would have known whether he did or didn't say it?

1   Sergeant Tripp would have had no right to tell a parent, David
2   Bush or any, you have no rights to the children because you
3   have a PFA that's expired on you?
4        MR. HENZES:  He doesn't say that.  He doesn't say
5   that.
6        MR. PURICELLI:  Randy, that was your argument.
7        MR. HENZES:  No, not my argument.  Right here.  David
8   Bush was told by Sergeant Tripp that because the protection of
9   abuse order had been entered into that he had no rights to his
10  children.  It doesn't say and because he has no rights to his
11  children because it's expired.  Then the next question is David
12  Bush only requested investigation into his missing children
13  upon expiration.  It doesn't say Tripp said because of the
14  expired PFA you have -- you have no rights.
15       MR. PURICELLI:  Randy, do you hear yourself?
16       MR. HENZES:  Yes, Brian.  Do you hear yourself?
17  That's the question I ask.
18       MR. PURICELLI:  Randy, thank you, very much.
19       MR. HENZES:  Read what it says.
20       MR. PURICELLI:  I did.
21       MR. HENZES:  All right.  He's not complaining about
22  the statement.  He's saying he didn't do his job by entering
23  the kids into NCIC.  That's Christopher Bush's allegation, and
24  that he laughed at him.  At the end of the day those are the
25  two things they investigated, and they didn't look at it once.

1  And I'll give you that much.
2  BY MR. PURICELLI:
3      Q    All right.  You gave me that much.  So let's help the
4  Captain.  I wasn't going to do this, but Randy always does
5  this.  I take it you're trained in the Crimes Code?
6      A    Trained?
7      Q    Trained?
8      A    Yeah.
9      Q    Updates, as a matter of fact?
10     A    Right.
11     Q    Every year?
12     A    Yeah, for something new.
13     Q    Yeah, okay.  Are the troopers, sergeants, station
14 commanders all required to at least be familiar with the laws
15 as set out in the Crimes Code?
16     A    Sure.
17     Q    Okay.  And there is a particular statute, 2908, of the
18 Crimes Code that deals specifically with missing children,
19 doesn't it?
20     A    Yes, it does, um-hum.
21     Q    All right.  Would a member of the State Police, and
22 specifically Tripp, be required to follow the dictates of that
23 law?
24     A    Yeah, if he -- it was missing, yeah.
25     Q    Okay.  And he's required to know what the definition

1  is of missing, what the law is?
2      A    I don't know if it has a definition here.
3      Q    To make an entry -- can I draw your attention to 2908
4  A-1?
5      A    Um-hum, missing children.
6      Q    Can we agree that the State Police is a law
7  enforcement agency?
8      A    Yeah, sure.
9      Q    Okay. I thought we could agree to something. Can we
10 agree that Christopher -- or David Bush came in to report his
11 kids missing? When he came to the barracks they called it
12 concealment?
13     A    Concealing the whereabouts.
14     Q    Okay. He didn't know where the kids were? Would that
15 be a fair interpretation? He was reporting them missing?
16     A    No, no. I think -- he didn't know where they were.
17 I'm not going to classify it as missing. He didn't know where
18 they were.
19     Q    2909, concealment of whereabouts of children, that's a
20 crime, right?
21     A    Um-hum.
22     Q    It says the person who removes a child from the
23 child's known place of residence with the intent to conceal
24 child's whereabouts from the child's parent?
25     A    Um-hum.

1   Q   Is there any dispute David Bush was the parent of the
2 children he was reporting as not knowing where they are, their
3 location?  Not who they're with, where they are?
4   A   Um-hum.
5   Q   Can we --
6   A   Can we go on?
7   Q   Absolutely.
8   A   Unless concealment is authorized by the court order or
9 is reasonable or responsive domestic violence child abuse, et
10 cetera, et cetera.
11  Q   Okay.  Was there a court order allowing the children
12 to be taken?
13  A   No, but he had the PFA that ended --
14  Q   It ended?
15  A   -- six months before.
16  Q   It ended -- the right to operate under it ended too,
17 didn't it?
18  A   Um-hum.
19  Q   Which means mom would have been required to do what,
20 Captain?
21  A   I don't know what she would have been required to do
22 quite honestly.  I mean, if the father then comes forward, it
23 would have to be determined where she was.  I don't think the
24 mom would be under any --
25  Q   How would we find out if mom was authorized -- if mom

```
 1  was concealing the whereabouts of the children because of
 2  domestic abuse?  How would we know that if they were a state
 3  trooper?
 4       A    Through the PFA.
 5       Q    How do we know that was the reason she left?
 6       A    Well, from what you're saying -- I don't recall the
 7  PFA.
 8       Q    Just go by the facts.  I'm not asking you to guess.
 9  Just go by the facts we know.  How did the State Police know
10  that?  How did Tripp --
11       A    How did they know what now?
12       Q    That mom left, concealed herself?
13       A    Because they were doing the investigation.
14       Q    Where does it say that she left because of the PFA?
15       A    It probably doesn't.
16       Q    It doesn't?
17       A    Yeah.
18       Q    How would we ever know that's why she left?  If we
19  were a state trooper and you were reviewing all these facts to
20  find out if you have a trooper, a sergeant out there who's
21  picking and choosing who he's going to help?
22       A    I'm missing --
23       Q    Wouldn't you ask the mom?
24       A    Wouldn't I ask the mom?
25       Q    Isn't that the person --
```