```
 1     A    I'm sorry.  What -- we're trying to the find the
 2  whereabouts of the kids.
 3          MR. HENZES:  He's talking about --
 4          THE WITNESS:  I'm sorry.  I'm missing your point.
 5  BY MR. PURICELLI:
 6     Q    I'm reading what you read.  You said can we read the
 7  rest?  Do you remember that?
 8     A    Right, yeah.
 9     Q    I said absolutely.  Then you wanted to point out to me
10  that, well, if the kids are being concealed.
11     A    Um-hum.
12     Q    Okay.  Under a court order, which we agree there's
13  none that we know of here, right?
14     A    At that point it's expired.
15     Q    Or domestic abuse, okay, okay.  I asked you how would
16  Tripp or the State Police investigating this know mom left --
17     A    How would they know she left?
18     Q    Yeah, she left because of the PFA?
19     A    By doing an investigation.
20     Q    Right.  And they did one.  Did they talk to mom?
21     A    To try to find the whereabouts of the mom.
22     Q    Right.  Did they find her?
23     A    Yeah, they did eventually.
24     Q    Who fond her?
25     A    Detective Bush.
```

```
1    Q    Yes, okay.  They didn't find her, right?
2    A    Yes.  Not at that point they hadn't, no.
3    Q    At what point did they finally find mom?  After David
4  Bush is already back in Pennsylvania with the kids; isn't that
5  true?
6    A    I'm sorry.  They found who, mom?
7         MR. HENZES:  They didn't find mom.  Mom found them.
8         THE WITNESS:  Mom came back to them, if I recall
9  correctly, right?
10        MR. HENZES:  They didn't find mom.  Mom came to them.
11 BY MR. PURICELLI:
12   Q    Right.  So can we agree they never knew where mom was,
13 right, until they showed up three years later, or 18 or
14 whatever you want?  They never knew where she was, so can we
15 agree they didn't know, they being Tripp and all the people you
16 say were looking for mom, didn't know why mom concealed the
17 kids?
18   A    Yeah.
19   Q    Okay.  So they were just guessing then, Tripp, that
20 she was concealing the kids and no harm had come to them, mom
21 and the kids?
22   A    No.  I think it's because he obviously said they were
23 with -- the kids were with mom.
24   Q    He could have been wrong, couldn't he?
25   A    Could have been.
```

```
 1    Q    And their job was to investigate because the
 2  children's safety is paramount?
 3    A    Correct, absolutely.
 4    Q    But they chose not to, right, according to the report,
 5  which you're relying on, that they were investigating?
 6    A    Um-hum.
 7    Q    They went two places, two?
 8    A    Okay.
 9    Q    And did you notice the length of times it took them to
10  go to the two places?
11    A    No, I did not.
12    Q    Report came in February 23rd?
13    A    3/16 -- or 3/11, I'm sorry.  According to this 2/23,
14  3/6, 3/11.
15    Q    3/6, about two weeks later?
16    A    Yeah.
17    Q    Two weeks later is the first time they started looking
18  for mom and the children, correct, two weeks?
19    A    3/6.  I don't know who Haven is.
20    Q    Haven is an organization, as it says right in there.
21  They went down to --
22    A    Oh, okay.
23    Q    Up there it's officially known as an abuse center.
24    A    Okay.  Yeah, okay.
25    Q    Two weeks?
```

1   A   Apparently, yes.

2   Q   That's not immediate, is it, for paramount looking for
3   the safety of kids?

4       MR. HENZES:  They weren't looking for the kids.  They
5   were looking for the mother.
6   BY MR. PURICELLI:

7   Q   Well, what's paramount, wanting mom or the kids?  I
8   don't want to go down this road.

9   A   The kids.

10  Q   We're splitting hairs.

11  A   I don't want to.

12  Q   I'm just trying to make something clear on this.  If
13  you're trying to find out mom's reason for concealing and we're
14  looking for -- and our concern is the kids, it doesn't make a
15  difference whether we're looking for the kids as missing
16  children or the mom's reason for concealing them; does it?
17  We're looking, right?

18  A   Right.

19  Q   Because ultimately it's going to come down to the
20  kids, isn't it?

21  A   Um-hum.

22  Q   Does mom have a reason to be missing with the kids?
23  Has something happened to mom or the kids?  That should be the
24  focus of the State Police, right?

25  A   Correct.

1   Q   On February 23?
2   A   Um-hum.
3   Q   Correct. Why two weeks if they're doing their job?
4   Hile doesn't explain that, does he?
5   A   No. But I wouldn't expect him to explain every --
6   every little detail of every report.
7   Q   Well, he went into some pretty good detail about
8   things that didn't matter about going to Luzerne County?
9   A   He's explaining to me when he starts off why Tripp did
10  what he did, and that's the allegation.
11  Q   Tripp didn't do anything, did he? In fact, he --
12      MR. HENZES: No, no, the investigators.
13  BY MR. PURICELLI:
14  Q   Right.
15  A   Whisner.
16  Q   Whisner. Do you know Whisner wasn't even a criminal
17  investigator, he was a road trooper brought in?
18  A   No.
19  Q   Did you know that they had actual criminal
20  investigators up there, three of them?
21  A   Mansfield?
22  Q   Yeah.
23  A   I'm sure they did.
24  Q   Do you know why they picked a road trooper to start an
25  investigation?

1   A   No.

2   Q   Do you know he had never done a missing child report
3   before?

4   A   No, no, I don't.

5   Q   State Police, when they choose who's going to be a
6   criminal investigator, how do they make that choice?  Do you
7   know?

8        MR. HENZES:  Could we stick to why he did what he did
9   in IAD as opposed to what someone else's decision was?

10       THE WITNESS:  Everyone does it differently.  It would
11  be a posting, a specialized position.  Some people give a test.
12  Some people would ask for investigative reports that they've
13  done in the past.  Every place is, you know, different.  They
14  all have their own testing procedure.  So I -- you know,
15  everyone's different.  There's no -- as far as I know there's
16  no standard, but I've been away from the field for five years
17  now, so I don't really know.
18  BY MR. PURICELLI:

19  Q   I'm relying on the fact that you actually oversee,
20  make sure there's no misconduct, everybody's doing things the
21  way it's supposed to be done.  That's my concept of your job.
22  Is that a fair concept?

23  A   What was that again?

24  Q   The concept is that your job as director is to make
25  sure that everybody in the State Police are following the rules

147

1 and regulations so that everything is consistent?

2     A    Correct.

3     Q    Okay. And nobody's out there being arbitrary in the

4 performance of the duties that the State Police are charged

5 with?

6     A    Right.

7     Q    Okay. And that's what I said, that's my idea of what

8 your role is, to make sure that basically everybody's getting

9 treated the same?

10     A    Um-hum.

11     Q    And that nobody gets special treatment and nobody gets

12 ignored?

13     A    Um-hum.

14     Q    Is that fair to conclude that?

15     A    Well, yeah. I think that's fair.

16     Q    Okay. Now, is it your thinking that Tripp was

17 justified in not making sure the children were ever put in

18 NCIC?

19     A    Is it my thinking that he's justified?

20     Q    Yeah.

21     A    No, because I don't know where they would have

22 eventually -- when they would have done it. I don't know.

23     Q    From Hile's report what was the reason the children

24 weren't put into NCIC?

25     A    David Bush and his ex-wife had been in a custody

1 battle for the three children since their divorce in '04.
2 There are records of David physically abusing Sarah.
3     During the same time David Bush was serving a jail
4 sentence and Sarah Bush obtained a PFA order that prevented
5 David from having contact with her or their children until
6 January 6, 2006.
7     During that time Sarah changed her name, changed the
8 names of her children as well, and moved out of state.
9     February 23rd Bush reports his children -- yeah, his
10 children as missing in an attempt to have the police locate his
11 children and ex-wife. Because members of PSP Mansfield were
12 familiar with the past domestic history of the Bush family, an
13 effort was made to locate Sarah Bush, AKA, Isara Serene, to
14 determine the well being of the children, but not to disclose
15 their location to David Bush.
16     Q   Why would they not disclose the whereabouts of his
17 children?
18     A   Well, if he had a PFA against him, if he physically
19 abused them, if he was, in fact, arrested for abuse, if he
20 wanted to locate them, I would think that they would be
21 cautious as far as giving him that information.
22     Q   Do they have a right to tell a father we've located
23 your kids, but we're not telling you?
24     A   I don't see why not. If they had --
25     Q   Can you site to me any State Police rule or

1  regulation, and I know you got a lot of them --
2      A     I got plenty of them.
3      Q     -- that says if we're investigating --
4      A     Go ahead.  I'm sorry.
5      Q     If we're investigating a crime that says we're
6  supposed to talk to the parent because you guys are charged
7  with what the statute says and your own regulations we're going
8  to make a conscious decision that if we locate your children,
9  we're not going to tell you where they are?
10     A     Well, we're looking at the concealment, okay, and
11 missing.  That's semantics, and I'm -- you know.
12     Q     We'll debate that for a while.
13     A     That's fine.  I got all day.
14     Q     You'll be almost done soon.  I'm only going on what
15 you read here.
16     A     Right.
17     Q     Where he tells you that the Mansfield barracks has
18 decided if they find the children, they're not going to tell
19 David?
20         MR. HENZES:  They said if they find the wife.
21 BY MR. PURICELLI:
22     Q     Well, let's not split hairs.  Wife is kids.
23     A     They're looking to determine the welfare of the
24 children.
25     Q     And to do that they got to find wife?

1    A    I would guess that they're hopefully with the wife,
2 like that's what they're saying.
3    Q    That's the whole premise here.
4    A    I would think that they would need to check to make
5 sure that -- and I'm --
6    Q    Go ahead.
7    A    I'm going to play devil's advocate here.
8    Q    Fine.
9    A    And no disrespect to you, but I don't know.  I don't
10 know the players here.  God forbid something happened though.
11    Q    Um-hum.
12    A    That I would want to make sure that everything is
13 okay, and that he's allowed to, and that -- and I would say --
14 I would probably say, just me, okay, your kids are okay.  We've
15 located your wife.  If you have a custody issue, then go to the
16 court, okay, to get that resolved.  That's just me.  You know,
17 we've located them, you know, like I said, they're okay.  Deal
18 with that through the court.
19    Q    Well, that's not what he's saying factually, Hile, is
20 it?  That scenario he's saying is we're not going to tell him?
21    A    Well, that's basically what I'm saying.  I wouldn't --
22 I wouldn't -- I wouldn't tell them either, okay.  I would just
23 -- I would tell him they're okay, okay.  But I wouldn't -- I
24 wouldn't disclose the location.
25    Q    So you --

```
1    A    And that's me.  I'm going to err on the side of --
2    Q    And would you --
3    A    -- caution.
4    Q    -- want to know about that decision about not telling
5  a father where his children are what the nature of the PFA was,
6  this domestic abuse?  Would you want to know that?
7    A    Well, sure I would.
8    Q    Okay.  And would you expect since the barracks was so
9  familiar with it, that they knew what it was all about?
10   A    Yeah, I would hope so.
11   Q    Okay.  And if I told you it was a push and shove, it
12 was in his home, she came in his home, they were separated, he
13 tried to get her out, pushed her, and that's all it was, no
14 broken bones, no broken hands, no blood drawn, no scrapes, just
15 a push, would your same scenario that you said, erring on the
16 side of caution, fall in that category, a push and shove?
17   A    Well, I didn't grant the PFA, okay.
18   Q    I understand.
19   A    The court did.  The court did.  He was obviously
20 arrested for it.
21   Q    Do you know --
22   A    Okay.
23        MR. HENZES:  Let him finish answering the question.
24        THE WITNESS:  Okay.  All right.  I'm just -- I'm more
25 of a cautious person by nature, okay.  Again, I think I would
```

```
 1  go back to I would find the kids.  They're okay.  And I would
 2  tell the father they're okay.  You know, I'm going to let -- if
 3  something happens, God forbid, let them go through the court.
 4  BY MR. PURICELLI:
 5      Q    Okay.  Would you wait two weeks to start looking for
 6  them?
 7      A    No, I probably wouldn't wait two weeks.
 8      Q    Okay.  What was the distance, the time, after we went
 9  to Haven two weeks ago -- strike that.  Two weeks after we get
10  a report until we next start doing something, how much time
11  passed?
12      A    Five days.
13      Q    Five days.  Before we do anything, and the only thing
14  we've done first is contact an agency and leave a message;
15  isn't that correct, according to the report?
16      A    I don't know.  Haven contacted your reporting officer.
17      Q    Five days later Haven calls back, right?
18      A    No.  It says Haven representative contacted your
19  reporting officer.  So it's obviously he's done something prior
20  to that, but it doesn't say.
21      Q    Um-hum.  Not very detailed report.  So we don't know
22  if he calls that day and they call him back?
23      A    No.
24      Q    Okay.  Now --
25      A    We don't.
```