Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 1 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

## Page 1

```
 1         UNITED STATES DISTRICT COURT
 2                    for the
 3         EASTERN DISTRICT OF VIRGINIA
 4
 5
 6
 7   CHRISTOPHER BUSH AND DAVID BUSH
 8              Plaintiff
 9
10       v.        Civil Action No. 07-4926
11
12   S.C. ADAMS, ET AL.
13              Defendants
14
15
16         Deposition of LIEUTENANT BRIAN RUSSELL,
17   taken at the instance of the Plaintiff, before
18   Mary E. Aliff, Court Reporter and Notary Public for
19   the State of Virginia at Large on May 20, 2010
20   commencing at 2:45 p.m. at the offices of the City
21   of Richmond City Attorney, 900 E. Broad Street,
22   Richmond, Virginia, pursuant to Rule 4:5 of the
23   Supreme Court Rules of Virginia, pursuant to notice.
24
25
```

COPY

## Page 2

```
 1   APPEARANCES:
 2
 3       Mr. Brian Puricelli, Esq.
 4       Law Offices of Brian Puricelli
         691 Washington Crossing Road
 5       Newtown, PA  18904
 6                 on behalf of Plaintiff;
 7
 8       Mr. Nicholas Simopoulos, Esq.
         Office of the City Attorney
 9       900 East Board Street
         Richmond, Virginia  23219
10
11                 on behalf of Defendant.
12
13
14
15              I N D E X
16
17   DIRECT EXAMINATION
18      By Plaintiff       pages   3 - 103
19
20   No Cross Examination
21
22   Exhibit No. 1         page       71
23
24
25   Eratta           pages   105 - 108
```

## Page 3

```
 1          LIEUTENANT BRIAN RUSSELL
 2   Being called as a witness by and on behalf of the
 3   Plaintiff, being first duly sworn, as hereinafter
 4   certified, was examined and testified as follows:
 5              DIRECT EXAMINATION
 6   BY MR. PURICELLI:
 7      Q   Lieutenant Russell; correct?
 8      A   That's correct.
 9      Q   My name is Brian Puricelli.  We're down
10   here for an action that is in the Eastern District
11   of Pennsylvania against the Pennsylvania State
12   Police.  We're asking some question of a witness
13   status.  Have you ever been deposed before?
14      A   Yes.
15      Q   Okay.  You're familiar with the phrase
16   "usual stipulations?"
17      A   No.
18      Q   All right.  Basically, it means I'm going
19   to ask you questions.  Hopefully, you'll be able to
20   answer them.  There are two objections that apply
21   here, one is privilege.  Being I ask you a question
22   such as something you said to you doctor, your
23   priest or your lawyer goes to privilege.  In those
24   cases we'll just move past them.  And the form of
25   the questions generally means that your attorney
```

## Page 4

```
 1   believes that maybe the question is vague or needs
 2   to be explained.  If it has two different meanings
 3   he wants to make sure that you understand the
 4   question so that you're answering what I'm asking.
 5       Aside from that you may hear other
 6   objections but you'll answer those questions.
 7   They're reserved for a decision by a judge later;
 8   okay?
 9      A   Yes.
10       MR. PURICELLI:  Anything you want to
11   instruct the witness on?
12       MR. SIMOPOULOS:  No.
13       MR. PURICELLI:  He knows about reading?
14       MR. SIMOPOULOS:  You'll have the right to
15   read and sign your deposition and I will advise
16   that you do that.
17       THE WITNESS:  Okay.
18       MR. PURICELLI:  And that means, assuming
19   that your attorney is getting a copy, he will
20   meet with you and you'll look over it and any
21   mistypes -- I doubt that there will be -- can
22   be corrected by you.
23       An example would be maybe you used the
24   word butt and it comes up B-U-T and you meant
25   the butt of a gun or something and it's
```

Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 2 of 6

Deposition of Lieutenant Brian Russell                Christpher Bush & David Bush V S.C Adams, et al.

Page 5

B-U-T-T. You can correct those things. You can't change an answer. If you said yes and you meant to say no, you can't change that.

    MR. SIMOPOULOS: We'll discuss that.

BY MR. PURICELLI:

    Q  Prior to coming here did you read anything to prepare for coming?

    A  No.

    Q  Have you had any discussions with anybody about coming here today other than your attorney?

    A  No.

    Q  Do you know why you've been asked to come and visit with us today?

    A  Yes.

    Q  So I don't need to go into the history of the case?

    A  No.

    Q  All right. It's our understanding that at some point in time you became involved in an allegation that the Bush children were improperly taken from Virginia. You understand that?

    A  Yes.

    Q  Okay. Can you tell me when it is you first became involved with any part of the arrest of David Bush?

Page 6

    A  Well, I wasn't involved in the arrest of David Bush.

    Q  Okay. Were you involved in the procurement of any warrants for him?

    A  No.

    Q  Were you involved in any discussions with the state police in regards to David Bush?

    A  Which state police?

    Q  Pennsylvania State Police.

    A  I'm sorry. Can you repeat the question again.

    Q  Did you have any discussions with anybody from the Pennsylvania State Police regarding David Bush's children or Ms. Bush?

    A  Yes.

    Q  Who did you speak with?

    A  I don't remember.

    Q  Do you remember a rank?

    A  Sergeant.

    Q  And if I told you the name "Tripp" would that refresh your memory?

    A  It wasn't Tripp.

    Q  If I told you "McDermott" does that help you?

    A  I don't recall the name of the sergeant I

Page 7

spoke to with the state police.

    Q  Do you recall what barracks was the trooper that you spoke with?

    A  It was outside of Philadelphia.

    Q  Did you make any notes or record any type of medium, electronic or otherwise of the conversation?

    A  No.

    Q  What was the substance of the conversation?

    A  I talked to the sergeant at the state police at the barracks outside of Philadelphia explaining to him that we had -- or Sergeant Adams had entered the individual's children into NCIC. And the children were listed as missing individuals, and we were assisting in the help of the state police for the safe return of those children back to Virginia.

    Q  What made you think it was a sergeant from a state police facility outside of Philadelphia?

    A  Because I think I asked him where they were located at.

    Q  Did he say what the reason for the call was? Was he calling you to confirm something, or was he calling you to give you information?

Page 8

    A  He didn't call me.

    Q  You called him?

    A  That's correct.

    Q  How did you know to call the barracks or the facility at the state police outside Philadelphia?

    A  Because he knew the location of Mr. Bush's address.

    Q  Oh, okay. If I told you Dublin?

    A  I'm sorry?

    Q  Dublin Barracks PSP? Pennsylvania State Police.

    A  (Witness shakes head.)

    Q  That doesn't refresh your memory?

    A  No, sir; it doesn't.

    Q  Okay. If I told you Trevose, does that refresh your memory?

    A  No.

    Q  Okay. So you called him looking for David Bush?

    A  No.

    Q  You called the state police for what reason?

    A  To assist us in retrieving the three children back to Virginia.

Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 3 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

### Page 9

 1  Q   Okay.  Under what authority were you
 2  looking to retrieve the children?
 3  A   A court order issued by the Juvenile &
 4  Domestic Relation's Court of the City of Richmond.
 5  Q   Okay.  That's a civil lawyer; right?
 6  A   It's a court order signed by a judge
 7  stating that Mr. Bush did not have legal custody of
 8  those children, and they were to be immediately
 9  returned to Ms. Bush.
10  Q   Okay.  Was there any order that was ever
11  provided to you that said Ms. Bush had legal custody
12  of the children when she entered the Commonwealth of
13  Virginia?
14  A   I don't understand the question.
15  Q   Sure.  Did you have knowledge whether
16  Ms. Bush was lawfully in Virginia with the children?
17  A   Once again, I don't know what time period
18  you're talking about.  I don't understand the
19  question.
20  Q   At any time?
21  A   At any time did I know that Ms. Bush --
22  Q   At any time did you learn that Ms. Bush
23  was in Virginia without a court order from
24  Pennsylvania authorizing her to be in Virginia with
25  the kids?

### Page 10

 1  A   No.
 2  Q   What did you do, if anything, to find out
 3  if she was in Virginia with the kids lawfully?
 4  A   I didn't.  I had a court order from the
 5  City of Richmond that she produced by a judge
 6  stating that Mr. Bush was not to have custody of the
 7  children, and the children were to be immediately
 8  returned to Ms. Bush.
 9  Q   Is that the first you had any knowledge of
10  how the incident where David Bush retained custody
11  of the children in Virginia and removed them?
12  A   I'm sorry.  Repeat the question.
13  Q   Said another way, when was the first time
14  you learned about David Bush coming to Virginia to
15  pick up his children?
16  A   After the report was filed with the
17  Richmond Police Department.
18  Q   What report?
19  A   It was an incident based report.
20  Q   I show you packet of documents marked
21  Adams 1.  Can you identify it?  Is that the report
22  (proffered) you're referring to?
23  A   (Reviews documents.)  This is the report,
24  yes.  Runaway and Missing Person.
25  Q   For the purposes of the record, I have

### Page 11

 1  three pages, each double sided, each one identified
 2  Runaways/Missing Persons, Incident No. 2006
 3  10240027 -- what is that?
 4  A   Appears to be 29 on that one.
 5  Q   Okay.
 6  A   That would be the one for Dominik Serene.
 7  Q   And the other one looks like a date that's
 8  been modified.  It's 0482?
 9  A   No.  That's the incident number.  The date
10  has not been modified.
11  Q   Not the date.  The number.
12  A   Yes.  The incident number has been
13  modified to 0482, that's correct.
14  Q   Okay.
15  A   Also this report.
16  Q   This report being?
17  A   That's the incident date.
18  Q   For the purposes of the record Case No.
19  20061014063.  Seven pages?
20      MR. SIMOPOULOS:  I'd like to see that.
21      MR. PURICELLI:  (Document proffered.)
22      MR. SIMOPOULOS:  Look at all this.
23      THE WITNESS:  (Reviews documents.)
24  Actually, the RPR report would only be three
25  pages.  It would be these three pages.

### Page 12

 1      MR. PURICELLI:  Okay.  Those three pages.
 2      MR. SIMOPOULOS:  Maybe we can mark them in
 3  some other way so we now what we're referring
 4  to?
 5      MR. PURICELLI:  I'm trying to do that now
 6  because we have them all in one packet of Adams
 7  1.
 8      MR. SIMOPOULOS:  I'll just put like a
 9  little number at the bottom.
10      MR. PURICELLI:  All right.  That's
11  acceptable.  We'll call it --
12      MR. SIMOPOULOS:  1, 2 and 3.
13      MR. PURICELLI:  We've already got 1.  How
14  about we call it A,B,C.
15      MR. SIMOPOULOS:  All right.
16      MR. PURICELLI:  And we've designated in
17  ink for Adams 1, three pages for an Incident
18  Investigation Internal copy, three letters A, B
19  and C in the lower right-hand corner.  Is that
20  correct; Counsel?
21      MR. SIMOPOULOS:  Yes.
22  BY MR. PURICELLI:
23  Q   All right.  Lieutenant, for the purposes
24  of this record you've identified three
25  Runaway/Missing Persons reports; correct?

Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 4 of 6

Deposition of Lieutenant Brian Russell                 Christpher Bush & David Bush V S.C Adams, et al.

Page 13

1  A  That's correct.
2  Q  One of them is circled; correct? Up in
3  the upper right-hand corner?
4  A  (Reviews documents.) You're referring to
5  Missing Person 90B?
6  Q  The only one of the three that's circled?
7  A  Correct.
8  Q  What does the circle indicate?
9  A  A missing person.
10 Q  Okay. And the other two are not circled.
11 Is that for any particular reason?
12 A  I don't know.
13 Q  I assume, and correct me if I'm wrong,
14 there are procedures within the Richmond Police
15 Department about completing this form?
16 A  Correct.
17 Q  Would those procedures say whether or not
18 a particular block on that form should or shouldn't
19 be circled?
20 A  That's correct.
21 Q  What should it be? Circled or not
22 circled?
23 A  They all, by the rule, should be circled
24 in missing persons.
25 Q  Okay. So this is an over sight?

Page 14

1  A  Okay. I didn't take the report.
2  Q  Who did?
3  A  Mark Segal.
4  Q  Mark Segal?
5  A  Uh-huh.
6  Q  Do you know Mark Segal?
7  A  Yes.
8  Q  Who is he?
9  A  He is now a Deputy with the Hanover County
10 Sheriff's Office.
11 Q  When were the reports that we're looking
12 at completed?
13 A  I stand corrected. The reports are filled
14 out properly. When I flip over to page 1 all three
15 reports are circled Missing Person 90B.
16 Q  Okay. So they're all a Missing Person
17 Report?
18 A  Correct.
19 Q  At the time that he was preparing this
20 report as indicated by the signature there in the
21 block you're identifying for who filled it out, was
22 he a member of the Richmond City Police Department?
23 A  Yes, he was.
24 Q  Okay. When did he leave the Richmond City
25 Police Department?

Page 15

1  A  I don't know.
2  Q  Do you have an approximation? Last year?
3  A  I don't know.
4  Q  Okay. Was he a member of any specialized
5  unit to take that report?
6  A  No.
7  Q  Do you know how that report came to be
8  prepared?
9  A  No.
10 Q  What was your position with the Richmond
11 Police Department when that report was created?
12 A  The report was created October 24, 2006.
13 I was Lieutenant in charge of Major Crimes Unit.
14 Q  And as Lieutenant of Major Crimes, who did
15 you supervise?
16 A  I supervised Youth Services, the Fugitive
17 Unit, Aggravated Assaults, the Sex Crime Unit, the
18 Pawn Shop and Pawn Watch Unit and the Expediter
19 which means the individual that screens reports.
20 Q  The expediter who screens reports also
21 screen reports for persons determined to be missing?
22 A  No.
23 Q  No? Okay. Do they screen reports for
24 that would concern abduction of children?
25 A  No.

Page 16

1  Q  Would it be fair for me to say that the
2  person who reviews those reports as expediter would
3  have nothing to do with looking at anything with the
4  Bush case?
5  A  Correct.
6  Q  All right. Who was the person below you
7  who would have supervised Youth Services?
8  A  It would have been Sergeant Sean Adams.
9  Q  Anybody below him that supervised lesser
10 persons or subordinates of that unit?
11 A  No.
12 Q  How many people were in that unit in 2006
13 on or about October 1 through December 1, 2006?
14 A  Eight.
15 Q  Would that be one sergeant for eight
16 people or one sergeant for seven others?
17 A  It would have been one sergeant for eight
18 detectives.
19 Q  So there would have been nine below you in
20 that unit?
21 A  Correct.
22 Q  What were the duties for Sergeant Adams in
23 regards to supervising the eight subordinates?
24 A  To oversee all the investigations that
25 were assigned to the eight detectives he had working

Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 5 of 6

Deposition of Lieutenant Brian Russell                                         Christpher Bush & David Bush V S.C Adams, et al.

Page 17

1 for him at the time.
2  Q  Would he do the assignments to the eight
3 detectives?
4  A  Yes.
5  Q  Okay. And how, under policy, is the
6 assignment given to a detective?
7  A  Just a regular case that comes in?
8  Q  Yes. Say you get a phone call.
9  A  There's a procedure. Basically, the
10 uniform officers fill out an incident based report
11 similar to the one you have in front of you.
12  Q  Okay. The ones we marked A, B and C?
13  A  Correct. That goes electronically to the
14 sergeant, their immediate supervisor which is the
15 street sergeant. That sergeant will then approve
16 that report or disapprove it and send it back for
17 corrections. Once that sergeant approves that
18 report it automatically gets sent to Youth Services
19 for follow-up later.
20  Q  The reports that we have here, would there
21 be any indication you can point me to as to whether
22 or not a street sergeant reviewed this report?
23  A  Yes.
24  Q  Who was that street sergeant?
25  A  Sergeant Childress.

Page 18

1  Q  Because his name appears on it does that
2 mean he approved it?
3  A  Yes.
4  Q  And it would have been that sergeant who
5 then had it electronically sent? Or would it just
6 be returned to the patrol officer for that?
7  A  No. If there was something incorrect to
8 the report the sergeant would send it back for
9 correction before approving it.
10  Q  And then if everything was fine?
11  A  It would automatically be approved and
12 would be automatically sent to Youth Services.
13 Because it involves juveniles it automatically gets
14 sent to Youth Services. Not immediately but four
15 or five hours later for assignment for follow up by
16 a detective if Sergeant Adams determined that was
17 necessary.
18  Q  When the incident report's prepared is it
19 prepared on a computer screen? Electronically it
20 goes back and forth? Or is it actually printed out
21 and sent that way?
22  A  No. It's zip drive.
23  Q  Oh, okay. So the officer takes the
24 information in, stores it electronically, sends it
25 to the sergeant who reviews it electronically. If

Page 19

1 it's fine, he electronically forwards it?
2  A  Well, once the street sergeant approves
3 it, it automatically gets forwarded to the
4 respective division.
5  Q  What would be the criteria, if there is,
6 for a missing child?
7  A  A missing child?
8  Q  Yes. Someone calls up and says, My child
9 is missing. I assume the department has a criteria
10 as to whether the report will fit a missing child's
11 report or not?
12  A  Correct.
13  Q  What would be the criteria?
14  A  It depends on the age, number one.
15  Q  What would be the minimum age?
16  A  There's a different response for children
17 ten and above and ten and under.
18  Q  Okay. What's the difference?
19  A  Anybody ten and under reported missing we
20 actually set up an incident based command. Usually
21 near the incident, where it occurred. If we do not
22 know where -- if the child is not with somebody and
23 is missing as in probably an abduction by a stranger
24 that would be set up, reports would be filed. Youth
25 Services and detectives would be assigned to that

Page 20

1 particular post, and then we'd start looking for the
2 child after the report was filed.
3  Q  Okay. And I'll cut to the chase. You
4 have a situation where the natural children of the
5 father are removed from Virginia. And the natural
6 mother is complaining about it. How does that fit
7 into your missing child report?
8  A  Well, a report needs to be filed first.
9  Q  A missing child report?
10  A  Yes. Runaway missing person report needs
11 to be filed. It needs to be taken by the officer.
12 And if you look at the block, lower left-hand side.
13  Q  The one that has the following section
14 must be completed and signed?
15  A  Right. And it needs to be signed off by
16 the guardian of that individual.
17  Q  All right. This is certifying the person
18 missing is under 18?
19  A  Uh-huh.
20  Q  Information being provided to the officer
21 is true and correct to the best of their
22 information. Correct? I'm paraphrasing.
23  A  You're asking a question?
24  Q  Yes. Am I paraphrasing that correctly?
25     MR. SIMOPOULOS: Document speaks for

Farnsworth & Taylor Reporting, LLC                                                                                      Page: 5

Case 2:07-cv-04936-MAM   Document 54-21   Filed 10/01/10   Page 6 of 6

Deposition of Lieutenant Brian Russell                           Christpher Bush & David Bush V S.C Adams, et al.

Page 21

itself.
   MR. PURICELLI: I just want to make sure I understand it. That's all.
BY MR. PURICELLI:
   Q   Authorizing law enforcement to use photographs and other identifying information in attempt to locate the person being reported missing?
   A   Yes. It says, I authorize any law enforcement official to use photographs and/or other identifying information that I have provided in any manner they deem necessary in attempting to locate the person I am reporting missing.
   Q   And the last one simply says, the parent or legal guardian of person reported missing?
   A   I represent that I am the natural parent or legal guardian of the person named in this report and have the legal right to sign this authorization and consent.
   Q   What would constitute legal guardianship?
   A   Mother, father, grandmother that has been appointed by the Court as a guardian, guardian ad litem.
   Q   And a parent is obvious?
   A   (Nods.)
   Q   And they have what appear to be initials

Page 22

in the upper right-hand corner. Do you know what those are?
   A   I can read them. It says, Okay, per M.K. Segal.
   Q   So they're actually a note. That's not an okay for some of these names. It's an actual word?
   A   I have no idea. I did not complete that.
   Q   Is it usual for something to be in that block according to the policies of the department?
   A   I don't know.
   Q   You were the person who supervised ultimately these documents; weren't you?
   A   No.
   Q   Who would have been?
   A   These documents were taken by Mark Segal and put on file with the Youth and Services Unit per state law.
   Q   Who would have supervised to see that they were completed according to department policy?
   A   Sergeant Adams.
   Q   So you never would have been involved at that level of supervision?
   A   No.
   Q   All right. Now, this report's filed for a person that you don't know where that person is or

Page 23

who they're with; is that correct?
   A   No. It's a missing person report. It could be that the person is just missing. We get a lot of missing person reports that they haven't seen the child or the individual. Everybody has a right based on facts and circumstances surrounding this to file a missing person report if they believe that the person is missing.
   Q   What do you at the department classify as a person missing?
   A   Somebody that hasn't been seen in three hours, there's unusual circumstances that they haven't been seen. Each case is different. We have to look at them on a case to case basis.
   Q   How about if the person reporting a child missing knows that the child has been turned over to the natural father by the police? Does that mean the child's missing by Richmond Police Department's policy?
   A   If the individual that signs this that actually reports the child missing knows that, that would be a different circumstance.
   Q   What circumstance would it be?
   A   I think it would probably raise to the level of further investigation would need to be done

Page 24

by the Youth Services Detective to follow up.
   Q   Well, Sergeant Adams would have to supervise this form; wouldn't he?
   A   I think he would have seen it, yes. These are forms filled out by requirement of state police. This on the other hand would create follow up.
   Q   I understand. I just want to stick with this right now.
   A   Okay.
   Q   I want to know what the department's need was for filling out this missing child form when the child has been picked up by the police, the same police filling out the form, and turns it over to the natural farther, and the child is reported missing and is leaving with the father and there's a whole police report on it?
      MR. SIMOPOULOS: Calls for speculation and objection.
      MR. PURICELLI: You can answer the question.
      MR. SIMOPOULOS: Answer if you can.
      THE WITNESS: I don't know exactly what you're trying to ask me.
BY MR. PURICELLI:
   Q   I'm asking how it is that you have a