Case 2:07-cv-04936-MAM   Document 54-22   Filed 10/01/10   Page 1 of 6

Deposition of Lieutenant Brian Russell                           Christpher Bush & David Bush V S.C Adams, et al.

Page 25

missing child report from a police department for a child that's not missing under definition? The child's whereabouts is known. The child is with the natural parent. In fact, the Richmond Police Department turned the child over to the natural parent.

A   And this rises, based on the narrative in this report made by Mark Segal, to unusual circumstances that need to be followed up with further investigation based on our policy.

Q   Well, tell me about that policy.

A   That's what the policy says. I'm telling you. Unusual circumstances as a result of a child being missing.

Q   It says here on this narrative that his wife -- meaning David Bush's -- had sole custody. What evidence did you have that she had any lawful custody let alone sole?

A   A court order issued by the City of the Richmond Juvenile and Domestic Relations Court appointing her sole custody of those children signed by a judge, and that they were not to be in the custody of David Bush.

Q   Okay. So these children were deemed missing after they were turned over to Mr. Bush?

Page 26

A   On the date of 10/24/06 those children according to our policy were missing children.

Q   So it's based on the fact that she obtained an order down here giving her custody?

A   She produced an order from Juvenile & Domestic Relations Court giving her sole custody.

Q   And it says here she was in witness protection. On what facts or documents were --

A   I have no idea. I didn't take the report.

Q   And this guy is no longer in the department?

A   No.

Q   It says here in the report that Mr. Bush was able to locate the children and convince a court official to issue a valid order of custody; correct?

A   Uh-huh.

Q   Is there a department policy about writing an incorrect police report, a false police report?

MR. SIMOPOULOS: Objection to form. You can answer it. Who are you talking about?

BY MR. PURICELLI:

Q   The officer writing this? Is he required to know what he's talking about when he writes the report?

A   He takes the information provided him by

Page 27

the individual filing the report and files it to the best of his ability and documents the same.

Q   Okay. Can we assume based on what he's required to do there was something that he saw to determine there was something valid?

MR. SIMOPOULOS: Objection. Calls for speculation?

THE WITNESS: I'm going to answer no.

BY MR. PURICELLI:

Q   Okay. There would have been something the complainant, in this case Serene, would have been saying to make him write that? He wouldn't just make that up?

MR. SIMOPOULOS: Objection. Calls for speculation.

THE WITNESS: Once again, the officer takes the information provided by the individual reporting the children missing and documents it to the best of his ability.

BY MR. PURICELLI:

Q   If the officer taking this report was working with the Pennsylvania State Police would he be required to make notation somewhere in the report that he was working with Pennsylvania State Police to prepare this document? This document being the

Page 28

missing children report?

A   According to our procedure you mean?

Q   Yes.

A   No.

Q   To your knowledge was he working with the Pennsylvania State Police?

A   Don't know.

Q   Now, you indicated that the three-page document, the incident investigation sheet would be the document showing that this unusual circumstances warranted further investigation. Did I understand that correctly?

A   I would have to look at that. Number one, the missing person reports would be based on the narrative, yes. The investigative report, (reviews documents) this is the report that was filed October 14, 2006. Suspicious situation filed by Ms. Serene saying that the victim stated --
Ms. Serene -- that an unknown person may have entered her house using a spare key on her back deck. She stated she has had several problems with ex-husband past seven years, and has had protection orders on him for some time. When her friend went to house today several items had been moved and key was missing from porch. Nothing was missing from

Case 2:07-cv-04936-MAM Document 54-22 Filed 10/01/10 Page 2 of 6

Deposition of Lieutenant Brian Russell  Christpher Bush & David Bush V S.C Adams, et al.

Page 29

1  the house and the doors were locked. And that was
2  taken by Officer Rodenhauser approximately ten days
3  before the missing person report was filed.
4  Q  Did she identify Mr. Bush as being the
5  person that allegedly entered her property?
6  A  I don't know.
7  Q  Was there any physical evidence required
8  that would place him in Virginia during the time
9  that this event took place?
10 A  I don't know.
11 Q  Any photographs or anything that was taken
12 to indicate that her report was actually true?
13 A  Once again, based on our policy if someone
14 reports a crime we're obligated to document it and
15 follow up on it if we deem necessary to do so.
16 Q  I take it it's also a crime in the
17 Commonwealth of Virginia to file a false police
18 report?
19 A  That is correct.
20 Q  Was there any investigation to find out
21 whether Serene was filing a false police report?
22 A  I don't know.
23 Q  Was there any evidence other than her own
24 words to substantiate her allegations on --
25   MR. SIMOPOULOS: Again, this is going to

Page 30

1  speculation.
2    MR. PURICELLI: Well, I don't know if he
3    does or doesn't know.
4    MR. SIMOPOULOS: The objection is noted.
5    THE WITNESS: I don't know. I didn't
6    investigate that.
7  BY MR. PURICELLI:
8  Q  Okay. Can you tell me why that would have
9  been then part of the runaway children file if it
10 has nothing to do with this case?
11 A  More than likely based on a subpoena those
12 documents were given up as part of the subpoena
13 request.
14 Q  Okay. So it was just the mere fact that
15 the subpoena requested any and all reports about it?
16 A  That's correct.
17 Q  That's fine. So A, B and C, Counsel,
18 we'll note that although they are a part of one,
19 they aren't part of the arrest file for the
20 investigation file?
21   MR. SIMOPOULOS: It's part of the file I
22   was given. I don't know what you're asking me.
23   MR. PURICELLI: I just want to make sure
24   we keep it separate. It has nothing to do with
25   the facts of what we're litigating.

Page 31

1    MR. SIMOPOULOS: I can't stipulate to
2    that. I have to ask Sergeant Adams that
3    question. I don't know if that's part of what
4    he had in his file. I had his file. I assume
5    it was part of his file if it was in his file.
6    MR. PURICELLI: Let me ask the lieutenant.
7  BY MR. PURICELLI:
8  Q  Lieutenant, what is your job as far as
9  supervision goes then, over Sergeant Adams?
10 A  I oversee investigations that we have the
11 authority on major crimes to investigate.
12 Q  And in the course of that supervision did
13 you oversee the investigation of the alleged missing
14 Bush children and the ultimate arrest of David Bush?
15 A  Investigation and missing children, yes.
16 Q  Were you involved in any way, shape or
17 form in the procurement of the warrants that led to
18 Mr. Bush's arrest?
19 A  No.
20 Q  Were you involved in any way, shape or
21 form in arranging the warrants to be sent to any
22 federal or state agency that caused the arrest of
23 Mr. Bush?
24 A  Yes.
25 Q  What was your involvement?

Page 32

1  A  I notified the U.S. Marshals as part of
2  the Richmond Regional Capital Task Force that we had
3  felony warrants on file for Mr. Bush and provided
4  them with an address in Pennsylvania.
5  Q  Just so I'm clear. You had know
6  involvement what so ever causing the warrants to be
7  issued. You spoke with nobody from the Commonwealth
8  Attorney's Office to find out whether the warrants
9  should be obtained against Mr. Bush?
10 A  Yes. I spoke with someone in the
11 Commonwealth Attorney's Office as part of the
12 conversation Sergeant Adams had, yes.
13 Q  You don't consider that involvement in
14 obtaining the warrants?
15 A  No, sir.
16 Q  Tell me what happened with this
17 conversation with the Commonwealth Attorney.
18 A  Facts and circumstances were presented to
19 the Commonwealth Attorney based on the court order
20 issued by Richmond Juvenile & Domestic Relations
21 Court, signed order. It was first discussed with
22 Commonwealth Attorney having the children returned
23 with no arrest warrants being issued and try to get
24 Mr. Bush to return the children to Virginia as part
25 of the court order.

Case 2:07-cv-04936-MAM   Document 54-22   Filed 10/01/10   Page 3 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 33

1  Q   What effort if any are you aware of was
2  done to have the children returned pursuant to this
3  domestic violence order?
4  A   Pursuant to the court order giving custody
5  to Ms. Bush.
6  Q   The court order is a domestic violence
7  order; is it not?
8  A   No. It's a custody order granting sole
9  custody of those children to Ms. Bush.
10 Q   Was that order issued out of a custody
11 hearing or was it out of ex-parte domestic abuse --
12 A   I was not present at the court hearing.
13 It was a valid document from the courts of the City
14 of Richmond.
15 Q   How long have you been a police officer in
16 Richmond?
17 A   27 years.
18 Q   In those 27 years have you become familiar
19 with domestic abuse orders?
20 A   Yes.
21 Q   Are you aware there are temporary orders
22 issued to people for domestic abuse allegations?
23 A   Against the individual being abused?
24 Q   Not against. For them and against the
25 person abusing if I understand what you're asking.

Page 34

1  A   I don't understand what you're asking.
2  Q   Let's rephrase then. In your 27 years
3  being a police officer are you aware that there is a
4  process to obtain a temporary order to protect a
5  person who is alleging being abused?
6  A   Correct.
7  Q   And you've seen those orders; haven't you?
8  A   I have.
9  Q   And have you seen permanent orders,
10 meaning orders issued after a full hearing, the
11 judge hears the story, the allegations and the other
12 side and then issues an order. Have you seen those?
13 A   Yes.
14 Q   Is the second order substantially similar
15 to the temporary orders?
16 A   Yes.
17 Q   And they're standard form orders; right?
18 A   I couldn't say. The Court issues them. I
19 don't know that.
20 Q   Okay. The ones that you have seen, are
21 they always the same?
22 A   In the format?
23 Q   The format? Not some blocks checked and
24 some not.
25 A   Yes.

Page 35

1  Q   So you've become acquainted with the
2  format to know whether they're valid or made up.
3  Would that be fair to say?
4      MR. SIMOPOULOS: Objection to form. Calls
5  for speculation.
6  BY MR. PURICELLI:
7  Q   You can answer it?
8  A   I wouldn't know. A valid order? Are you
9  asking me if I know what a false order looks like?
10 Q   I'm asking if you know the form of the
11 order, whether it was something unusual you never
12 saw before or something you were acquainted with as
13 being valid?
14     MR. SIMOPOULOS: He answered that already.
15     MR. PURICELLI: Answer it again and I'll
16 move on.
17     THE WITNESS: I don't know what you're
18 asking me.
19 BY MR. PURICELLI:
20 Q   Is there a distinction between a custody
21 order, nothing to do with protection, just two
22 parents go to court and got a custody order; and the
23 one you get in the domestic abuse statute?
24 A   You're talking about a permanent
25 protection order?

Page 36

1  Q   No. I'm talking about a custody order.
2  A   You're talking about the difference
3  between a permanent protection order or temporary
4  protection order and a custody order?
5  Q   Yes.
6  A   Yes, there's a difference.
7  Q   All right. In all your years you would
8  recognize whether it was just a court order saying
9  this parent has custody in a custody matter, not a
10 domestic abuse matter, and when one parent gets it
11 because of an allegation of abuse; correct?
12 A   Correct. But --
13 Q   The order that you had --
14     MR. SIMOPOULOS: Let him finish.
15     MR. PURICELLI: Go ahead. I'm sorry.
16     THE WITNESS: But in the State of Virginia
17 that could be contained in that permanent
18 protection order.
19 BY MR. PURICELLI:
20 Q   And it can in the Commonwealth of
21 Pennsylvania too.
22 A   Okay.
23 Q   All right. I'm only trying to find out
24 now that you recognize that there is a distinction
25 between every day custody orders, not an allegation

Case 2:07-cv-04936-MAM Document 54-22 Filed 10/01/10 Page 4 of 6

Deposition of Lieutenant Brian RussellChristpher Bush & David Bush V S.C Adams, et al.

Page 37

of abuse, and one that is issued where there's allegation of abuse; whether or not the order you're talking about was an abuse order or a custody order?

A  Without looking at it I couldn't tell you. All I can tell you is, it's been four years ago. If you have a copy I'm more than happy to look at it.

MR. SIMOPOULOS: I'd appreciate if you have a copy you'd show him.

MR. PURICELLI: And I'm not going to go digging through the paperwork unless --

MR. SIMOPOULOS: Then don't speculate and don't answer any questions if you --

BY MR. PURICELLI:

Q  You're saying you don't remember whether it was or wasn't custody issued through a domestic abuse order or custody issued through a straight custody court?

A  I do remember that it was an order that clearly stated that Ms. Bush had sole custody of those children, sole custody alone.

Q  Was that a permanent or temporary order?

A  Without looking I can't tell you.

Q  Okay. When you talked with the Commonwealth Attorney did you describe the order that you were relying on?

Page 38

A  I don't know.

Q  What do you recall telling the Commonwealth Attorney other than what you told us already?

A  Just that if we could possibly get those children back as part of that order without getting arrest warrants. She said why don't you try that first, and if we have to I will approve warrants.

Q  All right. Who was it from the Commonwealth Attorney's Office that told you to try to get them back without getting warrants, and if that doesn't work I'll approve warrants?

A  Mary Langer.

Q  Did you provide the Commonwealth Attorney with any documentation at all?

A  I did not.

Q  Did anybody?

A  I can't speculate that Sergeant Adams did, but she was familiar with the case.

Q  What makes you say she was familiar with the case?

A  She is actually the Deputy Commonwealth Attorney ahead of Juvenile & Domestic Relations Court, and she was dealing with Ms. Serene over the order obtained in Richmond Juvenile & Domestic

Page 39

Relations Court prior to Ms. Serene coming to us.

Q  So in other words, the Commonwealth Attorney was helping Serene obtain the custody order that you're relying on?

MR. SIMOPOULOS: Objection to form.

BY MR. PURICELLI:

Q  Did I understand that correctly?

A  No. She was doing her job based on what they do in Juvenile & Domestic Relations Court.

Q  Is her job always to help someone who's left Pennsylvania with children?

A  I am not a Commonwealth Attorney, and I can not comment on that.

Q  Then you don't know if she was doing her job then; right?

MR. SIMOPOULOS: Objection to form.

BY MR. PURICELLI:

Q  Do Commonwealth Attorneys approve warrants or do the magistrates approve warrants?

A  The magistrates.

Q  When the Commonwealth Attorney was contacted, Mary, did you contact her or did she contact you?

A  I contacted her.

Q  Okay. Who did you talk to in order to

Page 40

contact her? Meaning, who came to you?

A  Sergeant Adams.

Q  What did Sergeant Adams tell you?

A  Basically that Ms. Serene had obtained a court order from City of Richmond Juvenile & Domestic Relations Court giving sole custody to Serene Bush and nobody else, and that was obtained -- I don't know the date, but I know it was prior to the 24th following this report.

Q  And did the sergeant talk to you about what particular charges he would like to bring against Mr. Bush?

A  Not at that point, no.

Q  At what point did he?

A  After we consulted with the Commonwealth Attorney's Office and explored the options. What we tried to do, myself and Sergeant, is just get the kids returned to the State of Virginia to Ms. Bush based on a valid court order.

Q  Were you aware that there was already a valid court order in Pennsylvania and in New Mexico compelling Serene to appear in court to explain why she had the children?

A  I knew there was a court order from Luzerne County that had been overturned, and we had

Case 2:07-cv-04936-MAM   Document 54-22   Filed 10/01/10   Page 5 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 41

1  a copy of the overturned order from Luzerne County
2  giving custody of those children to Mr. Bush that
3  was overturned. And that was presented to the court
4  in Richmond where an order of custody was provided
5  to Ms. Bush giving her sole custody of the children.
6      Q  My question is, did anybody bring to your
7  attention, anybody in your police department or any
8  other police department or agency you contacted,
9  tell you that there were two court orders prior to
10 the Virginia Court Order directing Serene to appear
11 in court with the kids?
12     A  No.
13     Q  Do you know Detective Myrna?
14     A  I'm sorry?
15     Q  Larson. Do you know Detective Larson?
16     A  No.
17     Q  Never met him?
18     A  Detective Larson? No.
19     Q  Ever seen this note that's been marked
20 Tripp 4? (Document proffered.)
21     A  (Views document.) No.
22     Q  Lawson. It's Lawson. Do you know
23 Detective Lawson?
24     A  Yes.
25     Q  In the course of your involvement with

Page 42

1  David Bush's personal arrest did you talk to
2  Detective Lawson about the involvement he had?
3      A  First, I wasn't involved in the personal
4  arrest of David Bush. Second, no. I did not talk
5  to Detective Lawson because he had left the Richmond
6  Police Department.
7      Q  When a detective is involved in an
8  incident involving children being returned to a
9  father out of state should there be a detailed
10 report according to Richmond Police Department's
11 policy?
12     A  No.
13     Q  So your department allows a father to come
14 in, show a court order and your department will go
15 pick the children up, turn them over to the father,
16 and there will be no incident report, no missing
17 child report, no report?
18     A  Our policy is if it's a valid court order
19 presented at the time -- a lot of times they don't
20 even call us at the police department to assist. If
21 it's a valid court order there would be no report
22 because there's no crime that's been committed.
23     Q  So your department policy is to only
24 prepare reports if there's a crime?
25     A  Yes.

Page 43

1      Q  So the reports that I'm seeing here is
2  that you saw that there was a crime, not you
3  personally, but you the police department saw that
4  there was a crime here?
5      A  There was a report of a missing person
6  with unusual circumstances, yes, that needed to be
7  looked at.
8      Q  All right. What were the circumstances
9  that caused the concern?
10     A  Once again, I go back to the missing
11 person report.
12     Q  Well, you can just tell me. Is it just
13 limited to what's written? Is that it?
14     A  Ms. Bush reported three children missing,
15 okay? She had paperwork reversing a court order
16 from Luzerne County, Pennsylvania issued by the
17 Court giving Mr. Bush custody of those children.
18 Came back down to Richmond, obtained an order from
19 the Richmond Juvenile & Domestic Court giving her
20 sole custody of those children. Sole custody only.
21 To me at that point it is a crime.
22     Q  What was the crime?
23     A  Parental abduction.
24     Q  What are the elements for parental
25 abduction?

Page 44

1      MR. SIMOPOULOS: Objection to form.
2  BY MR. PURICELLI:
3      Q  You can answer the question if you
4  understand it.
5      A  That a parent of a child that does not
6  have legal custody of those kids, has custody of
7  those kids and is refusing to return them.
8      Q  Do you know whether or not David Bush had
9  notice of the hearing Serene obtained the order
10 from?
11     A  No.
12     Q  Have you received any type of training
13 before the Bush matter on civil rights?
14     MR. SIMOPOULOS: Objection to form.
15 BY MR. PURICELLI:
16     Q  Do you understand what civil rights are?
17     A  Absolutely.
18     Q  Do you know about the rights of parents to
19 be with their children?
20     A  Are you asking me if I've had training in
21 reference to parents and civil rights, no.
22     Q  How did you know, if you did, whether or
23 not you were violating a parent's civil rights by
24 using the criminal process to return children?
25     A  Number one, we talked to the Commonwealth

Case 2:07-cv-04936-MAM   Document 54-22   Filed 10/01/10   Page 6 of 6

Deposition of Lieutenant Brian Russell                Christpher Bush & David Bush V S.C Adams, et al.

Page 45

 1  Attorney who is much better versed than we are in
 2  Juvenile & Domestic Relations as to these orders.
 3  And number two, Sergeant Adams presented probable
 4  cause to a neutral magistrate.
 5      Q   Were you present for that?
 6      A   No.
 7      Q   How do you know he did that?
 8      A   Because the warrants are sitting right
 9  here in front of me.
10      Q   Do you have any record that you read?
11      A   I'm sorry?
12      Q   Did you see any record that he said
13  anything to that judge?
14      A   To the judge?
15      Q   To the magistrate?
16      A   Did I personally witness Sergeant Adams
17  present his probable cause to the magistrate, no.
18      Q   So you don't know what he told the
19  magistrate?
20      A   Once again, I was not present when
21  Sergeant Adams presented the probable cause to the
22  magistrate for the issue before us.
23      Q   So the mere fact that the warrant exists
24  you believe Sergeant Adam said something the
25  magistrate accepted as probable cause. True?

Page 46

 1      A   You have to ask Sergeant Adams.
 2      Q   I did already. I'm asking you.
 3      A   This to me based on my 27 years experience
 4  appears to be a valid warrant issued by a magistrate
 5  in the City of Richmond.
 6      Q   Okay. Do you know whether or not at any
 7  time Sergeant Adams told the magistrate when he was
 8  explaining for this warrant that Serene was
 9  compelled by two court orders to return to
10  Pennsylvania with the children?
11          MR. SIMOPOULOS: Objection. Asked and
12      answered and calls for speculation. The
13      witness said he was not present.
14          MR. PURICELLI: That's okay. He can tell
15      me no, and I'll move to the next question or he
16      can tell me yes.
17          THE WITNESS: No.
18  BY MR. PURICELLI:
19      Q   In your years of experience if there's a
20  court order telling someone to return to another
21  state with the children what's the policy of the
22  Richmond Police Department when a parent comes and
23  gets the children?
24      A   Usually the parent calls us. If there's a
25  valid court order that's issued by the Court from

Page 47

 1  Pennsylvania or any state which is a sister state,
 2  we have to honor any court order from another state.
 3      Q   Okay. So if there was an order it would
 4  have been honored by the police department?
 5      A   Correct.
 6      Q   You just weren't aware of the order; is
 7  that true?
 8      A   What order are you talking about?
 9      Q   The order from Pennsylvania ordering
10  Serene and the children into an ongoing custody
11  hearing in Tioga County, Pennsylvania. You're not
12  aware of the order?
13      A   Show me the order I could tell you.
14          MR. SIMOPOULOS: There are like five
15      orders.
16          MR. PURICELLI: There are more than that.
17      There was the order from New Mexico telling her
18      to come there.
19  BY MR. PURICELLI:
20      Q   She's shown an affidavit -- or at least
21  it's been purported that she did. And I'll show
22  you. It's been marked an exhibit. It's a
23  three-page document. Can you tell me, is that your
24  signature on the last page? (Document proffered.)
25      A   (Reviews documents.) That's correct.

Page 48

 1  That's my signature.
 2      Q   Is everything here true and correct?
 3      A   (Reviews document.)
 4      Q   You don't have to worry about the whole
 5  document.
 6      A   You asked me if the document was correct?
 7      Q   Just the three pages that you signed, just
 8  your affidavit.
 9      A   The three pages with my signature, my
10  affidavit, yes.
11      Q   Is there anything you want to change?
12      A   No.
13      Q   Okay. Is this affidavit based on personal
14  knowledge, something you witnessed or were present
15  for?
16      A   I think it was based on questions that
17  were provided by you and were answered.
18      Q   Actually, it wasn't questions I asked.
19  Apparently, somebody asked you questions and asked
20  you to sign this. I don't know who. Who asked you
21  to sign this?
22      A   David Freeman.
23          MR. PURICELLI: Okay. And for the record,
24      that's an attorney. I'm not asking you --
25          MR. SIMOPOULOS: Attorney/client