Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 1 of 6

Deposition of Lieutenant Brian Russell                                    Christpher Bush & David Bush V S.C Adams, et al.

Page 49

1  privilege. You don't have to answer any
2  questions regarding that.
3  BY MR. PURICELLI:
4    Q   So my question is, what's on this document
5  that you notarized based on personal knowledge,
6  either you were present for or did it yourself?
7    A   Correct.
8    Q   Okay. So you were present on or about
9  October 24 for Sarah Bush to approach Sergeant Sean
10 Adams? Paragraph 5.
11   A   Yes. She was there and she presented the
12 copy of the order from Luzerne County Police
13 vacating the previous order that had granted custody
14 to David Bush. She also presented me and Sergeant
15 Adams with an order from the Juvenile & Domestic
16 Relations Court.
17   Q   And before that time you had no other
18 contact with her?
19   A   No.
20   Q   And you had no other contact with Adams in
21 regards to this case?
22   A   No.
23   Q   It indicates in Paragraph 4 you did not
24 have any interactions with David Bush, Sarah Bush or
25 the Bush children in Pennsylvania? Did you have any

Page 50

1  interaction with any of these people in Virginia?
2    A   Yes. Ms. Bush.
3    Q   And only Ms. Bush?
4    A   Correct.
5    Q   Did you have any contacts with anybody
6  with the Pennsylvania State Police other than the
7  sergeant we talked about outside of Philadelphia?
8    A   No.
9    Q   If that's true and you didn't, why does
10 Paragraph 6 of your affidavit say you contacted
11 people in Newtown, Pennsylvania?
12   A   That's not the state police.
13   Q   I asked you if you had contact with
14 anybody?
15   A   No, sir; you did not.
16   Q   No? Who did you contact in Pennsylvania?
17   A   Civilians?
18   Q   I don't care if it was your aunt as long
19 as it had to do with the Bush matter.
20   A   Okay. First I contacted Bucks County
21 Police Chief who was Mr. Duffy.
22   Q   Who did you contact after that?
23   A   I'm sorry. That's not Bucks County.
24 That's Newtown Police Chief.
25   Q   Actually, you're correct. He is from

Page 51

1  Bucks County but it is the Newtown Police
2  Department.
3    A   Right. Newtown Police Department. I
4  talked to Chief Martin Duffy, and I talked to a
5  sergeant in the Bucks County Sheriff's Office I
6  believe, and I talked to the trooper outside of
7  Philadelphia.
8    Q   You indicated there was a sergeant?
9    A   Sergeant with the state police.
10   Q   If I tell you the records indicate that
11 the only person contacted with the state police
12 about this matter was from the Dublin Barracks would
13 you have any reason to doubt that that's not true?
14   A   I don't recall what barracks it was. I
15 know I had a conversation with a sergeant with the
16 state police in a barracks outside Philadelphia.
17   Q   Are these people you're contacting?
18   A   Yes.
19   Q   Okay. Anybody else you contacted?
20   A   No.
21   Q   How did you know to call these people?
22   A   I looked up their phone numbers.
23   Q   Why did you look up a police department in
24 Newtown?
25   A   To try to arrange for Mr. Bush to bring

Page 52

1  those children back to Ms. Bush.
2    Q   Is that where you believed Mr. Bush was
3  going, Newtown, Bucks County, Pennsylvania?
4    A   Yes.
5    Q   Why did you believe that?
6    A   I think the address was provided to us by
7  Ms. Bush.
8    Q   Okay. You said you called a sergeant in
9  Bucks County?
10   A   Yes.
11   Q   Do you remember his name?
12   A   No.
13   Q   Why did you call the sheriff's office?
14   A   For assistance in helping returning those
15 children back to Ms. Bush.
16   Q   Is that why you called the state police?
17   A   Correct.
18   Q   I'm going to tell you the records reflect
19 it's Dublin. How did you come to call a particular
20 barrack with the state police?
21   A   If you call the state police you ask them
22 what district Newtown is in and they give you the
23 district state police that oversee that area.
24   Q   Is that what you did? You called
25 Pennsylvania State Police Department Headquarters?

Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 2 of 6

Deposition of Lieutenant Brian Russell                               Christpher Bush & David Bush V S.C Adams, et al.

Page 53

A   I don't know who I called, whether I called the 800 number. But I did specifically, I asked the individual sergeant whether his jurisdiction was Newtown and Bucks County, and he acknowledged it was.

Q   When you contacted the Newtown Police Department did you talk to anybody other than Martin Duffy?

A   I did. I talked to the detective that was on call that evening.

Q   Did you talk to any sergeant or patrol personnel?

A   I don't remember that, no.

Q   Do you remember the name Pat?

A   No.

Q   What did you tell Martin Duffy?

A   I explained to Mr. Duffy that we had a valid court order returning three children that we believed were at the residence of Mr. Bush in Bucks County or possibly Newtown, and we were asking him to go by and secure those children. And we would send somebody up there to pick those children up based on a court order from the City of Richmond.

Q   Did you at any time represent to Chief Duffy that you had a warrant for the arrest of

Page 54

Mr. Bush?

A   No.

Q   What if anything did Chief Duffy say in response to that information?

A   He told me he had to call the Bucks County District Attorney's Office to domesticate the order. And he'd get back to me.

Q   Did he tell you you had to domesticate the order, or did he just say he would get back to you?

A   No. He said he had to call the Bucks County District Attorney's Office to domesticate the order. I didn't ask me to do it. I don't have the authority to do that in Pennsylvania.

Q   Did he call you back?

A   Yes, he did.

Q   How much time had passed between when you spoke with him until when he called you back?

A   I don't know. Maybe an hour.

Q   Do you recall when it was you called, the date?

A   It would have been the date of the warrant which is October 25, 2006. And it was prior to 7:40 p.m.

Q   So you already had the warrant?

A   No. The warrants were not obtained at

Page 55

that point.

Q   Oh. So you had no warrants. They were not issued?

A   That's correct. We had not obtained the warrants.

Q   What did Chief Duffy tell you an hour later?

A   He told me Bucks County Attorney wasn't going to handle this this evening because it was in the evening and to follow up tomorrow. And at that point I asked him, I said at least go by the residence to check to see if the children are all right, and if you could take them into custody and hold them and we'll send somebody up there. We can get up there within five or six hours.

Q   What authority do you believe he had to do that?

A   I was asking his assistance in obtaining those children.

Q   I know. But you're asking him to go in and take children who lived in Pennsylvania. Under what authority were you telling him to do that?

A   I wasn't telling him to do that. I was asking his cooperation to take the children to a safe place to get the kids picked up.

Page 56

Q   Did he answer that?

A   He said basically we couldn't do anything until morning. And even if we went over there to the residence to take custody of those children we had nowhere to keep them. And I explained to Chief Duffy at that point that we felt there was danger to those children based on statements from Ms. Bush. And we just wanted to make sure they were all right, and we did not want to go the route of getting warrants for Mr. Bush. And we wanted to just safely return the children and let the courts in Virginia and Pennsylvania work it out.

Q   What did Ms. Bush tell you that caused you to believe the children were in danger?

A   Well, that he, Mr. Bush, had threatened the children before, owned a firearm and had committed spousal abuse I think.

Q   Did you inquire as to what type firearm?

A   No.

Q   Did she ever tell you he used the firearm inappropriately?

A   No.

Q   So the mere fact that he owned a firearm put the children in danger?

A   In my mind?

Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 3 of 6

Deposition of Lieutenant Brian Russell                 Christpher Bush & David Bush V S.C Adams, et al.

Page 57

1  Q  Yes.
2  A  Yes.
3  Q  Okay. Why?
4  A  There's a firearm, that he has committed
5  violence against the children and her in the past.
6  Yes, I thought those children were in danger.
7  Q  Okay. What evidence did you have that he
8  committed a violence against the children?
9  A  I had statements from Ms. Bush.
10 Q  So you only had her word. Aside from her
11 word what did you have?
12 A  I had nothing else.
13 Q  Nothing else. What did she tell you he
14 did to the children?
15 A  What I just stated, that he had committed
16 acts of violence against the children and owns a
17 firearm and had committed spousal abuse against her.
18 Q  Did she tell you he punched me in the
19 nose? He broke my arm?
20 A  I didn't get into it. It was
21 Pennsylvania. I had no jurisdiction there. I had
22 no reason to ask her anything further than I did.
23 Q  You didn't ask her what did he
24 specifically do and when?
25 A  No.

Page 58

1  Q  How long was she a resident in Virginia?
2  A  The incident that I'm talking about and
3  what she told me did not take place in Virginia. It
4  was prior to her moving down to Virginia from
5  Pennsylvania. I had no jurisdiction over that
6  matter.
7  Q  Did she tell you what acts he did to the
8  children allegedly --
9     MR. SIMOPOULOS: Objection. Asked and
10    answered.
11    THE WITNESS: Once again, she said that he
12    had threatened the children and abused the
13    children prior to coming to Virginia. I did
14    not get into it with her.
15 BY MR. PURICELLI:
16 Q  And you did nothing to find out if she was
17 telling you the truth? In other words, verify her
18 statement before you acted?
19 A  No.
20 Q  In your years of experience you've come to
21 know that some parents don't always tell the truth
22 in order to get the police to do something?
23 A  Do people lie to us, yes.
24 Q  What made you think she wasn't lying to
25 you?

Page 59

1  A  I had no reason to believe that she was
2  lying to me.
3  Q  Did you know that she had changed the
4  children's names?
5  A  Yes.
6  Q  Did you know that she had changed the
7  children's social security numbers?
8  A  No.
9  Q  In your years of experience for someone
10 saying a parent is dangerous, owns a gun, and
11 they've changed their name and the kids' name did
12 you always find that to be true?
13 A  In this case I did.
14 Q  Okay. What did you find out to be true?
15 A  That she changed her name. Once again,
16 that she had a legal order and those children were
17 missing, and they shouldn't be in the custody of
18 David Bush. And I felt that based on the totality
19 of the circumstances and everything that she
20 provided along with the court orders that those
21 children were in danger.
22 Q  Prior to her obtaining a Virginia court
23 order who had lawful custody of the children?
24 A  I don't know who had lawful custody of the
25 children.

Page 60

1  Q  Prior to Mr. Bush leaving Virginia with
2  the assistance of the Richmond Police Department
3  with the kids who had valid legal custody of the
4  kids?
5     MR. SIMOPOULOS: Objection. Don't
6     speculate.
7  BY MR. PURICELLI:
8  Q  If you know?
9  A  I have no idea.
10 Q  So is it true the only reason you obtained
11 warrants against Mr.Bush is because he would not
12 return to Virginia with the children?
13    MR. SIMOPOULOS: Objection. This witness
14    did not obtain warrants as he's testified.
15    THE WITNESS: My answer is no.
16 BY MR. PURICELLI:
17 Q  What caused you then to go get warrants?
18 Not you personally. But the Richmond Police
19 Department?
20 A  You have to ask Sergeant Adams.
21 Q  Did you talk to him?
22    MR. SIMOPOULOS: Objection. Asked and
23    answered.
24    THE WITNESS: Did I talk to him?
25

Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 4 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 61

1  BY MR. PURICELLI:
2     Q  Prior to him getting the warrants, but
3  after you talked to all these people in Bucks
4  County?
5     A  You're confusing two things. Did I talk
6  to Sergeant Adams about the warrants, yes.
7     Q  No. We already know you did. My question
8  was. Setting the parameters as I see the facts as
9  you've testified to, you spoke to the Commonwealth
10 Attorney. She told you to try and get the kids
11 back?
12    A  Correct.
13    Q  At the time you talked to her you had no
14 warrants for the arrest of Mr. Bush?
15    A  That's correct.
16    Q  You then talked to three people basically:
17 Chief Duffy from Newtown Police Department, an
18 unidentified sergeant for the Bucks County Sheriff's
19 Office, an unidentified trooper that you don't know
20 from where in Pennsylvania State Police?
21    A  I know that they had jurisdiction of Bucks
22 County.
23    Q  But you didn't know that there's actually
24 two barracks? There's one in Trevose and in Dublin,
25 Pennsylvania; right?

Page 62

1     A  No, I didn't.
2     Q  So it's really unknown barracks to you;
3  right?
4     A  I talked to a sergeant who relayed to me
5  that they worked Bucks County.
6     Q  All right. Let's get past that. Duffy
7  says essentially, can't do anything for you. You
8  asked him to go check on the wellbeing of the kids.
9  Did it get reported back to you that the children
10 were in danger by the Newtown Police Department?
11    A  No.
12    Q  Do you know whether they did or didn't
13 check on the wellbeing of the children?
14    A  I don't know.
15    Q  Did Duffy say he wouldn't check on the
16 children?
17    A  No.
18    Q  So the information you have there doesn't
19 provide any information to me that the children are
20 in danger?
21    A  My conversation with Chief Duffy, no.
22    Q  And you call the Sheriff. What do you
23 tell the Sheriff? The Deputy Sheriff, really.
24    A  Same thing. Can you assist us. And he
25 said no. It's Newtown. Call Newtown.

Page 63

1     Q  That's the extent of it?
2     A  Yes.
3     Q  You don't ask them to go check on the
4  wellbeing of the children?
5     A  I asked and he said they usually don't get
6  involved in township matters. I needed to call
7  them.
8     Q  Did he give you any advice as to who you
9  should call in Newtown?
10    A  No. I called Bucks County after I talked
11 to Newtown.
12    Q  I understand. You gave it to me in the
13 order. The next call was to a trooper?
14    A  Correct.
15    Q  What did you tell the trooper?
16    A  The same thing. And he said we don't get
17 involved in township matters.
18    Q  Okay. So from all your calls you received
19 no information that David Bush was a danger to the
20 children?
21    A  From anybody in Pennsylvania?
22    Q  Correct.
23    A  That is correct.
24    Q  Okay. At this point have you come to
25 realize that Pennsylvania is not going to pick up

Page 64

1  the children and return them to Virginia?
2     A  No.
3     Q  Okay. What happens next?
4     A  I believe a teletype entering those
5  individuals into NCIC as missing persons prior to
6  those conversations.
7     Q  Whose teletype?
8     A  The national.
9     Q  Somebody puts it into NCIC?
10    A  Right.
11    Q  Whose the ORI?
12    A  The ORI is us. Richmond Police.
13    Q  So Richmond Police put the children in?
14    A  Right. As missing.
15    Q  Just so I'm factually correct, you do know
16 they're with Mr. Bush?
17    A  At the time of this entry, yes.
18    Q  And you do know he's the natural father?
19    A  Yes.
20    Q  So it's Ms. Bush's claim that he poses a
21 danger to them and her court order that are the
22 factors here; correct?
23    A  Missing persons has nothing to do with
24 endangering a child. We do that automatically. If
25 it's a missing person report filed it automatically

Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 5 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 65

1  gets placed into NCIC.
2  Q  I understand. I'm just trying to --
3  A  That was entered on the 24th. So this
4  missing persons on the three children were entered
5  as a result of this (indicates) document and this
6  document only that they were missing. There's
7  nothing in there that says endangerment or anything.
8  It's policy not in Richmond but throughout the
9  country to do this.
10  Q  And you were unaware at any time even with
11  the Pennsylvania State Police having already
12  determined for years that the children weren't
13  missing?
14      MR. SIMOPOULOS: Objection. Calls for
15      speculation.
16      THE WITNESS: I don't know.
17  BY MR. PURICELLI:
18  Q  Are these the only people you spoke to in
19  regard to David Bush?
20      MR. SIMOPOULOS: Objection. Asked and
21      answered.
22  BY MR. PURICELLI:
23  Q  Did you speak to anybody within the
24  Richmond Police Department that arranged for the
25  warrants that we have marked as Adams 2 to be

Page 66

1  processed by anybody in the federal agency?
2      MR. SIMOPOULOS: Object to the form.
3      THE WITNESS: I don't know what you're
4      asking.
5  BY MR. PURICELLI:
6  Q  Did you call the U.S. Marshals?
7  A  I think I talked to the U.S. Marshals,
8  absolutely. They're a task force and they get all
9  our felony warrants.
10  Q  You said I think. Do you have a
11  recollection at all?
12  A  Oh, no, no, no. I talked to them. I
13  talked to them.
14  Q  Who?
15  A  Probably Detective Leadbetter. She is our
16  contact. Or Detective Pendergrast. One of those.
17  They are our Richmond officers actually assigned to
18  that Richmond Regional Capital Area Task Force.
19  Q  What's Leadbetter's first name?
20  A  Sandy.
21  Q  Pendergrast?
22  A  Pendergrast. And his first name's Brian.
23  Q  Do you know those two people?
24  A  Yes.
25  Q  Have you worked with those two people?

Page 67

1  A  Yes.
2  Q  Are you socially familiar with them?
3      MR. SIMOPOULOS: Object to form.
4      THE WITNESS: Socially, no.
5  BY MR. PURICELLI:
6  Q  So you only know them through the police
7  department?
8  A  That's correct.
9  Q  And you know they work for the task force?
10  A  That's correct.
11  Q  And you contacted them?
12  A  Yes.
13  Q  Did you contact them before or after the
14  warrants had been issued for Mr. Bush?
15  A  After. Because we turn all of our felony
16  warrants over to them to be served.
17  Q  All right. Why did you contact them in
18  regards to those particular warrants?
19  A  Policy and procedure. All felony warrants
20  that are issues are turned over to them to be
21  executed.
22  Q  Were they turned over directly meaning you
23  contacted them first? Or did somebody contact the
24  local FBI?
25  A  Warrants are obtained. They immediately

Page 68

1  go on file down in the information section and they
2  stay there until they're executed.
3  Q  And if you know where the individual is
4  named in the warrant, what does the department do?
5  A  Locally. We would go by the address and
6  check if it was local.
7  Q  Say if it was in some other town in
8  Virginia?
9  A  We send a teletype to that jurisdiction
10  and ask them to go by that address and arrest the
11  individual.
12  Q  And if the person lives in another state?
13  A  Send a teletype to Pennsylvania?
14  Q  Did you send a teletype to Pennsylvania?
15  A  Yes, I did.
16  Q  Who did you send a teletype to?
17  A  I believe it was -- I'd have to look at
18  the file.
19  Q  There's the file right in front of you.
20  Look away.
21  A  (Reviews documents.) I don't see a
22  teletype of the arrest warrant they sent. I see the
23  entries into the missing persons report. The
24  teletype that was sent to Pennsylvania is not part
25  of the packet.

Case 2:07-cv-04936-MAM   Document 54-23   Filed 10/01/10   Page 6 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 69

Q But you definitely sent personally a teletype?
A I filled out the form based on our procedure and sent it to our department of emergency communications who enters it under our OIR number.
Q And the form you completed is not in that packet either; is that correct?
A That's correct.
Q And you sent the teletype to what Pennsylvania authority?
A Without looking at the OIR number I have no idea.
Q And you contacted three?
A Yes.
Q The state police and they wouldn't get involved. Is there any reason you can think of you would have sent it to them?
A No.
Q You contacted the sheriff's office. They said no. Any reason you think of you would send it to them?
A To Bucks County?
Q Sure.
A Yes. Because they have jurisdiction. I definitely wouldn't have sent it to the state police

Page 70

if that's what you're asking me. Whether I sent it to Newtown or Bucks without looking at the ORI I have no idea.
Q But the teletype you sent out asked them to go to a place and look for the kids or Mr. Bush?
A Yes.
Q Do you recall what was in the teletype?
A To go by the address and check on the wellbeing of the children.
Q At this point you had the warrants; correct? When you sent the teletype?
A No.
Q Did you send a similar teletype after the warrant was issued?
A No.
Q So is it then, correct me if I'm wrong, the extent of you doing anything was call these persons in the pursuit of justice and give them the warrant?
A I didn't give them the warrant. But like I said, it's policy that all felony warrants go to them, and they execute them or try to locate the individuals and serve them.
   MR. PURICELLI: We'll call this Russell 1.

Page 71

   (The aforementioned document was marked for purposes of identification as Deposition Exhibit No. 1.)
BY MR. PURICELLI:
Q I'm showing you (proffered) what's been marked Russell 1. Have you ever seen that document before?
A No.
Q All right. Now, I know it's been a few years but the order you're telling me is you sent a teletype out before you had the warrants.
A I sent a teletype out before I had the warrants and before I talked to Newtown, Bucks County and the state police.
Q Did you send a teletype after the warrants?
A No.
Q All right. Turning to Paragraph 8 of your affidavit indicates that based on the warrants you then sent a teletype?
A (Reviews documents.) That's what it says.
Q All right. Now, I showed you this document before and asked if everything was correct.
A Yes.

Page 72

Q And gave you a chance to correct it if it wasn't; correct?
A That's correct.
Q And that's even highlighted that part; isn't it?
A Yes.
Q And you were able to see the highlighted part even before me asking if everything was correct. Is that true?
A Yes.
Q All right. Now you're telling me differently than what is written in this paragraph?
A That is correct.
Q That the warrants, in fact, existed when you started contacting people?
A Without looking at the teletype I would have no idea. The way I recall it is that the report was filed, the teletype was sent. I contacted Newtown, Bucks County and the state police before the warrants were issued.
Q Okay. And you told me -- and you're under oath here too. During the course of this deposition you have to tell the truth; correct?
A Yes.
Q You said that you spoke to Duffy. In