Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 1 of 6

Deposition of Lieutenant Brian Russell                            Christpher Bush & David Bush V S.C Adams, et al.

Page 73

1 fact, he called you back. You spoke with the
2 sheriff. But you have in Paragraph 9 of your
3 affidavit, based on no response. What did you mean
4 by that?
5   A   (Reviews documents.) No response from
6 help from either of those jurisdictions.
7   Q   So you meant because neither would help
8 you get the kids back? Is that what you meant by
9 that?
10   A   Yes. That's correct.
11   Q   So it brings me back to the question I
12 asked you before. When you asked law enforcement
13 authorities in Bucks County to recover the kids was
14 it based on the warrants, or was it based on the
15 custody order?
16   A   It was based on the custody order.
17   Q   Okay. And you don't recall what the
18 custody order said?
19   A   The custody order gave sole custody to
20 Ms. Bush and sole custody only.
21   Q   In your years of experience, the type of
22 custody order that you had received does it direct
23 the police to go and recover the kids --
24   A   I'd have to look --
25   Q   -- even though the order gives one parent

Page 74

1 --
2   A   I'd have to look at the custody order.
3   Q   I'm asking your experience, not this
4 particular one.
5   A   I'd have to look at the custody order.
6   Q   On your experience in reading these have
7 you ever had one to do that to you?
8       MR. SIMOPOULOS: Asked and answered.
9       MR. PURICELLI: He says he has to look at
10   this one.
11 BY MR. PURICELLI:
12   Q   I'm asking in your experience of these
13 types of orders do they direct the police to go and
14 get the kids?
15   A   Once again, I'll have to look at the order
16 to see what it says. Orders can be different. The
17 wording in them can be different. Forms can be
18 different.
19   Q   In your experience as a policeman have you
20 ever seen that?
21   A   Without looking at the specific order I
22 can't answer that.
23   Q   This wasn't the only order you saw; true,
24 this type of order? We went through that; right?
25   A   As in a protection order?

Page 75

1   Q   Yes.
2   A   I've seen other protection orders, yes.
3   Q   Okay. I'm just asking you in your basic
4 experience with these type of orders have you ever
5 had one say the police are directed to go get the
6 kids, that we've just granted exclusive custody to
7 this parent?
8       MR. SIMOPOULOS: Objection to form.
9 BY MR. PURICELLI:
10   Q   You can answer that.
11       MR. SIMOPOULOS: Do you recall an order
12   with that exact language?
13       THE WITNESS: No. I don't recall an order
14   with the exact language giving the authority to
15   the police to go after the kids.
16 BY MR. PURICELLI:
17   Q   And I know I'm beating this horse, but I
18 want this record to be clear. You just don't recall
19 what this order said other than it gave her
20 exclusive custody?
21       MR. SIMOPOULOS: Objection to form again.
22       THE WITNESS: Once again, if I saw the
23   order to recollect my memory I would be more
24   than happy to answer those questions.
25

Page 76

1 BY MR. PURICELLI:
2   Q   Okay. Now, Paragraph 10 indicates that
3 you contacted the Richmond Field Office of the FBI.
4   A   That's correct.
5   Q   Who did you speak with?
6   A   A female agent. Sarah was her first name.
7 I forget what her last name was.
8   Q   Sarah?
9   A   I think it was Sarah. It was a female
10 agent that would have had duty that particular
11 night. They had a duty agent.
12   Q   We have a Richmond Police Department fax
13 that Adams already talked about. He has a Candice.
14 Do you know anything about that?
15   A   (Reviews documents.) No.
16   Q   Were you present for the call or
17 communications by Adams to Candice?
18   A   I remember the phone call placed to the
19 FBI. I talked to Candice -- I didn't talk to
20 Candice, not Candice. I talked to the people on the
21 answering machine and left a message. I never
22 talked to Candice.
23   Q   But you did talk to Sarah?
24   A   Yes. Which is probably the answering
25 service.

Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 2 of 6

Deposition of Lieutenant Brian Russell                        Christpher Bush & David Bush V S.C Adams, et al.

Page 77

1  Q  So that's not an FBI agent. It's just an
2  answering service?
3  A  Correct.
4  Q  Do you recall what you told the service?
5  A  They have a DI duty agent. I can't
6  remember if I had a call or I called Sergeant Adams,
7  but I didn't talk to anybody at the FBI that night.
8  Q  Okay. Now, just to backtrack a little
9  bit. When you talked with the Commonwealth Attorney
10 she said if you can't recover the kids I'll approve
11 a warrant. Did I hear that correctly?
12 A  That's correct.
13 Q  Did you ever contact her back?
14 A  Yes.
15 Q  When? After all the calls to Bucks County
16 and teletypes?
17 A  After the teletypes and calls to Bucks
18 County, yes.
19 Q  What did she say?
20 A  Well, we were on speaker phone with
21 Sergeant Adams, and she authorized Sergeant Adams to
22 go obtain the warrants.
23 Q  Did she identify the charge to bring?
24 A  I don't recall. I know it was a felony
25 charge if that's what you're asking me.

Page 78

1  Q  I just want to know if she told you what
2  to charge the person with. He ultimately was
3  charged with conspiracy and abduction by a parent.
4  Were you aware of that?
5  A  (Reviews documents.) That's correct. It
6  looks like it's abduction and conspiracy to abduct;
7  yes, that's correct.
8  Q  Now, in Virginia does conspiracy require
9  two or more people agreeing to do something?
10 A  Correct.
11 Q  Who was the second person Mr. Bush was
12 agreeing with?
13 A  I have no idea.
14 Q  And in the course of your discussions with
15 the Commonwealth Attorney what information did you
16 hear that Mr. Bush was agreeing to do something
17 illegal?
18 A  I didn't have that conversation with the
19 Commonwealth Attorney about the specific charges to
20 charge Mr. Bush. That would have been Sergeant
21 Adams.
22 Q  I understand. But all the conversations
23 that you had with the Commonwealth Attorney did you
24 provide any information to the Commonwealth Attorney
25 to say that David Bush was agreeing with some other

Page 79

1  person in the world to commit a crime?
2  A  Did I personally, no.
3  Q  Okay. Did Sergeant Adams come up to you
4  at any time and provide you with any information
5  that the investigation led him to believe that
6  Mr. Bush was agreeing with some other person in the
7  world to do some illegal crime?
8  A  Not to me but to the Commonwealth
9  attorney.
10 Q  I beg your pardon?
11 A  Not to me but to the Commonwealth
12 attorney.
13 Q  Were you present for that conversation?
14 A  Yes.
15 Q  What did Sergeant Adams tell the
16 Commonwealth Attorney?
17 A  That Mr. Bush's brother accompanied him
18 down to Virginia to retrieve those children.
19 Q  Did you see any records to indicate the
20 brother was in Virginia?
21 A  No, sir.
22 Q  So the only evidence that you're aware of
23 is Sergeant Adams saying that David Bush's brother
24 came to Virginia. Do I understand that correctly?
25 A  That when Mr. Bush came to Virginia to

Page 80

1  pick his children up, alright, Mr. Bush's brother
2  accompanied him.
3  Q  Okay. Do you know whether anybody ever
4  saw David Bush's brother in Virginia at that time?
5     MR. SIMOPOULOS:  Objection. Calls for
6     speculation.
7     THE WITNESS:  That I don't know.
8  BY MR. PURICELLI:
9  Q  Aside from what you told me you know of no
10 other reason David Bush was charged with conspiracy?
11 A  No.
12 Q  Now, it indicated in your Paragraph 10
13 that that entity, meaning the FBI, however, did not
14 act immediately. Did I read correctly?
15 A  Correct.
16 Q  What do you mean by that?
17 A  They didn't act that night.
18 Q  Okay. When did they act?
19 A  I don't think they ever acted.
20 Q  Why didn't you say that? They didn't act
21 at all instead of not immediately?
22 A  I have no -- I wasn't involved in this
23 with the FBI after initial contact.
24 Q  So would it be true, Lieutenant, that you
25 have no knowledge that the FBI acted on anything?

Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 3 of 6

Deposition of Lieutenant Brian Russell                Christpher Bush & David Bush V S.C Adams, et al.

Page 81

1  A   On anything? That's correct.
2  Q   Okay. You say, Therefore, I contacted two
3  Richmond Police Officers who are members of the
4  United States Marshal Service Fugitive Task Force.
5  I'm paraphrasing. Did I read that essentially
6  correct?
7  A   Yes.
8  Q   Are those two people you mean, Leadbetter
9  and Pendergrast?
10  A   That's correct.
11  Q   It says, I requested these officers'
12  assistance in arresting Bush and returning the Bush
13  children to Virginia in accordance with JDR Court
14  Orders. The conversation took place in Virginia.
15  Did I read that correctly?
16  A   (Reviews document.) Uh-huh.
17  Q   How did you ask for their assistance?
18  A   In contacting the marshals in Pennsylvania
19  and arresting Mr. Bush and returning those children.
20  Q   Was it your intent to have someone in
21  Pennsylvania to arrest Mr. Bush?
22  A   Was it my intent?
23  Q   Yes. By contacting the U.S. Marshals
24  Office was it your intent to have someone in
25  Pennsylvania arrest him?

Page 82

1  A   Based on a valid warrant, yes.
2  Q   Okay. And you weren't looking anywhere
3  else in the United States other than Pennsylvania
4  for him?
5  A   At this point, that's correct.
6  Q   So it wasn't by chance you were looking in
7  Pennsylvania?
8  A   I wasn't looking in Pennsylvania. The
9  Fugitive Task Force was looking in Pennsylvania.
10  Q   Did you tell them to look in Pennsylvania?
11  A   We provided them with the address that was
12  on the warrant.
13  Q   Did you tell them to look in Pennsylvania?
14  A   Yes, of course.
15  Q   Did you tell them to look anywhere in the
16  United States for him other than Pennsylvania?
17  A   No.
18  Q   So it wasn't by chance that you were
19  directing someone in Virginia to have someone in
20  Pennsylvania arrest Mr. Bush in Pennsylvania?
21  A   I was communicating with our U.S. Marshal
22  Service. As protocol the address on the warrant and
23  any information of the whereabouts of Mr. Bush or
24  those children would have been provided to the U.S.
25  Marshal Service for follow-up by them. I do not

Page 83

1  have the authority to direct anybody in Pennsylvania
2  or the U.S. Marshal Service to arrest anybody
3  outside of my jurisdiction. They have the authority
4  to do that. I do not.
5  Q   You went to them because you didn't have
6  the authority to arrest Mr. Bush in Pennsylvania.
7  Is that true?
8  A   That's correct.
9  Q   So you went to somebody you thought did?
10  A   Yes.
11  Q   And you directly used their authority to
12  have Mr. Bush arrested in Pennsylvania; correct?
13     MR. SIMOPOULOS: Objection to form.
14     THE WITNESS: No. Once it's turned over
15  to the marshals they get the warrant. They get
16  the address. They do everything. You have no
17  authority over the U.S. Marshals.
18  BY MR. PURICELLI:
19  Q   Why did you go to the two officers that
20  were Richmond Police Officers as opposed through
21  channels?
22  A   That is our protocol. They are our
23  detectives that are cross designated as U.S.
24  Marshals. Every warrant that we have, felony, that
25  comes out of our division or anywhere in the

Page 84

1  department is turned over to the marshals for follow
2  up.
3  Q   Does protocol require them to clear with
4  the U.S. Marshal's office, the use of the Marshal's
5  office to facilitate arrests from Richmond?
6     MR. SIMOPOULOS: Objection. Lack of
7  foundation.
8     THE WITNESS: I have no idea of the
9  protocol. My understanding is between the U.S.
10  Marshals and the Richmond Police Department.
11  BY MR. PURICELLI:
12  Q   Now, you say here, Upon information and
13  belief these officers arranged for plaintiff's
14  arrest. If you don't know what the protocols are
15  why do you put that in Paragraph 12?
16  A   Because after his arrest they did.
17  Q   What information did you have?
18  A   That they contacted the Marshal's office
19  in Philadelphia and passed the information onto
20  them.
21  Q   How did you get that information?
22  A   They provided it to me.
23  Q   Who did?
24  A   Detective Leadbetter and Pendergrast.
25  Q   Both of them did?

Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 4 of 6

Deposition of Lieutenant Brian Russell                            Christpher Bush & David Bush V S.C Adams, et al.

Page 85

1  A   I can't recall which one, but I know it
2  came from one of our representatives in the U.S.
3  Marshals Office that they forwarded the lead to
4  Pennsylvania.
5      Q   Did you make the contact with them, or did
6  they make the contact with you to give you that
7  information?
8      A   They made the contact with me.
9      Q   How long a time passed from when you went
10 to them with the warrants that they called you to
11 give you this information?
12     A   Well, number one, as protocol I passed
13 felony warrants onto them for follow up with the
14 U.S. Marshals under their protocol.  So I did not
15 direct them to go to Pennsylvania to arrest
16 Mr. Bush.  I turned this over as policy like we do
17 on all felony warrants to give them for follow-up
18 with the U.S. Marshals Office.
19     Q   Was there anyplace else in the whole
20 United States that you gave them information about
21 other than Pennsylvania?
22         MR. SIMOPOULOS:  Objection.  Asked and
23     answered.  You don't have to answer the
24     question again.  You don't have to.  This is
25     becoming harassing.

Page 86

1          MR. PURICELLI:  It's not harassing.  He's
2      avoiding the question.
3          MR. SIMOPOULOS:  It is.  You asked the
4      question once already.  Twice actually.
5          MR. PURICELLI:  Actually three times.
6  BY MR. PURICELLI:
7      Q   What was your belief that these officers
8  arranged for the plaintiff's arrest?
9      A   They called me and said they passed the
10 lead onto the marshals office in Philadelphia I
11 believe as protocol.  Just the way for marshals
12 office receives other leads on other marshals
13 offices throughout the country.
14     Q   Do you know the outcome of the arrest
15 charges?
16     A   I understand they were dismissed or nol
17 pros'ed.
18     Q   How did you come to that understanding?
19     A   Sergeant Adams told me or maybe the
20 Commonwealth Attorney, Mary Langer, told me.
21     Q   What's normal protocol when a felony
22 warrant is turned over to the U.S. Marshals Office?
23 An arrest is made and the person is brought back to
24 Richmond.  What occurs after that?
25     A   A trial.

Page 87

1      Q   If there's no trial?
2      A   Hearing.  What do you mean if there's no
3  trial?
4      Q   Do you know if there was a trial?
5      A   I don't know.  I don't know if there was.
6      Q   How do you learn the disposition in the
7  ordinary course of business?
8          MR. SIMOPOULOS:  Objection to form.  You
9      can answer.
10         THE WITNESS:  The individual investigators
11     who are assigned the case will tell us.
12 BY MR. PURICELLI:
13     Q   You don't receive any kind of paperwork
14 from anybody?
15     A   No.
16     Q   Is there any disposition form you're
17 required to complete for the FBI on an arrest?
18     A   No.  Disposition form on the court case?
19     Q   Sure.  When a person is arrested you have
20 to fingerprint them; correct?
21     A   Are you asking me the procedure after
22 somebody's arrested?
23     Q   No.  I just want to know if you know what
24 forms exist.  And obviously you do know people are
25 fingerprinted?

Page 88

1      A   Correct.
2      Q   And I assume after all these years in the
3  police department you're aware that there's a
4  disposition sheet that's sent into the FBI?
5      A   Optical CCR Form, yes.
6      Q   And that disposition sheet is required to
7  be filled out by the originating agency.  In this
8  case, Richmond Police; true?
9      A   Once again, you know, that's not my realm
10 of responsibility.  I don't know who fills those out
11 and who sends those to the FBI.  But I know that
12 fingerprint cards and arrest sheets are sent to the
13 FBI and state police.
14     Q   Okay.  So in your years of experience
15 you're not aware of the actual mechanism how the
16 City's required to notify you so you can fulfill
17 your duty to the FBI --
18         MR. SIMOPOULOS:  Objection to form.
19         THE WITNESS:  Not me.
20 BY MR. PURICELLI:
21     Q   Not you personally.  The police
22 department.
23     A   I'm not familiar once that CCR goes to the
24 Court.  Because it does go to the Court.  I don't
25 think it comes back to us after it goes to the

Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 5 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 89

1  Court.
2  Q  Did Sergeant Adams tell you why the
3  charges did not result in a trial or a conviction?
4     MR. SIMOPOULOS: Objection to form.
5     THE WITNESS: I don't remember that. I
6  don't remember whether he did or he didn't.
7  BY MR. PURICELLI:
8  Q  You weren't present for any of the
9  hearings; correct?
10 A  No.
11 Q  Did you speak to anyone from Luzerne
12 County?
13 A  No.
14 Q  From Tioga County?
15 A  No.
16 Q  Did you speak to anyone from Mansfield
17 State Police?
18 A  No.
19 Q  Did you speak to anyone from Montoursville
20 State Police?
21 A  No.
22 Q  Did you speak to Captain Mark Segal?
23 A  No.
24 Q  Do you know who he is?
25 A  Yes.

Page 90

1  Q  Who is he?
2  A  He's the captain who took the missing
3  person report.
4  Q  Are those the three forms that we have
5  there?
6  A  That is correct.
7  Q  Is it usual for a captain on night watch
8  to take a missing child report?
9  A  No.
10 Q  Why would the captain be taking this as
11 opposed to a patrol officer?
12 A  I have no idea.
13 Q  Did you have any conversations with
14 Captain Mark Segal about the Bush incident: The
15 arrest, the missing children report?
16 A  No.
17 Q  Ordinarily a person comes in and reports a
18 child missing. How is that assignment taken and
19 delegated to someone under the procedures of the
20 police department?
21 A  It comes into Youth Services Department,
22 and if there's a detective working that particular
23 night it's assigned to that detective who
24 immediately responds to follow up. If it comes in
25 after hours it would have been assigned the

Page 91

1  following day unless there was really unusual
2  circumstances. If the kid's a 2-year old or a
3  10-year old we would send somebody out after hours
4  if they were 10 or below.
5  Q  Okay. Assume this is unusual
6  circumstances, and assume nobody from Youth Services
7  is there. That means it's not going to be delayed
8  until the next morning. It's going to be handled
9  immediately; correct?
10 A  Correct.
11 Q  What would happen next?
12 A  Sergeant Adams would assign a detective to
13 follow up on it or handle it himself.
14 Q  I'm talking about the initial report when
15 the report comes in?
16 A  Oh. We don't do the initial reports.
17 Q  That's what I'm trying to get to.
18 A  The uniform officer does the initial
19 report.
20 Q  And Captain Segal is not a uniform
21 officer?
22 A  Yes, he is.
23 Q  He's a high ranking officer; isn't he?
24 A  I believe at that time, watch commander.
25 Q  He's in charge of all the divisions in the

Page 92

1  city?
2  A  Yes.
3  Q  I call them divisions.
4  A  We call them precincts. But he was in
5  charge of the city at the time.
6  Q  And because I'm not familiar with the
7  police department each precinct has a commander in
8  charge of that precinct?
9  A  That's correct.
10 Q  What rank is that person?
11 A  Commander which is the captain.
12 Q  Would he have an administrative
13 lieutenant, a person who does the paperwork?
14 A  Yes.
15 Q  And a captain wouldn't go out doing
16 patrol, but taking reports, answering bank alarms,
17 things of that; correct?
18 A  At a precinct?
19 Q  Yes.
20 A  Usually not but they have in the past.
21 Q  And night command, which is what I'm
22 referring to the sergeant. He made sure all the
23 precincts were working; correct?
24 A  Correct.
25 Q  And each has an area of responsibility, a

Case 2:07-cv-04936-MAM   Document 54-24   Filed 10/01/10   Page 6 of 6

Deposition of Lieutenant Brian Russell                    Christpher Bush & David Bush V S.C Adams, et al.

Page 93

1 district?
2   A   Right.
3   Q   And the captain would know basically from
4 the complaint and say they live in which precinct or
5 district to send that person to?
6   A   Yes.
7   Q   How many times does night command take in
8 complaints, incidents?
9       MR. SIMOPOULOS:  Objection. Calls for
10      speculation.
11 BY MR. PURICELLI:
12  Q   In your experience?
13  A   They have in the past maybe once a week,
14 once every two weeks.
15  Q   What type jobs are you familiar with
16 taking in?
17  A   They're actually the highest official at
18 night.
19  Q   I understand that. I understand that.
20  A   There's reports that they have to do.
21 They have to take complaints, complaints against
22 officers. They have to follow up. If you're asking
23 me if it's unusual for a captain to take a report
24 like this?
25  Q   I am.

Page 94

1   A   The answer would be yes.
2   Q   This is essentially a missing child
3 complaint. And children are important but under
4 these facts and circumstances why would that not be
5 assigned to the precinct?
6   A   You have to ask Captain Segal.
7   Q   Good suggestion. And Captain Segal never
8 contacted you?
9   A   Never contacted me, no.
10  Q   And you're the person in charge of
11 Children Services Unit?
12  A   Correct.
13  Q   What is the chain of command you follow?
14  A   I have a Chief, Assistant Chief, Major of
15 Support Services, Captain of Major Crimes Division
16 and then three lieutenants. At that time I was
17 Lieutenant of Major Crimes who oversees Youth
18 Services.
19  Q   Is it usual for a captain not to contact
20 you about a matter that you overlooked?
21  A   He wouldn't have contacted me on this
22 matter.
23  Q   Why?
24  A   That's not protocol. He would have
25 contacted a Youth Services detective or a sergeant

Page 95

1 with Youth Services.
2   Q   He wouldn't have gone through you?
3   A   No.
4   Q   Is there anyone you spoke to in regards to
5 any of the matters we've talked about today that we
6 haven't discussed?
7   A   No.
8   Q   Any documents you're aware of that exist
9 that you haven't seen today?
10  A   No.
11  Q   Have you seen the Pennsylvania court
12 orders?
13  A   I don't recall without looking at them.
14  Q   So there could be documents?
15  A   I don't recall reading any of them, but it
16 doesn't mean I didn't.
17  Q   Did you receive any teletypes from the
18 Pennsylvania State Police?
19  A   No.
20  Q   Did anybody tell you they received
21 teletypes from Pennsylvania State Police?
22  A   No.
23  Q   Did anybody tell you they spoke with
24 somebody with the Pennsylvania State Police?
25  A   No.

Page 96

1   Q   Did anybody tell you they spoke with
2 anybody with any law enforcement in Pennsylvania?
3   A   Yes.
4   Q   Who?
5   A   U.S. Marshals.
6   Q   And who at the U.S. Marshals?
7   A   I have no idea.
8   Q   All right. This unknown marshal said
9 what?
10  A   If you're asking me do I have any
11 knowledge of any conversations that Detective
12 Leadbetter and Pendergrast had as a result of the
13 lead to Pennsylvania?
14  Q   We'll start with that one.
15  A   Yes. I know they spoke to U.S. Marshals
16 in Pennsylvania.
17  Q   But you don't know who they talked to?
18  A   No.
19  Q   Aside from that conversation are you aware
20 of any other conversations with any law enforcement
21 entity in Pennsylvania that we haven't talked about
22 today?
23  A   No.
24  Q   And your job to supervise Sergeant Adams
25 included when he seeks warrants; is that right?