## Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID BUSH and CHRISTOPHER BUSH : ACTION NO. 07-4936
: 
Plaintiffs, :
:
vs. : ORAL DEPOSITION of
: KENNETH HILL
S.C. ADAMS, LT. BRIAN RUSSELL, (RICHMOND CITY, P.D., VIRGINIA) and KENNETH HILL, STEVEN J. IGNATZ, SERGEANT TRIPP, (PA STATE POLICE), and SARA NICOLE BUSH, a/k/a SERENE ISARA ISABELLA, a/k/a SARA NICOLE MONSERRATE, a/k/a SARA NICOLE BUSH :
:
Defendants. :

* * * * *
APRIL 15, 2010
* * * * *

Transcript in the above matter taken before Cindy Liffman, Shorthand Reporter and Notary Public of the State of Pennsylvania, at the Law Offices of the Attorney General, 1000 Madison Avenue, Pennsylvania, commencing at 10:00 a.m.

BUCKS COUNTY COURT REPORTERS, INC.
99 LANTERN DRIVE
DOYLESTOWN, PENNSYLVANIA 18901
(215) 348-1173

## Page 2

APPEARANCES

BY: BRIAN PURICELLI, ESQUIRE
691 Washington Crossing Road
Newtown, Pennsylvania 18946
Attorney for the Plaintiff

OFFICE OF THE DISTRICT ATTORNEY
BY: RANDALL J. HENZES, ESQUIRE
21 S. 12th Street
3rd Floor
Philadelphia, Pennsylvania 19107-3603
Attorney for the Defendant

## Page 3

| WITNESS | | PAGE |
|---|---|---|
| KENNETH HILL | | |
| By Mr. Puricelli | | 4 |

### EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Hill 1 | Use of Force Form | 88 |
| Hill 2 | Fax | |
| Hill 3 | Letter | 105 |
| Hill 4 | News Print | 110 |
| Hill 5 | Report | 140 |
| Hill 6 | Internal Investigation | 187 |
| Hill 7 | Missing Person Check List | 200 |
| Hill 8 | Petition for Gruber Hearing | 208 |
| Hill 9 | Petition for Custody | 208 |
| Hill 10 | Memo | 218 |
| Hill 11 | 201 Form | 224 |
| Hill 12 | Complaint | 269 |
| Hill 13 | Answer | 269 |

## Page 4

(It is agreed by and between counsel that all objections, except as to the form of the question be reserved until the time of trial.

-----

KENNETH HILL having been duly sworn, was examined and testified as follows:

-----

BY MR. PURICELLI:

Q. Mr. Hill, you were here for the depositions in January, correct?

A. Correct.

Q. Did you hear the instructions that I gave to those persons that I was deposing that day?

A. I did, sir but I can't say that I recall them.

Q. All right. I'll give them to you again. I will give you a question. And hopefully, it will be articulated in a manner that you can understand it. I would ask you to wait until I finish the question before you answer. I will try my best not to interrupt any of your answers. If I do, let me know because I want for you to be able to answer your questions. If I ask however, a question that you don't understand, please tell me that you don't understand my question. I'll try and rephrase it.

MR. PURICELLI: We do have the normal

5

1  stipulations?  That is fine?
2         RAN yeah.  That is fine.
3         MR. PURICELLI:  What we just agreed to is
4  that all objections are received except for two that can
5  be raised here.  One is as to the form of a question.
6  The other one is privilege.
7         If Randy was to argue or raise an objection
8  as to privilege, we will try to find out what it is and
9  we'll avoid the question.  You don't have to answer.
10 Unless Randy specifically tells you not to answer the
11 question, you'll answer all the questions.
12        If Randy raises an objection to the form of
13 the question, his interpretation of the question may
14 have more than one meaning, we'll try to rephrase it if
15 you don't understand it.  If we have a common
16 understanding of a question, I'll ask you to answer it.
17        You generally don't have a right to turn to
18 your attorney during your deposition and ask questions
19 whether you should or should not answer or on how to
20 answer the deposition, similar to being on the stand.
21 You're asked a question.  You answer it to the best of
22 your information, knowledge and belief.  Don't guess.
23 If you don't know something, don't answer it as if you
24 had knowledge.  Tell me it's a guess.  Tell me you are
25 estimating but don't answer it as if you have knowledge.

6

1  So, don't guess.  Your counsel is not going to want you
2  to guess.
3         If you don't know something, if you don't
4  recall something, it's perfectly all right to say you
5  don't recall something.
6         If during the deposition you recall the
7  information that you didn't remember before, let us
8  know.  We can go back and you can let us add that
9  information.
10        Anything you want to add?
11        MR. HENZES:  No.
12        MR. PURICELLI:  Okay.  Read and sign?
13        MR. HENZES:  No.
14        MR. PURICELLI:  Do you have any questions,
15 Mr. Hill?
16        THE WITNESS:  No.
17 BY MR. PURICELLI:
18   Q.  Okay.  All right.  Prior to coming here, did you
19 speak with anyone about what might be asked of you at
20 this deposition?
21        MR. HENZES:  In respect to his counsel?
22        MR. PURICELLI:  Well, he'll say your
23 attorney.  I'm not going to ask any questions.  Did you
24 speak with anyone about what might be discussed or
25 conducted during this deposition today?

7

1   A.  I spoke with my attorney.  I spoke with Sergeant
2  Tripp.  I spoke with Corporal Wheeler.
3   Q.  When did you speak to Tripp?
4   A.  Yesterday and this morning.
5   Q.  Who initiated the conversation?
6   A.  Who initiated the conversation?  I did.
7   Q.  And why did you speak to Tripp?
8   A.  To verify my thoughts.
9   Q.  What thoughts?
10  A.  Concerning the appearance by David Bush at the
11 Mansfield Station, I believe in August, with the
12 materials that he provided to us.
13  Q.  He being David Bush?
14  A.  Correct.
15  Q.  You were not present when David appeared at any
16 time at the Mansfield Barracks; is that correct?
17  A.  Correct.
18  Q.  Why did you need to talk to Tripp about that?
19  A.  Why?  Because I felt the need to find out what
20 occurred.
21  Q.  Okay.  Did you have any knowledge before
22 yesterday speaking with Tripp about that, those visits?
23 Did you have any knowledge?  Did you read something
24 because we know you weren't there.  Did you read
25 something about those visits before?

8

1   A.  Yes.
2   Q.  Any reason you couldn't go back and reread
3  whatever it was you read before?
4   A.  I did reread what I read before.
5   Q.  Why do you need to have a conversation with
6  another person about an incident you knew nothing about
7  personally?
8   A.  Because I felt that need.
9   Q.  Okay.  Tell me why.
10  A.  I don't know that I can tell you why I felt that
11 need.
12  Q.  Prior to speaking with Trip, let's strike that
13 question.
14        What did Tripp tell you?
15  A.  That he confirmed what I understood and what was
16 written in the report.
17  Q.  Which was what?
18  A.  That Mr. Bush appeared in August at the Mansfield
19 Station, dropped off the various items that he did.
20  Q.  What was the struggle in your mind to have to
21 know that he showed up in August to drop materials off?
22  A.  I don't know how to answer that.  I felt the
23 need.  I wanted to talk to him about that issue.
24  Q.  Is that the only thing the two of you talked
25 about, that August visit by Mr. Bush to drop off

## Page 9

1 material?
2  A. Yes.
3  Q. And the materials would have been the information related to the missing children?
5  A. Yes.
6  Q. Was that the only thing the two of you talked about related to this case?
8  A. It's best of my knowledge, yes.
9  Q. You said you also talked to Wheeler, I thought?
10 A. Corporal Wheeler.
11 Q. And he is from where?
12 A. Mansfield.
13 Q. And when did you talk with him again?
14 A. Yesterday.
15 Q. And why did you talk to him? Who initiated that conversation?
17 A. I did.
18 Q. Why did you initiate that conversation with Wheeler?
20 A. I wanted to confirm some thoughts in my mind.
21 Q. What were the thoughts in your mind?
22 A. He and I conversed at some point during the investigation.
24 Q. That simply, the two of you had talked?
25 A. (The witness nods head in the affirmative.)

## Page 10

1  Q. During which investigation?
2  A. The IAD investigation.
3  Q. That would have been related to the Christopher Bush complaint about Tripp?
5  A. Correct.
6  Q. Okay. And what was it that you were struggling with? Whether you did or didn't have conversations with him?
9  A. No. I thought I did. I just wanted to confirm in his mind that he recalled the conversation.
11 Q. What conversation do you believe you had with him?
13 A. We discussed various points in the investigation, a conversation with the District Attorney, the District Attorney's involvement.
16 Q. Okay. And did you have any conversations yourself with the District Attorney of either county?
18 A. I did not.
19 Q. Okay. And what, if anything, did Corporal Wheeler tell you yesterday?
21 A. Confirmed our conversation.
22 Q. Is that all he said, yes, you did talk?
23 A. No. I think he probably used more, more words than that. That was the conversation.
25 Q. Tell me what he told you?

## Page 11

1  A. I thought I just did.
2  Q. You said that in a conclusionary form. Tell me what words he used.
4  A. I don't recall the exact words.
5  Q. In your best recollection since it was just yesterday, tell me what he told you?
7  A. He confirmed the fact that we had a discussion concerning the investigation.
9  Q. Specifically, he said what?
10         MR. HENZES: He told you he recalls specifically.
12         MR. PURICELLI: That is a fair enough objection.
14 BY MR. PURICELLI:
15 Q. The point is, it's just yesterday. Are you telling me that Corporal Wheeler yesterday said yes, we did talk about the district attorney or did he use other words?
19 A. I think that's the gist of the words he used. To try to lay them out exactly would be problematic. I remember those are the gist of the words he used.
22 Q. As problematic as that may be, I need to know.
23         MR. HENZES: He just told you. You two can go back and forth and she can make a lot of money but...
25 BY MR. PURICELLI:

## Page 12

1  Q. It was only yesterday, Mr. Hill.
2     Now, in your lifetime, have you had any difficulty recalling events as they occurred for long periods or short periods?
5  A. Absolutely.
6  Q. All right. When did you first recognize your ability to recall events that happened within a short period of time, say, within the last twenty-four hours, start to become a concern to you?
10 A. It's never of a concern to me.
11 Q. When did you first notice your ability to recall what people told you, specifically a day before, in a conversation that you started, you couldn't recall what they said, only the gist of what they said?
15 A. I think I can say that for a lifetime, to be able to remember word for word verbatim, a conversation with somebody I had a conversation with three two to three hours previously, I've never been able to do.
19 Q. Would that be true then for either a short period of time, like, twenty-four hours versus a long period of time, like, two years?
22 A. I'm sorry. One more time.
23 Q. Your notation that you struggled with the ability to recall what people tell you word for word, okay, if I understand your testimony, you said you noticed that

**Page 13**

1 your entire life?
2 A. Yeah. Unless I write down a conversation or take
3 notes of a conversation, to be able to recall that
4 conversation word for word within twenty-four hours, I
5 don't think I could do and do it with accuracy if you
6 compared what I said and what is on a tape recorder.
7 Q. Would that be true that you neither wrote notes
8 of yesterday's conversation or recorded them?
9 A. Correct.
10 Q. Did you review anything to prepare for today's
11 deposition?
12 A. Yes.
13 Q. Okay. Aside from the two individuals we talked
14 about, you talked to no one else. True?
15 A. My attorney.
16 Q. I'm not going to ask you anything about your
17 attorney. What did you review to prepare for today?
18 A. Many items contained in that folder.
19 Q. Well, I don't know what items you brought to this
20 deposition. Why don't you tell me what you brought to
21 the deposition?
22 A. Would you like me to go through?
23 Q. Sure.
24 A. My testimony at the arbitration hearing.
25 Q. Okay.

**Page 14**

1 A. Correspondence to Newtown Township Supervisors.
2 Q. Are those the July 31st correspondence?
3 A. Correct, complaints, a verification completed by
4 Christopher Bush.
5 Q. What is known as State Police 301 Form?
6 A. No, sir. It's the State Police 1-108, Complaint
7 Verification.
8 Q. Okay.
9 A. Correspondence to Detective Bush.
10 Q. What was the date of the correspondence?
11 A. July 31st. Court order issued on 23, October
12 2006.
13 Q. From what court?
14 A. Luzerne County.
15 Q. Correspondence from Tony Ignatz to Chief Duffy.
16      MR. HENZES: Dated?
17      THE WITNESS: June 6th.
18      MR. HENZES: What year? You said June 6th.
19      THE WITNESS: '08. I'm sorry, June 6th of
20 2007.
21 BY MR. PURICELLI:
22 Q. Which?
23 A. 4/25. 101 submitted by Detective Bush to IAD,
24 dated 11/19/06.
25 Q. Just for the record, can you identify what the

**Page 15**

1 State Police 101 Form is?
2      MR. HENZES: The title?
3      MR. PURICELLI: The title.
4      THE WITNESS: Use of Force Complaint,
5 Complaint, Reception, Processing.
6      Correspondence to Mr. and Mrs. Bush from the
7 District Attorney, Tyler County, dated April 26th, 2006.
8 BY MR. PURICELLI:
9 Q. Is that the one for the grandparents?
10 A. I don't know who Mr. and Mrs. Bush are.
11 Grandparents, I would assume.
12 Q. Attached to that was, appears to be a CLEAN
13 record with some drawings and sketches and markings?
14 A. Yeah, yeah.
15 Q. Okay.
16 A. Another copy of Chief Duffy's letter.
17 Q. July 31st or is that the one from Ignatz?
18      MR. HENZES: Ignatz.
19      THE WITNESS: Ignatz.
20      MR. PURICELLI: December?
21      THE WITNESS: June 6th, 2007. The
22 assignment report completed by Trooper McDermott on
23 10/23, 10/23/2006, correspondence from Lieutenant Hile
24 to me dated July 21st, 2007.
25      Another copy of that.

**Page 16**

1 BY MR. PURICELLI:
2 Q. 24?
3 A. 4/25.
4 Q. 4/25?
5 A. 4/25. The incident report dated 1/31/06
6 submitted by Trooper Wizner.
7 Q. Is that in regard to the contact with Mrs. Bush?
8 A. That is in regards to the investigation that he
9 conducted regarding the complaint made by David Bush.
10 Q. Okay.
11 A. Various Lexis-Nexis material.
12 Q. Which would be what?
13 A. The Lexis-Nexis material, Primary Municipal
14 Police Jurisdiction, Statewide Municipal Police
15 Jurisdiction, Sections AI52 and AI53, Title 42.
16 Q. These particular two documents, who did the
17 research for that, the Lexis-Nexis, the legal research
18 base, right?
19 A. The office of the Chief Counsel provided them to
20 me.
21 Q. And when did you contact the office of Chief
22 Counsel to ask them to do legal research for you?
23 A. I think it was prior to the January depositions.
24 It was prior to the January depositions, if I recall
25 correctly.

**Page 17**

1  Q. Can I see the documents, please?
2  A. The dates of which I'm not sure.
3     It's up to my attorney.
4        MR. HENZES: Yeah. Go ahead. He has asked
5  to look at public records.
6        THE WITNESS: Actually, I don't think I'm
7  the one that made a request for the research. I think
8  it was my counsel and my attorney requested OCC and the
9  meeting with them.
10        MR. PURICELLI: We're going to ask about
11 that in a second.
12 BY MR. PURICELLI:
13    Q. You were saying that you think that this legal
14 research was asked by someone else?
15    A. Yes.
16    Q. Who?
17    A. Mr. Henzes.
18        MR. HENZES: I'm just going to object to any
19 of the contents of the conversation.
20 BY MR. PURICELLI:
21    Q. So, it's true then you had this discussion about
22 this legal research with Chief after the litigation
23 against you had already been initiated?
24        MR. HENZES: You can answer that question.
25        THE WITNESS: I had a -- yes. That would be

**Page 18**

1  true.
2  BY MR. PURICELLI:
3     Q. Okay. Not talking, not discussing the matters
4  with Mr. Henzes, did you go to Chief Counsel's office
5  and make the request for this particular research?
6     A. No. I was in the Chief Counsel's office when the
7  request was made.
8     Q. Oh, I see. Okay. I see. Not to interfere with
9  the attorney-client privilege so, you were in the Chief
10 Counsel's office to speak to Mr. Henzes about this
11 lawsuit, yes or no?
12    A. Correct.
13    Q. Okay. Don't tell me what the two of you talked
14 about.
15        MR. HENZES: That assumes that's in the
16 question.
17        MR. PURICELLI: Well, if it wasn't about
18 this case, I'd be free to ask about it. That is why I
19 asked, so I know.
20        MR. HENZES: No, not necessarily. We could
21 have other matters.
22        MR. PURICELLI: Let me clear that up so we
23 know if it's a privileged area or not. I'm sure it is.
24 BY MR. PURICELLI:
25    Q. Do you have any other legal matters that would

**Page 19**

1  require you to talk with Mr. Henzes?
2     A. No.
3     Q. All right. So, if I understand, you don't have
4  any other legal, right?
5     A. Do I have any other legal? Can you repeat the
6  question?
7     Q. Sure. I want you to fully understand this
8  question. Let me give you the framework so you know
9  where I'm coming from. This is not a guess.
10       There are privileges that I told you about. One
11 is attorney-client. I'm sure you know about that?
12    A. Yes, right.
13    Q. You go to an attorney and you seek legal advice,
14 it's limited advice, legal advice, not just chitchat, a
15 discussion between you and an attorney is privileged.
16 I'm not entitled to know about it.
17    A. Okay.
18    Q. So, you were speaking or at least present in
19 Chief Counsel office, correct?
20    A. Correct.
21    Q. I am assuming from my questions, please tell me
22 if I'm wrong?
23    A. I got that.
24    Q. That you were in there because you were seeking
25 legal advice about some legal matter?

**Page 20**

1     A. Correct.
2     Q. I don't need to know what it is, but I'm
3  assuming, tell me if I'm wrong, that legal matter was
4  this case?
5     A. Correct.
6     Q. I wanted to know, based outside Mr. Henzes'
7  information that there could be other things whether
8  there was anything else that would have put you in that
9  room speaking with Mr. Henzes or even the Chief
10 Counsel's office, that would have dealt with any other
11 legal matter you needed advice on?
12    A. No.
13    Q. All right. Now, during that conversation, during
14 that presence, was it you doing the talking to the Chief
15 Counsel Mr. Henzes?
16    A. I believe it was Mr. Henzes about this issue.
17    Q. About this case or this issue?
18    A. This issue.
19    Q. The two cases that cite 8952 and 8953, correct?
20    A. Correct.
21    Q. Do you recall the date?
22    A. No.
23    Q. But it was before the January deposition?
24    A. I believe that was, yes.
25    Q. And that was January 2010?

## Page 21

1  A. Correct.
2  Q. Do you recall approximately when those cases,
3  those two research topics were given to you?
4  A. That day.
5  Q. The same day?
6  A. Right.
7  Q. Who gave it to you?
8  A. I believe it was passed around from the Chief
9  Counsel who produced it to me, handed it to me. Whose
10  hands it came from, I don't recall.
11  Q. Who was the Chief Counsel present?
12  A. Kelly Neary.
13  Q. Is that N-E-A-R-Y?
14  A. I think so, yes.
15  Q. Randy will laugh because he knows I'm a terrible
16  speller.
17         MR. HENZES: Fortunately, it's well
18  documented.
19         MR. PURICELLI: Yes, it is.
20  BY MR. PURICELLI:
21  Q. All right. We were going through your pile of
22  what you reviewed before today's deposition?
23  A. GI reports submitted by Trooper Fultz dated
24  6/4/07.
25  Q. Regarding the CLEAN Investigation?

## Page 22

1  A. Yes. Court order from Luzerne County, dated
2  6/23/06, correspondence from me to the Director IAD,
3  dated August 1st, 2007.
4  Q. That would be the clearance letter for Trooper
5  Tripp related to the complaint by Officer Bush?
6  A. Sergeant Tripp, yeah, yes.
7  Q. I apologize, Sergeant Tripp. That document?
8  A. Same thing, another copy.
9  Q. Okay.
10  A. Another copy of my letter to Detective Bush.
11         MR. HENZES: Dated?
12         MR. PURICELLI: July 31st?
13         THE WITNESS: Yes, sir. Copy of the
14  arbitration award from Newtown Township Benevolent
15  Association of Newtown Township.
16  BY MR. PURICELLI:
17  Q. Do you know where you got that document from?
18  A. I don't recall, sir.
19  Q. Why would you have an arbitration decision of a
20  local arbitration?
21  A. It was relevant for the case that I testified in.
22  Q. You were a witness in that case for Newtown
23  Township, correct?
24  A. Correct.
25  Q. Have you acted as witnesses for local police

## Page 23

1  departments in these disciplinary matters for the Bush
2  matter?
3  A. Never.
4  Q. Never meaning before or after. Would that be
5  fair?
6  A. I never acted and testified, to my recollection,
7  to a police arbitration hearing other than the Detective
8  Bush matter.
9  Q. Have you testified for the purposes of the
10  Pennsylvania State Police Bargaining Units?
11  A. In an arbitration?
12  Q. Yes.
13  A. Yes.
14  Q. And have you, other than for the purposes of the
15  Pennsylvania State Police Bargaining Grievances,
16  Collective Grievance Decisions, Arbitration Decisions
17  for any local police officers who are grieving a
18  dismissal or punishment or discipline?
19  A. I may have read grievances, other grievances that
20  may have been related to PSP labor issues. I have --
21  it's very possible I may have read them.
22  Q. You have no direct recollection of ever having
23  done that before?
24  A. I may have.
25  Q. I understand you may have but I ask, do you have

## Page 24

1  any specific direct recollection of doing it?
2  A. As in a specific case?
3  Q. Yeah, that you can recall right now?
4  A. Not that right now.
5  Q. Okay. And you don't recall who gave this to you.
6  Why do you have it, other than the fact that you were a
7  witness to testify? What interest do you have in the
8  decision, outcome?
9  A. Because I testified, it was relevant to this
10  case.
11  Q. Okay. How did you find it relevant?
12  A. Because it covered the same matters we're
13  discussing here today.
14  Q. Whether he got his job back or didn't you believe
15  is important in this case or at least relevant?
16  A. Relevant, yeah.
17  Q. In what way, in your mind?
18  A. Because it covered the same material we're
19  covering here today.
20  Q. The decision?
21  A. The material that was, the decision rested upon
22  was based on the same material we're covering here
23  today.
24  Q. How would the arbitrator's view of that evidence
25  help you in determining what you did or didn't do in

## Page 25

1 this case?
2    A. I'm sorry. One more time.
3    Q. I'm trying to find out, Mr. Hill, why an
4 arbitrator's decision of his view of the evidence you
5 believe would help you answer questions about what you
6 did or didn't do?
7        MR. HENZES: He didn't say that.
8        MR. PURICELLI: I'm trying to find out why
9 you think it's relevant.
10       MR. HENZES: He told you. You asked three
11 different ways. He gave you the same answer.
12       MR. PURICELLI: Absolutely true. That's
13 absolutely true.
14       MR. HENZES: Maybe you may want to try
15 another topic.
16       MR. PURICELLI: I think he answered my
17 question.
18       MR. HENZES: He answered your question.
19 Just as much and you say to somebody if you don't know,
20 you don't know, you have to accept what they say. You
21 cannot argue with him, what you're doing. He gave you
22 the answer, that he deemed it was relevant. That is it.
23       MR. PURICELLI: And I asked the question
24 why. He said because it covers the same material. What
25 material then.

## Page 26

1       MR. HENZES: He told you the stuff we're
2 here for today.
3       MR. PURICELLI: I don't know what he means
4 by stuff.
5 BY MR. PURICELLI:
6    Q. What stuff, to use your attorney's word, did you
7 believe we were going to cover?
8    A. **The same series of events covered in the**
9 **arbitration.**
10    Q. Okay. And that is a conclusion. What in your
11 mind are these series of events?
12    A. **The entire affair.**
13    Q. Those are conclusions, Mr. Hill.
14       MR. HENZES: He wants you to go step by
15 step. Torture him. That is what he wants. Give it to
16 him.
17       MR. PURICELLI: Right torture me.
18       THE WITNESS: The complaint.
19 BY MR. PURICELLI:
20    Q. The January verbal complaints by Christopher Bush
21 of '06? The complaint by David Bush that his children
22 were missing? What complaint?
23    A. **Both of those.**
24    Q. Tell me. Don't make me guess.
25    A. **I don't understand. I tried to answer your**

## Page 27

1 question, what I thought was a reasonable answer. That
2 didn't satisfy you.
3       Clarify your question. I'll try my best to
4 answer.
5    Q. And that's why we're going through this exercise.
6 I don't understand your answer. So, I'm asking you to
7 be specific. When you say --
8       MR. HENZES: You don't understand his
9 answer, I just think you're being a pain in the ass.
10 That is my opinion. You know why we're here. You know
11 what the arbitration is about but she gets to make
12 money. Go ahead.
13       THE WITNESS: I'm sorry. The question
14 again?
15 BY MR. PURICELLI:
16    Q. My question was, the arbitrator spoke about a
17 series of events. Are you telling me that you need to
18 know about his discussion of those same events we're
19 going to talk about for some reason?
20    A. **His particular discussion?**
21    Q. Yes.
22    A. **I think that was all inclusive of the entire**
23 **record of the arbitration that I recorded, that I read.**
24    Q. How did you believe in your mind, an arbitrator's
25 decision was going to help you in this deposition?

## Page 28

1    A. **I didn't say that was going to help me.**
2    Q. Why did you review it then?
3    A. **Because it was relevant.**
4    Q. That brings us back to the table.
5    A. **I don't how better to answer the question,**
6 **Counselor.**
7       MR. HENZES: If anyone knew the relevance,
8 we wouldn't have these evidentiary hearings. In his
9 mind, it's relevant. He determined it to be relevant.
10       MR. PURICELLI: That's why I wanted to know,
11 in his mind, what relevance.
12       MR. HENZES: He told you why. You keep
13 running in circles.
14       MR. PURICELLI: We're building a record for
15 no reason because --
16 BY MR. PURICELLI:
17    Q. Let's go to the next document. It's pretty clear
18 on the record what happened here.
19    A. **This is a court order from Virginia.**
20       MR. HENZES: What county?
21       THE WITNESS: City of Richmond.
22       MR. HENZES: Is there a date on it?
23       THE WITNESS: I'm looking.
24       MR. PURICELLI: Why don't we just use the
25 fax date?