## Page 29

1   THE WITNESS: The fax date is 10/9/2008, I
2   believe.
3   MR. PURICELLI: We're only trying to
4   identify a document.
5   MR. HENZES: No. You cannot use the fax
6   date because, let me see if we --
7   MR. PURICELLI: They put it.
8   MR. HENZES: October 9th, 2008.
9   MR. PURICELLI: Uh-huh.
10   MR. HENZES: Order dated entered October
11   9th, 2008, from the Juvenile and Domestic Relations
12   District Court, the city of Richmond.
13   BY MR. PURICELLI:
14   Q. That particular document, you weren't present for
15   any of the court proceedings, right?
16   A. Correct.
17   Q. And why do you have the court order?
18   A. It's relevancy to me.
19   Q. We're back to that order. That order talks about
20   what, in your mind? I know what it says if I read it.
21   A. I believe the order is discussing the decision by
22   the Juvenile Court disposition of the custody of the
23   children in Virginia.
24   Q. And that was after any involvement that you had.
25   Isn't that true? In regard to the CLEAN Investigation?

## Page 30

1   A. Yes, I believe.
2   Q. That is -- that order is after any involvement
3   you had in the Christopher Bush complaint. Isn't that
4   true?
5   A. No.
6   Q. No?
7   A. I have had involvement in the Christopher Bush
8   complaint since that order was issued.
9   Q. When is that order date again?
10   MR. HENZES: October 9th of 2008.
11   MR. PURICELLI: Correct. That's what I
12   thought.
13   BY MR. PURICELLI:
14   Q. August 1, 2007, is when you put your findings on
15   the Bush complaint. Isn't that true?
16   A. Yes.
17   Q. 2008, in my calendar, is after the Bush
18   complaint. Is it the same as yours?
19   A. Yes.
20   Q. What were you doing between August 1, 2007 and
21   October of 2008 that involved anything to do with
22   Christopher Bush?
23   A. I testified in the arbitration proceeding. I
24   testified in the, or I was present at the deposition in
25   this case.

## Page 31

1   Q. And your deposition, correct me if I'm wrong,
2   dealt with events that you had been involved in from
3   what date to what date?
4   A. Since I adjudicated the incident in August of
5   2007.
6   Q. Right. What were you doing other than testifying
7   about the events of 2007 to need a 2008 adjudication in
8   Virginia about David Bush?
9   A. Participating in that ongoing civil litigation.
10   Q. So, you read that for the purposes of the lawsuit
11   that you're in today?
12   A. Sure.
13   Q. Okay. All right. The next document?
14   A. Another copy of the correspondence to Newtown
15   Township Supervisors to me dated July 31st or from me.
16   Q. Another copy of the August 1 adjudication?
17   A. It's a notification to Sergeant Tripp from me
18   August 1st. I didn't determine it to be invalid.
19   Q. Can I see that document for a second?
20   MR. HENZES: Oh, yeah. Go ahead.
21   BY MR. PURICELLI:
22   A. That is the document we asked Tripp about in that
23   packet.
24   MR. HENZES: You should have it.
25   MR. PURICELLI: I know I should have it.

## Page 32

1   Sometime during the day, can we get a copy of it?
2   MR. HENZES: Take that. We can get another
3   copy.
4   MR. PURICELLI: Just turn it sideways.
5   MR. HENZES: Give it to him.
6   MR. PURICELLI: I don't want to take his
7   copy.
8   MR. HENZES: We can find another one.
9   MR. PURICELLI: I brought the disc with me
10   if I have it.
11   MR. HENZES: You said --
12   THE WITNESS: Another copy of the assignment
13   report from Trooper McDermott. The same sections from
14   Lexis-Nexis, appears to be extra copies.
15   MR. HENZES: Okay.
16   BY MR. PURICELLI:
17   Q. Do you have any problems if I have your extra
18   copies?
19   A. You know what? I do. I like to have my little
20   file.
21   MR. HENZES: They're his copies.
22   THE WITNESS: If you want to make a copy and
23   he doesn't object, that's fine.
24   MR. PURICELLI: Any problem if I get a copy
25   of what he brought to the deposition?

## Page 33

MR. HENZES: You can have them. We can make copies of it.

MR. PURICELLI: Yeah. Why don't you give them to your attorney and he'll make copies?

THE WITNESS: A copy of the victim witness statement form from Evelyn Marie Martin, dated June 20, 2006, victim witness statement form from David Bush dated 2/23/06.

MR. PURICELLI: They're part of the Wizner, Trooper?

THE WITNESS: Right, all part of the incident report.

MR. PURICELLI: I'm doing it for the record. Another copy of that.

THE WITNESS: Yes. Various other attachments to the incident report, NCIC, a copy of CLEAN messages.

BY MR. PURICELLI:

Q. They're all a part of the Wizner report. Isn't that true?

A. Yeah.

Q. All right.

A. Another copy of the 101 from Detective Bush, verification from Detective Bush.

MR. HENZES: Another copy.

## Page 34

THE WITNESS: Another copy, more attachments from the incident report.

BY MR. PURICELLI:

Q. Wizner's?

A. Wizner's incident report.

MR. PURICELLI: Randy, are these all documents you provided?

MR. HENZES: Yeah.

MR. PURICELLI: I just want to make sure he didn't get it from some other source.

MR. HENZES: Everything that he has been reading that is provided to you, multiple forms, multiple papers.

THE WITNESS: Copies of various court matters involving David Bush and Sara Nicole Bush from Tarryton County.

BY MR. PURICELLI:

Q. These are all attached?

A. Wizner reports.

MR. HENZES: Yeah.

MR. PURICELLI: Okay.

BY MR. PURICELLI:

Q. Did you review anything other than what we went through today, to prepare for those depositions?

A. I didn't believe so, sir.

## Page 35

Q. You talked to no other persons, right?

A. Correct.

Q. Have you taken or ingested anything that would prevent you from understanding my questions today?

A. No.

Q. Okay. Do you have any physical or mental limitations that would prevent you from understanding my questions?

A. No.

Q. Or from recalling events?

A. I guess that's up for argument, Counsel, whether or not I do or not, but I believe I do not, in my opinion, have any problem understanding them.

Q. That is all that is important.

Is there any physical or mental limitations that would prevent you from sitting and continuing this deposition today?

A. Depends how long we go.

Q. We go up to seven hours. If you need breaks, just go ahead and say.

Have you taken any depositions other than this one before?

A. In regard to this case?

Q. No. In regard to anything?

A. Yeah. I have taken depositions before.

## Page 36

Q. And how many? If you need to estimate, estimate.

A. Ten, twelve. That is an estimate.

Q. Okay. Any of those depositions involve your duties as a Pennsylvania State Police Officer?

A. They all did.

Q. They all did. And are they all basically the same nature on -- could one have been, like an automobile accident, not one, another lawsuit against you as opposed to you being a witness?

A. Both.

Q. All right. How many of those ten to twelve that you estimate, did you testify as only a witness?

A. I think one or two.

Q. And what were the nature of those concerns, one two or two?

MR. HENZES: Nature of what he testified to?

MR. PURICELLI: Automobile accident, grievances, things like that.

THE WITNESS: The one I testified as a witness was a civil suit between a member under my command at one point and his ex-wife.

BY MR. PURICELLI:

Q. What is the name of the member? What trooper?

A. Connors.

Q. When was that suit?

### Page 37

1  A. It was in, I testified in the deposition within
2  the last year. I believe the case is still ongoing.
3  Q. It was the suit that was brought by an attorney
4  named Don Bailey?
5  A. Yes.
6  Q. Is that a suit involving an investigation you did
7  into Connors' activity?
8  A. I adjudicated an investigation of that.
9  Q. Okay. Fair enough. In that adjudication, you
10 found that the trooper had engaged in misconduct?
11 A. No. I found the trooper did not engage in
12 misconduct.
13 Q. What was the allegation against the trooper?
14 A. He molested his own daughter, four year old
15 daughter and that he used a state car for inappropriate
16 sexual activity.
17 Q. Okay.
18      MR. HENZES: Off the record.
19      -----
20      (Whereupon, a discussion was held off the
21 record.)
22      -----
23 BY MR. PURICELLI:
24 Q. And the other one that you testified as a
25 witness?

### Page 38

1  A. I don't know that I can recall specifically. I
2  estimated a couple as a witness.
3  Q. One or two, you said. A couple is two. We're on
4  the second one now.
5  A. One or two, I estimated.
6  Q. It's not a problem. Do you recall the nature?
7  A. I don't at the moment recall but it's possible
8  that I have over the course of my career.
9  Q. Now, that takes us now to the balance of the
10 estimated, maybe ten, maybe less, maybe more. Those,
11 you were a party?
12 A. Correct.
13 Q. Okay. Any lawsuits that you were a party involve
14 Civil Rights violation?
15 A. Yeah.
16 Q. Did they all involve that? When I say Civil
17 Rights, I'll exclude first, employment law. People
18 alleged that they cheated and investigate. And that is
19 a violation of Title 7. Do you know what Title 7 is?
20 A. No. Please.
21 Q. Let me help you out so we can get through this
22 real quick. Title 7 is employment law. That means a
23 person was treated differently in terms of the
24 conditions of employment because of race, sex, religion,
25 things like that. You had that training, right?

### Page 39

1  A. Yes. I had training relative to that subject.
2  Q. The same thing with a hostile work employment?
3  A. Yes.
4  Q. That is what I call employment law disabilities.
5  A. Okay.
6  Q. Any of the lawsuits that you were a party involve
7  allegations under that type of theory of the law?
8  A. You're asking me two different questions. Did I
9  testify or are any of the lawsuits?
10 Q. Any of the lawsuits?
11 A. There is one current lawsuit that involved
12 employment law.
13 Q. And who is the attorney in that case?
14 A. I don't recall.
15 Q. Okay.
16 A. What is --
17      MR. HENZES: The plaintiff's lawyer?
18      MR. PURICELLI: Yeah.
19      MR. HENZES: Okay.
20      MR. PURICELLI: I'm pretty sure that would
21 be your office.
22      MR. HENZES: Not necessarily, but go ahead
23 just for the record.
24 BY MR. PURICELLI:
25 Q. Give me the flavor of what the allegation is?

### Page 40

1  A. An employee, a girlfriend of services alleged
2  that she was retaliated against for reporting
3  allegations of wrong doing in terms of what her job
4  assignments were.
5  Q. Okay. Who was alleged to be the retaliator?
6  A. I believe I am named as a defendant as being
7  Director of the Bureau but there's several, a couple
8  layers that are included there.
9  Q. What is the --
10 A. One of my captains.
11 Q. What is the name of the employee?
12 A. Morganthal.
13 Q. What is her first name?
14 A. Virginia.
15 Q. Is that currently being litigated in the Middle
16 District?
17 A. I believe it is, yes.
18 Q. Who is representing you?
19 A. The office of the Attorney General.
20 Q. Mr. Henzes?
21 A. It is not.
22 Q. When was that lawsuit initiated?
23 A. Within the past, probably, six weeks.
24 Q. Okay. And you gave a deposition on that already?
25 A. No. I did not.

41

1  Q. Oh, okay. Have there been any other lawsuits
2  that you have been named in as a party?
3  A. Yes.
4  Q. Where there's been an allegation that you or
5  someone working with you or you worked with, retaliated
6  against a person for some sort of conduct similar to the
7  type of allegation in this case, the Morganthal case?
8  A. No. I don't believe there has.
9  Q. Okay. What are the other types of lawsuits
10 against you?
11 A. Excessive force, illegal arrest, false arrest,
12 wrongful death.
13 Q. Are these over the course of your career?
14 A. Yeah.
15 Q. All right. That explains it. I'm trying to
16 figure out how the captain gets all that.
17         MR. HENZES: When he started, may explain a
18 lot.
19 BY MR. PURICELLI:
20 Q. Why don't I ask you this, have any lawsuits other
21 than the one Mr. Morganthal won, been brought against
22 you in regards to any conduct you did in adjudicating or
23 investigating allegations of misconduct by a state
24 trooper?
25 A. Yes.

42

1  Q. All right. What case is that?
2  A. I'm trying to recall the guy's name.
3  Q. The trooper's name?
4  A. No. The plaintiff's name.
5  Q. Okay. Okay. Is that one of Don Bailey's cases,
6  too?
7  A. Yes, Gross Nicole.
8  Q. What was the nature of that?
9  A. He alleged that he made a complaint against a
10 trooper and nothing was done to him.
11 Q. Was that, like, a stalking case?
12 A. That is what he alleged, yeah.
13 Q. You adjudicated that?
14 A. I did.
15 Q. Tell me what you recall of that?
16 A. The trooper ended up getting eight days off,
17 illegal use of the computer system.
18 Q. The inappropriate use of the computer system was
19 actually looking up a license tag of Mr. Gross?
20 A. I don't remember what specific uses. I don't
21 recall exactly. I don't recall it being a license
22 plate.
23 Q. Let me tell you some facts. You tell me if those
24 are what we're talking about, the same case?
25 A. Go ahead.

43

1  Q. The trooper is seeing a girl. The girl is seeing
2  another guy. The trooper learns that the girl is seeing
3  the guy. He runs his tag?
4  A. No.
5  Q. Did you do any type of adjudication involving the
6  trooper? Don Bailey is the attorney?
7  A. Don Bailey is the attorney. Your facts are
8  similar but not quite. It wasn't the relationship. The
9  past. It wasn't an ongoing one. The -- as I
10 understand, the trooper texted her a couple of times.
11 And Mr. Grossnickle alleged that the trooper told the
12 girl at some point they did a check on him and didn't
13 find anything. From that point, he asked me to stop the
14 contact between the trooper. And his current wife
15 didn't want the complaint made. Then he sent a
16 complaint to IAD.
17         When we checked the computers, the trooper's
18 computer activity, he inappropriately used a computer
19 including a criminal history check and inappropriate
20 e-mails that went back and forth between various
21 parties.
22 Q. In your course of adjudications, you became aware
23 that the permitted use, which you call the computer, the
24 NCIC System?
25 A. The Enterprise Network.

44

1  Q. This trooper accessed those computers systems,
2  the Criminal Justice Systems for personal?
3  A. Correct.
4  Q. There was no ongoing criminal investigation,
5  correct, about law enforcement?
6  A. Correct.
7  Q. Is it your understanding that no person from any
8  agency can use the Criminal Justice data based on what
9  we're talking about, for a personal reason?
10 A. I'd say that's accurate, yeah.
11 Q. And in the course of the process that you were
12 involved in, to adjudicate Christopher Bush, was there a
13 criminal investigation being done against him?
14 A. No. I don't think there was a criminal
15 investigation initiated against him.
16 Q. Okay. A review of all of the documents that you
17 have including the ones that you brought, since your
18 involvement, did you come across any documents that
19 indicated Christopher Bush was involved in any criminal
20 investigation as a target?
21 A. Well, I think there are questions about whether
22 or not there was criminal activity associated with his
23 actions in this case at some point.
24 Q. I understand that there may be questions. My
25 question was more specific, though. Was there a

## Page 45

1 criminal investigation started by the Pennsylvania State
2 Police in the activities of Christopher Bush?
3   A.  **Started in the activities of Christopher Bush?**
4 **No.  There was not one started in the activities of**
5 **Christopher Bush.**
6   Q.  I understand that.  So, under that theory then,
7 the access to the same type of computer systems we're
8 talking about would not have been permitted?
9   A.  **Not correct.**
10   Q.  What exceptions do you know of?
11   A.  **There was an ongoing criminal investigation**
12 **related to Christopher Bush and his activities.**
13   Q.  What was that criminal investigation?
14   A.  **A report filed by David Bush concerning his**
15 **allegation that his former wife was concealing the**
16 **whereabouts of the children.**
17   Q.  The State Police did at some point make a
18 determination that the wife leaving might be in
19 violation of criminal law?
20   A.  **On the initial face of it, it was worthy of**
21 **investigation, yes.**
22   Q.  Okay.  And that would have been in both, all
23 other criminal statutes as well?
24   A.  **I'm sorry?**
25   Q.  The fact that the State Police had made a

## Page 46

1 determination that David Bush's report, I guess you're
2 referring to the report investigated by Eric Jay Wizner.
3 Is that true?
4   A.  **Yes.**
5   Q.  I'm just trying to get the record clear.
6       And just so I'm clear, that would be the incident
7 number "F" as in fox, 050891031.  No sense going through
8 all that?
9   A.  **Thank you, sir.  Yes.  That appears to be the**
10 **same.**
11   Q.  That is the report that listed concealment of the
12 whereabouts of the child?
13   A.  **Correct.**
14   Q.  So we're clear for the record, the report that I
15 just talked about by Wizner was a criminal
16 investigation.  And through that investigation, you
17 believed that doing the criminal history searches, use
18 of criminal data banks, okay, warranted or allowed at
19 least, searches of David Bush, David's brother
20 Christopher Bush and their attorneys?
21   A.  **Yes.**
22   Q.  Okay.  And why was that?
23   A.  **Because of the course of the events that occurred**
24 **during their investigation that they had uncovered and**
25 **felt it was reasonable.**

## Page 47

1   Q.  In your review of the records, what conduct, if
2 any, would any of the attorneys involved with the Bush,
3 David Bush, Sara Bush involvement involve?
4   A.  **The court order I believe was obtained under**
5 **fraudulent circumstances from Luzerne County.**
6   Q.  What Criminal Statute in your mind would have
7 been violated?
8   A.  **I don't know.  I don't know if there was one, if**
9 **there is one but I believe it was worthy of an**
10 **investigation to obtain a court order under a court**
11 **order, excuse me, under fraudulent circumstances.**
12   Q.  Okay.  Well, in your history and I don't know if
13 I asked you this, how long have you been with the
14 department but you're probably close to thirty years.
15 Is that fair?
16   A.  **Yes.**
17   Q.  How many investigations have you personally
18 started where you have no idea whether there was or
19 wasn't a violation of a specific Criminal Statute?
20   A.  **Like?**
21   Q.  I can identify a little more specific if you
22 want.
23   A.  **Please do, Counselor.**
24   Q.  Go to a scene, someone says my home was broken
25 into, trespassing, burglary, right?

## Page 48

1   A.  **On the surface, you do, yeah.**
2   Q.  You started an investigation because you want to
3 know if there was a trespass or a burglary?
4   A.  **Right.**
5   Q.  You get a call of a man urinating on the street.
6 You go out find a drunk in violation of public
7 drunkenness, disorderly conduct, open lewdness, correct?
8   A.  **Yes.**
9   Q.  Start an investigation, right?
10   A.  **Yes.**
11   Q.  The person calls you and says someone took their
12 mail.  That's a theft, right?
13   A.  **Right.**
14   Q.  You have a concept for some criminal conduct to
15 start an investigation, correct?
16   A.  **Correct.**
17   Q.  With that thinking, out of your vast experience
18 with the State Police, all the updates, the training you
19 had in the Crimes Code, what crime could you fathom was
20 being committed by the attorneys in getting an order?
21   A.  **Perjury, false swearing.**
22   Q.  And did you have any evidence, any evidence of
23 perjury testimony?
24   A.  **Did I?**
25   Q.  Yes.  To start an investigation?

**Page 49**

1  A. Yes.
2  Q. What?
3  A. They obtained a court order in Luzerne County for
4  not having any jurisdiction for the court to see that.
5  Q. What does perjury require?
6  A. To make a false statement to the court,
7  essentially, to lie to the court.
8  Q. Okay. And starting an investigation, what was
9  false that was said?
10 A. I don't know if there was a false statement. The
11 result of what may have been a false statement was a
12 court order obtained under fraudulent circumstances.
13 Q. How many investigations prior to the one we're
14 talking about with Wizner, have you been involved in
15 where the State Police looked into how a court order
16 came to get issued or revoked?
17 A. I don't know.
18 Q. How many can you recall ever knowing about other
19 than this one?
20 A. Let's go back to the specific question and hit me
21 with that question again.
22 Q. Sure. How many cases have you personally been
23 involved in where you investigated a court order, either
24 how it was issued or obtained and how it was dismissed?
25 A. I don't know. I don't know.

**Page 50**

1  Q. Can you recall any?
2  A. Well, when you say investigate, reviewed, study
3  court orders? Do I recall any that were obtained under
4  fraudulent circumstances? Is that a fair question?
5  Q. No. I'm asking you how many criminal
6  investigations you were involved in where the subject of
7  the investigation other than this one we're talking
8  about, involved a court order and how it was issued or
9  dismissed?
10 A. I don't know that I recall any.
11 Q. Now, I asked you whether you were involved. How
12 many as a Major and use all your experience from
13 whatever source you obtained that information, was
14 involved in a State Police investigation into a court
15 order and how it was obtained or dismissed?
16 A. I don't know that I recall any.
17 Q. So, the only one we can recall and talk about
18 today is the one involving David Bush?
19 A. That is what I recall, yes.
20 Q. Okay. Now, we stopped with Grossnickels. Are
21 there any other? Let me exclude some of the -- use of
22 force would be someone saying you used force when it
23 wasn't necessary, right?
24 A. Right.
25 Q. Forget those.

**Page 51**

1  A. Okay.
2  Q. Wrongful death. Someone said you should have
3  done something, right?
4  A. I'm sorry.
5  Q. For the wrongful death claim, somebody saying you
6  didn't do something that you should and somebody died?
7  A. Or I did something.
8        MR. HENZES: Wrongful death falls under use
9  of force.
10 BY MR. PURICELLI:
11 Q. Let's forget that one. Did they say you somehow
12 used force and this person is being deprived of their
13 right to life?
14 A. Yeah. I believe part and parcel.
15 Q. It's a leap for me to guess, is what I'm assuming
16 that ended well with you?
17 A. It did.
18 Q. Has there been any adjudication in a court
19 against you?
20 A. No.
21 Q. All right. That is fair enough. And aside from
22 the one retaliation claim, there is no other claims
23 against you where it's alleged you took action or didn't
24 take action to retaliate for someone's activity such as
25 reporting misconduct or reporting a trooper if they were

**Page 52**

1  doing something wrong aside from this lawsuit?
2  A. No.
3  Q. And the --
4        MR. HENZES: The Gross Nichols, what is the
5  guy's first name?
6        THE WITNESS: It's Jerry. I think it's
7  Jerry.
8        MR. HENZES: I actually know a Joe.
9        THE WITNESS: I think it's Jerry, Counselor.
10       MR. HENZES: Was this up in Williamsport?
11       MR. PURICELLI: It's a Don Bailey case.
12 BY MR. PURICELLI:
13 Q. Have there ever been any complaints filed against
14 you for, by other troopers alleging misconduct?
15 A. By other troopers?
16 Q. Everybody is a trooper in my book. Everybody is
17 a trooper, so I don't know.
18 A. Any other members of the department?
19 Q. Correct.
20 A. Not that I recall.
21 Q. Have you ever been the subject of an Internal
22 Affairs investigation?
23 A. Yes. I --
24 Q. Were those investigations that involved all these
25 lawsuits?