### Page 53

1  A. They would.
2  Q. And that is because the manual says that a
3  lawsuit, they have to investigate, correct?
4  A. Generally speaking, yes. They can.
5  Q. Aside from that experience of being the subject
6  of an IAI investigation, an Internal Affairs
7  Investigation, an IAI, I should say, what is the source
8  of your knowledge of the Internal Affairs' rules and
9  regulations on how an investigation is done?
10  A. My experience within the department, the various
11  rules and regulations.
12  Q. Reading the regs and being trained on the regs,
13  the administrate regs, the OMs, the FRs; is that
14  correct?
15  A. Yeah. I have had some specific training relative
16  to AR425, yes.
17  Q. Aside from this particular one, you have no
18  specific training on the rest of the regulations, the
19  field regs, the operating manuals?
20  A. Yes. You're talking about a huge realm. So,
21  there has been training on various portions of all those
22  rules and regulations throughout the course of my
23  career.
24  Q. In 2006, on or about November and up to around
25  January of 2007, did you have any refresher training on

### Page 54

1  any of the field operations, operating manuals in an
2  IAI?
3  A. I don't recall.
4  Q. Okay. Did you review any of those regulations in
5  the course of adjudicating the Christopher Bush
6  complaint against Sergeant Tripp?
7  A. I don't recall if I did or not.
8  Q. Okay. And 2006, you held the rank of the
9  captain?
10  A. I did, yes.
11  Q. When did you become a captain?
12  A. January of 2004.
13  Q. In 2006, you were assigned where as the captain?
14  A. Troop P. Wyoming and Troop F. Montoursville.
15  Q. And what is the designated title?
16  A. Troop commander.
17  Q. And for the record, could you explain what a
18  troop commander does?
19  A. He is the commanding officer of a troop which a
20  troop is composed of a number of stations.
21  Q. Could you identify the stations under your
22  command?
23     MR. HENZES: In which spot?
24     THE WITNESS: In both spots.
25     MR. HENZES: The Williamsport spot.

### Page 55

1     MR. PURICELLI: Well, he is a troop
2  commander of P. And F.
3     MR. HENZES: At one point it was P., then
4  F., not both.
5     MR. PURICELLI: For the purposes of my
6  questions --
7     MR. HENZES: Mansfield is what troop is the
8  question you can ask.
9     MR. PURICELLI: I was going to do that. I
10  wanted to be specific.
11     MR. HENZES: February of 2006, when David
12  showed up.
13     MR. PURICELLI: Well, I know he was in
14  charge of that.
15  BY MR. PURICELLI:
16  Q. There is the Mansfield and the Montoursville. Is
17  there a Montoursville?
18  A. Yes, and six other stations in Troop F.
19  Q. And what were the other stations?
20  A. Seals Grove, Stonington, Milton, Uporium,
21  Callersport, Lamar.
22  Q. Okay. Does Montoursville and Mansfield kind of
23  work close to one another?
24  A. They're about an hour apart.
25  Q. Are you familiar with the Trevose Dublin

### Page 56

1  Barracks?
2  A. No.
3  Q. Okay. I was going to do a similarity but you're
4  not familiar.
5     You started with the State Police when?
6  A. October 12th, 1981.
7  Q. So, between '81 and '04, you went through various
8  ranks, correct?
9  A. (The witness nods head in the affirmative.)
10  Q. During the course of --
11     MR. HENZES: You have to say yes.
12     THE WITNESS: I'm sorry. Yes.
13     MR. PURICELLI: I didn't give you that
14  instruction. You have to speak audibly.
15  BY MR. PURICELLI:
16  Q. In your career with the State Police, do you
17  recall receiving any training in domestic law, Title 23
18  of the Pennsylvania Code, Pennsylvania Title?
19  A. What is Title 23?
20  Q. That is a Domestic Code, Domestic Title. It's
21  family law, custody, divorce, protection from abuse,
22  equitable distribution.
23  A. We discussed -- I possibly received training on
24  protection from abuse.
25  Q. Do you have any training on divorce matters? Let

## Page 57

1  me help you, why a person could get a divorce?
2  A. No.
3  Q. Do you have any training on custody, meaning, who
4  should get it and why and how much?
5  A. No.
6  Q. Do you have any training on the custody orders,
7  who has it and what their rights are?
8  A. I don't know if I have training on this issue,
9  specifically. I think we have experience that involved
10 arguments or domestics over child custody issues.
11 Whether or not I have had specific training about the
12 contents of child custody orders, I don't recall.
13 Q. In the course of those domestic matters, a
14 dispute, children get picked up, not picked up and not
15 dropped off, something like that?
16 A. Right.
17 Q. The State Police has a policy on how to handle
18 those types of calls?
19 A. I believe they do.
20 Q. What is that policy?
21 A. Generally, the court will make a determination if
22 those violations have occurred or not.
23 Q. Send them to the court?
24 A. Correct.
25 Q. Don't enforce the order, correct?

## Page 58

1  A. Generally speaking, yes.
2  Q. What are the exceptions to the general rule?
3  A. I don't know, some concern for the safety of the
4  children. I don't know that I can recall any specific
5  regulations that address that.
6  Q. In the course of your involvement with David or
7  Christopher Bush, did you review any of the policies in
8  regard to how custody matters should be handled by
9  members of the State Police?
10 A. I don't believe I did no, sir.
11 Q. You relied on the same type of information you
12 just told me, your understanding of policies the State
13 Police handling custody matters involving children?
14 A. I think that is accurate, yes.
15 Q. Okay. Now, do you know of any policy of the
16 Pennsylvania State Police that deals with a situation
17 where there's no custody order between two parents?
18 Okay? To have the children, between the two of them,
19 divorce or going through a divorce?
20 A. I'm sorry. I thought the question was going on.
21 One more time.
22 Q. That is okay. Let me help you out.
23 A. Okay.
24 Q. I'll give a scenario. Let's suppose it's a
25 situation where you're in uniform, working the street.

## Page 59

1  I don't care what rank you were. Okay?
2  A. (The witness nods head in the affirmative.)
3  Q. You get a call, two parents arguing about who
4  should have possession of their child at the moment or
5  at any time. Neither has a court order saying, from a
6  court saying you get custody at this time for this long.
7  Both of them don't have one?
8  A. Okay.
9  Q. One wants the child. The other one has fled?
10 A. The other one has what?
11 Q. Has fled the state?
12 A. With --
13 Q. The children are gone. Okay.
14 A. So, the children are gone?
15 Q. The children are gone. How is it handled at that
16 point, the policy of the State Police, how that's
17 handled?
18 A. I don't know that I recall a specific policy that
19 addresses that issue.
20 Q. How would you handle that?
21 A. The children are gone?
22 Q. The children are gone. The father says neither
23 of us have a court order. I want to see my children.
24 A. Then I think I would institute an investigation
25 for concealing the whereabouts of the child.

## Page 60

1  Q. I'll change the scenario then. Both parents are
2  present. Both are there. The kids are there. One says
3  I want my kids. The other says no, I want my kids.
4  Neither has a court order, your call. They're not
5  fighting, no physical, to anybody but each just wants
6  the children what do you do?
7  A. It's not our business. It's a civil matter.
8  Q. Good enough. How do you know it's a civil
9  matter?
10 A. Because to my knowledge, child custody issues are
11 a civil matter. And if there's no allegation of
12 emergencies, abuse, other issues, then it wouldn't
13 constitute a police issue.
14 Q. Okay.
15 A. In my experience.
16 Q. In your career with the Pennsylvania State
17 Police, have they instructed you on any constitutional
18 rights afforded to parents to be with their children?
19 A. I don't recall.
20 Q. Okay. In your experience as a trooper, have you
21 reviewed any documents, articles or anything that dealt
22 with the constitutional rights afforded the parent to be
23 with their children?
24 A. I don't recall.
25 Q. Have you reviewed any literature of any type with

## Page 61

1  regards to custody rights of parents?
2  A. I don't recall.
3  Q. Okay. Have you received any training in family
4  law? We talked about custody. We talked about divorce.
5  Is it true that you have received no training in
6  equitable distribution of property?
7  A. I don't recall receiving any, no.
8  Q. Okay. Fair enough.
9      Do you have any experience, training or
10 knowledge, if you open up wide enough, someone in your
11 past, as to the legal ramifications of Pennsylvania
12 residents going through a divorce with a custody action
13 started that fleas the state without state permission
14 with children?
15 A. I don't know if I've had any personal experience
16 with that matter, no.
17 Q. You're not familiar I guess with the Gruber
18 Decision, Pennsylvania State Supreme Court decision?
19 A. No.
20 Q. Okay. As the commander, you are in a supervisory
21 position; is that correct?
22 A. Yes.
23 Q. Who would you be supervising directly?
24 A. Station commanders in the troop and three
25 lieutenants from the troop or section commanders, troop

## Page 62

1  administrative manager.
2  Q. You supervise the people in charge of each
3  barracks?
4  A. Correct.
5  Q. That is directly, correct?
6  A. Correct.
7  Q. And indirectly, you supervise everybody all the
8  way down to the one on the street, correct?
9  A. Correct.
10 Q. Who would have been the person in 2006, let's
11 just start with January 2006, would have been a person
12 under your immediate supervision in Montoursville?
13 A. I wasn't in Montoursville in January of 2006. I
14 didn't get there until December of 2006.
15 Q. As a supervisor who shows up, let's say 11/06,
16 supervisor, would you have been able to review the
17 conduct of these members before that to see if there
18 were any rules or regulations violations?
19    For example, suppose in May of 2006, a station
20 commander didn't do what he was required to, assigned
21 someone to do an investigation, you showed up in
22 November of '06 and learned about it, could you take
23 action for that incident?
24 A. I could, yes, depending on the nature of the
25 violation.

## Page 63

1  Q. Okay. What violations, the nature of them, would
2  you have jurisdiction authority over?
3  A. I don't know.
4  Q. If it occurred before you were the commander?
5  A. I don't know.
6  Q. You don't know of any, right?
7  A. No. I don't know that there are any that I
8  wouldn't have jurisdiction.
9  Q. Okay. You answered.
10     And when you became the troop commander, who was
11 the supervisor at Montoursville when it was under your
12 direct command supervision?
13 A. There were three section commanders, not a
14 station commander.
15 Q. Who was involved in the criminal? You don't
16 recall?
17 A. I do but I'm -- embarrassingly, I'm having
18 trouble figuring out who was there and when.
19 Q. Just pop off three peoples' names. That is all.
20 A. Lieutenant Hile was one. Lieutenant Wlondoloskie
21 was another.
22 Q. Wendoloskie?
23 A. Wlondoloskie, W-L-O-N.
24 Q. D-A-L?
25 A. W-L-O-N-D-O-L-W-S-K-I-E,

## Page 64

1  W-L-O-N-D-O-L-S-W-S-K-I-E, I believe. Wlondoloskie,
2  Hile left.
3  Q. Let me help you out here because -- of the
4  people, person that you don't recall his name, you had
5  no involvement with him whatsoever, involved in anything
6  regarding the David Bush investigation, about his kids
7  or Christopher Bush. That person had no involvement
8  whatsoever?
9  A. Not that I know of, no.
10 Q. You can only tell me what you know.
11 A. Yeah.
12 Q. And Wlondoloskie, I've gone through a lot. I
13 didn't see his name pop up.
14 A. Not --
15 Q. So, Hile is the only one, right?
16 A. Correct. That I recall, yes.
17 Q. That is fair enough. I'll ask you what you
18 recall. That takes us to Mansfield. That would be
19 Tripp?
20 A. In November of 2006.
21 Q. Was there anybody else that would have been the
22 supervisor that you oversaw in Mansfield for the periods
23 of time involving any of the David Bush events or the
24 Christopher Bush complaint?
25 A. Sergeant Tripp came to Montoursville at some

## Page 65

1 point in 2007, I believe, during Christopher Bush,
2 Internal Affairs. I think he was transferred from
3 Mansfield down to Montoursville and another sergeant
4 took over Mansfield.
5    Q. And was that sergeant in any way, shape or form
6 involved in any of the complaints made?
7    A. Not to my recollection.
8    Q. You have to wait for me to finish the question.
9 We both know what we're talking about but somebody
10 reading it won't.
11    A. My apologies.
12    Q. That is okay. Just for purposes of your answer,
13 that meant that whoever took over, had no involvement
14 whatsoever, that involved David Bush or Christopher
15 Bush?
16    A. Not that I recall.
17    Q. Okay. And you obviously would be subject to
18 supervision, correct, in the captain's position?
19    A. Yes.
20    Q. Above you, who supervised Jeff?
21    A. At what time, sir?
22    Q. Let's just stick to when you were the troop
23 commander over at Mansfield and Montoursville.
24    A. I believe John Rice was the major for most of
25 that period. And I think Joe Merit may have been for

## Page 66

1 some period.
2    Q. Joe is?
3    A. Both of them are majors.
4    Q. Joe Rice would have been stationed where?
5    A. John Rice.
6    Q. John Rice. I apologize.
7    A. He was stationed in Wyoming.
8    Q. And I take it, correct me if I'm wrong, Joe Merit
9 took over from John Rice?
10    A. The other way around.
11    Q. Oh, I'm sorry. Was John Rice the major the
12 person supervising you for any involvement you had in
13 the David Bush complaint period and the Christopher Bush
14 period?
15    A. I had no involvement in the David Bush complaint
16 period until Christopher Bush's Complaint was filed.
17    Q. Joe Merit was gone by then?
18    A. I'm not sure when Joe left and when John took
19 over. John is the one that concurred with my
20 investigation, at the conclusion of the investigation,
21 if I recall correctly.
22    Q. When David Bush made his complaint in 2006,
23 procedurally, through the chain of command, how would
24 you have been informed that that type of complaint was
25 made?

## Page 67

1    A. I probably would not have been.
2    Q. How far up would a supervisor know that that
3 complaint was made and an investigation was started in
4 the chain of command?
5    A. I think it went up as high as a lieutenant at
6 some point during this investigation, the crime section
7 commander.
8    Q. Would that have been Hile?
9    A. No. At that time of the David Bush complaint, it
10 was Lieutenant Donald Peters.
11    Q. Now, for purposes of the question, David Bush
12 makes a complaint. Assuming it went up to Lieutenant
13 Peters, what, if anything, would Peters response be in
14 regard to David Bush's complaints?
15    A. Lieutenant Peters at the time was a criminal
16 investigations section command. So, and he was
17 responsible for all criminal investigations in the troop
18 to some degree.
19    Q. What does that mean? He is responsible?
20    A. He oversees all criminal investigators and their
21 investigations.
22    Q. Does he assign an investigator?
23    A. Depends on the nature. Most of them, he does
24 not. Most of those are assigned by a crime supervisor
25 at stations. He may on occasion assign one if there is

## Page 68

1 some specific reason.
2    Q. Let's stick with the -- he came in and he made a
3 complaint, correct?
4    A. Correct.
5    Q. And we know Trooper Eric Wizner did the
6 investigation, correct?
7    A. Correct.
8    Q. Do you know how Wizner got assigned that
9 investigation?
10    A. Not specifically.
11    Q. Well, procedurally, under the Rules the State
12 Police operates, how would he have been assigned?
13    A. The supervisor would have assigned an
14 investigation based on the, as a result of the complaint
15 or, and a supervisor not being present, Police Criminal,
16 the PCO would assign someone to the incident to
17 investigate.
18    Q. So the record is complete, when you say a PCO, I
19 know what that is but --
20    A. Police Communications Operator.
21    Q. Civilian, correct?
22    A. Correct. I believe that is an accurate term.
23    Q. Okay. What would be the criteria in this
24 particular case that Peterson would have been the person
25 responsible to assign or you said a crime supervisor

## Page 69

1   other than Peterson?
2   A. No Peterson, Peters. Lieutenant Peters.
3   Q. I apologize. Peters.
4       Okay. A person comes in, makes a complaint. Who would take the complaint of the concealment claim?
6   A. A trooper.
7   Q. A trooper?
8   A. Yes. It could have been a criminal investigator
9   or it could have been a patrol trooper.
10  Q. A trooper or anybody up, an investigator or
11  somebody like that?
12  A. They're the same.
13  Q. Everybody is a trooper?
14  A. Well --
15      MR. HENZES: No, no. You might want to get
16  that clarified. You're starting to mix up the chains of
17  command and stuff like that. That is where you're
18  causing him a little confusion.
19  BY MR. PURICELLI:
20  Q. I just want to know how Wizner as a trooper ended
21  up doing this criminal investigation. Isn't he a road
22  officer?
23  A. He is but road officers can do a criminal
24  investigation as well as patrol investigations, crashes,
25  etcetera.

## Page 70

1   Q. Would there be any documentation I could find to
2   see how Trooper Wizner was assigned this investigation?
3   A. To see how he was assigned? I don't understand
4   what you're looking for, Counsel. What particular
5   document?
6   Q. I'm trying to found out how Wizner got assigned
7   to do this investigation. He didn't take the report of
8   the complaint, correct? When David Bush came, he didn't
9   speak to Wizner, correct?
10  A. He spoke to Wizner, yes. Who he spoke to
11  initially, I don't know that I know that, if it was
12  Wizner or not.
13  Q. And if you wanted to find out, you as a major,
14  this report, how did Wizner get assigned to do this, how
15  would you find that?
16  A. A communication. Those are communications, what
17  is the name of the report? A communications memo or an
18  automated incident memo that lists who assigns the case.
19  Q. An automated memo?
20  A. Exactly.
21  Q. Message memos talked about IAIs, AR? Doesn't it?
22  A. Yes.
23  Q. That would have been generated by -- who would
24  send it to Wizner?
25  A. Generally, a desk a person at PCO or it could be

## Page 71

1   whoever spoke with him officially and entered the
2   incident into the computer system.
3   Q. Hypothetically, not saying the facts, let's
4   assume that David Bush came in and said I need to find
5   -- my kids have been whisked away. I don't where they
6   are. He speaks with the PTO. This person generates an
7   automated memo?
8   A. Uh-huh.
9   Q. How would they know who to send it to?
10  A. Who to assign it to?
11  Q. Who to send the message to?
12  A. It's not a sent message. It produces a document
13  listing when the complaint came in, the phone number it
14  came from, the address, etcetera. It's the initial
15  document upon receipt of the call.
16  Q. Well, we'll call it the initial complaint, an
17  incident report, whatever.
18  A. Yeah.
19  Q. Takes this initial cursory information. Where
20  does it go?
21  A. It goes to the assigned investigator.
22  Q. There's, no one is assigned yet?
23  A. No. That person, when they take the information,
24  would have assigned it to someone.
25  Q. How would they know who to assign it to?

## Page 72

1   A. Zones, availability, who is present, who isn't.
2   Q. A trooper comes in and says zone 2, 4, zone,
3   district. The person says I live in zone 2, it goes to
4   zone 2. Fair enough?
5   A. It depends on the incident, and availability of
6   the people working at the time.
7   Q. Okay. Would that assignment be reviewed by a
8   supervisor to make sure --
9   A. Yes.
10  Q. Can we assume then that when Wizner was doing his
11  investigation at least sometime, Lieutenant Peters could
12  have, if he wanted, reassigned it to someone else if he
13  didn't think that Wizner could do the job?
14  A. I think that's a fair statement. He could have.
15  You're speaking --
16  Q. A hypothetical?
17  A. Yes.
18  Q. We also then, speaking a hypothetical, will
19  assume because Wizner wasn't taken off of that, that
20  Peters had no problem with him and his conduct?
21  A. Again, clarify Lieutenant Peters' involvement. I
22  don't know that it was down to that level. That would
23  have been more a decision for Corporal Wheeler, the
24  crime investigation supervisor, to engage to reassign an
25  investigation if he felt it necessary.

### Page 73

1  Q. Fair enough. Would it be fair then, from my
2  understanding then, that Lieutenant Peters might not
3  have been involved in the review process because
4  Corporal Wheeler would have been intermediary or direct
5  supervisor over Wizner, on this investigation?
6  A. It would have been, yes.
7  Q. Would it also then be fair to say that because
8  Wizner remained on the investigation, that there was no
9  question by Corporal Wheeler of his ability to do that
10 type of an investigation?
11 A. I don't know if there was.
12 Q. That is my point. Would it be fair to say that
13 if there was a question whether he was doing it right or
14 not capable of doing it, under the State Police
15 standards, okay, they would have pulled -- Wheeler would
16 have pulled Wizner off and reassigned it?
17 A. I don't -- one more time, sir.
18 Q. Sure. I'll ask it a different way.
19 A. Okay.
20 Q. To your knowledge, is there any reason that you
21 could believe that Corporal Wheeler wasn't supervising
22 Corporal Wizner in the investigation, the concealment
23 investigation we're talking about?
24 A. Not to my knowledge.
25 Q. Okay. Do you have any reason to believe that

### Page 74

1  Corporal Wheeler would not have pulled Wizner off if
2  Corporal Wheeler didn't believe Wizner was, one; capable
3  of doing the investigation or two; was doing it wrong,
4  under state standards?
5  A. I have no reason to believe that, sir.
6  Q. In your function as the adjudicator in the
7  Christopher Bush matter, you looked at all these
8  reports, true?
9  A. Yes.
10 Q. And did you see anything being done that would
11 have been inconsistent with the State Police Rules and
12 Regulations, including the ARs, the OM, the FRs?
13 A. Nothing that jumps out at the moment, sir, no.
14 Q. Let's assume something did jump out at you during
15 the course of your review, what, if anything, would you
16 have been required to do, if anything?
17 A. I guess it would depend on the nature of what
18 jumped out at me.
19 Q. Okay. And since we're looking at the
20 investigation, this is a criminal investigation report,
21 correct?
22 A. It's an incident report, title report.
23 Q. Is there a distinction between this incident
24 report and a criminal investigation?
25 A. Well, it, a criminal investigation that is

### Page 75

1  documented on this incident report.
2  Q. All right. This is, what you referred to as the
3  incident report created for the purposes of a criminal
4  investigation?
5  A. Correct.
6  Q. Now, above you, you said was John Rice and maybe
7  Joe Merit during the course of the David Bush
8  Christopher Bush events?
9  A. Correct.
10 Q. Okay. Who would have been above Major Rice?
11 A. The Deputy Commissioner of Operations.
12 Q. Who was that in the period of time we're talking
13 about?
14 A. I'm going to guess at Lieutenant Corneal Ralph
15 Periandi.
16 Q. Can you spell that?
17 A. That would be P-E-R-I-A-N-D-I.
18 Q. And above that person would have been?
19 A. The Commissioner of the State Police.
20 Q. And that would have been who during that period
21 of time?
22 A. Jeff Miller.
23 Q. Did you have any contact with either of those two
24 individuals, any correspondence, discussions, e-mail,
25 you know, through another person, any type of

### Page 76

1  communication with these two in regards to any of the
2  events involving David Bush or Christopher Bush?
3  A. No, not that I recall.
4  Q. Okay. Was there anybody above you, not now as a
5  major but as a captain, okay, that you had contact with
6  in regards to either David Bush or Christopher Bush?
7  A. Beside Major Rice?
8  Q. Beside Rice. I believe your document indicates
9  that was Rice. So, I'm not picking on you about that.
10 A. Not that I recall.
11 Q. Did there ever come a time that you got assigned
12 to do the adjudication into the complaint by Christopher
13 Bush?
14 A. Yes.
15 Q. How did you get that assignment?
16 A. The assignment was part of the investigatory
17 process that was referred to us by IAD.
18 Q. What is the form of communication you first
19 received to learn about that complaint?
20 A. To the best of my knowledge, it was 101 forwarded
21 by, IA.
22 Q. Would you know what that document looked like if
23 you saw it?
24 A. Yes.
25 Q. Is that document among those that you brought?