## Page 77

1  A. Yes.
2  Q. Okay. Could you pull that out?
3      MR. HENZES: 101, 101 is stapled.
4      MR. PURICELLI: Can I see the document?
5      MR. HENZES: You have it. It's all in
6  there.
7      MR. BUSH: It's in there. I just saw it.
8      MR. HENZES: The initial.
9      MR. PURICELLI: I know there was one done.
10     MR. HENZES: That is the initial call sheet
11 when he called. When you look at it, you go to the
12 narrative.
13     MR. PURICELLI: That is a similar page.
14     MR. HENZES: It should be the second page
15 with the narrative.
16     MR. PURICELLI: There it is. I was looking
17 for that.
18         -----
19     (Whereupon, a discussion was held off the
20 record.)
21         -----
22 BY MR. PURICELLI:
23   Q. This document, a use of force complaint 101?
24   A. Uh-huh.
25   Q. How did you receive that?

## Page 78

1   A. I believe it came with the 108 upon receipt of
2  the complaint verification of Detective Bush.
3   Q. And who did you receive this from?
4   A. IAD.
5   Q. Who at the AID, is an entity?
6   A. I don't recall.
7   Q. Is this all you got?
8   A. I believe it was.
9   Q. Does it instruct you to do anything? I don't see
10 where it instructs you to do anything.
11  A. May have come in conjunction with an e-mail or
12 attached to an e-mail.
13  Q. This document has a cover sheet, correct?
14  A. I don't have a cover sheet on mine.
15     MR. HENZES: Third page witness two pages.
16     MR. PURICELLI: Here's the one you gave me.
17     MR. HENZES: There is a fax cover sheet.
18     MR. PURICELLI: Fax cover sheet.
19 BY MR. PURICELLI:
20  Q. So, there is a third page, right?
21  A. There is.
22  Q. Just so we can clear up something, the first page
23 of the 101 has a date, 11/19/06, correct?
24  A. Correct.
25  Q. Let's go over some of the pages, Major.

## Page 79

1  A. Okay.
2  Q. I'm assuming in your years, you have seen that
3  use of force before?
4  A. I have.
5  Q. I'm assuming this is not the first time. This
6  one is not the first one. You have seen that before?
7  A. Correct.
8  Q. Okay. Does anything other than the front, the
9  second page and a fax cover sheet if it's faxed, come
10 with the use of force complaint that is being sent to
11 you to do something?
12  A. You refer to the fax cover sheet, Counsel. I
13 don't believe this is a fax cover sheet for this
14 particular document.
15     MR. HENZES: It doesn't matter. Just, do
16 they come with a fax cover sheet?
17     MR. PURICELLI: We're going to get that fax.
18 BY MR. PURICELLI:
19  Q. You don't think that fax cover sheet belongs with
20 that document?
21  A. I don't think so.
22  Q. Why do you think that?
23  A. It looks like the date is wrong. I'm not sure
24 who Corporal Hills is.
25  Q. We're going to ask about that, too.

## Page 80

1  A. Okay.
2  Q. I agree there's things I'm going to try to clear
3  up here. When you received it, did it come in the mail?
4  Did it come in an electronic form? Did it get faxed?
5  A. I don't remember.
6  Q. Tell me what is the first thing you remember
7  after you saw the use of force form?
8  A. I'm sorry? What was the first thing I remember
9  now or then?
10  Q. When somebody handed it on your desk?
11     MR. HENZES: What you remember now, remember
12 doing back then is the question.
13     MR. PURICELLI: Right. There's no simple
14 way to ask that question.
15 BY MR. PURICELLI:
16  Q. What is the first thing you remember doing with
17 this document?
18  A. Okay. The first thing I remember doing --
19  Q. Yes.
20  A. Probably assigning it to somebody.
21  Q. You say assigning it to someone probably. Do you
22 remember doing that?
23  A. Not specifically.
24  Q. All right. We'll go through that process, see if
25 we can figure that out. You said you don't think the

## Page 81

1  fax cover sheet went because the date is different,
2  correct? Did I understand that correctly, Major?
3  A. It -- that doesn't -- I don't know what it is.
4  Q. You had adjudicated Christopher Bush's complaint against Tripp, right?
6  A. Correct.
7  Q. What date did his complaint come in?
8  A. The original complaint came in 11/19/06.
9  Q. And you know that only because it's on this
10 document, correct?
11 A. Yes, correct.
12 Q. That was faxed 11/19/06, correct?
13 A. Yes.
14 Q. The fax also scribbled out -- it was being sent
15 to the news media?
16 A. Correct.
17 Q. Then that was sent to a Corporal Hills?
18 A. It's Hills.
19 Q. You're correct, Hills? That is your last name,
20 Hills, correct?
21 A. No.
22 Q. What is it?
23 A. Hill.
24 Q. Do you know of any Hills?
25 A. I don't. I don't know Corporal Hills. I don't

## Page 82

1  recall a Corporal Hills. I don't say I don't know him
2  because I have met thousands of troopers on the job.
3  Q. Fair enough. And it's being faxed to
4  717-772-1424 number?
5  A. Correct.
6  Q. We can agree with that? And that wouldn't be an
7  area code for you, would it?
8  A. No.
9  Q. It's just from a Sergeant David Young, PSP,
10 Montoursville?
11 A. Yes.
12 Q. Do you know a David Young?
13 A. I do.
14 Q. Did you ever ask him about the document?
15 A. I don't recall ever asking him about the
16 document.
17 Q. Did you see the document in the course of the
18 investigation?
19 A. I'm sure I did.
20 Q. You never --
21     MR. HENZES: If you look at the whole
22 document, you'll figure it out. You heard the name.
23 It's not Hill. It's Hillis.
24     MR. PURICELLI: If you get information, fire
25 away.

## Page 83

1     MR. HENZES: Hillis was the corporal
2  assigned to CLEAN. Young is Troop, forwarding a letter,
3  that appears that he is just sending something. So,
4  he's just sending something to Hillis from the Troop on
5  a NCIC entry by Christopher Bush on 11/9/2006.
6     MR. PURICELLI: That is what we think.
7     MR. HENZES: Hillis because his name came up
8  in depositions.
9     THE WITNESS: I remember Fultz. I don't
10 remember Hillis, but anyway...
11    MR. HENZES: Fultz was a trooper.
12    THE WITNESS: Right, yeah.
13    MR. HENZES: 772 is the fax number for
14 Harrisburg, is an exchange in Harrisburg.
15    MR. PURICELLI: 772 is an exchange for the
16 department headquarters.
17    MR. HENZES: Yeah. One of them.
18    MR. PURICELLI: I was going to send you to
19 admissions.
20    MR. HENZES: It's a number in.
21    MR. PURICELLI: Why don't you track it down
22 and save me the admissions and we'll agree which fax
23 that is.
24    MR. HENZES: They can tell us. They know
25 the fax.

## Page 84

1     MR. PURICELLI: Okay.
2  BY MR. PURICELLI:
3  Q. So, prior to 11/19, are you saying you didn't
4  know that Officer Bush had made an NCIC entry?
5  A. Yeah. I was saying I did not know.
6  Q. Okay. And you've testified before, at
7  arbitration, you requested CLEAN to investigate
8  Christopher Bush's --
9  A. No.
10 Q. You had never testified to that?
11 A. No, sir. I did not testify to that. I requested
12 a CLEAN inquiry be done.
13 Q. Fair enough. We'll use specific words. What is
14 the difference between an inquiry and an investigation
15 under the State Police standards?
16 A. I'm not arguing that distinction. I'm arguing
17 the distinction that I called him and asked him to have
18 it done. I believe I asked Lieutenant Hile or Sergeant
19 Young through some fashion that they asked that it be
20 done.
21 Q. Let's explore that. What do you recall actually
22 doing in regard to having a department unit, the CLEAN
23 Unit start an inquiry into Christopher Bush?
24 A. I seem to believe it going through Lieutenant
25 Hile, the investigator, saying, you need to find out if

85

1  this is a legitimate entry or not.
2  Q.  Do you recall when you did that?
3  A.  No.
4  Q.  Was that before or after the packet on the
5  limited investigation and Tripp's comment?
6  A.  It would have been after.
7  Q.  It would have been after that?
8  A.  Right.
9  Q.  Okay.  Do you recall when you got that packet?
10 A.  No, I don't.
11 Q.  You made adjudication on August 1st?
12 A.  Correct.
13 Q.  You sent your letters July 31st to the township
14 for Bush, in regards to your findings, correct?
15 A.  Correct.
16 Q.  Documents we're going to go through indicate June
17 of 2007, Tripp requesting from Hile, the Wizner
18 investigation.  Do you remember seeing that
19 documentation in the review yesterday?
20 A.  If you show me, sir.
21 Q.  We'll get to that.  I just want to short cut the
22 process.
23        MR. HENZES:  Requesting from Hile or Hile
24 requesting from Tripp?
25        MR. PURICELLI:  Actually, we'll get to this.

86

1  You'll see it.
2        THE WITNESS:  Can we take a break, Counsel?
3        MR. PURICELLI:  Absolutely.  No problem.
4        THE WITNESS:  Thank you.
5        -----
6        (Whereupon, a short break was taken.)
7        -----
8  BY MR. PURICELLI:
9  Q.  The documents we are going to go through indicate
10 June 2007, Tripp was requesting from Hile, from Hile,
11 the Wizner investigation.  Do you recall?  You said you
12 reviewed the testimony at the arbitration on October
13 4th, 2008?
14 A.  Yes.
15 Q.  Is what you testified at that hearing true and
16 correct?
17 A.  To my knowledge.
18 Q.  Nothing you need to change today?
19 A.  Not that I recall.
20 Q.  Okay.  So, can I rely, if I asked the same
21 questions, you'd give me the same responses?
22 A.  My memory being consistent and it's sometime ago,
23 the best of my ability.
24 Q.  What you reviewed yesterday, was there anything
25 that jumped out at you that you said was completely

87

1  wrong?
2  A.  Nothing that was said.
3  Q.  We were talking about the fact sheet 101.  You
4  believe that the fax transmittal cover sheet
5  purportedly, David Young is not related to the 101,
6  correct?
7  A.  Not relate to the 101.  I don't think it is, sir.
8  No.  I don't think it is.
9  Q.  This is based on what you know, correct?
10 A.  Correct.
11 Q.  Do you know David Young?
12 A.  Yes.
13 Q.  Did you have a conversation with David Young in
14 regards to any aspect of this litigation?
15 A.  I don't know.  I may have.
16 Q.  Okay.  Do you have any direct recollection of
17 doing it?
18 A.  I don't remember if it was him or Lieutenant
19 Hile.  We had discussions with checking the CLEAN Unit.
20 I may have discussed with him at some point, yeah.
21 Q.  The discussion that may have occurred, I'm not
22 saying it did, would have been after 11/9/06?
23 A.  Yes.
24 Q.  Okay.  Do you know, David Young from
25 Montoursville, what he was doing on or about 11/9/06,

88

1  what his duties, or job duties were?
2  A.  I think he was a crime section supervisor.
3  Q.  In your experience, in your career, how many
4  times have you asked for an NCIC inquiry to be done?
5  A.  Similar to this one?
6  Q.  Yeah.
7  A.  I don't know that I have ever.
8  Q.  Since this time, have you done that?
9  A.  No.
10 Q.  So, Christopher Bush is the first time you had
11 asked the NCIC Unit of the State Police to do an inquiry
12 examination of an entry from the local department?
13 A.  Correct.
14       -----
15       (Whereupon Exhibit No. Hill 1, Use of Force
16 Form, was marked for identification.)
17       -----
18 BY MR. PURICELLI:
19 Q.  Now, you don't recall the specific date that you
20 received this Use of Force Complaint that we marked as
21 Hill 1.
22 A.  I'm sorry, sir?
23 Q.  Your testimony is you don't recall a specific
24 date that you received and how you received this Use of
25 Force Form, this 101?

## Page 89

1  A. I don't remember.
2  Q. Can we agree it was after, either on or after
3  11/19/06?
4  A. Correct. It was not on 11/19/06. I believe it
5  was after January 15th, 2007.
6  Q. And these, this two page document is the only
7  thing that you recall receiving?
8  A. Pardon me? It should have come with either an
9  e-mail, I believe an e-mail. It should have come on an
10 e-mail with this attachment.
11 Q. In your review of the documents for today and in
12 your review of the records before, do you have any
13 recollection of ever seeing that e-mail?
14 A. I don't. In my review of the documents today, I
15 don't recall seeing that e-mail, no.
16 Q. Okay. And have you received before this Use of
17 Force Form, other Use of Force Forms and been told to
18 investigate the Use of Force complaint?
19 A. Yes.
20 Q. So, this wasn't your first one?
21 A. Correct.
22 Q. What ordinarily would come with those?
23 A. I think we went from faxes to e-mails and most of
24 them came from e-mails.
25 Q. What would be contained on either the fax or the

## Page 90

1  e-mail? What information.
2  A. I believe, if I recall correctly, a short
3  paragraph indicating, sign the attached complaint,
4  forwarded for your action under what specific type of
5  investigation you're going to do, a full or limited.
6  Q. Would it be fair to say, some form of instruction
7  to do with the two page document?
8  A. Yeah. I think that would be fair to say.
9  Q. Would it be fair to say in this particular case
10 we're talking about, this document wasn't being sent to
11 read and file away?
12 A. No.
13 Q. It was tasked to do something with that?
14 A. Correct.
15 Q. What was your understanding of that task?
16 A. To do a limited investigation into the complaint.
17 Q. How did you know a limited investigation was
18 being called for?
19 A. I believe there were instructions that would have
20 come at some point from the Director of IAD.
21 Q. So, there would be a document I could find that
22 would be from the Director saying to do a limited
23 investigation?
24 A. I would think there is. Whether it's still there
25 or accessible, I don't know. An e-mail came on or a

## Page 91

1  document that it came on.
2  Q. Okay. Now, when you do those types of
3  investigations, you create a package; is that correct?
4  A. Correct.
5  Q. And you don't throw away any documents from that
6  package. Do you?
7  A. No.
8  Q. That would include an e-mail or the instructions
9  what to do with this 101?
10 A. I may have gotten rid of the e-mail at some
11 point, yes.
12 Q. Why would you do that?
13 A. Because it's, a Use of Force, 101 and 108, are
14 significant documents. And I don't know that there is
15 any requirements included in the e-mail.
16 Q. Did you review the Operation Manuals or ARs to
17 find out what would have been required to be maintained
18 or not?
19 A. I don't know that I did.
20 Q. Did you review any policy regulations which say
21 you could or couldn't discard?
22 A. I don't know that I did.
23 Q. What evidence is there other than your own say
24 so, is the Director tasked to do in this investigation?
25 A. He didn't task me to do the investigation. The

## Page 92

1  investigation was tasked to be assigned by me to a
2  member of my troop to conduct an investigation.
3  Q. What evidence do you have other than your say so,
4  that's the case?
5  A. The 101 and the 108 forwarded to me.
6  Q. And what evidence do we have that it was
7  forwarded to you?
8  A. I have nothing, no document to show you that,
9  sir.
10 Q. But there should be one, correct?
11 A. I think there is one, yes.
12 Q. Okay. Ordinarily, when a Use of Force Complaint
13 is received, it's received by who, the State Police?
14 A. It would have been received by any number of
15 people.
16 Q. And under the policy, what is -- where is this
17 form supposed to go?
18 A. IAD.
19 Q. For purposes of the record, would you identify
20 that?
21 A. Internal Affairs Division.
22 Q. That is a division within the bureau?
23 A. Yes.
24 Q. And what is that bureau?
25 A. Bureau of Professional Responsibility.

## Page 93

1  Q. Commonly referred to as BPR?
2  A. It's not commonly referred anymore. It's now the
3  Bureau of Integrity and Process System, the Bureau of
4  some BIPS now.
5  Q. If I say BPR, would you know what that is?
6  A. Yes.
7  Q. Can we agree, everyone in this room, if we say
8  BPR, we're talking about that new long title they've
9  given?
10 A. Which includes the Internal Affairs Division
11 which remains the same.
12 Q. Correct. And there's one person in charge of
13 that Bureau which includes the division, correct?
14 A. Correct.
15 Q. All right. It is who?
16 A. Major Charles Skurkis.
17 Q. And back when you were a captain, who was it?
18 A. I think it was Major Charles Skirkus then, too.
19 I'm not sure. I know he was in charge of the Bureau.
20 The Director of Internal Affairs was Captain Willard
21 Oliphant.
22 Q. We're going to get to that. You're jumping
23 ahead.
24 A. Sorry.
25 Q. That's okay. The 101 goes to BPR, Internal

## Page 94

1  Affairs. And they decide what they're going to do with
2  it, correct?
3  A. Correct.
4  Q. Christopher Bush's complaint, were you involved
5  in any way, shape or form, discussions, memos, anything,
6  in the decision process, that would make it a limited
7  investigation?
8  A. I could have been.
9  Q. Do you have any direct recollection of being
10 involved?
11 A. I do not.
12 Q. If you had been involved, how would that
13 involvement have been?
14 A. Generally, a discussion with the Director of
15 Internal Affairs.
16 Q. And what type of things might you talk about if
17 you had a discussion?
18 A. The nature of the complaint and whether it falls
19 within the category of a limited investigation.
20 Q. And the complaint is, the synopsis is the second
21 page, correct?
22 A. Correct.
23 Q. And that without reading it --
24 A. And I think -- I'm sorry.
25 Q. It is okay. Without reading it, you can read it

## Page 95

1  to yourself into the record, is there anything in there
2  when that tells, it jumps out at you that says, yeah,
3  this qualifies for a limited investigation under the
4  State Police criteria?
5  A. Yes.
6  Q. What?
7  A. The fact that an investigation was being
8  conducted and failed to conduct a proper investigation
9  according to the complainant.
10 Q. Performance complaint, right, under the
11 Operations Manual, didn't do the duties accurately or
12 properly?
13 A. I think if you look at the category under
14 limited, I'm looking at the opportunity to have the
15 matter adjudication as the subject of participants in
16 the investigation.
17 Q. So, you have no direct recollection of being
18 involved in the process. And that's your understanding
19 that that might qualify?
20 A. A couple different reasons.
21 Q. Looking at that document, can you tell me any
22 others?
23 A. The ability of the Director of ID and the
24 Captain, looking at the mitigating factors in the
25 materials and investigation.

## Page 96

1  Q. What mitigating factors do you see in this
2  document that warranted a limited investigation?
3  A. The fact that an investigation was conducted.
4  Q. What investigation were you referring to?
5  A. The missing person and concealment and
6  whereabouts of a child investigation conducted by our
7  people.
8  Q. Christopher Bush was not the subject of that
9  investigation, was he?
10 A. No.
11 Q. Isn't it true that under a limited investigation,
12 that the issue of about whether it's limited or not is
13 if the complainant is the subject of the investigation?
14 A. Yeah. It says that. There is one section of it,
15 also says mitigating factors associated or complaining
16 on behalf of his brother. The investigation wasn't done
17 with the mitigating factor in my mind. I make that a
18 limited investigation.
19 Q. Isn't it true, Major that the types of
20 investigations you are referring to is like a
21 complainant is the target, not the person making it or
22 at least the brother of a person making the complaint
23 against somebody?
24 A. You got a little -- Counsel...
25 Q. Let me give it to you in example form.

**Page 97**

1  A. Yes.
2  Q. Let's say, for example, Randy's being
3  investigated by the State Police or police for getting a
4  fraudulent court order. Okay. And Randy says, you need
5  to investigate that properly. He calls the State Police
6  to get a BPR. He says, look, Randy is being
7  investigated by us for getting a fraudulent court order.
8  That would be a type of scenario that would fall into a
9  limited category. Isn't that true?
10  A. That's one type, yes.
11  Q. And have you ever known the State Police to
12  investigate as a limited investigation claim against a
13  trooper who is not investigating the complaint?
14  A. One more time.
15  Q. Have you known of any limited investigation where
16  the subject of a limited investigation, in this case,
17  Tripp?
18  A. Sergeant Tripp.
19  Q. Okay. Is not investigating Christopher Bush, not
20  investigating the person that is complaining?
21  A. Counselor, I'm completely lost at the gist of
22  your question.
23  Q. Okay. I'll try it again.
24  A. Okay.
25  Q. Christopher Bush was not being investigated by

**Page 98**

1  Tripp, was he?
2  A. Christopher Bush at some point was involved in
3  the investigation that was conducted by the people at
4  Mansfield.
5  Q. Tripp wasn't investigating anything about that
6  concealment, was he?
7  A. Sergeant Tripp was involved to some degree in the
8  investigation of that case, yes.
9  MR. HENZES: The question he's trying to ask
10  you is, was Christopher Bush the subject of any criminal
11  investigation, to your knowledge?
12  THE WITNESS: There was no specific criminal
13  investigation directed solely at Christopher Bush.
14  BY MR. PURICELLI:
15  Q. And what investigation was Tripp involved in as
16  an investigator or person supervising the investigation
17  or that Christopher Bush was involved?
18  A. I'm losing you, Counsel.
19  Q. You want to try?
20  A. Sergeant was involved --
21  MR. HENZES: You're losing it because of the
22  tag at the end. You have to -- you're trying to use
23  disjunctive. Stop using the disjunctive or you're going
24  to have -- I know it's ten questions. You're trying to
25  cut it down. You're going to have to ask the ten

**Page 99**

1  questions to get where you want to go. Don't try to use
2  the or because that is where it confuses it.
3  BY MR. PURICELLI:
4  Q. Christopher Bush was not involved, as we agreed,
5  in any type of criminal investigation being done by
6  Trooper Tripp, correct?
7  A. No, Christopher Bush was involved.
8  MR. HENZES: He is not a target. That is a
9  better question. You keep dragging it. There was a
10  criminal investigation. He got himself involved in the
11  criminal investigation. That is --
12  MR. PURICELLI: As the target?
13  MR. HENZES: That's the difference.
14  BY MR. PURICELLI:
15  Q. As the target?
16  A. Christopher Bush's activities in relation to the
17  entry into the NCIC was part of the investigation
18  conducted originally in this case.
19  Q. What --
20  A. Sergeant Tripp was a supervisor in some capacity
21  of various investigative actions during that
22  investigation.
23  Q. And Christopher Bush's entry as a police officer
24  of the missing children into a NCIC data violated what
25  criminal law?

**Page 100**

1  A. Well, I don't know the answer to that, if it did
2  or did not or may have. They were looking into it. I
3  would imagine that was some portion of their action.
4  Q. It was investigated by the State Police, was it
5  not?
6  A. What was, sir?
7  Q. Christopher Bush, of the entry of the children
8  into the NCIC to the CLEAN system?
9  A. Yes.
10  Q. And it was determined by the State Police that
11  there was no CLEAN violation, correct?
12  A. That was the ultimate decision, yes.
13  Q. And you reviewed that investigation as well as
14  the investigation done by Hile in regard to the Bush,
15  Tripp, right?
16  A. I did.
17  Q. And you didn't refer the matter to any criminal
18  review, did you?
19  A. I did not.
20  Q. Okay. Did you consult with the District
21  Attorney's office?
22  A. I did not.
23  Q. Why not?
24  A. I felt that was the place of Newtown Township.
25  Q. Did you see any conduct that you as a state