1  trooper, a state captain, a state major now, that knows
2  that it would violate the Crimes Code provision of the
3  Commonwealth of Pennsylvania?
4  **A. The Crimes Code?**
5  Q. Yes.
6  **A. No. I don't think I saw anything that I'm aware**
7  **of that he violated the Crimes Code. He, being**
8  **Detective Bush.**
9  Q. Okay. And what, other than criminal?
10 **A. I'm sorry. I have to retract that. I believe at**
11 **some point, he, yes. He may have committed acts of a**
12 **criminal nature by concealing his knowledge of the**
13 **whereabouts of the children at some point in the**
14 **investigation.**
15 Q. So, you would then say that the acts of any
16 person which would conceal the whereabouts of the
17 children would be a crime?
18 **A. No, sir. I would not say that.**
19 Q. What act do you believe he, being Christopher
20 Bush did that would be criminal?
21 **A. I don't know that I said would be criminal. I**
22 **said it's a possibility and what circumstances**
23 **surrounding the children being recovered from Virginia**
24 **and then that subsequent court order being obtained**
25 **clarifying the custody of those children. He was asked**

1  **if he knew where the children were. He indicated he**
2  **did. He refused to give the information up.**
3  Q. Are you sure about that order of events?
4  **A. I think at some point, that was the gist of the**
5  **conversation with Sergeant Tripp.**
6  Q. Okay. Oh, okay. Aside from the Crimes Code,
7  Title 18, what other areas of law did the State Police
8  enforce?
9  **A. We are empowered, I believe, to enforce many**
10 **different statutes, the Game Code, Fish Code, various**
11 **others.**
12 Q. Of the codes that you know of, what you're
13 empowered, which, if any, were applicable to the Bush
14 complaint and the David Bush investigation of
15 concealment issues, if any? Just trying to eliminate
16 all those things you can.
17 **A. Well, we can look at a lot of things, Counsel.**
18 **Whether or not we have the power to enforce or not, I**
19 **don't know all of that.**
20 Q. Well, if you don't have the power to do anything
21 about it, you shouldn't be looking at it, true?
22 **A. Not. That's not true. Maybe somebody else has**
23 **power to look at something to discover a violation of**
24 **municipal jurisdiction. Whether or not that is somebody**
25 **else's purview to enforce or enact.**

1  Q. How many time, to your knowledge, have you known
2  that you investigated whether a police officer had the
3  power to act or not, a local police officer?
4  **A. Well, I don't know that I personally have. I**
5  **believe that issue has come up at various points many**
6  **times in the Commonwealth. There's lots of case law on**
7  **the subject.**
8  Q. With all that knowledge, you couldn't find
9  anything that Christopher Bush did wrong that you could
10 refer someone for enforcement. Is that true?
11 **A. I did not refer anything other than concerning**
12 **Detective Bush to anybody other than Newtown Township**
13 **Supervisors.**
14 Q. Prior to Christopher Bush, how many times have
15 you referred a decision -- prior to Christopher Bush,
16 how many times, prior to the letter that you wrote to
17 the Board of Supervisors about Christopher Bush, how
18 many times have you written a similar letter?
19 　　　MR. HENZES: To?
20 　　　MR. PURICELLI: To the Board of Supervisors
21 about a police officer.
22 　　　THE WITNESS: I don't believe I ever have.
23 BY MR. PURICELLI:
24 Q. After Christopher Bush, how many times have you
25 written a letter to the Board of Supervisors?

1  **A. I don't believe I ever have.**
2  Q. Do you know any policy, rule, article, regulation
3  of the Pennsylvania State Police that directs you to
4  write such a letter?
5  **A. I don't know. I don't believe there was such a**
6  **policy or procedure that directs me to write such a**
7  **letter.**
8  Q. Okay. Would it be fair to say that you wrote
9  that letter on your own choice? It wasn't an accident,
10 in other words?
11 **A. No.**
12 Q. It was intentional, correct?
13 **A. Correct.**
14 Q. And when you wrote that, did you know whether or
15 not it was likely that the Board of Supervisors would
16 act on that letter?
17 **A. I felt that was likely, yes.**
18 Q. Okay. So, when the Board did act on it, it was
19 not a surprise to you?
20 **A. No, sir.**
21 Q. Okay. So, now, getting back to Hill 1, the Use
22 of Force, the first page indicates it's information only
23 in block 5, correct?
24 **A. Correct.**
25 Q. And that is the block that says details of

105

1  allegations?
2      A.  It says type of allegation.
3      Q.  Type of allegation.  When it was information
4  only, what made you think that an investigation was to
5  be started, limited or otherwise?
6      A.  Because this didn't come alone.  It came in
7  conjunction with that.  That came in conjunction, I
8  believe, either an e-mail type investigation.
9      Q.  You said this, you were referring to the 108?
10     A.  108, yes, sir.
11     Q.  These State Police forms, 101 and 108 generally
12  run in consecutive order like 102?
13     A.  I make no guesses as to how they're numbered
14  or --
15     Q.  So, you can't tell what a 101, 102, 105, 106 is?
16     A.  No, sir.
17     Q.  I'm going to show you the November 22nd, 2006
18  letter from Captain Willard M. Oliphant.  Mark that.
19              -----
20          (Whereupon Exhibit No. Hill 3, Letter, was
21  marked for identification.)
22              -----
23  BY MR. PURICELLI:
24     Q.  Have you ever seen this document before?
25     A.  I don't remember having seen this one,

106

1  specifically.
2      Q.  Would that have been something that would have
3  been generated in the ordinary course of business from
4  the State Police at least for the type of complaint
5  we're talking about, the 101?
6      A.  Yes.
7      Q.  Have you ever seen such a type of document?
8      A.  Yes.
9      Q.  Do you recognize the document that would be sent
10  out as a matter of course in the ordinary course of
11  business for the purpose of investigating a complaint?
12     A.  It's not sent in every case.  It's sent in a lot
13  of cases.
14     Q.  And how long have you known, if you have, Willard
15  M. Oliphant?
16     A.  Probably fifteen years.
17     Q.  Do you recognize that to be his signature?
18     A.  I have no idea.
19     Q.  In that fifteen years, have you ever worked with
20  him?
21     A.  Yes.
22     Q.  Did you have any conversations with him at all in
23  regards to Christopher Bush's complaint?
24     A.  I may have.
25     Q.  If you may have talked to him, what might you

107

1  have been talking about?
2      A.  The contents of the complaint.
3      Q.  Okay.  Okay.  Were you involved in any part of
4  the process to make this a limited investigation?
5      A.  I may have.
6      Q.  Okay.  But you have no specific recollection?
7      A.  No.
8      Q.  This document is dated November 22nd, 2006,
9  correct?
10     A.  Correct.
11     Q.  Do you know whether or not a verified complaint
12  is required in order for you to investigate the Use of
13  Force, 101?
14     A.  There is a -- I don't specifically recall the
15  list of what requires a verification or what doesn't.
16     Q.  So, your testimony then is you don't know if you
17  have to investigate or not if there is or isn't a
18  verified complaint?
19     A.  I'm sorry, sir.  I'm losing you again.
20     Q.  If you got just the 101 and this cover letter,
21  e-mail or whatever that we don't have, I'm sure Randy
22  would tell me if he saw it and gave it to me, I'm
23  assuming?
24         MR. HENZES:  Assuming one would exist.  I
25  don't know.

108

1          MR. PURICELLI:  We'll talk about the Ruiz
2  stuff when we get down that far.
3          THE WITNESS:  Uh-huh.
4          MR. HENZES:  If your question is do you need
5  a written verification form to conduct a --
6          MR. PURICELLI:  Yes.
7          MR. HENZES:  So, you need a signed written
8  complaint to conduct an investigation.  Did the Bureau
9  of Internal Affairs need a written complaint to conduct
10  an investigation?  Is that what you're asking?
11         MR. PURICELLI:  Yeah.  Can you investigate
12  solely on the use of force?
13         MR. HENZES:  You've got to understand, he
14  doesn't make that determination.  That's a different
15  division that is making that decision.  He is --
16         MR. PURICELLI:  He'll tell me I don't know
17  and I'll move on.
18         THE WITNESS:  One more time.
19         MR. PURICELLI:  You know what?  I'm going to
20  move past.
21         MR. HENZES:  To your knowledge, do they
22  actually need a written complaint.
23         THE WITNESS:  Not every case, if that is the
24  question, no.
25  BY MR. PURICELLI:

109

1   **Q.** Just so the record is clear, you can't tell me
2 you didn't have a discussion with Captain Willard M.
3 Oliphant about Christopher Bush to determine whether a
4 limited investigation should be done and sent to you to
5 do?
6   **A. I cannot tell you that I didn't have a**
7 **conversation nor can I tell you that I did have it.**
8   **Q.** So, there would be a document that would speak to
9 that. Is that true?
10  **A. That's not necessarily so. That him and I**
11 **conversed about it?**
12  **Q.** Sure.
13  **A. No. I don't know there would be a document.**
14  **Q.** Are you sure?
15  **A. I'm pretty sure.**
16      MR. HENZES: Put it this way; do you have
17 one?
18      MR. PURICELLI: We're going to get to it.
19 BY MR. PURICELLI:
20  **Q.** In your fifteen years of knowing him, have you
21 known he was being sued?
22  **A. Captain Oliphant?**
23  **Q.** Yes.
24  **A. Sued?**
25  **Q.** Yeah.

110

1  **A. Yes. I believe I knew he was being sued.**
2  **Q.** Did you have a discussion with him in regard to
3 any lawsuit where it was alleged in 2009, that he had
4 initiated an investigation into the activities of the
5 Secret Service?
6  **A. Did I have discussions with him?**
7  **Q.** Yeah.
8  **A. Not that I recall.**
9  **Q.** Did he talk to you about it?
10  **A. At some point, he may have mentioned that.**
11  **Q.** What is your understanding of what it was about?
12  **A. Something about a registration plate being run,**
13 **surveillance with a local cop and a Secret Service**
14 **Agent, something along those lines. And I don't know if**
15 **that is the result of reading about it, hearing about**
16 **it, talking about it. That is my general knowledge of**
17 **it.**
18      -----
19      (Whereupon Exhibit No. Hill 4, News Print,
20 was marked for identification.)
21      -----
22 BY MR. PURICELLI:
23  **Q.** I'm showing you what is marked Hill 4, the
24 Philly.com news print posted April 17th, 2009, involving
25 the State Police Officer. Again, target of the probe.

111

1 Did I describe, basically, the document to you properly?
2  **A. It appears to be a copy of a Philly.com.**
3  **Q.** I understand that. My question was, did I
4 describe that accurately?
5  **A. I'm sorry, sir. I wasn't really listening. I'm**
6 **sorry.**
7  **Q.** Do you need me to repeat it?
8  **A. How about you repeat it?**
9  **Q.** I handed you a document marked as Hill 4.
10  **A. Yes.**
11  **Q.** A Philly.com article posted, dated April 17th,
12 2009 referring to a State Police officer, again, target
13 of probe. Did I describe the document I handed you
14 accurately?
15  **A. You did.**
16  **Q.** All right. This document, on the second page
17 talks about a federal jury adversely ruling for Mr.
18 Oliphant in 2003, correct?
19  **A. Correct.**
20  **Q.** I described that correctly?
21  **A. You have.**
22  **Q.** Did you have discussions with him about that
23 before?
24  **A. I'm sure I did.**
25      MR. HENZES: It is so wrong. They should

112

1 sue that guy. The last line is wrong.
2      MR. PURICELLI: The last line of the second
3 paragraph?
4      MR. HENZES: Off the record.
5      -----
6      (Whereupon, a discussion was held off the
7 record.)
8      -----
9 BY MR. PURICELLI:
10  **Q.** Well, this -- so, you are at least aware that
11 there have been allegations against Oliphant about
12 misusing his position in AIB?
13  **A. In where?**
14  **Q.** In Internal Affairs, BR?
15  **A. I was aware of both of these incidents.**
16  **Q.** Okay. When you got your assignment and when you
17 were speaking with him?
18      MR. HENZES: No. It couldn't have been.
19 You said this is dated 2009. You said assignment.
20      MR. PURICELLI: 2003.
21 BY MR. PURICELLI:
22  **Q.** You were at least aware in 2006, were you, of the
23 allegations that appeared on the second page of that
24 news article?
25  **A. Regarding a phone conversation?**

1    Q.   Yes.  The jury coming back against him?

2    A.   I was aware of that, yes.

3         MR. HENZES:  Aware of the conversation.  The

4    jury doesn't come until after that time.

5         MR. PURICELLI:  After 2006?

6         MR. HENZES:  After 2006, filed well after

7    because you got the two year deal.  The Middle District

8    can take forever.

9

10        MR. PURICELLI:  Big --

11        MR. HENZES:  The allegation, yes, that is in

12   there.  Whether the finding, is another story.  So,

13   split them up.

14        MR. PURICELLI:  He is the guy that's

15   important.

16   BY MR. PURICELLI:

17   Q.   In 2006, if you spoke 2006 to 2007, we're talking

18   about 11/19/06, to whenever you got this Use of Force

19   Form, it was at least after 11/22/07 or after --

20        MR. HENZES:  You can say.

21        MR. PURICELLI:  11/22.  It had been after

22   that, that you actually had a conversation with him,

23   right?

24        THE WITNESS:  I may have had a conversation

25   with him about other things prior.  Relative to this,

1    yes.

2    BY MR. PURICELLI:

3    Q.   Okay.  Is it your testimony and correct me if I'm

4    wrong, that Oliphant did not assign you the task to have

5    investigated Christopher Bush's complaint against Tripp?

6    A.   Internal Affairs Division assigned a troop

7    through me, to have this investigated.

8    Q.   It will require a name, a person.  Internal

9    Affairs itself can't speak itself, right?

10   A.   No.

11   Q.   Because it will --

12   A.   Some person.

13   Q.   Who was that person?

14   A.   I don't recall.

15   Q.   Who would have, under the policy, been authorized

16   to make a decision?

17   A.   The policy is the Director of Internal Affairs

18   but the process is once it's handed out to one of his

19   employees or members under his supervision, goes through

20   the process of forwarding it.  It may have his name,

21   words on it, his name attached to it.  So, the policy is

22   the Director of Internal Affairs makes those decisions.

23   Q.   Okay.  It's the policy that you'd have to operate

24   off, right?

25   A.   Yeah.

1    Q.   It is not permitted or is it, that someone from

2    Internal Affairs just gives you this without a

3    Director's specific instruction to do a limited

4    investigation like that?

5    A.   I think that would be accurate.

6    Q.   And would you have been relying on that if

7    someone was sent to you that --

8    A.   I'm sorry.

9    Q.   When you got the 101?

10   A.   Right.

11   Q.   Were you relying on the policy that said only the

12   Director could decide if this was to be a limited or not

13   investigation?

14   A.   Well, I think that's accurate, yeah.

15   Q.   Okay.

16   A.   But it doesn't say only the Director.  You've

17   read what it says.  The troop commander has the input.

18   The Director has to concur on the decision.

19   Q.   I read the policy but you don't recall having

20   such a conversation, do you?

21   A.   I don't recall it, no.

22   Q.   So, that would only leave one course of action.

23   Isn't it true, Major, the Director had to make that

24   decision?

25   A.   No.  That doesn't mean one course of action.

1    That means him and I could have consulted and I don't

2    recall.

3    Q.   How many times had you consulted with the

4    Director since 2006?

5    A.   Many times, before 2006 and after 2006 about

6    IADs.

7    Q.   How many of those times that you consulted with

8    him resulted in a limited investigation being assigned

9    to you to task to an officer?

10   A.   Probably several, I would say.

11   Q.   How many?

12   A.   Several, I would say.

13   Q.   Do you recall any other conversations, any other

14   cases?

15   A.   That I recall?  Lots of IADs assigned.

16   Q.   That involved a decision process that you were to

17   do a limited investigation since 2006?

18   A.   I don't recall anything specifically.

19   Q.   Okay.  And in any of these conversations you had

20   with the Director about making a complaint, limited or

21   not, how many were actually recorded to some type of

22   writing or record?

23   A.   I don't know.

24   Q.   Do you know of any?

25   A.   I don't know of any.  I don't recall any.

117

1   Q.  Do you have training in wire tap law?

2   A.  Yes.

3   Q.  Do you have a certificate?

   A.  Hopefully, I have it somewhere.

5   Q.  So, the answer is yes, not physically.  You're

6   still certified to do wire tapping?

7   A.  I believe I am, yes.

8   Q.  And do you have to take a test to be certified?

9   A.  I did.

10   Q.  All right.  Your understanding of the wire law,

11   correct me if I'm wrong, that without the consent of

12   both parties or a court order, wire tapping is not

13   permitted.  A person cannot record another person's --

14   A.  Counselor, my knowledge on current Wire Tap Act

15   related case law has not been used in over fifteen,

16   eighteen years.  So, I would be using antique

17   information.

18   Q.  So, you wouldn't know if there was a violation or

19   not if a person came up to you and told you, Mr. Henzes

20   recorded my phone conversation without my permission?

21   A.  I think if that was in, and it was exactly that

22   scenario, yes.  I think that wire tapping, be a

23   violation but we need to investigate it.

24   Q.  What policy, rule, regulation, field regulations,

25   OM, anything within the State Police as State Police

118

1   official, member can record the conversations of another

2   State Police officer member?

3   A.  I don't know of a particular policy you're

4   referring to.

5   Q.  You don't.  Would you agree, you know of no

6   policy that allows one member of the State Police to

7   record the conversations on the telephone of another

8   member?

9   A.  Are you talking about the recorded line at the

10   barracks?

11   Q.  Yes.

12   A.  Sure.  A trooper can call on a recorded line and

13   be recorded on that conversation at any time.

14   Q.  And there is a beep that tells him he is being

15   recording?

16   A.  I believe there is.  It's my understanding there

17   is.

18   Q.  Do you know of any authority within the State

19   Police that allows a State Police official to record a

20   conversation of another trooper who doesn't know the

21   recording is being, taking place?

22   A.  No.  I don't know of any policy that permits that

23   without a person knowing the conversation is taking

24   place.

25   Q.  Would such conduct potentially be criminal?

119

1   A.  It could potentially be criminal.

2   Q.  Is there any immunity that you're aware of for a

3   State Trooper, a State Police person of wire tapping

4   laws of Pennsylvania?

5   A.  I don't know of any particular immunities for

6   State Troopers.

7   Q.  Okay.  In your career, do you know of any

8   exceptions written in any of the policies of the State

9   Police to any Crimes Code?

10   A.  What, sir?

11   Q.  Do you know of any immunities in the State Police

12   Regulations that provides an immunity to a State Trooper

13   for violating any of the Crimes Provisions?

14   A.  I don't.  Nothing comes to mind.

15   Q.  Okay.  I'm showing you what's been already marked

16   Christopher Bush 2.  You already testified that

17   particular document came with what we have marked as, I

18   believe, Hill 1.

19   A.  I believe so, yes.

20   Q.  Okay.  And it's been your testimony that you

21   don't recall your specific action once you got that,

22   correct?

23   A.  Other than I assigned it to somebody.

24   Specifically, I don't know what you mean by I don't

25   recall.

120

1   Q.  I'm trying to find out, what was the first thing

2   you did.  Would it be fair then to say the first thing

3   you did was you assigned it.  You just don't know where,

4   when you assigned it for an investigation?

5   A.  I don't have a recollection of an exact date that

6   I assigned it, no.

7   Q.  Okay.  Do you have a direct recollection of

8   meeting with the person you were assigning it to?

9   A.  At some point.  Specifically to this, no.  I

10   don't recall meeting directly with him.

11   Q.  Do you recall how you assigned the investigation

12   to whoever you assigned it to?

13   A.  Not specifically, no.

14   Q.  Do you recall who you assigned it to?

15   A.  Yes.

16   Q.  Who?

17   A.  Lieutenant Hile.

18   Q.  Okay.  Now, Lieutenant Hile is a criminal

19   investigator?

20   A.  No.  He is not.

21   Q.  What is he?

22   A.  He is, was, let's see.  I believe -- I don't know

23   if he was the staff services section commander or the

24   criminal investigations section commander at the time I

25   assigned it to him.  I don't recall.

121

1    Q.   Do you know Hile?

2    A.   Do I know him?

3    Q.   Yes.

4    A.   Yes.

5    Q.   Do you know him in a personal nature?

6    A.   What do you mean a personal nature?

7    Q.   Do you go out drinking, socialize other than just

8    meeting him at work?

9    A.   I have been to various trooper picnics with him,

10   retirement affairs.  I don't know that we ever

11   personally had gone to dinner one on one together, to

12   lunch together.  I worked with the guy many, many years.

13   Q.   Did you consider him a friend?

14   A.   Yeah, yeah.

15   Q.   Okay.  How did you -- why did you choose him?

16   A.   Because it required a lieutenant in my mind, to

17   investigate because a sergeant was alleged to be

18   involved in wrong doing.

19   Q.   For rank reasons?

20   A.   Yeah, appropriate, for rank reasons.

21   Q.   Do you recall giving him any instruction,

22   specific instruction?

23   A.   Other than a discussion about looking into the

24   NCIC entry, I don't recall any specific instruction.

25   Q.   Did you give him those instructions before he

122

1    started his investigation or after?

2    A.   I don't think so.

3    Q.   You think it was after?

4    A.   Yeah.  It was after it started.

5    Q.   What caused you to believe there was an NCIC

6    issue?

7    A.   No jurisdictional reason for the entry.

8    Q.   Well, looking at the two documents, the Use of

9    Force forms and the verified Complaint, is there

10   anything in those two documents that caused you to

11   question jurisdiction?

12   A.   Sure.

13   Q.   What?

14   A.   Third paragraph down, July 2006, the undersigned,

15   Detective Bush employed by Newtown Township, entered

16   David Bush's children.

17   Q.   What did you know prior to this being sent to you

18   about the Davis Bush incident?

19   A.   Prior to it?

20   Q.   Yes.

21   A.   I don't think I knew anything prior.  I knew

22   nothing about this prior to this coming to my attention.

23   Q.   So, knowing nothing about that event, what in

24   that paragraph would have caused you to think that it

25   was jurisdiction involved?

123

1    A.   I don't know that prior to me seeing that report,

2    the incident report, I would have any knowledge of a

3    jurisdiction issue.

4    Q.   We're sticking to the two documents, the verified

5    Complaint, the one you called an incident report, can we

6    agree then that those two documents don't raise any

7    flags about jurisdiction if you just look at them for

8    the first time?

9    A.   Yeah, they do.  He's claiming children were

10   contacted and met with the State Police and the person

11   filing the reports in Mansfield.  And you have Sergeant

12   Tripp not entering the children, according to him, into the

13   NCIC and him entering the children into the NCIC.

14   Q.   How did you know that that might be a

15   jurisdictional issue?

16   A.   I don't think that I knew.  Might be a

17   jurisdictional issue, that's a reasonable conclusion

18   after seeing that.

19   Q.   Based on what?

20   A.   What I just read to you.

21   Q.   Just reading that, did you think that a police

22   officer couldn't put missing children on NCIC?

23   A.   I believe without having jurisdiction, yes.  It

24   was not proper to put them in.

25   Q.   It turned out to be the case, that wasn't so.

124

1    Isn't that true?

2    A.   No.  I don't know that I would say that that was

3    so at all.  I would say it was not a violation of the

4    NCIC policy as determined by the union.

5    Q.   What violation would it have been then?

6    A.   A violation of the Municipal Local Police,

7    Municipal Jurisdiction Act.

8    Q.   The one your attorney asked Chief Counsel's to

9    investigate after this lawsuit.  Is that true?

10   A.   I don't know if we asked him to investigate

11   anything.

12   Q.   Did the legal research?

13   A.   I think we asked for copies of the section.  You

14   have to ask him what he asked for.

15   Q.   Before your attorney asked Chief Counsel to

16   legal research, you didn't know anything about those

17   laws, did you?

18   A.   Yeah, I did.

19   Q.   Why didn't you say, oh, it violates those at that

20   point?

21   A.   Why didn't I say that to who?

22   Q.   Chief Counsel office.  Did you tell them that?

23   A.   I believe that the detective acted without

24   jurisdiction, yes.

25   Q.   Did you tell anybody that?