**Page 125**

1  A. I probably did.
2  Q. Who?
3  A. Well, let's take a look at the letter.
4  Q. Tell me who.
5  A. I have to look, Counsel. Give me a minute.
6  Q. Okay.
7  A. I told Newtown Township Supervisors.
8  Q. Can you describe the word, the statutes that
9  you're referring to? Did you use those words anywhere
10 that you said he lacked police powers under the Statute?
11       MR. HENZES: That's not what he said. That
12 has nothing to do with the policy.
13       MR. PURICELLI: You don't use the word
14 jurisdiction.
15       MR. HENZES: That's what he used. I'm
16 clearing up your question. You asked him who did he
17 tell didn't have jurisdiction.
18       MR. PURICELLI: You want to read the
19 question back? We talked about statute title, not the
20 word just jurisdiction.
21       THE WITNESS: Read the question back.
22 BY MR. PURICELLI:
23 Q. Major, you keep telling me.
24 A. Okay. Those are the words I used, Counsel.
25 Q. I know the words you used. Did you cite the

**Page 126**

1  State Wide Municipal Police Jurisdiction Act?
2  A. Did I cite it?
3  Q. Yes.
4  A. No, sir.
5  Q. That is what you were looking at. Your attorney
6  was asking the Chief Counsel to look at it, wasn't it?
7  A. The attorney asked Chief Counsel to look at those
8  sections, yes.
9  Q. You asked to look at that after this lawsuit got
10 started, correct?
11 A. These, specifically?
12 Q. Yes.
13 A. Yes, those specific sections.
14 Q. This lawsuit was started after you wrote your
15 July 31st, 2007 letter. Is that true?
16 A. Yes.
17 Q. Why didn't you use specific Statute names or at
18 least their numbers in these letters if you knew about
19 it?
20 A. Because I don't think I needed to.
21 Q. You needed to be specific, didn't you?
22 A. I was specific in my mind.
23 Q. If you were specific and you knew the Statute
24 names and numbers, why did research have to be done to
25 find them?

**Page 127**

1  A. I'm sorry. I don't get your question, sir.
2  Q. I didn't think you would.
3       MR. HENZES: Then why would you ask such a
4  question?
5       MR. PURICELLI: To see what his response
6  would be.
7  BY MR. PURICELLI:
8  Q. Did you consult with any Statutes at all in your
9  adjudication of the Christopher Bush complaint?
10 A. I may have. I don't recall.
11 Q. If you had, wouldn't there be a record of it?
12 A. That I looked something up?
13 Q. Yes.
14 A. No. There would be no record of that, Counsel.
15 Q. What are you required to utilize to make
16 adjudication under your own regulations?
17 A. I don't know what I'm limited to. You'd like to
18 show me, I'd be glad.
19 Q. We're going to get to the regulations, Major.
20 Rest assure of that.
21     In the course of your review of the 108, there is
22 a second page, an allegation about comments attributed
23 to Sergeant Tripp, correct?
24 A. Yes.
25 Q. Okay. Did you delegate to Hile the task to find

**Page 128**

1  out whether Tripp did or didn't make these statements?
2  A. I don't know what I did specifically, other than
3  to assign him to the case.
4  Q. Did you provide any documents to Hile whatsoever,
5  the scope of his investigation, what he is supposed to
6  look for?
7  A. He got copies of the 101 and everything I got
8  from BPR went to him.
9  Q. You didn't prepare these though, did you?
10 A. No.
11 Q. Did you prepare anything to tell him the scope of
12 this investigation?
13 A. Not that I recall.
14 Q. Did you give him an e-mail that told you the
15 scope of the investigation?
16 A. I may have forwarded the e-mail.
17 Q. Do you have direct recollection of doing it?
18 A. I do not.
19 Q. And your testimony before is you might have
20 destroyed it, right, thrown it away?
21 A. I said I don't know what I did with it. I may
22 have.
23 Q. I'm showing you what's been already marked Ignatz
24 4. Have you ever seen this Statute before, 2908 and
25 2909?

129

1  A. I believe I have, yes.
2  Q. In the course of your adjudication, did you look
3  at the Statute?
4  A. I don't recall if I did or not.
5  Q. Were you familiar with this Statute at the time
6  of the adjudication?
7  A. I don't recall if it was, to what degree then
8  versus now.
9  Q. Are you familiar with this Statute and its
10 requirement?
11 A. I think so, yes.
12 Q. Does this Statute apply to members of the
13 Pennsylvania State Police?
14 A. Yes, sir.
15 Q. Is it true that this Statute imposes on the law
16 enforcement agency the duty to investigate a report of
17 missing children, immediately to investigate?
18 A. Yes. It says that, sir.
19 Q. And the Pennsylvania State Police is a law
20 enforcement agency?
21 A. Yes.
22 Q. Okay. And that Statute would apply to members of
23 the State Police such as Tripp or Wizner?
24 A. Yes.
25 Q. And if Wizner were not complying with the

130

1  Statute, whose duty, if anybody, in his barracks, would
2  it have been to ensure the requirements of this Statute
3  were followed?
4  A. Any of the supervising members at the station.
5  Q. That would include Tripp?
6  A. Yes.
7  Q. Was there an allegation that Tripp, that he
8  wasn't causing the Bush children to be -- that he wasn't
9  causing, he was holding up, the entry of David Bush's
10 children into the data base?
11       MR. HENZES: Read the Complaint. What
12 allegation, if you want to be specific?
13 BY MR. PURICELLI:
14 Q. Major?
15 A. I would read the allegation, Counsel. Sergeant
16 Tripp not only didn't do his job, failed as required by
17 law, regardless of circumstances and without delay, to
18 enter David Bush's children into the NCIC.
19 Q. Is one of his jobs as a supervisor, to ensure the
20 children are required to be entered into NCIC as
21 missing.
22 A. One of his jobs is to oversee the operations of
23 the station. That is one of the operations that could
24 occur in the station. So, by extension, he is
25 responsible for that oversight.

131

1  Q. Okay. So, the complaint would have fallen within
2  this purview we're talking about, not causing children
3  to be put into NCIC. It's not that difficult, Major.
4  A. Sergeant Tripp was not assigned an investigation.
5  Sergeant Tripp was assigned to supervise the station.
6  There was an assigned investigator, a criminal
7  investigation supervisor. Then there's Sergeant Tripp
8  supervising that portion of it. He is not directly
9  responsible for interviewing, ensuring the assignment or
10 conduct of the investigation. He was responsible for
11 supervising the whole station.
12 Q. All right. Let's do it this way; Major, if a
13 trooper isn't doing his job and the next line supervisor
14 isn't doing his job, you as a Major, look into that,
15 would you be able to hold Tripp responsible?
16 A. To the extent they're aware that the person is
17 not conducting their jobs properly, yes. I would hold
18 them accountable for that.
19 Q. We agree that Wizner did not place the children,
20 the Bush children into the NCIC data?
21 A. Yes.
22 Q. We agree that the supervisor, Peters, was it?
23 A. No.
24 Q. Who was it?
25 A. Corporal Wheeler.

132

1  Q. Corporal Wheeler didn't place the children into
2  the NCIC?
3  A. We can agree to that.
4  Q. Would the next person above them, being Tripp?
5  A. Yes.
6  Q. There was nobody else bigger than, higher in
7  command than Tripp at that station. Is that true?
8  A. That is true.
9  Q. Is it also true that another station doesn't
10 supervise other joining stations?
11 A. Yes. That is true.
12 Q. It would then become your responsibility or
13 people between you then, correct?
14 A. Correct.
15 Q. You knew nothing about it and your staff,
16 correct, this investigation until after the complaint?
17 A. I knew nothing.
18 Q. How about your staff? Did your staff know, the
19 people that fall below you, from Tripp?
20 A. I believe he wasn't falling below me at the time.
21       MR. HENZES: What time are you talking?
22       MR. PURICELLI: Before the children were
23 recovered, this whole thing.
24       MR. HENZES: That wasn't his staff.
25       THE WITNESS: I wasn't there. I don't know.

**Page 133**

BY MR. PURICELLI:
Q. Did you read anything if anybody knew anything outside the troop barracks?
A. Did I read anything?
Q. Yeah. Did you find out that anybody above Tripp knew that the Bush children --
A. I found out?
Q. Yes.
A. Yeah. I think Lieutenant Peters may have been aware of, the crime section commander at the time. But I don't have anything that I read that told that.
Q. What makes you think that?
A. Probably our discussions about this case.
Q. Before or after the lawsuit started?
A. Before or after the lawsuit was started?
Q. Right.
A. I don't recall.
Q. What was it that Peters told you?
A. I don't know what Peters told me directly.
Q. Okay. Tell me what you learned.
A. I don't recall how I learned it, Counsel.
Q. I didn't ask how you learned. Tell me what you learned.
A. Peters at some point may have been aware what was going on in this case.

**Page 134**

Q. Let's assume that Peters didn't tell you. Okay. Let's assume for this question, he didn't. Somebody else did.
A. Okay.
Q. Would it be your practice as a member of the State Police as supervisor, to then go talk to him and say, what do you mean?
A. For me to go and talk to see what he knew?
Q. Yeah. Say, I heard you know something. Is that true or not? Something to that effect?
A. It may have been a reasonable course of action, yeah.
Q. Do you recall doing that?
A. I don't recall a specific discussion with Lieutenant Peters, no.
Q. Do you know, can you tell me anything that would cause me to think that you weren't acting reasonable, that you were told that, that you wouldn't go approach Peters?
A. I don't believe that Peters had any independent knowledge what the rest of the people involved in this investigation did. Peters was given the same, given at some point, a portion of the information, the same stuff that I ended up with at that point.
Q. Christopher Bush worked in a law enforcement

**Page 135**

agency. Isn't that true?
A. Yes.
Q. And is it also true from your understanding of the Statute where it's read, doesn't say that the duty of a law enforcement agency to put children into the missing child data bank is limited to the agency that was investigating it?
A. I don't see that anywhere in the Statute.
Q. Okay.
A. The first duty under 2908A1 is that they have to investigate the report of a missing child immediately. Detective Bush had no jurisdiction to investigate that matter.
Q. Why didn't he? Is it a felony?
A. There is no --
Q. Is it a felony, Major?
A. There is no reason that I know of that gave him any jurisdiction whatsoever to investigate the case.
Q. You did read the two Statutes?
A. I did, Counsel. There is nothing that leads me to believe -- there is nothing in there.
Q. That is fine. My question was isn't child concealment a felony in this state?
A. Concealment of the whereabouts of a child.
Q. Yes. And the concealment applies to anybody who

**Page 136**

actively removes the children or prevents them from returning? Isn't that true?
A. Concealment applies to anybody that?
Q. That would be the person removing them, allowed them or preventing them from being returned. Isn't that true?
A. Uh-huh.
Q. So, isn't it also true that the Concealment Statute, that the person who is allowing another person to conceal is just as guilty as the person who is actually hiding the children?
A. I don't know that I recall seeing that in the Statute. Generally, goes to conspiracy to engage in a crime covered. I don't know that I saw that specifically in that section.
Q. If State Police such as Trooper Tripp or Sergeant Tripp or any of the people of law investigating that learned the whereabouts of the children, what was their duty?
A. I think the duty requested by the district attorney was to locate the mother and just check on the welfare of the children.
Q. What was the duty under law, not what the district attorney told him was?
A. I don't know what you're referring to, Counsel.

137

```
 1    Q.  If you don't know, you can't answer the question.
 2        What was the duty under State Police regulations,
 3   if you know?
 4    A.  I don't know if there is any specific regulation
 5   that directly refers to it.
 6    Q.  Fair enough.  You don't know.
 7        If you draw your attention to Statute 2909A, just
 8   above the B.
 9    A.  Uh-huh.
10    Q.  Okay.
11    A.  2909.  I'm sorry.
12    Q.  Concealment of whereabouts of a child, that is
13   what Wheeler was investigating?
14    A.  Wizner, sir.
15    Q.  Ignatz, 508, mark.  So, you can see.  That is
16   what he was investigating, correct?
17    A.  Correct.
18    Q.  Okay.  We've identified F050891031, is the
19   incident number?
20    A.  Correct.
21    Q.  2909 would have been the specific Statute he was
22   investigating because it's referenced on the reports,
23   correct?
24    A.  Yes, sir.
25    Q.  So, the Statute we're looking at, he was
```

138

```
 1   investigating, correct?
 2    A.  Correct.
 3    Q.  All right.  Now, if we look at the Statute, under
 4   A, and there is a sentence off to the right column,
 5   starts with for the purpose.  Do you see that?
 6    A.  For purposes of the section?
 7    Q.  The term remove.  So, it defines what removes
 8   mean, right?
 9    A.  Yes.
10    Q.  And it includes preventing the child from being
11   returned to the child's known place of residence,
12   doesn't it?
13    A.  Preventing a child from or preventing the
14   children, yes.
15    Q.  Okay.  So, any person who prevents the child
16   through any act from being returned to the child's
17   residence?
18        MR. HENZES:  Known, known.
19        MR. PURICELLI:  You can argue all you want.
20        MR. HENZES:  No, no.  Read the Statute,
21   right.  Read the Statute right.  Read the Statute right
22   because you keep reading the Statute.  Read it right.
23        MR. PURICELLI:  It says preventing a child
24   from returning or being returned.
25        MR. HENZES:  To known.
```

139

```
 1        MR. PURICELLI:  You can interpret it the way
 2   you want.  It's a legal issue.
 3        MR. HENZES:  I'm only reading what the
 4   Statute says because you keep making reference to it.
 5        MR. PURICELLI:  Let me just get the
 6   deposition done.
 7        MR. HENZES:  If that's the case, why are we
 8   talking about wire tapping crap?
 9        MR. PURICELLI:  We didn't get there yet.
10   BY MR. PURICELLI:
11    Q.  If the State Police knew the whereabouts of the
12   children and didn't disclose it to the father,
13   preventing him from returning the children?
14    A.  Prevented him from --
15    Q.  By not disclosing to him that they learned where
16   the children were, would they be preventing him from
17   going and returning the children?
18    A.  If the State Police knew.
19    Q.  The children were in Virginia.
20    A.  If we knew the children were in Virginia and we
21   didn't tell the father.
22    Q.  Right.
23    A.  That would prevent the father from knowing where
24   they were.
25    Q.  Right.  And returning the children, correct?
```

140

```
 1    A.  And knowing where they're at and what actions you
 2   can take from that, yes.
 3    Q.  What reason do you know, under the State Police
 4   policy that says the State Police can make a conscious
 5   decision if they learned the whereabouts, not to tell
 6   the father?
 7    A.  I think there is nothing written that can show
 8   that, that says that.
 9    Q.  There's no policy that tells a State Police
10   member they're to make a decision about whether the
11   children should be returned or not who have been
12   concealed by one of the other parents?
13    A.  I don't know of any policy that says that.
14    Q.  Now, there was a CLEAN Investigation into the
15   NCIC -- into the Bush children, correct?
16    A.  Correct.
17        MR. HENZES:  CLEAN investigation or the
18   entry?  There was an investigation into the entry.
19        MR. PURICELLI:  Whatever.
20        -----
21        (Whereupon Exhibit No. Hill 5, Report, was
22   marked for identification.)
23        -----
24   BY MR. PURICELLI:
25    Q.  It's your testimony at some time you made a
```

**141**

1  request for an inquiry of the CLEAN Unit for the State
2  Police to look into the entry by Christopher Bush, true?
3  A. True.
4  Q. Have you ever seen that report before that we
5  marked as Hill 5?
6  A. Yes, I have.
7  Q. Do you recall what the first time was that you
8  saw this?
9  A. I'm guessing sometime after the date it was
10 completed. I don't recall the actual date.
11 Q. And did you learn at any time before you saw this
12 report that your request for an inquiry into the CLEAN
13 entry had been granted?
14 A. I don't know that I heard that it wasn't granted.
15 Q. When you made your request, you made it as a
16 captain?
17 A. Yes.
18 Q. Okay. And you made that request of a person in a
19 lesser ranking than you?
20 A. I made it, yes.
21 Q. Did that person that you made the request of have
22 the election to say yes or no?
23 A. People of a lesser rank generally don't disobey
24 orders but they certainly ask questions about an order,
25 saying yes or no is a little bit tightly confined to

**142**

1  your question. Generally speaking, they obey the
2  orders.
3  Q. So, it really wasn't a request, was it? A
4  superior officer requesting a subordinate or less to do
5  something, was it?
6  A. You may certainly couch in that language.
7  Q. Well, if the person had not done it, would they
8  have been subject to discipline?
9  A. If I chose to do that, I imagine if they directly
10 refused what I asked them to do, yes.
11 Q. Did you tell someone that you were requesting to
12 do something that he had the choice not to do it?
13        MR. HENZES: Why are we getting into it? It
14 was done. We talked about shit that we knew was done
15 for an hour and a half. Why are you badgering with him
16 over nonsense?
17        THE WITNESS: Can I take a break?
18        MR. PURICELLI: You can.
19            -----
20        (Whereupon, a short break was taken.)
21            -----
22 BY MR. PURICELLI:
23 Q. I'm showing you what has been marked as Hill 5.
24 A. Right.
25 Q. Have you seen that document before?

**143**

1  A. Yes.
2  Q. All right. Now, this document was created by
3  Richard T. Fultz, correct?
4  A. Correct.
5  Q. Have you had any conversation with him before he
6  indicated he started this investigation?
7  A. Before? No, not to my knowledge.
8  Q. And he indicates on his report February 12th,
9  2007, he started this investigation, correct?
10 A. Uh-huh.
11 Q. And do you know whether or not that date is
12 before or after you received Christopher Bush's
13 complaint and incident report?
14 A. It was after I received the complaint but I don't
15 have a specific recollection of the date.
16 Q. Okay. But you're comfortable saying that this
17 investigation date start was after you had already
18 tasked Hile to --
19 A. It would seem so, yes.
20 Q. Okay. Your attorney and I were having a
21 discussion just before we took a break, maybe could
22 short the point?
23 A. Sure. If I may?
24 Q. Yeah.
25 A. I'll attempt -- I often will request somebody to

**144**

1  do something in the form of a request and asking
2  somebody to complete a task. And I do not stand around
3  and say I order you to do this or that.
4  Q. All right. And I have been on this side of the
5  line arguing on a request or an order and arguing back
6  to me by the State Police Department when we say a
7  request, we're really giving a direction, an order. We
8  don't say order, a play on words thing.
9  A. I don't know if you can call it a play on words.
10 Q. Can we cut through the chase of all that? When
11 you requested, you're essentially saying, I'm the
12 captain. I want this done?
13 A. Essentially, that's the gist of the message, yes.
14 Q. So, cutting through the chase, you wanted
15 Christopher Bush's entry investigated by CLEAN, to see
16 if there was wrong doing. And you wanted that after
17 Christopher Bush already complained about Tripp?
18 A. Yes.
19 Q. And you knew about the complaint Bush made
20 against Tripp?
21 A. Yes.
22 Q. Okay. Did you know at that time that the law
23 protected Christopher Bush from retaliation in any form
24 from making that complaint?
25 A. Did I know?

## Page 145

1  Q. Did you know federal law of the Civil Rights Act,
2  the First Amendment, protected Christopher Bush from
3  reprisal, retaliation, adverse action, however you want
4  to describe it, for making the complaint against Tripp?
5  A. Yeah. I could not retaliate against Detective
6  Bush for making the report. I think that's accurate,
7  yes.
8  Q. And you knew that if it was deemed retaliation,
9  you would be subject to liability?
10 A. I think that's accurate, yes.
11 Q. What I mean by liability, you may be determined
12 that you violated civil rights?
13 A. Yeah.
14 Q. Potentially lose your job as a State Police. You
15 knew all that, correct?
16 A. Correct.
17 Q. Did you know writing the letters to Duffy --
18 strike that, to the Board of Supervisors could be viewed
19 as a retaliatory act?
20 A. I don't know that I ever thought that. No, sir.
21 Could it be viewed by anybody as anything? I'm sure it
22 could.
23 Q. Did you consult with anyone as to whether you
24 should or shouldn't send that letter.
25 A. I don't recall.

## Page 146

1  Q. Did you do any legal research to see if that
2  could be deemed a retaliatory act?
3  A. Not that I recall.
4  Q. You knew that retaliation was illegal?
5  A. I think you can say that, yes.
6  Q. Was this general investigation by Fultz reviewed
7  during the adjudication?
8  A. Yes. I believe it was.
9  Q. And you knew then when you adjudicated the
10 complaint against Tripp that the CLEAN Department that
11 had done the investigation you requested, determined
12 there was no CLEAN Rule violation?
13 A. Correct.
14 Q. And a CLEAN investigation wasn't delegated to
15 determine whether Christopher Bush did or didn't have
16 jurisdiction to make that entry, were they?
17 A. No. I believe that was my main concern.
18 Q. There is no mention in here as to the act, the
19 Police Jurisdictional Acts. Is there, by Fultz?
20 A. Chief Duffy was advised that this was an
21 administrative investigation concerning only the NCIC
22 entries made by Detective Bush. His department did not
23 have jurisdiction to make entries as the children were
24 not missing in his jurisdiction and not associated with
25 the IAD or any other investigation. It's goes on from

## Page 147

1  there.
2  Q. Uh-huh. No mention of the Statutes that you're
3  referring to, right?
4  A. There is no mention of the Statutes I referred to
5  specifically by number.
6  Q. It does however, specifically mention
7  Christopher's Bush's filing of the IAD complaint,
8  doesn't it?
9  A. It does, yes.
10 Q. How did they learn about the complaint?
11 A. I would imagine the discussions when we asked to
12 have the NCIC entry looked into. We were doing an IAD
13 complaint.
14 Q. Did you mention when you were making your
15 request, that there was a complaint by Christopher Bush
16 about Tripp being investigated?
17 A. Did I mention it to who?
18 Q. To the CLEAN Unit, persons you were making the
19 request?
20 A. I don't believe that I ever talked directly at
21 the assignment portion, the CLEAN Unit.
22 Q. Isn't it true that a complaint against troopers
23 being investigated by IADs are confidential?
24 A. Well, I can't conduct an investigation without
25 letting someone know what you're doing.

## Page 148

1  Q. CLEAN wasn't delegated to look into the
2  complaint. They were delegated to look into Christopher
3  Bush's entry, correct?
4  A. Correct.
5  Q. And why he entered the children had nothing to do
6  about his complaint against Tripp, did it?
7  A. Well, I think it most certainly did.
8  Q. Tell me why.
9  A. I thought it was relevant.
10 Q. Why would it be needed to know by someone whether
11 investigating the belief that the person shouldn't have
12 made an entry or not have also made a complaint against
13 a state trooper or a state trooper sergeant?
14 A. I don't know you can parcel out from what you
15 investigate and what you don't investigate. The
16 circumstances behind the entire course of events. The
17 totality of the course of the circumstances I believe is
18 the common term, sir.
19 Q. Were you trying to influence the investigation by
20 saying that the person you wanted investigated for
21 conduct which may or may not be appropriate had just
22 made a complaint?
23 A. Counsel, I didn't talk to anybody in the CLEAN
24 Unit prior to assignment.
25 Q. Are you saying you didn't disclose to Fultz's