Bush's complaint against Tripp?

A. **Correct. I did not.**

Q. So, when you saw him mention that, when Fultz mentioned that in his report, you didn't inquire to him how he had knowledge about that Internal Affairs complaint?

A. **No. I did not.**

Q. You didn't inquire why he even put it in the Complaint?

A. **No. I did not.**

Q. Now, Fultz also used the word fraudulently on the first page, correct, in the last paragraph, second line up?

A. **Correct.**

Q. What court order did you review that there was a finding by the judge of fraud?

A. **I believe the term fraud was used in the petition from Mrs. Bush at some point. The term used in the court order issued was inappropriately granted or obtained.**

Q. That doesn't answer my question, Major. What court order did you read?

A. **I think I just answered your question. I am comfortable with that answer.**

MR. HENZES: The question was, did you see



the word fraud in any court order. If you did, you did. If you didn't. Whatever it is, it is.

BY MR. PURICELLI:

Q. Did you find any finding by the court of fraud?

A. **No.**

Q. You used the word fraud a number of times in your letter to Newtown Township about Christopher Bush. Didn't you?

A. **Let's take a look. Do you want to me to look at it or do you want to look at it.**

MR. HENZES: No. Go ahead. Are you saying the word fraud in the letter or is he referring to Christopher Bush's doing something fraudulent?

MR. PURICELLI: I don't remember the question. Just so we're referring to the record, we're referring to what is already marked Christopher Bush 4.

THE WITNESS: If you have that handy, Counsel?

BY MR. PURICELLI:

Q. Do you have a copy?

A. **Just point out where you used the fraudulent phrase. I'm just looking for it.**

Q. I didn't mean to interrupt you.

A. **I don't see the one marked Commonwealth, Commonwealth Exhibit.**



MR. HENZES: Christopher Bush 4.

THE WITNESS: 4. I don't see the use of the word fraud, Counsel.

BY MR. PURICELLI:

Q. When you prepared your letter to the Township Board of Supervisors, did you use the language that is found in the general investigation report by Richard T. Fultz?

A. **I don't know what language I may have used on that report. You can compare the two if you --**

Q. I'm asking you whether you took the language there or it was your own thoughts?

A. **I may have taken some thoughts or portions from various written reports.**

Q. When a trooper prepares a report under the Administrative Rights Operation Manual, are they to put a conclusion in their own personal thinking?

A. **It depends on the type of report.**

Q. So, you're saying this general investigation report requires a conclusion, opinions by an investigator?

A. **Yeah. Some of them do.**

Q. This is the one I'm talking about?

MR. HENZES: This one being?

MR. PURICELLI: This one by Fultz.



MR. HENZES: What is the Exhibit number you're making a reference to?

THE WITNESS: The general investigation report of this type includes a conclusion.

BY MR. PURICELLI:

Q. The conclusion, does that require an opinion of the investigator?

A. **I don't know that it requires an opinion of the investigator.**

Q. Under the policies, is an opinion of the investigator supposed to be put in that general investigation report such as the one we're looking at, Hill 5?

A. **I think it does permit in this particular type versus an IAD, that an opinion, a conclusion on an opinion. If it was, I can't recall.**

Q. Can you cite any Operation Manual regulation that would say that an opinion of the investigator is permitted?

A. **I don't see where you're -- the only preclusion for opinions I know of is the AR 425 and the IAD report.**

Q. When Fultz wrote an order was obtained fraudulently, you didn't question him why he used that word?

A. **No. I did not.**

Q. On the second page under the synopsis, that last sentence reads the FBI had charged him, meaning Dave Bush of three counts conspiracy to commit abduction. Did I read that correctly?

**A. You did.**

Q. Is that true?

**A. I don't know.**

Q. Are these reports, these general investigation reports supposed to be truthful?

**A. Sure.**

Q. Factually accurate?

**A. Sure.**

Q. Okay. Did you determine in view of all of the other documents whether or not the FBI charged David Bush with --

**A. No, sir.**

Q. Would it surprise you to learn they didn't?

**A. No, sir.**

Q. Why? Did you expect this to be true and accurate?

**A. Mistakes happen.**

Q. Oh. And what is the penalty?

MR. HENZES: You ought to know that mistakes happen.

MR. PURICELLI: Oh, I know. I paid a pretty



heavy one. I'm guessing that Trooper Fultz wasn't punished for writing his report. Was he?

THE WITNESS: Not by me, sir.

BY MR. PURICELLI:

Q. Do you know of any punishment proposed on him for his report?

**A. No, sir. I do not.**

Q. And you relied on the report?

**A. I did, yes.**

Q. So, you relied on the information in the report that isn't truthful?

**A. No. I think I relied on truthful information to make a decision.**

Q. You were aware the children had been recovered and brought back to Pennsylvania by Mr. Bush?

**A. I was aware, yes.**

Q. Okay. Do you know in the course of your investigation, whether or not at any time Wizner had a face-to-face conversation with the children after they were returned back to Pennsylvania?

**A. Do I know that?**

Q. Yes.

**A. I don't recall that occurring.**

Q. Do you know whether it was required?

**A. I don't. If there is, I don't recall it.**



Q. If he had not fulfilled his obligation under the State Police policies to have a face-to-face conversation with the children, would that have been an act that would subject him to discipline?

**A. Not in this case, absolutely not.**

Q. Why not in this case?

**A. Because I don't think that applies to the general regulation you're concerned with about children being returned. I think the circumstances are such that precluded that in this case.**

Q. So, when I read the policies about circumstances, I'm going to see that exception. Is that true?

**A. You may see. I don't know what you're going to see, Counsel. I would not have found Trooper Wizner to be negligent, doing that in this case.**

Q. Where would I find the regulation that says when the policy requires certain acts, you don't have to follow that policy?

**A. I think you have to look at the totality of the circumstances. And we do that regularly on a daily basis.**

Q. You're saying I won't find a specific policy that says you don't have to apply that policy?

**A. I don't think you'll find anything that says that.**



Q. You kind of apply the policies as you think they should be applied for every circumstance?

**A. Yes. I think that's accurate.**

Q. How does a trooper know whether or not the circumstances are going to require him to comply with a policy or not?

**A. Training, experience and supervision. I guess would be my answer to that.**

Q. In a factual case here, we did have a criminal investigation ongoing?

**A. Yes. We did.**

Q. Did you have a Statute that requires certain types of conduct?

**A. There is a Statute that requires a certain type of conduct, yes. I don't think it applied in this case but you have that Statute.**

Q. That's your personal opinion?

**A. Yes.**

Q. You couldn't point to any policies that says your opinion was supported by it?

**A. Yes, supports to the district attorney and say my opinion supports it.**

Q. Another instruction. Let me finish my question.

**A. I thought your question was finished, Counsel. I apologize for interrupting.**

Q. It's okay. I've done it.

You can't point me to any State Police policy that says when there is a criminal investigation already started and a numbered assignment, a violation or a potential violation of criminal law, concealment charges, where the trooper would be excused from a policy saying talk to the kids when they showed up?

**A. I think I can. I think the district attorney termed the crime was not being committed under that Statute. And the totality of the circumstances precluded that trooper from doing that.**

Q. Can you point to any notation in the reports that indicated that after the children were recovered, brought back to Pennsylvania, any member of the Pennsylvania State Police went to the district attorney and said should I talk to the kids or not?

**A. No. I cannot.**

Q. Didn't happen, did it?

**A. No, sir. It did not.**

Q. And you were present at Mr. Ignatz's deposition, correct, back in January?

**A. Correct.**

Q. Since then, have you had conversations with him other than anything we talked about today?

**A. I don't think so.**



Q. And have you talked to Fultz in regards to anything he wrote in his report other than what was in his report?

**A. Since when, sir?**

Q. Since the deposition.

**A. No.**

Q. Have you before the deposition, before you made your adjudication on August 1?

**A. Yes. At some point during my adjudication, I talked to either Ignatz or Fultz. I don't recall which one, over the contents of their report.**

Q. So. The only thing you testified to is what is written in the report, what is written in their reports?

**A. Yes.**

Q. Is there anything else you can tell me they stated that I wouldn't read in a report, is my question?

**A. Not that I know of. No, sir.**

Q. That is why I asked that question. Now, you have been quite particular during the course of this deposition to call a document certain things like an incident report, general investigation, correct?

**A. They are what they are. Yes.**

Q. I understand that but you are specific because it's important to be specific, correct, as to when you're describing a document, true?



**A. Okay.**

Q. Tell me. Isn't it?

**A. I don't know what you mean. The name of the report is an incident report, a GI. I have used those terms.**

Q. When we referred to the complaint, you called it an incident report, 101?

**A. I don't know what you're referring to, what you referred to what and what I corrected you or --**

MR. HENZES: You referred to this as an incident report.

BY MR. PURICELLI:

Q. I'm just trying to understand. When the State Police Officers ask for documentation, they're specific as to what they're looking for. Is that true?

**A. I would generally say yes.**

Q. Okay. So, if you were looking for a missing child's report, you would ask for a missing child's report?

**A. No.**

Q. What would you ask for?

**A. I'd ask or an incident report, a missing person report.**

Q. Which is it? An incident report or a missing child?



**A. A missing person report is an attachment if I remember correctly, to an incident report. And I could be wrong. It's years since I've been involved directly in those activities.**

Q. Are you aware that Ignatz and Fultz went to the Newtown Township, they had asked for certain types of documents?

**A. They asked for investigative reports to document, to support the documentation.**

Q. Did they ask for an investigative report, an incident report or a missing child?

**A. I don't know what terminology they used.**

Q. Did they tell you?

**A. They may have said what they asked for. I don't know.**

Q. Did you ask?

**A. I did not specifically ask them that, no.**

Q. Did you recall reading Fultz's report where he talked about the report? He said it didn't exist and then pulling one out. He called it a lie?

**A. Correct.**

Q. Did you read any of the depositions of the plaintiffs?

**A. In this case?**

Q. Yes.

A. **I don't believe I did.**

Q. Were you aware that the difference was that Newtown Police had called their report an incident report and that they were being asked for a missing child's report which was something different in their field?

A. **I have no knowledge what excuse they came up with.**

Q. Assuming for the purpose of my question that Ignatz or Fultz asked for a missing child report as opposed to an incident report?

A. **No. I don't assume that. I think Detective Bush was perfectly aware of what they were looking for. He didn't adequately provide something, only when forced to do so. I'm comfortable with their take, their position. I take their word for it.**

Q. You weren't there, were you?

A. **No.**

Q. And you only have --

A. **I rely on the information that was given to me, Counsel.**

Q. You didn't talk to Christopher Bush?

A. **No.**

Q. And you didn't talk to Chief Duffy?

A. **No, sir.**



Q. But they were people that might have information in this investigation you were doing?

A. **They had an opportunity to present that information. They chose the route they chose.**

Q. Did you send your file down to talk to them?

A. **I did not.**

Q. Why not?

A. **I didn't think it was necessary.**

Q. You didn't think it was necessary to find out whether they asked for a report, an incident report or a missing child report?

A. **I think it was very clear from Detective Fultz and Ignatz's documentation that they asked for what they asked for and that they got what they got. I'm quite comfortable with that.**

Q. Isn't the command under the regulations to do or under the AR, to do an AR investigation, that you maintain a neutral position and open mind to be a fair investigation?

A. **I think that is generally the thought, yeah.**

Q. How would you get all of the information about an event if you didn't talk to both sides?

A. **I think I was comfortable with the side they provided to me.**

Q. You were only willing to listen to their side,



the State Police side?

A. **I don't know that I was only willing to listen to their side.**

Q. Why didn't you pick up the phone and call?

A. **I didn't feel it was necessary. I had what I needed.**

Q. You had what the State Police version was?

A. **Correct, yes.**

Q. And in your experience of a road person, even a supervisor, when you talk about event's, isn't there always two sides to an event?

A. **Sure.**

Q. You have to pick which is the right one?

A. **On occasions, yes.**

Q. In the case of Christopher Bush, you didn't get both sides, did you? You just got the State Police?

A. **No. We got his side.**

Q. You only got his complaint?

A. **Correct.**

Q. But it was a witness to what Fultz was saying was occurring that you didn't interview. Isn't that true?

A. **I didn't interview, correct.**

Q. You didn't ask for it to be interviewed either, to get both sides or the other party. Did you?

A. **I did not.**



Q. I'm showing you what is marked as Bush 3, the letter of June 6th, 2007 written by Steven J. Ignatz, a lieutenant of the Pennsylvania State Police. And how many times do lieutenants actually go out on types of inquiries that you asked?

A. **I have no idea, sir.**

Q. You heard him testify that he didn't do one before and after. Would that be consistent with your information?

A. **I would have no idea, it's consistent with the testimony I heard from him.**

Q. You have no reason to believe that wasn't true, do you?

A. **No.**

Q. Okay. Now, he clearly, if you get past all the language here, it clearly says no violation of the CLEAN rules and regulations, correct?

A. **It says, although it is apparent your agency lacked jurisdiction in the case in question, I find no violations of the CLEAN and Criminal Justice Information Services Policies. That would lead me to conclude that having jurisdiction to conduct an entry, somebody didn't think to write that into the regulations where in fact, it probably should be in the written regulations.**

Q. But's it's not a violation. Is it?

A. **No. It is not.**
Q. And you're stuck with what the regulations actually say. Aren't you?
A. **I don't know that I'm stuck with that regulation. In this particular case, it did not rise to a level of a CLEAN violation.**
Q. Okay, but that is not what you thought, is it? You thought it should have been a violation?
A. **I absolutely thought it should have been a violation.**
Q. Regardless of what the regulation said, you thought it should be a violation. Didn't you?
A. **I think it should be a violation, absolutely.**
Q. And you acted on that. Didn't you?
A. **I acted on the --**
Q. As a violation?
A. **I acted on the totality of issues uncovered during the course of the investigation, is what I acted on, sir.**
Q. You acted from the belief that there was no jurisdiction?
A. **I did.**
Q. And clearly, the CLEAN rules and regulations had nothing to do with this jurisdiction issue. Is that true?



A. **That's true.**
Q. And you can point to no criminal violation, could you?
A. **In terms of?**
Q. The entry.
A. **In terms of the entry?**
Q. Yes.
A. **In terms of the entry, the totality of the circumstances? What.**
Q. The entry. We're talking about the entry, Major?
A. **The entry, no, criminal.**
Q. And Christopher Bush's complaint to Tripp, about Tripp don't rise to any criminal violations of law. Do they?
A. **The complaint in and of itself?**
Q. Yeah.
A. **The complaint in and of itself, I didn't see a violation of law that I can recall.**
Q. And you were investigating, through you, Hile, actually, Bush's complaint about Tripp, correct?
A. **Which that included the entire course of events.**
Q. Isn't it also true that if a violation appears in the course of a limited investigation, it's supposed to then become a general investigation?
A. **A full investigation?**



Q. Yes.
A. **A violation of State Police procedures?**
Q. Is there any policy that says that if during the course of your investigation or limited investigation it becomes apparent that there's a violation, it's to be turned into a full investigation?
A. **We can get the language out and read it.**
Q. We're going to get it. Tell me your understanding.
A. **I'll just get the language out and read it.**
Q. You can go ahead.
A. **A limited investigation must be converted into a full investigation if any element of misconduct is determined, yeah.**
Q. A crime would be misconduct?
A. **A crime committed by troopers?**
Q. Anybody during the course of that investigation. It doesn't limit an investigation to just the target, does it, or the complainant, does it? If you find misconduct, you can convert it, correct?
A. **Correct.**
Q. You thought it was misconduct, right?
A. **Not on the part of the troopers.**
Q. But you thought Bush, right?
A. **Yes.**



Q. But you never converted this to a full investigation?
A. **The investigation is directed towards personnel under my command. He is not under my command.**
Q. You wrote to the supervisors, didn't you?
A. **I did.**
Q. And, but he wasn't under your command?
A. **Correct.**
Q. Why?
A. **Because he committed misconduct. In my opinion, I had a duty to report that misconduct.**
Q. So, why didn't you commit a full investigation?
A. **Because he is not a trooper. He wasn't the subject of the investigation.**
Q. It doesn't say that, does it?
A. **No, sir. It does not say that.**
Q. While we're here on this thing?
A. **Yes.**
Q. Okay. This regulation specifically identified the criteria for it to be a limited investigation, doesn't it?
A. **It does.**
Q. Can we agree if I read every single one of the criteria, absent this mitigating circumstances that appears later on, that all of the elements are taken out

of the limited investigation. In other words, it doesn't fall within the criteria?
A. **I think it does. There's a couple of them, L2, L3, and the portion.**
Q. Well, let's go over them then.
A. **Okay.**
Q. 4-25L is the first area that talks about the limited investigation, correct?
A. **Actually, no. Yeah. Yes. I'm sorry. It is defined.**
Q. We can go all the way down to 4-25F, page 33 and also look at parts of it, correct?
A. **And G, yes, and F.**
Q. So, let's just look at L.
A. **Yes.**
Q. As a precursor. It says an investigation which is reported by correspondence form STD501 and clearly establishes that at least one of the following applies, allows for a limited, right?
A. **Correct.**
Q. We don't have a 501, do we?
A. **A 501?**
Q. That's the correspondence?
A. **201, Counsel.**
Q. Mine says 501.



A. **That's the old version, sir.**
Q. Was in effect 10/29/04?
A. **I have 12/23/08.**
Q. That was before. Yours was after your investigation?
MR. HENZES: Use this form. What page are you looking at, Brian? The bottom of the page.
MR. PURICELLI: Three. I gave him one. Yours is after the event, unless you can tell me.
THE WITNESS: The 501 and the 201 are the same document with a different number, a change.
MR. PURICELLI: I agree. I agree.
MR. HENZES: Are you sure, our I3?
MR. PURICELLI: L, Randy. We're at L.
THE WITNESS: Page 3. At least -- wait a minute.
BY MR. PURICELLI:
Q. Unless you can identify that there has been a change from '04?
A. **Okay.**
Q. I don't know of any. Yours in '08 is past the investigation. That is why we can't look at yours.
A. **Well, here's what happened. They changed the title on the 201 to a 501 at some point. And the AR catches up eventually. So, that's what occurred.**



MR. HENZES: What document were you looking at? What is the first sheet of your --
MR. PURICELLI: The first one says internal investigation, 25-01.
MR. HENZES: What's on the top?
MR. PURICELLI: AR4-25.
MR. HENZES: What is the next page you're looking at?
MR. PURICELLI: The next, page 3 of that document, L.
MR. HENZES: Page 3L. Okay. Under definitions.
MR. PURICELLI: Limited investigations.
MR. HENZES: You're looking under 2504L, using the word definition.
MR. PURICELLI: It's an investigation which is reported by correspondence form ST501, now called 201. We don't have that form.
MR. HENZES: 501 is just a memo.
MR. PURICELLI: I know it is.
MR. HENZES: 501 is just a memo. Your guy's internal memo form.
THE WITNESS: They changed the number.
MR. HENZES: No matter the number, it's a to from memo. That is what he is trying to get at. He



could have asked the question.
MR. PURICELLI: Off the record.
-----
(Whereupon, a discussion was held off the record.)
-----
MR. PURICELLI: We started this thing because he corrected me.
MR. HENZES: But he was going by a number. You should have said it is a to from memo.
BY MR. PURICELLI:
Q. The point being, now that we killed four hundred trees, we don't have a to from memo, do I, Major?
MR. HENZES: In this case?
THE WITNESS: Yes.
BY MR. PURICELLI:
Q. Where is it?
A. **From Lieutenant Hile to me.**
Q. Where is it?
MR. HENZES: No. He's talking about making reference to an allegation.
MR. PURICELLI: In order for this to be classified a limited.
THE WITNESS: No, sir. That is not correct. A limited -- this definition is providing you a