197

1  A. Right.
2  Q. Just to send it in, correct?
3  A. Correct.
4  Q. We're talking about an investigation, not how you
5  report the investigation?
6  A. Right.
7  Q. There is a difference, isn't there?
8  A. There is.
9  Q. An investigation is what you're doing and how you
10 report what you're doing whether on a written report or
11 a correspondence. It doesn't say that you don't do what
12 the regulations require. Does it?
13 A. No. It didn't say that.
14 Q. The requirements are that you do your
15 investigation, not write your reports in forty or ninety
16 days, it means wrap up the investigation, doesn't it?
17 A. I don't know if forty days applies to the limited
18 or not, Counsel. I don't think it does. I think
19 there's a lighter requirement in time.
20 Q. They get more time or less time?
21 A. That is the gathering of the materials necessary.
22 That there is not a due date assigned to the limited, if
23 I recall correctly, as it is to a full investigation.
24 Full investigations come with a due date. I don't
25 remember if the limited does but I can be wrong.

198

1  Q. I actually read this thing, cover to cover. I
2  couldn't find that. That's why I'm asking you that
3  question.
4  A. I cannot find anything that says that either.
5  Q. Well, we were on ninety. Assuming I'm correct
6  and you're not, the time limits control. According to
7  the regulations, the Christopher Bush complaint should
8  have been given status reports about his complaint by
9  Hile. Is that true?
10 A. I don't know unless you show me, sir.
11 Q. Page 30. See the note?
12     MR. HENZES: A status report by Hile?
13     MR. PURICELLI: Yeah. Let me read that to
14 you.
15 BY MR. PURICELLI:
16 Q. When an investigation exceeds ninety days, the
17 investigator, that was Hile, correct? He was the
18 investigator in the Bush complaint?
19 A. Where are you reading from, sir?
20 Q. Page 30, the top note?
21 A. Uh-huh.
22 Q. Hile was the investigator, right?
23 A. He was.
24 Q. So, I'll read his name. When an investigation
25 exceeds ninety days, Hile shall provide periodic status

199

1  reports either verbally or in writing to the complainant
2  until the investigation has been adjudicated. Did I
3  read that correctly?
4  A. You did.
5  Q. Interpreting, in this case, it meant that Hile
6  was required to call Christopher Bush until August 1st,
7  when you adjudicated. Is that true?
8  A. No. I don't think it says he provide the status
9  reports. It doesn't say he has to initiate the inquiry.
10 Q. Where?
11 A. Or initiating the correspondence. If Chris would
12 have called, Hile might have done an update.
13 Q. It says clearly here, Major, the investigator
14 shall provide?
15 A. Yeah.
16 Q. Are you trying to tell me that the complainant is
17 supposed to know this regulation and he can call?
18 A. Sure. I'm not saying he has to know the
19 regulation. He can call and check the status.
20 Q. Did the State Police give Christopher Bush the AR
21 Regulations and say, by the way, you have the right to
22 call in ninety days?
23 A. No.
24 Q. How is a person supposed to know that?
25 A. I'm not saying he is supposed to know that. I'm

200

1  just telling you that I don't say -- where it says that
2  Lieutenant Hile had the responsibility to contact him
3  and give him that information. If he asked, he would
4  give it to him.
5  Q. Do you know what fraud is?
6  A. Tell me.
7  Q. In your mind, do you know what fraud is?
8  A. In relation to what? Be more specific, Counsel.
9  Q. Do you agree that fraud could be saying something
10 that is not true to cause someone to do something or
11 holding back something that you should tell them so they
12 can't do it?
13 A. I don't think that any action comitted by
14 Lieutenant Hile committed a fraud.
15 Q. Maybe Randy will --
16 A. I look forward to hearing that, being educated by
17 those such as you.
18 Q. Thank you.
19     MR. HENZES: Free of charge, no less.
20     MR. PURICELLI: Can we take a short break?
21 As a matter of fact, why don't we take a half hour lunch
22 break and get some salad.
23           -----
24     (Whereupon, a short break was taken.)
25           -----

## Page 201

```
 1    (Whereupon Exhibit No. Hill 7, Missing
 2  Person Check List, was marked for identification.)
 3                    -----
 4  BY MR. PURICELLI:
 5    Q.  Major, I'm handing you what's been marked Hill 7?
 6    A.  Yes.
 7    Q.  OM7-2 section dated 10/17/2003.  Did I describe
 8  the document correctly?
 9    A.  You did.
10    Q.  Are you familiar with the OM, Operations Manual,
11  702?
12    A.  Somewhat.
13    Q.  I take it you didn't review this for today's
14  deposition?
15    A.  I did not.
16    Q.  Did you review this for the purposes of your
17  adjudication?
18    A.  Not that I recall, no, sir.
19    Q.  Do you recognize it as being the OM 7 Manual
20  referring specifically to missing children's check list?
21    A.  Missing persons check list.  It appears to be
22  such, yes.
23    Q.  Do you have any reason to believe I made this up?
24    A.  No.  I do not.
25    Q.  Okay.  Now, if we look to special instruction?
```

## Page 202

```
 1          MR. HENZES:  Page?
 2          MR. PURICELLI:  39-2.
 3          MR. HENZES:  Second page.
 4          MR. PURICELLI:  Second page.
 5  BY MR. PURICELLI:
 6    Q.  There is a 4 that talks about requirement for
 7  entries of a missing person under twenty-one years of
 8  age?
 9    A.  Uh-huh.
10    Q.  We're in agreement that the State Police never
11  placed any of David Bush's children in the NCIC,
12  correct?
13    A.  Correct.
14    Q.  Do you know what the federal law was, as referred
15  to in 4B?
16    A.  Do I know specifically what that refers to?
17    Q.  Sure.
18    A.  I can't say I do.  I believe that I have a guess
19  as to what it is.
20    Q.  I'm not asking you to guess.
21    A.  I don't know for sure.
22    Q.  Can we agree going through Wizner's report, he
23  mentions nothing about federal law being the basis for
24  not entering the children into the NCIC?
25    A.  He did not.
```

## Page 203

```
 1    Q.  Can we agree that Tripp never mentioned anything
 2  about the federal law saying children should not be
 3  entered into NCIC?
 4    A.  We agree.
 5    Q.  Now, if we go to C2, members shall ensure a
 6  search of the last known location and areas frequented
 7  by the missing person, income and -- well, I'll read it
 8  the way it is, is conducted.  And that an attempt to
 9  locate message containing appropriate information, IE
10  possibly destination, direction of travel, etcetera, is
11  entered into the CLEAN system.  Did I read that
12  correctly?
13    A.  You did.
14    Q.  Do you know what that means?
15    A.  Yeah.
16    Q.  What does that mean?
17    A.  Just what it says.
18    Q.  Shall look for the person and then send out a
19  CLEAN message?
20    A.  Yes.
21    Q.  Was there a CLEAN message sent out?
22    A.  I think there was several.
23    Q.  Okay.  Did any of them indicate where the child,
24  where they might be going?
25    A.  I don't recall seeing that specifically.
```

## Page 204

```
 1    Q.  If we go to 5, it says members shall initiate a
 2  follow up contact with complainant within twenty-four
 3  hours, a report of a missing person to determine if
 4  additional information is available which would
 5  necessitate supplementary searches, interviews or other
 6  investigatory measures.  Did I read that correctly?
 7    A.  You read it correctly.
 8    Q.  If we look at Wizner's report, does he make
 9  contact with David Bush in twenty-four hours of the
10  report?
11    A.  Not required to, in my opinion.
12    Q.  Okay.  Can you direct me anywhere in the OM
13  Manual where there's an exception to that rule?
14    A.  It's not a missing person case.  It's a
15  concealment of the whereabouts of a child case.  It's a
16  legitimate apparent defense.  And Mr. David Bush
17  reported it as such and not as a missing persons case.
18    Q.  You're saying that OM7-2 doesn't apply to this
19  case?
20    A.  Pretty much, yes.
21    Q.  Because he says he knew where the children were?
22    A.  He says he knew they were being concealed by the
23  mother.
24    Q.  Did he know where she was concealing them?
25    A.  No.  He did not.
```

## Page 205

Q. Did he have any idea where they were in the United States?
A. Not that I know of, no.
Q. What is the difference between missing and concealing?
A. I think wherever lies the rub between us, Counsel.
Q. As a police officer?
A. As a police officer, this isn't a missing persons case.
Q. Because?
A. It's a concealment of the whereabouts of a child case.
Q. How did you know the children were with the mother?
A. I think David Bush is a good source and the sister of David Bush, Sara Bush indicated that Sara was planning on leaving, not showing up and there's a history of domestic violations that we talked about, the history of the custody court matters. All those were reasonable conclusions that she was in fact concealing the whereabouts of the child.
    The totality of the circumstances were, led one to that appropriate conclusion in my mind.
Q. You used the word appropriate?

## Page 206

A. In my mind, Counsel.
Q. They went out and talked to the sister. She said she had no contact with her sister purposely so she couldn't say where the children were, correct?
A. Yes. I believe that was the subject.
Q. The sister didn't know if any foul play had occurred at any time, did she?
A. No.
Q. In fact, if you go through the totality of the circumstances, absolutely nobody knew whether foul play occurred, the wife, mother just was gone with the kids, right?
A. There was no indication of foul play. That would be an accurate, whatever you call that, an accurate phrase.
Q. But you don't need foul play for a person to be missing?
A. Not necessarily.
Q. Missing means you just don't know where they are?
A. No. I don't know that there's a definition of missing person that you and I are going to agree on.
Q. I guess not.
    By the way, if we read the missing persons section, OM7-2, that doesn't mention a distinction anywhere between concealment and missing, does it?

## Page 207

A. No.
Q. And is there any comparable OM Regulation for concealment, what you're supposed to do when there is an allegation of concealing the whereabouts of the children?
A. No. I don't think there is.
Q. Do you know whether any trooper has been disciplined under OM7-2 for a failure to place a child in the missing child data?
A. I don't have any direct knowledge that I can recall.
Q. I have a question for you, Major. If you can turn to OM7-2, 39, page 39.8, we have the State Police 7-0052 form, Pennsylvania State Police, missing person check list. And if we go to block five, it talks about abduction by a parent?
A. Uh-huh.
Q. Or non family member or other family member. If a person is known to have taken the child, they're now missing. Is that your theory?
A. Yes.
Q. Why do you have on the missing child report a block they can check off in this section when you know who the child is with if this section does not apply in this situation?

## Page 208

A. Because she didn't abduct the children.
Q. How do you know she didn't?
A. Based on the totality of the circumstances at the time.
Q. Did she have a court order?
A. Not at that -- at the time she left, she probably did have an active court order, yes.
Q. Do you know that, factually?
A. Yes.
Q. You do?
A. Yeah. The order expired, I believe in January of 2006. She had full custody of the children up until that time. She left sometime after that court order was issued.
Q. In the course of your documents, in the course of your investigation, you collected a series of documents, court orders and petitions. And you testified to them, haven't you today?
A. I don't know that I testified to any of them in particular. I testified during the -- they're in the stack of papers in the investigatory pile, yes.

-----

(Whereupon Exhibit Nos. Hill 8, Petition for Gruber Hearing and 9, Petition for Custody, were marked for identification.)

## Page 209

BY MR. PURICELLI:

**Q.** Showing you Hill 8 and 9. Have you ever seen those documents before?

MR. HENZES: 8 and 9.

THE WITNESS: I don't know if I have, if they're in your pile or not, Counsel. I think -- hold on. I'm checking a second one.

MR. HENZES: Brian, I'm going to say something to you right now and you don't take it the wrong way but I'm going to put this out there. And I hope that this isn't the first time you saw that particular document because if you read what you identify as 8, your client, Mr. Bush, not Christopher Bush and I don't blame him for this but David Bush has a verification attached to this document.

MR. PURICELLI: Uh-huh.

MR. HENZES: And paragraph 5 revealed that he knows the children are with the mother. Throughout this litigation, you have referred to them as missing. And you referred to the section 28 -- 2908 of the Pennsylvania Crimes Code.

MR. PURICELLI: Is this necessary for the record? Go off the record.

MR. HENZES: No. This is on the record.

## Page 210

I'm going to put you on notice that if you continue to push this as a missing child abduction analogy, I'm going to move for sanctions because your client, not your, your client is saying in his own document, in his own court filing that he knows the children are with the mother. And we're going to refer go this matter as what it was investigated as, as the concealment of the whereabouts of children.

If we continue to use missing person and we continue, and you can smirk all you like, I will move for sanctions. I will put you on notice right now. You are on notice right now that your client had never determined them to be missing. It's right in the document. Read it.

MR. PURICELLI: Like your client sitting next to you, everything is subject for interpretation and legal argument.

MR. HENZES: No, no.

MR. PURICELLI: I will wait for you to finish.

MR. HENZES: I am not done. There is nothing to interrupt what your client said. You have to accept what he said there. You cannot spin that. This is a court document. You can't stand in front of the court and say that is --

## Page 211

MR. PURICELLI: If you continue, I'm going to ask for sanctions for billing this record and not allowing my deposition.

MR. HENZES: I'm putting you on notice right now. You have peppered this witness about missing.

MR. PURICELLI: You continue, I'm going to seek sanctions.

MR. HENZES: You have continued misrepresenting the nature of what your client's own investigation, own complaints are on. And that's why it's missing.

MR. PURICELLI: You're on notice, Randy.

MR. HENZES: So are you.

MR. PURICELLI: We're done playing lawyers. Can we get back now?

MR. HENZES: Go ahead.

THE WITNESS: I'm having serious trouble reading number 9. The copy is not very clear.

BY MR. PURICELLI:

**Q.** I didn't say that they were pristine. They're copies of copies. I'm asking if you have ever seen them before?

**A.** I don't recall.

**Q.** Do you know what a petition for a Gruber hearing is?

## Page 212

**A.** Not particularly.

**Q.** It looks like a Bates stamped. One of them is February of 2006?

**A.** Okay.

**Q.** The second one has a date of May '06. It looks like 4. That is a petition for custody.

**A.** Okay.

MR. HENZES: You're looking at the --

THE WITNESS: I can't read.

MR. HENZES: The one he cannot read.

MR. PURICELLI: Well, I can read it and you can read it.

THE WITNESS: Can you read mine, sir?

MR. HENZES: Try my copy.

MR. PURICELLI: Yeah. May 2006, May 2006, 04, approximately 9:33 a.m.

THE WITNESS: May? Where do you see that, sir?

MR. HENZES: Where do you see the time stamp?

MR. PURICELLI: 2006, May 4th.

THE WITNESS: I think if you had not known previously, you --

MR. PURICELLI: I read these things all the time.

### Page 213

```
 1        THE WITNESS: I'm sorry, sir. I cannot
 2   decipher.
 3        MR. HENZES: You're saying that this is time
 4   stamped by some court that we -- by somebody you can't
 5   decipher who stamped it.
 6        MR. PURICELLI: Well, the totality of the
 7   circumstances tell me that it was probably filed in the
 8   Court of Common Pleas, okay, of my own totality, would
 9   end up there in Tioga County because that is where all
10   the paperwork is. Taking all the --
11        THE WITNESS: That's right, Counsel. You're
12   forgetting the Luzerne County paperwork.
13        MR. HENZES: Off the record.
14                          -----
15        (Whereupon, a discussion was held off the
16   record.)
17                          -----
18        MR. PURICELLI: It's a mess. That is what
19   happened when you go to the totality of the
20   circumstances, doesn't it?
21        THE WITNESS: Counsel, you're trying to lay
22   this on us?
23        MR. PURICELLI: Yeah.
24        MR. HENZES: Your point?
25   BY MR. PURICELLI:
```

### Page 214

```
 1   Q.  The point I'm trying to get is there were
 2   petitions filed for custody before or after your
 3   investigation of what Randy likes to say is now
 4   absconding or concealing of the children?
 5        MR. HENZES: No. I didn't say that,
 6   absconding. That is a legal term of art.
 7   BY MR. PURICELLI:
 8   Q.  Let me ask you, if a person conceals the
 9   whereabouts of a child, another parent, outside the
10   state without court approval, are you saying the child
11   is not supposed to be placed in NCIC and missing?
12   A.  Yes.
13   Q.  Where does it say that?
14   A.  In the section. She had a defense. She was not
15   committing any crimes. She had a reasonable fear of
16   domestic violence.
17   Q.  How do you know the defense was true?
18   A.  It is a reasonable conclusion based -- in fact,
19   we're lucky it didn't end up in a murder suicide
20   comitted by David Bush against this woman is a miracle.
21   I think I came to a reasonable conclusion that she had a
22   defense of the section. She committed no crime
23   whatsoever, had no legal reason to enter the children as
24   missing persons.
25   Q.  That's your conclusion but it's all based on
```

### Page 215

```
 1   reviewing all the records?
 2   A.  Yes, the totality of the circumstances.
 3   Q.  If you get a call of two men fighting, you said
 4   he punched me first, isn't that self defense?
 5   A.  Depending on the nature of the circumstances.
 6   Self defense may be an appropriate circumstance.
 7   Q.  Even though there may be an offense, you can
 8   arrest the person?
 9   A.  Counsel, what is the word I'm looking for?
10        MR. HENZES: Hypothetical situation.
11        THE WITNESS: I need more specificity.
12   BY MR. PURICELLI:
13   Q.  What specificity did you have other than the fact
14   that she had one PFA and a violation of that PFA that
15   she had a spousal --
16   A.  A fear of domestic violence?
17   Q.  That she can prove in a court of law?
18   A.  I don't think she has to prove it in a court of
19   law. She has to be in fear of domestic violence. I
20   think she had a reasonable fear of domestic violence.
21   Q.  That means the State Police didn't do anything?
22   A.  They did do something.
23   Q.  They started a report, right?
24   A.  Yeah.
25   Q.  Did they locate the children in Virginia?
```

### Page 216

```
 1   A.  No. They did not.
 2   Q.  Why not?
 3   A.  Because they failed to locate those children.
 4   Q.  Why did they fail? They had all the resources?
 5   A.  They did.
 6   Q.  Why couldn't they locate the children if they
 7   were doing their job, as you say?
 8   A.  Uh-huh.
 9   Q.  Why was Officer Bush in Newtown able to find them
10   but the State Police couldn't?
11        MR. HENZES: You don't want to go there.
12        THE WITNESS: I would give Detective Bush
13   credit for his ability to manipulate people and to give
14   him information that should have been protected and use
15   that information to his advantage.
16   BY MR. PURICELLI:
17   Q.  What information did he use that was protected
18   and shouldn't have been given?
19   A.  Getting information from the Social Security
20   Administration about the location of those children and
21   probably manipulation of somebody to give that
22   information out.
23   Q.  Where do you get that conclusion from? Probably,
24   the word you used?
25   A.  I said probably.
```

### Page 217

1  Q. Why do you say that?
2  A. Because I think generally speaking, there's a
3  privacy issue with Social Security information. He had
4  no legal right to it and he got it.
5  Q. How do you know he didn't have a legal right?
6  A. I'm just guessing, Counsel.
7  Q. To be fair, I'll say --
8  A. I give him credit for it.
9  Q. You have no legal training as to privacy laws?
10 A. You can go with that conclusion.
11 Q. It's a yes or no. If you do, I'll ask you about
12 it. If you don't, you don't?
13 A. I don't know. I may have had some discussion
14 about various privacy issues at some point in my career.
15 Q. But you also may not have. Is that true?
16 A. That may be true.
17 Q. And you can't direct me to any of the training
18 that you may have gotten that you say. Can you?
19 A. No.
20 Q. Do you have any training in the Social Security
21 Regulations rules and law?
22 A. No.
23 Q. Do you always assume things under oath?
24 A. I don't think I always assume things. I think
25 it's perfectly okay to state what I stated under oath.

### Page 218

1  And I probably think that, yeah. I think that's okay.
2  Q. So, you don't know what a Gruber hearing?
3  A. Not specifically, no.
4  -----
5  (Whereupon Exhibit No. Hill 10, Memo, was
6  marked for identification.)
7  -----
8  BY MR. PURICELLI:
9  Q. I'm showing you what is marked as Hill 10, the
10 June 28th, 2007, to from memo to the Director of Bureau
11 of Records and Identification from Dennis C. Hile. Did
12 I describe the document correctly, Major?
13 A. Yes.
14 Q. Hile again was the lieutenant assigned to
15 investigate Christopher Bush's complaint against Tripp?
16 A. Yes.
17 Q. The requesting party, personnel to be specific,
18 noted on this memo is Sergeant Joseph Tripp, correct,
19 the bottom line entry?
20 A. Yes.
21 Q. And this particular memo to the Director from
22 Hile indicates the requesting personnel?
23 A. May I have a moment, Counsel?
24 Q. You may.
25 -----

### Page 219

1  (Whereupon, a short break was taken.)
2  -----
3  BY MR. PURICELLI:
4  Q. The memo asks for copies or at least the
5  following reports, F5891081, correct?
6  A. Yes, yes.
7  Q. We've identified that already for the record as
8  being the Wizner investigation file of the concealments
9  of the whereabouts of the children investigation?
10 A. Can I just confirm that?
11 Q. Sure.
12      MR. HENZES: Sure. Referring to, it is.
13      THE WITNESS: He is looking for the
14 attachments to that report.
15 BY MR. PURICELLI:
16 Q. Dated June 28th, 2007, why was Joseph Tripp on
17 June 28th, 2007 seeking attachments of the report?
18 A. He wasn't. Lieutenant Hile was but Sergeant
19 Tripp needed to provide the report to Lieutenant Hile
20 for the investigation and the attachments had been sent
21 in to the report because it was concluded from
22 department headquarters, no longer had the attachments
23 so they sent down to department headquarters to get the
24 attachment of that report.
25 Q. Do you know that factually or are you just

### Page 220

1  assuming that?
2  A. I don't know the difference.
3  Q. Well, you were present at Tripp's deposition?
4  A. Yes.
5  Q. You don't recall him testifying he needed to
6  complete his report about Hile's investigation?
7  A. That's what I just said.
8  Q. The person requesting it really is Tripp so he
9  can have it. He is going through Hile. Is that fair?
10 A. The person requesting it is Lieutenant Hile. He
11 is the one that is making the request. It says
12 requesting person is Sergeant Tripp. The combination of
13 the two of them are asking for attachments to the
14 report. I don't understand the distinction.
15 Q. Why would Sergeant Tripp need records to give a
16 statement to Hile about whether or not he did or didn't
17 enter the children into NCIC when he did, they know he
18 did?
19 A. I have no idea what you're referring to. He
20 wanted the reports.
21 Q. Let me help you.
22 A. Okay.
23 Q. Hile's sole purpose was to investigate the
24 veracity, one way or the other of Christopher Bush's
25 complaint against Tripp, right?