221

1  A. The sole purpose was to investigate the totality
2  of the circumstances. You don't do part of the
3  investigation and leave all the rest of it out,
4  Counselor.
5  Q. Well, we know the scope of the investigation if
6  we have the document, wouldn't we? That says what the
7  scope of the investigation is, wouldn't we?
8  A. I wish we did. I'm sorry.
9  Q. I wish we did, too.
10  A. Let's not go into that. Are you arguing?
11  Q. I'm not arguing with you. I'm trying to find out
12  why you needed a document?
13          MR. HENZES: These are questions better
14  asked of Dennis Hile than him.
15          MR. PURICELLI: I am when I get him, Hile.
16          MR. HENZES: Why are you asking him?
17          MR. PURICELLI: If he's the adjudicator, I
18  want to know.
19          MR. HENZES: He is the --
20          MR. PURICELLI: You should ask him, have you
21  ever seen this before. Have you seen this before. It's
22  part of the packet, isn't it?
23          MR. HENZES: No, it's not.
24          THE WITNESS: I don't recall having seen
25  this. May I attempt to explain the procedure?

222

1          MR. PURICELLI: Absolutely. Randy doesn't
2  want you to.
3          MR. HENZES: Go ahead.
4  BY MR. PURICELLI:
5  Q. Let's cut to the chase. Do you know anything
6  about this document at all, factually?
7  A. Whether or not I remember or I'm supposing, I
8  can't give you the difference. I do not.
9  Q. I don't want you to guess. I don't want you
10  assuming anything. Did you have any contact? You
11  didn't see the document? You don't know why it is done?
12  A. I do know why it's done.
13  Q. Do you know that because somebody told you?
14  A. I can't tell you why I know that, Counsel. But I
15  know why it was done. Knowing why I know why, I can't
16  tell you.
17  Q. If you tell me you know it's going to lead me
18  down to who told you that?
19  A. I can't answer those.
20  Q. So, you have in your mind a reason why it was
21  done but you can't direct me to a source of why you know
22  that?
23  A. I'll go with that.
24  Q. Fine.
25          MR. HENZES: It's because you don't know the

223

1  source.
2          MR. PURICELLI: Let's be clear because,
3  Randy, you don't know or you don't recall the source.
4          THE WITNESS: I don't recall the source of
5  my knowledge.
6  BY MR. PURICELLI:
7  Q. Tell me your knowledge then. We're fine. Your
8  okay. You don't know who told you but that's how you
9  learned it? Tell me what you learned.
10  A. The process, when we complete an investigative
11  report, the attachments are separated from the station
12  copy and forwarded to department headquarters. That is
13  every report. That is the process.
14          Apparently, that was what occurred in this case.
15  Sergeant Tripp needed to provide those documents to
16  Lieutenant Hile to complete the investigation. Then
17  Hile writes the letter, puts Sergeant Tripp down as the
18  request. It's merely a formality to get all the
19  attachments to be seen throughout the course of this,
20  attached to the report so Lieutenant Hile can submit it
21  to me. We can submit that to IAD.
22  Q. You have a set of procedures on how a certain
23  document got from one place and had gotten to another
24  place?
25  A. Yes.

224

1  Q. And this is the process?
2  A. Okay.
3  Q. So, you don't know really what's going on other
4  than the process of getting certain documents from one
5  place or the other and that is met.
6  A. I think I -- yes. I'll go with that.
7  Q. You don't know of any factual reasons why Hile
8  specifically wanted the investigation report F05089104?
9          MR. HENZES: To be clear, he's asking for
10  the attachment. He is not asking for a report. He has
11  the report. He didn't have the attachment. That's what
12  he was explaining to you, that this front sheet.
13          MR. PURICELLI: I got that, Randy.
14          MR. HENZES: Oh my God. Go ahead. Go
15  ahead.
16          MR. PURICELLI: Thank you.
17                        -----
18          (Whereupon Exhibit No. Hill 11, 201 Form,
19  was marked for identification.)
20                        -----
21  BY MR. PURICELLI:
22  Q. I'm showing you what is marked as Hill 11. It's
23  a July 21st, 2007 201 form from Dennis Hile to yourself,
24  correct?
25  A. Correct.

### Page 225

1  Q. Have you seen this before?
2  A. Yeah.
3  Q. Can you tell us what that is?
4  A. It is Lieutenant Hile's summary of the
5  investigative reports.
6  Q. Did he provide anything to you about his
7  investigation other than this two page document and
8  attachment to it?
9  A. In written format?
10 Q. In a written format.
11 A. Not that I'm aware, written.
12 Q. What did he provide you here other than what is
13 indicated?
14 A. We discussed that numerous times.
15 Q. What did he mention, if anything, other than
16 what's indicated on the report?
17 A. Couldn't recall.
18 Q. What did he direct you to as documents that he
19 might have known exist other than what is indicated on
20 this report?
21 A. None.
22 Q. What did you rely on for your adjudication other
23 than what is indicated in this report?
24 A. I think I relied on my discussions and what's
25 indicated in that report.

### Page 226

1  Q. And you don't recall your discussions?
2  A. Not specifically.
3  Q. Tell me generally what you recall then?
4  A. I don't know that I can.
5  Q. So, my question is, you don't recall discussions
6  is true?
7  A. No. We have had discussions about various issues
8  and I don't recall specifically what they may have been.
9  I don't want to preclude things that we might have
10 talked about but I don't specifically recall.
11 Q. He indicates right here in the beginning, David
12 Bush and Sara Bush had been in a custody battle about
13 the three children since 2004. Do you see that?
14 A. Yes, sir.
15 Q. The petition that we showed you before and the
16 Gruber?
17         MR. HENZES: 8.
18 BY MR. PURICELLI:
19 Q. What document do you recall that showed the two
20 of them engaged in a custody battle?
21 A. I don't recall a specific document.
22 Q. So, how did you know that is a fact?
23 A. I relied on the information he provided me and
24 the attachments contained, some of which may have been
25 very similar to these.

### Page 227

1  Q. How did he rely on that fact?
2  A. You have to ask him, sir.
3  Q. Okay. Hile was supposed to investigate
4  Christopher Bush's complaint against Tripp. We've
5  established that, correct?
6  A. Yes.
7  Q. Where in that report does he talk about
8  interaction between Tripp and Bush?
9  A. I don't know that it does.
10 Q. The investigation limited as it be was supposed
11 to deal with all Christopher Bush's complaints about
12 Tripp. Wasn't it?
13 A. I don't know how it's written, Counselor.
14 Q. What is your understanding how it's written?
15 A. Regulations concerning a limited and full
16 investigation. I think we went over pretty much to
17 death?
18 Q. Are you telling me --
19 A. If you're talking about the laughter comment?
20 Q. Yeah.
21 A. I didn't consider that worthy, of the laughing.
22 Q. Rude behavior contended?
23 A. I don't think it's particularly rude. When he
24 was provided the information that he was and he found
25 out that Detective Bush was in fact the one that entered

### Page 228

1  it into NCIC, the brother of the complainant in this
2  case, I probably would have laughed, too. And I
3  certainly wouldn't hold my man to a standard higher than
4  I would hold myself to.
5  Q. There is a regulation about how a state trooper
6  is supposed to interact?
7  A. True. And I don't think he was rude at all,
8  under the circumstances.
9  Q. But someone else?
10 A. He made a complaint that he thought it was rude
11 behavior.
12 Q. Did you ask Christopher Bush why he believed it
13 was rude behavior?
14 A. No. I didn't talk to Chris Bush at all.
15 Q. And you have no statement from Tripp about that
16 phone call?
17 A. No.
18 Q. We know looking at everything that was listed,
19 theres is no statement?
20 A. No, sir.
21 Q. There's no acknowledgement that he was even told
22 the complaint, let alone when he was told. Was there?
23 A. Correct.
24 Q. Is the complaint against a trooper minimized or
25 overlooked if the person complaining is believed to have

**Page 229**

1  engaged in misconduct?
2  A. Once an investigation is conducted and the
3  totality of the circumstances revealed, the trooper
4  engaged in misconduct or the claimant engaged in
5  misconduct, wouldn't be a differentiation. If he was
6  engaged in misconduct and reported the trooper engaged
7  in misconduct and you establish that, the trooper would
8  be disciplined.
9  Q. Why does it talk about, all about David Bush in
10  here, going to Luzerne County and getting custody
11  orders? What does that have to do with whether or not
12  Tripp or someone from the barracks should have entered
13  the children or not? Under your theory, there was no
14  crime. Why was it necessary to talk all about David
15  Bush's trips to Luzerne County and down to Virginia?
16  A. Part of the totality.
17  Q. How did that resolve Christopher Bush's
18  complaint?
19  A. It was relevant and part and parcel to the
20  entirety of the circumstances.
21  Q. All of the relevant parts of it, why don't they
22  discuss the laughter and the phone call and you then
23  determining that it wasn't considered a violation.
24  A. I didn't consider it a violation, will not
25  consider it a violation.

**Page 230**

1  Q. Why didn't you say that in your adjudication
2  then?
3  A. I didn't think I addressed it. It's unfounded.
4  It's not rudeness, not misconduct.
5  Q. Why didn't you say that?
6  A. I think I did say that.
7  Q. Well, let's get to it. Tripp 3, Tripp 3 is an
8  August 1, 2007 adjudication by you, memo from you to the
9  Director of Internal Affairs, no name indicated, through
10  channels, having the following enclosures, SP3201, dated
11  7/26/07. That's the memo we just got done talking
12  about, right?
13  A. Yes.
14  Q. The correspondence dated 7/31/07, to complainant.
15  That is the letter that you wrote to Christopher Bush
16  that we looked at earlier that was called Christopher
17  Bush C-4, correct?
18  A. Yes.
19  Q. Correspondence dated 7/31/07 to Newtown Township
20  Supervisors who we referred to as Christopher Bush 5,
21  correct, earlier?
22  A. I don't know what number you referred to earlier.
23  That would be a letter that I wrote to the supervisors.
24  Q. Well, let me help you so you're not confused.
25  Right here?

**Page 231**

1  A. Yeah. I recognize the letter. Is that
2  attachment, Exhibit 5? That is what I was asking.
3  Q. When we were looking about the reference to
4  fraud, if you remember, 4, correspondence dated 8/1/07
5  to Sergeant Tripp, that is one you provided me this
6  morning that Randy said was in the packet. Do you
7  recall that? All the documents indicated on this,
8  correct?
9  A. That is what it indicates here, correct.
10  Q. What you sent to the Director with the closure,
11  with you adjudication, correct?
12  A. Correct.
13  Q. Now, correct me if I'm wrong, when you referred
14  to SP3201, a letter, do you also mean to say all the
15  attachments that Hile indicated in his --
16  A. Yeah.
17  Q. So, we can add all of those to your adjudication?
18  A. Right.
19  Q. It says after the thorough review of enclosure 1,
20  I have determined that the allegations of
21  dissatisfaction with the performance of duty against
22  Sergeant, Trooper to be unfounded. Commander Area 2,
23  Major John G. Rice concurred on 7/21, enclosure 2
24  through 4 are forwarded to the designated recipients,
25  meaning you sent the letter to Bush, the Township and

**Page 232**

1  Tripp?
2  A. Yes.
3  Q. Now, no mention in there at all about the
4  laughing part, right?
5  A. No.
6  Q. And the performance of duties meant not entering
7  the children into NCIC, correct?
8  A. I don't know that to mean, maybe including the
9  entire package. He was dissatisfied that he got laughed
10  at. He was dissatisfied with the performance of duty.
11  Categorize it all.
12  Q. That is the purpose of going through all those C,
13  E, F and G classifications we talked about?
14  A. Yeah. I'm sorry. I don't get the connection
15  but...
16  Q. I know you don't. Could you describe to me the
17  channels you sent the documentation through that is
18  indicated on the document?
19  A. Through the Area 2 commander.
20  Q. But you sent it through Rice to who?
21  A. To the Director of IAD.
22  Q. Will it go directly to him?
23  A. I don't remember if it goes through Rice or the
24  Director of the IAD. I don't recall. It was one of
25  those two.

233

1  Q. You cannot tell me here today if you sent it
2  directly to the Director of Internal Affairs or if it
3  went through?
4  A. Major Rice.
5  Q. Major Rice?
6  A. Right.
7  Q. What documentation do you have, if any, of the
8  meeting with Major Rice on 7/21/07?
9  A. I don't know that I have any documentation other
10 than what is written right there.
11 Q. What recollection do you have of what occurred
12 when you met or talked?
13 A. Independent of what is written there?
14 Q. Yeah.
15 A. I have none.
16 Q. You cannot tell me if you called him on the
17 telephone or met him in person or mailed him a copy?
18 A. I probably talked to him on the phone.
19 Q. But you cannot say you didn't?
20 A. I probably -- that's what I remember.
21 Q. Let's assume you called him on the phone. Would
22 you have sent him a complete copy of the report?
23 A. Yes. Would have a copy of the reports.
24 Q. Okay. So, if you did not receive Hile's report,
25 the 7/21/07 and you conferred on the same day, are you

234

1  saying the entire document was copied and sent over to
2  him?
3  A. What entire document?
4  Q. Your package. When he does the review with you
5  to get the concurrence, he reviewed everything. He
6  doesn't just rely on your say so?
7  A. I don't know what he reviewed, certainly
8  e-mailed. It is consistent with our operations that we
9  e-mailed the documents to be reviewed and engage in
10 discussion.
11 Q. All right. Let's go through that then. You use
12 an e-mail system to tell him you need his concurrence?
13 How do you get --
14 A. Generally, these reports are forward through
15 e-mail. I get them from IAD, generally speaking.
16 They're completed in an electronic format and they're
17 reviewed in the same fashion.
18 Q. So, you scan the hard copy in?
19 A. I don't think you can scan. You save it, forward
20 it.
21 Q. Maybe it's my misunderstanding. When you have
22 this 201 here, it comes out of the printer like that
23 but --
24 A. You can save it electronically.
25 Q. Fills in blanks but it prints, comes out looking

235

1  like this?
2  A. I'm not getting a difference, Counselor.
3  Q. You're telling me you can e-mail everything. For
4  me to create a document, word processor and print it
5  out, looks like this, put it so I send it to somebody, I
6  scan it to a PDF file?
7  A. You can't just save it electronically to the
8  e-mail?
9  Q. I can but I don't get a logo on it.
10 A. Yes. We can. It doesn't have to be a PDF file.
11 Q. If I look on a screen, I'll see a logo?
12 A. Yes. I think so.
13 Q. We don't have that. That's why I'm asking
14 questions.
15 A. Okay.
16 Q. Nobody else knows unless I ask the question. So,
17 when that report, 201 is being created by Hile, he just
18 does it on the computer?
19 A. Right.
20 Q. He didn't print it out?
21 A. He may have printed it out and attached it to
22 that.
23 Q. How do you deal with the court files? They're
24 not documents you -- how do you get them electronically
25 into the system?

236

1  A. I don't think they're in the system. They're
2  copies.
3  Q. So, you have to copy something?
4  A. If he looks at them at all.
5  Q. If you send it to him, you would have to copy or
6  scan them and then attach them in, scanned to a PDF file
7  and somehow get him physical control of a piece of paper
8  or accessed on an electronic file of that copy?
9  A. Correct.
10 Q. I'm just trying to find out how. What did he
11 get? What did he look at?
12 A. I don't remember what I looked at and what I
13 didn't look at.
14 Q. You don't remember what you sent to somebody on
15 concurrence?
16 A. Correct. How long ago was it? Three years ago.
17 I don't remember, Counsel. I apologize.
18 Q. Did you do something different in that
19 investigation than what you have done before?
20 A. No.
21 Q. How do you usually do it then?
22 A. It goes through e-mail and a major or the officer
23 looks at the report. I look at the report. We get on
24 the phone and talk. We reach a conclusion.
25 Q. Got that.

**237**

1  A. Okay.
2  Q. Now, we're back to the attachments. That may not
3  be things that you create in your file?
4  A. Right. All these court documents, I can pretty
5  much say I would not have attached in the e-mail I sent
6  to the Major.
7  Q. Can I take it from your answer then until I talk
8  to Rice, you cannot say if he did or didn't have the
9  court records?
10 A. Yeah. I don't recall if he did or not.
11 Q. Now, his concurrence is based on what?
12 A. That he look at the same material that I look at
13 and that I reached a reasonable conclusion.
14 Q. Right. If you couldn't give him the court
15 records, he couldn't look at the same materials as you.
16 Could he?
17 A. He couldn't look at the court records, right.
18 Q. His concurrence is based on less information?
19 A. He may have been. I don't know if he had those
20 or not.
21 Q. We have no evidence that I can look at right now.
22 We looked at a lot of paperwork that you sent him,
23 anything including an e-mail. Do we?
24 A. No.
25 Q. How did the concurrence come back?

**238**

1  A. I don't remember.
2  Q. How would it normally be given to you?
3  A. I think Major Rice may attach a concurrence. I
4  don't recall but usually verbally or an e-mail if we
5  were doing an e-mail.
6  Q. What does the regulation say?
7  A. I don't remember. I don't know if there is any
8  specific method that you can describe in the concurrence
9  that is covered in the regulation. If there is, I don't
10 recall it.
11 Q. Could you go to July 21, 2007, report from Hile?
12 That is 1.
13 A. You got it?
14 Q. Will you read for your attorney the first
15 sentence of that second paragraph?
16    MR. HENZES: For me? Why?
17    MR. PURICELLI: Yeah.
18    THE WITNESS: On 2/23/06, David Bush
19 reported his children as "missing", an attempt to have
20 the police. Is that it?
21 BY MR. PURICELLI:
22 Q. An attempt to have the police locate his
23 children, right?
24 A. Right.
25 Q. Anybody charge David Bush for a false police

**239**

1  report?
2  A. No.
3     MR. HENZES: Not yet.
4     MR. PURICELLI: In you review,
5  retaliation -- you can rest assure of that.
6     THE WITNESS: Was there a question?
7     MR. PURICELLI: It was for your attorney
8  putting me on notice about using the word missing?
9  BY MR. PURICELLI:
10 Q. Did you punish Lieutenant Hile for using the word
11 missing?
12    MR. HENZES: Lieutenant Hile reported it.
13 Your client said it.
14 BY MR. PURICELLI:
15 Q. Did you punish Lieutenant Hile for using the word
16 missing in his report?
17 A. Lieutenant Hile quoted David Bush as using the
18 word missing.
19 Q. Exactly my point. He picked that up from where
20 to quote it?
21 A. No idea.
22 Q. What did he have to look at?
23 A. I don't know what you're talking about, Counsel.
24    MR. HENZES: You're asking him where Hile
25 got that information?

**240**

1  BY MR. PURICELLI:
2  Q. You have a series of documents that you reviewed
3  as well. Major, one of them looks like them. I'll
4  identify them for the record. It's a P5200, in the
5  upper left hand corner. You can get your documents in
6  your file if you want to find it. It's an electronic
7  e-mail. If you want to do a message. And you can
8  interpret it for me. That's got Tripp's name down
9  there. Doesn't it?
10 A. Yeah. That looks like the --
11 Q. State Police form?
12 A. No. It's not a State Police form, any I'm
13 familiar with. It's from some other agency than the
14 Pennsylvania State Police.
15 Q. But you have it, right?
16 A. That's a copy of it in there.
17 Q. And you looked at that, right?
18 A. I don't know if I independently remembered that
19 one or not.
20 Q. Did you ever ask Tripp if he ever called anybody
21 and referred to Bush's kids as a missing child case?
22 A. I don't know that I did ask him that, no.
23 Q. Did you ever ask him if he called Sergeant Patton
24 at Newtown in reference to a missing child case and he
25 would like to talk to the sergeant?

1  MR. HENZES: This is your guy's entry, you
2  knucklehead.
3  MR. PURICELLI: No, it isn't. If you read
4  it, it's an entry.
5  MR. HENZES: At Newtown Township, not Tripp.
6  Oh my God.
7  BY MR. PURICELLI:
8  Q. Did Sergeant Tripp ever refer to Bush's report as
9  missing children?
10 A. I don't know. He may have.
11 Q. All this lawyering going back and forth about the
12 missing and threatening sanctions?
13 A. It's a very, very important distinction, yes.
14 Q. I can tell. I know. It's been important for me.
15    Can we agree that concealment and missing are
16 kind of interchangeably used in law enforcement?
17 A. In general terms?
18 Q. Yeah.
19 A. I think I can agree to that in general terms.
20    Specific to this case, Counsel, it is not very
21 clear that it is not a missing person. It is not a
22 concealment of the whereabouts of a child. It's a woman
23 exercising her right to go move with her children.
24 Q. When you said right, that is what is most
25 troubling. Do you know that a woman doesn't have the

1  right in Pennsylvania to just up and move with her
2  children in a custody battle.
3  A. I think the District Attorney determined she
4  comitted no crime. She was in fear of domestic
5  violence. She exercised her ability to remove herself.
6  Q. Do you know that under the Gruber Decision, a
7  parent, woman or male just doesn't have the right as you
8  described, your words, up and leave the state with the
9  children?
10 A. No. You may make that argument, sir.
11 Q. I'm not making the argument. I'm telling you the
12 law.
13    MR. HENZES: No. That would be a nice case
14 to show us. You keep referring. You might want to
15 bring it. Maybe we can agree with you if we read it.
16 BY MR. PURICELLI:
17 Q. I'm only asking you about what your knowledge is
18 about it. Are you criminal, talking criminal rights,
19 civil rights? What kind of rights are you talking
20 about?
21 A. She was not charged by the District Attorney for
22 exercising her ability to remove herself to a place for
23 safety, with the custody of her children.
24 Q. Did there come a time that you learned she
25 changed the identity of the children?

1  A. I think at some point I learned that, yes.
2  Q. Do you know how he she did that?
3  A. I don't recall. I think I recall reading
4  somewhere she went to court in Virginia.
5  Q. Aside from what you read, you have no personal
6  knowledge, true?
7  A. True.
8  Q. Aside from what you read, you didn't talk to
9  anybody other than your attorney?
10 A. I don't know if I did or not.
11 Q. Did you mean you don't know or you don't recall?
12 A. I don't recall.
13 Q. Okay. Showing you what is marked C-4 Christopher
14 Bush.
15    MR. HENZES: C-4.
16    MR. PURICELLI: His July 31st, 2007 letter
17 to Christopher Bush.
18    MR. HENZES: No. July. His letter to Bush.
19    MR. PURICELLI: That is what I said. That
20 is okay.
21 BY MR. PURICELLI:
22 Q. Signature, just to cut to the chase, you wrote
23 the letter?
24 A. Yeah.
25 Q. And that's an accurate copy?

1  A. Appears, yes.
2  Q. Is there anything on there that I've shown you,
3  so I can be sure now that somebody added that you didn't
4  authority to be said or, like, you didn't type yourself
5  or --
6  A. Not that I'm aware of.
7  Q. Did you actually type this?
8  A. Yes.
9  Q. Nobody helped you with it?
10 A. Believe it or not, Counsel, I can type over forty
11 words a minute. I'm pretty good at it.
12 Q. You got my respect. I think people that type are
13 very, especially the court reporters.
14    Now, on the last sentence of the second page you
15 write, I am forwarding this letter along with your
16 original complaint, to the Newtown Township Police Chief
17 and Supervisors for whatever action they deem
18 appropriate. Then you show the copy to the Chief
19 Newtown PD, Supervisors of Newtown Township, correct?
20 A. Yes.
21 Q. Did you actually send that copy to Chief Duffy?
22 A. I believe I did, yes.
23 Q. Any reason you know that he didn't get a copy?
24 A. No.
25 Q. Now, when you say I'm forwarding the letter along