245

1  with your original complaint, do you mean the verbal
2  complaint he made to the State Police about Tripp or are
3  you referring to the verified complaint he made?
4      A.  I think the original complaint I included in the
5  letter as the attachment.
6          MR. HENZES:  He wants to know if it's this
7  or both.
8          THE WITNESS:  It should have been both of
9  these.
10 BY MR. PURICELLI:
11     Q.  It should have been.  Do you know which?
12     A.  I think one.  That is not.
13     Q.  The one, the verified complaint, right?  That is
14 the question.
15     A.  The complaint verification.
16     Q.  On the record, this, we have no idea what it is.
17 That's why I'm doing it.
18     A.  Okay.
19     Q.  This, what we referred to as Christopher Bush 2
20 and is the verified complaint, complaint verification,
21 correct?
22     A.  Correct.
23     Q.  The original complaint from November, we marked
24 earlier, correct, which is what you gave me this
25 morning.  We looked at that?

246

1      A.  Right.
2      Q.  Hill 1, I think we called it?
3      A.  Okay.
4      Q.  I think you mailed both of them?
5      A.  It's definitely this one.  I don't know if it's
6  included.
7      Q.  Definitely the verification, maybe the --
8      A.  Use of Force forms.
9      Q.  Yes, Use of Force.
10         Why did you send his complaint about Tripp to the
11 supervisors?
12     A.  I think it was relevant.
13     Q.  To your complaint that he did what?
14     A.  To the totality of the circumstances.
15     Q.  Well, your letter to the Township, your letter to
16 him, why did he need his complaint for your letter?
17 What was the purpose?
18     A.  I don't recall.
19     Q.  You indicate in your second paragraph, second
20 letter, your actions exposed yourself, your Chief of
21 Police and Department to the possibility of expensive
22 civil liability at the hands of the former Mrs. Bush.
23 Did I read that accurately?
24     A.  Yes.
25     Q.  What liability did he expose himself to?

247

1      A.  I think the actions could have led to civil
2  liability, my opinion.
3      Q.  What were you thinking?  What liability?  To
4  what?
5      A.  For seizing the children.
6      Q.  He didn't seize the children, did he?
7      A.  I didn't say that he seized the children.  Just
8  the children being seized with documentation, actions,
9  his participation in the entry to NCIC without having
10 jurisdiction to that.
11     Q.  Christopher Bush only put the children into NCIC,
12 correct?
13     A.  What do you mean only?
14     Q.  Only put the children's identify into the missing
15 children database?
16     A.  Yes.
17     Q.  He didn't go to court, did he?
18     A.  I don't know that he went to court.
19     Q.  You didn't see any indication from him in any of
20 his petitions that were filed by David Bush, did you?
21     A.  No.
22     Q.  Did you see any petitions that he filed at all to
23 compel the children to be turned over to his brother?
24     A.  I didn't see a petition.
25     Q.  So, the only thing you know of that he did was

248

1  put the children into NCIC, correct?
2      A.  Correct.
3      Q.  Doing that how created a civil liability for you
4  to write that?
5      A.  I think that was used in part by the Richmond
6  Police Department when they chose to execute the court
7  order and presented it, NCIC for those children.
8      Q.  You have been sued how many times, as a member of
9  the State Police?
10     A.  Several.
11     Q.  Every time you get sued, you know why, either
12 excessive force or a Civil Rights violation.  You know?
13     A.  Uh-huh.
14     Q.  Someone tells you there's a statute.  There's a
15 law that says you can be sued, correct?
16     A.  Uh-huh.
17     Q.  Now, what is the statute?  What law did you think
18 existed that exposed him to liability?
19     A.  Civil Rights Act 1983.
20     Q.  And by putting the children into NCIC as missing,
21 okay, how would that have exposed him, in your mind, to
22 at 1983 liability?
23     A.  I think the total circumstances that occurred
24 after the children were seized and removed
25 inappropriately would have led, could have led to a

249

1    **Civil Rights violation?**

2    Q.   And based on what?

3    A.   **What I have just told you, Counsel.  I'm**

4    **comfortable with that answer.**

5    Q.   So, the fact you have been sued in 1983 leads you

6    to believe he could be for that?

7    A.   **No.  I didn't say that.**

8    Q.   What provision in 1983 your counsel will tell

9    you, it's not a Substantive Rights Statute.  It's only a

10   vehicle to get you to court.  That means you've got to

11   prove another violation to use, to get to court?  What

12   did he do?  What other thing did he do in order for

13   1983, in order for him to be dragged into court?

14   A.   **I think everything I discussed, what he did.**

15   Q.   Did you think that statement there wouldn't alarm

16   him, get him upset?

17   A.   **I thought the entire letter probably would upset**

18   **him.  I don't know whether I remember that particular**

19   **statement being upsetting any more than others.**

20   Q.   When you sent this letter, it wasn't by accident

21   that you thought it might cause alarm to him, get him

22   upset?

23   A.   **I don't -- it wasn't by accident.  I don't**

24   **understand your question.**

25   Q.   When you look at these words, you chose them

250

1    carefully or just, like, put thoughts together and sent

2    it out?

3    A.   **I thought about it enough to write it.**

4    Q.   Did you think at any time in your adjudication

5    when you wrote this letter, that David Bush needed a

6    court order to get his children?

7    A.   **I don't know.  I don't recall.**

8    Q.   Was there anything?

9        MR. HENZES:   He did.

10       MR. PURICELLI:   Who did?

11       MR. HENZES:   David Bush did because he got

12   one.

13       MR. PURICELLI:   Legally.

14       MR. HENZES:   That's another story.

15       MR. PURICELLI:   Your counsel makes a good

16   point.  You're the guy running around saying everyone's

17   going to get sued for what they did.

18   BY MR. PURICELLI:

19   Q.   Why did David Bush during the period of time the

20   kids were in NCIC, need a court order to go just take

21   his kids from Virginia legally?

22   A.   **Is that the question?**

23   Q.   That is the question, yes.

24   A.   **I don't know that, unless he used force, if he**

25   **could go and pick up his children.  Yeah.  I don't know**

251

1    that there is any law that prohibited him as the court

2    order is expired to picking up his children.  I don't

3    know I can say that.

4    Q.   If a trooper, theoretically, a trooper called to

5    a scene, David Bush said my children, at my friend's

6    house, and I want them and grabbed his children and

7    left, was he talking to the trooper after he grabbed

8    them, could he be arrested for taking the children?

9

10   A.   **That depends on the situation.  I don't like your**

11   **hypotheticals.  I'm not comfortable the way you lay them**

12   **out.  I'll just, I'll put that down as I'm not going to**

13   **answer that until I get more.**

14   Q.   What do you mean?

15   A.   **Specifics.  Just lay it out.  Give me it all.**

16   Q.   David Bush is the father?

17   A.   **Okay.**

18   Q.   Children at a house on the front yard playing?

19   A.   **Yep.**

20   Q.   Goes over, tells the kids, get in the car, puts

21   them in, drives away.  The person in the home who has

22   the kids is not a parent but is not on -- not anything

23   other than the mother?

24   A.   **No existing court order.**

25   Q.   No court order.  Neither of them have a court

252

1    record?

2    A.   **No crime was committed in course of taking those**

3    **children.**

4    Q.   What would he have to do to snatch his own kids?

5    A.   **That's what I'm asking you.  Did he trespass?**

6    **Did he commit a burglary?  Did he commit any of those**

7    **offences?**

8    Q.   He pulled up, told the kids get in the car?

9    A.   **Got in the car?**

10   Q.   Got in the car and left.

11   A.   **No existing court order?**

12   Q.   No existing court orders.

13   A.   **I don't see a crime then.**

14   Q.   David Bush, when he went to Virginia, got a court

15   order, didn't he?

16   A.   **Yes.**

17   Q.   Now, did he need one?  In your knowledge, did he

18   need one if they were in Pennsylvania, to go there and

19   get the kids out of school.

20   A.   **Well, they weren't in Pennsylvania.  I don't know**

21   **if he would have needed one to get the kids out of the**

22   **school but given the extensive nature of the child**

23   **custody, I don't know that that decision is appropriate**

24   **for me to make a decision in this case.**

25   Q.   What legal action would a trooper take to stop

253

1  him from getting his children out of school if he wanted
2  to?
3      A.  Well, I guess if the trooper was knowledgeable
4  about the circumstances in this case, he had concerns
5  for their wellbeing, he probably could stop them,
6  determine their wellbeing.
7      Q.  You're saying a trooper can stop a parent from
8  picking up a child?
9      A.  I didn't say a parent.  I was very specific about
10  that.  I think there's some preclusions in our abilities
11  to ensure the wellbeing of the children that allows us
12  to have some investigatory powers there, if I recall
13  correctly.
14      Q.  Now, your letter to Christopher Bush talks a lot
15  about his brother David, doesn't it?  Based on the fact
16  --
17      A.  Please save us.
18      Q.  Thank you.  Then you can.
19      A.  I can see David Bush mentioned on the second
20  paragraph.  I don't see it again after that.  I see it
21  mentioned one time.
22      Q.  It talks about your brother, didn't say his name,
23  your brother in Luzerne County.  That is as much
24  referencing it, doesn't it?
25              MR. HENZES:  What is the question, relevance

254

1  of why you --
2  BY MR. PURICELLI:
3      Q.  When you wrote this, and you wrote it to
4  Christopher, was it because of what David Bush was doing
5  or what Christopher Bush was doing in your mind?
6      A.  For what Christopher Bush was doing.
7      Q.  What was the need to discuss his brother's acts?
8      A.  Apparently, I felt the need to include that
9  material.
10      Q.  There was no doubt in your mind that you knew the
11  two were family, blood related?
12      A.  No doubt in my mind I knew the two were family.
13  Blood related, I don't know that I knew the extent of
14  their relationship.
15      Q.  What was your knowledge as to the extent of the
16  relationship?
17      A.  That they were brothers.
18      Q.  Brothers by?
19      A.  I have no knowledge beyond that.
20      Q.  That they were family at least.
21      A.  Some relation in a category similar to brothers.
22      Q.  And you didn't approve about how the way his
23  brother was acting?  You formed an opinion that his
24  brother was a wife beater or something?
25      A.  Counselor, what was written in the letter was in

255

1  the letter.
2      Q.  It's also a legal theory that you don't know
3  anything about and I have to ask you certain questions.
4  Okay?
5      A.  Okay.
6      Q.  They may not be clear to you why I'm asking them.
7  I'm asking for a reason.
8      A.  And I'll answer as best I can.
9      Q.  When you wrote that, did you take into
10  consideration the actions of David Bush's brother when
11  you wrote the letter?
12      A.  I took the totality of the circumstance.
13      Q.  What does that mean, Major?  Did you mean yes or
14  no to my question?
15      A.  That means that three years after I have written
16  the letter, I used this material that's in here, my
17  conversations with the people involved.  And I wrote
18  that letter.
19      Q.  Can we agree then that everything we're talking
20  about, this pile you are talking about includes the
21  actions of David Bush?
22      A.  Sure.
23      Q.  And it includes actions of David Bush that had
24  nothing to do with Christopher Bush?
25      A.  I don't know whether they had anything to do with

256

1  Christopher Bush or not.
2      Q.  What evidence do you have that it was?
3      A.  I don't know.
4      Q.  You cannot point me to any act that David Bush
5  did, going to court, making a report to the State Police
6  that were a product of Christopher Bush's decision?  In
7  other words, Chris --
8      A.  I have no evidence to point you to those things.
9      Q.  I'll show you what is marked as Christopher 5.
10  It's a July 31st, 2007 letter, your name and signature
11  on the second page?
12      A.  Uh-huh.
13      Q.  Did I describe this letter correctly?
14      A.  You did.
15      Q.  Did you authorize this letter?  Did you sign this
16  letter?
17      A.  I did.
18      Q.  No one helped you with that letter?
19      A.  Not that I recall.  No, sir.
20      Q.  The purpose of this letter was to get Christopher
21  Bush in trouble with the Township?
22      A.  The purpose of the letter was to provide the
23  Township officials based on the information concerning
24  what I believe to be police misconduct, needed to be
25  reported to somebody in that police department.

1    **Q.** I think I asked you this earlier. Maybe you'll
2    say the same answer. You understood this might lead to
3    trouble, likely lead to him getting disciplined?
4    **A. I believed an investigation would be investigated**
5    **in the Township Department.**
6    **Q.** An investigation in fact was done?
7    **A. Yes.**
8    **Q.** In fact, he was dismissed, wasn't he?
9    **A. I believe that he was.**
10    **Q.** And he was dismissed because of the letter you
11    wrote, correct?
12    **A. No, sir. That's not correct.**
13    **Q.** The investigation was because of your letter,
14    wasn't it?
15    **A. It was undertaken as a result of my letter. I**
16    **assume, yes.**
17    **Q.** You testified at an arbitration, didn't you?
18    **A. I did.**
19    **Q.** And that arbitration testimony, I asked you
20    whether or not there was anything you wanted to change
21    earlier, correct?
22    **A. Correct.**
23    **Q.** Okay. And it was based on what you wrote July
24    31st that caused Christopher Bush to be investigated,
25    disciplined and to lose his job?

---

258

1    **A. I believe that I was the initiator down in the**
2    **Township. I don't know if they received any other**
3    **issues.**
4    **Q.** He in fact got his job back?
5    **A. I believe he did.**
6    **Q.** The fact finding was that he didn't do anything
7    wrong?
8    **A. That's not the finding that I read, Counsel.**
9    **What I read was that the Township made a disaster, due**
10    **process and he is lucky to have his job.**
11    **Q.** You're saying the Township didn't do a good job
12    of due process. Is that what you're saying?
13    **A. They did a disaster of job of due process.**
14    **Q.** The township did?
15    **A. Yes.**
16    **Q.** An arbitrator says that?
17    **A. Yeah. He does.**
18    **Q.** It says they didn't give him a proper due
19    process? They fired him without just cause.
20    **A. No. They fired him without due process,**
21    **Counselor. In other words, they did not go through the**
22    **correct procedures in their dealing with Chris Bush.**
23    **Q.** That is your interpretation?
24    **A. At arbitration, yes.**
25    **Q.** Your allegation was that Officer Bush lied?

---

1    **A. Yeah. I believe he lied.**
2    **Q.** I guess the arbitrator didn't find that?
3    **A. You may certainly review what the arbitrator**
4    **found.**
5    **Q.** He didn't say that?
6    **A. He did not mention that in particular.**
7    **Q.** Didn't agree with your analysis, right?
8    **A. I think he did agree.**
9    **Q.** Did he?
10    **A. Despite the monumental due process, I believe**
11    **Detective Bush still lost thirty days which is a rather**
12    **significant penalty.**
13    **Q.** Isn't that true because of the interaction
14    between Tripp and him?
15    **A. Isn't what true?**
16    **Q.** That he got thirty days suspension?
17    **A. I think he cited that as part of the reason. It**
18    **doesn't say that in its entirety.**
19    **Q.** But they at least looked at that conduct, you
20    didn't, though. Did you?
21    **A. Why didn't I?**
22    **Q.** You didn't ask Tripp about the phone call in your
23    investigation, did you?
24    **A. I don't remember asking Tripp in particular about**
25    **anything.**

---

260

1    **Q.** So, the purpose of this letter was to merely make
2    your complaint against Christopher Bush based on your
3    adjudication, correct?
4    **A. The purpose of this letter was to notify the**
5    **Township Supervisors that I believe misconduct on one of**
6    **their officers as condoned by the Chief of Police.**
7    **Someone should be aware of it.**
8    **Q.** That entry into CLEAN did not violate any State
9    Police or federal regulation?
10    **A. It didn't violate the CLEAN policy.**
11    **Q.** Didn't violate any law, did it?
12    **A. Oh, I think it -- Local Police Jurisdiction Act**
13    **was the violated. I think you need to have jurisdiction**
14    **to conduct the investigation. You should have -- you**
15    **have to be able to conduct an investigation to make an**
16    **entry but that isn't part of CLEAN?**
17    **Q.** If you thought that, why didn't you take that to
18    a district attorney?
19    **A. I took the action I believed appropriate by**
20    **notifying the Township of his action.**
21    **Q.** If you thought it was so bad and requiring the
22    Township to know about it so bad, why didn't you take it
23    to the district attorney?
24    **A. Because I thought the township where he worked**
25    **was the appropriate people to decide whether or not his**

261

1    action met their requirement.

2        Q.   Long story short, your wrote the letter to the

3    Township for them to take this action against

4    Christopher Bush if they agreed with what you said?

5        A.   I wrote the letter for them to take whatever

6    action they deemed appropriate.

7        Q.   Well, you used pretty strong language, incredible

8    lack of professional behavior.  What training do you

9    have about local police for professional behavior?

10       A.   Twenty-eight years of experience.  How's that?

11       Q.   With the State Police?

12       A.   Yeah, interacting with the local police on a

13   daily basis.

14       Q.   The State Police has different rules than the

15   local police, don't they?

16       A.   Yes.

17       Q.   They run their police department differently?

18       A.   In some degrees, yes.

19       Q.   Are you saying the Newtown Township should have

20   had run its police department to the standard of the

21   State Police?

22       A.   No.  I didn't say that.

23       Q.   Do you know any incidents of Newtown Township

24   where any members wiretapped other members of the --

25       A.   No.

262

1        Q.   Isn't it true that the State Police have had a

2    number of events where commanders wiretapped their

3    district, their barracks?

4        A.   What?

5        Q.   You're not aware of any commander or any station?

6            MR. HENZES:  Use the word numbers.

7    BY MR. PURICELLI:

8        Q.   Say at least two, I would say.

9        A.   I am aware that there was allegations of

10   wiretapping against Captain Oliphant, criminal charge

11   that resulted after that, a civil jury reached a

12   conclusion.

13           I'm aware of some history in the 1960s, of a

14   vague allegation of a wiretapping issue.

15       Q.   In the '60s?

16       A.   I think it was in the '60s, yeah.  You may remind

17   me if something occurred.

18       Q.   You don't know any that occurred in the '90s?

19       A.   Not ringing a bell, no.  I don't remember.  I

20   don't particularly recall.

21       Q.   You've never been involved in any of these

22   incidents, described reports between David Bush, his

23   kids, David Bush and his wife, you call domestic

24   violence.  You don't have any independent personal

25   knowledge, in other words seeing it or hearing it

263

1    yourself?

2        A.   Right.  I relied on the information obtained

3    within the investigation.

4        Q.   Right.  Now, the allegations about David Bush

5    hurting his kids, David Bush hurting his wife, you

6    weren't there for any of those events to say, hey, I saw

7    it myself?

8        A.   Correct.

9        Q.   You weren't within hearing range to hear,

10   correct?

11       A.   Correct.

12       Q.   Okay.  But you believe what was written, correct?

13       A.   That is a pretty broad statement.  I believe what

14   was written.  I believe there is a documented history of

15   domestic violation of David Bush.

16       Q.   And the documented history is the reports written

17   either by a State Trooper or --

18       A.   Contained within a report.

19       Q.   Or his wife making the reports other than the PFA

20   matter, correct?

21       A.   I don't remember what that was, Counselor.

22       Q.   I did say children.  Didn't I?

23       A.   Yeah, he did.

24       Q.   Thank you.  For the purposes of this question,

25   when I said the children, it's either together or

264

1    separate.  The answer remains the same if it was just

2    children.  You weren't present?

3        A.   I was not there for anything, no.

4        Q.   Now, in the letter to the Township, you again say

5    I have no confidence of a discussion or correspondence

6    directed to Chief Duffy that would be beneficial in

7    preparing your department for the ramifications of civil

8    liabilities possible from former members of the Bush

9    family.  How did you know there was going to be any, let

10   alone possible?

11       A.   I didn't know there would be any.

12       Q.   What made you think there would be any?

13       A.   Because of the actions of Detective Bush.

14       Q.   Did you have any discussion with any member of

15   the Bush family that they told you to give you a

16   reasonable belief that they were going to sue the police

17   department, the Township or Christopher Bush?

18       A.   No.  I had no discussions with the members of the

19   Bush family.

20       Q.   That was a guess on your part?

21       A.   It was an opinion, I'd say, on my part.

22       Q.   And what do you mean by ramification, have to pay

23   money?  What was the ramification you were thinking

24   about?

25       A.   I think all the ramifications that come with

265

1  civil liability.  I don't know that I remember money in
2  particular being a part of my thought process at the
3  time.
4      Q.  Let me -- Major, in the years that you have been
5  doing state police work, how many troopers were you
6  aware of that got fired for alleged misconduct that got
7  their jobs back?
8      A.  Several, I think.  I don't remember any in
9  particular.
10     Q.  How many people at Newtown Township were alleged
11 of misconduct and were fired and the firing was upheld?
12     A.  I have no idea.
13     Q.  Any of them got fired and got their jobs back
14 other than Christopher Bush?
15     A.  No.  I don't, no idea.
16     Q.  If you're at least aware that state police who
17 have all these sophisticated rules and regulations and
18 all these investigations can conduct, can engage in
19 misconduct and get fired, why is that Christopher Bush
20 can engage in such unprofessional conduct by putting the
21 children into the NCIC but those who your department say
22 engaged in misconduct get their job back?
23     A.  I don't know what your question is, Counselor.
24     Q.  You said he was incredibly involved in?
25     A.  The totality of the circumstances he was involved

266

1  in.  They're laid out there.  You can go and read my
2  words for what they were.  I thought his behavior was
3  completely out of line.
4      Q.  You wrote them.  I'm just trying to find out what
5  that is?
6      A.  That is my answer.
7      Q.  Now, you indicated you had taken the
8  extraordinary steps by forwarding this correspondence to
9  you?
10     A.  Yeah.
11     Q.  Which means as you said before, you never did
12 before?
13     A.  I think that's true.  I never did but that's not
14 the only reason.
15     Q.  And you didn't have the permission of the
16 commissioner, did you, to use State Police letterhead
17 for your personal opinions?
18     A.  Did I have specific permission from the
19 commissioner from the state?
20     Q.  Yes.
21     A.  As a matter of fact, I did.  I notified the
22 complainant of the investigation.
23     Q.  Did you have permission of the Commissioner of
24 the State Police?
25     A.  Yeah.

267

1      Q.  To use letterhead of the State Police to send
2  this letter?
3      A.  Yes.
4      Q.  Where did you get that permission?
5      A.  It is inherent in my position as a troop
6  commander.
7      Q.  So, you think you got permission by some rule?
8      A.  There is no specific rule of that point.
9      Q.  Show me --
10     A.  Letterhead is available for my use as a troop
11 commander.
12     Q.  Isn't there a regulation that specifically
13 prevents you from using State Police property including
14 the letterhead for personal reasons?
15     A.  No.  It is not.
16     Q.  It is not?
17     A.  No.
18     Q.  So, any trooper can write a letter?
19     A.  That is for personal reasons?  Is that what
20 you're asking me?
21     Q.  Yeah.  So, tell me what rule or regulation you
22 followed to write this letter to the Township?
23     A.  By being aware of misconduct and reporting it,
24 doing my duty as a police officer in the Commonwealth of
25 Pennsylvania, to report activities that are above and

268

1  way out of line by a police officer in the Commonwealth.
2      Q.  That is your opinion?
3      A.  You're damn right.  This is my opinion.  I'm
4  proud of the opinion as well and look forward to the
5  opportunity to state that opinion in front of a jury.
6      Q.  I'm glad you say that because you may get that
7  opportunity.
8      A.  I look forward.
9      Q.  So, if I depose the commissioner, he is going to
10 tell me that you have the authority to do that?
11     A.  Sure.  I don't know what he is going to tell you.
12     Q.  Okay.  If he says you don't, could you be subject
13 to discipline?
14     A.  Up to him.
15     Q.  Based on your extensive knowledge and police,
16 with the State Police, would you be subject to
17 discipline?
18     A.  No.
19     Q.  No?
20     A.  No.
21     Q.  Okay.  I'm going to show you Ignatz 2.  Have you
22 seen that before, the December 12th, 2007 letter to
23 Martin Duffy?
24     A.  No.  I don't recall ever seeing this.
25     Q.  You knew when you did your adjudication, though,