```
            - - -
   IN THE UNITED STATES DISTRICT COURT
 FOR THE EASTERN DISTRICT OF PENNSYLVANIA
            - - -

DAVID BUSH AND        : No. 07-4936
CHRISTOPHER BUSH      :
         vs.          :
                      :
S.C. ADAMS, LT., et al:
            - - -
       Thursday, January 7, 2010
            - - -
    Deposition of JOSEPH TRIPP,
taken pursuant to notice at the offices
of Attorney General, Norristown,
Pennsylvania, on the above date,
beginning at approximately 1:12 p.m.
before Barbara C. Stalheim, Certified
Shorthand Reporter and Notary Public.
----------------------------------------
      BUCKS COUNTY COURT REPORTERS
       99 Lantern Drive, Suite 201A
       Doylestown, Pennsylvania 18901
              215.348.1173
```

Page 2

```
2  COUNSEL APPEARED AS FOLLOWS:
3     BRIAN M. PURICELLI, ESQUIRE
4     691 Washington Crossing Road
      Newtown, Pennsylvania 18940
5         for the Plaintiffs

6     OFFICE OF ATTORNEY GENERAL
      BY: RANDALL J. HENZES, ESQUIRE
7     Litigation Section
      21 South 12th Street, 3rd Floor
8     Philadelphia, Pennsylvania 19107
9         for the Defendants
              - - -
```

COPY

Page 3

```
           I N D E X
WITNESS                       PAGE
STEVEN J. IGNATZ
    By Mr. Puricelli            4
              - - -
          E X H I B I T S
NUMBER                       MARKED
Tripp-1                         99
Tripp-2                        112
Tripp-3                        178
Tripp-4                        188
Tripp-5                        199
              - - -
EXHIBITS ATTACHED TO ORIGINAL COPY OF
TRANSCRIPT ONLY
              - - -
```

Page 4

              - - -

    (It is hereby stipulated
and agreed by and between counsel for
the respective parties that signing,
sealing and certification are waived;
and that all objections, except as to
the form of the question, are reserved
to the time of trial.)
              - - -
    JOSEPH TRIPP, after having
been duly sworn, was examined as
follows:
              - - -
         P R O C E E D I N G S
              - - -
BY MR. PURICELLI:
    Q.   Good afternoon, Sergeant Tripp.
    A.   Good afternoon.
    Q.   I take I told you were present
and heard the instructions I gave Lieutenant
Ignatz?
    A.   Yes.
    Q.   Okay.  Knowing all of those
instructions are you -- do you have any

Page 5

```
 2  questions in regards to any of that?
 3      A.   None.
 4      Q.   All right.  I started off with
 5  the lieutenant in asking if you had reviewed
 6  anything before coming today.
 7           Did you review anything
 8  before coming today?
 9      A.   Yes.  I reviewed my testimony
10  from I believe it was his arbitration
11  hearing.
12      Q.   He being Christopher Bush.
13      A.   Chris.  Yes.
14      Q.   Thanks.  Okay.  Yes.
15           I'll show you that
16  document.  See if I can.  I've marked the
17  page for you.  I believe you start at 117.
18      A.   Yes.
19      Q.   Okay.  And so that's what you
20  reviewed?
21      A.   Yes.  Appears to be.
22      Q.   Okay.  Did you review anything
23  else?
24      A.   The Municipal Police Act, also.
25      Q.   Okay.  Why did you review that?
```

Page 6

```
 2      A.   Because that was one of the
 3  questions that was brought up during his,
 4  Chris Bush's, hearing.
 5      Q.   Okay.
 6      A.   And I wanted to make sure I fully
 7  understood because I didn't really understand
 8  the day of this what he was actually asking
 9  me.
10      Q.   Okay.  Before you testified had
11  you reviewed that Act?
12      A.   Before I testified at.
13      Q.   Yes?
14      A.   Chris Bush's.
15      Q.   Yes?
16      A.   No.
17      Q.   And in the course of any of the
18  activities you were questioned about in that
19  Act -- or strike that -- that deposition,
20  that arbitration had you reviewed that Act?
21      A.   Repeat the question, please.
22      Q.   Sure.
23           Before you engaged in any
24  of the conduct that had been discussed at the
25  arbitration, your conduct --
```

Page 7

JOSEPH TRIPP

```
 2      A.   Yes.
 3      Q.   -- had you reviewed that Act?
 4      A.   No.
 5      Q.   Would it be fair to say then that
 6  you did not consider the information learned
 7  after your review to do the actions that you
 8  were being questioned about?
 9      A.   One more time.
10      Q.   Sure.  I'll do it slowly.
11           In that arbitration you
12  were asked a serious of events and acts by
13  you.
14           Correct?
15      A.   Correct.
16      Q.   Okay.  Since then you looked at
17  the Municipal Police Officers Jurisdictional
18  Act.
19           Correct?
20      A.   Correct.
21      Q.   All right.  But you had not done
22  that before the activities that you were
23  being asked about.
24           Correct?
25      A.   Correct.
```

Page 8

JOSEPH TRIPP

```
 2      Q.   So would it be fair to say that
 3  whatever was in that Act that you read was
 4  not a factor in your actions that you were
 5  being asked about?
 6      A.   Correct.
 7      Q.   Okay.  Now, you can keep that in
 8  front of you.  If you turn to page 123 around
 9  line eight.
10      A.   Yes.
11      Q.   You had indicated that --
12  paraphrasing that area of testimony -- you
13  were told by David Bush that his kids were
14  put into NCIC.
15           Correct?
16      A.   Correct.
17      Q.   Okay.  And you were asked by who.
18           Correct?
19      A.   Correct.
20      Q.   Okay.  And your testimony is he
21  didn't tell you.
22      A.   That is correct.
23      Q.   Okay.  Why would you want to know
24  that?
25      A.   I want to know what police agency
```

Bucks County Court Reporters
215.348.1173

9

was also investigating the same case we were.
Q. Okay. Now, did you check NCIC to see whether or not David Bush was truthful in saying his kids were put into NCIC?
A. Yes, sir.
Q. You did?
A. Yes.
Q. Did you indicate that you never looked at NCIC before in your testimony?
A. Never looked at NCIC before about what?
Q. Whether the kids were entered or not.
   Do you recall reviewing in your review saying that?
A. No.
Q. Okay. Now, everything that you testified to under oath at that arbitration was that true and correct?
A. To the best of my recollection. Yes.
Q. At that time.
A. Yes.
Q. Okay. So is it your testimony

10

today that you looked at NCIC to see whether or not David Bush was being truthful that his children had been put into NCIC?
A. Did I, personally --
Q. Yes.
A. -- or did somebody else?
   Me, personally --
Q. Yes.
A. -- go and run his -- I don't believe so.
Q. Did you review any reports to see if a subordinate under you at Troop F had entered the children into NCIC?
A. I believe Corporal Wheeler told me that he checked NCIC and the kids were in there.
Q. So you knew that David Bush was being truthful.
A. With the NCIC entry?
Q. Yes.
A. Yes.
   And I believe he provided us with a copy of it.
Q. Okay. So you knew he was telling

11

JOSEPH TRIPP

the truth.
A. Well, again, it was verified that the kids were in NCIC.
Q. All right. The fact is he told you they were there and that was truthful.
   Correct?
A. He told me what.
Q. The kids were entered and that was truthful.
A. Correct.
Q. Okay. The fact is that when he told you that you didn't believe him though.
   Did you?
A. Wouldn't say either way.
Q. Well, didn't you testify at the arbitration nothing he told you you believed?
A. Everything that he told you you had to verify.
Q. Is that what you testified to at the arbitration?
   Do you recall?
A. I testified to did I trust what he was telling me?
Q. Yeah.

12

JOSEPH TRIPP

A. When I first met David Bush I didn't know him from Adam. Okay? There is other individuals including Corporal Wheeler that I believe they might have even went to school together. I don't know. But he's known Mr. Bush for a long time.
Q. So --
A. He was the one that flew the flags up right away.
Q. Okay. Well, based on our short conversation are you telling me that your testimony under oath before the arbitrator may not be accurate or true?
A. No. I'm not saying it was not accurate.
Q. Okay. So I can rely on those answers to be accurate and true?
A. To the best of my belief at that time. Yes.
Q. And having reviewed it, is there anything that you want to change?
A. I have not read the whole thing in front of you.
Q. When did you get a copy of your

### Page 13

testimony?
A. Awhile ago.
Q. How long is awhile ago?
A. I don't know.
Q. Well, I don't know unless you tell me.
How many days? Months?
A. I don't know, either. I don't know.
MR. HENZES: Its been asked and answered. He doesn't know.
THE WITNESS: I don't know.
BY MR. PURICELLI:
Q. Is it more than a week?
A. Yes.
Q. Okay. Is it more than two weeks?
A. I would bet it was more than two weeks.
Q. How about this way: You came to the knowledge that you were going to be deposed in this action.
Correct?
A. For this current one?

### Page 14

Q. Yes.
A. Yes.
Q. Okay. Do you remember when you were told you were going to come today?
MR. HENZES: Objection to the -- you're asking for attorney-client privilege information.
MR. PURICELLI: He can tell me yes or no.
BY MR. PURICELLI:
Q. I'm not asking what when you were told.
MR. HENZES: What's the difference?
MR. PURICELLI: Big difference. My next question --
MR. HENZES: No. It elicits it's attorney-client privilege information one way or the other.
MR. PURICELLI: It's not attorney-client privilege. You know that.
MR. HENZES: Suffice it to say its been at least over a month.

### Page 15

JOSEPH TRIPP

MR. PURICELLI: I will agree that he's not waiving attorney-client privilege to the extent that it may apply.
MR. HENZES: Its been over a month that he's had it.
MR. PURICELLI: Okay.
MR. HENZES: If that's what your question is.
BY MR. PURICELLI:
Q. I'm trying to find out how long you've had the transcript. That's all.
So we can agree you've had the transcript after you learned you were going to be deposed or before?
A. I don't know.
Q. You don't know?
A. I honestly don't know.
Q. Well, relying on your best recollection then when you reviewed it did anything jump out at you and say that's not true what I said?
A. No.
Q. Oh, okay. Now, we were -- we'll

### Page 16

JOSEPH TRIPP

get back into that in a second.
The information about your history with the State Police is that correct?
A. Yes.
Q. Okay. Have you had any other law enforcement experience other than what you testified to?
A. No.
Q. Okay. Have you received any training whatsoever from the Pennsylvania State Police?
I know it's going to be a yes, but --
A. Yes.
Q. Okay. Did any of that training involve the crimes code?
A. Yes.
Q. Did any of it involve the statutes in the crimes code?
A. Yes.
Q. Were you taught how to read the crimes code statute?
A. Yes.

Page 21

JOSEPH TRIPP

Q. investigate just because there's a history of domestic violence?
A. You used the term missing children.
Q. I did.
A. That's your opinion.
Q. Do you prefer me to use the term concealed that appears in your police reports?
A. Mr. Bush told us where his kids were.
Q. Oh, well then why, if that was the report labled concealment of whereabouts of the child if you knew where they were?
A. It was not where we -- he stated they were with his mother. When you take -- that's pretty much what he's telling us is going on.
Q. Okay. And he told you he didn't know where she was or the kids.
       Right?
A. Correct.
Q. So there's a big difference, isn't there, Sergeant about knowing kids'

Bucks County Court Reporters
215.348.1173

Page 22

JOSEPH TRIPP

whereabouts, but with their mother is and missing?
       Is that what you're telling me?
A. There's a big difference.
Q. What is the difference?
A. The difference is if I remember correctly, I believe he was under a PFA and was to have no contact. And they left a couple years before that, I believe.
Q. And so they were missing.
       Weren't they?
A. No. In my opinion, no.
Q. Oh, okay.
A. And according to the attorney or the district attorney of Tioga County, he's the one who made the ultimate decision that, no, they're not missing.
Q. So you're saying the district attorneys told you that you weren't to investigate the whereabouts of the kids?
A. Could you define investigate?
Q. Define anything you want.
       I want you to tell me what

Bucks County Court Reporters
215.348.1173

Page 23

JOSEPH TRIPP

the district attorney told you in your mind, Sergeant?
A. Pretty much considered an attempt to locate.
Q. Why would you be trying to attempt to locate kids if in your mind you said you knew where they were; with the mother?
A. That was his decision.
Q. And you were to follow it.
       Aren't you?
A. Yes.
Q. So are you trying to tell me under oath that a district attorney says locate the whereabouts of kids that that wouldn't classify them as missing?
A. That is correct.
Q. Okay. And on what training have you received to make that conclusion?
A. I didn't make the conclusion.
Q. You didn't make the conclusion.
A. No. The information was presented to the district attorney.
Q. When?

Bucks County Court Reporters
215.348.1173

Page 24

JOSEPH TRIPP

A. He made --
Q. When?
A. Corporal Wheeler was on the phone with him, I believe, the day that I was talking to David Bush.
Q. I want to show you what's been marked as Ignatz-5.
       Could you identify that front page for me?
A. It's an incident report.
Q. About what?
A. About what?
Q. About what?
A. Concealments of the whereabouts of a child.
Q. What child?
A. The Bush children.
Q. The Bush children. The ones you say weren't missing.
       Correct?
A. Correct.
Q. Okay. This is what in regards to David Bush's interaction with you and the corporal?

Bucks County Court Reporters
215.348.1173

## Page 17

```
 2    Q.   Did you go through the crimes
 3  from the beginning to the end including the
 4  definitions?
 5    A.   I don't believe we covered every
 6  section.
 7    Q.   Okay.  But they taught you how to
 8  read the crimes code.
 9    A.   Yes.
10    Q.   Did you at any time ever consult
11  sections 2908 and 2909 of the crimes code?
12         They would have been the
13  ones you were reviewing in the book earlier
14  today.
15    A.   Right.
16    Q.   Okay.
17    A.   What are you asking?  When did
18  I --
19    Q.   Before today when you were
20  looking at the book I was showing --
21    A.   Yes.
22    Q.   -- Lieutenant Ignatz.
23    A.   Yes.
24    Q.   So you've seen those statutes
25  before.
```

## Page 18

```
 2    A.   Correct.
 3    Q.   Did you ask anybody in the
 4  department to interpret those statutes for
 5  you?
 6    A.   Inside the department?
 7    Q.   Yes.
 8    A.   I interpreted them and also
 9  Corporal Wheeler the crime unit supervisor
10  interpreted them.
11    Q.   Okay.  And do you recall when you
12  first asked the corporal to interpret them
13  for you?
14    A.   I don't think I asked him to
15  interpret them for me.  He interpreted them
16  himself and we talked about it.
17    Q.   Okay.  Was that before or after
18  David Bush reported his children missing?
19    A.   It was the day of David Bush
20  coming in.
21    Q.   Okay.  Now, were you present when
22  David Bush arrived at the police at the
23  station?
24    A.   Yes.
25    Q.   Okay.  And what, if anything,
```

## Page 19

JOSEPH TRIPP

```
 2  were you doing at the time he came in?
 3    A.   I don't recall.
 4    Q.   Okay.
 5    A.   Working.
 6    Q.   How did you come to interact with
 7  David Bush if you did on that day?
 8    A.   I think being notified by
 9  Corporal Wheeler that David Bush was in the
10  lobby and was making a complaint of his kids
11  being missing or whatever you want to deem
12  that.
13    Q.   Okay.  And before that particular
14  day had the corporal always told you every
15  time somebody came in to make a report?
16    A.   No.
17    Q.   What was there a difference this
18  time that you had to be told?
19    A.   Because there's an issue with
20  David Bush's past history with his wife and
21  there's a multitude of background information
22  that I was unaware of with Mr. Bush.
23    Q.   Are you saying the corporal was?
24    A.   The corporal was aware?
25    Q.   Yes.
```

## Page 20

JOSEPH TRIPP

```
 2    A.   Yes.
 3    Q.   Okay.  And what did the corporal
 4  tell you?
 5    A.   History in domestic violence.
 6  Multitude of PFA violations.  Stuff like
 7  that.
 8    Q.   Okay.  Well, tell me exactly what
 9  you recall him saying other than that.
10    A.   The history of domestic violence.
11  PFA violations.  PFA just recently expired
12  and now he's looking for his kids.
13    Q.   Okay.  And as a result of that
14  did you form any opinions or conclusions
15  about what the corporal told you about David
16  Bush?
17    A.   Sure.
18    Q.   What?
19    A.   That he's been involved with
20  domestic violence.
21    Q.   And is that all?
22    A.   That's just it in a nutshell.
23    Q.   Okay.  And the Pennsylvania State
24  Police when they train you to take reports of
25  missing children do they train you not to
```

## Page 25

```
 2    A.    What do you mean this is what?
 3    Q.    Is this the incident report that
 4  you created --
 5    A.    No.
 6    Q.    -- or had created?
 7    A.    No. This is Trooper Whisner's
 8  report.
 9    Q.    About what?
10    A.    The concealment about the
11  whereabouts of a child.
12    Q.    Okay. And that's a crime in this
13  state?
14    A.    Depends.
15    Q.    Depends on what?
16    A.    Depends on whether you have a
17  defense as far of domestic violence.
18    Q.    Well, were you to investigate the
19  defense or collect the facts to present to an
20  attorney?
21          What was your job?
22    A.    Our job is to investigate what
23  his complaint is.
24    Q.    So just because you knew that
25  there might be a defense, are you saying you
```

Bucks County Court Reporters
215.348.1173

## Page 26

```
 1  JOSEPH TRIPP
 2  took it upon yourself under State Police
 3  policy to not investigate all of the facts?
 4    A.    Again, I told you that we provide
 5  the information to the district attorney. He
 6  makes the decision on which way we're going.
 7    Q.    Well, you said you talked to the
 8  district attorney the first day.
 9    A.    I did not.
10    Q.    That's what you just told me
11  under oath.
12          Didn't you?
13    A.    No. I didn't.
14          MR. HENZES: No. He
15  didn't.
16  BY MR. PURICELLI:
17    Q.    Well, you just told me your
18  corporal --
19    A.    Corporal Wheeler.
20    Q.    Corporal Wheeler did.
21    A.    Uh-huh.
22    Q.    But you said he was talking to
23  you and told you about it.
24          Isn't that what you told
25  me?
```

Bucks County Court Reporters
215.348.1173

## Page 27

```
 1                JOSEPH TRIPP
 2    A.    Told me about what?
 3    Q.    About all this domestic violence
 4  stuff.
 5    A.    When he first came in? Yeah.
 6    Q.    Uh-huh.
 7    A.    Before he ever got through the
 8  door.
 9    Q.    First day, what's the first entry
10  on this report say?
11          Maybe I'll make it simple.
12          Could you show me on the
13  first entry where it says he talked to the
14  district attorney?
15          MR. HENZES: Who's he?
16          THE WITNESS: This is
17  Trooper Whisner's report.
18  BY MR. PURICELLI:
19    Q.    Right.
20          Did you show me anywhere
21  on this report where it says anybody from
22  your department on the first day of this
23  report called the district attorney?
24    A.    No.
25    Q.    So how do you know he did it?
```

Bucks County Court Reporters
215.348.1173

## Page 28

```
 1                JOSEPH TRIPP
 2    A.    Relying on the facts presented to
 3  me.
 4    Q.    Aren't you required as a member
 5  of the State Police to have a full and
 6  thorough investigation?
 7    A.    On the first day?
 8    Q.    Got to start sometime.
 9          Don't you?
10    A.    What's your -- I'm missing the
11  question then.
12    Q.    I'm asking you aren't you
13  supposed to as a policy of the Pennsylvania
14  State Police have a thorough and detailed
15  investigation?
16    A.    Yes.
17    Q.    Okay. And that includes the
18  activities relevant to the investigation.
19          Correct?
20    A.    Correct.
21    Q.    And the first activity you're
22  telling me under oath is the corporal talks
23  to you and that doesn't appear in any of the
24  reports.
25          Isn't that true?
```

Bucks County Court Reporters
215.348.1173

29

2  A. That is true.
3  Q. And the next activity that you
4 tell me has been done is the District
5 Attorney's office has been called.
6      Isn't that true?
7  A. That is true.
8  Q. And that doesn't appear in any
9 report.
10      Does it?
11  A. Nope.
12  Q. Yet, based on all of this, you
13 make a conclusion unsupported by any of your
14 records, okay, after you've been sued that
15 the children weren't missing.
16      Is that true?
17  A. That is not true.
18  Q. Oh, okay. Well, you -- that day
19 you said the children weren't missing because
20 why?
21  A. I didn't tell you that -- I told
22 you he comes in, makes a complaint.
23  Q. Uh-huh.
24  A. And, again, with all the past
25 history involved in this case --

Bucks County Court Reporters
215.348.1173

30

1          JOSEPH TRIPP
2  Q. That you didn't know about.
3  A. I knew about before he came
4 through the door of our lobby.
5  Q. I thought you said you didn't
6 know before that.
7  A. Apparently you're not listening
8 to me.
9  Q. Apparently not.
10  A. He's in the lobby.
11  Q. Uh-huh.
12  A. Corporal Wheeler comes to me,
13 says, we have David Bush in the lobby. I
14 don't know David Bush from Adam.
15  Q. That's what I thought you said.
16  A. Exactly. He fills me in on
17 what's going on.
18  Q. Do you know if he was being
19 truthful?
20  A. Who?
21  Q. The corporal.
22  A. I would hope so.
23  Q. I would hope so, too, but did you
24 know he had his facts --
25  A. I can only rely on the facts

Bucks County Court Reporters
215.348.1173

31

1          JOSEPH TRIPP
2 given to me.
3  Q. Okay.
4  A. Do I trust my crime corporal?
5 Absolutely.
6  Q. Okay. Now, he tells you all
7 these things and you decided you're not going
8 to deem the children missing.
9      Is that true?
10  A. Not my decision to make, as I
11 stated before.
12  Q. So you're telling me the District
13 Attorney's office tells you or your man who
14 then tells you these children are not
15 missing.
16      Is that what you're
17 saying?
18  A. It was deemed to be attempt to
19 locate the kids. Pretty much check the
20 welfare of the kids.
21  Q. Then why was it listed as a crime
22 on this report?
23  A. That's the way it came in. These
24 kind of reports are unfounded all the time.
25 An alleged crime comes in. We investigate

Bucks County Court Reporters
215.348.1173

32

1          JOSEPH TRIPP
2 it. That's why the block is up there to be
3 unfounded.
4  Q. Okay. But this didn't turn out
5 to be unfounded.
6      Did it?
7  A. I don't know what the end result
8 is.
9  Q. You don't?
10  A. Exceptionally cleared.
11 Prosecution declined is the end result.
12  Q. Which means what?
13  A. The district attorney chose not
14 to prosecutor.
15  Q. So his complaint that the
16 children were being concealed had to be
17 founded.
18      Correct?
19  A. Not necessarily.
20  Q. No?
21      Well, did you ever read
22 this report?
23  A. Yes.
24  Q. Attributes activity to you.
25      Doesn't it?

Bucks County Court Reporters
215.348.1173

33

JOSEPH TRIPP

2   A.   Excuse me?
3   Q.   It attributes activity to you.
4        Doesn't it?
5   A.   Yes.
6   Q.   Okay. So you did know what was
7   going on.
8        Didn't you?
9   A.   All the facts? Probably not.
10  Q.   All right. Let's find --
11  A.   Was I kept updated? Yes.
12  Q.   You were in what supervisory
13  capacity in the barracks when this call came
14  in?
15  A.   Station commander.
16  Q.   Nobody higher than you, right, in
17  that station?
18  A.   No.
19  Q.   Okay. So it would have been your
20  responsibility to know what was going on in
21  your station.
22       Wouldn't it?
23  A.   It is very difficult to know
24  everything going on in your station.
25  Q.   Okay. But you were present for

Bucks County Court Reporters
215.348.1173

34

JOSEPH TRIPP

2   Lieutenant Ignatz's testimony.
3        Correct?
4   A.   Correct.
5   Q.   And he's higher in rank than you.
6        Correct?
7   A.   Correct.
8   Q.   And he testified that sergeants
9   and himself and higher go to supervisory
10  schools.
11       Didn't he?
12  A.   That's correct.
13  Q.   Was that accurate?
14  A.   Uh-huh.
15  Q.   Okay. He testified that
16  supervisors should be keeping track of
17  investigations if they're late.
18       Was that correct?
19  A.   Station commanders or
20  supervisors.
21  Q.   Supervisors.
22  A.   Supervisors. Correct.
23  Q.   And station commanders are
24  responsible to make sure their supervisors
25  are doing their job.

Bucks County Court Reporters
215.348.1173

35

1        JOSEPH TRIPP
2        Isn't that correct?
3   A.   That is correct.
4   Q.   So he testified accurately and
5   correctly into that area.
6        Correct?
7   A.   Correct.
8   Q.   Now, did you keep track of this
9   concealment of the whereabouts of child
10  investigation?
11  A.   As far as making sure that it was
12  submitted on time?
13  Q.   To make sure that the rules and
14  regulations of the Pennsylvania State Police
15  were being followed.
16  A.   For this particular
17  investigation?
18       We don't do that for
19  particular --
20  Q.   Is there --
21  A.   -- investigations.
22  Q.   Is there a difference on criminal
23  investigations?
24       One type doesn't get
25  followed up on and is allowed and another one

Bucks County Court Reporters
215.348.1173

36

1        JOSEPH TRIPP
2   does?
3   A.   Again, trooper takes a report,
4   submits it to the crime supervisor is if it's
5   a criminal investigation. He then keeps
6   track of when the supplemental reports are
7   do.
8   Q.   Uh-huh.
9        And it's your job to make
10  sure that he does his job.
11       Correct?
12  A.   Correct.
13  Q.   And you told me a moment ago you
14  kept watch on this one.
15       Correct?
16  A.   I didn't say I -- I said I was
17  updated.
18  Q.   Well --
19  A.   I never said I kept watch on it.
20  Q.   -- this was, I believe you
21  testified to in the arbitration, an unusual
22  thing.
23  A.   It is.
24  Q.   So that testimony was correct.
25       Right?

Bucks County Court Reporters
215.348.1173