2 So knowing it was unusual
3 and not occurring, are you telling me today
4 you didn't keep track of this investigation?
5    A.    What are -- define keep track of.
6    Q.    Making sure that the 60 day
7 periods --
8    A.    Absolutely --
9    Q.    -- weren't being violated?
10   A.    -- not. No.
11   Q.    You didn't keep track?
12   A.    No.
13   Q.    Why not?
14   A.    I was kept updated. If I hadn't
15 heard anything in awhile I would talk to
16 Corporal Wheeler, where are we at?
17   Q.    Where is it indicated in the
18 reports that you were kept updated?
19   A.    That's the kind of stuff that's
20 not documented in an investigation. That is
21 common practice within the State Police.
22   Q.    What about the common practice of
23 the Pennsylvania State Police not documenting
24 contacts with district attorneys?
25   A.    Again, if you want documentation

2 every time somebody talks to the district
3 attorney it would be none stop.
4    Q.    Okay. Well, could you show me in
5 this I believe its been described as Captain
6 Hill's letter as a thorough and detailed
7 report where there was a call, contact or
8 letter sent to the district attorney in
9 regards to this investigation and let's just
10 start with prosecution that you say was
11 declined?
12   A.    I don't know what you're asking
13 me.
14   Q.    I want you to show me in the
15 report that I said Captain Hill has described
16 as thorough and accurate these contacts or at
17 least one with the district attorney and what
18 was said and done.
19   A.    I mean, there's several
20 references here that state that he is
21 consulting with the D.A.'s office, but I
22 don't see any date, time what you're looking
23 for is saying he did it on this date and
24 time.
25   Q.    Okay. Isn't it true the first

1                JOSEPH TRIPP
2 entry we can find anywhere in this thorough
3 and detailed report, okay, is on the last
4 page where it's written the Tioga County
5 District Attorney's Office is not seeking any
6 prosecution toward any party involved at this
7 time?
8    A.    No.
9         MR. HENZES: You might
10 want to turn to page five of the report.
11        THE WITNESS: Yeah.
12 That's where I'm at.
13 BY MR. PURICELLI:
14   Q.    Oh, you're referring to -- so
15 we're being fair on the record, this
16 investigation was furthered per the Tioga
17 County District Attorney's Office request
18 into finding reasoning for Monserrate's
19 possible willingness to keep location of the
20 Bush children and herself from David Bush?
21        Is that what you're
22 referring to?
23   A.    Yes.
24   Q.    Okay. What date did that occur
25 on?

1                JOSEPH TRIPP
2    A.    Don't know.
3    Q.    Don't know.
4         Why not?
5    A.    Because it's not written here.
6    Q.    Uh-huh.
7         Should it have been?
8    A.    Probably would have been nice.
9    Q.    How was the conversation
10 occurring?
11        Was it in letter form?
12   A.    I don't know.
13   Q.    Was it on telephone?
14        MR. HENZES: He said he
15 didn't know.
16        MR. PURICELLI: I asked
17 him about a telephone. He said he
18 didn't know. So I'm being specific. I
19 like to be specific.
20        MR. HENZES: You asked
21 about a conversation. A conversation
22 can't take place by letter.
23        Go ahead.
24        MR. PURICELLI: If you
25 want I'll reread the question. I said

41

JOSEPH TRIPP

1  by telephone.
2          MR. HENZES: He doesn't
3      know.
4          THE WITNESS: I have no
5      idea how the conversation took place.
6  BY MR. PURICELLI:
7      Q.   Okay. You're reading a thorough
8  and detailed report.
9          Shouldn't that tell you?
10     A.   If you say so.
11     Q.   Well, I'm asking you the
12 Pennsylvania State Police requirements of
13 thorough and detailed reports referenced by
14 Captain Hill as having, shouldn't I be able
15 to read this report and find out when it
16 occurred and how it occurred and where it
17 occurred?
18     A.   Sure.
19     Q.   Aren't you trained as members of
20 the State Police by the State Police to
21 answer questions who, what, where, when and
22 why?
23     A.   Yes.
24     Q.   Okay. And all that says is to

42

JOSEPH TRIPP

1  try and find out why she's hiding the kids.
2          Correct?
3          In paraphrasing form.
4      A.   I'll read it again.
5          Okay. What was your
6  question again?
7      Q.   Well, my question is,
8  paraphrasing, the district attorney is
9  instructing the Pennsylvania State Police to
10 find out why Sara is not disclosing the
11 whereabouts of the kids?
12     A.   Correct.
13     Q.   And did anybody follow up such as
14 yourself to find out why he would want to
15 know that information if you didn't think the
16 kids were missing?
17     A.   I don't understand your question.
18     Q.   Why would the District Attorney's
19 Office ask you to find Sara and explain why
20 she's hiding the kids if they weren't
21 missing?
22         MR. HENZES: No. They
23     didn't ask that. Read it again.
24         MR. PURICELLI: I did.

43

JOSEPH TRIPP

1          MR. HENZES: It says find
2      a reason why she would be hiding. It
3      didn't say find Sara and ask her why
4      she's hiding the kids.
5  BY MR. PURICELLI:
6      Q.   So they asked you to investigate
7  a defense.
8          Is that what you're
9  telling me?
10     A.   Asked me, personally?
11     Q.   You, the Pennsylvania State
12 Police?
13     A.   No.
14     Q.   Is that what you're saying?
15     A.   I am not Pennsylvania State
16 Police. There's multiple people involved
17 here.
18     Q.   I can split words, Trooper.
19         MR. HENZES: That would be
20     nice because you're suing him,
21     personally.
22         THE WITNESS: Yeah.
23 BY MR. PURICELLI:
24     Q.   Isn't every member of the

44

JOSEPH TRIPP

1  Pennsylvania State Police under your own FR
2  referred to as trooper regardless of rank?
3      A.   Sure.
4      Q.   Okay. So when I refer to you as
5  trooper I'm doing it affectionately because
6  the regulations so, not to be demeaning to
7  your rank, Sergeant?
8      A.   Okay.
9      Q.   Okay. I would have thought you
10 would have known that.
11         MR. HENZES: Since you
12     sued him personally why don't you just
13     stick to what he did since your clients
14     are suing him personally as opposed to
15     what someone else did or didn't do?
16         MR. PURICELLI: Well, I
17     will. And what he did or didn't do
18     depends on what other people did;
19     according to his testimony.
20 BY MR. PURICELLI:
21     Q.   Now, you didn't keep track of the
22 investigation by making sure that the
23 investigator was doing things in timely
24 fashion.

```
 2                 Correct?
 3       A.    Not my job.
 4       Q.    Not your job.
 5             And you didn't contact the
 6  supervisor to make sure that the
 7  investigator, the assigned investigator was
 8  doing things within a 60-day period that
 9  Lieutenant Ignatz talked about.
10             Did you?
11       A.    Sir, do you understand how many
12  incidents comes into a station a month?
13       Q.    Of this type, one.
14             Isn't that true?
15       A.    Sure.
16       Q.    Okay. And you said this was
17  unusual.
18             Correct?
19       A.    Absolutely.
20       Q.    And I can agree with you that you
21  probably don't keep attack of every --
22       A.    Absolutely not.
23       Q.    -- vandalism that comes in
24  because kids hit a mailbox with a bat or
25  something like that.
```

Bucks County Court Reporters
215.348.1173

```
 1                           JOSEPH TRIPP
 2       A.    Correct.
 3       Q.    Okay. But this was more than one
 4  of these minor events.
 5             Wasn't it?
 6       A.    Well, again, it was -- actually,
 7  not really. It was deemed at the very
 8  beginning as pretty much an attempt to locate
 9  by the District Attorney's Office.
10       Q.    Well, you didn't classify that on
11  the State Police forms.
12             Correct?
13       A.    That was how it was initially
14  called in.
15       Q.    Well, he came in. Not called in.
16             Correct?
17       A.    Yes.
18       Q.    So we're specific.
19       A.    Yes. He came in.
20       Q.    Okay.
21       A.    Yes.
22       Q.    Okay. All right. So you knew
23  the complainant.
24             Right?
25             The person who was
```

Bucks County Court Reporters
215.348.1173

```
 1                           JOSEPH TRIPP
 2  complaining that some problem existed.
 3             Right?
 4       A.    I knew him?
 5       Q.    You knew his identity.
 6             Didn't you?
 7       A.    Yes.
 8       Q.    Okay. He identified the person
 9  he believed took his children.
10             Correct?
11       A.    Correct.
12       Q.    Okay. And he couldn't find his
13  children.
14             Correct?
15       A.    That's what he said.
16       Q.    And he wanted to report those
17  facts to you.
18             Correct?
19       A.    Correct.
20       Q.    Now, under State Police policies
21  what should you, if anything, have done in
22  regards to locating the kids?
23       A.    Exactly what we did.
24       Q.    Now, isn't there a statute that
25  controls your activity?
```

Bucks County Court Reporters
215.348.1173

```
 1                           JOSEPH TRIPP
 2       A.    Which statute would you be
 3  referring to?
 4       Q.    I'm asking if you know, Sergeant.
 5       A.    You're looking for us to enter
 6  the kids into NCIC.
 7       Q.    Don't try and guess where I'm
 8  going, Sergeant.
 9       A.    Well --
10       Q.    We'll get done a lot easier.
11       A.    -- that's why I asked you.
12       Q.    Isn't there a statute that
13  controls that activity? That complaint?
14       A.    As far as missing kids?
15       Q.    Isn't that what he reported?
16       A.    Yes.
17       Q.    Okay. So can we stop sparring
18  about that?
19       A.    I want to know what you're asking
20  me.
21       Q.    I want to know isn't there --
22       A.    At the very beginning did you not
23  ask me to ask you if I don't understand your
24  question?
25       Q.    I did.
```

Bucks County Court Reporters
215.348.1173

2   A. That's all I'm doing.
3   Q. Okay. Now, we can agree that
4 there's a statute to control the State Police
5 conduct when kids are reported missing.
6       Correct?
7   A. Correct.
8   Q. And Mr. Bush did report his kids
9 missing.
10      Correct?
11  A. Correct.
12  Q. Now, did you tell me under your
13 understanding of the statute you're aware
14 ever where there is an exception of putting
15 in kids into NCIC?
16  A. There is an exception.
17  Q. What is that exception?
18  A. If you deem that the kids are not
19 missing.
20  Q. Could you show that to me?
21      You have it over there.
22  A. They're with their mother. He
23 told us they were with their mother.
24  Q. That's fine.
25      If that's true, Sergeant

50

JOSEPH TRIPP

2 Tripp, why did the State Police after the
3 kids were located and were known to be in the
4 natural father's possession require the
5 Virginia State Police to declare them
6 missing?
7   A. I don't understand your question.
8 You're going to have to repeat that one for
9 me.
10  Q. Isn't the thinking that you just
11 testified to that the kids weren't missing by
12 virtue of the fact that they were with the
13 mother?
14      Is that what you're
15 telling me?
16  A. Yes.
17  Q. Now, isn't it true in this
18 investigation report -- you can look at it --
19 that the Pennsylvania State Police were
20 interviewing Serene to enter the kids into
21 the missing children's databank?
22  A. I don't know. I don't see what
23 you're referring to.
24  Q. Why don't we take a second and
25 let you look at the pages a couple in from

51

1   JOSEPH TRIPP
2 that last one you're looking at starting with
3 a 10/23/06 --
4       MR. HENZES: The report by
5   McDermott.
6       THE WITNESS: That was
7   done out of --
8 BY MR. PURICELLI:
9   Q. Both on the same troop.
10      Aren't they?
11  A. Yes.
12      MR. HENZES: Different
13  building location.
14 BY MR. PURICELLI:
15  Q. Is it your testimony they weren't
16 communicating with your building?
17  A. No. We had communication with
18 them.
19  Q. About this, in fact, what
20 McCormick was doing.
21      True, isn't it?
22  A. Yes. I talked to McCormick.
23  Q. So let's not split hairs. I'm
24 not trying to build a record.
25      Please read the document

52

1   JOSEPH TRIPP
2 so that you become familiar again with the
3 facts.
4   A. I don't have it.
5   Q. Sure you do. Believe me, you do.
6       MR. HENZES: Just take it
7   from mine. This is what he's asking
8   for.
9       THE WITNESS: Okay. Now,
10  what's your question?
11 BY MR. PURICELLI:
12  Q. My question is: Isn't it true
13 after David Bush learned where the kids
14 were --
15  A. Uh-huh.
16  Q. -- and the kids were turned over
17 to him --
18  A. Uh-huh.
19  Q. -- the Pennsylvania State Police
20 knew where the kids were when Serene came on
21 or about October 23, 2006 at or about 2100
22 hours, and to the rest of the world that's
23 nine o'clock p.m., okay, to report the kids
24 missing?
25  A. Okay.

53

JOSEPH TRIPP

Q. Isn't that true?
A. Yes.
Q. Okay. Isn't it also true that the Pennsylvania State Police under the same troop that you were supervising --
A. Uh-huh.
Q. -- okay, determined that the kids could be classified as missing and entered into NCIC?
A. Yes.
Q. And isn't it also true that you knew the whereabouts of the kids when the Pennsylvania State Police were having the kids put into NCIC?
A. They were with Mr. Bush.
Q. Thank you.
Now --
MR. HENZES: Wait a second. You're distorting the facts.
MR. PURICELLI: No. I'm not.
MR. HENZES: The Pennsylvania State Police never entered the kids into NCIC.

54

JOSEPH TRIPP

BY MR. PURICELLI:
Q. Oh, okay. Didn't the Pennsylvania State Police have the Virginia State Police enter them in based on the State Police's report, the Pennsylvania State Police report?
Read it.
A. They said that they would file a report based on -- it doesn't say that we had them do it. They wanted -- Virginia State Police wanted me to get the information required in filling in missing person report.
MR. HENZES: Me being Matthew R. McDermott.
THE WITNESS: Right.
BY MR. PURICELLI:
Q. Doesn't that report from McDermott, Troop F, say that the State Police in Virginia first would not enter the kids into NCIC?
You can turn to the first page of the report.
MR. HENZES: And you're asking him does it say there --

55

JOSEPH TRIPP

MR. PURICELLI: Yes.
MR. HENZES: -- that the Virginia State Police would not enter them?
MR. PURICELLI: Would not enter the children.
MR. HENZES: Does it state what you just said, that the Virginia State Police would not enter them?
MR. PURICELLI: Uh-huh.
MR. HENZES: Unless you know where it is, Brian, because I read this many, many times. There's not that wording in there that they said they would not enter them.
And, again, you're asking him to talk about what someone else is writing.
THE WITNESS: Yeah.
MR. HENZES: But that's something for you to decipher for yourself. Again, this is Trooper McDermott's report.
MR. PURICELLI: I

56

JOSEPH TRIPP

understand that.
BY MR. PURICELLI:
Q. In what capacity does Trooper McDermott fall under your command?
A. He doesn't.
Q. He doesn't?
A. No.
Q. Wasn't he contacting your unit to let you know there had been a report?
A. Sure, but he doesn't fall under my chain of command.
Q. Did you tell him anything at all when he was contacting your unit --
A. Yeah. I filled him in.
Q. -- about a case that you had been working?
A. Not that I had been working. That PSP Mansfield had been working.
Q. Did you tell him that we had determined through the advice, allegedly, of the District Attorney's Office that since the children were known to be with their parents, the mother in this case, that they weren't deemed to be missing?

**57**

JOSEPH TRIPP

A. You are totally twisting the whole thing.

Q. It could be said the same for you, sir. So let's not --

MR. HENZES: Let's go back to your original question.

Does it say --

MR. PURICELLI: Uh-huh.

MR. HENZES: -- they would not enter --

THE WITNESS: I don't see that.

MR. PURICELLI: Well, it's in there.

MR. HENZES: Then do us the favor and point it out. And I repeat, use the words that you use, the Virginia State Police would not enter the kids into NCIC.

THE WITNESS: I don't see it.

BY MR. PURICELLI:

Q. Okay. It's not for me to justify it. You're saying you don't see it.

**58**

JOSEPH TRIPP

A. I don't see it.

Q. Okay. It does say here that McCann, that's the individual from --

A. Who?

Q. McCann, M-C-C-A-N-N, then called me back and stated -- me being McDermott -- then stated the informant was going to go through the chain of command and he was waiting to hear back from the Virginia State Police headquarters. It does say that.

Right?

So you're saying you don't know that they said they weren't going to do it originally?

A. Yes. I don't know.

Q. When McDermott was contacting you didn't he say that she was here to report her children missing?

A. Yes. He did say that.

Q. And what did you tell him?

A. I don't recall.

Q. Okay.

A. I filled him in as to what was going on.

**59**

JOSEPH TRIPP

Q. Could you show me in this report from McDermott where he says he spoke with you and you told him that?

A. Yeah. I spoke with Sergeant Tripp PSP Mansfield station and filled him in all the information. He stated that he knew --

MR. HENZES: He being me --

THE WITNESS: Yes.

MR. HENZES: -- so the record shows.

THE WITNESS: He stated that he knew of the supposed actor David Bush.

MR. HENZES: He being you.

THE WITNESS: He being me.

BY MR. PURICELLI:

Q. I understand that. Okay. I know the document may not show that.

And that's all it says you said.

Right.

A. That I advised McDermott that

**60**

JOSEPH TRIPP

there was no act of custody paperwork and a PFA expired on January 1 of 2006.

Q. Okay. So in your knowledge then what parent could or couldn't have possession of their child with those facts that you just related to McDermott?

A. Sir, you're asking me to form an opinion on a report that I was not there to take, nor did I have the information.

Q. I'm only asking you to read what you said.

Did you say these things to him?

MR. HENZES: You're asking him to read what someone else reported that he said.

BY MR. PURICELLI:

Q. And that's why I just asked him did you say these things that he wrote?

A. Yes.

Q. Okay. So that goes back to my other question.

Based upon what you told him, nobody had a PFA anymore, nobody had a

61

```
 1                                 
 2  custody order, isn't it true either parent
 3  had the right to be with their kids?
 4      A.   Had the right to be with their
 5  kids?  That's not for me to decide.
 6      Q.   Well, you have to decide whether
 7  the kids are lawfully in possession with
 8  someone to make a criminal arrest.
 9           Correct?
10      A.   Correct.
11      Q.   Could you make a criminal arrest
12  based on that information?
13      A.   Because he took the kids from
14  Virginia?
15           It's out of our
16  jurisdiction.
17      Q.   Because he had them.  Because he
18  had them?
19      A.   Because who had them.
20           Does David Bush have the
21  kids now?
22      Q.   Uh-huh.
23      A.   Apparently.  I don't know.  I
24  didn't see him with the kids.  I don't know.
25      Q.   Did McDermott tell you?
```

Bucks County Court Reporters
215.348.1173

62

JOSEPH TRIPP

```
 2           MR. HENZES:  McDermott
 3  tell him what?
 4           MR. PURICELLI:  That David
 5  Bush had the kids.
 6           MR. HENZES:  No.  He just
 7  told David Bush -- he, Tripp, told --
 8  Tripp, as written in the report, told
 9  McDermott that the children were with
10  David Bush.
11           MR. PURICELLI:  I know all
12  that.
13           MR. HENZES:  Apparently
14  you don't because you're getting it
15  confused.
16           MR. PURICELLI:  Sorry, I'm
17  not.  If you want to testify to all the
18  facts, go right ahead.
19           MR. HENZES:  I'm trying to
20  get it cleaned up because you're all
21  confused.
22           MR. PURICELLI:  You're not
23  cleaning it up.
24           MR. HENZES:  Maybe to
25  seven other people in the room I am, not
```

Bucks County Court Reporters
215.348.1173

63

```
 1                 JOSEPH TRIPP
 2  to you.
 3           MR. PURICELLI:  You want a
 4  show of hands of how many are confused
 5  and think I'm confused?
 6           MR. HENZES:  I don't think
 7  you want us to take a vote.
 8           MR. PURICELLI:  All right.
 9  I'll take a vote.
10           MR. HENZES:  Go ahead.
11           MR. PURICELLI:  I don't
12  see any hands up.
13           MR. HENZES:  Ask your
14  question.
15           Well, I would hope your
16  clients wouldn't embarrass you, but
17  that's just my hope.
18           MR. PURICELLI:  Well, I
19  didn't see your clients put their hands
20  uphill.
21           MR. HILL:  We're trying to
22  remain professional.
23           MR. HENZES:  Ask the
24  question.
25           You said, your original
```

Bucks County Court Reporters
215.348.1173

64

```
 1                 JOSEPH TRIPP
 2  question was Virginia would not.
 3           And can we agree there's
 4  nothing in the document that supports
 5  your question?
 6           MR. PURICELLI:  No.  No.
 7  We can't.
 8           MR. HENZES:  Okay.
 9           MR. PURICELLI:  Now, if
10  you want to clean it up on your turn,
11  fine.
12           MR. HENZES:  You distort
13  the records so poorly that you can't get
14  your witnesses to answer a question
15  because they're confused.
16           MR. PURICELLI:  I disagree
17  with that.
18  BY MR. PURICELLI:
19      Q.   Now, we're back to where I was,
20  which is you are -- it's represented in this
21  report that you made these statements.  You
22  made these statements.
23           Correct?
24      A.   The ones in McDermott's report?
25      Q.   Yes.
```

Bucks County Court Reporters
215.348.1173

## 65

JOSEPH TRIPP

2  A. What I told him?
3  Q. Yes.
4  A. Yes.
5  Q. Now, that's all you told
6  McDermott?
7  A. I don't recall everything I told
8  him.
9  Q. Well, tell me what you do recall
10 having now read what he said you said.
11 A. Well, I agree with this.
12 Q. Is that all you recall him
13 saying?
14         MR. HENZES: Him say you
15     say.
16         THE WITNESS: Me saying.
17         Yeah. This seems to be
18     the phone call we had and he sent up all
19     the information he had from I can't
20     recall first name, Mrs. Bush, when she
21     came in.
22 BY MR. PURICELLI:
23 Q. Well, why would the children be
24 deemed missing in the custody of Mr. Bush
25 when they were known, but weren't deemed

Bucks County Court Reporters
215.348.1173

## 66

JOSEPH TRIPP

2  missing when they were in the custody of
3  Mrs. Bush?
4  A. Good question.
5  Q. I thank you.
6  A. When Mrs. Bush left apparently
7  with the kids I believe her husband was in
8  jail and also a PFA violation in place.
9  Q. Uh-huh.
10 A. She then was gone. Exact amount
11 of time, I don't know. Year and a half?
12 Year? I don't know. All of a sudden he then
13 goes down and grabs the kids out of school
14 and takes them.
15 Q. He had a court order.
16     Didn't he?
17     Yes or no?
18     Yes or no, Sergeant?
19         MR. HENZES: Does he know
20     if he had a court order with him?
21         He don't know that. He
22     wasn't with him.
23 BY MR. PURICELLI:
24 Q. You don't know then.
25     Do you?

Bucks County Court Reporters
215.348.1173

## 67

JOSEPH TRIPP

2  A. I say --
3  Q. You don't know how he got
4  custody.
5      Do you, Sergeant?
6  A. Yes. I do.
7  Q. Personally or somebody told you?
8  A. I saw a court order out of
9  Luzerne County.
10 Q. Do you have personal knowledge,
11 Sergeant, being professional as the captain
12 over there likes you to be --
13         MR. HENZES: He's a major
14     now.
15         MR. PURICELLI: Major now.
16     I know he's a major. I heard him out in
17     the parking lot.
18         MR. HENZES: Well, you
19     called him a captain.
20         MR. PURICELLI: For
21     purposes of this litigation he is one.
22 BY MR. PURICELLI:
23 Q. Do you have personal knowledge of
24 how the children came into the custody of
25 David Bush in Virginia?

Bucks County Court Reporters
215.348.1173

## 68

JOSEPH TRIPP

2  A. Yes.
3  Q. Were you present?
4  A. No.
5  Q. How did you acquire the personal
6  knowledge?
7      Not what somebody told you
8  or you read.
9  A. Oh, then I don't have personal
10 knowledge.
11 Q. Thank you.
12 A. I was told.
13 Q. You were told.
14 A. Uh-huh.
15 Q. Did that person tell you that
16 they -- by the way, who told you?
17 A. I believe it was the FBI.
18 Q. You think the FBI?
19 A. Sure.
20 Q. Okay. Did you write a report on
21 what the FBI told you?
22 A. No.
23 Q. Why not?
24 A. Why would I write a report on
25 something that happened in Virginia?

Bucks County Court Reporters
215.348.1173