## Page 69

Q. Why were they contacting you?
You may think it's funny.
A. It is funny.
Q. I don't think so.
A. But the reason why they contacted us, because he took the kids and apparently they found out the custody order was crap and they wanted us to check his residence in Tioga County.
Q. Is that what you think?
A. Yes.
Q. Do you know that they got involved because no one would assist the Richmond Police Department and the Richmond Police Department had to call two of their friends who are assigned to the marshall's office down there to get involved and use their influence to get a fugitive warrant so that the FBI up here could get involved?
Did you know all of that Sergeant?
A. Nope.
Q. No.
So would you do something

## Page 70

JOSEPH TRIPP

like that?
You can't get the cooperation of any law enforcement agency, okay, including the Pennsylvania State Police and then you call members of your unit who are assigned to, let's say, a marshall's office and use your influence to do that, would you do that?
A. I don't know the circumstances.
Q. I know you don't.
A. You're asking me to form an opinion based on not having --
Q. But you think this is funny and you don't know all the facts, but you think it's funny.
Don't you?
MR. HENZES: No. He thinks what's funny is how you're trying to misconstrue everything. That's the funny thing, Brian.
MR. PURICELLI: Well, that's your interpretation.
THE WITNESS: That's mine, also, sir.

## Page 71

JOSEPH TRIPP

MR. PURICELLI: Well, may be so, but I would expect you to say so for your attorney.
BY MR. PURICELLI:
Q. Now, did you have any training in custody law?
A. Specifically, not that I recall.
Q. Do you have any training as a lawyer?
A. No.
Q. Do you have any training in civil rights?
A. Just what we get through the department.
Q. And you heard the lieutenant say that he knew that you couldn't interfere with a parental right to be with their children.
Didn't you?
A. Again, it depends on the circumstances.
Q. Could be a lot of things.
A. What circumstances>.
Q. Was there any court order that you knew of that gave Sara the right to take

## Page 72

JOSEPH TRIPP

the children from Pennsylvania?
A. I believe there was a court order in effect that he -- I don't know. Without reviewing the court order, there was something in there. Whether it was his parental rights that he signed off at the time that expired, there was something in there. I don't have the court order in front of me.
Q. Okay. Did you FAX anything to the State Police?
A. FAX anything to?
MR. HENZES: The State Police according to you.
BY MR. PURICELLI:
Q. To the Virginia State Police.
A. I believe after the fact. Yes.
Q. Yes.
In fact, it was an expired PFA.
Wasn't it?
A. Yeah. The one I believe I testified to expired in January --
Q. Why did you FAX an order that had

## Page 73

2 no legal effect at all?
3  A. They asked for it.
4  Q. Didn't they ask you for a court
5 order that gave her custody?
6  A. I don't recall. They asked us
7 for any court orders that we had copies of
8 relative to the children.
9  Q. Okay. So when we started this
10 whole conversation and asked you if you had
11 made notes, reports, you said why.
12     The question now is you're
13 doing all these activities.
14     Are you making a report
15 about your activities?
16  A. That I sent a copy of a custody
17 order to Virginia State Police? No. I did
18 not make a report of that.
19  Q. And the same thing about the
20 discussion with the FBI.
21     Correct?
22  A. No.
23  Q. Okay. Now, is there anybody else
24 you talked to, for example, Captain Hill that
25 you didn't make any reports about?

Bucks County Court Reporters
215.348.1173

## Page 74

JOSEPH TRIPP

2  A. I talk to my captain all the
3 time.
4  Q. About this?
5  A. I don't recall if I talked to him
6 relative -- I talked to Lieutenant Peters.
7 He was actually at our station, who was the
8 crime lieutenant.
9  Q. Uh-huh.
10     When did you talk to him?
11  A. He was there and had a meeting
12 with -- I believe he was there, Whisner,
13 Trooper Whisner who wrote the report,
14 Corporal Wheeler and I believe John Cowley,
15 the district attorney was also there and I
16 sat in on that.
17  Q. Okay. And was that noted in any
18 documents that you have in front of you?
19  A. I don't recall seeing it there.
20  Q. I don't recall reading anything.
21 Randy will say if he saw it or not.
22     MR. PURICELLI: Randy, did
23  you see anything like that anywhere so
24  I'm not distorting the record?
25     MR. HENZES: See anything

Bucks County Court Reporters
215.348.1173

## Page 75

JOSEPH TRIPP

2 that what?
3     MR. PURICELLI: About this
4  meeting he's referring to.
5     MR. HENZES: Well, there's
6  a reference on page seven of the report
7  that Tioga County was not going to seek
8  any prosecution towards any party, let
9  alone against her or him.
10     MR. PURICELLI: Okay.
11     MR. HENZES: So they did
12  that. Doesn't say when the meeting took
13  place. But, again, that's not his
14  report. Again I come back to this.
15  You're asking him if he prepared any
16  reports and he's already answered your
17  question no. But as I said before,
18  you're free to do what you want to do.
19     Go ahead.
20     MR. PURICELLI: Thank you.
21 BY MR. PURICELLI:
22  Q. Now, when Dave came in to report
23 his belief his kids were missing, he
24 reported, in fact, that he believed a crime
25 had been committed.

Bucks County Court Reporters
215.348.1173

## Page 76

JOSEPH TRIPP

2     Correct?
3  A. Yes.
4  Q. In fact he cited 2908 and 2909.
5     Didn't he?
6  A. I don't recall that.
7  Q. I'm going to show you what's been
8 previously marked as David Bush-1 from a
9 December 22, 2009 deposition.
10     Do you recognize that
11 document?
12     MR. HENZES: Have you ever
13  seen it before is the question?
14 BY MR. PURICELLI:
15  Q. Same thing.
16  A. Yeah. I don't recall ever
17 reading this.
18  Q. Okay. The last page, last --
19  A. Excuse me?
20  Q. Last page --
21  A. Uh-huh.
22  Q. -- last entry there's some
23 numbers 2808 and 2809 (sic).
24     Correct?
25     Your attorney will show

Bucks County Court Reporters
215.348.1173

### Page 77

```
 2   you.
 3             Correct?
 4       A.    Yeah.  I see that.
 5       Q.    Okay.  So he specifically
 6   identified in his report for his missing
 7   children.
 8       A.    To Trooper Whisner.
 9       Q.    Okay.  Didn't you keep track of
10   the investigation?
11       A.    Again, did I -- was I kept
12   updated to the investigation?
13             Did I know that he wrote
14   criminal statute 2909 or 2908 on his victim
15   witness form?  No.
16       Q.    Okay.  So when you said you knew
17   he reported those sections how did you know
18   if you didn't read the report?
19             MR. HENZES:  He said he
20       didn't know he reported those sections.
21             THE WITNESS:  I didn't
22       know.
23             MR. HENZES:  That's why we
24       through that exercise.
25             MR. PURICELLI:  It's not
```

### Page 78

```
                    JOSEPH Tripp
 2   why we went through that exercise.
 3             MR. HENZES:  Sure we did
 4       because you wanted to show it in the
 5       report.
 6             MR. PURICELLI:  If you're
 7       going to let me get through this, Randy,
 8       or we can adjourn it.
 9             MR. HENZES:  Hey, we got
10       through it and then you totally changed
11       it.  I thought we were done with it.
12             MR. PURICELLI:  We
13       weren't.
14   BY MR. PURICELLI:
15       Q.    Now, when this was reported to
16   your investigator, okay, did anybody tell you
17   such as a supervisor about the reference to
18   crimes?
19       A.    We don't need his reference to
20   the crimes.  He comes in and reports his kids
21   as missing.
22       Q.    So is that a no, Sergeant?
23       A.    No.
24       Q.    Thank you.
25             Is there anything you just
```

### Page 79

```
                    JOSEPH TRIPP
 2   want to say that's on your mind and then I
 3   will ask you my questions and get my answers
 4   so that they're off your mind?
 5       A.    No.  I'm good.
 6       Q.    So is it your testimony you
 7   didn't see the investigation report at all?
 8       A.    No.  I saw the report.
 9       Q.    When?
10             MR. HENZES:  The whole
11       report?
12   BY MR. PURICELLI:
13       Q.    The whole report.  The whole
14   report, of course.
15       A.    I saw the report.  What bits and
16   pieces or at what timeframe, I have no idea,
17   but I was mostly kept updated by the crime
18   supervisor.
19       Q.    Now, at some point in time David
20   Bush came back to your barracks with a court
21   order and an NCIC entry.
22             Correct?
23       A.    Correct.
24       Q.    And subsequent to that you called
25   the Newtown Township Police Department.
```

### Page 80

```
                    JOSEPH TRIPP
 2             Didn't you?
 3       A.    Correct.
 4       Q.    Who did you speak to?
 5       A.    I'm not sure who answered the
 6   phone.  I asked for the investigator in
 7   charge of the missing Bush children.
 8       Q.    Okay.  And did somebody answer?
 9       A.    Detective Bush.
10       Q.    Okay.  And what transpired?
11       A.    When he answered Detective Bush,
12   again, I was not surprised because I had
13   asked David Bush who he knew at Newtown
14   Township Police Department because, again, he
15   lives in Tioga County.
16       Q.    What did he tell you?
17             MR. HENZES:  Would you let
18       him finish his answer?
19   BY MR. PURICELLI:
20       Q.    Sure.
21       A.    What did who tell me?  David
22   Bush?
23       Q.    Finish your answer.
24       A.    Okay.  I see this posture.  It
25   says children are entered national center for
```

## Page 81

```
exploited or missing children.  If you have
any information contact Newtown Township
Police Department.  I don't even know where
Newtown Township is.  So I ask Mr. Bush.
            MR. HENZES:  David Bush.
            THE WITNESS:  David Bush.
            And he states, down near
Philadelphia.
            I said, how in God's name
do you have a police department down
near Philadelphia entering the kids?
            They just took it.
            I said, who do you know at
Newtown Township?
            I don't know anybody.
            So I asked him to step
outside and I called down to Newtown
Township.  They hooked me up with
Detective Bush.
            MR. HENZES:  Christopher
Bush.
BY MR. PURICELLI:
    Q.    "They," whoever answered the
phone?
```

## Page 82

JOSEPH TRIPP

```
    A.    Yeah.  I don't recall who it was
that answered.  I asked to speak to whoever
was in charge of the Bush children
investigation.
    Q.    Did you ever speak with a
Sergeant Patton?
    A.    I don't know.
    Q.    Do you have any reason to
believe -- do you know a Patton?
    Q.    Sergeant Charles Patton,
P-A-T-T-O-N.
    A.    No.  I do not know a Sergeant
Charles Patton.
    Q.    Do you recall speaking to any
persons other than the two people you're
referring to, Detective Bush and whoever
answered the phone?
    A.    I don't know if I talked to the
chief or tried to talk to the chief.  I don't
remember.  But I did speak with Detective
Chris Bush.
    Q.    Okay.
    A.    Chris.
    Q.    And as a result of that you
```

## Page 83

JOSEPH TRIPP

```
learned that he, in fact, had put the kids in
NCIC?
    A.    Correct.
    Q.    Okay.  And after you learned that
did you contact CLEAN?
    A.    No.
    Q.    Did you contact Captain, now
Major Hill?
    A.    No.
    Q.    Why not?
    A.    I asked Mr. Bush if he had an
investigation.
            He said, no.
    Q.    Okay.
    A.    I said, how did you enter the
kids?
            He said, off of your
investigation.
    Q.    Okay.  And you did nothing except
talk to your, I think the word was, guys at
your station?
    A.    Yeah.  I don't recall talking to
anybody about him entering them into CLEAN.
    Q.    Okay.  Why not?
```

## Page 84

JOSEPH TRIPP

```
    A.    I don't know.
    Q.    Well, I don't know, either, if
you don't tell me.
            So you knew no reason to
contact anybody except your guys at the
station about that CLEAN entry.
    A.    Yeah.  I don't know if Corporal
Wheeler contacted CLEAN.  I don't know.
Somebody obviously did.
    Q.    Well, do you know when somebody
obviously did?  Time?  A date?
    A.    No.
    Q.    Was it before or after the
children were recovered that somebody
obviously --
    A.    I don't know.
    Q.    -- called CLEAN?
    A.    I don't know.
    Q.    Okay.  When was the first time
you learned somebody had contacted the State
Police CLEAN unit about that CLEAN entry?
    A.    I think after the kids were
picked up.
    Q.    Okay.  Did there come a time that
```

85

2 you were being investigated for your
3 interactions with Detective Bush?
4   A.   Yes.
5   Q.   Okay. Was the information that
6 you learned about that entry to NCIC before
7 or after you learned you had a complaint
8 against you about your interaction?
9   A.   Okay. You totally lost me.
10  Q.   Okay.
11  A.   One more time.
12  Q.   Did you learn someone had called
13 CLEAN before or after you learned you were
14 the subject of an investigation that was
15 started because of a complaint against you by
16 Detective Bush?
17  A.   I don't know before or after. I
18 don't know.
19  Q.   What evidence do you have, if
20 any, that you can provide to me today that
21 you didn't learn that there was a CLEAN entry
22 until after you learned that you were the
23 subject of an investigation?
24  A.   I don't have any evidence here.
25  Q.   All right. Do you recall --

Bucks County Court Reporters
215.348.1173

86

JOSEPH TRIPP

2 double negative I know.
3        MR. PURICELLI: So we'll
4   clean it up, Randy. I'm sorry.
5 BY MR. PURICELLI:
6   Q.   Is there are anything you can
7 tell me factually to dispute the fact that
8 you learned about the CLEAN entry after you
9 learned you were being investigated because
10 of a claim made by Detective Bush?
11  A.   You asked me if I learned of the
12 CLEAN entry. I knew of the CLEAN entry.
13  Q.   The investigation concerning the
14 CLEAN entry.
15  A.   Or the CLEAN complaint?
16       Which one are you asking?
17  Q.   However you want to phrase it.
18       MR. HENZES: No. How you
19  phrase it because you're asking him to
20  answer your questions.
21       MR. PURICELLI: All right.
22       THE WITNESS: The first --
23 BY MR. PURICELLI:
24  Q.   We're going to try to clean this
25 up for Randy and you.

Bucks County Court Reporters
215.348.1173

87

JOSEPH TRIPP

2   A.   Okay.
3   Q.   You learned at some time, is your
4 testimony as I understand it, that there
5 became an investigation about that CLEAN NCI
6 entry that David Bush told you about.
7        Correct?
8   A.   Yes. I learned that --
9   Q.   Okay.
10  A.   -- the CLEAN section was looking
11 into the entry.
12  Q.   Okay.
13  A.   Yes.
14  Q.   Can you provide me with any fact
15 to dispute that you learned of that CLEAN
16 investigation into the entry, okay --
17  A.   Okay.
18  Q.   -- after you were being
19 investigated as a result of the complaint by
20 David Bush about you or Christopher Bush?
21  A.   No. I don't have any evidence.
22  Q.   Okay. Do you recall any agencies
23 other than Tioga County District Attorney's
24 Office, the Haven unit, the Newtown Township
25 Police Department, Richmond City Police

Bucks County Court Reporters
215.348.1173

88

JOSEPH TRIPP

2 Department, the Virginia State Police and the
3 FBI?
4        Did you speak to anybody
5 other than those agencies?
6   A.   Trooper Smith from our fugitive
7 unit.
8   Q.   Okay. From the Pennsylvania
9 State Police.
10  A.   Yeah. But not out of our
11 building.
12  Q.   No -- any other entity other than
13 the ones I've named in regards to the matter
14 we've been talking about in this lawsuit?
15       MR. HENZES: That he spoke
16  to personally?
17 BY MR. PURICELLI:
18  Q.   Yes. Yes.
19  A.   Yeah. The people from the
20 arbitration.
21  Q.   Okay. Aside from the arbitration
22 and your attorney, obviously. And let's just
23 stick with --
24  A.   And PSP people.
25  Q.   Yeah. We already covered PSP.

Bucks County Court Reporters
215.348.1173

```
 2      A.    Okay. The investigator from the
 3  arbitration that's not --
 4      Q.    That's Newtown Township, that
 5  investigator.
 6      A.    Okay. Mr. Bush. Both Bushes.
 7      Q.    I said agencies. They're not
 8  agencies.
 9            MR. HENZES:  I believe
10       there's Haven House, which you
11       identified as Haven.
12  BY MR. PURICELLI:
13      Q.    I'll get to Haven in a second.
14      A.    I don't recall anything else.
15      Q.    Do you know when I say Haven
16  what's meant by Haven?
17      A.    Yes.
18      Q.    It's mentioned in the reports.
19      A.    Yes.
20      Q.    I want the transcript to be
21  detailed.
22            Now, what is Haven?
23      A.    It's like a women's shelter.
24      Q.    Okay. Do you have any, you,
25  personally, or through your State Police have
```

```
 2  any relationship with Haven?
 3      A.    No relationship with Haven.
 4      Q.    Okay. Do you have -- do you,
 5  personally, or members of your station, not
 6  the present, back then during this case, have
 7  any relationship with Haven?
 8      A.    Yeah. Working relationship.
 9      Q.    Other than the working?
10      A.    That's it.
11      Q.    Okay. And in the report
12  indicates contact was made to Haven to try to
13  locate the kids.
14      A.    Yeah. Looking for a location for
15  Sara, I think her name is.
16      Q.    What, if anything, was said by
17  David Bush to cause the State Police to
18  believe Haven would know anything about the
19  whereabouts?
20      A.    Just the past history of the
21  domestic violence.
22      Q.    Other than the history of the
23  domestic violence was there anything in the
24  records anywhere that you saw that indicated
25  she ever went to Haven?
```

```
 1                JOSEPH TRIPP
 2      A.    I believe she used an attorney
 3  out of Haven at some point.
 4      Q.    Okay. So Haven provides women
 5  with attorneys?
 6      A.    I'm not sure. I don't know if
 7  this woman had been an attorney prior to that
 8  something was -- there was contact with
 9  Haven.
10      Q.    Why did you form the opinion that
11  Haven provided her with an attorney?
12      A.    Whether this woman now works at
13  Haven that used to be her attorney through
14  their divorce, I don't know. There was some
15  connection there.
16      Q.    You just told me you believed
17  Haven provided Mrs. Bush with an attorney. I
18  heard that correctly.
19            Right?
20      A.    No. What I'm saying is she had
21  an attorney. Whether she currently works for
22  Haven now, I don't know the whole connection,
23  but there was a connection to Haven.
24      Q.    What was the connection? You
25  don't know?
```

```
 1                JOSEPH TRIPP
 2      A.    She was a victim of domestic
 3  violence.
 4      Q.    I understand that.
 5      A.    Uh-huh.
 6      Q.    And I asked you what made you
 7  think she had any contact with Haven other
 8  than she claimed to be a victim of domestic
 9  violence?
10      A.    Again, this was Trooper Whisner
11  doing this, not --
12      Q.    I know, but you said you were the
13  one. You believed. That's why I'm forming
14  your belief.
15      A.    You're asking me to form an
16  opinion off of Whisner's report. That's what
17  I believe --
18      Q.    Okay.
19      A.    -- is why Whisner, you know,
20  contacted Haven. It was not at my direction
21  he contacted Haven.
22      Q.    Is there anything in Whisner's
23  report that you read that indicated Haven
24  provided an attorney to Mrs. Bush?
25      A.    No.
```

93

Q. How did you know that Mrs. Bush even had an attorney?
A. Because I read the history on Mr. Bush.
Q. Okay. And that history was provided to you how?
A. Through prior reports.
Q. So you did read reports.
A. Of -- yes. I testified to that earlier.
Q. Now, was there anything in that report that indicated Haven supplied the attorney to Mrs. Bush?
A. I don't recall the specifics.
Q. In your review of the reports did you see any notation where the attorney was contacted?
     The attorney representing Mrs. Bush.
A. How she was contacted?
Q. Was she contacted by the investigator?
A. I don't -- no. He said he contacted Haven.

Bucks County Court Reporters
215.348.1173

94

Q. In fact, isn't it true that's the only person he contacted other than the sister of Mrs. Bush?
A. No. He contacted --
Q. Smith.
A. -- Trooper Smith.
Q. We've been over that.
     Anybody else that you saw he contacted?
A. Talking with the district attorney.
Q. District attorney didn't know where she was.
     Right?
A. Okay.
Q. Okay. Isn't it limited to the district attorney saying see if you can find out information about her?
     Isn't that your interpretation of the entry?
A. Yes.
Q. Okay. So he wasn't calling the district attorney to find the whereabouts, was he?

Bucks County Court Reporters
215.348.1173

95

JOSEPH TRIPP

A. No.
Q. All right. From your review of the records now that we know you read tell me what you saw your investigator in your station under your command doing to locate the kids other than call Haven, talk to the criminal officer and talk to the sister.
A. Again, I remember you asking relative to drivers' histories and stuff like that, you know, change of registration and I was positive all that stuff was in here.
Q. Well, you just passed some of it. Right?
A. That was on Mr. Bush.
Q. I noticed that.
     I noticed it was on his attorney, too.
A. His attorney?
Q. Yeah. There's two of them there. Notice of his attorney.
     You didn't know that?
A. What do you mean?
     I don't know what you're talking about. There's Chris Bush and David

Bucks County Court Reporters
215.348.1173

96

JOSEPH TRIPP

Bush.
Q. Uh-huh.
A. Yeah. I believe he ran looking for a driver's license. Stuff like that. I don't know who that is. Friend.
Q. Friend of Mr. Bush.
A. Yeah. There was --
Q. Attorney right there. Notation right there.
A. Steve Banik. Yeah.
Q. Mr. Banik was for Mr. Bush.
     Wasn't it?
     You have to at least answer my question.
     That was a yes?
A. I don't know --
Q. Oh.
A. -- the relationship between Mr. Bush and Banik. I don't know.
Q. You don't know if Banik was his attorney?
A. I don't recall that.
Q. Okay.
A. I mean, I can believe it. Yes.

Bucks County Court Reporters
215.348.1173

Q. So you leafed through the investigation file.

Would it be true that I couldn't find any motor vehicle search for Sara? Her sister.

I could only find them for the noted victim, his family member and his attorney and friends.

A. I don't believe that.

What I'm wondering is all the attachments to Whisner's reports here, which I don't believe they are.

Q. I can only operate with what I'm given, so.

A. Right.

Yeah. I don't believe all the attachments are with this report because that's common practice.

Q. Oh, I'm sure it is.

Not to keep bouncing back and forth, but since they merge, there did come a time that after you called down to Newtown about this NCIC entry and discovered that Christopher Bush, brother of David Bush,

had made the entries that you learned that you were under investigation for a complaint.

Correct?

A. Afterwards. Yes.

Q. Okay.

A. Yeah.

Q. Okay. And that afterwards I can tell you the paperwork indicates after the children were located.

A. I agree.

Q. Okay. And it appears from the verifying complaint -- let me see if I can get that for you.

MR. HENZES: Complaint meaning the one he filed, Christopher Bush filed?

MR. PURICELLI: I thought you marked it.

MR. HENZES: I did. I just wondered. You throw the word complaint around frequently.

MR. PURICELLI: Complainant versus complaint. There's a difference.

JOSEPH TRIPP

MR. HENZES: No. You talk about the complaint from CLEAN and then the complaint in the civil matter.

MR. PURICELLI: I think you marked it Christopher-1, but I'm not sure. So I'll mark this.

- - -

(Exhibit Tripp-1, marked for identification.)

- - -

BY MR. PURICELLI:

Q. I'm showing you what's been marked Tripp-1, and I refer to this as a complaint. All right. You may refer to it as something else.

MR. HENZES: No. I'm just asking. That's all.

MR. PURICELLI: Oh, okay. All right.

BY MR. PURICELLI:

Q. Now, did you come to learn that you were the subject of this complaint by Christopher Bush?

A. Yes.

JOSEPH TRIPP

Q. Okay. This complaint was made on January 15, '07 by the date on the bottom.

Correct?

Lower right-hand side.

A. Again, it appears so.

Q. Okay. Do you have any reason to dispute that date?

A. Nope.

Q. Okay. Would it be fair to conclude after January 15, '07 you came to the knowledge that you were the subject of this complaint?

A. Sure.

Q. Okay. Can you tell me how you learned you were the subject of this complaint?

A. I believe from Lieutenant Hile.

Q. Okay. And how was that communication?

A. Well, when he interviewed me for it.

Q. Did you provide any written statement knowing that you were the subject of this complaint?