## Page 101

2  A.  I believe I had to give, like, a brief overview as to what happened and then he came up and interviewed me.
5  Q.  Okay. So the first one occurred in person or on the phone?
7  A.  The first actual interview?
8  Q.  Well, you said --
9  A.  I don't --
10  Q.  -- he came up.
11  A.  Yeah. I don't recall how. I don't recall if it came through e-mail, he called me, whether it was in person, but he asked me for a summary of the events that went on.
16  Q.  So you received some form of communication from Lieutenant Hile.
18  A.  Some form.
19  Q.  Who is located where?
20  A.  Montoursville.
21  Q.  And you don't know whether it was phone, correspondence or electronic.
23  A.  No, sir.
24  Q.  And you replied to that communication how?

Bucks County Court Reporters
215.348.1173

## Page 102

JOSEPH TRIPP

2  A.  I believe in written form.
3  Q.  All right. And was that written form a report handwritten or did you do it on the computer or what?
6  A.  I don't recall.
7  Q.  Did you maintain a copy of that written form?
9  A.  Did I make a copy?
10  Q.  Uh-huh.
11  A.  Probably.
12  Q.  Well, do you recall specifically doing it?
14  A.  No, but I usually don't send something to headquarters without having a copy.
17  Q.  That's a good, safe thing.
     Do you recall making a copy of that and providing it to your attorney?
21  A.  No.
22  MR. HENZES:  Copy sent to BPR is in the BPR file.
24  MR. PURICELLI:  Interesting thing about the BPR file is

Bucks County Court Reporters
215.348.1173

## Page 103

JOSEPH TRIPP

2  your reference was that there was no report.
4  MR. HENZES:  It's all in the documents.
6  BY MR. PURICELLI:
7  Q.  Now, do you recall what you said in your written statement?
9  A.  I stated the facts that I was aware of.
11  Q.  Okay. Do you recall any words you used in this fact reply?
13  A.  Excuse me?
14  Q.  Do you recall any of the words you used in this fact reply?
16  A.  I just explained the things that I'm telling you today.
18  Q.  Do you recall what you said?
19  A.  As far as my interaction with Mr. Bush?
21  Q.  Yes. Whatever -- I don't know what the lieutenant told you.
     What did he tell you?
24  A.  He told me to give a summary of my contact with Mr. Bush and the reason why I

Bucks County Court Reporters
215.348.1173

## Page 104

JOSEPH TRIPP

2  contacted Mr. Bush.
3  Q.  Okay.
4  A.  Which --
5  Q.  And I assume you did that?
6  A.  Yeah.
7  Q.  So there should be a written document someplace with that information.
     I'll show you what your attorney produced to me. It's still in the form that it was produced.
     Could you see if you could find your written report in there?
14  MR. HENZES:  We'd have to see what the question asked for.
16  MR. PURICELLI:  His written statement that he gave.
18  MR. HENZES:  Again, I'd have to see what the question --
20  THE WITNESS:  I think you're confusing a written statement for the BPR with a general overview of what happened so he could determine what he was going to ask me.

Bucks County Court Reporters
215.348.1173

BY MR. PURICELLI:
Q. Well, classify it however you want.
MR. HENZES: My question to you is --
MR. PURICELLI: It's the document we're talking about.
MR. HENZES: My question to you is: What does the document request say so that we can refer to what's --
MR. PURICELLI: The BPR. The BPR report.
MR. HENZES: Is that what was asked for?
That's all I'm asking, Brian, is what does the question ask for?
MR. PURICELLI: Sure.
MR. HENZES: I am looking to see if -- I don't think --
MR. PURICELLI: I know. That's why I asked about it.
MR. HENZES: I don't think

a BPR was ever done.
MR. PURICELLI: That's what you represented in the last deposition.
MR. HENZES: It wasn't done. In fact, I know it wasn't done.
MR. PURICELLI: That's interesting.
- - -
(Discussion held off the record.)
- - -
MR. PURICELLI: So can we stipulate on the record --
MR. HENZES: Whatever documentation on here is what was done. If it's on there, it's on there, but it should have been --
MR. PURICELLI: Well, I don't want you to think we're misstating something.
MR. HENZES: No.
MR. PURICELLI: I can represent to you that there's no BPR

investigation report on the disk you provided. There are none in the domuments I just provided you, which were the hand carried ones, the hand documents.
MR. HENZES: Right.
MR. PURICELLI: And you represented to me on December 22 that no investigation BPR report was done.
MR. HENZES: Right. Nothing that would be classified as a BPR report was completed.
MR. PURICELLI: All right. Then we're splitting hairs.
MR. HENZES: No. There's a difference. There's a difference; as you'll find out.
MR. PURICELLI: I take it -- I think we will find out if we're going to play splitting hairs with limited investigations, troop investigations that were discussed at the arbitration.

BY MR. PURICELLI:
Q. You weren't aware that there was an investigation, a, quote, unquote, limited investigation being done on you?
A. I was under the assumption a BPR was being done on me.
Q. Thank you.
And what made you believe that there was a BPR being done?
A. Because I get a lieutenant calling me up and telling he was going to come interview me on a complaint from somebody that --
Q. How long have you been with the State Police?
A. It will be 20 years.
Q. Have you ever been investigated by BPR?
A. Yes.
Q. Okay. And is it your experience that a member of BPR comes and talks to you?
A. I've had both.
Q. Okay. So you've been investigated by a command person outside of

1  BPR for BPR investigation?
2  A.  When you say command personnel --
3  Q.  Lieutenant.
4  A.  -- previous ranks. As a trooper
5  you get investigated it could be a corporal
6  or sergeant, not necessarily a commanding
7  officer.
8  Q.  All right. A superior.
9  A.  Yes.
10 Q.  All right. Fair enough.
11     Now, in this particular
12 case you were unaware that there allegedly
13 was a decision that BPR would not investigate
14 you?
15 A.  I just told that I was the
16 subject of an investigation.
17 Q.  Okay. And aside from doing this
18 first communication --
19 A.  First communication?
20 Q.  Well, we don't know how the
21 lieutenant got you. You can't tell me if it
22 was by phone.
23 A.  I got you.
24 Q.  Okay. I'm not trying to be

Bucks County Court Reporters
215.348.1173

JOSEPH TRIPP

1  cryptic. I'm trying to stay in your
2  testimony. Okay.
3      You then responded in
4  writing somehow.
5  A.  (Nods head up and down.)
6  Q.  And do you know whether or not
7  that writing was put on the communication
8  center like an e-mail, that you mailed it or
9  you did what?
10 A.  I honestly don't recall.
11 Q.  Okay. And you're unable to find
12 that communication in the documents, right,
13 that I gave you?
14 A.  Correct.
15 Q.  And I will let you look at the
16 disks.
17     MR. HENZES:  Put the disk
18 in.
19 BY MR. PURICELLI:
20 Q.  Now, how long in time had passed
21 from the time you sent your writing out until
22 the time the lieutenant showed up?
23 A.  Not that long.
24 Q.  Okay. When you say "not that

Bucks County Court Reporters
215.348.1173

JOSEPH TRIPP

1  long," are we referring to a week? Less than
2  a week? More than a week?
3  A.  Oh, more than a week, I'd say.
4  Q.  Okay. Could we say it was a
5  month? Less than -- obviously less than a
6  month or more than a month?
7  A.  Let's go with a month.
8  Q.  Okay. Month, but no more than a
9  month.
10     Right?
11 A.  I don't think so.
12 Q.  I've got to ask.
13 A.  I don't know.
14 Q.  Okay. Now, in your communication
15 down to Newtown Township Police Department,
16 you don't recall who you talked to?
17 A.  I remember talking to Detective
18 Chris Bush.
19 Q.  Aside from him you don't remember
20 anybody else?
21 A.  Like I said, I don't remember if
22 I talked to the chief or not.
23     - - -
24     (Discussion held off the

Bucks County Court Reporters
215.348.1173

JOSEPH TRIPP

1  record.)
2      - - -
3      (Exhibit Tripp-2, marked
4  for identification.)
5      - - -
6  BY MR. PURICELLI:
7  Q.  Okay. I'm showing you a
8  statement I received from Charles Patton.
9  Your attorney was provided with this
10 statement in discovery. So this is no
11 surprise.
12     You're having a chance to
13 read it now.
14     Correct?
15 A.  Yes.
16     - - -
17     (Discussion held off the
18 record.)
19     - - -
20 BY MR. PURICELLI:
21 Q.  You've had a chance now to read
22 this --
23 A.  Yes.
24 Q.  -- Trooper? Sergeant Tripp.

Bucks County Court Reporters
215.348.1173

113

1   JOSEPH TRIPP
2       Sergeant Patton indicates
3   he's the person who received the phone call
4   and he identifies his recollection of the
5   events.
6       Have you read that?
7   A.  Yes.
8   Q.  Is that consistent with what you
9   said?
10  A.  I don't recall talking to this
11  guy.
12  Q.  I understand you don't recall
13  talking to him.
14      I'm just saying as to what
15  he writes as to what occurred, is that
16  consistent to what you did when you called
17  down the first time?
18  A.  No.
19  Q.  Okay.  Did you do any of this
20  that's described?
21  A.  No.  When I called down I didn't
22  even know he existed.
23      MR. HENZES:  The first
24  time?
25      This is the October

Bucks County Court Reporters
215.348.1173

114

1   JOSEPH TRIPP
2   meeting.
3       MR. PURICELLI:  That's why
4   I had him read the whole thing.
5   BY MR. PURICELLI:
6   Q.  I'm trying to find out if more
7   than one phone call occurred or one occurred
8   because you don't recall who you talked to.
9       Right?
10  A.  Which -- time the first time I
11  talked to Detective Chris Bush.
12  Q.  Did you talk to him directly?
13  A.  Yes.
14  Q.  Okay.  Second time.
15      Did you talk to him a
16  second time?
17  A.  I talked to him twice.
18  Q.  Did you talk to -- well, you did.
19  You told me you talked to somebody and they
20  transferred you.
21  A.  Yeah.  I don't know who answered
22  the phone.
23  Q.  That's what I'm asking you then,
24  sergeant.
25      MR. HENZES:  He told you

Bucks County Court Reporters
215.348.1173

115

1   JOSEPH TRIPP
2   that.
3       MR. PURICELLI:  No.  He
4   didn't.
5       MR. HENZES:  He told you
6   he didn't know who answered the phone.
7       Go ahead.
8   BY MR. PURICELLI:
9   Q.  The question, if you'll listen,
10  is what Sergeant Patton has written and
11  attributes to you is what he attributes you
12  doing consistent with what you recalled doing
13  when you called down?
14  A.  No.
15  Q.  Okay.  What's inconsistent?
16  A.  I called down the first time, as
17  I testified to earlier, to find out who was
18  investigating the missing Bush children.
19  They connected me with Detective Bush.  Who
20  that person was, dispatcher, chief, I have no
21  idea.  All I asked, the only conversation
22  between me and the first person is I told
23  them who I was and I would like to talk to
24  whoever was handling the investigation with
25  the Bush children.

Bucks County Court Reporters
215.348.1173

116

1   JOSEPH TRIPP
2   Q.  All right.  So is it your
3   testimony that where Sergeant Patton writes
4   that he was contacted in the first paragraph
5   none of that ever occurred in any of the
6   phone calls you made to Newtown Township?
7   A.  That I was involved in the
8   investigation?
9       I don't recall any of
10  that.  That this guy is asking me if David
11  Bush is Chris Bush's brother.  I have no
12  idea.
13  Q.  You have no idea.
14  A.  Never.  No.
15  Q.  Okay.  Now, the second paragraph
16  attributes things that you stated.
17      Okay.  Are you saying
18  what's attributed to you as being said isn't
19  true?
20      It's only the second
21  paragraph we're looking at.
22  A.  Yeah.  I'm trying to understand
23  what he's saying here.
24      Okay.  So he could have
25  been the person that answered the phone.

Bucks County Court Reporters
215.348.1173

```
 2    Q.   Okay.  He's saying he is.
 3    A.   Okay.
 4    Q.   But you're saying you don't know.
 5         What I'm now looking to
 6  say is his statement consistent --
 7    A.   But there was never --
 8    Q.   -- with what you did say?
 9         If you're telling me it's
10  not, if not, what's inconsistent?
11    A.   Like I said, the only
12  recollection I have of the first call was
13  identifying myself and stating that I was
14  looking to talk to whoever was handling the
15  Bush children investigation.
16    Q.   Okay.  So are you telling me what
17  he writes --
18         MR. HENZES:  But he's
19  writing on the second phone call.
20         Can we get that straight?
21         This is 10/24/06.  The
22  first call happened in August of '06.
23         MR. PURICELLI:  I know.
24         MR. HENZES:  Well, then
25  ask him those questions about the second
```

```
 2  conversation not the first because he
 3  already answered the first one.  He
 4  doesn't remember who he spoke to.  Now
 5  ask him about about the second one.
 6         God, how hard is that?
 7         MR. PURICELLI:  It's not
 8  hard if he'd answer the question.
 9         MR. HENZES:  He tried.
10  You don't like the answer.  That's the
11  problem.
12              - - -
13         (Discussion held off the
14  record.)
15              - - -
16         (Recess.)
17              - - -
18  BY MR. PURICELLI:
19    Q.   All right.  Sergeant Tripp,
20  you've had a chance to look at Tripp-2.
21         Correct?
22    A.   Yes.
23    Q.   Okay.  Now, and I represented to
24  you it's a statement of Sergeant Patton;
25  although, you don't remember who you talked
```

```
 2  to.  I'm trying to find out if what Sergeant
 3  Patton wrote about what he believed occurred
 4  between you and he is consistent to your
 5  memories or at least what you did, not if you
 6  remember who you did it with.  That's all I'm
 7  looking for.
 8    A.   Is it consistent with --
 9    Q.   Your --
10    A.   No.
11    Q.   -- memory of at least your
12  actions.
13    A.   No.
14    Q.   All right.  That's fair.
15         So can you tell me in this
16  statement what you dispute Sergeant Patton
17  attributes to the interaction between you and
18  him?
19    A.   I believe I've already stated
20  that.  The first phone call that I made was
21  to Detective Bush.
22    Q.   And no one else.
23    A.   Well, I had to be transferred to
24  somebody.
25    Q.   I know.
```

```
 2    A.   Who that person is, I have no
 3  idea.
 4    Q.   Sergeant, hold on a second.  I
 5  know all that.  I just told you that so we
 6  wouldn't go through this exercise.  I know
 7  you don't know who you talked to on the phone
 8  except when you finally got to Christopher
 9  Bush, but we know you talked to somebody.
10         You agree.  You just don't
11  know who.
12         Right?
13    A.   Correct.
14    Q.   All right.  Now, Sergeant Patton
15  says that somebody is him.
16         MR. HENZES:  Okay.
17  BY MR. PURICELLI:
18    Q.   Okay.  You can't dispute it.
19         Right?
20    A.   Nope.
21    Q.   No.
22         He writes a statement,
23  which I gave your attorney and that said this
24  is what happened.
25         Even though you don't know
```

## Page 121

```
 2  who you talked to do you remember what you
 3  said to the person?
 4                  Yes or no?
 5      A.   First phone call or second?
 6      Q.   First one.
 7                  Do you remember what you
 8  told that person?
 9      A.   As I've stated at least three
10  times, identified myself as who I was, asked
11  who was involved in handling the Bush
12  children investigation.
13                  They said, hold on. We'll
14  transfer you.
15                  That is my only
16  conversation on the first phone call.
17      Q.   So the answer would have been
18  able to be, short version, yes. I do
19  remember.
20                  Correct?
21      A.   Yes. I do remember.
22      Q.   Okay. My question, had that been
23  your answer, is what's written here
24  consistent with your memory for the first
25  phone call?
```

Bucks County Court Reporters
215.348.1173

## Page 122

```
 2                  Yes or no?
 3      A.   No.
 4      Q.   Thank you.
 5                  Now, going to the second
 6  phone call. Okay. You again spoke to
 7  somebody. You don't remember who it was.
 8                  Correct?
 9      A.   Yes.
10      Q.   Yes, you don't remember.
11      A.   Yes. I talked to somebody. I
12  don't believe he answered the phone.
13      Q.   Okay. Is what's written by
14  Sergeant Patton with a date of 10/24/06
15  consistent with what you said to that unknown
16  person?
17      A.   Some of it, yes. Some of it, no.
18      Q.   Okay. Now, when you say to the
19  no, are you saying you know you didn't say
20  that or you don't recall saying that?
21      A.   In here Detective Bush entered
22  the Bush children into NCIC, I said that
23  because he told me he did.
24      Q.   Okay.
25      A.   Me stating that the missing
```

Bucks County Court Reporters
215.348.1173

## Page 123

JOSEPH TRIPP

```
 2  children -- David Bush's children were living
 3  with Detective Bush, didn't say that.
 4      Q.   Okay.
 5      A.   The second -- when I got to Chris
 6  Bush, Detective Bush, I asked him if he knew
 7  where the kids were.
 8      Q.   Okay. Well, I'm only trying to
 9  find out what you say -- agree you said and
10  what you disagree you said.
11      A.   Okay. I don't believe I've ever
12  told him that David Bush had executed a
13  fraudulent court order.
14      Q.   Now, you said, "I don't believe I
15  said that."
16                  Do you have specific
17  recollection of not saying that?
18      A.   I didn't say that. No.
19      Q.   So you're saying --
20      A.   Because --
21      Q.   -- Sergeant Patton in this
22  document --
23      A.   Because it was not a fraudulent
24  order.
25      Q.   Well, what was it then?
```

Bucks County Court Reporters
215.348.1173

## Page 124

JOSEPH TRIPP

```
 2      A.   My opinion?
 3      Q.   No. What you actually know it to
 4  be or not?
 5      A.   I can only offer you an opinion.
 6      Q.   All right. So you don't know
 7  anything about court orders if they're good
 8  or bad.
 9                  Correct?
10      A.   Well, it apparently was good. It
11  got signed by a judge. The means to obtain
12  it might have been a little off the wall,
13  but --
14      Q.   Okay. Now, do you know any
15  reason you can tell me, factual reason, why
16  Sergeant Patton of the Newtown Township
17  Police Department would attribute these
18  statements to you?
19      A.   No.
20      Q.   The ones you say you didn't. The
21  ones you say you didn't make.
22      A.   Again, this is not my writing. I
23  don't know what his thought process is.
24      Q.   I know. I'm asking you for
25  factual. I'm not asking for opinion.
```

Bucks County Court Reporters
215.348.1173

                Do you know any reason why
Sergeant Patton would have to say something
that wasn't true?
            MR. HENZES: Objection to
the form. Now you're asking him for a
reason why somebody would do something.
            MR. PURICELLI: Factual
reason.
            MR. HENZES: The reason is
a reason.
            MR. PURICELLI: Make your
argument someplace else. Come on, we'll
get passed this --
            MR. HENZES: Object to the
form of the question.
            MR. PURICELLI: Thank you.
Then object that way.
            It's your clients over
there saying --
            MR. HENZES: You asked him
for a factual reason.
            MR. PURICELLI: Yes. I
am.
            MR. HENZES: Just because

you modify reason with a factual doesn't
change the fact that you're asking him
what someone's thought process is.
            Does it?
            MR. PURICELLI: Do you
really want to have that conversation?
            MR. HENZES: Yes. I do.
            MR. PURICELLI: Okay.
BY MR. PURICELLI:
    Q.   Trooper, Sergeant Tripp, isn't it
true for you to come to a conclusion you
should have facts?
    A.   Yes.
    Q.   All right. Thank you.
            Now, all I'm asking you is
based on facts that you know.
            Do you know of any reason,
factual reason, so we're specific, okay, why
Sergeant Patton would attribute something to
you that you say you didn't say?
    A.   No.
    Q.   Okay. You've never had any
fights with anybody from Newtown Police
Department absent whatever your thinking is

127

JOSEPH TRIPP

with your discussions with --
    A.   No. I didn't even know where it
was.
    Q.   Never met Sergeant Patton before.
         Correct?
    A.   Not that I'm aware of.
    Q.   Okay. So you can't offer to me
any basis he would have, factual basis, to
write a statement that's not true.
    A.   No.
    Q.   Okay. And is it true you don't
recall everything you said to whoever this
person was you talked to?
    A.   That is correct.
    Q.   Is it true you didn't write a
report when you made the phone call down to
Christopher Bush?
    A.   That is correct.
    Q.   Okay. So you don't have any
contemporaneously created documents of that
phone call. Either one of them.
    A.   No.
    Q.   Now, after you gave your
statement, which Mr. Randy was kind enough to

128

JOSEPH TRIPP

find in the file for us --
            MR. HENZES: I never found
it.
            MR. PURICELLI: You never
found it?
            MR. HENZES: I found the
report, but there was no statement.
There was no statement that was
attached. I'm looking at another
document.
            MR. PURICELLI: Okay.
BY MR. PURICELLI:
    Q.   While Randy continues to look,
now, after you prepared this written whatever
you want to call it document and sent it to
the lieutenant, he came up and visited you
and asked you questions.
         Correct?
    A.   Not sure whether he came up or I
went down.
    Q.   Okay.
    A.   Doesn't really matter here or
there.
    Q.   Which means you don't really --

129

you can't really describe for me the nature
of the room or surroundings where you
actually had a conversation with him.
        Correct?
    A.    In a PSP building.
    Q.    Fine.
          Now, do you know whether
or not he had any tape recorders with him
when you talked to him the second time?
    A.    Don't recall.
    Q.    Do you recall any specific
questions that he asked you at the second
conversation?
    A.    No.
    Q.    Did you learn that there was any
problems -- well, strike that.
          Did you tell the
lieutenant you believe there was problems
with the NCIC entry?
    A.    I don't believe I would have
put -- made that there was a problem with the
NCIC entry more than what is this guy doing
getting involved in an investigation with his
brother. Yeah. I probably could have told

130

him, too, that the CLEAN NCIC entry that I
don't believe -- because when I asked
Detective Bush if he had an investigation
going he stated no.
    Q.    Okay. Well, I agree that you
could have done it.
          Did you do it?
    A.    I'm not sure.
    Q.    Okay. So when you testified a
moment ago you could have done it you can't
testify whether you did or didn't do it.
          Correct?
    A.    No.
    Q.    Do you have any direct
recollection of telling the lieutenant at the
second contact, wherever it was in the PSP
building, okay, oh, by the way, you aught to
look into that entry, that NCIC entry?
          Say anything to that
effect?
    A.    Not that I can recall.
    Q.    Okay. Assuming you didn't say
it, okay, did you come to learn that there
was an investigation by the Pennsylvania

131

JOSEPH TRIPP

State Police into that NCIC entry?
    A.    Yes.
    Q.    Do you recall when you learned
that?
    A.    No.
    Q.    Do you recall if it was before or
after your second interview with the
lieutenant?
    A.    No idea.
    Q.    Can you offer to me any factual
reasons to believe you didn't learn that
until after the second entry?
    A.    No.
    Q.    Okay. And do you recall how you
learned there was that investigation?
    A.    No.
    Q.    Do you recall who told you about
it?
    A.    No.
    Q.    Do you recall if somebody told
you or you read something?
    A.    I don't recall at all.
    Q.    Okay. Have you had any
communications with then Captain Hill, now

132

JOSEPH TRIPP

Major Hill about Christopher Bush or David
Bush?
    A.    Could have.
    Q.    Do you have any direct
recollection of having any?
    A.    No.
    Q.    Okay. Did you learn from any
source that there was no violation of the
Newtown Township Police Department or
Christopher Bush for making the entry into
the NCIC?
    A.    I don't think I learned that
until I reviewed all the stuff before this or
before going down to his arbitration hearing.
    Q.    Okay. And is it true, assuming
you didn't say something to the lieutenant
the second time, you've never alleged that
Christopher Bush did anything wrong in making
an entry of the kids in NCIC as missing?
    A.    I asked him if he made the entry.
    Q.    Yeah, but you didn't say it was
improper.
          Did you?
    A.    I asked him if he had an