133

1    investigation.

2        Q.    Did you say it was improper him

3    entering the kids?

4        A.    I don't recall.

5        Q.    That's my question.

6        A.    No.  I don't think so.

7        Q.    Ever.

8        A.    I'm not sure of that.

9              As the investigation moved

10   forward do I feel what he did was wrong?

11   Yes.

12       Q.    I'm not asking if you felt what

13   he did was wrong and I take it you mean being

14   involved with his brother, not putting the

15   entry in.

16             Is that what you mean?

17       A.    No.  I mean both.

18       Q.    Both?

19       A.    Yeah.

20       Q.    Okay.  So you believe he did

21   something wrong by entering the kids into

22   NCIC?

23       A.    Yes.

24       Q.    Why?

134

2        A.    Why?

3        Q.    Yes.

4              Why?

5        A.    If somebody is going to put kids

6    into NCIC as missing, he obviously knows from

7    his brother that we are hailing an

8    investigation.  He made no contact with us.

9        Q.    Excuse me.  You weren't

10   investigating missing children.

11             Were you?

12       A.    That was -- you're going to play

13   these word games again.

14       Q.    No, I'm not.  That's your --

15       A.    That's what he reported to us.

16       Q.    And you, according to your

17   determination, you determined it wasn't a

18   missing children event because they were with

19   the kids (sic).

20             Isn't that what you said?

21       A.    Again, a determination not made

22   by me.

23       Q.    I don't care about that.

24             You were of the premise,

25   however you got it, that the kids weren't

135

2    missing.

3        A.    Correct.

4        Q.    Obviously, Newtown Police didn't

5    agree with that.

6              Correct?

7        A.    No idea what their thought

8    process was.

9        Q.    Okay.  But somehow they were

10   wrong to believe the kids -- the children

11   were missing?

12             How is that?

13       A.    Again, you're asking me to come

14   up with his thought process.

15       Q.    I am asking your thought process

16   because you said there was something wrong

17   and I want to know what and how you came to

18   that conclusion.

19       A.    He would have known that we were

20   doing an investigation.

21       Q.    Into what?

22       A.    Locating Mr. Bush's children.

23       Q.    Why were you trying to locate his

24   kids?

25       A.    Because he asked us to.

136

2        Q.    Okay.  Did he tell you they were

3    missing?

4              Yes or no, Sergeant?

5        A.    He said they were missing.

6        Q.    So the only information you had

7    were the kids were missing and the D.A. told

8    you to keep going around this circle that

9    they weren't missing.

10             Is that your testimony?

11       A.    The decision was made by the

12   Tioga County District Attorney as to not

13   treat this as a missing children.

14       Q.    And that decision, if I

15   understand you correctly, was almost

16   immediate from the start of this

17   investigation.

18             Is that true?

19       A.    It was very quick.  Yes.

20       Q.    State Police want me to be very

21   specific.  So I need to know what you mean by

22   very quick.

23       A.    I don't know.  You're asking me.

24   This is not my investigation.  Trooper

25   Whisner's investigation, Corporal Wheeler

137

2 supervisor, I am station commander. You're
3 asking me to form opinions on this stuff
4 that -- you know what I mean?
5    Q.    I do, but you have to understand
6 from my point of view.
7    A.    I do.
8    Q.    Okay. You're telling me you know
9 things under oath, but then telling me, well,
10 I don't really know them, that Whisner is the
11 only one that knows them.
12         So do you know or don't
13 you know other than what you were told that
14 the District Attorney's Office formed an
15 opinion that this wasn't a missing persons
16 event?
17    A.    That is what the opinion was from
18 the district attorney.
19    Q.    And you know that personally
20 because you were present when he said that.
21    A.    Trooper Whisner and Corporal
22 Willard, yes. Not when John Cowley, the
23 district attorney, made the statement. No.
24 I was not present.
25    Q.    So you then only know it from the

138

2 result of what somebody told you. You
3 weren't present for the D.A. to say that.
4    A.    Correct.
5    Q.    All right. Is it your testimony
6 you've never spoken with Captain Hill, now
7 Major Hill before this litigation?
8    A.    Relative to what.
9    Q.    I'm just going to ask a yes and
10 no.
11         MR. HENZES: In general?
12 BY MR. PURICELLI:
13    Q.    Yes. And I expect certain
14 answers.
15    A.    Well, you need to be more
16 specific.
17    Q.    No. I don't.
18         MR. HENZES: Ever?
19         MR. PURICELLI: Ever.
20         MR. HENZES: Then say
21 ever.
22         MR. PURICELLI: I don't
23 have to say ever.
24         MR. HENZES: Well, yes.
25 You do.

139

JOSEPH TRIPP

2         MR. PURICELLI: No. I
3 don't.
4         THE WITNESS: Have I
5 spoken to Major Hill prior to this
6 litigation.
7 BY MR. PURICELLI:
8    Q.    I think that's what I said. Yes.
9    A.    Yes.
10    Q.    See, it's much easier if you
11 answer yes or no.
12         Now, follow-up question.
13         Did you speak with him
14 ever about Christopher Bush or David Bush?
15    A.    I don't recall.
16    Q.    Can you provide me with any facts
17 to dispute the allegations that you and
18 Captain Hill, now Major Hill talked about
19 David and Christopher Bush and after talking
20 Captain Hill, now Major Hill called CLEAN to
21 have them look into the NCI entry?
22    A.    Okay. That was --
23    Q.    I know it was.
24    A.    Did we talk about these two prior
25 to him calling CLEAN?

140

JOSEPH TRIPP

2    Q.    Can you offer me any facts to
3 dispute --
4    A.    No.
5    Q.    -- their claim?
6    A.    No.
7    Q.    And it's your testimony you
8 didn't see McDermott's report?
9    A.    I have seen McDermott's report.
10    Q.    Were you aware when you spoke to
11 McDermott that Serene, Mrs. Bush, had
12 reported the kids missing to the Richmond
13 Police Department?
14    A.    I know she was here in Lycoming
15 County to report her kids missing. Yes.
16    Q.    I understand that.
17         My question is: Were you
18 aware before she had come to your troop that
19 she had tried to report the kids missing in
20 Virginia and specifically the Richmond,
21 Virginia Police Department?
22    A.    No.
23    Q.    When you reviewed McDermott's
24 report did you review the first page?
25    A.    That report was kept at

2  headquarters.  I got a copy of that report
3  long after when I got a copy of everything.
4      Q.     Okay.  So did McDermott ever tell
5  you when he spoke to you about the history
6  that it was known to him that the allegations
7  of the kids being missing had already been
8  reported by the local police department and
9  that they had not agreed with Mrs. Bush?
10     A.     I don't recall that.  No.
11     Q.     McDermott never told you that
12 Serene told him that she reported the kids as
13 missing to Richmond, Virginia Police
14 Department and they would not help her?
15     A.     Not that I recall.  I know he
16 was -- McDermott was filling out a missing
17 persons gathering all the information for
18 somebody.
19     Q.     Did he tell you that Mrs. Bush
20 told Trooper McDermott the following:  That
21 she contacted the Virginia State Police and
22 they told her that she had to figure out what
23 court papers was issued from Luzerne County
24 before they could do anything?
25     A.     There was talk about the Luzerne

2  County court order.
3      Q.     Did McDermott tell you that when
4  he called you?
5      A.     There was some conversation about
6  the court order.
7      Q.     Okay.  And you previously
8  testified you wouldn't know if a court order
9  was good or bad.
10            Correct?
11            Just by looking at it.
12     A.     No.
13     Q.     And --
14     A.     Other than it was coming from
15 Luzerne County.
16     Q.     All right.  The Luzerne County
17 court order that you were talking about,
18 okay, you weren't a party in any way to the
19 discussion on how that order came to be.
20            Correct?
21     A.     I asked Mr. Bush how he got a
22 court order out of Luzerne County.
23     Q.     And what did he tell you?
24     A.     I said, did you suddenly move to
25 Luzerne County?

JOSEPH TRIPP

2          He said, no.
3      Q.     Okay.  You didn't know that any
4  Court of Common Pleas Court would have
5  jurisdiction over -- subject matter
6  jurisdiction over divorce matters?
7          Did you know that?
8      A.     That you can go to any county you
9  want and file?
10     Q.     Yeah.
11     A.     No.  I didn't know that.
12     Q.     You didn't know that people
13 regularly go to Dauphin County for divorce
14 matters when they don't live in Dauphin
15 County?
16     A.     No, sir.  I didn't know that.
17     Q.     You didn't know there were
18 attorneys that actually advertise to do that?
19     A.     No.
20     Q.     Okay.  Were you aware in the
21 investigation done by your station that the
22 Tioga County judge had indicated that he no
23 longer had jurisdiction over the custody
24 issue?
25     A.     No.

JOSEPH TRIPP

2      Q.     Did you receive any -- did David
3  Bush provide you with any transcripts of
4  court proceedings from Tioga County?
5      A.     He provided us with a ton of
6  stuff.
7      Q.     Okay.  And do you recall any of
8  your investigators telling you they actually
9  read those transcripts?
10     A.     No.
11     Q.     I assume you didn't.
12            Correct?
13     A.     I don't recall if I read
14 transcripts or not.
15     Q.     Okay.  Do you have any
16 relationship with the Haven organization?
17     A.     Working relationship.
18     Q.     Other than working.  I think you
19 talked about that.
20     A.     What type?  No.
21     Q.     Do you receive any monies from
22 them?
23     A.     No.
24     Q.     Did you develop any information
25 that Sara Bush had changed the identities of

1 the children?

2     A.    Did I or did our investigation?

3     Q.    Your investigation.

4     A.    I believe they did. Yeah. They

5 have different names listed.

6     Q.    Okay. And did your investigator

7 conclude why she changed the identities of

8 the children?

9     A.    Again, you're asking me to make a

10 conclusion of what one of my troopers did. I

11 don't know.

12     Q.    You couldn't tell from the

13 report?

14     A.    No.

15     Q.    When was the first discussion you

16 had with the FBI?

17     A.    When they were looking for Dave

18 Bush.

19     Q.    Okay.

20     A.    After the children were taken

21 from Virginia, I think.

22     Q.    Do you know who Detective Lawson?

23     A.    Doesn't ring a bell.

24     Q.    What, if anything, did you learn

---

2 about the changing of the kids' names?

3     A.    Excuse me?

4     Q.    What, if anything, did you learn

5 about the changing of the kids' names from

6 the name Mr. Bush reported to you?

7     A.    What did we learn?

8     Q.    If anything.

9     A.    I didn't learn anything from it.

10     Q.    Even from the review of the

11 report you learned nothing of why the kids

12 were changed -- their names were changed and

13 who changed them and under what authority

14 they were changed?

15     A.    I would assume their mother

16 changed them.

17              - - -

18           (Recess.)

19              - - -

20 BY MR. PURICELLI:

21     Q.    All right. The Attorney

22 General's Office has provided me with

23 documents responsive to my requests, one of

24 which was an investigation conducted in

25 regards to the Christopher Bush complaint.

1           JOSEPH TRIPP

2 Randy has done an exhaustive search --

3         MR. HENZES:  On Brian's

4 computer using a disk my secretary

5 copied for him.

6         MR. PURICELLI:  And come

7 to the same conclusion I did on my

8 search, which is we can't find the

9 writing that Sergeant Tripp has

10 testified to and that I'm sure we will

11 continue to look for it.

12         Right?

13         MR. HENZES:  If it exists.

14         MR. PURICELLI:  If it

15 exists.

16         MR. HENZES:  If it exists.

17         I think he testified he's

18 not sure if he gave him something in

19 writing or it was over the phone. He

20 said he wasn't sure what he did with it.

21         MR. PURICELLI:  I think

22 the record will show he did something in

23 writing and sent it. He didn't remember

24 how he sent it, but may have kept a copy

25 because he always keeps a copy when he

1           JOSEPH TRIPP

2 send something to company headquarters.

3         At least that's my

4 recollection.

5         We went to all that battle

6 for nothing and we'll move on.

7 BY MR. PURICELLI:

8     Q.    All right. Sergeant Tripp, a

9 moment ago you had told me you learned the

10 kids' names had been changed.

11     Do you know how you

12 learned the kids' names had been changed?

13     A.    I believe through Trooper

14 Whisner.

15     Q.    Okay. Do you know about when it

16 was you learned?

17     A.    (Shakes head from side to side.)

18     Q.    Would it have been before or

19 after you learned that the kids had been

20 located?

21     A.    I think it was before.

22     Q.    You think.

23     A.    I think.

24     Q.    If we looked at his report would

25 that help refresh your memory whether it was

before or after?

A.   It says on 10/23/06 Sara Bush,
who had changed her name to Isara Isabella
Serene.

Q.   10/23/06?

A.   That's the date that she had the
Luzerne County order vacated, but that's the
first where I see documentation.

Q.   And if I tell you she had the
Luzerne County order vacated after
Christopher Bush and David Bush had already
located them and picked up the children, can
we agree that there's no entry that you can
see in that report to say that the State
Police had developed the same information as
Newtown had in locating the children?

A.   I don't know what you're asking
me.

Q.   Did the State Police find the
kids?

A.   Nope.

Q.   Did they find out the kids' names
had been changed on their own?

A.   You asked me. I don't know.

Q.   I'm asking you based on the
report that you reviewed.

A.   It says right here like I told
you that she had the order vacated. It
appears after the kids were located they find
out the kids' names were changed.

Q.   Can we agree if I rely on this
report we'll see that the entry made in NCIC
of the kids' names were their given names,
not their changed names?

A.   We didn't put the entry in. He
did.

Q.   I understand that. I'm asking if
you would agree with that.

A.   I don't know how he entered them
without looking.

Q.   I thought you looked at the
report.

A.   That's the one out of Virginia.
I don't see the copy of
the one made by Detective Bush.

Q.   All right. So you can't agree
with me.

Right?

A.   That's the Virginia.
Yeah. I don't know how he
entered them.

Q.   Okay.

A.   I don't recall.

Q.   Do you recall -- well, strike
that.
Last page of the report.
It's a June 28, 2007 memo.

MR. HENZES:   June 28?

MR. PURICELLI:   June 28,
2007 memo. Requests for duplication of
report from Lieutenant Dennis C. Hile,
commander criminal investigation
section, Troop F, Montoursville.
He might need that Randy.

MR. HENZES:   Yeah. I'm
just looking at what you're looking at.
All right. You're asking
him about what Dennis Hile wrote to
somebody.

BY MR. PURICELLI:

Q.   Well, did I describe the document
accurately?

A.   Can I --

Q.   You may.

A.   Did you ask me if I could --

Q.   No. I described it for the
record.

MR. HENZES:   He wants to
know if he described --

THE WITNESS:   Yes.

BY MR. PURICELLI:

Q.   Okay. Bottom of it apparently is
a request for Report No. F5891031 to be
duplicated and sent to Dennis C Hile.

Correct?

A.   Correct.

Q.   And the document that I've given
you, Ignatz-5, has an incident number on it
in the upper right-hand corner.

Does it not?

A.   Yes.

Q.   Are they the same numbers?

A.   Yes.

Q.   All right. So this memo from
Hile is requesting the David Bush
investigation report.

153

2      Correct?
3      A.    Yes.
4      Q.    Okay.  All right.  And Lieutenant
5  Dennis C. Hile has in this document David
6  Bush as the victim and Sara Nicole Monserrate
7  AKA Sara Bush as the suspect.
8      Correct?
9      A.    That's what he has listed.
10     Q.    And it has you down as the
11  requesting personnel.
12     Doesn't it?
13     A.    Correct.
14     Q.    And what were you requesting?
15          MR. HENZES:  No.  No.  No.
16          He has him as the
17  requesting personnel.
18          MR. PURICELLI:  Yeah.  I'm
19  just reading it, Randy.
20  BY MR. PURICELLI:
21     Q.    It says requesting personnel
22  colon Sergeant Joseph Tripp.
23          Doesn't it, Sergeant?
24     A.    Yes.
25     Q.    Okay.  So I read it correctly.

154

2          MR. HENZES:  But you're
3  asking him what someone else wrote.
4  BY MR. PURICELLI:
5      Q.    I'm only trying to find out
6  factually what's going on here.
7      A.    Why was this --
8      Q.    Why were you listed as the
9  requesting personnel?
10     A.    Again, whether it be from being
11  notified that you're a subject of a BPR or a
12  pending lawsuit when these reports are kept
13  on station once it's closed out the
14  attachments are separated and sent down to
15  DHQ.
16     A.    I saw that.  I saw it noted in
17  the report.  I understand that.
18     A.    It says here:  Due to attachments
19  being not needed, which again, we need all
20  the attachments to a report.  That's why we
21  were requesting another copy.
22     Q.    That's where I'm going.
23          Are you the one requesting
24  the duplicate copy of these attachments or is
25  Dennis C. Hile requesting them?

155

1          JOSEPH TRIPP
2      A.    I think I did.
3      Q.    Thank you.
4          Why?
5      A.    To have all the information.
6      Q.    Well, wasn't the subject of your
7  investigation merely the contact you had with
8  David Bush and Newtown Township?
9          It's a yes or no.
10     A.    The subject of my investigation?
11     Q.    Yes.
12     A.    Yes.
13     Q.    Okay.  Why did you need every
14  attachment in whatever you classified this, a
15  missing person report or concealment of, why
16  did you need everything?
17     A.    To be able to prepare thoroughly.
18     Q.    To say what you said and didn't
19  say, know and don't know when you call why?
20     A.    To have at all information in
21  front of me.
22     Q.    Well, how would an NCIC entry by
23  Virginia help you to discuss what you said to
24  Christopher Bush when you never saw the NCIC
25  entry?

156

1          JOSEPH TRIPP
2      A.    Okay.  What's your question?
3      Q.    Well, my question was:  How would
4  that help you to answer the question that
5  would be raised about the complaint that you
6  said certain things and act a certain way?
7      A.    Well, wasn't the date of his
8  complaint January of '07?
9      Q.    Well, let's answer my question
10  first.  Okay?
11     A.    Well, you're asking me the date
12  on this is June 28, 2007.  That investigation
13  would have been over.  So this could have
14  been the possibility of requesting report for
15  this pending litigation.
16     Q.    Do you know?
17     A.    I can only assume.  I don't
18  remember.  Like I said, when you get involved
19  in something either BPR, litigation, you want
20  copies of all your attachments.  Simple as
21  that.
22     Q.    Well, if you requested all these
23  attachments to prepare for this litigation
24  when I requested you to produce what you
25  requested, did you make copies of your

157

1 attachments that you got and send them to
2 your attorney?
3     A.    Your request goes through
4 departmental headquarters.
5     Q.    No.  My request --
6     A.    It has nothing to do with me.
7     Q.    So would your answer then be no
8 one ever told you to collect documents and
9 send them to your attorney however you got
10 them to him?
11     A.    Yes.
12     Q.    Well, did you make notes from any
13 activities that you had been involved in
14 either with David Bush or Christopher Bush?
15     A.    Have I made notes?
16     Q.    Yes.
17     A.    Yes.
18     Q.    Okay.  And I think you told me
19 you keep the notes.  Investigator keeps the
20 notes.  They don't get attached.
21     Right?
22     A.    That's what Lieutenant Ignatz
23 said.  Yes.  Correct.
24     Q.    Okay.  So when I asked for your

158

JOSEPH TRIPP

2 notes, too --
3     A.    Oh, they're long gone.
4     Q.    When would they have been long
5 gone?
6     A.    Because -- Mansfield station
7 commander?
8     Q.    Uh-huh.
9     A.    I no longer work in Mansfield.
10    Q.    Okay.
11    A.    I now work in Montoursville.  If
12 I kept every note from every investigation I
13 would need a room this big to put them in.
14 That's why it gets documented in a report.
15    Q.    Okay.  And then you would have
16 been able to tell me that, that you destroyed
17 your notes?
18    A.    That's not common practice to put
19 in your report that you destroyed stuff in
20 your notebeoke.
21    Q.    I'm referring to your assumption
22 that memo is in response to this litigation.
23    A.    Could have been.  I told you I'm
24 not sure which one it was.
25    Q.    Okay.  So it just as equally

159

JOSEPH TRIPP

2 could be about your BPR investigation.
3     A.    It appears it's long after the
4 BPR investigation.
5     Q.    Okay.  So what other reason would
6 you need to see --
7     A.    Apparently litigation.
8     Q.    Let me get the question out.
9 We've been yelled at enough by the court
10 reporter.
11         MR. PURICELLI:  I'm trying
12    to slow down here for you, Barb.
13 BY MR. PURICELLI:
14    Q.    What reason other than this
15 litigation would you need to get a copy of
16 only the attachments in the Sara Bush, David
17 Bush case on that date of June 28 of '07?
18    A.    I believe this letter says -- of
19 course it was not typed by me, but it says
20 due to the attachments being needed it is
21 hereby requested that the following report.
22 So they got the whole report plus the
23 attachments.
24    Q.    Okay.  Then I'll add the report.
25    A.    But I can get a copy of the

160

JOSEPH TRIPP

2 report from the Mansfield station --
3     Q.    Under what --
4     A.    -- that would not have any of the
5 attachments.
6     Q.    Under what State Police
7 reasoning, FR reg, AR reg, whatever, would
8 you have the need to ask for that report?
9         MR. HENZES:  So we're
10    clear, he's not asking for the report.
11    It's being requested by Dennis Hile.  It
12    says from Lieutenant Dennise Hile to the
13    Director of Bureau Records
14    Identification attention.  This is what
15    Hile wrote.  You're asking him what Hile
16    wrote, and for whatever reason this is
17    the information Hile put in his memo.
18        MR. PURICELLI:  What's the
19    last entry?
20        MR. HENZES:  It says
21    interesting personnel.  Hile wrote
22    Tripp.
23        Did you write this letter?
24        THE WITNESS:  No.
25        MR. HENZES:  Why is your

Case 2:07-cv-04936-MAM   Document 55-21   Filed 10/01/10   Page 8 of 8

2   name there?

3       Do you know why?

4       THE WITNESS:  I don't.

5       MR. HENZES:  It's

6   self-explanatory.  And if you read what

7   it says it's forwarded to the attention

8   of CT2 Julia Foster, whoever that is.

9   Maybe you want to know who CT2 Julia

10  Foster is.

11      MR. PURICELLI:  Well, we

12  can ask if you want to do my deposition

13  for me.

14      MR. HENZES:  Well, you're

15  asking something that has really nothing

16  to do with anything.

17      MR. PURICELLI:  Well, then

18  why is it in the packet of the BPR

19  and --

20      MR. HENZES:  Because it

21  was part of what Trooper Hile, who did

22  the inquiry said this is part of the

23  file.  I need this.  So here you go.

24  Because this is part of the inquiry for

25  part of the documents.

---

2      MR. PURICELLI:  Inquiry

3  for what, Randy?

4      MR. HENZES:  The

5  supervisory inquiry that was done on

6  Chris's complaint.

7      MR. PURICELLI:  Oh, so we

8  are talking about the BPR.

9      MR. HENZES:  No.  We're

10  talking about supervisory inquiry, as

11  you will, when you talk to Major Hill,

12  you'll find out there's two different --

13  they're two different things.

14  BY MR. PURICELLI:

15    Q.   How many times were you

16  investigated over Christopher Bush's

17  complaint?

18    A.   Once.

19    Q.   All right.  I thought so.

20      Has anybody talked to you

21  that you were under supervision by any other

22  inquiry other than the BPR?

23      Do you know what he's

24  talking about the supervisory inquiry?

25    A.   I do now.

---

JOSEPH TRIPP

2    Q.   Okay.  Tell me what you know now.

3    A.   That it was not a full

4  investigation.  It was a supervisory inquiry.

5    Q.   And you always thought it was?

6    A.   Just flat out BPR.  Just common

7  term for it.

8    Q.   Now, this supervisory means, in

9  other classical terms, limited.

10      Right?

11    A.   Sure.

12    Q.   Okay.  And if I understand

13  correctly, and you tell me if I'm wrong, in

14  order for it to be a supervisory it's got to

15  be approved by IA, director of internal

16  affairs, for example, Captain Hill, would be

17  allowed to assign somebody to do the

18  investigation on the Christopher Bush

19  complaint.

20      Correct?

21    A.   That would -- that's his

22  bailiwick.

23    Q.   I'm only asking your knowledge.

24    A.   I have no idea how they determine

25  whether it's a limited, full investigation.

---

JOSEPH TRIPP

2  I don't know.

3    Q.   Okay.  But you do know --

4    A.   And who makes the decision.

5    Q.   But you do know -- but you do

6  know, if I understand correctly, by the time

7  that request was done for attachments your

8  investigation, whether supervisory or BPR,

9  was over.

10    A.   I don't know that.

11    Q.   When were you officially notified

12  that the complaint against you was resolved?

13    A.   Not sure.

14    Q.   Not sure.

15      Did you get a letter?

16    A.   Yes.

17    Q.   Okay.  And did you produce that

18  letter to your attorney?

19      MR. HENZES:  You have the

20  letter.  It's on the disk.

21      MR. PURICELLI:  Okay.

22  BY MR. PURICELLI:

23    Q.   Do you know if that letter is

24  dated before or after June 28, 2007?

25    A.   Don't know.