## Page 165

JOSEPH TRIPP

Q. So when you were testifying moments ago before Randy jumped in about that little notation at the bottom, requesting party --

A. Okay.

Q. -- all you said about it could have been a guess?

A. I'm not sure. I've never seen that before.

Q. In the course of the investigation into the location of the David Bush children could you tell me why it would be that an attorney representing the victim identified in the report was being looked at?

A. I don't know who you're referring to.

MR. HENZES: Banik.

Do you know why Whisner put Banik's information in there?

THE WITNESS: No.

BY MR. PURICELLI:

Q. Do you know why he was looking at Christopher Bush's information?

A. No.

Bucks County Court Reporters
215.348.1173

## Page 166

JOSEPH TRIPP

Q. Okay. Do we still have your transcript or did I take that?

A. I think you have it.

Q. Okay. If I recall correctly, you told me when David Bush came into your office the NCIC notification and the poster you called Christopher Bush from your office, but David Bush wasn't in the office.

Did I hear that correctly?

A. I don't believe he was. I think he was out in the lobby.

Q. Did you tell Christopher Bush when you talked to him on the telephone, whether it was the first or second time, that David Bush was in your office?

A. I don't recall. The first time, no. I never even got that far.

Q. Okay.

A. I know that for a fact.

Q. Okay. So let's go to the second phone call?

A. I don't know.

Q. You don't know or you don't recall?

Bucks County Court Reporters
215.348.1173

## Page 167

JOSEPH TRIPP

MR. HENZES: Well, considering he was in Bucks County on the second phone call I don't think he was in the office because October 24 was the second phone call.

MR. PURICELLI: Interesting point, but he just got done saying it wasn't the first call.

MR. HENZES: He said it was the first call.

BY MR. PURICELLI:

Q. Is that what you said?

THE WITNESS: The first call he was not.

MR. HENZES: In the office.

THE WITNESS: In the office.

MR. HENZES: In the office, office, office, office. He said he was in the lobby.

MR. PURICELLI: I know that.

MR. HENZES: Right.

Bucks County Court Reporters
215.348.1173

## Page 168

JOSEPH TRIPP

He said -- and he couldn't have been in there the second time because he was in Bucks County at that time.

Right?

MR. PURICELLI: You'll catch up with me eventually what I'm thinking.

BY MR. PURICELLI:

Q. Do you recall what it was you, quote, unquote, told your guys about the NCIC entry?

A. Told them that the children were entered.

Q. Okay. I'm using the term guys because I read transcript and using the word you used.

A. Troopers. Members. Guys.

Q. Is that all you told them; that the children were entered?

A. That's all I can recall.

Q. And do you recall who these guys were?

A. Members of the Mansfield station.

Bucks County Court Reporters
215.348.1173

**Page 169**

2  Q. Okay. And their names would be?
3  A. Exactly which ones, I don't know,
4  unless you want me to list all the members of
5  the Mansfield station.
6  Q. No. I would prefer you to tell
7  me the ones you were talking to.
8  A. I don't know.
9  Q. So I don't have to depose the
10 entire barracks.
11     Okay. We got through
12 that.
13     Do you recall receiving
14 any correspondence or seeing any
15 correspondence in the investigation file from
16 John F. Cowley, the district attorney of
17 Tioga County?
18 A. Do I recall seeing any in this --
19 Q. Seeing --
20 A. No. I don't.
21 Q. Seeing or discussing with anyone
22 any correspondence from the district
23 attorney, John Cowley, from the Tioga County.
24 A. I talked to him in person. Yes.
25 I know Corporal Wheeler also talked to him.

**Page 170**

JOSEPH TRIPP

2  Q. Did he at any time tell you he
3  had communication with Lyle and Helga Bush?
4  A. I believe so.
5  Q. Okay. And you believe that based
6  on what?
7  A. I believe there's an attachment
8  to our report with a -- I think they wrote a
9  letter; if I remember correctly.
10 Q. And do you recall what that
11 letter was asking?
12 A. The specifics of it, no.
13 Q. Okay. If they were indicating
14 the children were missing, you'd have no
15 reason to dispute that?
16 A. No. I don't know what they
17 actually said.
18 Q. Have you ever talked to
19 Lieutenant Ignatz about anything to do with
20 this case?
21     Either the missing
22 children or the BPR investigation or the NCIC
23 investigation?
24 A. First time I met Lieutenant
25 Ignatz was at his hearing, Detective Bush's

**Page 171**

JOSEPH TRIPP

2  hearing.
3  Q. Have you talked to Corporal Shawn
4  Sankey ever?
5  A. Not that I recall.
6  Q. Okay. Do you recall having any
7  conversations with anybody at CLEAN in
8  regards to the CLEAN or NCIC entry of the
9  Bush children?
10 A. No, sir. I don't.
11 Q. You've already testified you've
12 had no communications at all with Captain
13 Hill, now Major Hill.
14     Correct?
15 A. I've had communications with him.
16 Q. Other than normal business stuff.
17 A. Not that I can recall.
18 Q. Well, do you recall having any
19 discussion with Captain Hill, now Major Hill
20 about any approval or disapprovals by the
21 Tioga County District Attorney's Office in
22 regards to the David Bush complaint?
23 A. Did I have conversation with --
24 no. I don't recall any conversations
25 relative to what the district attorney said.

**Page 172**

JOSEPH TRIPP

2  Q. Did you tell anyone at any time
3  that the District Attorney's Office endorsed
4  the actions of the investigators in the
5  investigation of the Bushes' kids?
6  A. When we talked with our crime
7  lieutenant he had asked -- the first meeting
8  we had with him he had asked us if we had
9  contact with the district attorney and we
10 said yes and explained what his wishes were.
11 Q. Well, my question was did you
12 ever have any conversations with anybody that
13 stated that the District Attorney's Office
14 for Tioga endorsed the actions of the
15 investigators in Pennsylvania State Police
16 investigators in the missing children case?
17 A. It would only be possibly at his
18 hearing.
19 Q. Okay. Aside from that hearing.
20 Before that hearing.
21 A. I don't know.
22 Q. Okay. When I say before July 31,
23 2007 did you ever tell anybody that the
24 District Attorney's Office from Tioga County
25 endorsed the actions of the Pennsylvania

173

2  State Police investigators in the David Bush
3  complaint?
4      A.   Not that I recall.
5      Q.   Do you know the code of conduct
6  in the FR?
7      A.   Am I familiar with it?
8      Q.   Yes.
9      A.   Yes.
10     Q.   And what is your understanding of
11 what the purpose of that is?
12     A.   It puts out a guideline as to how
13 we are to behave and do our job.
14     Q.   Okay.  And do you know whether or
15 not it says that you are to treat people as
16 if they were families?  Members of families.
17     A.   I don't recall that exact
18 verbiage.
19     Q.   Let me see if I can point you to
20 it.
21          MR. HENZES:  Wait.  You
22     said treat members as family?
23          MR. PURICELLI:  Treat
24     people.  Members is a classification
25     they call State Police.

174

1          JOSEPH TRIPP
2          MR. HENZES:  Well, you
3     said treat members as family.
4          MR. PURICELLI:  Treat
5     people who come in looking for service
6     as families.
7          THE WITNESS:  I don't --
8          MR. HENZES:  That's
9     something different.  You said treat
10    members as family.
11         MR. PURICELLI:  Well, he
12    doesn't remember the verbiage.  I'm
13    trying to get any actual notes on it so
14    I can point him to the actual verbiage
15    so we can get it right.
16         MR. HENZES:  You said
17    members and members are people that work
18    there.
19         MR. PURICELLI:  That is
20    true.  We've come to an agreement on
21    that.  All right.
22         MR. HENZES:  And in this
23    day and age if it says treat members of
24    the public as family you may want to
25    change that.

175

1          JOSEPH TRIPP
2              - - -
3          (Discussion held off the
4     record.)
5              - - -
6  BY MR. PURICELLI:
7      Q.   I'm not going to be able to find
8  it for you.
9           All right.  If I told you
10 that the records of the State Police show
11 Captain Hill, now Major Hill filing a memo on
12 August 1, 2007 on IAD investigation 2006-0692
13 limited as being unfounded would that help
14 refresh your memory as to when you received a
15 clearance?
16     A.   I would assume that I would have
17 gotten it shortly after the dated letter.
18     Q.   Okay.  And that memo we were
19 talking about at length --
20          MR. HENZES:  But does it
21     refresh his recollection as to when he
22     got it?
23          MR. PURICELLI:  It assumes
24     it would be after that.
25          MR. HENZES:  Yeah.  But

176

1          JOSEPH TRIPP
2     your question was does that actually
3     refresh his recollection?
4          MR. PURICELLI:  Yeah.
5     When he got it.
6          MR. HENZES:  Yeah.  But
7     the question is does that refresh your
8     recollection as to when you got it?
9          THE WITNESS:  No.
10         MR. PURICELLI:  Your point
11    is, Randy?
12         MR. HENZES:  Well, your
13    point was you're asking does that
14    refresh his recollection as to when he
15    got it.  That's a different question.
16         That question, by telling
17    you this does that give you an idea?  He
18    says, no.
19         Sitting here today he
20    still has no recollection of getting it.
21    That's a question.  You asked him did it
22    refresh his recollection.
23         MR. PURICELLI:  Did you
24    hear the last part he assumed after
25    that?

177

JOSEPH TRIPP

MR. HENZES: No. He assumed when it was over. He didn't know when it was over and you're asking him, you said, does did it refresh your recollection.

BY MR. PURICELLI:

Q. All right. Now, we were originally talking about a June 28, 2007 memo.

Weren't we?

A. Which memo are you referring to now?

Q. The one we went to great length discussion about requesting personnel notation on the bottom and you didn't know if it was for the attachments were being requested for litigation or the BPR investigation. I heard all that right.

Correct?

A. Yes.

Q. All right. I don't need to go through all that again.

A. No.

Q. And I thought I heard you tell me

178

JOSEPH TRIPP

that you assumed it was for litigation because the BPR investigation was long over, and I think that was the exact words you used, long over as of June 28, 2007.

Do you recall saying that?

A. I believe I said I believe the complaint was from January. I would assume that the BPR would have been over.

Q. All right. So can we agree then if -- I'm going to show it to you. We'll mark it so we're not living in a vacuum here.

- - -

(Exhibit Tripp-3, marked for identification.)

- - -

BY MR. PURICELLI:

Q. I'm showing you Tripp-3. I'm going to represent to you this is a copy of a document I took off the disk that we all know so affectionly now. I won't purport it to be saying it's accurate or anything other than this is what I got. We'll find out from Captain Hill what the story is. Major Hill.

And it's dated August 1,

179

JOSEPH TRIPP

2007.

Correct?

A. Yes.

Q. And it shows in the enclosure the documents which reference stuff from Dennis C. Hile.

Correct?

A. Correct.

Q. And that was the person you talked to about your investigation.

Correct?

A. Yes.

Q. Okay. And it references a complaint on 7/31/07.

Correct?

MR. HENZES: Correspondence.

BY MR. PURICELLI:

Q. Correspondence. Correspondence to complainant.

MR. HENZES: Right.

BY MR. PURICELLI:

Q. Okay. And then it says Newtown Township on line three supervisors.

180

JOSEPH TRIPP

Do you see that?

A. Yes.

Q. Okay. Correspondence dated 8/1/07 to Sergeant Joseph A. Tripp.

Correct?

A. Correct.

Q. That's you.

Right?

A. That is me.

Q. Okay. Assuming Captain Hill is going to tell me that correspondence dated 8/1/07 is your clearance date letter, okay, which coincides with the finding, can we agree then that the June 28, 2007 memo, okay, does not mean that the investigation against you had been long over?

A. I would like to know the date I was interviewed by Lieutenant Hile because that was the last contact I had.

Q. If you want you can look through the disk. I have no problem.

A. That's all right. I believe that my interview would have been long before June 28, 2007.

181

JOSEPH TRIPP

2 Q. But the investigation from your
3 experience with the State Police is over when
4 you receive a clearance or charges.
5 Correct?
6 A. Correct.
7 Q. Okay. And could we also be
8 correct that as of August 1 you had not
9 received either?
10 And that's 2007, mind you.
11 Either a clearance or
12 charges.
13 A. Correct.
14 Q. Okay. And so can we also agree
15 then that the June 28, 2007 memo that's
16 attached to the last page of Ignatz-5, okay,
17 cannot support a belief that your
18 investigation had been long over?
19 The investigation being
20 the Complaint into --
21 A. I disagree.
22 Q. Okay. And what can you tell me
23 factually what can you tell me to support the
24 reason you disagree?
25 MR. HENZES: You just

182

JOSEPH TRIPP

2 asked him his belief that it was over.
3 That's a different question.
4 BY MR. PURICELLI:
5 Q. Okay. Well, factually tell me
6 what you rely on in forming that belief.
7 A. When you look at the dates of
8 Major Rice concurred with, I'm assuming,
9 Captain Hill on 7/21, July 21 of '07. So
10 Captain Hill would have had to receive the
11 investigation, make the determination,
12 contact the major and then by the time this
13 gets kicked out and the complaint was January
14 of '07.
15 Q. I believe it's January 15 on the
16 bottom.
17 A. January something of '07. Sure.
18 And I would -- without looking, once I was
19 interviewed, I was done.
20 Q. You were done all you could do.
21 A. Correct.
22 Q. Didn't mean the investigation was
23 over.
24 Correct?
25 A. Correct.

183

JOSEPH TRIPP

2 Q. All right.
3 A. But as far as I'm concerned it's
4 over. Once he's done interviewing me it's
5 over.
6 Q. Well, if the investigation led to
7 charges it wouldn't be over for you.
8 Would it?
9 A. Well, commonsense led me to
10 believe there would be no charges from that.
11 Q. I understand, but that wasn't my
12 question.
13 If you were, in fact,
14 charged it wouldn't be over.
15 Would it?
16 A. Nope.
17 MR. HENZES: Well, it
18 would have have to be over. If there's
19 charges, the investigation is over.
20 MR. PURICELLI: Let me do
21 my deposition. Make your argument --
22 MR. HENZES: I mean, how
23 would they --
24 MR. PURICELLI: Randy.
25 MR. HENZES: The

184

JOSEPH TRIPP

2 investigation would be over. They made
3 a determination. The investigation is
4 over. If they determine he did
5 something wrong, the investigation is
6 still over.
7 MR. PURICELLI: Really?
8 BY MR. PURICELLI:
9 Q. Did you know it was over?
10 A. Like I said, my belief and
11 assumption would be when he was done
12 interviewing me I was done.
13 Q. Your belief was based only on
14 your thinking, not on anything somebody told
15 you.
16 Correct?
17 A. Correct.
18 Q. And did Major, at that time
19 Captain Hill call you and say before he made
20 his conclusion on August 1, oh, don't worry,
21 it's over?
22 A. No.
23 But you asked me for my
24 opinion.
25 Q. That's true, but your attorney

JOSEPH TRIPP

over there likes to throw a lot of things in that makes me have to ask all these questions.

Now, after your interview is it true they could have interviewed you again if they found something?

They being whoever the investigator was.

A. Very well could have.

Q. They could have look verifying what you were saying was true or not true.

Couldn't they?

A. Sure.

Q. So can we agree that after your interview, whenever it was, the investigation wasn't over?

A. Again, no. I'm not going to agree with you.

Q. Okay. Did anybody tell you not to worry about that investigation?

A. Nope.

Q. But you knew it was over.

A. My belief --

Q. Am I correct?

JOSEPH TRIPP

A. -- it was over.

Q. Okay. And the only person you talked to was the lieutenant to make that --

A. I talked to Lieutenant Hile.

Q. Let me get the question out.

-- to make that belief?

A. Yes.

Q. Okay. Did you talk to anybody from Virginia in regards to the David Bush matter other than the Virginia State Police?

A. I'm not sure who I talked to.

Q. So the answer to that is, yes, you did talk to somebody?

A. From Virginia?

Q. Yes.

A. Yes.

You said other than the Virginia State Police.

Q. I know what I said.

Who do you think you talked to other than the Virginia State Police about the Bush matter?

A. Talked to, obviously, Detective Lawson. That's my writing.

JOSEPH TRIPP

Q. When I asked you if you recognized that name before --

A. I didn't until I went through the paperwork there.

Q. Thank you.

So paperwork does help you remember things.

Detective Lawson is from where?

A. I'm not sure.

Q. Is that your handwriting on that document?

A. Absolutely.

Q. Okay. What did you write?

A. Detective Lawson. Phone number. FAX number. And removing from NCIC.

Q. Okay. Now, I didn't write it. I don't know anything about it. Tell me what that tells you, all your notes.

A. Again, as I testified to earlier, I FAXed information they requested to them.

Q. To the Virginia State Police?

A. Could be Richmond City. Could be Virginia State Police. I don't know.

JOSEPH TRIPP

Q. So do you remember talking to anybody from the Richmond City Police Department?

A. I don't recall. He could be from Richmond City. I don't remember.

Q. Did you tell Detective Lawson that what you were FAXing to him was a custody order?

A. No. I don't recall any of that.

Q. Do you have any reason to believe Detective Lawson is untruthful?

A. No. Don't know him from Adam.

MR. PURICELLI: Can we mark this?

- - -

(Exhibit Tripp-4, marked for identification.)

- - -

BY MR. PURICELLI:

Q. I'm showing you what's been marked Tripp-4 and draw your attention to the second page, fifth paragraph down.

MR. HENZES: On the first page or second page?

189

JOSEPH TRIPP

MR. PURICELLI: Second page.
MR. HENZES: Okay.
MR. PURICELLI: That's what I said.

BY MR. PURICELLI:
Q. I represent to you that these are notes received from Lawson in the course of this investigation and they were represented to the court as his notes of his events in the David Bush case.
On the second page --
A. Yeah.
Q. -- fifth paragraph he attributes contact to you.
A. Okay.
Q. Correct?
A. Yes.
Q. He says -- he refers to you as a trooper, okay, on the last sentence and he says you FAXed him a copy of a custody order and said that you reported that Serene, Mrs. Bush, wanted her ex-husband, meaning David Bush, arrested, but there is no

Bucks County Court Reporters
215.348.1173

190

JOSEPH TRIPP

probable cause, PC, for same.
Do you see that?
A. Yeah. I see it.
Q. Did you tell that to Detective Lawson?
A. I don't recall that at all.
Q. Okay. Are you disputing that you said that?
A. I don't recall that at all.
Q. I know, but I'm being thorough here.
Are you disputing you said it?
A. Why would I -- yeah. I would dispute that.
Q. Okay. So you're saying Detective Lawson's notes are inaccurate to your phone conversation with him.
Is that true?
A. Yeah. I don't recall saying that. I don't understand why that would even be said.
Q. Okay. He doesn't reference in here anything about an expired protection

Bucks County Court Reporters
215.348.1173

191

JOSEPH TRIPP

from abuse order, though.
Does he?
A. I believe it does.
Q. Okay.
A. He stated that the mother's last court order for custody of the children expired January of 2006.
Q. Okay. Well, protection from abuse order isn't a custody order.
Is it?
MR. HENZES: It says he stated the mother's last custody order for full custody of the children expired on January of 2006.
MR. PURICELLI: Well, what was my question, Mr. Henzes? I was talking about a PFA.
THE WITNESS: I believe it was all wrapped into one.

BY MR. PURICELLI:
Q. You believe.
MR. HENZES: It actually is.
MR. PURICELLI: It

Bucks County Court Reporters
215.348.1173

192

JOSEPH TRIPP

actually isn't.
MR. HENZES: It is. Read it.
MR. PURICELLI: I know what they say.
MR. HENZES: Do you want it?
MR. PURICELLI: Go ahead.
MR. HENZES: Did you see this?
One you didn't see this one.
MR. PURICELLI: Go ahead and give me this one, Randy.
MR. HENZES: All right. You can move on to your next question.
MR. PURICELLI: No. I'll wait for it because I want to see this expired January 2006 full custody order.
MR. HENZES: Here we go. Final court order.
Since you guys are real good on this do you know what 6108 of the Act is?

Bucks County Court Reporters
215.348.1173

193

JOSEPH TRIPP

MR. PURICELLI: 6108 is the Domestic Violence Act. It's a PFA action, not a custody action, which is 23.

MR. HENZES: At the risk of embarrassing you in front of your clients, here's the final court order, page --

MR. PURICELLI: Give me the whole thing.

MR. HENZES: Page two is PFA is granted.

MR. PURICELLI: This is the PFA order.

MR. HENZES: No. It's not. And then it says the custody order is in there. All the custody stuff is in there.

BY MR. PURICELLI:
Q. This is what your attorney represents to be a custody order?
        Could you read for the record --

MR. HENZES: No. It says

Bucks County Court Reporters
215.348.1173

194

JOSEPH TRIPP

the full court order.

MR. PURICELLI: Do we agree, Randy, that this says, caption for the order, protection from abuse?

MR. HENZES: No. It says full order of court.

MR. PURICELLI: Yes.

MR. HENZES: No. The order of the court says final order of court.

MR. PURICELLI: Randy --

MR. HENZES: This is the order of the court, Brian. And it then gives the PFA and then it says: Defendant shall have no physical custody.

MR. PURICELLI: Yeah. I know. It's a PFA.

MR. HENZES: It says custody of the following minor children shall be to the plaintiff. Read the first paragraph.

MR. PURICELLI: Uh-huh. Uh-huh.

Bucks County Court Reporters
215.348.1173

195

JOSEPH TRIPP

        What is the order under, Randy?

MR. HENZES: It's under final order of court.

MR. PURICELLI: For what action?

MR. HENZES: It says final order of court.

MR. PURICELLI: For what action, Randy.

MR. HENZES: For protection of abuse.

MR. PURICELLI: Exactly.

MR. HENZES: It doesn't say this is -- it tells you what it is.

MR. PURICELLI: No. You argue that in a court of law, Counselor.

BY MR. PURICELLI:
Q. Now, Sergeant Tripp, the State Police are charged to know the Protection From Abuse Act.
        Aren't they?
A. They're what?
Q. Charged to know the Protection

Bucks County Court Reporters
215.348.1173

196

JOSEPH TRIPP

From Abuse Act.
        Aren't they?
A. Yes.
Q. And, in fact, they get protection from abuse orders all the time.
        Correct?
A. Correct.
Q. In fact, now those orders are put in a central location and you have access to them throughout the state through the electronic system.
        Isn't that true?
A. That is correct.
Q. Okay. Now, do you get custody orders if one parent goes to court and tries to just get custody of their children ordinary without a protection order?
        Do you get copies of those orders?
A. Custody orders? No.
Q. All right. Isn't it true you FAXed to Richmond City Police Department an expired protection from abuse order that dealt also with temporary custody?

Bucks County Court Reporters
215.348.1173