ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER BUSH and DAVID BUSH,
Plaintiffs
vs.
S. C. ADAMS, LT. RUSSELL, STEVEN J. IGNATZ, SGT. JOSEPH TRIPP, SARAH NICOLE BUSH a/ka SERENE ISARA ISABELLA a/k/a SARAH NICOLE MONSERRATE a/k/a SARAH NICOLE MONSERRATE BUSH,
Defendants

Case No. 07-4936

CIVIL ACTION

Pages 1 through 76

DEPOSITION OF: CORPORAL CHRISTOPHER WHEELER

TAKEN BY: BRIAN M. PURICELLI, ESQUIRE

DATE & TIME: MONDAY, MAY 17, 2010
3:18 P.M. to 5:03 P.M.

LOCATION: Stephen J. Banik & Associates
41-42 Water Street
Wellsboro, PA 16901

APPEARANCES:

BRIAN M. PURICELLI, ESQUIRE
691 Washington Crossing Road
Newtown, PA 18940
(For the Plaintiffs)

RANDALL J. HENZES, ESQUIRE
PA Deputy Attorney General
Litigation Section
21 South 12th Street - 3rd Floor
Philadelphia, PA 19107
(For the Defendants)

ALSO PRESENT:

MR. DAVID BUSH, Plaintiff

CARLTON W. SWETLAND
Court Reporter - Notary Public
3085 Route 49
Westfield, PA 16950-9106
(814) 367-5482

ORIGINAL

CONTENTS

| WITNESS: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| CPL. CHRISTOPHER WHEELER | 3 | — | — |

EXHIBITS

| WHEELER NUMBER: | PAGE |
|---|---|
| 1 - John F. Cowley letter of 2-23-06 to Corporal Christopher Wheeler. | 9,38,64 |
| 2 - Investigation File, PSP Montoursville, Incident No. F01-0915008. | 48 |
| 3 - John F. Cowley letter of 4-17-06 to Trooper Eric Whisner. | 66 |

No other exhibits identified or marked.

Any reproduction of this transcript is prohibited without authorization by the certifying Court Reporter.

* * * * * *

PROCEEDINGS

Whereupon, at 3:18 p.m.,

CORPORAL CHRISTOPHER WHEELER

was called upon by Brian M. Puricelli, Esquire, counsel for the Plaintiffs, to give an oral deposition under oath, and having first been duly sworn by Carlton W. Swetland, a Notary Public in and for the Commonwealth of Pennsylvania, was examined and testified as follows:

DIRECT EXAMINATION

BY BRIAN M. PURICELLI, ESQUIRE:

Q Is it Trooper Wheeler?

A Corporal.

Q Corporal, okay. Corporal Wheeler, my name is Brian Puricelli and we're here to ask you some questions as a witness. I hope we're not inconveniencing you too much.

A What's that?

Q I hope we're not inconveniencing you too much. Have you ever given a deposition before?

A No.

Q Alright. Let me give you some ground rules here so you understand how it works.

A Okay.

Q You have the right to read and sign, if your attorney so elects. That means that before the Court Reporter sends me the transcript he'll give you the opportunity to read it and correct anything that may be incorrect. What you can correct is you can correct if the word you said was "went" and he wrote "when",

you can correct something like that.

A Okay.

Q You can't change the substance of an answer, but you can correct a word that might be wrong, okay?

A Okay.

MR. PURICELLI: Randy, are you going to have him read and sign, or are you waiving that?

RANDALL J. HENZES, ESQUIRE: No, he's not going to read and sign.

MR. PURICELLI: Okay.

DIRECT EXAMINATION (Continued)

BY MR. PURICELLI:

Q We're going to ask you questions and there are two types of objections that will be controlling; one is to the form of the question, meaning if I ask a question that might possibly be able to be interpreted in a series of different ways, Randy may think it's confusing and he'll ask me to restate it in a way that's less confusing. If I ask you a question that you think is confusing in any way, shape, or form, tell me and I'll try and rephrase it so that you understand my question and I at least get the answer, hopefully, to the question.

A Okay.

Q Aside from that objection the only other objection is privilege, meaning that I have discussed or asked a question that would concern you talking to a lawyer for legal advice. And since you're a witness, that one is likely not going to come up.

A Okay.

Q    Alright. Aside from that, generally if I ask you a question, hopefully you'll be able to give me an answer. Don't guess. You can approximate. If you don't recall something, tell me you don't recall it. I may probe a little bit to see if I can spark a memory a little bit, but aside from that, no guessing.

A    Sure.

Q    I'm sure Randy doesn't want you to guess. If you don't recall, just say you don't recall.

A    Okay.

Q    Alright.

MR. PURICELLI: Aside from those ground rules, is there anything you want to give, Randy?

MR. HENZES: Nope.

MR. PURICELLI: Alright.

DIRECT EXAMINATION   (Continued)

BY MR. PURICELLI:

Q    Corporal Wheeler, very quickly, can you tell me when you became a Trooper and how you came to be where you are today?

A    I graduated from the State Police Academy in September of 1994. I was sent to the Wyoming Barracks. I did my training at the Wyoming Barracks in Luzerne County. In about January of 1995 I transferred to the Dushore Barracks, which is now Laporte, Sullivan County. In or about September of 1998 I transferred back to Mansfield as a Patrol Trooper. In or around August of 2003 I got promoted to Corporal, and was promoted to and assigned to the Patrol Unit at the Reading Barracks in Troop L. And then sometime around February of 2004 I transferred back to Mansfield, and later on in that year I had applied for the position of the

Criminal Unit Supervisor that was posted, and I was selected for that position.

Q Okay. Prior to 2004 did you receive additional training of any kind with the State Police in regards to that new assignment as an Investigator for the State Police in Mansfield?

A I have attended a number of trainings over the years, to include a two week Basic Criminal Investigation course years ago, so I've had a lot of training. I mean if you want to narrow it down to specifics –

Q Sure. Did you receive any training, other than the basic training, in regards to Sections 2908 and 2909 of the Crimes Code?

A No.

Q Okay.

A Specifically, no, not that I'm aware of.

Q That's all you can answer.

A Right.

Q Have you received any type of training from any source in regards to PFAs, Protections From Abuse?

A We received certain type of training relative to source and the applicability, in general, of PFAs, and now that they've been adopted, you know, basically nationwide, meaning one filed in Pennsylvania can become valid in New York State, and vice versa, or any of the other states, under the federal statutes.

Q You're referring to the Uniform Enforcement Orders?

A Well, that and the – in particular, yes, where a Court Order from Pennsylvania could be valid in another state, yes.

Q And vice versa?

A Right.

Q Okay. Aside from the Uniformity Act, meaning you can enforce as a Police Officer Domestic Violence Orders from other states, –

A Right.

Q – that's the only additional training you received?

A That I specifically recall, yes.

Q Alright. Have you received any training what so ever in regards to Pennsylvania's Title 23, the Domestic Laws, and in particular, custodies?

A No.

Q Okay.

A No, not specifically.

Q On or about February of 2006 did you have occasion to meet with a David Bush in regards to a complaint he had?

A I believe I did.

Q Okay. And before February of 2006 did you ever have contact with David Bush?

A I don't recall myself specifically ever having contact with Mr. Bush prior to that.

Q Okay. Do you recall having contact with anybody in regards to David Bush prior to February of 2006?

A Yes. There would have been – I would have been aware of Incident Reports involving Mr. Bush that perhaps other members would have generated that I would have seen in the process of reviewing or, you know, knowing the name, or in some way seeing the name.

Q Do you recall seeing any Incident Reports prior to February of 2006 involving David Bush?

A I don't specifically know what the dates were. I know that there were some prior incidents.

Q Aside from Incident Reports, were there any Criminal Reports?

A Well, I guess I'm speaking Incident Report as in a Criminal Report.

Q Okay. Well, that's why we need to be clear here.

A Okay.

Q To me – and I'm a former Police Officer – an Incident Report is a small single incident that - some event occurred. Is that your understanding of an Incident Report?

A No.

Q Okay.

A My understanding –

Q There's Crime Reporting Reports?

A Uh-huh.

Q Okay. Is it your understanding from the training with the State Police that Crime Information Reports are known as Incident Reports?

A Yes, that's what the heading for our reporting system is is an Incident Report.

Q Okay.

A So that's, I guess, maybe the difference in terminology.

Q Okay. That's why I wanted to be clear.

A If we were just taking down information it might be recorded on an Assignment Report.

Q Okay.

A A general reporting system.

Q Do you recall what the Incident Reports regarded?

A I believe they would have regarded some type of assaults with Mr. Bush being the Defendant, or the accused, and his wife being the victim.

Q Do you know whether they led to any type of criminal charges being brought?

A I believe he was charged, but specifically right now I can't –

Q And you believe he was charged with assault?

A I believe he was. Whether it would be a harassment or simple assault, I don't know, but I believe he was charged.

Q Okay. And this was when you were in Mansfield?

A Yes.

Q Okay. And just so we're clear, this was before February of 2006, this event that you're referring to?

A I guess I would be referring – my recollection is that Mr. Bush came in to the barracks. That would have started the whole custody issue after his PFA expired. If that's when we're talking, February of 2006, then yes, it would have been previous to that.

Q Alright. Well, I'm picking just a – you're wondering why I'm picking February of 2006. There's a letter from the District Attorney that's indicating February of 2006. (Wheeler Exhibit No. 1)

A Okay.

Q So I'm picking that date because we've had testimony to that particular date.

A Okay.

Q But I'm trying to find out if you had contact before that date, since we

have a document already that identifies that date?

A I couldn't tell you, other than there's probably a date on the Incident Report. Because I remember him coming in to the barracks, and I believe I spoke with him briefly. And that would have been when I –

Q Let me help you.

A Okay.

Q I'm going to show you what we've already marked as Ignatz No. 5.

A Okay.

Q Okay. And it's an Incident Report that you identified.

A Uh-huh.

Q And it's dated at the bottom, –

A Okay.

Q – as you can see?

A Yup.

Q Okay. Let me read that date. February 23?

A Right.

Q 2006?

A Yup.

Q Okay. When you're saying you remember seeing something, do you remember seeing any Incident Reports before the February 23, 2006 report that I'm showing you now?

A I'm sure that there were other reports because there was a genesis for the PFA and the issues that we had, so I know that we had had interaction with Mr. Bush prior to that date, yes.

Q Okay. And your review of these wasn't in the course – when you first

saw them, it wasn't in the course of any kind of activity that you would have been involved in, other than becoming familiar, is that true?

A I may or may not have reviewed them as the supervisor or the reviewing officer.

Q On the report?

A Right.

Q Okay.

A I may or may not have. I couldn't tell you.

Q Alright. Let me ask it a little more specifically. You weren't looking at the report for the purposes of actually deciding whether you will or won't prosecute something, is that a fair way to describe it?

A No, I don't think I would be looking for reports in the past to say that I wouldn't prosecute something, no.

Q Okay. Now when you became the Supervisor for Criminal Investigations, I take it you would look at different types of crimes, and you would look at certain crimes as the investigator, is that a fair way to –

A My function wasn't really much of an investigator at that point.

Q What was it?

A I would still handle some cases and do some cases myself, but it was mainly reviewing reports for completeness and correctness, and approving or disapproving the recommendation that the officer had, and then I would assign that either to be continued to be followed up by the officer that had the investigation, or I would assign it to one of my three investigators in the Criminal Investigation Unit.

Q Who were your three Criminal Investigators?

A At that time it would have been Trooper Todd Wagaman, Trooper