1   Roger Williams, and Trooper Mark Bowne.  Trooper Bowne is now retired,
2   B-o-w-n-e.
3       Q    Okay.  So you had three individuals to do criminal investigations as
4   they came into the barracks, and you supervised them, correct?
5       A    Yes.
6       Q    And from time to time you might have had to do an investigation
7   yourself?
8       A    I might do an investigation myself, yes.
9       Q    Okay.  So there were four of you basically available to do
10  investigations, and specifically on or about February 23, 2006?
11      A    There would have been four of us assigned to that unit.
12      Q    Alright.  I understand you were a supervisor.
13      A    Yes, right, absolutely.
14      Q    But it didn't preclude you from doing it, I understand that.
15      A    Uh-huh.
16      Q    So theoretically there were four people –
17      A    Yes.
18      Q    – that could do an investigation that came in to the barracks –
19      A    Yes.
20      Q    – on February 23, 2006, or about then?
21      A    Right.
22      Q    Alright.  How would you assign an individual to do a particular case?
23      A    Generally incidents are assigned to the Patrol Trooper that is
24  assigned those zones.  The county is broken up into specific zones.
25      Q    Okay.

1   A    And we cover those with the Patrol Troopers. Generally when an
2   incident comes in it's assigned to – that's his area of responsibility, so that's who
3   takes those calls, the Trooper that's involved in those zones.
4   Q    And the Whitneyville Road area, –
5   A    Uh-huh.
6   Q    – whose area would that have been?
7   A    That would have been whoever was assigned to it that day.
8   Q    So it's a day to day thing?
9   A    Yes, yes.
10  Q    Okay.
11  A    Yes. They come in and they get their shift assignments. The county
12  is generally broken up into six zones; 38, 39, and 40 on the east side of the county,
13  and 41, 42, and 43 on the west side of the county. There's generally two Patrol
14  Troopers working; one gets the east half, and one gets the west half.
15  Q    But those are the Patrol Troopers?
16  A    Yes.
17  Q    Are these three officers that you're talking about Patrol Troopers?
18  A    No, they're Criminal Investigators.
19  Q    Alright. I was hoping I had that right.
20  A    Yes. But that's generally how incidents are assigned.
21  Q    Okay.
22  A    Generally the Patrol Trooper will take the initial report, and then
23  depending on the type of investigation, it may be assigned to a Criminal Investigator
24  to follow up, and it may be given back to the Patrol Trooper to follow up.
25  Q    Okay. Tell me what would be the determining factors as to whether

1  a Patrol Trooper is going to keep it, or it's going to go to the Crime Investigation
2  Unit?
3      A    It could depend on the seriousness of the offense, the grading of the
4  offense, the size of the offense. I mean do we have – Is it something where we
5  have a large crime spree, a string of burglaries, where we might have a ton of
6  victims involved, versus one victim? Those kinds of things along that line of thought
7  go into assigning or reassigning.
8      Q    In the scheme of seriousness classification, where does concealment
9  of children fall?
10     A    I couldn't tell you specifically what the grading is.
11     Q    It's a felony.
12     A    Okay. It's a felony?
13     Q    Uh-huh.
14     A    Felony One, Two, or Three?
15     Q    Three.
16     A    Okay.
17     Q    Where would it fall in the scheme of seriousness, just to determine –
18 on your scheme, not my scheme, your scheme, in a –
19     A    Well, a Felony Three is obviously a serious offense.
20     Q    Agreed, but where does it fall in? I mean you make decisions based
21 on seriousness, you told me that's a factor?
22     A    Uh-huh, right.
23     Q    And I've told you in this particular case it's a Felony of the Third
24 Degree.
25     A    Uh-huh.

| | | |
|---|---|---|
| 1 | Q | And you agree with me that's a serious factor? |
| 2 | A | Right. |
| 3 | Q | Now you're faced with a guy – an investigation, a serious investigation involving a Felony Three, – |
| 5 | A | Okay. |
| 6 | Q | – what do you do with it then; who do you give it to? |
| 7 | A | I assigned it back to Trooper Whisner. |
| 8 | Q | You did in this case? |
| 9 | A | Yes. |
| 10 | Q | Okay. But under your policy you say a certain factor in your deciding whether you send it back, or you keep it, – |
| 12 | A | Right. |
| 13 | Q | – depends on the seriousness? |
| 14 | A | Right. |
| 15 | Q | Okay. And I said, and you agreed this is a serious offense; why was it coming back to Whisner? |
| 17 | A | Because I felt that he was capable of handling the case. |
| 18 | Q | Okay. So another factor – and correct me if I'm wrong – in whether you allow a Trooper to do something or not, not an Investigator, a Trooper, a Road Trooper, – |
| 21 | A | Right. |
| 22 | Q | – is whether you think he can handle the investigation? |
| 23 | A | Yes, I think so. |
| 24 | Q | What experience did Trooper Whisner have with investigating a concealment? |

1     A    I don't know that he had any specific training for that.

2     Q    Okay. What experience did he have that you believed he could
3 investigate a concealment?

4     A    I thought he was an intelligent Trooper; I thought he was fairly well
5 spoken, and I found that he had ability.

6     Q    What abilities did he have in locating children that were concealed?

7     A    What – for followup for any – it's not any different than any other type
8 of investigation; interviews –

9     Q    Did he have experience in the Social Security Administration, locating
10 whether or not a person has changed their numbers or names?

11     A    Not that I'm aware of specifically.

12     Q    Did he have experience placing missing children, or concealed
13 children in NCIC before?

14     A    Yes, I believe he had put children in NCIC before, or he would have
15 had training in how to put children in NCIC before, or received some type of
16 direction.

17     Q    What specific training do you know he had in the requirements for
18 NCIC and placing children in the Missing Children's Data Bank?

19     A    I don't know that he has any specifically in manually entering them
20 himself, but –

21     Q    Causing them; how about that, causing them to be?

22     A    There's – there's a – he would have certainly received training in the
23 academy and in his coach training period, in the review of our manuals, that, "Okay,
24 this is how we conduct a missing person investigation", or "Here's a missing person
25 checklist and this is what we want".

Case 2:07-cv-04936-MAM   Document 55-29   Filed 10/01/10   Page 6 of 11

17

| | | |
|---|---|---|
| 1 | Q | How many years did he have as a Trooper at the time you assigned |
| 2 | | him? |
| 3 | A | I don't remember. He hadn't had a long time. |
| 4 | Q | Okay. How much training – what was the last training he had |
| 5 | | received, particularly in investigating missing children so that they were to be put |
| 6 | | into NCIC? |
| 7 | A | I couldn't tell you what he had after the academy. I'm not sure that he |
| 8 | | had any. |
| 9 | Q | Okay. So can you tell me – |
| 10 | A | Specifically I couldn't tell you the – |
| 11 | Q | – aside from the feeling that he could do it, can you tell me what other |
| 12 | | factors you relied on to send this serious offense back to the Trooper to |
| 13 | | investigate? |
| 14 | A | He was capable, and that was the decision I made. |
| 15 | Q | Okay. Now when he started to investigate, obviously you supervised |
| 16 | | his conduct, correct? |
| 17 | A | Yes. |
| 18 | Q | Okay. How many times did you meet with him within the first week |
| 19 | | of the investigation? |
| 20 | A | I couldn't recall. |
| 21 | Q | Being his supervisor, obviously you would be responsible that he |
| 22 | | followed the law, correct, in this type of investigation? |
| 23 | A | Yes. |
| 24 | Q | Okay. When did he contact David Bush after the initial report? |
| 25 | A | I don't know. |

| | | |
|---|---|---|
| 1 | Q | When was he required to under the law? |
| 2 | A | Under the law? |
| 3 | Q | Under the law? |
| 4 | A | I'm not familiar with any requirement under the law. |
| 5 | Q | You aren't aware of a 24 hour reply contact with the report under the |
| 6 | law? | |
| 7 | A | No. |
| 8 | Q | Okay. |

9  MR. HENZES: Under what law?

10  MR. PURICELLI: The administrative one we talked about.

11  MR. HENZES: What administrative law?

12  MR. PURICELLI: 2908.

13  MR. HENZES: Your question pre-supposes that that's how they

14  classified his investigation, Brian, so before you –

15  DIRECT EXAMINATION   (Continued)

16  BY MR. PURICELLI:

17  Q   Do you classify anything on this investigation you assigned to

18  Whisner?

19  A   Do I – what do you mean by "classify"?

20  Q   When you assigned him the investigation what was the classification

21  for the investigation?

22  (Brief pause.)

23  Q   What was he investigating?

24  A   He was investigating a complaint that Mr. Bush had –

25  Q   Of what?

1   A      – that his wife and children – or his wife had taken his children.

2   Q      What did you call that complaint?

3   A      Well, it's carried under the heading, obviously, of Concealment of the Whereabouts of a Child, but that is not indicative in itself of the crime that has been committed, or if a crime has been committed.

6   Q      So you're telling me –

7   A      We have to have some type of classification when we generate an incident number, alright, so we fall on the closest thing. We call it something, alright, and then once the investigation is done, then we can wrap it up and discuss it as far as whether or not there's going to be any prosecution, or not prosecution, or if the elements of a criminal offense are met.

12  Q      Uh-huh. What are the elements for Concealment of the Whereabouts of a Child?

14  A      Without specifically looking at the Crimes Code I wouldn't tell you.

15         (Brief pause to locate the Crimes Code.)

16  BY MR. PURICELLI:

17  Q      2909. Was this the same 2909 that you have classified on here, on your Incident Report?

19  A      It's not my Incident Report, but that would be Trooper Whisner's.

20  Q      The one you signed off on, right?

21  A      I didn't sign off on that report.

22  Q      You didn't sign off on this as the supervisor?

23  A      No.

24  Q      Who was the supervisor?

25  A      That looks like Trooper Green.

1   Q   Trooper Green?

2   A   That's Corporal Green.

3   Q   Corporal?

4   A   Yes.

5   Q   I'm sorry. I didn't see his name come up as being a member of your
6   unit.

7   A   He's not in my unit.

8   Q   Weren't you the supervisor of the investigation?

9   A   Yes. He was the Assistant Supervisor at the time.

10  Q   Oh. So there's other people involved, other than –

11  A   This is the first I've talked to you. You never asked me a question
12  before today.

13  Q   That's because we all assumed it was you. That's why we called you
14  in.

15  A   It's not me.

16  Q   So Corporal Green is a supervisor over what people, road people?

17  A   He was at the time, he was a Patrol Supervisor, but he was the
18  Alternate Criminal Investigation Unit Supervisor.

19  Q   Do you sign off anywhere here as actually having supervised this
20  investigation?

21      (Brief pause. Corporal Wheeler reviewing a document.)

22  A   Uhm – on this page; six, seven – page six and seven, the last two.

23  Q   So when you signed those particular pages you're just signing off
24  those particular sections, is that true?

25  A   Well, that was the part of the report that I reviewed and approved.

1  　　　　　MR. HENZES: It's not his signature, it's his initials.

2  　A　　So there will be my initials and my Badge Number.

3  BY MR. PURICELLI:

4  　Q　　7483?

5  　A　　Correct.

6  　Q　　So you signed off on the part of the report where David Bush came
7  and brought materials in for Whisner to use?

8  　A　　Yes, I signed off on whatever Whisner put in.

9  　Q　　Yeah

10 　A　　Okay.

11 　Q　　I'm merely reading it.

12 　A　　Yes. Whisner reported this to me – well, reported it for the report,
13 and I reviewed it, and found it to be proper for a supplemental and –

14 　Q　　And the next – you said six and seven?

15 　A　　Yes.

16 　Q　　And that was six. Seven is your signing off Whisner's report of events
17 occurring from October 13, 2006 to 11-26-06, did I get that correct?

18 　A　　Yes, that would be the characterization. He dated the report 12-17
19 and it contains kind of like a time line that he's reporting, so yes.

20 　Q　　Okay. So aside from that, I can't ask you any questions about where
21 he went before your supervision, I'd have to go talk to the supervisor? In other
22 words; he says he went to Haven, and you didn't know he went to Haven, correct,
23 other than the report saying it?

24 　A　　Correct.

25 　Q　　You didn't talk to him about him going to Haven?

| | | |
|---|---|---|
| 1 | A | I don't – I may have. |
| 2 | Q | Well, tell me if you did or didn't? |
| 3 | A | I can't recall because this is – this is what I do.  I mean I sign off on |
| 4 | | reports.  I see hundreds of reports. |
| 5 | Q | I'm sure you do. |
| 6 | A | I'm not – I'm not trying to stone anybody. |
| 7 | Q | Oh, I don't think you are. |
| 8 | A | I'm not trying to give you a hard time. |
| 9 | Q | Oh, I don't think you are; really you're not. |
| 10 | A | I'm just – |
| 11 | Q | After you assigned – |
| 12 | | MR. HENZES: A better question may be was he aware of what |
| 13 | | Mr. Whisner was doing to investigate the matter, in a general sense. |
| 14 | | MR. PURICELLI: Well, let's ask that. |
| 15 | | CORPORAL WHEELER: Okay. |
| 16 | | BY MR. PURICELLI: |
| 17 | Q | Of your personal knowledge – not what the reports says – |
| 18 | A | Alright. |
| 19 | Q | – because we already know you only signed off on what you saw of |
| 20 | | that report, correct? |
| 21 | A | Right. |
| 22 | Q | Okay. |
| 23 | A | I didn't do anything that's in the report, I just signed off on what he did. |
| 24 | Q | No problem.  Did you direct him in any way in this investigation? |
| 25 | A | I recall – I believe when Mr. Bush came in he came in on-station in |