1  person.
2  Q  Did he talk to you?
3  A  I believe I spoke with him.
4  Q  Okay.
5  A  And at that point we assigned Trooper Whisner to it because –
6  Q  We?
7  A  Well, I did.
8  Q  Okay.
9  A  Alright. Trooper Whisner would have spoken with him at that point, as did I. He – I don't recall – I recall there being a need anyways for more paper work, and I don't specifically remember what it was, but I don't believe he had all – necessarily all of the identifying information we were looking at for his children, or something like that. There was something that stuck in my mind. We all knew that there were some documents that we wanted him to come back with.
15 Q  "We", meaning you and Whisner, or you and other people?
16 A  Trooper Whisner, myself, and Mr. Bush.
17 Q  Okay. The three of you, okay. And that's from his initial come-in?
18 A  Yes.
19 Q  Before that did you ever talk to Mr. Bush?
20 A  I don't recall that I ever did. Yeah.
21 Q  Before he came in and talked to you at the station did you talk to anybody about investigating his allegation that the children were being concealed, were missing, or otherwise?
24 A  No, I don't believe I did. I wouldn't have had an occasion to.
25 Q  A reason to, right.

1   A   Because I think he came in very shortly after the PFA Order expired.

2   Q   Okay. Just so I'm clear; before this Incident Report was started there
3   was no investigation to look for his kids?

4   A   I don't believe so, no.

5   Q   If there were –

6   A   I believe that was the genesis for it.

7   Q   That's fair. I just want to know whether or not I should look for more
8   documents, that's all.

9   A   Yeah.

10  Q   Would there be any?

11  A   No.

12  Q   In your review of this case, did you come across any other
13  investigation with the State Police in your barracks –

14  A   Uh-huh.

15  Q   – to look for the kids before this, before this incident?

16  A   Not that I'm aware of, to look for the kids, no.

17  Q   Okay. And if there was an investigation, there would be reports,
18  correct?

19  A   There should be, yes.

20  Q   Is there any reason you could tell me there wouldn't be reports if,
21  say, like the District Attorney's office asked you to look into it?

22  A   I'm not – I don't know why there wouldn't be some type of report for –
23  even if the District Attorney's office asked to look into something, I would imagine
24  that we would.

25  Q   Wouldn't there be like State Polices Rules and Regulations that say

1  that if the District Attorney asks you to look into something you would create, at
2  least, a number and you do it?
3     A     Well, I would say that would be the generally accepted practice.
4     Q     Okay. Is there any reason you know why that practice wouldn't be
5  followed in the Mansfield Barracks?
6     A     No, I'm not familiar with any reason why it wouldn't be.
7     Q     The State Police are pretty good about enforcing their rules and
8  regulations, right?
9     A     I would like to think so.
10    Q     Trust me, they like to enforce their rules. I think Randy will tell you
11 that too. Alright. From what we can tell so far, the Incident we have here marked
12 as Ignatz No. 5, and the number is F05-0891031, is initiated as a result of Dave
13 coming in, and you guys initiating this investigation?
14    A     Yes.
15    Q     Captioned "Concealment"?
16    A     That's my understanding, yes. That's the best of my memory.
17    Q     Alright. Now aside from David, yourself, and Trooper Whisner, did
18 you talk to anybody else about this investigation?
19    A     Eventually, yes.
20    Q     Who?
21    A     I would have spoken with Sergeant Tripp at the time.
22    Q     And why would you call Sergeant Tripp?
23    A     I didn't have to call him, he was there.
24    Q     Oh, okay. You went to his office, or he went to your office, or you saw
25 him in the hall?

1   A   Yes. The subject – it came up

2   Q   It came up?

3   A   Yes.

4   Q   What came up?

5   A   Well, the fact that we had the investigation.

6   Q   Okay.

7   A   I may have given him a heads-up, and I also spoke – I believe I spoke with John Cowley about it.

9   Q   Do you recall when it was, date wise, that you spoke to Sergeant Tripp about giving him the heads-up?

11  A   I do not. It would have been shortly after I spoke with Mr. Bush.

12  Q   His report indicates that would have been February 23, 2006 when he came in.

14  A   Okay.

15  Q   At 11:30. Victim David Bush reported.

16  A   Okay.

17  Q   Okay. How do you classify a person a victim for the State Police Incident Report, as opposed to just a complainant?

19  A   We wouldn't use a complainant on an Incident Report; we would use a victim on an Incident Report.

21  Q   Why?

22  A   That's the structure of the manuals that they give us for guidance on filling out an Incident Report.

24  Q   Okay.

25  A   Now we may have a complainant for an Assignment Report for an

1 automatic alarm, or something like that, but —

2 Q Is that because if you're looking at a criminal matter you have to have
3 a victim of the crime? I mean I don't want to put words in your mouth, but I'm trying
4 to figure out what they're teaching you.

5 A Ideally you would have a victim of a crime, or you would have society.
6 Or if you have an entity, a store or something like that, it's permissible to put the
7 store in as the victim, and in the next block under "Employer". specifically you would
8 put the contact person or a complainant — would be your word — in there as a
9 followup or a contact, a point of contact.

10 Q Okay. Now you spoke to Sergeant Tripp to give him a heads-up.
11 Now was the heads-up that "We're starting an investigation", or was the heads-up
12 "We've come to a conclusion", or what was the heads-up?

13 A No, I think I made him aware that we had — that Mr. Bush had came in
14 and we were investigating his complaint; we were looking into his complaint.

15 Q When you say "we", you mean Whisner, or the State Police?

16 A The State Police.

17 Q Okay. Now after Whisner started his investigation we know that the
18 next time you oversee any of his reports is — this doesn't have a date, does it?

19 MR. HENZES: Six, page six.

20 A It should be on top.

21 MR. HENZES: In the left hand corner.

22 A Well, that's the date of the report.

23 MR. HENZES: The date of the report.

24 BY MR. PURICELLI:

25 Q Well, there's a date up here of 12-17-06.

1  A  Okay. Let me –

2  Q  And that says "Prosecution" here?

3  A  Prosecution Declined?

4  Q  Uh-huh.

5  A  Okay.

6  Q  Do you know who wrote that there?

7  A  That looks like –

8  MR. HENZES: Well, here's the second date of the report, or the other

9  one he signed off. It's on page six. His initials are on pages six and seven.

10  MR. PURICELLI: Right.

11  MR. HENZES: Page six had a date on it of August 13th.

12  MR. PURICELLI: Okay.

13  A  Okay. I would have wrote that date.

14  BY MR. PURICELLI:

15  Q  You would have wrote that date?

16  A  Uh-huh.

17  Q  And your signature is down on the bottom?

18  A  Yes.

19  Q  Okay. And how did you know prosecution had been declined on

20  12-17 –

21  A  That was the date of investigation.

22  Q  Is that a double-0 or 06?

23  A  06.

24  Q  Alright.

25  A  12-17-06. So this is kind of like my record keeping block because this

1  is where the report gets coded for UCR entries and things like that that I also do.

2  Q     Uh-huh.

3  A     So the date of the report is 12-17-06. He puts in the body that the
4  District Attorney's office is not seeking prosecution. The investigation is closed.
5  Well, the investigation is closed because prosecution is declined. It's exceptionally
6  clear that I have to put in the date because I need a date to close the report.

7  Q     How do you ordinarily submit a criminal investigation to the District
8  Attorney's office for a decision on whether to prosecute or not prosecute?

9  A     I don't know that we normally – we have a set way. It's not
10 uncommon for us to fax them over, so they generally will have a copy of them
11 anyways. Or in the past we have called them up and discussed the case over the
12 phone; and in the past we've gone over and had a sit-down with the District
13 Attorney, or the District Attorney has come over to the barracks and we've
14 discussed cases.

15 Q     In the investigation that we're looking at in this Incident Report how
16 was that investigation turned over to the District Attorney's office?

17 A     How was it?

18 Q     Yes.

19 A     I don't know. I know John – we had discussed it with John. I don't
20 know if Trooper Whisner faxed it over to him, or whether he provided him with a
21 copy.

22 Q     And did you specifically have any conversations with John Cowley
23 about whether you should or shouldn't prosecute the case?

24 A     I don't know if I did or not. I know that we discussed the case.

25 Q     How many times did you discuss the case?

1     A     I recall discussing it with him once.

2     Q     Early on, middle, or late, do you know?

3     A     I don't recall.

4     Q     Well, your first entry is what, August, your first notation?

5     MR. HENZES: His first initial, yes. Is that your initials on this page?

6     CORPORAL WHEELER: That's my initials, yes.

7     MR. HENZES: On page six.

8     MR. PURICELLI: Page six.

9     MR. HENZES: That's your initials?

10     CORPORAL WHEELER: Yes.

11     MR. HENZES: And what's the date of this report?

12     CORPORAL WHEELER: 8-13-06.

13             DIRECT EXAMINATION (Continued)

14 BY MR. PURICELLI:

15     Q     8-13?

16     A     Right.

17     Q     So the investigation comes in what, 2-23-06?

18     A     Uh-huh.

19     Q     You see the report to supervisor for the first time six months later?

20     A     Yes.

21     Q     Okay. Were you having conversations with Whisner during that

22 six months?

23     A     I believe we may have spoken about it a couple times.

24     Q     Do you have any direct recollection of meeting with Whisner and

25 speaking about this investigation?

Case 2:07-cv-04936-MAM   Document 55-30   Filed 10/01/10   Page 9 of 11

31

1  A    No, not of any substance. I believe that he at some point spoke with
2  Trooper Smith, who would have been in our Fugitive Unit, about attempting to
3  locate an address for Sarah because we thought that she had moved out of town.
4  I think the emphasis that we placed on it was that we needed to determine where
5  she was, and where the children were, and at that point, you know, if there were
6  sufficient – if it merited prosecution, then that would be a determination that was
7  by Mr. Cowley.
8  Q    When you went – go ahead. I didn't mean to interrupt you.
9  A    I don't specifically remember any specific conversation with Trooper
10 Whisner.
11 Q    Okay. And would that be fair to say in that same six months you have
12 no specific recollection of telling him, "Well, you should do this, or you should do
13 that to find the kids.", or "You should go to this place and that might lead you to
14 someplace.", did you do anything like that?
15 A    Someone – or I became aware of it – and I don't know if I suggested
16 that he speak with Trooper Smith, or if someone else had suggested that he speak
17 with Trooper Smith and – I was aware of it – use any tools that he had at his
18 disposal through the Fugitive Apprehension Unit to look under various data bases
19 that they have to do searches for Labor and Industry and things like that.
20 Q    Okay. When you spoke to Sergeant Tripp do you recall about what
21 you said, or words to what effect you told him?
22 A    I don't specifically recall them. I told him that it was an odd case.
23 Q    How did he respond?
24 A    Not something ordinary. I expressed concerns that we would have to
25 handle this relatively delicately because we needed to get a determination as to

1   whether or not there was an actual offense that has occurred. It was an unusual
2   case once we started looking at it.
3       Q   Alright.
4       A   And the fact that, again, Mr. Bush had came to us immediately after
5   the PFA had expired, we were unsure – or unaware of any contact that he had had
6   with them, you know, prior to the expiration of that because I believe it was a "no
7   contact order".
8       Q   Right. So there was no violation, correct? The fact that he obeyed
9   the order –
10      A   Not that I can specifically tell you of here. Then we have –
11      Q   Well, my point is: If it was a "no contact order", it wouldn't have been
12  unusual that he wouldn't have had contact, right; that would be explainable?
13      A   It would be –
14      Q   He wouldn't know where his kids were because he had no contact?
15      A   Yeah, uh-huh.
16      Q   Okay.
17      A   But that's – that's not really the crux of the issue. The crux of the
18  issue is we have many PFAs, you know, that are "no contact" –
19      Q   And you had –
20      A   – and the Defendant will know exactly where they are.
21      Q   Okay.
22      A   Or will have contact with family members, or whatever. This was not –
23      Q   So the fact that he had a "no contact order" means he wasn't to have
24  have any contact, okay. It just meant he obeyed it, had no contact, and didn't know
25  where they were?

1   A   Well, I'm not going to say that he obeyed it and didn't know where
2 they were, but that, as a general principle, would be –
3   Q   Okay. Well, what evidence did you have that he knew where the
4 children were?
5   A   I didn't have any evidence.
6   Q   Okay. But you can't say he did know where they were?
7   A   No.
8   Q   I'm just trying to understand why you said that.
9   A   No, no.
10   Q   Alright.
11   A   It was an odd case.
12   Q   How many violations of 2909 do you recall your barracks investigating
13 before Mr. Bush's?
14   A   It's very odd.
15   Q   Did you consult the statute?
16   A   Yes.
17   Q   Okay. So you knew that a person – a parent could not remove the
18 children and conceal them from another parent?
19   A   Uh-huh.
20   Q   Okay. And you knew that was a Felony of the Third Degree because
21 it says that right in the paragraph, doesn't it?
22   A   Excuse me?
23   Q   You knew it was a Felony of the Third Degree because it's right here,
24 it says, "Felony of the Third Degree"?
25   A   Uh-huh.