1   Q   Do you see it? It's like about the third line down in the second column
2   over.
3   A   Well, could I get the whole statute?
4   Q   Yes, we probably could if we had the cut off portion.
5   A   Because I think there might be something in the entire statute that –
6   Q   Okay.
7   A   – goes to the crux of this.
8   Q   Well the crux of this is what; that the children were being concealed
9   or they weren't, right?
10  A   No, it's to whether or not it's a reasonable response to child abuse or
11  domestic. So I'd really like to see the entire statute prior to discussing the whole
12  thing.
13  Q   Alright, let's take a break. I'm sure we can find it. I'm here to make
14  you feel comfortable, not trick you.
15  A   Alright. I like that.
16      (Two minute recess taken at 3:59 p.m.)
17      MR. PURICELLI: Okay, we're back on the record.
18              DIRECT EXAMINATION   (Continued)
19  BY MR. PURICELLI:
20  Q   Have you had a chance to look at the whole statute now?
21  A   Yes.
22  Q   You said there was a crux to something?
23  A   Well, I believe what we were looking at was the child's place of
24  residence and whether or not she caused the child to be removed from that place
25  of residence, because it was our understanding that she had custody of the children.

| | | |
|---|---|---|
| 1 | Q | That custody was under a PFA Order, wasn't it? |
| 2 | A | I don't know. |
| 3 | Q | You don't know, okay. |
| 4 | A | Was it? But that's where it was at the time when she left, so we |
| 5 | | have – |
| 6 | Q | You guys weren't familiar with the decision in Gruber? |
| 7 | A | Who? |
| 8 | Q | Gruber. |
| 9 | A | Gruber? |
| 10 | Q | Uh-huh. There's a law in Pennsylvania that says that a parent can't |
| 11 | | remove their child, with or without a custody order, from even the county without |
| 12 | | court permission. |
| 13 | A | No, at that time I wouldn't say that I was. |
| 14 | Q | Alright. Did you consult any lawyer like the District Attorney to find out |
| 15 | | whether a parent, even with custody, could remove the child? |
| 16 | A | At some point Mr. Cowley was brought into the loop, but I don't know |
| 17 | | when. |
| 18 | Q | Alright. |
| 19 | A | And if that's the – |
| 20 | Q | Where did the children actually reside, from your investigation, or |
| 21 | | your review of this investigation? |
| 22 | A | I think they found them in Virginia. |
| 23 | Q | They found them in Virginia. |
| 24 | A | Okay. |
| 25 | Q | But when Mr. Bush came to you in 2006, in February, what was the |

1  residence of the children?
2  A   I don't know.
3  Q   What county did they live in?
4  A   Tioga.
5  Q   Tioga. When did they leave Tioga –
6  A   Well, when Mr. Bush came to us?
7  Q   Yes, February.
8  A   I don't know.
9  Q   Where were they in school?
10  A   I don't know.
11  Q   Where were their medical records?
12  A   I don't know.
13  Q   When you consulted Mr. Cowley, the District Attorney, what questions
14  did you ask him?
15  A   I don't know that I asked him any specific questions. I think we just
16  kind of discussed the case and, "Okay. Well, is this something that meets the
17  statue on its face?"
18  Q   What did he tell you?
19  A   I believe he wanted us to locate her, or at least make contact with her,
20  and then he would make a determination. I believe is –
21  Q   Did you have any written communications from him?
22  A   I don't specifically recall anything. There may have been.
23  Q   Did he tell you to investigate any Private Criminal Complaints related
24  to the children being missing?
25  A   I don't recall, but we would investigate Private Criminal Complaints

1  anyway, because he generally wouldn't accept them.

2  Q    Now the report of February 23, 2006, –

3  A    Uh-huh.

4  Q    – that is the day you started Mr. Bush's investigation, correct?

5  A    That should have been the day that Mr. Bush came on-station.

6  Q    Okay. What was the date you recall if that's not the correct date?

7  A    I don't recall a specific date when he did. I just know that he – I'm

8  positive that he came in, and I'm positive that I spoke with him, and Trooper

9  Whisner did. I'm assuming that that is the date because that's the date that

10  Trooper Whisner put on his report.

11        (Brief pause. Corporal Wheeler reviewing a document.)

12  A    Yes, 2-23-06.

13  Q    Alright. So for the purposes of reporting we would say that the State

14  Police actually started investigation into the missing children on 2-23-06?

15  A    I believe.

16  Q    Okay. And before that date you have no direct recollection of the

17  District Attorney, John Cowley, telling you to investigate the Bush children missing?

18  A    I don't recall him.

19  Q    I'll show you what we've marked as Cowley Exhibit No. 5. It's a letter

20  dated February 23, 2006.

21  A    Okay.

22        MR. HENZES: Are you going to show him the letter?

23        MR. PURICELLI: I am.

24        MR. HENZES: Okay.

25        (Mr. Puricelli handed a document to Corporal Wheeler.)

1  BY MR. PURICELLI:

2  Q   Have you ever seen that letter before? You can't take the yellow off.

3  A   Oh, I can't? I'm sorry.

4  Q   It's not our yellow sticky.

5  A   Okay.

6  MR. HENZES: Well, he can take it off and put it back on when he's

7  looked at the letter.

8  MR. PURICELLI: I was trying not to alter things from the way they

9  were found.

10  (Brief pause. Corporal Wheeler reviewing a document.)

11  BY MR. PURICELLI:

12  Q   Do you recall receiving that letter?

13  A   I may have.

14  Q   Well, I know a lot of things may have happened, my question is: Do

15  you recall –

16  MR. HENZES: Do you have a recollection of receiving that?

17  A   I don't specifically have a recollection of receiving this letter.

18  BY MR. PURICELLI:

19  Q   Now that's, coincidentally, the same date that Mr. Bush was in your

20  office?

21  A   Yes.

22  Q   Uh-huh. And if the District Attorney has sent you that letter asking

23  you to investigate –

24  A   Uh-huh.

25  Q   – the same thing you're already investigating would there be a reason

1  you would tell me it's not in this report, or noted anywhere in this report?

2  A    It's not noted anywhere in the report? It may have never been made
3  an attachment to the report.

4  Q    Do the State Police Regulations say that anything having to do with
5  an investigation has to be made an attachment to the investigation?

6  A    It's generally accepted that attachments are supposed to be attached.

7  Q    If the District Attorney's office is sending you an attorney's exhibits for
8  you to use for the investigation, wouldn't that be part of the investigation packet
9  then?

10  A    An attorney's exhibit to –

11  Q    Well, if you read the letter he says there's a packet from an attorney,
12  doesn't he?

13  A    Uh-huh.

14  Q    That goes along with that letter, correct? Do you ever recall receiving
15  a packet from the District Attorney's office, John Cowley, to be used to investigate
16  the children which you are, in fact, allegedly investigating?

17  A    It's possible that I did. If that's the case, I would have given it to
18  Trooper Whisner.

19  Q    And he would have made it a part of it?

20  A    He should have, yes.

21  Q    For what reason wouldn't he do it?

22  MR. HENZES: Who?

23  BY MR. PURICELLI:

24  Q    Whisner. If he received it?

25  A    I couldn't tell you why Trooper Whisner wouldn't do that. He should

1  have.

2  Q   And he –

3  A   Unless it was duplicative of information that he had already received
4  from Mr. Bush, or something along those lines.

5  Q   Wouldn't he then have made a notation in the report for you to sign off
6  on, saying that you gave him certain documents, so that the chain of evidence was
7  maintained?

8  A   No, it's not specific evidence.  It's not physical evidence that we would
9  have necessarily packaged and put into evidence.

10 Q   How do you know what was in that packet if it wasn't evidence?

11 A   Well, I don't.

12 Q   Right, that's my point.  How do you know something is evidence in an
13 investigation that's ongoing?

14 A   If he's just giving us documents –

15 Q   Uh-huh.

16 A   – then they may not be of evidentiary value.

17 Q   How do you know?

18 A   I don't have an answer for that.

19 Q   So if they turned out to have an evidentiary value later, –

20 A   Then they should have –

21 Q   – how would you be able to establish the chain –

22 A   Well, we wouldn't be able to.

23 Q   – if it wasn't in the report?

24 A   We wouldn't be able to.

25 Q   You wouldn't.

1   A   Other than by direct testimony.

2   Q   So isn't it training in the State Police in an important investigation that
3   everything gets listed so you can always establish the chain of evidence?

4   A   That's certainly accepted, yes.

5   Q   And that's not in that report to indicate that that letter and those
6   documents actually were sent to you, is it?

7   A   No.

8   Q   And you have no direct recollection of ever receiving a packet from
9   the District Attorney, do you?

10  A   I don't have any direct knowledge. If I did, like I said, I probably would
11  have just given it to Trooper Whisner.

12  Q   Right. Aside from the one time that you spoke with Trooper Tripp,
13  Sergeant Tripp, did you have any conversations from that day to present –

14  A   Uh-huh.

15  Q   – with Tripp about David Bush?

16  A   Yes.

17  Q   And what is the most recent conversation you had with Tripp that
18  regarded David Bush?

19  A   That would have been right after his deposition.

20  Q   Right after his deposition?

21  A   I believe right after his deposition; within the last several weeks.

22  Q   Okay. And what did you two talk about?

23  A   He called me up and said that Mr. Henzes would be looking for me.

24  Q   Is that all he told you?

25  A   Yes.

1    Q    Okay.

2    A    Relative to the Bush case.

3    Q    Did he talk to you —

4    A    I said, "What ever went on with that?", and he told me that — because I guess my understanding was one of the Bush's — Mr. Bush's brother had been fired because he had entered the kids into NCIC. I said, "Well, what ever happened?" because my understanding was that David Bush had been arrested in Virginia, and I never heard any outcome of the case.

9    Q    Well, that's a lot to talk back on, but before he called you and told you "I've been deposed", because I'm assuming that's how you knew he was deposed, he told you, right?

12   A    Well, he said that he had been — he and Major Hill had been deposed, and that I needed to contact — your are Mr. Henzes, is that correct, I suspect?

14   MR. HENZES: Yes.

15   BY MR. PURICELLI:

16   Q    So Tripp called you and said that Major Hill had been deposed?

17   A    I believe he said that both of them had, or were going to be.

18   Q    I don't know. I wasn't there for your conversation, but tell me?

19   A    Yes, that was the basic substance, that they had been deposed, or they were going to be deposed, and that I needed to speak with —

21   Q    Mr. Henzes?

22   A    — the attorney because I would probably be getting deposed.

23   Q    Well, I assume at some time you talked to Mr. Henzes?

24   A    I did.

25   Q    Well, in the distance of time from the time Tripp called you and the

Case 2:07-cv-04936-MAM   Document 55-31   Filed 10/01/10   Page 10 of 11

43

|   |   |   |
|---|---|---|
| 1 |   | time Mr. Henzes was contacted, how much time had passed? |
| 2 | A | I didn't get a chance to call Mr. Henzes the day that I spoke with Sergeant Tripp because I was going over to Coudersport to the range to qualify. So it would have been a matter of two days maybe, three days. It was shortly thereafter. |
| 6 | Q | Okay. |
| 7 | A | I believe I – |
| 8 | Q | Do you recall the date? |
| 9 | A | I don't. |
| 10 | Q | Do you recall how far distance in time it was from today? |
| 11 | A | A couple weeks back. |
| 12 | Q | Alright. Two weeks back? |
| 13 | A | Two weeks, three weeks. |
| 14 | Q | Three weeks? |
| 15 | A | Three weeks probably. |
| 16 | Q | Alright, okay. So no later than three weeks from today is when Tripp talked to you, the soonest in time? |
| 18 | A | Roughly. I mean that's – a month. Whenever Tripp's – |
| 19 | Q | Okay. |
| 20 | A | Because I don't want to get caught later saying, "Okay. Well you were insistent that it was no later than three weeks", because if it was three weeks and a day, then – |
| 23 | Q | I'm not that way. I just want to try and start a time line, that's all I wanted to do. |
| 25 | A | And that's what I'm trying to give you. It was – |


```
 1   time Mr. Henzes was contacted, how much time had passed?
 2        A    I didn't get a chance to call Mr. Henzes the day that I spoke with
 3   Sergeant Tripp because I was going over to Coudersport to the range to qualify.
 4   So it would have been a matter of two days maybe, three days. It was shortly
 5   thereafter.
 6        Q    Okay.
 7        A    I believe I –
 8        Q    Do you recall the date?
 9        A    I don't.
10        Q    Do you recall how far distance in time it was from today?
11        A    A couple weeks back.
12        Q    Alright. Two weeks back?
13        A    Two weeks, three weeks.
14        Q    Three weeks?
15        A    Three weeks probably.
16        Q    Alright, okay. So no later than three weeks from today is when Tripp
17   talked to you, the soonest in time?
18        A    Roughly. I mean that's – a month. Whenever Tripp's –
19        Q    Okay.
20        A    Because I don't want to get caught later saying, "Okay. Well you were
21   insistent that it was no later than three weeks", because if it was three weeks and a
22   day, then –
23        Q    I'm not that way. I just want to try and start a time line, that's all I
24   wanted to do.
25        A    And that's what I'm trying to give you. It was –
```

| | | |
|---|---|---|
| 1 | Q | So within a month ago – |
| 2 | A | Yes. |
| 3 | Q | – was the last contact you had with Tripp – |
| 4 | A | Yes. |
| 5 | Q | – about the Bush case? |
| 6 | A | Yes. It would have been the day that he called me, and again, it was |
| 7 | | to tell me that I needed to get with Mr. Henzes, and that was the discussion. |
| 8 | Q | And the extent of the discussion is what you said on the record? |
| 9 | A | Yes, the extent of the discussion was that he and the Major either had |
| 10 | | been deposed, or were going to be deposed, and that I needed to speak with |
| 11 | | Mr. Henzes. And at that point I said, "Well, what ever became of this?" because I |
| 12 | | had heard quite a while back that some sort of civil suit had been filed and Tripp |
| 13 | | had been – I asked him who was even named because I was unaware that Tripp |
| 14 | | left. |
| 15 | Q | You had also mentioned something about also hearing that Mr. Bush |
| 16 | | had been arrested in Virginia? |
| 17 | A | Yes. |
| 18 | Q | How did you – |
| 19 | A | It's in the report. |
| 20 | Q | Yes, it is, but I didn't think you read the whole report? |
| 21 | A | What's that? |
| 22 | Q | Did you read the report? |
| 23 | A | Yeah. |
| 24 | Q | Okay. When was the last time you read it? |
| 25 | A | Back in 06. |