1  Q   Okay.
2  A   Well, let me – let me look because the last time I read it would have
3  been the date of the last supplemental.
4  Q   Would it be fair to say that –
5  A   I don't recall what date that was.
6  Q   – whatever the last date you signed off is the last date you read it?
7  A   Yes.
8  Q   Okay. So nobody gave it to you later on and said, "You need to read
9  this"?
10 A   No.
11 Q   Okay. And did anybody give you anything to read to prepare for
12 today?
13 A   No.
14 Q   Did you talk to anybody other than Mr. Henzes about coming today,
15 and this conversation you're speaking about with Tripp?
16 A   I don't believe so. I might have spoke with Mr. Cowley about it.
17 Q   Well, we know in December of 2006 you have indicated that you
18 probably spoke to him then?
19 A   Right.
20     MR. HENZES: Spoke to whom?
21     MR. PURICELLI: Cowley.
22     MR. HENZES: Okay.
23 BY MR. PURICELLI:
24 Q   So we've got two and a half years?
25 A   Yes.

1  Q  In the two and a half years –

2  A  Well, we're going on three and a half years.

3  Q  Yes, 2006.

4  A  Yeah.

5  Q  Okay. I'll give you three and a half years. In the three and a half
6  years you never spoke with Cowley about the Bush investigation that's in front of
7  you, right?

8  A  I don't recall ever, even informally. I had heard, like I said, that –

9  Q  I know there's grapevines within the barracks, so I mean –

10  A  Excuse me?

11  Q  I know there are informal grapevines, you hear things, and people
12  talk.

13  A  I – like I said, I had heard later on that – and this was even, I believe,
14  after Sergeant Tripp had transferred to Montoursville, that he and the Major had
15  been – had had a civil suit filed on them. That's pretty much all until, again,
16  Sergeant Tripp called me a month or so ago back. I don't specifically recall
17  anything else about it.

18  Q  Did you have any contact with Trooper McDermott?

19  A  Corporal McDermott or Trooper McDermott?

20  Q  Corporal. I call everybody a Trooper. Corporal McDermott?

21  A  Well, because there's a difference.

22  Q  Oh, okay. Is there?

23  A  We have a couple Trooper McDermott's and a Corporal McDermott.
24  Regarding this case?

25  Q  Uh-huh.

1   A   I don't specifically remember any.

2   Q   Did you talk to anybody named McDermott in regards to the arrest

3   of Christopher Bush?

4   MR. HENZES: David Bush.

5   BY MR. PURICELLI:

6   Q   David Bush? I think Matthew is his first name.

7   A   Who?

8   MR. BUSH: Matthew, Matthew McDermott.

9   BY MR. PURICELLI:

10  Q   Trooper McDermott?

11  A   Okay. Because his father is the Crime Unit Supervisor in

12  Montoursville.

13  Q   Okay.

14  A   It would be John McDermott.

15  Q   Okay. Well, this is Matt.

16  A   No, I don't think so. I don't specifically remember it.

17  Q   If you were –

18  A   If you have something to refresh my memory then?

19  Q   Did anybody call you, including Matthew McDermott, for background

20  information about your investigation in order to aid them on an investigation that

21  they were conducting?

22  A   I don't specifically remember it, but again –

23  Q   You have no recollection of being contacted on or about October 24th,

24  2006?

25  A   No, not specifically.

1    Q    Did Sergeant Tripp contact you on or about October 24th, 2006 and

2 ask you about the investigation that we've classified as the Whisner investigation?

3    A    It's possible.

4    Q    Anything is possible in the world.

5    A    Yeah, I know. It's quite possible that he did.

6    Q    Do you have any direct recollection?

7    A    Well, I'm thinking that possibly after he – after he transferred to

8 Montoursville he may have been down there and told me that he had received

9 notice of a suit, or the Major had.

10    Q    Aside from that?

11    A    I don't – I'm not – I don't specifically remember anything.

12    Q    Okay.

13    A    I mean if you have something you want to show me I'll look it over

14 and I'll – go ahead.

15    MR. PURICELLI: I'm going to mark that.

16    (Whereupon, a document was marked for identification as

17    Wheeler Deposition Exhibit No. 2.)

18    BY MR. PURICELLI:

19    Q    Have you ever seen this document before?

20    A    This one?

21    Q    Yes.

22    A    No. No, it's a Montoursville document.

23    Q    Yes, I know it's from Montoursville.

24    A    And my signature is not on it. So no, I –

25    Q    Right. The thing is, it deals with Mrs. Bush, Serena Bush, coming

1  there to have her children declared as missing children, doesn't it?

2  A      I'm trying to figure it out here. "I was contacted by the Virginia State
3  Police" –

4  Q      You never saw it before?

5  A      I have not seen this before.

6  Q      Alright. Now you told me that you had concerns about where the
7  children actually lived, and that was a major crux as to whether you could pursue
8  the concealment charge, did I understand that correctly? You remember I went
9  through all those questions about it?

10 A      Yes. Again, it was an odd case.

11 Q      I'll grant you that.

12 A      From the get go I was concerned as to whether or not this really
13 arises to the level of criminal conduct because at the point where they went
14 missing, for lack of a better word, they were with the parent who had custody at
15 the time.

16 Q      Why would the Montoursville Barracks be involved with the Bush
17 children?

18 A      I don't know. That's what I'm trying to read.

19 Q      Alright. Don't worry about reading it; I want to know in your mind.
20 I don't want to know what somebody else's mind was. I can read that too.

21 A      I don't know why they would be. I don't know why they would have
22 called there instead of Mansfield, other than the fact that Montoursville –

23 Q      When did Tripp leave to go to –

24 A      – is the Troop Headquarters.

25 Q      When did Tripp leave to go to Montoursville?

1      A      I couldn't tell you. We've had – I'll qualify that.

2      Q      Okay.

3      A      We've had, I believe, around our ninth Station Commander since I've
4 been there in 1998.

5      Q      Wow. These guys aren't hunters who are coming, or what?

6      A      So the time frames of them coming and going – since Tripp left I
7 believe we're on our third, so I can't tell you even in a generalization.

8      Q      But you don't recall when Tripp left?

9      A      No. I believe he left before this investigation was concluded, but I'm
10 not positive.

11      Q      "This" being the Whisner investigation; your investigation from your
12 barracks?

13      A      I would say it would be the Bush investigation.

14      Q      Well, we have two Bush investigations, so I identified it by the name –

15      MR. HENZES: The investigation conducted by Trooper Whisner?

16      MR. PURICELLI: Correct.

17      A      Yes.

18      MR. PURICELLI: Alright.

19 BY MR. PURICELLI:

20      Q      Because the investigation done by McDermott in Montoursville
21 involved Mrs. Bush, correct? I mean I know you didn't get it.

22      A      I have no idea, and I haven't read it.

23      Q      I know.

24      A      So Serene is Mrs. Bush?

25      Q      Yes. Okay. I guess you didn't know that from your report?

1   A   It didn't stick out in my mind.

2   Q   It didn't click?

3   A   Well no, it's been so long that –

4   Q   I'm just funning with you a little bit.

5   A   – these two things start to run together.

6   (Nine minute recess taken at 4:22 p.m.)

7   MR. PURICELLI: Okay, we're back on the record.

8   DIRECT EXAMINATION (Continued)

9   BY MR. PURICELLI:

10  Q   Okay. Can you answer my last question, Corporal Wheeler?

11  A   I may have been remotely aware that she showed up down there,

12  but it's not – it was all after the fact, and our investigation, I believe, was closed at

13  that point.

14  Q   Well, it was twelve-something – 12-01-06 wasn't it that you have

15  "Declined Prosecution" on page six?

16  A   Right. But I mean it would have been wrapped up, as in – as in –

17  Q   Well, they didn't do anything about it.

18  A   Who didn't do anything about it?

19  Q   That's what I'm saying, when you say it was "wrapped up", that's

20  saying "We ain't doing anything more because there's no prosecution".

21  A   No, it's being wrapped up in that –

22  Q   Now the notation you have, Corporal Wheeler, about 12-17-06, –

23  A   Yes.

24  Q   – you've identified that as your handwriting?

25  A   That is my handwriting.

1   Q   Okay. But –

2   A   I'm very confident that it is.

3   Q   Here's my issue with that, okay?

4   A   Okay.

5   Q   There's no notation anywhere in there about a conversation with Cowley though. Why is that?

7   A   From my part?

8   Q   Uh-huh. You say you're the one that wrote that, so that must mean you had the conversation?

10   MR. HENZES: No, no, no, he wrote the date.

11   A   No, no, no, no, I wrote that. (Indicating)

12   MR. HENZES: The date.

13   A   I didn't do this Supplemental. I just signed off on this.

14   BY MR. PURICELLI:

15   Q   No, I understand that, but if you spoke to Cowley, you would have had to write a report, wouldn't you?

17   A   Not necessarily.

18   Q   Well, that's not what the regulations say.

19   A   I don't document everything that – it may have been a conversation that Trooper Whisner and I both had with Cowley that's documented here.

21   Q   Alright.

22   A   I don't specifically recall.

23   Q   But then he would have noted a conversation with you, wouldn't he, in his report, and you would have signed off on it, correct?

25   A   He probably should have, yes.

1  Q  Right. And you were the supervisor to make sure the Investigation
2  Reports were complete, accurate, and detailed, isn't that true?
3  A  Right, uh-huh.
4  Q  Because that's what the State Police tell you about reports, isn't it?
5  A  Right.
6  Q  And that's what I said in the beginning; they are very particular about
7  their rules, aren't they?
8  A  Correct.
9  Q  And this particular report doesn't indicate any conversations with
10 Cowley, does it?
11 A  It doesn't specifically detail a conversation with Mr. Cowley, no.
12 Q  Nor do they detail conversations with Tripp that you say you had,
13 isn't that true?
14 A  That's correct.
15 Q  Why is that?
16 A  An oversight.
17 Q  An oversight? One of the most unusual investigations up here –
18 A  Yes.
19 Q  – and it's an oversight?
20 A  Yes.
21    (Brief pause.)
22 BY MR. PURICELLI:
23 Q  So there are events occurring that aren't in the reports?
24 A  Admittedly so.
25 Q  And you've had a chance now to see that there were events occurring

1  over in Montoursville that occurred after your investigation, correct?

2      A    Correct.

3      Q    Does the State Police have a system where they can find out if there's

4  an ongoing or a closed investigation file?

5      A    Yes

6      Q    And what would that system be?

7      A    That would be – we call it a QIC, or a Query Initial Crime Data Base

8  that we maintain.

9      Q    Okay.  And your computer systems are monitored and trackable,

10 meaning we could find – you could find out who accessed that data bank, correct?

11     A    They tell us they can.

12     Q    They can.

13     A    Okay.

14     MR. HENZES: Are you answering questions, or is he answering

15 questions?  He has answered your question.

16     MR. PURICELLI: He says they do, and we both know they can.

17     MR. HENZES: No, he said –

18     A    No, I –

19     MR. HENZES: He answered the question, Brian.  Next question?

20 Come on.

21     MR. PURICELLI: Alright.

22 BY MR. PURICELLI:

23     Q    Now is it your testimony no one, including Tripp, told you McDermott

24 was investigating the other side of the coin, if I can describe it that way, of Sara

25 coming in and saying her kids were missing?

1      A      I may have been made aware of that when it took place, but it was after the fact. It was conducted down in Montoursville, and it would have been just like an aside. I –

4      Q      Well, the report indicated Tripp knew about it, correct?

5      A      Hold it. That –

6      Q      Tripp knew about McDermott's investigation?

7      A      That report indicates that Trooper McDermott talked to Corporal Tripp – or excuse me, Sergeant Tripp about it, yes.

9      Q      Right. And did Tripp tell you, "Oh, by the way, there's the other side going on down in Montoursville now, Sarah is down there trying to say the kids are missing"?

12      A      I know – I'm confident that at some point I was made aware that the kids were removed on behalf of Mr. Bush in Richmond, Virginia. I later became aware that it was through a Court Order that was issued in Luzerne County.

15      Q      Uh-huh. And who is making you aware of all this?

16      A      I don't recall. I'm thinking that it was in here.

17      Q      Look at anything you want there.

18      A      Yes. Alright. And that's what it was, and this is 12-17. But this would have been after – after that. But that took place in between these two.

20      Q      "That" being the McDermott investigation?

21      A      Yes.

22      Q      Okay. Just for the record.

23      A      Yes. So I did have some knowledge of a Court Order being filed in Luzerne County, and –

25      Q      But you don't know who is telling you that?