| | | |
|---|---|---|
| 1 | A | I don't specifically – |
| 2 | Q | You don't recall? |
| 3 | A | I don't recall, no; I do not. I know it was in the report, it was in the report that I signed off on. I don't remember if I specifically had a conversation with Trooper Whisner about it, or if I just learned it from here, or if Tripp gave me a heads-up and said that she had showed up in Montoursville. But again, this was all after the deal in Richmond. |
| 8 | Q | Who made the decision not to place the Bush children in NCIC? |
| 9 | A | I guess ultimately – |
| 10 | Q | Don't guess. |
| 11 | A | – it would have been mine. |
| 12 | Q | You made a decision – you consciously told Whisner. "Don't put them in NCIC"? |
| 14 | A | That would have been my decision. |
| 15 | Q | I know it would have been, but did you tell him to do that? |
| 16 | A | I don't know if I specifically did, but I probably said that we wouldn't be putting them in. |
| 18 | Q | Okay. If you don't know, who would know if you did it? |
| 19 | A | Who would know? |
| 20 | Q | Yes, because that's how you answered the question. |
| 21 | A | Trooper Whisner. |
| 22 | Q | Alright. And wouldn't he have put that in the report, that you specifically instructed him not to put the children in NCIC? |
| 24 | A | He may have; he may not have. |
| 25 | Q | Well, if you read the report he doesn't. |

1   A   Right.

2   Q   Why wouldn't he do that?

3   A   I don't have an answer for that.

4   Q   What other decisions are being made that aren't in the report?

5   A   I'm not aware of anything specific. If you have a specific question I'll
6   be happy –

7   Q   Let me put it this way: You're having conversations with people about
8   your investigation that isn't in your report?

9   A   Okay.

10  Q   One of which is Tripp.

11  A   Okay.

12  Q   You're making, according to your testimony now under oath, a
13  decision to tell a person "Don't put the children in NCIC", is that what you're saying?

14  A   I'm saying that I would have been part of that decision.

15  Q   I'm asking who made the decision, not part of it.

16  A   I can't –

17  Q   Who made the decision?

18  A   I can't tell you, but ultimately it would have –

19  Q   Who do you answer to?

20  A   I answer to Sergeant –

21  Q   Sergeant Tripp?

22  A   – or I did answer to Sergeant Tripp.

23  Q   Did Sergeant Tripp tell you not to put the children in NCIC?

24  A   No, I don't ever specifically recall him telling me not to.

25  Q   Did he talk to you about putting the children in, or not putting the

1    children in?

2    A    We may or may not have discussed it, and the applicability of NCIC as it relates to the children.

4    Q    Okay. Why would you need his permission, if you did, to place the children in NCIC under 2908?

6    A    I wouldn't.

7    Q    2908, from your understanding, requires the Police Officer to do what with the children?

9    A    Where's the section? Let me read it again.

10    Q    Okay.

11         (Brief pause to locate 2908.)

12    A    Okay.

13    Q    It requires you to put the children in and investigate, right?

14    A    Missing children, yes.

15    Q    Right. And you said the crux of this case was you didn't know if they were –

17    A    Missing.

18    Q    – residents of Tioga County?

19    A    Missing or not.

20    Q    Did you know where they were?

21    A    No, I did not know where they were.

22    Q    What is the definition in the statute for "missing"?

23    A    I don't think we've crossed that line yet.

24    Q    We didn't. What is the definition for "missing"?

25    A    I would have to refer to the statute for the specific legal definition of

1     "missing".

2     Q    Did you ask Mr. Cowley?

3     A    I don't believe so.

4     Q    What did you rely on to find out whether or not they were missing

5 under the terms of that statute, 2908?

6     A    I believe that we had a conversation, and they didn't, per se, meet

7 the definition of "missing", or what we thought was missing. Mr. Cowley wanted us

8 to locate Sarah and the children, and to determine that they were in good health

9 and nothing was wrong with them, and then the point would be –

10     Q    And did you locate them?

11     A    No, I don't believe we did.

12     Q    So within your ability to find them they were missing, you couldn't

13 find them, could you?

14     A    No, I couldn't.

15     Q    But you did investigate and knew that they did at some time live in

16 your jurisdiction, correct?

17     A    We knew that they lived in Tioga County at some point, yes.

18     Q    And you also knew sometime during the PFA she left?

19     A    She left with the children.

20     Q    You have an interview, not you personally, – the State Police

21 investigation shows that you went to her sister.

22     A    Okay.

23     Q    And she told you they left.

24     A    Okay.

25     Q    Okay. So were they missing from their residence under the training

1  the State Police gave you to enforce 2908 and 2909?

2  A    No, because they were with a parent.

3  Q    Doesn't 2909 say even if a parent removes them from another parent
4  the child is concealed?

5  A    But that child – or parent had custody of the child at the time.

6  Q    Did that Custody Order ever expire?

7  A    At some point I'm sure it did.

8  Q    Did it expire before or after Mr. Bush came to the barracks to report
9  his child missing?

10 A    Before, before.

11 Q    So when he came to you, the parent had children that she no longer
12 had sole and exclusive custody of under a Court Order, isn't that true?

13 A    I don't know.  I honestly don't know what the Court Order was.

14 Q    Then tell me how you resolved this crux that you say?

15 A    She was – they were with a parent.

16 Q    Did you go and check with the Social Security Administration to see
17 if she was working someplace?

18      MR. HENZES: Did he?

19      MR. PURICELLI: Yes.

20 A    No.

21 BY MR. PURICELLI:

22 Q    Did anybody that you were supervising do that?

23 A    I believe that was part of the assistance that Trooper Whisner would
24 have got from Trooper Smith.

25 Q    You believe that?

1     A    I believe.

2     Q    What reason do you have to believe that?

3     A    The Fugitive Unit has access to different data bases. That would have been the whole point; like Labor and Industry, and things like that.

5     Q    Okay.

6     A    So I guess my thought is that they would be avenues that another investigator would pursue. We provided him with a name, date of birth, and Social Security Number, and he would run it through his data bases and attempt to locate. And I think at some point he did.

10     Q    Did he locate her?

11     A    He had come up with an address, or there was an address in – no, he never located her, but he located an address perhaps in – somewhere out west is –

13     Q    Mexico, New Mexico?

14     A    – coming to mind. Yes.

15     Q    Would you be surprised to learn that – that you learned about that from Mr. Bush, not your investigation, not the State Police investigation?

17     MR. HENZES: When you say "you", are you asking about when he learned about it?

19     MR. PURICELLI: That's why I corrected it to say the "State Police" because I know it's not him. I know he's not doing the investigation.

21     BY MR. PURICELLI:

22     Q    And I don't mean to say you weren't, but you're the supervisor and you're the guy that everybody is saying was doing all the talking and doing here, so that's why you're here.

25     A    Okay.

1   MR. HENZES: Nobody said any of that. You asked who the Crime Supervisor was and we told you it was Corporal Wheeler, and that's who you wanted to depose. No one said he did anything. In fact, they told you it was Whisner who did the investigation.

MR. PURICELLI: That's not what Cowley was saying today. I'm not going to debate it with you, Randy.

MR. HENZES: Well, what Cowley says has nothing to do with why you wanted to depose Trooper – Corporal Wheeler here. We told you, and it's right there, that Trooper Whisner was assigned this investigation, and he told you, "I initialed them on the dates that are in front of me".

MR. PURICELLI: Okay. Are you done?

MR. HENZES: Yes.

MR. PURICELLI: Alright.

DIRECT EXAMINATION   (Continued)

BY MR. PURICELLI:

Q   Now while you were supervising Whisner, okay, –

A   Uh-huh.

Q   – you say he went to Smith?

A   I believe it was Trooper Smith at the time.

Q   And it's indicated in there that he went to Smith. It doesn't say what happened, but it's indicated in there.

A   Okay.

Q   And Smith – we don't know what he is because there's no indication what he does. What, if anything, should appear in the report from Whisner about what he found out from Smith?

1  A    On 3-11-06 Trooper Smith related that he had located two mailing

2  addresses, one used by Monserrate outside of PA, 3305 Kelly Court Northwest,

3  Apartment 921, Albuquerque, New Mexico.

4  Q    New Mexico.

5  A    So that's where Trooper Whisner put that he spoke with Trooper

6  Smith.

7  Q    On what date did he do that?

8  MR. HENZES: What date did he do what, speak with Smith, or what

9  date –

10  MR. PURICELLI: Yes.

11  MR. HENZES: – did he write the report?

12  MR. PURICELLI: Write the report?

13  BY MR. PURICELLI:

14  Q    Well, he indicates –

15  A    He says – the date indicated is 3-11-06.

16  Q    Okay. Now before March 11th, 2006 did you receive – or should it

17  be indicated in the report whether that address had already been turned over to

18  the State Police?

19  MR. HENZES: Should the report have indicated that they got that

20  information, is that your question?

21  MR. PURICELLI: Yes.

22  A    Yes.

23  MR. PURICELLI: Okay.

24  A    Yes. If they got that information it should have been indicated in here.

25  BY MR. PURICELLI:

1  Q   So if the information that Trooper Smith found had already been in
2  the hands of Whisner, no new information was learned?
3  A   Yes.
4  Q   Okay. And it's your testimony –
5  A   That's my understanding.
6  Q   – that you have no recollection of the February 17th, 2006 letter from
7  Cowley?
8        MR. HENZES: February 23rd.
9  BY MR. PURICELLI:
10 Q   Or February 23rd, indicating a packet being turned over?
11 A   I don't – I don't specifically recall it, no. I may have received it, and
12 if I received it I probably would have put it in Trooper Whisner's mailbox because
13 the letter is dated the same day that Mr. Bush came over, and it had already been
14 assigned to Trooper Whisner, so it would have been given to him to followup up on.
15 Q   When you spoke to Tripp about giving him a heads-up, did Tripp tell
16 you that he had all the information about Bush's history; he knew all about David
17 Bush?
18 A   No, I don't believe so.
19 Q   Did he indicate that he had never heard of him before?
20 A   I don't believe we ever discussed what he knew.
21 Q   Well, you said you wanted to give him a heads-up, and I want to see
22 what the reaction was. Did he say, "Who? I don't know this guy.", or something to
23 that effect?
24 A   No. I just brought it to his attention, because he was the Station
25 Commander, that "This is an odd case".

Case 2:07-cv-04936-MAM   Document 55-33   Filed 10/01/10   Page 10 of 11

65

1    Q    Right.  And I –

2    COURT REPORTER: Excuse me.  I have to change the tape.

3    MR. PURICELLI: Alright.

4    (Three minute recess taken at 4:45 p.m.)

5    MR. PURICELLI: Okay, we're back on the record.

6            DIRECT EXAMINATION   (Continued)

7    BY MR. PURICELLI:

8    Q    Alright.  What I'm trying to find out is whether or not Tripp at any time

9 ever told you he knew about Bush's history, as you referred to it in the beginning?

10    A    No, because I think I brought that up to him myself.

11    Q    Alright.  So you understand that he knew nothing about David Bush,

12 and any contacts, or any PFA violations?

13    A    I don't know if he would have been familiar with any contacts or PFA

14 violations.  I don't know why he would have been in his capacity as Station

15 Commander.

16    Q    I don't know either.

17    A    So what I'm saying is I specifically brought it to Sergeant Tripp's

18 attention because, again, this was an odd case.

19    Q    Okay.  Now on 3-11-06 Trooper Smith tells Trooper Whisner –

20    A    Uh-huh.

21    Q    – "Oh, we have a couple addresses"?

22    A    Okay.

23    Q    By 3-11-06 Cowley has already told you, through a letter to you, not

24 the State Police, –

25    A    Uh-huh.

1      Q      – to look into the location of the children and Mrs. Bush, isn't that
2  true?
3      A      Yes. The letter was dated February 26th, the day that Mr. Bush came
4  into the barracks.
5      Q      Did you receive any other letters from the District Attorney asking you
6  to look further into the case?
7      A      I don't specifically –
8      Q      Recall?
9      A      I don't, but –
10     MR. PURICELLI: Alright.  Let's mark this one.
11     (Whereupon, a document was marked for identification as
12     Wheeler Deposition Exhibit No. 3.)
13     BY MR. PURICELLI:
14     Q      Okay. I'm showing you what's been marked as Wheeler No. 3.
15     A      Okay.
16     Q      It's an April 17, 2006 letter from John Cowley.
17     A      Uh-huh.
18     Q      He's looking to give you that today, and he's sending it to you.
19     A      Okay.
20     Q      Okay. Do you recall receiving this letter?
21     A      I may have, or it may have gone right to Trooper Whisner.
22     Q      Well, it wasn't addressed to him, was it?
23     A      Yes, it was; Trooper Eric Whisner, PA State Police.
24     Q      Okay. So it was. Now if he had received that letter, should it have
25  been noted in his report?