1      A      It probably should have been.

2      Q      Okay. And can we agree that as you read it, it's not in there, right?

3      (Brief pause.)

4      A      I mean I'm assuming that it has not been incorporated as an

5 attachment.

6      MR. HENZES: The actual letter?

7      A      Yes. Or a copy of the letter.

8      MR. HENZES: A copy of the letter is not an attachment, no.

9      A      Okay.

10      MR. PURICELLI: No, or even noted that it's in there.

11      A      Okay.

12      MR. HENZES: What's not noted in there?

13      MR. PURICELLI: The letter being received.

14      MR. HENZES: Well, it's not noted that he received the letter, but

15 there is a reference that the matter has been asked to be looked into by the Tioga

16 County DA's office.

17      MR. PURICELLI: Uh-huh.

18      MR. HENZES: If you'll look at Page four? I believe it's on –

19      MR. PURICELLI: I'm looking at four.

20      MR. HENZES: Or Page five of the report.

21      MR. PURICELLI: Okay.

22      MR. HENZES: Which does not bear his initials.

23      MR. PURICELLI: That's true.

24      DIRECT EXAMINATION (Continued)

25 BY MR. PURICELLI:

1  Q   The first entry on that is August 11, 2006, correct?

2  MR. HENZES: No.

3  A   Page five does.

4  MR. HENZES: On Page five are those your initials?

5  A   Yes.

6  MR. HENZES: No, the entry is not August 11th.

7  MR. PURICELLI: Oh, that's right. Five is the missing notice.

8  MR. HENZES: It's June 19th, 2006.

9  (Brief pause.)

10              DIRECT EXAMINATION   (Continue)

11  BY MR. PURICELLI:

12  Q   May 26th is the first entry date, right?

13  A   Yes.

14  Q   Alright. And when you do these reports the date of the event runs

15 concurrent, right? So if he did something between March 11, 2006 and 5-26-06

16 it would be indicated in between there, right? In other words; if he got this letter on

17 April 17th there would be an entry between Page five and Page four, correct?

18  A   No.

19  Q   No? Why not?

20  A   It's covered here. (Indicating)

21  Q   This indicates on May 26th a request was sent to Albuquerque Police

22 in New Mexico, correct?

23  A   Correct.

24  Q   Okay. It indicates in the second paragraph that "The investigation

25 was furthered – was furthered per the Tioga District Attorney's request into finding

1     reasoning for Monserrate's possible willingness to keep the location of the Bush

2     children and herself from David Bush.", right?

3         A    Correct.

4         Q    Where does that appear here in his April 17 letter?

5         A    It doesn't.

6         Q    It doesn't. So where did he get that information?

7         MR. HENZES: Where did he get it?

8         MR. PURICELLI: Yes.

9         MR. HENZES: Well, you might want to ask him.

10        MR. PURICELLI: I will ask him, but this is the supervisor.

11       A    I'm drawing the assumption that Mr. Cowley has generally always

12    forwarded Private Complaints to the State Police for investigation.

13       MR. PURICELLI: Okay.

14       A    If they get forwarded over on an open investigation, then, you know,

15    he is, in a sense, asking us to look into what we're already looking into.

16       MR. PURICELLI: Alright, you're looking into it.

17    BY MR. PURICELLI:

18       Q    Now on March 11th you come up with two addresses, right?

19       MR. HENZES: He did not come up with anything.

20    BY MR. PURICELLI:

21       Q    You, the State Police, –

22       A    Okay.

23       Q    – come up with an address, or possible addresses, right, but Trooper

24    Whisner doesn't indicate anywhere any communications with the District Attorney

25    by phone, visiting his office, or sending a letter or a fax –

1   MR. HENZES: We'll stipulate that the document doesn't say any of
2   that. Is there any particular reason why you want to yell at this witness for what
3   somebody else did?
4   MR. PURICELLI: I'm not yelling.
5   MR. HENZES: Well, at this point your tone is getting a little rough
6   there, Brian. Just ask him a direct question. He doesn't know, he didn't prepare
7   the report, all he did was review it and initial it. So you're asking him, for whatever
8   reason, other than making this nice man over here relatively rich because we're
9   taking up time and space on paper, about stuff he did not personally do, other than
10  "These are my initials".
11  MR. PURICELLI: He's the supervisor.
12  MR. HENZES: I don't care. To make matters – yes, he's not even a
13  Defendant, so I don't even know what we're doing here.
14  MR. PURICELLI: Well, that's careful.
15  MR. HENZES: He told you, "They're my initials". Whisner did the
16  report.

17                    DIRECT EXAMINATION   (Continued)
18  BY MR. PURICELLI:
19  Q   Now we're back to where you're making a decision, you, not the
20  State Police, –
21  A   Okay.
22  Q   – not to put the children in NCIC.
23  A   Okay.
24  Q   And it's because you don't know where the children were from?
25  A   No, I never said that at all.

1  Q      You don't know that they're missing?

2  A      That they specifically fall under the definition of "missing" because we
3  are aware that they are with their parent. When the children left they were in the
4  custody of their parent.

5  Q      Well –

6  A      The parent left and there was a history of domestic violence incidents
7  between the wife and the husband, hence the PFA.

8  Q      Which had expired, correct?

9  A      It had.

10 Q      Before Mr. Bush came to you and said his children were missing,
11 correct?

12 A      Correct.

13 Q      So you knew, from your training about PFAs and the enforcement of
14 them, that she no longer had full custody under a Court Order, isn't that true?

15 A      No, I didn't know that.

16 Q      Why not?

17 A      Because I was unaware of that. I don't know why I didn't know it,
18 I don't know why – I don't know why I didn't know it.

19 Q      Well, if –

20 A      No one handed me a Custody Order and said, "Okay, the day this
21 PFA expires David Bush now has all parental rights and obligations". I didn't know.
22 Like I said, this was an odd case from the get go.

23 Q      So the State Police didn't know?

24 A      No.

25 Q      It's obvious they didn't.

1      A      I didn't.

2      Q      Well, let me ask you this: If your training – well, let me ask you.
3 You do receive the same training as McDermott from the State Police, don't you,
4 about the Crimes Code, Domestic Violence?

5      A      Yes, yes.

6      Q      It wasn't that you were kept out of the loop anywhere, right?

7      A      No.

8      Q      And you don't know of any reason he was given more training about
9 something, do you?

10      A      No.

11      Q      Now can you tell me why it would be then that a member of the
12 Montoursville State Police would be talking to Virginia to have the children, which
13 you didn't know where the lived, declared as missing children when Trooper
14 McDermott knew that the children had been released to Mr. Bush pursuant to a
15 Court Order; why would they be considered missing children in Montoursville but
16 not in your barracks?

17      A      I don't know. And that's not the way that I would have pursued that.

18      Q      I understand that.

19      A      So I don't know why Trooper McDermott did what he did either.

20      Q      What would have been the way you would have pursued "this",
21 meaning the way McDermott pursued it, by calling Virginia and helping them
22 declare the children missing children?

23      A      I – I'm not – I guess I'm not following that.

24      Q      Well, I want to know why it is they're not missing children in your
25 barracks, but they are missing children in Montoursville, Pennsylvania?

1   A   I don't know. Like I said, we didn't specifically have a Custody Order saying that Mr. Bush had any – the time previous to that Mr. Bush did not have custody, she had custody. There was a Protection From Abuse Order that was there based on incidents of past allegations of domestic violence.

5   Q   All of that was true when they were – when she was in the Montoursville barracks, wasn't it?

7   MR HENZES: Well, you're asking does he know that. You don't know what he knows at that moment in time. You're making these assumptions now. Ask him what he knew at that time.

10   MR. PURICELLI: I'm asking him why it is in Montoursville –

11   MR. HENZES: Well, you should ask the Montoursville people.

12   MR. PURICELLI: I will ask them that.

13   A   I can't answer why Trooper McDermott did that. I can't answer if he had any discussions with the Crime Supervisor down there, or another supervisor down there, or why he did it.

16   BY MR. PURICELLI:

17   Q   But he spoke with your Station Commander, Tripp, –

18   A   Okay.

19   Q   – and you spoke with Tripp, didn't you, about the Bush case?

20   A   I spoke with Tripp, yes. He knew what was going on.

21   Q   Okay. When you spoke to Tripp didn't you ask him, "Well, are these kids missing or not?"

23   A   No, I didn't.

24   Q   But you – you –

25   A   Again, I'm not picking up –

1  Q   Well –

2      MR. HENZES: No, he answered the question. He said –

3  BY MR. PURICELLI:

4  Q   Did you go to Tripp and ask him for some guidance as to what "missing" meant in your barracks?

6  A   No, I don't believe I did.

7  Q   You didn't. Who did you consult with?

8  A   Again, I believe I discussed it with Sergeant Tripp, and at some point I discussed it with John Cowley.

10 Q   Did Cowley tell you they weren't missing?

11 A   No, I don't believe he did. Again, it was indicated that he wanted us to look into –

13 Q   He wanted you to find them, and find out if they were okay, didn't he?

14 A   Yes.

15 Q   So he didn't even know where they were?

16 A   No.

17 Q   Incidently, how did you know that the children were with the mother?

18 A   That was our assumption based on Mr. Bush.

19 Q   What did you do to prove out your assumption?

20 A   We started looking for the mother.

21 Q   Did you find her?

22 A   No, we did not.

23 Q   What reason did you have to believe something didn't happen to the mother and kids?

25 A   I didn't know that something hadn't.

1   Q   So they were missing then, mother and kids?

2   A   No, they were unable to be located.

3   MR. DAVID BUSH: Crux, my ass. Excuse me. I'm –

4   MR. HENZES: We're done. Let's go.

5   MR. DAVID BUSH:  – sorry.

6   MR. PURICELLI: We're done.

7   MR. HENZES:  We're done.

8   (Whereupon, at 5:03 p.m., the deposition of CORPORAL

9   CHRISTOPHER WHEELER was concluded.)

10   (Reading and signing of deposition was waived.)

11   * * * * * *

CERTIFICATE OF NOTARY-REPORTER

I, Carlton W. Swetland, Court Reporter and Notary Public, do hereby certify that the witness, whose testimony appears in the foregoing pages, was first duly sworn by myself, a Notary Public in and for the Commonwealth of Pennsylvania; that the testimony given by said witness was taken stenographically by me, and thereafter reduced to typewriting by me; that this transcript is a true and accurate record of said testimony, as taken from my stenographic notes thereof.

Witness my Hand and Seal this 22nd day of May, 2010, in the Township of Westfield, County of Tioga, Commonwealth of Pennsylvania.

*[signature: Carlton W. Swetland]*

CARLTON W. SWETLAND,

Court Reporter - Notary Public

Westfield Township, Tioga County, PA

My commission expires 9-22-2012.

* * * * *