IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DAVID BUSH, et al.              :        CIVIL ACTION
                                :
        v.                      :
                                :
S.C. ADAMS, et al.              :        NO. 07-4936


MEMORANDUM

McLaughlin, J.                              May 18, 2011


        This action arises out of the efforts of plaintiffs

David Bush and his brother Christopher Bush to locate David

Bush's children in 2006 and 2007.  In 2004, David Bush consented

to the entry of a Protection from Abuse ("PFA") order against him

and in favor of his ex-wife, Isara Isabella Serene.[1]  The PFA

order granted primary physical custody to Serene, who took the

children from Pennsylvania to Virginia and changed their

identities in an effort to avoid being found.  After the PFA

order expired in 2006, David Bush enlisted the help of his

brother, Christopher Bush, a police officer in Newtown Township,

Pennsylvania, to locate his children.  David Bush obtained a

custody order from a Pennsylvania court, which was later vacated

as improperly granted, and subsequently enlisted the aid of the

_____

        [1]Serene is named in the caption of the plaintiffs' complaint
as "Sara Nicole Bush a/k/a Serene Isara Isabella a/k/a Sara
Nicole Monserrate a/k/a Sara Nicole Monserrate Bush."  At oral
argument, her counsel informed the Court that Serene has legally
changed her name to Isara Isabella Serene, and the Court will
therefore refer to her under that name.  5/2/08 Tr. of Oral Arg.
on May 2, 2008, at 32.

Virginia police to take custody of the children. The Virginia police removed the children from school and brought them to their father, who in turn returned to Pennsylvania with the children.

Upon learning that her children had been given to her ex-husband, Serene succeeded in having the court order granting custody to David Bush vacated for lack of jurisdiction. Serene also enlisted the help of the Pennsylvania State Police ("PSP"). As a result of these efforts, the Virginia police issued a warrant for David Bush's arrest for child abduction by a parent and for conspiracy. David Bush was arrested in Pennsylvania and was extradited to Virginia where the charges against him were ultimately dropped. Serene was later awarded full custody over the children, and David Bush was awarded no visitation rights. Christopher Bush, in turn, was investigated and disciplined by the PSP for his actions in assisting his brother.

David and Christopher Bush filed this suit under 42 U.S.C. § 1983, as well as state law, seeking damages both for David Bush's arrest and for the PSP investigation into Christopher Bush's activities. In their first amended complaint, the plaintiffs named as defendants Isara Isabella Serene; two officers of the Richmond, Virginia Police Department, Sergeant Sean Adams and Lieutenant Brian Russell; and three officers of the PSP, Captain Kenneth Hill, Lieutenant Steven J. Ignatz, and Sergeant Joseph Tripp.

In a Memorandum and Order dated November 3, 2008, this Court found that it lacked personal jurisdiction over defendants Adams and Russell.[2]  In a subsequent Memorandum and Order dated January 27, 2009, the Court dismissed all claims against defendant Serene for failure to state a claim and for lack of personal jurisdiction.  The only defendants remaining in this action are therefore defendants Hill, Ignatz, and Tripp.[3]  Defendants Hill, Ignatz, and Tripp have moved for summary judgment on Christopher Bush's claims.  After a full round of briefing, the Court held oral argument on October 25, 2010.  For the reasons that follow, the Court will now grant the motion.

I.   Summary Judgment Record

The Court begins with the summary judgment record, which consists largely of undisputed facts except where otherwise noted.  The Court remarks as an initial matter, however, that many of the statements of fact offered in the plaintiffs' opposition brief do not find support in the record.  In several instances, the record either fails to support the plaintiffs'

_____

[2]In a subsequent Memorandum dated January 27, 2009, the Court decided to dismiss, rather than sever and transfer, the claims against defendants Adams and Russell.

[3]The plaintiffs subsequently brought suit in Virginia against the defendants that were dismissed from this action. That suit was dismissed on procedural grounds.  Tr. of Oral Arg. on Oct. 25, 2010, at 34.

claims, or the pages on which the plaintiffs rely are altogether missing. The Court has therefore attempted to piece together the undisputed facts based on its own independent review of the record, and will highlight any discrepancies below.

David Bush and Isara Isabella Serene were married in July of 1993 and had three children during their marriage. On July 6, 2004, David Bush consented to the entry of a Protection from Abuse ("PFA") order against him and in favor of Serene. The PFA order granted Serene primary physical custody of the three children. David Bush was prohibited from contacting Serene, and was granted no partial physical custody or visitation rights. The order expired on January 6, 2006. December 22, 2009 Dep. of David Bush ("12/22/09 D. Bush Dep."), Ex. 1 to Defs. Hill, Ignatz and Tripp's Mem. of Law in Support of the Mot. for Summ. J. ("Defs.' S.J. Br."), at 7; July 6, 2004, Protection from Abuse Order, Ex. 3 to Defs.' S.J. Br, ¶¶ 3, 5, 9.

After the PFA order expired, David Bush sought to obtain visitation rights with his children. Before a visitation hearing could be held, however, David Bush was required to find and serve Serene with a petition. In mid-February 2006, David Bush went to the PSP barracks in Mansfield, Pennsylvania, and requested assistance from PSP Troop F in locating Serene and his three children. At the Mansfield barracks, David Bush spoke with Sergeant Tripp, who informed the plaintiff that he had no rights

in view of the PFA order that had been in effect against him.

Sergeant Tripp then assigned Trooper Whisner to take a written

statement from David Bush.  Pennsylvania law requires law

enforcement agencies to investigate missing children upon receipt

of a report, and to enter missing children into the Commonwealth

Law Enforcement Assistance Network ("CLEAN") upon receipt of

sufficient identifying information.  David Bush's children were

not entered into the CLEAN network, however, because Troop F

deemed them not to be missing by virtue of the fact that they

were with their mother.[4]  12/22/09 D. Bush Dep. at 12-16; January

7, 2010 Dep. of Joseph Tripp ("1/7/10 Tripp Dep."), Ex. to Pls.'

Br. in Opp'n to Defs.' S.J. Br. ("Pls. Opp'n"), at 49-50; January

7, 2010 Dep. of Steven J. Ignatz ("1/7/10 Ignatz Dep."), Ex. to

Pls.' Opp'n, at 101-02; see also 18 Pa.C.S. § 2908.

        After visiting the Mansfield barracks, David Bush

contacted the PSP and inquired into the status of the

investigation, but received no further information.  Around April

of 2006, David Bush contacted his brother, Christopher Bush, a

detective at the Newtown Township Police Department, and informed

Christopher Bush of the difficulties he was having locating his

---

[4]The plaintiffs also argue that the investigation was not
started promptly, as required by Pennsylvania law.  The record
does not support these allegations.  The plaintiffs rely on the
testimony of Lieutenant Ignatz, who lacked personal knowledge and
who testified as to his opinion based on facts that were
presented to him by plaintiffs' counsel.  See January 7, 2010,
Dep. of Steven J. Ignatz, Ex. to Pls.' Opp'n, at 125-28.

ex-wife and children.  Christopher Bush in turn contacted

District Attorney John Cowley on multiple occasions and inquired

into the status of the investigation.  12/22/09 D. Bush Dep. at

16; December 22, 2009 Dep. of Christopher Bush ("12/22/09 C. Bush

Dep."), Ex. 2 to Defs.' S.J. Br., at 4, 9-12.

On June 23, 2006, David Bush obtained an order from the

Court of Common Pleas of Luzerne County, Pennsylvania, granting

him primary physical and legal custody of the three children, if

their location could be discovered.  The order also authorized

David Bush to take custody with the assistance of law enforcement

and return the children to Pennsylvania.  David Bush showed the

order to Christopher Bush, and Christopher Bush asked the Chief

of Police at the Newtown Township Police Department, Martin

Duffy, if he could assist with the search by entering the

children into the CLEAN/NCIC[5] network.  Chief Duffy approved of

Christopher Bush's request, and on July 22, 2006, Christopher

Bush entered David Bush's children into the CLEAN/NCIC network

and generated a report documenting the entry.  June 23, 2006,

Luzerne County Court of Common Pleas Order, Ex. 4 to Defs.' S.J.

Br., ¶ 1; 12/22/09 C. Bush Dep. at 13-16; Incident Investigation

Report, Ex. C.Bush-1 to 12/22/09 C. Bush Dep.

On August 11, 2006, Sergeant Tripp contacted

---

[5]CLEAN is an acronym for the Commonwealth Law Enforcement
Assistance Network.  NCIC is an acronym for the National Crime
Information Center.  Defs.' S.J. Br. at 5 n.3.

Christopher Bush to ask whether he was related to David Bush, and whether he had made the CLEAN/NCIC entry. After answering both questions in the affirmative, Christopher Bush asked whether he could share information with Sergeant Tripp, in response to which Tripp laughed and ended the phone conversation. 12/22/09 C. Bush Dep. at 18-19.

In September of 2006, Christopher Bush learned that David Bush's children were living in the Richmond, Virginia, area, and subsequently located the school district where the children were enrolled. Christopher Bush then contacted the Richmond City Police Department and spoke with Detective Lawson. Christopher Bush explained that he was a Newtown Township police officer and that he was in possession of a custody order for his brother's children. Christopher Bush forwarded the June 23, 2006, Luzerne County Court order to the Richmond Police. On October 12, 2006, Christopher Bush contacted David Bush and informed him that the children were in Virginia. On October 13, 2006, David Bush went to Richmond, Virginia, and picked up the children, who had been removed from school by the Richmond Police. They returned to Bucks County, Pennsylvania, the next day. 12/22/09 C. Bush Dep. at 21, 23-28; 12/22/09 D. Bush Dep. at 27.

On October 23, 2006, David Bush's ex-wife Serene obtained an order from the Luzerne County Court vacating the June

23, 2006, custody order as improperly granted.  The Luzerne County Court noted that the original petition did not contain a basis for jurisdiction, as neither party was a resident of Luzerne County.  Further, an ongoing proceeding in Tioga County had not been disclosed to the Court.  On or around October 23, 2006, Serene also sought the help of PSP Troop F, to whom David Bush had previously reported the children missing.  On the same date, Sergeant Tripp called Christopher Bush and asked if he knew the location of David Bush's children.  In response, Christopher Bush asked whether Sergeant Tripp had an order, and Tripp indicated that he did not.  Although Christopher Bush knew the location of the children, he did not tell Sergeant Tripp. October 23, 2006, Luzerne County Court of Common Pleas Order, Ex. 5 to the Defs.' S.J. Br., ¶¶ 1-2; 12/22/09 C. Bush Dep. at 20.

According to the plaintiffs, the PSP then assisted Serene by entering her children into the CLEAN/NCIC network even though the PSP officers knew the children were with David Bush. In contrast, the PSP had refused to enter the children into the CLEAN/NCIC network under similar circumstances when David Bush previously sought help.  The plaintiffs' allegations are not supported by the record.  First, the record does not support the contention that the PSP entered the children into the CLEAN/NCIC network.  In the deposition of Sergeant Tripp, on which the plaintiffs rely, Tripp reads from a report that he did not

prepare, and therefore his testimony is not based on personal knowledge. In addition, the facts in the report from which Sergeant Tripp reads are ambiguous and do not indicate that the PSP ever entered Serene's children into the CLEAN network. See Pls.' Opp'n ¶¶ 19-21; 1/7/10 Tripp Dep. at 51-56.

The record also fails to support the contention that the members of Troop F were aware that the children were with David Bush on the date when Serene sought help. The plaintiffs rely on the deposition of Sergeant Tripp who, as noted above, was reading from a report and not testifying based on personal knowledge. The plaintiffs also cite to the deposition testimony of Sergeant Sean Adams, a police officer from Richmond, Virginia, who originally helped David Bush locate his children. Sergeant Adams testified that he remembered speaking with Sergeant Tripp, but could not recall the date or the content of the conversation.[6] May 20, 2010 Dep. of Sergeant Sean Adams ("5/20/10 Adams Dep."), Ex. to Pls.' Opp'n, at 51-52.

On October 25, 2006, David Bush was taken into custody

---

[6]The plaintiffs also cite to the deposition of Lieutenant Brian Russell, Sergeant Adams' supervisor. Although Lieutenant Russell testified that he contacted Chief Duffy and other individuals to request that David Bush be arrested and the children be returned, the record does not indicate when those conversations occurred. Specifically, it is not clear whether those conversations occurred before October 23, 2006, when Serene reported the children as missing, such that Troop F would have been on notice. The only date in the testimony is October 25, 2006, when Russell called Chief Duffy. May 20, 2010 Dep. of Lieutenant Brian Russell, Ex. to Pls.' Opp'n, at 50-55.

by the FBI and was subsequently sent to Richmond, Virginia. David Bush was held for several days, and was then released on bail following a preliminary hearing. The charges against David Bush were ultimately dropped. After a subsequent hearing in Virginia, Serene was awarded full custody over the children, and at the present time David Bush has neither custody nor visitation rights. 12/22/09 D. D Bush Dep. at 41-42; Tr. of Oral Arg. on Oct. 25, 2010 ("Tr."), at 30.

Christopher Bush's involvement in David Bush's custody dispute ended after his brother's arrest. Sometime after October 23, 2006, the date on which Christopher Bush spoke with Sergeant Tripp, Christopher Bush contacted the PSP to determine the proper procedure for filing a complaint against a PSP officer. On November 19, 2006, Christopher Bush filed a preliminary complaint against Sergeant Tripp. On January 15, 2007, Christopher Bush filed a more detailed written complaint with the Pennsylvania Internal Affairs Division ("IAD") against Sergeant Tripp. The plaintiff complained about the manner in which Sergeant Tripp handled the investigation into the location of David Bush's children, as well as Tripp's demeanor when he communicated with Christopher Bush on the phone. 12/22/09 C. Bush Dep. at 30-32; PSP Use of Force or Complaint, Ex. Hill 1 to April 15, 2010 Dep. of Kenneth Hill ("4/15/10 Hill Dep."), Ex. to Pls.' Opp'n; PSP Complaint Verification, Ex. C.Bush-2 to 12/22/09 C. Bush Dep;

1/7/10 Tripp Dep. at 99-100.

The complaint against Sergeant Tripp was forwarded to Captain Kenneth Hill on January 26, 2007. Captain Hill was responsible for overseeing the operations of the Mansfield Station where Sergeant Tripp served as Station Commander.[7] Captain Hill, in turn, assigned Lieutenant Dennis Hile to conduct an investigation into Christopher Bush's complaint, and also requested that the CLEAN Administrative Unit conduct an independent investigation into Christopher Bush's CLEAN/NCIC entries.[8] 12/22/09 C. Bush Dep. at 58; July 31, 2007, Letter from Captain Kenneth Hill to Christopher Bush, Ex. C-Bush4 to 12/22/09 C. Bush Dep.; July 20, 2010 Dep. of Willard M. Oliphant

---

[7]Captain Willard Oliphant, who served as the Director of the Internal Affairs Division, was apparently the original recipient of Christopher Bush's complaint. Captain Oliphant referred the complaint to Captain Hill. See July 20, 2010 Dep. of Willard M. Oliphant, Ex. to Pls.' Opp'n, at 76-77; Pls.' Opp'n ¶ 61.

[8]The plaintiffs contend that, although it is customary in an investigation to interview the complainant and/or the accused, neither Sergeant Tripp nor Christopher Bush was interviewed in this case. The record is in dispute on this question, however, because Tripp testified that he was interviewed by Lieutenant Hile. Compare 7/20/10 Oliphant Dep. at 42 (testifying Tripp not interviewed) with 1/7/10 Tripp Dep. at 100 (testifying Tripp was interviewed by Hile). With respect to Christopher Bush, the plaintiffs rely on missing pages from the deposition testimony of Captain Oliphant, and therefore the record is not clear on whether Christopher Bush was interviewed. See Pls.' Opp'n ¶ 54 (citing missing pages).

("7/20/10 Oliphant Dep."), Ex. to Pls.' Opp'n, at 42.[9]

On February 13, 2007, Trooper Richard Fultz from the PSP CLEAN Administrative Unit received an email from Lieutenant Hile, requesting an investigation into Christopher Bush's CLEAN/NCIC entry. The email outlined the events leading to David Bush's arrest, and disclosed the fact that Christopher Bush had filed an IAD complaint against Sergeant Tripp. In April or May of 2007, Trooper Fultz requested a meeting with Christopher Bush to discuss his use of the CLEAN network. On May 17, 2007, Trooper Fultz and Lieutenant Ignatz, Commander of the CLEAN unit, met with Christopher Bush and Chief Martin Duffy. Prior to the meeting, Trooper Fultz and Lieutenant Ignatz discussed the case, and Fultz informed Ignatz of Christopher Bush's IAD complaint against Tripp. July 20, 2010, Dep. of Richard T. Fultz ("7/20/10 Fultz Dep."), Ex. to Pls.' Opp'n, at 8, 38-39; February 8, 2011 Email from Dennis Hile, Ex. Fultz 1 to 7/20/10 Fultz Dep; 1/7/10 Ignatz Dep. at 20-21; 12/22/09 C. Bush Dep. at 45-46.

During the meeting with Christopher Bush, Trooper Fultz did the majority of the talking and repeatedly asked Christopher Bush if he had prepared a "Missing Person Report" for the CLEAN

_____

[9]Although the plaintiffs cite to Captain Oliphant's deposition testimony, many of the pages referenced in the plaintiffs' opposition have been omitted from the record that was submitted to the Court. The Court has therefore attempted to piece the facts together based on its own review of the record. See Pls.' Opp'n ¶¶ 46-47, 49-50 (citing to missing pages of Oliphant deposition).

entry.  Christopher Bush indicated that he had not prepared such a report, but Chief Duffy subsequently produced an "Incident Investigation Report" that Christopher Bush had written to document the entry.[10]  During the course of the meeting, Chief Duffy suggested that Trooper Fultz and Lieutenant Ignatz were there because of the complaint Christopher Bush had filed against Sergeant Tripp.  Trooper Fultz testified, however, that he and Lieutenant Ignatz were only there as part of their CLEAN duties. 12/22/09 C. Bush Dep. at 45-49, 57; Incident Investigation Report, Ex. C.Bush-1 to 12/22/09 C. Bush Dep.

On June 6, 2007, Lieutenant Ignatz sent a letter to Chief Duffy indicating that the investigation into Christopher Bush's CLEAN entry had been completed.  Lieutenant Ignatz noted that although the Newtown Township Police Department had lacked jurisdiction, Ignatz found no violations of CLEAN policy. Nonetheless, Lieutenant Ignatz questioned the "truthfulness of Detective Bush," in view of the fact that Christopher Bush initially denied producing a report on the missing subjects until Chief Duffy produced the investigation report.  Lieutenant Ignatz separately informed Lieutenant Hile that there had been no CLEAN violations.  June 6, 2007, Letter from Lieutenant Ignatz, Ex.

_____

[10]Trooper Fultz later testified that when he requested a "Missing Person Report," that request encompassed the "Incident Investigation Report" that Chief Duffy ultimately produced, and any differences between the two would be merely semantic. 7/20/10 Fultz Dep. at 16-17.

C.Bush-3 to 12/22/09 C. Bush Dep.; 1/7/10 Ignatz Dep. at 47, 58-59.

On July 3, 2007, Captain Hill sent an email to multiple recipients, including Captain Oliphant, requesting that Christopher Bush's complaint against Sergeant Tripp be "bumped up" to a "supervisory investigation," and that Lieutenant Dennis Hile be assigned to conduct the investigation.[11] Captain Hill attached certain "correspondence" to his e-mail, but indicated that it had not yet been sent to the Newtown Township Supervisors because Captain Hill had been waiting for the results of the CLEAN investigation. Captain Hill explained that Christopher Bush had not violated CLEAN policy, but that he had lied to the CLEAN Administrative Unit investigators. Captain Hill directed Lieutenant Ignatz to send a copy of the CLEAN investigation to Lieutenant Hile. July 3, 2007 Email from Kenneth Hill to Captain Oliphant, et al., Ex. to 7/20/10 Oliphant Dep.[12]

On July 31, 2007, Captain Kenneth Hill sent a letter to Christopher Bush explaining that the complaint against Sergeant Tripp had been forwarded for his review. Captain Hill indicated that he found no evidence of wrongdoing by Sergeant Tripp or

---

[11]The record is unclear on the specific dates of the investigations. As noted above, it appears that Lieutenant Hile had already begun investigating the complaint against Sergeant Tripp prior to Captain Hill's email on July 3, 2007.

[12]The email is not marked as an exhibit, but was appended by the plaintiffs to the end of Captain Oliphant's deposition.

other members of the Mansfield barracks. Captain Hill also noted that the investigation had revealed certain instances in which Christopher Bush had used his police power for personal reasons, including making a CLEAN/NCIC entry with no jurisdiction, writing a minimal investigative report, and denying having made such report until being confronted with the document. Captain Hill informed Christopher Bush that he was forwarding the letter, as well as the original complaint, to the Newtown Township Police Chief and Supervisors for whatever action they deemed appropriate. 12/22/09 C. Bush Dep. at 58; July 31, 2007, Letter from Captain Kenneth Hill, Ex. C-Bush4 to 12/22/09 C. Bush Dep.

Also on July 31, 2007, Captain Hill sent a letter to the Newtown Township Supervisors. Hill indicated his belief that Christopher Bush had abused his authority as a police officer for personal reasons, and that his actions were condoned by Chief Duffy. 12/22/09 C. Bush Dep. at 61.[13]

Upon receipt of Captain Hill's letter, the Township conducted an investigation that commenced around August 2007 and lasted for nine months. In mid-May 2008, Joseph Czajkowski, the Township Manager, decided to terminate Christopher Bush based on the results of the investigation. Mr. Czajkowski sent a letter

---

[13]The July 31, 2007, Letter from Captain Kenneth Hill to the Newtown Township Supervisors was not marked during the deposition, but is appended to the December 22, 2009 Deposition of Christopher Bush, immediately following Exhibit C.Bush-4.

to Christopher Bush charging him with violations of 53 P.S. § 812
based on official misconduct and other offenses.[14]  The Township
terminated Christopher Bush's employment on May 15, 2008.
12/22/09 C. Bush Dep. at 61-62; Arbitration Opinion and Award,
Ex. 6 to the Defs.' S.J. Br., at 8-9.

Christopher Bush filed a grievance over his termination
on May 16, 2008.  After a hearing, an arbitrator reversed the
termination decision because the Township had failed to provide
Christopher Bush with a pre-termination hearing.  The arbitrator
concluded, however, that Christopher Bush had engaged in
"significant misconduct" that warranted a thirty-day
suspension.[15] Christopher Bush was reinstated as a detective on
May 28, 2009, and received full back pay minus the thirty-day
suspension.  Arbitration Opinion and Award, Ex. 6 to the Defs.'
S.J. Br., at 10, 26, 33, 36-37; 12/22/09 C. Bush Dep. at 65-66.

The plaintiffs initiated this action on November 26,
2007, and filed their first amended complaint on February 19,

_____

[14]Specifically, Christopher Bush was charged with official
misconduct, misuse of Newtown resources for non-police matters,
misrepresenting and/or omitting pertinent facts to other law
enforcement officials, abuse of authority, neglect of duty,
providing incomplete information on reports and to officials so
that appropriate analysis and decisions could be made,
potentially endangering the welfare of three minor children, and
conduct unbecoming to a Newtown Police Officer.

[15]The plaintiff admitted to having engaged in the conduct
for which he was suspended.  Tr. of Oral Arg. on October 25,
2010, at 60-61.

2008.  David Bush asserted five counts under 42 U.S.C. § 1983 and various state laws against defendants Serene, Adams and Russell, all of which have since been dismissed, and those defendants are no longer parties to this action.[16]  David Bush's subsequent suit against those defendants in Virginia was dismissed for procedural errors.  Tr. at 34.  David Bush's sole remaining claim in this action is a claim for civil conspiracy to commit state torts against Sergeant Tripp (Count V).

Christopher Bush has asserted two counts against defendants Hill, Ignatz and Tripp: (1) a § 1983 claim for First Amendment retaliation (Count III); and (2) a claim for civil conspiracy to commit state torts (Count V).  Defendants Hill, Ignatz and Tripp have moved for summary judgment on Christopher Bush's claims.  For the reasons that follow, the Court will grant the defendants' motion.

---

[16]See the Court's Memorandum and Order dated November 3, 2008, and the Court's Memorandum and Order dated January 28, 2009.

II.  <u>Analysis</u>[17]

The Court will begin its analysis with Christopher Bush's claims, which the Court concludes cannot survive summary judgment.  The Court will then discuss David Bush's remaining claim against Sergeant Tripp, with respect to which the defendants have not moved for summary judgment.  Defense counsel explained at oral argument that he understood this claim to have been dismissed by the Court's Memorandum and Order dated January 28, 2009.  The Court agrees that David Bush's claim cannot survive under the logic of the Court's prior decision.

A.  <u>Christopher Bush's Claims</u>

1.  <u>Count III: First Amendment Retaliation</u>

Christopher Bush asserts a First Amendment retaliation claim under 42 U.S.C. § 1983 against defendants Hill, Tripp, and Ignatz.  The plaintiff[18] argues that each of these defendants

_____

[17]On a motion for summary judgment, the Court considers the evidence in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  A party moving for summary judgment must show that there are no issues of material fact and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there are no issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 250.

[18]The Court will refer to Christopher Bush as "the plaintiff" throughout this section.

retaliated against him for engaging in protected activity: namely, for associating with his brother David Bush, and for filing a complaint with the PSP against Sergeant Tripp.[19]

In his amended complaint, the plaintiff identifies two adverse actions that he contends were based on a retaliatory motive: (1) the initiation and carrying out of a CLEAN investigation; and (2) the letter that Captain Hill sent to the Newtown Township Supervisors, which prompted an investigation. See Am. Compl. ¶¶ 52-55, 88, 92. In the parties' briefs and during oral argument, however, the parties focused almost entirely on Christopher Bush's subsequent termination - which was later reduced to a thirty-day suspension - as the adverse action at issue. As a consequence, there exists considerable confusion over the adverse actions giving rise to the plaintiff's First Amendment retaliation claim.

To prevail on a First Amendment retaliation claim, a plaintiff must establish that: (1) the activity in question was protected by the First Amendment; (2) the plaintiff suffered an adverse action; and (3) there was a causal link between the constitutionally protected conduct and the retaliatory action.

---

[19]Although the plaintiff alleges in his complaint that he was retaliated against for engaging in both of these protected activities, the plaintiff devotes his brief to arguing that the protected activity in question was the filing of a complaint against Sergeant Tripp. Neither party devotes analysis to Christopher Bush's association with his brother. See Pls.' Opp'n at 21-22.

Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

The first factor is a question of law; the remaining factors are

questions of fact.  Baldassare v. New Jersey, 250 F.3d 188, 194

(3d Cir. 2001).

*De minimis* actions do not give rise to a constitutional

violation.  Instead, the alleged retaliatory conduct must be

sufficient to deter a person of ordinary firmness from exercising

his First Amendment rights.  McKee v. Hart, 436 F.3d 165, 170

(3d Cir. 2006) (citations omitted); see also Brennan v. Norton,

350 F.3d 399, 418-19 (3d Cir. 2003).  The plaintiff must also

establish a causal connection by showing that his protected

activity was a substantial or motivating factor in the alleged

retaliatory conduct.[20]  Brennan, 350 F.3d at 419.  Once a

plaintiff establishes these factors, a defendant can rebut the

claim by demonstrating that it would have reached the same

decision even in the absence of the protected conduct.  Id. at

414 (citations omitted).

Where there are multiple defendants, the plaintiff must

also establish that each defendant individually participated or

acquiesced in each of the alleged constitutional violations.

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005);

---

[20]The causation required to establish a First Amendment
retaliation claim is identical to that required under Title VII.
Courts focus on factors such as the timing of the retaliation and
evidence of continuing animosity.  Brennan, 350 F.3d at 420.

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

The parties make no arguments with respect to the first factor. Instead, the defendants concede that the plaintiff engaged in protected activity by filing a complaint against Sergeant Tripp.[21] Defs.' S.J. Br. at 12. Because the defendants have conceded this point, the Court will assume for purposes of this motion that the plaintiff engaged in protected activity.

The Court notes, however, that it has certain questions about the nature of the plaintiff's activities, which neither party has addressed. With respect to the plaintiff's complaint against Sergeant Tripp, a public employee does not have an absolute right to free speech. Instead, as a threshold matter, a public employee must be speaking as a citizen about a matter of public concern to invoke constitutional protection. Public speech that is made pursuant to official duties, or that constitutes "merely personal grievances," is not protected by the First Amendment. Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

In contrast, where a public employee petitions the government through a formal mechanism, such as filing a lawsuit or a grievance, that employee is protected from retaliation by

_____

[21]The defendants make no argument with respect to the plaintiff's claim that he engaged in protected activity by associating with his brother, David Bush.

the Petition Clause of the First Amendment even where the activity is related to a matter of solely private concern. See Foraker v. Chaffinch, 501 F.3d 231, 236 (3d Cir. 2007); Brennan, 350 F.3d at 417. Internal complaints to an employer, which are processed up the chain of command, do not necessarily constitute protected petition activity, however. See Foraker, 501 F.3d at 237.

With respect to the second factor of the plaintiff's retaliation claim, the parties are unclear on the underlying adverse actions giving rise to this suit. As noted above, the plaintiff identified two adverse actions in his amended complaint: the CLEAN investigation and Captain Hill's letter to the Newtown Township Supervisors. In the briefs and at oral argument, however, the parties focused primarily on the plaintiff's termination, which was later reversed and reduced to a thirty-day suspension.[22] The termination occurred on May 15, 2008, over six months after the plaintiff filed his amended complaint. The plaintiff never sought leave to file a second amended complaint to reflect his termination, and therefore neither the termination, nor the plaintiff's subsequent thirty-day suspension, is properly before the Court as an adverse

---

[22]See, e.g., Pls.' Opp'n at 22 ("The adverse action was Christopher Bush's termination from employment with Newtown Township"); Tr. at 46 (plaintiffs' counsel identifies the fact that Christopher Bush "got fired" as the adverse action).

action.[23]

No reasonable juror could conclude that the CLEAN investigation was sufficiently adverse so as to implicate the First Amendment. Based on a review of the record, the CLEAN investigation in this case appears to have been consistent with the plaintiff's duties as a police officer. The FBI subjects any agency making CLEAN/NCIC entries to certain auditing requirements. To that end, agencies are regularly audited, or in some instances investigated, to ensure that CLEAN/NCIC reporting requirements are satisfied. 1/7/10 Ignatz Dep. at 25-27. As a consequence, the routine use of the CLEAN/NCIC network could result in an audit or investigation, even in the absence of protected activity. The plaintiff has not shown that the CLEAN investigation in this case was somehow atypical or otherwise improperly conducted.

In addition, the record fails to show how the plaintiff was harmed by the CLEAN investigation. The plaintiff was subject to a single interview in the course of the CLEAN investigation. Lieutenant Ignatz, who conducted the interview along with Trooper Fultz, ultimately concluded at the end of the investigation that

_____

[23]Even if Christopher Bush's termination or suspension were properly before the Court, the Court would still grant summary judgment in favor of the defendants. There is no evidence in the record that the defendants had any personal involvement in the decisions to terminate or suspend the plaintiff. In addition, as will be discussed below, the record cannot support an inference of causation with respect to any of the defendants.

the plaintiff had not violated any CLEAN policy.  At oral argument, when asked how the CLEAN investigation had harmed the plaintiff, plaintiff's counsel explained: "Well, he had to go and get interviewed" and then "[h]e got fired."  Tr. at 44-46.  There is no evidence in the record, however, suggesting that the CLEAN investigation was connected to the plaintiff's subsequent termination.  Instead, the plaintiff's termination was the result of the independent investigation by Newtown Township.  The only harm the plaintiff suffered as a result of the CLEAN investigation, therefore, was the inconvenience of being subject to an interview.  A single interview of a police officer is too trivial to implicate the First Amendment.  On these facts, no reasonable juror could conclude that the CLEAN investigation had more than a *de minimis* impact on the plaintiff's speech.

The Court questions whether Captain Hill's letter to the Newtown Township Supervisors was an adverse action.  One could argue that Captain Hill's letter began a process that ultimately resulted in the plaintiff's termination and subsequent suspension.  On the other hand, however, Captain Hill's letter was sent to a third party, which conducted an independent investigation and reached its own conclusions.  It is therefore not clear whether a letter to a third party would deter a person of ordinary firmness from exercising his constitutional rights.  Nonetheless, the Court will assume for purposes of this motion

24

that Captain Hill's conduct was sufficiently adverse.  As will be discussed below, however, the record cannot support an inference of causation with respect to Captain Hill.

Apart from the possible lack of adverse action in this suit, additional considerations with respect to each defendant warrant the grant of summary judgment.  First, there is no indication that Sergeant Tripp was personally involved in any of the purportedly adverse actions identified by the plaintiff.  As for Lieutenant Ignatz and Captain Hill, even assuming that the plaintiff has identified sufficiently adverse actions, there is no evidence of a retaliatory motive.

The record contains no evidence of Sergeant Tripp's personal involvement in the CLEAN investigation or Captain Hill's letter.[24]  The plaintiff offers two arguments to connect Tripp to the CLEAN investigation.  First, the plaintiff argues that Lieutenant Hile interviewed Sergeant Tripp, and in the course of the interview, Tripp urged Hile to conduct an investigation into the plaintiff's CLEAN entry.  Lieutenant Hile, in turn,

---

[24]At oral argument, plaintiff's counsel was initially unable to articulate Sergeant Tripp's role in the purportedly adverse actions, and instead conceded: "So if all he's doing is nothing ... I may not able [sic] to survive as to him."  Tr. at 37.

purportedly reported this information to Captain Hill.[25]  Second,

the plaintiff argues that Sergeant Tripp "might have been"

interviewed by Trooper Fultz from the CLEAN Administrative Unit.

The record does not support the plaintiff's arguments.

Although Sergeant Tripp testified that he was interviewed by

Lieutenant Hile, Tripp could not recall whether the CLEAN entry

was discussed during the interview, or whether he encouraged Hile

to conduct an investigation.  1/7/10 Tripp Dep. at 108-09; 129-

130.  Even assuming the CLEAN entry was discussed during the

interview, the record does not indicate whether the interview

occurred before or after Captain Hill had requested a CLEAN

investigation, or whether the results of the interview were ever

reported to Captain Hill.  Instead, the record indicates that at

some point, Sergeant Tripp became generally aware of the CLEAN

investigation, but there is no evidence that Tripp was otherwise

involved.  These facts cannot support an inference of personal

---

[25]As noted above, the record is in dispute on whether
Sergeant Tripp was ever interviewed by Lieutenant Hile.  In their
opposition brief, the plaintiffs argue that Sergeant Tripp was
never interviewed.  At oral argument, however, plaintiffs'
counsel argued that Sergeant Tripp was in fact interviewed by
Lieutenant Hile.  Compare Pls.' Opp'n ¶ 52 with Tr. at 53-54.

involvement.[26]  See Brennan, 350 F.3d at 419 (requiring plaintiff to establish retaliation by each particular defendant).

With respect to Captain Hill's letter to the Newtown Township Supervisors, the record also fails to support an inference of Sergeant Tripp's personal involvement.  The plaintiff has cited to no facts indicating that Sergeant Tripp ever communicated with Captain Hill or participated in either of his investigations.[27]  The plaintiff relies on speculation to connect Sergeant Tripp to Captain Hill's letter, arguing that Tripp "could have had" communication with Hill about Christopher Bush and David Bush.  Pls.' Opp'n ¶ 53.  In the deposition testimony on which the plaintiff relies, however, Sergeant Tripp testified that he could not recall whether he ever had a discussion with Captain Hill.  1/7/10 Tripp Dep. at 131-32.  Based on these facts, no reasonable juror could conclude that Sergeant Tripp was personally involved in any of the adverse

---

[26]The record is also unclear on whether Sergeant Tripp ever actually spoke with Trooper Fultz, as the plaintiff contends.  Even if Tripp and Fultz did speak, however, an interview alone cannot support an inference that Tripp was personally involved in the CLEAN investigation.  Instead, such an interview would be consistent with the fact that Sergeant Tripp was involved in the underlying events that gave rise to the investigations.  See Pls.' Opp'n ¶ 52; 1/7/10 Tripp Dep. at 100-02; 130-32.

[27]Indeed, at oral argument, plaintiffs' counsel conceded that he was unable to find anyone who had spoken to Sergeant Tripp about Captain Hill's letter.  Instead, counsel explained that it appeared that "the letter was the decision of Hill and Hill alone."  Tr. at 37.

action identified by the plaintiff.[28]

With respect to Lieutenant Ignatz and Captain Hill, assuming *arguendo* that the plaintiff has identified constitutionally cognizable adverse actions, the plaintiff has failed to establish a retaliatory motive. The record indicates that Lieutenant Ignatz was first made aware of the CLEAN investigation on the day that he interviewed the plaintiff. The morning of the investigation, Trooper Fultz asked Lieutenant Ignatz, for the first time, to accompany him to interview Christopher Bush. 1/7/10 Ignatz Dep. at 20-22, 29. Prior to that time, Trooper Fultz had been carrying out the investigation.[29] Lieutenant Ignatz explained that he participated in the interview because he was new to the job and

---

[28]The only evidence of Sergeant Tripp's personal conduct towards the plaintiff is based on events that occurred before the plaintiff filed a complaint against Tripp. Specifically, in the course of the plaintiff's investigation into the whereabouts of David Bush's children, Sergeant Tripp spoke to the plaintiff in a manner that the plaintiff found to be discourteous and unprofessional. The Court concludes that Tripp's demeanor when communicating with the plaintiff is *de minimis* and does not implicate the First Amendment. Courts have found retaliatory acts insufficiently adverse when the acts are akin to criticism, false accusations, or verbal reprimands. See Brennan, 350 F.3d at 418-19. Sergeant Tripp's communications with Christopher Bush fall into the category of *de minimis* criticism or verbal reprimands, and would therefore not deter a person of ordinary firmness from exercising his First Amendment rights.

[29]It was Trooper Fultz, not Lieutenant Ignatz, who received an email from Lieutenant Hile on February 13, 2007, requesting a CLEAN investigation. Lieutenant Ignatz was not yet a member of the CLEAN Administrative Unit at that time. 1/7/10 Ignatz Dep. at 49.

wanted to learn how such investigations were conducted.  1/7/10

Ignatz Dep. 37-38.  Although Lieutenant Ignatz was informed about

the complaint against Sergeant Tripp, there is no indication that

Ignatz knew either Tripp or the plaintiff, or that he had reason

to suspect that the CLEAN investigation was retaliatory.[30]  The

fact that Lieutenant Ignatz's report ultimately cleared the

plaintiff of any CLEAN violation further undermines the argument

that Ignatz's actions were motivated by a retaliatory purpose.[31]

The plaintiff has also failed to establish a

retaliatory motive with respect to Captain Hill.  In order to

show causation, the plaintiff relies on weak temporal proximity

between Captain Hill's receipt of the complaint against Sergeant

Tripp, and his decision to initiate a CLEAN investigation.  Apart

from this weak temporal proximity, however, nothing in the record

supports an inference that Captain Hill's actions were motivated

---

[30]The plaintiff's argument hinges on the fact that IAD
complaints, such as the one against Sergeant Tripp, are assigned
to specific investigators and only the assigned investigators may
carry out such investigations.  The plaintiff argues that Ignatz
and Fultz therefore interfered with the IAD investigation by
interviewing Christopher Bush about the CLEAN entry.  According
to the plaintiff, this interference suggests a retaliatory
motive.  The plaintiff has cited no evidence, however, suggesting
that Tripp and Fultz's interview was related to anything apart
from their CLEAN duties.

[31]The plaintiff makes no arguments attempting to connect
Lieutenant Ignatz to Captain Hill's letter.

by a retaliatory purpose.[32]

In addition, Captain Hill has articulated an independent, non-retaliatory reason for his conduct. Captain Hill explained that he requested a CLEAN investigation after he had already begun investigating the plaintiff's complaint against Tripp. In the course of investigating the complaint, Captain Hill noticed that the plaintiff had made a CLEAN entry with an apparent lack of jurisdiction, which prompted Hill to request a CLEAN investigation. October 24, 2008 Arb. Testimony of Captain Hill, Ex. to Pls.' Opp'n, at 45. Captain Hill's letter to the Newtown Township Supervisors was based both on Hill's own conclusion that the plaintiff had engaged in misconduct, as well as Lieutenant Ignatz's CLEAN report, which questioned the plaintiff's "truthfulness" and noted that the plaintiff had acted without jurisdiction.

_____

[32]The plaintiff points to the fact that Trooper Fultz and Lieutenant Ignatz were aware of the plaintiff's IAD complaint prior to conducting the CLEAN investigation. According to the plaintiff, this information must have come from Captain Hill, which suggests that Hill wanted the CLEAN investigators to retaliate against the plaintiff. The record does not support the plaintiff's argument. Captain Hill testified during his deposition that he never spoke with Trooper Fultz or Lieutenant Ignatz prior to the investigation, nor did he disclose the fact of the plaintiff's complaint against Sergeant Tripp. April 15, 2010 Dep. of Kenneth Hill ("4/15/10 Hill Dep."), Ex. to Pls.' Opp'n, at 148-49. The plaintiff has not been able to identify – and the Court has not been able to find – anything in the record to the contrary. There is no indication that Captain Hill made the decision to communicate this information to the CLEAN investigators.

Captain Hill's independent, non-retaliatory reasons for his conduct are corroborated by later developments in this case. As discussed earlier, the plaintiff was terminated following an independent investigation by Newtown Township. During a subsequent arbitration proceeding, the termination was reduced to a thirty-day suspension, which was imposed on the plaintiff for his own admitted conduct. Tr. at 60-61. The evidence therefore suggests that the plaintiff's termination and suspension were the result of superseding causes, rather than Captain Hill's own conduct. In addition, the fact that both Newtown Township and an independent arbitrator found that the plaintiff had engaged in misconduct warranting discipline further undermines any inference of causation. See Brennan, 350 F.3d at 423-24 (concluding that affirmation of plaintiff's suspension on appeal corroborated defendant's non-retaliatory rationale).

In view of the foregoing analysis, the Court concludes that the plaintiff has failed to establish a First Amendment retaliation claim against any of the named defendants. Because the Court will grant summary judgment on this basis, it need not address the defendants' alternative argument that they are shielded by the doctrine of qualified immunity.

## 2. Count V: Civil Conspiracy to Commit State Torts

Christopher Bush also asserts a claim captioned "Civil Conspiracy to Commit State Tort" against defendants Hill, Tripp and Ignatz. Many of the allegations in Count V relate to David Bush and defendants that have already been dismissed from this action. With respect to the allegations that pertain to Christopher Bush, the amended complaint does not identify the precise state torts that defendants Hill, Ignatz and Tripp allegedly conspired to commit. Instead, Count V repeats many of the same allegations set forth in the plaintiff's First Amendment retaliation claim.[33] The defendants have moved for summary judgment on the grounds of state sovereign immunity.

By statute in Pennsylvania, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall ... enjoy sovereign and official immunity," except where specifically waived by the General Assembly. 1 Pa. C.S. § 2310. The General Assembly has carved out nine exceptions to sovereign immunity, which are set forth in 42 Pa.C.S. § 8522(b).[34] Where

_____

[33]At oral argument, plaintiff's counsel was unable to identify the particular state torts on which Count V is predicated. See Tr. at 66-67.

[34]The nine exceptions to sovereign immunity are: (1) operation of any motor vehicle in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) care, custody or control of personal property in the possession or control of Commonwealth parties; (4) dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous

sovereign immunity applies, an employee of a Commonwealth agency acting within the scope of his duties is protected from the imposition of liability, even for intentional tort claims. <u>La Frankie v. Miklich</u>, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).

There is no dispute that the defendants in this action are Commonwealth employees. There is also no dispute that this case falls outside of the nine exceptions set forth in 42 Pa.C.S. § 8522(b). As a consequence, the sole question is whether the defendants acted within the scope of their duties. Because the factual underpinnings of Count V are identical to those underlying the plaintiff's First Amendment claim, the Court relies on its earlier analysis of the record to answer this question. For substantially the same reasons discussed above, the Court concludes that there is no evidence that the defendants acted improperly or otherwise outside the scope of their duties. Accordingly, the Court will grant summary judgment in favor of the defendants based on sovereign immunity.

---

condition of highways under the jurisdiction of Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements; (6) care, custody or control of animals in the possession or control of a Commonwealth party; (7) sale or liquor at Pennsylvania liquor stores; (8) acts of a member of the Pennsylvania military forces; and (9) administration, manufacture and use of toxoid or vaccine. 42 Pa.C.S. § 8522(b); <u>see also</u> <u>La Frankie v. Miklich</u>, 618 A.2d 1145, 1149 n.3 (Pa. Commw. Ct. 1992).

B.    <u>David Bush's Claims</u>

In the amended complaint, David Bush asserted four counts against defendants Adams, Russell, and Serene (Counts I-IV), and an additional count against the same three defendants, plus Sergeant Tripp (Count V).  In this Court's Memoranda and Order dated November 3, 2008, and January 27, 2009, the Court dismissed all claims against defendants Adams and Russell for lack of personal jurisdiction.  The Court also dismissed all claims against Serene for lack of personal jurisdiction, with the exception of David Bush's civil conspiracy claim, which the Court dismissed for failure to state a claim.  <u>See</u> Memorandum and Order of Jan. 27, 2009, at 3.  Therefore, David Bush's sole remaining claim is against Sergeant Tripp for civil conspiracy to commit state torts.

Defendant Tripp did not move for summary judgment on this claim.  At oral argument, defense counsel explained that he understood this claim to have been dismissed by the Court's Memorandum and Order of January 27, 2009.  Tr. at 5-7.  After the Court noted that Count V had not been dismissed against Sergeant Tripp, however, the parties offered arguments with respect to this claim.  Tr. at 26.  In addition, the plaintiff argued against summary judgment on this claim in his opposition brief, because he understood Count V to have survived this Court's prior decision.  The Court therefore concludes that the parties have

had ample opportunity to make arguments with respect to this claim, and it is ripe for resolution.

Based on the logic of the Court's prior decision in this case, and in view of the record, the Court will grant summary judgment in favor of Sergeant Tripp. In the Court's Memorandum and Order of January 27, 2009, the Court concluded that the plaintiff's civil conspiracy claim against Serene was implausible and failed the pleading standard. Specifically, the plaintiff had alleged that Serene entered into a conspiracy with Sergeant Tripp, pursuant to which Tripp helped Serene flee Pennsylvania with her children. As part of this conspiracy, Sergeant Tripp allegedly refused direct orders, and disregarded his duties by failing to enter David Bush's children into the CLEAN network when they were reported as missing by their father. The plaintiff also alleged that Sergeant Tripp was part of an organization that "hides women and children." See Memorandum and Order of Jan. 27, 2009, at 7-8.

The Court concluded that the allegations regarding a conspiracy between Serene and Sergeant Tripp were implausible because the amended complaint offered nothing more than the content of the alleged agreement. The plaintiff asserted no allegations regarding the relationship between Sergeant Tripp and Serene, or whether they even knew each other. In addition, the plaintiff's bare allegations that Sergeant Tripp was a member of

35

an organization that hides women and children were deemed to be conclusory, and could not support a conspiracy claim.  <u>See</u> Court's Memorandum and Order of Jan. 27, 2009, at 12-16.

The claim against Sergeant Tripp is identical to the claim that the Court already dismissed against Serene, and is predicated on the same purported agreement between the two defendants.  The Court concludes that Sergeant Tripp is entitled to summary judgment, because nothing in the record has cured the defects that the Court identified in its prior Memorandum.  As a consequence, no reasonable juror could conclude based on the undisputed facts that Serene and Sergeant Tripp entered into an agreement to commit state torts.

Finally, the plaintiff argues that additional claims remain before the Court.  At oral argument, plaintiff's counsel explained that Count V is meant to encompass more than a civil conspiracy claim, notwithstanding its label: "State Pendent Claim Civil Conspiracy to Commit State Tort against Plaintiffs."  The plaintiff argues that Count V also encompasses a § 1983 claim against Sergeant Tripp, based on Tripp's interference with David Bush's Fourteenth Amendment right to associate with his children. Tr. at 10-11.  The plaintiff argues that this claim is predicated upon the fact that Sergeant Tripp treated David Bush and Serene differently.  Namely, Sergeant Tripp did not enter David Bush's children into the CLEAN network when he reported them as missing.

Yet, Sergeant Tripp purportedly entered the children into CLEAN when Serene reported them as missing. Tr. at 14-18.

Even assuming that this claim is properly before the Court, the Court concludes that it is unsupported by the record. As discussed in Part I of this Memorandum, there is no evidence that the PSP entered the children into the CLEAN network when Serene reported them as missing, after having refused to do so for David Bush. The plaintiff's argument is predicated on the deposition testimony of Sergeant Tripp, which is not based on personal knowledge. Instead, Sergeant Tripp's testimony was based on a report that he did not prepare, and which also fails to support the plaintiff's argument. The plaintiff has been unable to cite any other facts in the record to support this claim. Accordingly, the Court concludes that summary judgment is appropriate.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will grant summary judgment on all remaining claims in favor of defendants Hill, Ignatz and Tripp.

An appropriate order shall issue separately.